1 | MacCONAGHY & BARNIER, PLC
JOHN H. MacCONAGHY, State Bar No. 83684
2 | JEAN BARNIER, State Bar No.231683
645 First Street West, Suite D
3 | Sonoma, CA 95476
Telephone: (707) 935-3205
4 | Email: jbarnier@macbarlaw.com

5 | Attorneys for Plaintiff,
Janina M. Hoskins, Trustee in Bankruptcy
6

7

8 | UNITED STATES BANKRUPTCY COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10

11 | In re                                    ) Case No.: 12-30143 DM
   |                                          ) (Chapter 7)
12 | CARL ALEXANDER WESCOTT and                )
   | MONETTE ROSEMARIE STEPHENS,               ) AP No. 12-3148
13 |                                           )
   |            Debtors.                       )
14 | _____      ) **PLAINTIFF'S EXPERT WITNESS
   | JANINA M. HOSKINS, Trustee in             ) DISCLOSURES**
15 | Bankruptcy of the Estate of Carl Alexander) **[Jay D. Crom]**
   | Wescott and Monette Rosemarie Stephens,   )
16 |                                           )
   |            Plaintiff,                     ) Date:
17 |                                           ) Time:
   | v.                                        ) San Francisco Courtroom 22 - Montali
18 |                                           )
   | CARL ALEXANDER WESCOTT and                )
19 | MONETTE ROSEMARIE STEPHENS,               )
   |                                           )
20 |            Defendants.                    )
   | _____      )

21 |        Pursuant to the provision of Bankruptcy Rule 7026 and F.R.Civ.P. 26(a)(2), attached are

22 | Plaintiff's Expert Witness Disclosures of Jay D. Crom.

23

24 | Dated: February 26, 2013              MacCONAGHY & BARNIER, PLC

25

26 |                                       /s/   Jean Barnier
   |                                       Jean Barnier
   |                                       *Attorneys for Plaintiff*
27 |                                       *Janina M. Hoskins, Trustee in Bankruptcy*

28 | 8039.expert.disclosures.ap.wpd                                          1



**BACHECKI, CROM & CO., LLP**
Consultants and Certified Public Accountants
180 Montgomery Street, Suite 2340
San Francisco, CA 94104
**www.bachcrom.com**

Gerald W. Bachecki
Jay D. Crom
Kimberly J. Lam
_____
Robert A. Block (1944-1992)

Tel. (415) 398-3534
Fax (415) 788-0855
bachcrom@bachcrom.com

*PRIVILEGED & CONFIDENTIAL*

April 2, 2013

Jean Barnier, Esq.
MacConaghy & Barnier
645 First Street West, Suite D
Sonoma, CA 95476
jbarnier@macbarlaw.com

**Re:** Carl Wescott & Monette Stephens, Debtors
**Case Number:** 12-30143
**Chapter 7 filed:** January 17, 2012

Dear Ms. Barnier:

You have asked me to prepare a written analysis ("Interim Report") on the financial affairs of the Debtors to document and describe their financial affairs pre-and post petition and our numerous attempts to understand how the Debtors Carl Wescott ("Wescott") and Monette Stephens ("Stephens") accumulated so much debt and what happened to their assets.

You have also asked me to document and explain the financial affairs of the Debtors and how it may relate to 11 USC Section 727(a)(2)(A)&(B) and 727(a)(5). It is my understanding from legal counsel that these code sections state the following:

*11 USC Section 727 - Discharge:*
*(a) The court shall grant the debtor a discharge, <u>unless</u>—*
    *(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—*
        *(A) property of the debtor, within one year before the date of the filing of the petition; or*
        *(B) property of the estate, after the date of the filing of the petition;*

    *(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;*

You have asked me to highlight certain financial transactions and assertions by the Debtors as they may relate to the "badges of fraud." It is my understanding that **Badges of Fraud** are

Case: 12-03148   Doc# 29   Filed: 04/03/13   Entered: 04/03/13 23:04:26   Page 2 of 21



commonly defined as evidence of conduct that strongly indicates intent to defraud a party to a transaction or evidence of intent to improperly delay or hinder litigation.

This Interim Report summarizes my investigation to date concerning certain Debtor transactions and assertions concerning their assets and financial affairs. It is called an "Interim Report" because it is limited to certain transactions only, based upon currently available information. Further investigation and information may reveal additional suspicious or improper transactions, in addition to those discussed in this Interim Report. The Debtors have been uncooperative with respect to the production of financial records, as is documented in this report. I reserve the right to update and amend my report as additional documents are discovered and become available.

In preparing my analysis, I reviewed available books and records of the Debtors including, but not limited to the following:

1. Bankruptcy Schedules and the Statement of Financial Affairs
2. Bank Statements, cancelled checks, deposit slips and deposit documents of the Debtors and Related Entities
3. Tax Returns & supporting documents
4. Tax Returns, Tax Documents and QuickBooks Reports for Related Entities
5. 341 meeting transcripts
6. Email correspondence obtained from Debtors' former bookkeeper

I have relied on my experience and training as a Certified Public Accountant, a Certified Insolvency and Restructuring Advisor, and a Certified Fraud Examiner, as well as training received in obtaining the designation of "Accredited in Business Valuation" by the American Institute of Certified Public Accountants. I have also relied on my experience from performing investigative and accounting services including evaluation of recoverable transfers in bankruptcy proceedings for more than thirty years.

Attached is a summary of my education, experience, certification and testimony during the past four years (**Exhibit A**). My normal hourly billing rate is $525.

This report is organized into the following sections.

**I.      Summary of Debtors' Bankruptcy Schedules and Statement of Financial Affairs**
**II.     Debtors' original Bankruptcy Schedules were illegible and Debtors delayed filing amended schedules**
**III.    Debtors' original schedules left out substantial assets**
**IV.     The Debtors have an extremely complicated financial history**
**V.      Debtors were represented by multiple professionals who have terminated services**
**VI.     Debtors' appearances at multiple 341 hearings**
**VII.    Debtors failed to produce certain income tax returns, certain income tax returns provided to Trustee were never filed**
**VIII.   Debtors assert that they did not often use QuickBooks or Quicken, which is inconsistent with records received from former Bookkeeper and Accountant**

Case: 12-03148     Doc# 29     Filed: 04/03/13     Entered: 04/03/13 23:04:26     Page 3 of 21



IX.     Debtors' Prior Personal Financial Statements show significant assets that were lost, consumed or destroyed (ring, art, wine)
X.      Stephens asserts that her Jewelry was lost in a swimming accident
XI.     Wescott asserts that his art collection was damaged and no longer has significant value
XII.    Wescott asserts that he no longer has wine of significant value
XIII.   Debtors assert that their Lexus autos were both crashed and "long gone"
XIV.    Failure to maintain and/or produce separate books and records for related entities and co-mingling of business funds with personal accounts
XV.     Complaint filed by Donecker against Wescott and his associate Singal
XVI.    Purchase of an expensive aircraft prior to bankruptcy and failure to disclose this asset, failure to disclose aircraft was damaged and insurance proceeds were collected
XVII.   Suspicious Financial Activity
XVIII.  Payments to Asset Protection Attorneys
XIX.    Transfer of Assets to Pook Snook Dook, LP (Fidelity Investments and Rainforest Capital Note)
XX.     Debtors never produced useful bank records to the Trustee
XXI.    Debtors failed to disclose that they kept a storage facility which contained the most relevant accounting records
XXII.   After the petition date, Debtors deposited funds to Atlas Consulting, LLC (an entity with little prior business activity) and paid living expenses through this LLC
XXIII.  Conclusion


**I. Summary of Debtors' Bankruptcy Schedules and Statement of Financial Affairs:**

The amended bankruptcy schedules filed on 7/5/2012 and 7/12/2012 list assets with stated values of **$11,132,821** and liabilities of $48,234,012 (**Exhibit F**), however assets to not add up correctly to $11,132,821 as it appears they may be some errors in Schedule B (mentioned below).

**Schedule A**, real property assets are listed at $2,050,000 and consist of two personal residences located in San Francisco and Santa Barbara.

**Schedule B**, other personal property is listed at $9,082,821 (**Exhibit F-12**), however the items in schedule B appear to not add up correctly to $9 Million.  For example, Accounts Receivable in Schedule B are scheduled at $1, but it appears that they may have been counted at $8.8 Million to arrive at $9,082,821 total for schedule B. Also, many claims were listed with unknown values.

The Schedule B assets primarily consist of miscellaneous personal property, investments in private entities (most of which are scheduled at zero), and contingent unliquidated claims against various parties.

**Schedule D**, secured debt is listed at $2,885,009 and consists of the secured debt on the San Francisco and Santa Barbara residences.

**Schedule E**, priority debt is listed at $0, or unknown.



**Schedule F**, general unsecured debt is listed at $48,234,012 and are primarily business debts or "trade debt," per the schedules.

In a 341 hearing continuance on 5/9/2012 Wescott asserted that according to their transmutation agreement in February of 2010, Wescott received all Latin American properties and Stephens received all California properties and one Nevada property (**Exhibit I-25**, page 92)

## II. Debtors' original Bankruptcy Schedules were illegible and Debtors delayed filing amended schedules:

The original bankruptcy schedules filed by the Debtors at docket numbers 14, 15, 46, 17, 18, 19, 20, 22, 23, 24, 25, 26, 27, 28 were not legible. The schedules were produced in pieces. The Debtors customized their own schedules as attachments rather that use the standard prescribed format.

The format invented by the Debtors and/or Debtors' counsel, combined with the Debtors' complicated financial history, were wholly inadequate to provide a basis for understanding the financial affairs of the Debtors. Ms. Jean Barnier ("Barnier") asked the Debtors to update and amend their schedules in a more legible format. The Debtors were finally compelled to amend their schedules on 6/18/2012 (Docket #112 & 113) however, the Debtors and/or counsel continued to use their irregular format.

The Debtors were again compelled to update and amend their schedules (Docket #137). The Debtors filed amended schedules on 7/5/2012 and 7/10/2012 (Docket #140 & 148).

## III. Debtors' original Bankruptcy Schedules omitted substantial assets:

The original bankruptcy schedules did not include or did not disclose the true value of Wescott's direct and indirect interests in Latin American Real Properties. For example the Debtors' amended schedules list the Latin American real property holding entities at a value of $0 (**Exhibit F-6 & F-7**). This is inconsistent with Wescott's 6/07/2010 personal financial statement which valued his "International Development Projects at $29,453,750 subject to debt of only $3,102,000 (**Exhibit P-4**). On 1/19/2010 Wescott wrote to John Schrader (**Exhibit ZB**):

*"Hi John, i am back from my travels. very good things happening overseas. got my permits in 2 places - uruguay and ecuador - so now i have 25 mil of inventory i can start turning in to cash. the earlier of those will be uraguay."*

Attached at **Exhibit ZA** is a copy of a 2011 K-1 form from Rainforest Capital, LLC which indicates that Stephens owned a 5.19% equity interest in Rainforest Capital, LLC as of 12/31/2011. The K-1 form also indicates that Stephens' capital account in the LLC had a balance of $187,711 as of 12/31/2011 (just 17 days before the petition filing). I did not locate an LLC equity interest in Rainforest Capital, LLC disclosed in the Debtors' bankruptcy schedules or Statement of Financial Affairs ("SFA").



Certain versions of the Debtor's bankruptcy schedules indicate that a "Rainforest Capital Note" was transferred from Wescott to Stephens on 2/13/2010 and from Stephens to Pook Snook Dook, LP in June of 2010 (Docket #140, page 64).

## IV. The Debtors have an extremely complicated financial history:

Below is an entity chart that summarizes many of the entities that Wescott controlled and/or was involved with. The chart was received with records obtained from the Debtor's former CPA, Steven Haggard:

| | Entity Chart | | | | | |
|---|---|---|---|---|---|---|
| **Name** | **Date Formed** | **Corp Type** | **FYE** | **Corp/LLC#** | **EIN** | **Partners** |
| Chuluganti Investments, Inc. | 12/4/2006 | C-corp but c | 31-Dec | C2794033 | 61-1520411 | Carl/Monette |
| Noesis Partners, Inc. | 8/28/2006 | C-corp | 31-Dec | C2925961 | 37-1537382 | |
| PeopleBridge, Inc. | 7/2/2003 | S-corp | 31-Dec | C2435013 | 20-0221099 | Carl 100% |
| Sycamore Investment Partners, Inc. | 9/26/2006 | C-corp | 31-Dec | C2792749 | 56-2616703 | Carl 100% |
| Unexpected Development LLC | 8/9/2007 | LLC | 31-Dec | 4405279Delaware | | Carl 100% |
| 1083 Mississippi St, LLC | 8/6/2007 | LLC | 31-Dec | 200721810195 | 26-0682578 | Carl /Monette |
| 11385 East Rd, LLC | 10/5/2007 | LLC | 31-Dec | 200728410208 | 26-2335520 | Carl 100% |
| 5760 Chemise Road LLC | 5/20/2009 | LLC | 31-Dec | 200914610198 | | Carl 100% |
| 7950 Hearst Road LLC | 5/20/2009 | LLC | 31-Dec | 200914610197 | | Carl 100% |
| Surprise Development | 4/4/2005 | S-corp | 31-Dec | C2632004 | 20-4487284 | Carl 100% |
| Atwater Development Company LLC | 2/5/2008 | LLC | 31-Dec | 200803610186 | | 50% Strategic 50% Surprise |
| Auburn Multifamily I, LLC | 4/15/2008 | LLC | 31-Dec | 200810610296 | 26-4421795 | Surprise=91%, SDHC=9% |
| AYSS Mini Storage, LLC | 8/27/2008 | LLC | 31-Dec | 200824010325 | 26-3260661 | Surprise = 100% |
| Bradshaw Urban Development LLC | 7/5/2007 | LLC | 31-Dec | 200718610204 | 02-0811387 | Surprise=91%, SDHC=9% |
| Delhi Mini Storage, LLC | 8/27/2008 | LLC | 31-Dec | 200824010324 | 26-3260708 | Surprise = 100% |
| Livingston Retail LLC | 8/19/2008 | LLC | 31-Dec | 200823210271 | 26-3199184 | 45% Surprise, 5% Donecker. 50% DDK Ventures |
| Modesto Multi Family I, LLC | 4/30/2008 | LLC | 31-Dec | 200812110185 | | 35% Strategic, 35% Surprise, 30% Amin Vohra |
| Natomas Urban Development LLC | 1/17/2007 | LLC | 31-Dec | 200701710105 | 26-4444103 | Surprise=50%, SDHC=50% |
| Oroville Industrial Park LLC | 2/5/2008 | LLC | 31-Dec | 200803610194 | 26-2345809 | Surprise=91%, SDHC=9% |
| Oroville Multi Family I, LLC | 2/5/2008 | LLC | 31-Dec | 200803610198 | | Surprise=91%, SDHC=9% |
| Oroville Mixed Use Commercial, LLC | 8/17/2007 | LLC | 31-Dec | 200722910029 | | SDHC = 100% |
| Strategic Development Holding Com | 2007 | LLC | 31-Dec | 200701710104 | 13-4354365 | Carl=50%, Suneet=50% |
| Wildhorse Lincoln Estates, LLC | 8/11/2008 | LLC | 31-Dec | 200822410237 | 26-3663307 | Surprise = 100% |
| Woodland Multi-Family I, LLC | 3/9/2009 | LLC | 31-Dec | 200908210181 | | Surprise = 100% |

Attached at **Exhibit B**, is a chart that I created that summarizes many of the bank, credit card and credit line accounts owned and/or controlled by the Debtors. There are at least **77 different accounts** that had activity during the 2008 through early 2012 time frame.

## V. Debtors were represented by multiple professionals who have terminated services:

As of March 7, 2013, Wescott has been represented by three different bankruptcy attorneys, per the court docket (**Exhibit D-1**). All three attorneys terminated their service to Wescott. Neil Ison terminated on 6/12/2012. Barbara Smart terminated on 6/27/2012. Sheila Gropper Nelson terminated on 8/24/2012 (all according to the court docket).

As of March 7, 2013, Stephens has been represented by four different bankruptcy attorneys. Three of the four attorneys have terminated their service to Stephens. Neil Ison terminated on 5/5/2012. Barbara Smart terminated on 6/27/2012. Brian Williams terminated on 6/12/2012. Sheila Gropper Nelson continues to represent Stephens as of 3/7/2012, per the court docket.



## VI. Debtors' appearances at multiple 341 hearings:

At the initial 341 hearing on 3/21/2012, Wescott had difficulty answering questions whether or not he owned a direct or indirect interest in property held in Latin America. The Trustee asked Wescott several times and he had difficulty answering the question and struggled to provide a coherent answer.

At the 341 hearing continuance on 4/18/2012, Wescott refused or was advised by counsel to refuse to answer certain questions due to attorney client privilege (**Exhibit H-4**, "page 5", Line 17).

At the 341 hearing continuance on 7/25/2012 Wescott asserted that he was unable to answer difficult questions about his financial affairs because he was on the prescription drug Seroquel. When asked about Unexpected Development, Hacienda Palo Alto, and Lightfoot Holding, Wescott was advised by counsel to exercise his 5th amendment rights and would not discuss such investments in detail.

In the best of circumstances, it is extremely difficult for the Trustee to research, market and sell an indirect investment in Latin American real estate. The fact that Wescott will not answer questions and provide detailed documentation concerning such Latin American entities and real properties makes the task of administering these assets nearly impossible.

## VII. Debtors failed to produce certain income tax returns, certain income tax returns provided to Trustee were never filed:

On 3/21/2012 Wescott told the Trustee that he would have his 2010 income tax returns prepared by 4/21/2012. Below is part of the transcript from the 341 hearing held on 3/21/2012 (**Exhibit G-43**, "page 165"):

*MS. BARNIER: Okay. So we are going to conclude now. I am going to check on the date with the Trustee. I will e-mail counsel and all the rest of counsels and let them know. We will continue this. Caveat, you are going to have the 2010 tax returns prepared and done a week beforehand and to us, and the schedules will be amended at least a week before that date. I believe it will be around April 21 st, I am --*
*MR. WESCOTT: So we would have it done by the 14th then.*
*MS. BARNIER: Yes. Everyone is agreed. We got agreement on that? Counsel, is that reasonable?*
*MR.ISON: Yes, that sounds well.*
*MR. WESCOTT: I will give it my best.*

From 5/09/2012 341 hearing transcript (**Exhibit I-11**, "page 35"):

*MS. BARNIER: Now, you provided a copy of your 2011 taxes. Is that correct?*
*MR. WESCOTT: That's correct.*
*MS. BARNIER: When did you file them?*
*MR. WESCOTT: We filed the state ones this morning.*
*MS. BARNIER: Did you pay any federal income taxes in 2011?*
*MR. WESCOTT: I don't believe so. You mean for tax year 2010?*
*MS. BARNIER: Yes.*
*MR. WESCOTT: I do not believe so.*
*MS. BARNIER: Do you owe any taxes?*

Case: 12-03148    Doc# 29    Filed: 04/03/13    Entered: 04/03/13 23:04:26    Page 7 of 21



*MR. WESCOTT: No, we do not.*
*MS. BARNIER: Do you owe any state income taxes for 2010?*
*MR. WESCOTT: Well, we don't believe we do, because we filed a tax return showing zero liability. However, we were so late in doing so, that the state made their own assessment, and decided a number on our taxes, and we got a letter from the state saying we owe taxes, even though we have later filed showing that we have zero liability. So I am not sure --*
*MS. BARNIER: How much does the state say you owe?*
*MR. WESCOTT: It is less than 2000 dollars, I believe.*
*MS. BARNIER: When do you plan to file your federal income tax return?*
*MR. WESCOTT: As soon as possible and hopefully within a couple of weeks. You are talking about for 2010 now?*
*MS. BARNIER: I just asked when do you plan to file your federal income taxes for 2011. We are in 2012.*
*MR. WESCOTT: I thought you meant for 2010.*
*MS. BARNIER: I asked that question earlier.*
*MR. WESCOTT: We have extension through October 15th, 2012, so as soon as possible, but no later than then.*

Attached at **Exhibits K & L** are redacted copies of Wescott's 2010 and 2011 IRS form 1040 tax return transcripts showing that **no Federal returns have been filed for 2010 and 2011 as of 2/12/2013.**

On 7/25/2012 the Debtors provided a copy of their 2011 California return, but did not provide a copy of their 2011 Federal Return. Barnier questioned the Debtors and asked how they could have a 2011 California return without the Federal Return.

It is perplexing that Wescott would prepare and file state income tax returns, but not file the federal income tax returns since the California return starts with the Federal adjusted gross income per the Federal Return and adds and subtracts certain adjustments to arrive at taxable income for California. At this time I have not confirmed the Debtor's assertion that he filed the 2010 and 2011 tax returns with the California Franchise Tax Board.

## VIII. Debtors assert that they did not often use QuickBooks or Quicken, which is inconsistent with records received from former Bookkeeper and Accountant:

At the 341 hearing continuance on 6/20/2012 Debtors asserted that they did not use Quicken personal finance software. When questioned again on whether they used Quicken personal finance software, Debtors asserted that it was used briefly five or six years ago, but for only about a month. Below is part of the transcript of the 6/20/2012 341 meeting prepared by West Coast Reporters as Counsel and Austin Wade, CPA of Bachecki, Crom & Co, LLP made inquiries to Debtors (**Exhibit J-14, "page 48"**):

*MR. WADE: Which entities have QuickBooks files? So do you have personal Quicken?*
*MR. WESCOTT: No.*
*MS. BARNIER: So Atlas QuickBooks has... I'm sorry, Atlas has QuickBooks. Do you have QuickBooks for your personal use?*
*MS. MS. STEPHENS: No. I think we just put – I don't know. I don't think we have-- we don't have QuickBooks for our personal use, and I do not know what was being used.-*
*MR. WESCOTT: By Leo, TurboTax.*
*MS. BARNIER: That's just to prepare taxes.*
*MR. WADE: So which entities have QuickBooks, you said Atlas Consulting?*
*MR. WESCOTT: People Bridge used to.*
*MR. WADE: People Bridge. What about Surprise Development?*



*MR. WESCOTT: I'm not sure. I don't think there was ever very much done with Surprise stuff.*
*MS. BARNIER: Where would any QuickBooks records be?*
*MS. MS. STEPHENS: All I have is the Atlas one, which I sent to Brian.*
*MR. WESCOTT: And there is People Bridge as well, which you have.*
*MS. BARNIER: So it is your explanation that those are the only two entities that have a QuickBooks file?*
*MR. WESCOTT: Correct.*
*MR. WADE: You've never used Quicken for your personal finances?*
*MR. WESCOTT: I used it briefly, maybe five or six years ago to try it out, and I might have used it for a month or so.*

This assertion by the Debtors is inconsistent with the Quicken data file that we received from Gina Perry, the Debtors former bookkeeper. We received a copy of the Debtors Quicken data file that contained substantial activity from September 2007 through August 2010. Attached at **Exhibit N** is a 11/04/2010 YTD payee report from Quicken. Attached at **Exhibit O** is a 11/04/2010 Balance Sheet report from the Debtor's Quicken file that we received from Gina Perry.

## IX. Debtors' Prior Personal Financial Statements show significant assets that were lost, consumed or destroyed (ring, wine, art):

Attached at **Exhibit P** is a copy of a 6/7/2010 personal financial statement of Wescott and Stephens. The personal balance sheet shows Assets of $131,249,493, Liabilities of $55,756,043 and a Net Worth of $75,493,429. The values of the assets in this personal financial statement are much higher than the values of the assets per the Debtors' bankruptcy schedules as of the 1/17/2012 petition dates, which was approximately one year and seven months later.

The bottom of page one of the personal financial statement lists the following personal property:

| | |
|---|---|
| Art Collection | $ 154,159 |
| Fillmore Collection | 123,007 |
| Jewelry | 276,700 |
| Market Value | **$ 553,866** |

## X. Stephens asserts that her Jewelry was lost in a swimming accident:

When asked about her jewelry at the 3/21/2012 341 hearing Stephens asserted that the Jewelry primarily consisted of a large diamond ring that was lost in a swimming accident. When asked if they filed an insurance claim, Stephens said that they did not because of a non-coverage issue (**Exhibit G-38**, "page 147").

For individuals that are sophisticated enough to form entities and prepare personal financial statements showing a net worth of over $75 million, it is nonsensical that a person would go swimming with $276,700 in purportedly uninsured jewelry, lose the jewelry, and would not attempt to either file an insurance claim or claim a causality loss income tax deduction.



## XI. Wescott asserts that his art collection was damaged and no longer has significant value:

When asked about his art collection at the 341 hearings, Wescott asserted that his art collection primarily consisted of vintage Fillmore street entertainment posters, but these valuable posters no longer had any significant value as they incurred water damage. Note that the "Fillmore Collection" is listed as a different line item than the Art collection (above) on Debtor's personal financial statement. This infers that Wescott owned other valuable art besides the Fillmore collection. Part of the 3/21/2012 341 transcript is copied below (from **Exhibit G-38**, "page 145")

*MR. WEAVER: You also indicated you had an art collection worth 255,000 bucks at some point in time. What is that based on?*
*MR. WESCOTT: Was it really 255, or was it one something?*
*MR. WEAVER: 255.*
*MR. WESCOTT: You know, I used to have an extensive Fillmore poster collection, and that is the majority of the value there.*
*MR. WEAVER: What happened to the collection?*
*MR. WESCOTT: Most of it we had some water damage in our house from a water heater. I sold part of it, and we still actually have some of it, it is listed in our -- we had a small, small amount remaining.*
*MR. WEAVER: What do you have remaining? How many posters?*
*MR. WESCOTT: I don't know. Couple, three dozen. Something like that.*

It seems improbable that all of the art incurred water damage, as fine art is typically displayed in multiple locations or kept in secure storage making it unlikely that all pieces would be damaged by a single event. The word "collection" in "Art Collection" and "Fillmore Collection" implies that there were multiple pieces and Wescott's testimony confirms there were multiple posters.

## XII. Wescott asserts that he no longer has wine of significant value:

When asked about his wine collection at the 341 hearings, Wescott asserted that he no longer had wine of significant value. Part of the 3/21/2012 341 transcript is copied below (from **Exhibit G-39**, "page 150"):

*MR. WEAVER: Wine collection. You still have a wine collection?*
*MR. WESCOTT: We have a little bit of wine left at the house but –*
*MR. WEAVER: What is left?*
*MR. WESCOTT: Maybe five or ten cases.*

*MR. WEAVER: You have to store any wine any place else?*
*MR. WESCOTT: No.*

*MR. WEAVER: You said a value at one point to my client of your wine in your collection at 74,000 dollars. Do you know how you reached that number?*
*MR. WESCOTT: Yeah, I mean, I am surprised the value was that low, I am sure we had more than that because we used to have over a thousand bottles in the cellar. But just based on purchase price, I am sure we had more than 74,000.*



## XIII. Debtors assert that their Lexus autos were both crashed and "long gone":

When asked about owning a 2005 Lexus RX 330, Wescott and Stephens asserted that they no longer owned any Lexus RX autos as both autos had been wrecked, sold and were long gone. Part of the 3/21/2012 341 transcript is copied below (from **Exhibit G-37**, "page 144"):

*MR. WEAVER: At one point you owned a 2005 Lexus RX 330. What happened to the Lexus?*
*MR. WESCOTT: We used to have two, and I wrecked one, and we sold the other.*
*MS. MS. STEPHENS: You wrecked that one.*
*MR. WESCOTT: I wrecked that one too before selling it.*
*MS. MS. STEPHENS: Wrecked both cars. He is a really bad driver.*
*MR. WEAVER: That's why you have the license suspended.*
*MR. WESCOTT: That's why I don't have a driver's license*
*MR. WEAVER: Both of those cars are gone?*
*MR. WESCOTT: Correct. Long gone.*

Attached at **Exhibit S**, is a copy of a $20,000 check from Keyes Lexus payable to Atlas Consulting, LLC. The check is dated 1/17/2012, which is coincidentally the petition date. This check was deposited into Atlas Consulting, LLC's Wells Fargo x2818 account on 1/18/2012 (**Exhibit Q-60**).

Atlas Consulting, LLC is an entity owned and controlled by Stephens. Atlas Consulting, LLC reported Stephens' consulting income in years prior. I have seen no evidence that Atlas Consulting, LLC owned an automobile, as Atlas Consulting, LLC did not report any depreciation in tax years 2008, 2009, 2010 or 2011 per the LLCs schedule C income tax forms.

The deposit of $20,000 suggests that the Debtors may have sold their Lexus auto and transferred the proceeds to Stephens' entity, Atlas Consulting, LLC. Thus, the receipt of proceeds from Lexus in 2012 is inconsistent with the Debtors' testimony on 3/21/2012.

## XIV. Failure to maintain and/or produce separate books and records for related entities and co-mingling of business funds with personal accounts:

We have obtained an electronic copy of the Wescott Quicken file from Gina Perry. The existence of the database file appears to be contrary to Wescott's assertion that he never used Quicken. Quicken personal financial software is best suited for personal check book type accounting and is not as robust as QuickBooks which is general ledger accounting software for businesses.

Further, Wescott or the Debtor's bookkeeper did not use the double entry features of Quicken.

The Quicken file appears to contain data from approximately September 2007 through August of 2010, with some transactions in Quicken entered as recently as 11/04/2010.

From Quicken it appears that the following bank accounts contained the most activity in 2010:
1. Wescott Personal WF 7024 (Wells Fargo Acct x7024) SFA indicates this account closed April or May 2011



2. Stephens Checking 5321 (Wells Fargo Acct x5321)
3. Joint Debtor WF 7420 (Wells Fargo Acct x7420) SFA indicates this account closed April or May 2011

The Quicken file that we received from Gina Perry is grossly inadequate to understand the financial affairs of the Debtor for the following reasons:

1. Quicken file only contains data through mid 2010
2. Wescott, or bookkeeper did not use the double entry features of Quicken
3. Many transactions were classified as "Unknown," "Deposit," or "No Payee."
4. The reports in Quicken do not make sense because it was not used properly
5. Quicken suggests that Wescott co-mingled his business affairs with his personal affairs.
6. The fact that Wescott co-mingled his business affairs with his personal affairs, combined with the fact that Wescott did not use Quicken properly for his personal finances and did not maintain general ledger accounting records for his business entities do not provide adequate information to fully understand the nature of numerous transactions.

Although I obtained  a copy of the Wescott's Quicken file, it does not provide adequate information for me to determine how the Debtors accumulated so much debt, what the debt proceeds were used for and what became of Debtors' assets.



## XV. Complaint filed by Donecker against Wescott and his associate Singal:

On 1/16/2012 (the day before the petition date) a complaint was filed by Steven & Krista Donecker against Wescott and Suneet Singal (**Exhibit T**). The complaint alleges that in 2005 Krista Donecker became acquainted with Singal, who was employed as a project manager for Surprise Development, an entity owned and managed by Wescott. Below is a summary of the original claims, some of which originated from Debt and Equity investments in projects that Wescott asserted he was developing:

**Carl Wescott & Monette Stephens, Case #12-30143**

**BCC Summary of Donecker Complaint (original transfers only - does not include accrued interest)**

| Date | Amt TFR to | Entity | Wired to | Description |
|------|-----------|--------|----------|-------------|
| 7/1/2008 | 250,000.00 | 4175 Dry Creek | Wescott Wells Fargo Personal Acct x7024 | Secured Loan (but not recorded) |
| 8/15/2008 | 50,000.00 | Wildhorse Lincoln | Comerica WildHorse | 5% Equity Interest |
| 8/22/2008 | 50,000.00 | Livingston Retail Pad | County Bank Livingston | 5% Equity Interest |
| 9/29/2008 | 100,000.00 | Panama Boca Del Drago | Wescott Personal WF x7024 | 10% Equity Interest |
| 9/29/2008 | 200,000.00 | Auburn Multi Family | Wescott Personal WF x7024 | 10% Equity Interest |
| 9/28/2008 | 200,000.00 | Atwater Development | Wescott Personal WF x7024 | 10% Equity Interest |
| 9/29/2008 | 500,000.00 | N/A | Wescott Personal WF x7024 | Loan |
| 12/31/2008 | 362,916.67 | N/A | Wescott Personal WF x7024 | Loan |
| **Subtotal** | **$ 1,712,916.67** | | | |

I was able to trace most of these transfers to Wescott's Quicken file. Quicken indicates that the largest 6 of these transfers were deposited into Wescott's Personal Wells Fargo Account x7024. Subsequent to the deposits, the funds appear to head out in many directions. A significant portion of the funds appear to be dispersed as cashier's checks and wire transfers.

Below is a summary of the largest disbursements which occur just after the deposits to Wescott's Personal Wells Fargo Account x7024. The information below from Wescott's Quicken file shows that Wescott was co-mingling his business and personal financial affairs and moving money in many different directions from his personal account. He was also dealing in cashier's checks and did not maintain the proper double entry general ledger accounting for his financial affairs. The payee and description is often missing in the information below as the Debtor was not maintaining a double entry accounting system that would force the bookkeeper to choose an appropriate, revenue, expense asset, or liability account. In my professional opinion, the way that Wescott maintained his financial records is grossly inadequate.



**Largest Withdrawals >$10,000 immediately after Debtor received $250k from S. Donecker on 7/1/08 (Source = Debtor Quicken):**

| Date | Amount | Type/Chk# | Payee | Description |
|---|---|---|---|---|
| 7/1/2008 | 10,605.00 | 1112 | LLD&B Acct 2440 | July Payment |
| 7/3/2008 | 22,000.00 | 1100 | Alliance Financial, Inc. | Oroville Industrial Park |
| 7/3/2008 | 44,875.00 | 1099 | PHA Architects | Inv#0801... |
| 7/3/2008 | 50,945.00 | Withdrawal | Withdrawal | for Rick Louie |
| 7/3/2008 | 30,000.00 | Withdrawal | Withdrawal | |
| 7/7/2008 | 10,000.00 | Withdrawal | Withdrawal | |
| 7/15/2008 | 10,000.00 | 1069 | Antoine Habis | replacement for #1102 |
| 7/16/2008 | 12,000.00 | 1124 | Bob Patterson | Deposit for Global Buildi |
| 7/16/2008 | 27,421.87 | 1129 | James Bratton | Madiera 136 |
| 7/16/2008 | 70,000.00 | 1131 | TNX Capital | Pay Dirt |
| | **287,846.87** | | | |

**Largest Withdrawals >$10,000 immediately after Debtor received $1 Million from S. Donecker on 9/30/2008 (Source = Debtor Quicken):**

| Date | Amount | Type | Payee | Description |
|---|---|---|---|---|
| 10/2/2008 | **256,550.00** | **Cashier's Check** | **Unknown** | |
| 10/1/2008 | 18,852.24 | Check #1193 | PeopleBridge | Loan |
| 10/1/2008 | 15,000.00 | Check #1195 | PeopleBridge | Loan |
| 10/1/2008 | 53,000.00 | EFT | PeopleBridge | Loan |
| 10/1/2008 | 15,000.00 | 1128 | Michael Deuine & Assoc | |
| 10/1/2008 | 19,376.84 | | Gina Perry | For Guatemala Wire TFR |
| 10/2/2008 | 20,000.00 | Wire | Nelson R Soria Grana | |
| 10/2/2008 | 43,328.79 | Wire | FCI | |
| 10/2/2008 | 21,500.00 | | Dave Maltz | |
| 10/2/2008 | 121,000.00 | Cashier's Check | **Rick & Joyce Wescott** | |
| 10/2/2008 | 23,625.00 | Check #1224 | for PB Wire to Giants | for PB Wire to Giants |
| 10/2/2008 | 18,000.00 | Check #1189 | Empire Mortgage | 4175 W Dry Creek |
| 10/3/2008 | 10,722.44 | EFT | Chase x6221 | |
| 10/3/2008 | 17,743.68 | EFT | Chase x2168 | |
| 10/3/2008 | 30,000.00 | 1217 | PHA Arhitects | |
| 10/3/2008 | 35,000.00 | 1218 | Michael Deuine & Associates | |
| 10/3/2008 | 30,000.00 | 1219 | Meredeth Engineering | |
| 10/3/2008 | 10,923.00 | 1221 | City of Oroville- | OIP Plan Check Fee |
| 10/3/2008 | 40,000.00 | | Bay Sierra | Bradshaw Cot Pmt |
| 10/5/2008 | 10,995.83 | | MTG Mortgage Services | |
| **Subtotal** | **810,617.82** | | | |

Case: 12-03148    Doc# 29    Filed: 04/03/13    Entered: 04/03/13 23:04:26



**Largest Withdrawals >$10,000 immediately after Debtor received $362k from S. Donecker on 12/31/08 (Source = Debtor Quicken):**

| Date | Amount | Type | Payee | Description |
|---|---|---|---|---|
| 12/31/2008 | 35,000.00 | Wire | Gina Perry | Wire to Panama |
| 12/31/2008 | 29,657.09 | Cashier's Checks | Cashier's Checks | for Empire & Lendar |
| 12/31/2008 | 61,741.94 | | Stu Kohler | Repayment |
| 12/31/2008 | 54,321.09 | EFT | | Loan |
| 1/2/2009 | 40,218.76 | | Onkar Mike Gill | for Villages December |
| 1/5/2009 | 44,001.70 | | Dan Harless | |
| 1/5/2009 | 15,000.00 | | Meredeth Sagan | |
| 1/5/2009 | 23,951.00 | EFT | Chase x3666 | |
| 1/5/2009 | 27,098.53 | EFT | Chase x2168 | |
| 1/5/2009 | 13,068.27 | EFT | Mass Mutual Insurance | |
| 1/6/2009 | 10,000.00 | | Calwest Industrial | settlement agreement |
| 1/6/2009 | 28,900.00 | Wire | Bay Sierra | |
| **Subtotal** | **382,958.38** | | | |

## XVI. Purchase of an expensive aircraft prior to bankruptcy and failure to disclose this asset, failure to disclose this aircraft was damaged and insurance proceeds were collected:

In reviewing the Debtors' bank and credit card statements I discovered that Wescott or Stephens, through the entities that they controlled, paid at least $255,200 to International Aircraft Title Escrow Company in late 2010 and early 2011. Wescott and Stephens never disclosed that they owned any aircraft or had an indirect interest in any aircraft. The Debtors' purchase of an expensive aircraft within 12 months before filing personal bankruptcy and at a time when many of their debts were delinquent indicates Debtors were not making reasonable efforts to pay their debts.

**Selected Payment Transactions:**

| Date | Type | Payee | Account | Payment Amt |
|---|---|---|---|---|
| 12/02/10 | Wire Out | International Aircraft Title Escrow | WF-Atlas x2818 | 25,000.00 |
| 01/26/11 | Wire Out | International Aircraft Title Escrow | WF-Surprise x1846 | 86,500.00 |
| 02/17/11 | Wire Out | International Aircraft Title Escrow | WF-Surprise x1846 | 30,000.00 |
| 02/22/11 | Wire Out | International Aircraft Title Escrow | WF-Surprise x1846 | 30,000.00 |
| 02/24/11 | Wire Out | International Aircraft Title Escrow | WF-Surprise x1846 | 83,700.00 |
| | | **Subtotal** | | **255,200.00** |

Through the use of a private investigator, the Trustee has discovered that the aircraft purchased was a 1981 Piper AeroStar602P. The aircraft was damaged and sold for scrap. The Trustee is in the process of researching any insurance proceeds that may have been received.



<u>**XVII. Suspicious Financial Activity:**</u>

Debtors' bank and credit card statements indicate that Wescott paid a total of $3,200 on his credit card to Funny Farms Hydroponics in Petaluma, CA during July of 2010 (**Exhibit U**). Below is a summary of these transactions. It is my understanding that hydroponics is a technique often used to grow marijuana.

**Selected Payment Transactions:**

| Date | Type | Payee | Account | Payment Amt |
|------|------|-------|---------|-------------|
| 07/02/10 | CC Charge | Funny Farms Hydroponics | WF CCx6302 | 1,000.00 |
| 07/09/10 | CC Charge | Funny Farms Hydroponics | WF CCx6302 | 2,200.00 |
| | | **Subtotal** | | **3,200.00** |

In October, 2012, Austin Wade viewed Wescott's flicker page at http://www.flickr.com/photos/carlMr. Wescott and found indications that Wescott continued to travel the world and drink fine wines and eat at some of the finest restaurants not only in town, but across the Americas. For example, his Flicker profile suggested that Wescott attended the Ecuador vs. Bolivia World Cup Qualification Game on or around 9/7/2012. His Flicker profile also suggested that he flew from Panama to Ecuador First class aboard a Boeing 737. Wescott's Flicker profile suggests that he flew from Cancun to SFO in July of 2012 (**Exhibit V**). Wescott's flicker page is inconsistent with his testimony on 6/20/2012 in which he testified that he had no income and had been borrowing money from his friends and relatives (**Exhibit J-4**, "page 8"). Wescott's flicker page no longer contains the photos of international travel.

The bank records of the Debtors, and of the related entities that they controlled, reflect numerous large and frequent ATM cash deposits. The cash deposits were often of $1,000 exactly. Many of the $1,000 ATM cash deposits were on the same days and at the same ATM locations. I contacted Wells Fargo and the bank confirmed that these "ATM Cash Deposits" were the deposits of actual cash/currency at the ATM. An example of this can be seen at **Exhibit Q-5**, which shows that Wescott or Stephens deposited thousands of dollars in cash at ATMs in Santa Barbara over a 4 day period from 12/27/2010 through 12/30/2010. This is one example of activity that occurred frequently in the accounts of the various entities controlled by Debtors.

The frequent and large ATM Cash deposits are suspicious.

Below is a list of red flags that raise questions as to whether the Debtors were involved in an activity such as marijuana growing:
- Large and Frequent ATM Cash Deposits.
- Large and Frequent wires to Central and/or South America
- Large payments to International Aircraft Title Escrow
- Ownership and/or control of hundreds of acres of property in Central and South America
- Frequent Travel to Central and South America



- Ownership and/or control of at least 85 acres in Healdsburg, CA
- Payment of $3,200 (total) to Funny Farms Hydroponics in Petaluma during July of 2010

## XVIII. Payments to Asset Protection Attorneys:

The Debtors' dealings with two different sets of asset protection attorneys are troubling and suggest that the Debtors may have made attempts to shift assets outside the reach of creditors. Below is a summary schedule of payments to these asset protection attorneys.

**Selected Payment Transactions to Asset Protection Attorneys:**

| Date | Type | Payee | Account | Payment Amt |
|------|------|-------|---------|-------------|
| 05/03/10 | CC Charge | Lodmell & Lodmell, AZ | WF CC x6302 | 5,000.00 |
| 06/30/10 | CC Charge | Lodmell & Lodmell, AZ | WF CC x6302 | 2,780.00 |
| 07/13/10 | CC Charge | Lodmell & Lodmell, AZ | WF CC x6302 | 2,780.00 |
| 12/15/10 | CC Charge | Lodmell & Lodmell, AZ | WF CC x7944 | 2,500.00 |
| 01/14/11 | Wire Out | Ogier | WF-Surprise x1846 | 7,500.00 |
| 04/18/11 | Wire Out | Ogier | WF-Surprise x1846 | 8,500.00 |
| 04/21/11 | CC Charge | Lodmell & Lodmell, AZ | WF CC x7640 | 2,500.00 |
| 06/02/11 | CC Charge | Lodmell & Lodmell, AZ | WF CC x7640 | 1,340.00 |
| 06/19/11 | CC Charge | Lodmell & Lodmell, AZ | WF CC x7616 | 2,000.00 |
| 06/19/11 | CC Charge | Lodmell & Lodmell, AZ | WF CC x7640 | 2,000.00 |
| | | **Subtotal** | | **36,900.00** |

Lodmell & Lodmell, AZ are described as asset protection attorneys who create "*offshore asset protection trusts*" according to their own website http://www.lodmell.com/.

Ogier is described as an "**offshore law firm that provides legal and fiduciary services and also trust, company, and fund administration services**" according to the company website http://www.ogier.com/.

It is troubling that the Debtors were employing asset protection attorneys at a time when they were already deeply financially distressed and likely insolvent.

## XIX. Transfer of Assets to Pook Snook Dook, LP (Fidelity Investments and Rainforest Capital Note):

According to the Debtors amended bankruptcy schedules, **Exhibit F-66 & 67**, the Debtors transferred a Rainforest Capital Note and an Interest in Catamount Ventures, LP to Pook Snook Dook, LP in June of 2010, around the time that the Debtor(s) was/were meeting with the asset protection attorneys described in the previous section.

The amended SFA does not disclose the value of the Rainforest Capital Note, but copies of 2010 Forms 1099-INT suggest that the note paid interest of $31,250, $6,250 and $35,183 to Wescott,



Stephens and Pook Snook Dook, LP in 2010 (**Exhibit W**). **Exhibit W** also suggests that the principle balance of the note(s) was over $500,000 at that time.

Attached at **Exhibit X** is a copy of a Pook Snook Dook, LP Wells Fargo bank statement from April of 2011, which shows that over $300,000 (total) was withdrawn from this account in April of 2011. This is around the time that the Debtors were likely meeting with the asset protection attorneys.

## XX. Debtors never produced useful bank records to the Trustee:

The Debtors produced very few useful accounting records to the Trustee. In the 341 hearings the Debtors asserted that they did not have copies of bank statements that were readily available to produce. This is very troubling as the Debtors primarily banked with Wells Fargo, and Wells Fargo allows accountholders to instantly obtain copies of statements online going back as far as seven years. Attached at **Exhibit Y** is a sample screenshot from a typical Wells Fargo Online showing that statements can be obtained instantly going back up to seven years.

In the 341 hearings Wescott asserted that he was having difficulty in obtaining bank records because some of his Wells Fargo accounts had been closed. Wescott said that he would attempt to provide bank records, but the Trustee received very few bank records directly from the Debtors.

The Trustee was forced to obtain copies of the Debtors' bank records directly from the banks. The Trustee obtained copies of the bank statements for the Debtors personal accounts and for entities relating to the Debtors from 2008 forward. Approximately 3,000 pages of bank statements were obtained.

When Austin Wade and Barnier toured the Debtors' residence at 853 Ashbury to examine the books and records, they looked in file drawers and noticed that the files in general were very organized, despite Wescott and Stephens assertions that they were very unorganized. The documents were well organized and labeled in hanging files, however substantially all of the documents were from many years prior, and were no longer relevant. Very few of the documents were from within four years of the petition date. It is perplexing that the Debtors would keep old documents in their home office, but not maintain the most current and relevant records.

While in the Debtors' home office, Stephens disclosed that she shared the office with Wescott and each had their own desk in the home office. It is difficult to believe Stephens' assertions that she knows little about the documents relating to the entities controlled by Wescott when the two of them shared a home office.

Case: 12-03148   Doc# 29   Filed: 04/03/13   Entered: 04/03/13 23:04:26   Page 18 of 21



**XXI. Debtors failed to disclose that they kept a storage facility which contained the most relevant accounting records:**

At the 5/09/2012-341 meeting Wescott asserted that he had boxes of records stored at the 5670 Chamise Road property in Healdsburg, but unfortunately there was an armed tenant there who was very threatening (**Exhibit I-24**, "page 87").  Part of this testimony is copied below:

*MR. WESCOTT: I tried to -- I hired somebody to try and go get both furniture and other things we own at the house and the **records**, it is behind a locked gate, there's -- our former tenant was very threatening and has firearms. So without his cooperation, I don't think that is going to happen. I'm not sure if he is there anymore.*

This assertion by Wescott is nonsensical because it was determined the Debtors stored many accounting records at City Storage in San Francisco.  Attached at **Exhibit Q-60** is a copy  of the Atlas Consulting, LLC January 2012 bank statement which shows that there was a charge on 1/23/2012 of $169.00 that was paid to City Storage in San Francisco (**Exhibit Q-60**).

The Debtors never disclosed that that they kept a storage facility in San Francisco. The Trustee obtained an order under seal to inspect the books and records held at the City Storage facility. On March 21, 2013 the Trustee, Barnier and Austin Wade inspected the storage facility and discovered that this storage facility held dozens of boxes of paper accounting records and 6 computers.  The accounting records held at the storage facility were much more recent and relevant than the old records that were stored in the Debtors' home office.  The location of these records held at the storage facility should have been disclosed in the SFA in item #19, but were not disclosed (**Exhibit F-75**).  This strongly suggests the Debtors attempted to conceal and hide these records from the Trustee.

Upon further review of the records, the storage facility contained many of the records requested by the Trustee, but not turned over by the Debtors.  For example the boxes of record contained many of the bank statements that the Trustee asked for but was not provided with.

The Trustee and Counsel are still reviewing these records and understanding more about the financial affairs of the Debtors.  I reserve the right to update and amend my report as additional records are discovered and become available.

**XXII. After the petition date, Debtors deposited funds to Atlas Consulting, LLC (an entity with little prior business activity) and paid living expenses through this LLC:**

In the 341 hearing on 6/20/2012 the Debtors asserted that they have borrowed money from friends and family members (**Exhibit J-4**, "pages 8-11").

Attached at **Exhibit Q** are copies of selected Wells Fargo bank statements for Atlas Consulting, LLC.  Atlas Consulting, LLC is an entity that was owned and controlled by Stephens and reported her consulting income.  This entity had gross revenues of $36,390 and 39,500 in 2007 and 2008 and no revenues in 2009 or 2010 according to this entity's Schedule C forms.



Atlas Consulting, LLC received deposits to its Wells Fargo checking account x2818 of $29,100 in January of 2012, $11,000 in February of 2012, $24,400 in April of 2012, $13,390 in May of 2012, and $3,990 in June of 2012. Atlas Consulting, LLC was receiving substantial deposits during a time in which the Debtors asserted that they were not working and had no income (**Exhibit J-4, "**pages 8-11"). Many of the expenditures within the Atlas Consulting Wells Fargo account appear to be personal in nature, for example $1,750.00 was paid on the Debit Card to SHN Theaters on 5/24/2012 (**Exhibit P-80**). This appears to be for theater tickets.

We obtained copies of the underlying deposit document to attempt to identify the sources of cash (**Exhibit Y**). The deposit documents reveal that the 2012 deposits consisted primarily of cash and U.S. Postal Money orders.

Attached at **Exhibit C** is a schedule of selected deposits to Atlas Consulting, LLC's Wells Fargo bank account. Both Wescott and Stephens names and signatures appeared on the bank deposit records (**Exhibit Y**).

According to the USPS website, https://www.usps.com/shop/money-orders.htm, US Postal Money orders can be obtained in denominations up to $1,000, and they never expire. I have not determined a business purpose for Debtors' dealing in U.S. postal money orders. Typically money orders are used by people who do not have checking accounts, or accepted by people who will not receive a personal check.

The numerous and frequent cash deposits are very perplexing, especially since the Debtors asserted that they had no income. I also noticed large and frequent cash deposits to other accounts that the Debtors controlled. It was not uncommon to see several thousands in cash deposited within a few days.

## XXIII. Conclusion:

It is my opinion, based upon the evidence outlined above, that the Debtors have been uncooperative, have engaged in extensive financial activities that have not been adequately documented or disclosed, and have failed to explain satisfactorily or provide documents to explain satisfactorily the loss of assets or deficiency of assets to meet the Debtors' liabilities and have not adequately disclosed the use of debt proceeds. Further, the documents suggest that the Debtors have made attempts to transfer assets out of the reach of creditors and to conceal assets and to conceal transfers from the Trustee by withholding documents and information.

Yours truly,

Jay D. Crom

Case: 12-03148   Doc# 29   Filed: 04/03/13   Entered: 04/03/13 23:04:26   Page 20 of 21



**Exhibits to the Report:**
**Exhibit A - Jay D. Crom, CPA - Resume and Experience**
**Exhibit B - BCC Chart of Wescott, Stevens, and related entity accounts**
**Exhibit C - BCC Summary of Atlas Consulting, LLC selected deposits**
**Exhibit D - Court Docket as of 3/07/2013**
**Exhibit E - Original BK Schedules and Statement of Financial Affairs ("SFA")**
**(unreadable)**
**Exhibit F - Amended BK Schedules and SFA (July 2012)**
**Exhibit G - 341 Meeting Transcripts from 3/21/2012**
**Exhibit H - 341 Meeting Transcripts from 4/18/2012**
**Exhibit I - 341 Meeting Transcript from 5/09/2012**
**Exhibit J - 341 Meeting Transcripts from 6/20/2012**
**Exhibit K - Wescott IRS 1040 Transcript 2010-NO Return filed as of 2/12/2013**
**Exhibit L - Wescott IRS 1040 Transcript 2011-NO Return filed as of 2/12/2013**
**Exhibit M - Debtor Quicken Banking Summary Report 11/04/2010 YTD**
**Exhibit N - Debtor Quicken Payee Report 11/04/2010 YTD**
**Exhibit O - Debtor Quicken Balance Sheet as of 11/04/2010**
**Exhibit P - Wescott and Stephens Personal Financial Statement 6/07/2010**
**Exhibit Q - Atlas Consulting, LLC - Wells Fargo Bank Stmts x2818 (Nov '10 - Aug'12)**
**Exhibit R - Atlas Consulting, LLC - Deposits Docs from Wells Fargo**
**Exhibit S - $20,000 Check from Keys Lexus to Atlas on 1/17/2012 (petition date)**
**Exhibit T - Donecker Complaint against Wescott 1/16/2012**
**Exhibit U - Wescott Credit Card Charges to Funny Farms Hydroponics**
**Exhibit V - Wescott Flicker Page Sample**
**Exhibit W - Rainforest Capital Notes 2010 Forms 1099-INT**
**Exhibit X - Pook Snook Dook, LP (large withdrawals in April 2011)**
**Exhibit Y - Wells Fargo Online Sample Screenshot from a typical account**
**Exhibit Z - City Storage, San Francisco rates and info**
**Exhibit ZA - Rainforest Capital, LLC 2011 K-1 form (redacted) (selected pgs)**
**Exhibit ZB - Wescott asserts in an email that he has 25 mil of inventory 1/19/2010**