

Gerald W. Bachecki
Jay D. Crom
Kimberly J. Lam

Robert A. Block (1944-1992)

**BACHECKI, CROM & CO., LLP**
Consultants and Certified Public Accountants
180 Montgomery Street, Suite 2340
San Francisco, CA 94104
www.bachcrom.com

Tel. (415) 398-3534
Fax (415) 788-0855
bachcrom@bachcrom.com

*PRIVILEGED & CONFIDENTIAL*

August 30, 2013

Jean Barnier, Esq.
MacConaghy & Barnier
645 First Street West, Suite D
Sonoma, CA 95476
jbarnier@macbarlaw.com

**Re:** Carl Wescott & Monette Stephens, Debtors
**Case Number:** 12-30143
**Chapter 7 filed:** January 17, 2012

**Supplemental Report on Financial Affairs of the Debtors**
Supplement to report dated April 2, 2013 ("the April report")

Dear Ms. Barnier:

You had previously asked me to prepare a written analysis ("Interim Report") on the financial affairs of the Debtors to document and describe their financial affairs pre-and post petition and our numerous attempts to understand how the Debtors Carl Wescott ("Wescott") and Monette Stephens ("Stephens") accumulated so much debt and what happened to their assets. You also asked me to document and explain the financial affairs of the Debtors and how it may relate to 11 USC Section 727(a)(2)(A)&(B) and 727(a)(5).

You have asked me to highlight certain financial transactions and assertions by the Debtors as they may relate to the "badges of fraud." It is my understanding that **Badges of Fraud** are commonly defined as evidence of conduct that strongly indicates intent to defraud a party to a transaction or evidence of intent to improperly delay or hinder litigation.

Our Interim Report was dated April 2, 2013 ("the April report") and summarized my investigations concerning certain Debtor transactions and assertions concerning their assets and financial affairs. It was called an "Interim Report" because the Debtors have been uncooperative with respect to the production of financial records, as is documented in our reports. I reserved the right to update and amend my report as additional documents are discovered and become available. At the time the April report was produced, the Trustee had just discovered dozens of boxes of accounting records and several computers located at an undisclosed storage facility paid for by the Debtors. The records were first discovered by the Trustee on March 21, 2013 when the Trustee, Jean Barnier ("Barnier") and Austin Wade ("Wade") inspected the storage facility. As of April 2, 2013 I had not had time to review the dozens of boxes of records and 6 computers



found at the storage facility. This supplemental report is primarily intended to include additional information that I have discovered since April 2, 2013 including information in previously obtained records that I determined was highly significant because of information learned from review of the records obtained from the storage facility.

In preparing my analysis, I reviewed available books and records of the Debtors as identified in the April report and including, but not limited to the following:

1. Bank Statements, cancelled checks, deposit slips and deposit documents of the Debtors and Related Entities
2. Credit Card Records of the Debtors
3. Tax correspondence & supporting documents
4. Email correspondence obtained from Debtors' former bookkeeper
5. Deposition Transcript of Monette Stephens on 3/15/2013
6. Deposition Transcript of Joe Martin (former Wescott business associate) on 4/17/2013

This supplemental report is organized into the following sections:

**I.     Stephens' Personal Credit Card Statements found at the undisclosed storage facility**
**II.    Monette Stephen's Sophisticated Financial Background**
**III.   In Stephens' Deposition Testimony she generally asserts that she has little or no detailed knowledge regarding the financial affairs of her husband**
**IV.    Transactions to and from the Atlas Consulting, LLC Wells Fargo account x2818**
**V.     Transactions to and from Monette Stephens' Personal Credit Card Accounts**
**VI.    Cash Deposits to Stephens' Personal Bank Account**
**VII.   Emails to and from Stephens and to and from Wescott**
**VIII.  Documents signed by Stephens**
**IX.    1/27/2012 Reliant complaint against Wescott & Stephens allege breach of contract, fraud, and defamation**
**X.     Records indicate that Wescott may have been intentionally overstating his assets**
**XI.    Claims #19 & 22 specifically allege fraud**
**XII.   Wescott was continuing to attempt to raise funds while unable to pay debts when due**
**XIII.  Conclusion**

**I.  Stephens' Personal Credit Card Statements found at the undisclosed storage facility:**

Below is a list of Stephens' personal credit card statements which appear to have been mailed to Stephens' residence at 853 Ashbury Street (per the address on each statement), but these documents ended up in the undisclosed storage facility and were retrieved by the Trustee, Barnier & Wade:

1. Chase Visa x2168 (Jan 2008 - March 2009)
2. Wells Fargo Credit Card x7044 (February 2009 - August 2010)



3. Bloomingdales Visa x8704 / x7421 (January 2009 - August 2010)
4. GAP Visa x4281 (May 2009 - July 2010)
5. Macy's Visa x8724 (October 2009 & November 2009)

Attached at **Sup. Exhibit C** includes selected copies of Stephens' personal credit card statements that were found at the undisclosed storage facility.

In her deposition on March 15, 2013, Stephens admitted that she knew that her husband had a storage unit and even admitted to paying the rent several times, but did not remember "*whether or not we (Stephens & Wescott) put it on the Schedules*" (**Sup. Exhibit D-197**).

In previous 341 hearings Wescott was asked many times regarding the location of records, but never mentioned a storage facility. Stephens never mentioned a storage facility and never disclosed any relevant information regarding the location of the majority of the Debtors' accounting records.

Upon review of the 75 boxes of records from the storage facility, the boxes contained many of the records that the Trustee had specifically asked the Debtors to produce such as personal banking and accounting records and the accounting and business records of the entities and real properties owned and controlled by Wescott and Stephens.

## II. Monette Stephen's Sophisticated Financial Background:

**Sup. Exhibit E** is Stephens' bio from Newforth Partners, LLC which discusses her: *"…15 years of entrepreneurial, analytical and technical experience."*

**Sup. Exhibit F** is the Newforth Partners, LLC company LinkedIn profile in which Newforth Partners is described as "*…a preeminent investment banking boutique headquartered in Silicon Valley*" which offers services in *"Investment Banking, Tech M&A, Private Placements, Financial Advisory Services, Corporate Finance, Mergers and Acquisitions, Corporate Development, Private Equity,"* Stephens served as a managing director of Newforth Partners, LLC for nine years (**Sup. Exhibit G-2**).

**Sup. Exhibit G** is Stephens' LinkedIn profile. This very extensive profile suggests that Stephens is experienced in many financial areas including, but not limited to mergers and acquisitions, investment banking, monetization, venture capital, private equity, valuation, and analysis. The profile also shows that Stephens holds an MSCS degree from UC Santa Barbara computer science, which appears to be a master's program.

**Sup. Exhibit H** includes loan documents dated 5/23/2007 and apparently signed by Wescott and Stephens. In this document Stephens is described as the managing director and 100% owner of Atlas Consulting, LLC. At **H-2** the document describes Stephens' profession as an "*investment banker*" with monthly income of $14,000.

**Sup. Exhibit I** is an IRS Installment Agreement Application dated 7/31/2009. The notes attached to the document, the email copy (**Sup. Exhibit I-3**) and Stephens' name at the top of the



IRS letter shows that Stephens was actively dealing with the IRS.  This demonstrates that Stephens was financially sophisticated, was involved in the family financial affairs and was aware of her family's financial distress at least as early as March 4, 2009.

Stephens' bio and dealings with the IRS show that she had knowledge regarding the financial affairs of her husband Wescott and possessed the ability to negotiate payment arrangements with the IRS' large dollar unit in regards to a 2006 income tax debt of $175,589.47.

### III.   In Stephens' Deposition Testimony she generally asserts that she has little or no detailed knowledge regarding the financial affairs of her husband:

In Stephens' 3/15/2013 deposition performed by Jean Barnier, some of Stephens' most frequent answers were "*I don't know*", "*I don't remember*," and "*not to my knowledge*."

**Stephens:**
*"I stopped working full-time after the birth of my first child, but I remained a managing director at Newforth until it was -- until we stopped -- until the company basically ceased to exist at the end of 2011."*   (**Sup. Exhibit D-161**)

*"I do not have a clear recollection of the structure of Pook Snook Dook."* (**Sup. Exhibit D-165**)

*"My husband was managing our overall estate planning and, you know, to some extent, he would say, "This is what we are doing. This is why we are doing it," and I would say, "Oh, okay. That sounds fine."*   (**Sup. Exhibit D-166**)

**"***My husband was managing our estate, he was our fiduciary and he would explain things to me when he was doing them and I signed it"*.   (**Sup. Exhibit D-168**)

**"***I was not paying attention to what my husband was doing and I assumed that he was managing all of our assets however he had -- you know, according to his plans."*   (**Sup. Exhibit D-168**)

*"He told me he was doing investments, he was running businesses and he was managing our funds."*  (**Sup. Exhibit D-170**)

**"***I was trusting my husband to do our financial management and he was using the money, I believe, to manage his businesses and he needed those funds for that and -- I don't know. I mean, to be honest, I didn't ask him."*   (**Sup. Exhibit D-171**)

*"You know, I didn't really ask him. He told me that it was part of our estate planning and he had -- you know, he was doing this with, you know, some attorneys and I just -- I trusted him."*
(**Sup. Exhibit D-177**)

**Barnier:** *"And when did you realize that you and your husband were in financial trouble?"*
**Stephens:** *"I don't know exactly when I thought we were in financial trouble. It was my understanding that my husband was -- had lost a lot of our money and was starting new businesses and/or managing -- you know, doing various projects and was going to make money*



*again. And he had made a lot of money in the past and I trusted him. He said he was going to clean up, you know, the messes he had made. He said he had new business ideas and that I should trust him."*
**Barnier:** *"And when did you first become aware that your husband filed for bankruptcy in December of 2011?"*
**Stephens:** *"I believe I knew when he filed. He told me he was filing for bankruptcy in 2011."*
(**Sup. Exhibit D-173 & 174**)

Given her business and financial background, as is documented in report **Section II**, Stephens demonstrates the ability and access to have a significant understanding of their combined to financial affairs.

### IV. Transactions to and from the Atlas Consulting, LLC Wells Fargo account x2818:

As noted in the April report, the records indicate that Atlas Consulting, LLC was owned 100% and controlled by Stephens (**Sup. Exhibit H**).

The April report many questionable transactions from the Atlas Consulting, LLC Wells Fargo bank account x2818. The Atlas Consulting, LLC bank statements (**Sup. Exhibit J**) appear to include many of Stephens' personal living expenses both before and after the petition date, such as Alpine Meadows (February 2012, Exh J-64), Anthem Blue Cross, PG&E, Verizon Wireless, Bloomingdales Visa, GAP Visa, Nordstrom, Mirage Hotel in Las Vegas and Sheraton Panama Hotel (June 2012 Exh J-84). The majority of the disbursements from this account appear to be either cash withdrawals or personal expenses.

Subsequent to the April report I learned of an additional bank account in the name of Atlas Consulting, LLC. Attached at **Sup. Exhibit K** are copies of the US Bank Statements account x8331 for Atlas Consulting, LLC. **Sup. Exhibit K-8** shows a post-petition $17,500 deposit on 3/5/2012 and a $2,500 deposit on 3/27/2012. The source of these funds was not disclosed and these funds were not turned over to the Trustee. From the bank records in **Sup. Exhibit K** appears that the majority of these funds were used to pay the personal expenses of Wescott and/or Stephens.

As previously noted in the April report, on 12/2/2010 $25,000 was wired from the Atlas Consulting, LLC's Wells Fargo account x2818 (**Sup. Exhibit J-5**) to International Aircraft Title Escrow. Attached at **Sup. Exhibit L** is an authorization to close escrow document dated 2/25/2011. The document relates to the purchase of a piper aircraft. The document is apparently signed by Stephen Cohen, manager of Atlas Consulting, LLC. Atlas Consulting, LLC is Stephens' entity. In her 3/15/2012 deposition, Stephens asserted that she had never heard of Stephen Cohen (**Sup. Exhibit D-203**).

Other notable transactions include:

**Sup. Exhibit J-5 & J-6** shows that Atlas Consulting, LLC received cash deposits totaling $11,018 during the four day period 12/27/2010 through 12/30/2010.



**Sup. Exhibit J-9** shows numerous transfers on 1/24/2011 to Wells Fargo Account x1846 which is owned by Surprise Development, Inc. There was also a $36,614.78 transfer to Surprise Development, Inc on 1/26/2011.

On 2/16/2011 a $3,500.00 wire was sent to Latin America (**Sup. Exhibit J-14**)

**Sup. Exhibit J-60** shows that on the petition date of 1/17/2012, $4,100 was deposited and $20,000 was deposited on 1/18/2012.

**Sup. Exhibit J-69** shows a $1,615.00 wire to Latin America.

On 4/17/2012 an $8,842.00 wire was sent to Latin America (**Sup. Exhibit J-74**)

In summary, there are numerous unexplained transactions and post petition cash deposits to the Atlas Consulting, LLC's Wells Fargo account x2818 and US Bank account x8331, which Stephens controlled. Further, it appears that the majority of the post petition cash deposits were used to pay the Debtors' personal expenses which include the personal expenses of Stephens.

## V.   Transactions to and from Monette Stephens' Personal Credit Card Accounts:

**Sup. Exhibit M** is Stephens' personal credit card statement which shows that she paid $7,695.00 to the U.S. Treasury on 10/15/2008. This payment to the United States Treasury from Stephens' personal credit card suggests that Stephens assisted in handling the family financial affairs including payment of income taxes.

**Sup. Exhibit N** is Stephens' personal credit card statement which shows that she paid $15,000 to Andregg Geomatics on 1/06/2009. Andregg Geomatics is a professional land surveying firm, which presumably provided services to Wescott's development projects.

## VI.   Cash Deposits to Monette Stephens' Personal Bank Account:

In the April report, **Section XVII,** I noted the suspicious financial activity of the debtors. I documented the numerous and frequent ATM cash deposits to the bank accounts owned and/or controlled by Wescott and Stephens. Attached at **Sup. Exhibit O** contains copies of ATM and Branch deposit receipts for cash deposits to Stephens' Personal Wells Fargo account x5321. Below is a table that summarizes these cash deposits to Stephens' Personal Wells Fargo x5321 account:



**Summary of Selected Cash Deposits to Stephens' Personal Wells Fargo x5321 Account:**

| Date | Time | Location | Account | Cash Deposit Amount |
|---|---|---|---|---|
| 07/28/10 | 8:00 PM | Serramonte ATM | Wells Fargo Monette Stephens personal acct x5321 | $ 920.00 |
| 07/28/10 | 8:02 PM | Serramonte ATM | Wells Fargo Monette Stephens personal acct x5321 | 940.00 |
| 07/28/10 | 8:04 PM | Serramonte ATM | Wells Fargo Monette Stephens personal acct x5321 | 980.00 |
| 07/29/10 | 2:24 PM | Store 70958 07 | Wells Fargo Monette Stephens personal acct x5321 | 2,820.00 |
| 08/02/10 | 12:16 PM | Store 00358 05 | Wells Fargo Monette Stephens personal acct x5321 | 2,700.00 |
| 08/04/10 | 12:23 PM | Serramonte ATM | Wells Fargo Monette Stephens personal acct x5321 | 1,000.00 |
| 08/04/10 | 2:09 PM | Store 70958 03 | Wells Fargo Monette Stephens personal acct x5321 | 2,500.00 |
| 08/05/10 | 3:06 PM | Store 00081 08 | Wells Fargo Monette Stephens personal acct x5321 | 2,900.00 |
| 08/18/10 | 3:55 PM | Store 00081 05 | Wells Fargo Monette Stephens personal acct x5321 | 2,040.00 |
| 08/18/10 | 3:57 PM | Serramonte ATM | Wells Fargo Monette Stephens personal acct x5321 | 100.00 |
| | | | **Subtotal - Selected Cash Deposits** | **$ 16,900.00** |

Of the $16,900 in cash deposits summarized above, $14,760 occurred within the nine day period 7/28/2010 through 8/05/2010. The records suggest that the majority of these cash deposits were $20 Bills.

In addition the numerous and frequent cash deposits, the April report also discussed that Wescott and/or Stephens were dealing in US Postal Money orders. Attached at **Sup. Exhibit P** is a copy of a receipt dated 3/22/2010 for three US Postal Money orders totaling $2,950. The receipt indicates that these money orders were purchased with cash of $2,980.00 less change of $6.66. I cannot determine business purposes of dealing in US Postal Money orders.

### VII.   Emails to and from Monette Stephens and to and from Wescott:

Despite Stephens' assertions that her husband managed their estate, email records (mostly obtained from former bookkeeper Gina Perry) indicate that Stephens was involved with the day to day management of the family financial affairs as far as paying bills and having enough cash on hand to pay the necessary bills. The email records also indicate that Stephens was aware of the family's financial distress, or reasonable should have been aware of the family financial distress at least as early as 2009.

**Exhibit AA** is a 10/06/2007 email from Wescott to Stephens, Matthesen, Joe (Martin), Lightfoot, Matusow and Marian to follow up after a lunch meeting regarding Latin American real estate development.

**Sup. Exhibit BB** is an email chain from 4/2/2009 in which Stephens states: *"I just got letters from both Amex and Visa saying am past due on my cards. Are we behind on either card? I thought we paid all my minimums last week."* and *"Carl – can we pay these? When does a past due on my credit card show up on my credit rating/report?"*

In this email chain dated 4/2/2009 shows that Stephens was aware that they were past due and only paying the minimums on their credits cards. This is over two years prior to when Stephens asserts that she became aware that her husband was going to file for bankruptcy in 2011.



**Sup. Exhibit CC** is an email dated 5/22/2009 in which Stephens tells Wescott and bookkeeper Perry: *"The check (to Harbor Meat and Seafood) was actually $376.85 – the caviar was a bit more expensive than usual."*

Stephens is purchasing expensive caviar around the time that she knew they were struggling to pay the minimums on her credit cards.

**Sup. Exhibit DD** is an email chain dated 3/06/2009 between Stephens and bookkeeper Gina Perry in which they discuss moving monies around to avoid bouncing payments. This email chain shows that Stephens was fairly active with respect to managing the family financial affairs, and should have know about the family's financial distress.

**Sup. Exhibit EE** is an email chain dated 2/10/2010 between Stephens and bookkeeper Gina Perry in which Stephens instructs Perry which bills to pay and offers to drop off certain bills to Perry at the office. Stephens states:

*"Hi, Let's pay the WF bill if we can – I just got the next one yesterday Also, my COX and SCE bills just sent a past due, pay immediately statement to the house. I also have another bill from SBAC stating there's a $528 amount due. I can drop these bills off later tomorrow if you'll be in the office or just wait until Carl gets back on Friday."*-Monette

**Sup. Exhibit FF** is an email chain from 2/08/2010 in which Wescott indicates that he was half asleep when Stephens asked him to sign a check. Wescott States: *"Monette, did you get info for Gina re the 4 checks that you have sent out? 1 you had me sign half-asleep on 2/2, which i think was a couple hundred bucks…"*

This email suggests that both Wescott and Stephens were actively managing the family financial affairs around February of 2010.

**Sup. Exhibit GG** is an email chain from 5/21/2009. These emails suggest that on 5/21/2009 Stephens was aware of that Wescott and Perry made deposits to the ATM. Stephens apparently provided Perry with an ATM pin so that Perry could make ATM deposits.

**Sup. Exhibit HH** is an email chain from 8/4/2010 in which Wescott mentions *"extra cash getting into the accounts."* Perhaps Wescott is referring to the frequent and large cash deposits to ATMs which have been documented in our reports. Also included in **Sup. Exhibit HH** Wescott tells bookkeeper Perry that *"We don't have a working physical credit card so I did the xfer so we could check in to our hotel."*

**Sup. Exhibit II** is an email from 8/5/2010 in which Wescott mentions that he *"dropped $1k cash in there this am."* This email suggests that Wescott was the one making the large cash deposits.

**Sup. Exhibit JJ** is an email chain dated 8/6/2010 in which Wescott asks Perry *"How much do we have in the US, still unallocated?"* This email suggests that Wescott may have been in the process of moving funds outside of the country and the email is dated just subsequent to when he was likely meeting with asset protection attorneys Lodmel & Lodmel according to the financial



records (see previous report **Section XVIII**) who create "*offshore asset protection trusts*" according to their website.

**Sup. Exhibit KK** is an email chain dated 8/3/2010 in which Stephens tells Wescott and Perry: "*We may want to put a bit more on it so we can use it to check into our hotel in Paris.*" This email is relevant in that it shows Stephens is helping to actively manage the family financial affairs.

**Sup. Exhibits LL** through **OO** include emails which discuss paying bills late. In general the emails suggest that the Debtors were almost always late or delinquent in paying their bills and were unconventional in managing their finances. The emails show a pattern of carefully manipulating overextended credit to pay at the last possible minute to avoid cancellation or a bounced payment. Many emails discuss paying credit card minimums up to 30 days late, at the last possible moment to avoid cancellation of credit.

**Sup. Exhibits PP** and **QQ** contain emails dated 1/23/2010 and 7/06/2010 between bookkeeper Perry and Wescott in which Perry inquires about the $46,000+ and $40,000+ that Wescott owes her. The amended bankruptcy schedules indicate that Wescott and Stephens still owe Perry $24,300 as of the petition date.

## VIII.   Documents signed by Monette Stephens:

Despite Stephens' assertions that she knew little regarding the financial affairs of her husband, her name and signature appear on several key documents.

When Wescott's former real estate partner Joe Martin was interviewed by Jean Barnier on 4/17/2013, Martin indicated that Stephens was present for at least two important meetings regarding Latin American real estate projects.

**Sup. Exhibit Q** is a $100,000 promissory note dated 4/15/2008. The note is apparently signed by Stephens.

**Sup. Exhibit R** is an agreement to split a Rainforest Capital note into two notes. The document is apparently signed by Stephens, General Partner of Pook Snook Dook, LP.

**Sup. Exhibit S** is an agreement to receive a discounted payoff on the Rainforest Capital note. The document is apparently signed by Stephens, General Partner of Pook Snook Dook, LP.

With Stephens' business background, and with her name appearing on so many important documents, it appears Stephens had significant knowledge of her financial affairs during the period 2008 through the petition date.



## IX. 1/27/2012 Reliant complaint against Wescott & Stephens allege breach of contract, fraud, and defamation:

**Sup. Exhibit T** is a 1/27/2012 complaint by the Reliant Group, Inc. et.al against Wescott, Stephens and Pook Snook Dook, LP for alleged breach of contract, fraud, and defamation. The complaint alleges that Wescott and Stephens transferred their LLC interests to Pook Snook Dook, LP under false pretenses apparently to avoid creditors.

## X. Records indicate that Wescott may have been intentionally overstating his assets:

The IRS Installment agreement dated 7/31/2009 and apparently signed by Wescott and Stephens on 7/28/2009 includes a personal financial statement dated 7/29/2009 (**Sup. Exhibit I-8**). In this personal financial statement Wescott and Stephens list their assets at $11,133,329, liabilities at $10,068,055 and Net Worth at $1,065,275.

This version of their personal financial statement is very different from a personal financial statement dated approximately 90 days earlier on 4/30/2009 (**Sup. Exhibit U**) which lists Wescott's assets at $111,957,209, Liabilities at $54,704,801 and Net Worth at $57,252,408. This version of Wescott's 4/30/2009 personal financial statement apparently includes Wescott's handwritten notes to his assistant or bookkeeper to make certain changes to the personal financial statement. Thus, the records suggest that Wescott and/or Stephens were representing their net worth as over 53 times or 5,300% greater just 90 days prior to the IRS Installment Agreement Application dated 7/31/2009. This suggests that Wescott and/or Stephens were misrepresenting their net worth to the IRS or Investors or both on or around the summer of 2009.

The July, 2009 "real estate cash flow statement" (**Sup. Exhibit I-11**), reveals annual payments of $842,695 plus annual tax/insur. Expenses of $96,223 and only $656,730 of annual income resulting in an annual net cash flow deficit of $282,188. This appears to be a document that Stephens provided to the IRS.

**Sup. Exhibit V** is a letter from Wescott to Washington Mutual dated 2/10/2009, in which Wescott asserts that he *"…didn't make a single dollar in 2008, and in fact will show a 6-digit loss for 2008. My wife Monette used to make over $200K a year, but her income for last year was $39K."*

**Sup. Exhibit W** is an email dated 2/22/2012 from a former investor, and now a creditor, Stephen Donecker to Trustee Janina Hoskins. In this email Donecker alleges that Wescott defrauded them:

*"In summary Wescott was fraudulent with us from the beginning, he failed to disclose lawsuits against him, falsified available collateral in the homes he owned, and failed to disclose that he was reporting multi-million dollar losses to the government at the time he was inducing us to invest with him."*-Stephen Donecker 2/22/2012

Page 10 of 12
Case: 12-03148   Doc# 81   Filed: 08/30/13   Entered: 08/30/13 15:33:51   Page 10 of 12



### XI.   Claims #19 & 22 specifically allege fraud:

**Sup. Exhibit X** contains claims #19 & 22.  Pages 2 and 28 of these claims specifically allege fraud.

### XII.   Wescott was continuing to attempt to raise funds while unable to pay debts when due:

**Sup. Exhibit Y** is a delinquency notice from GMAC indicating that Wescott and Stephens were extremely past due on their 2nd home loan as of 9/13/2006.  This indicates that the Debtors may have been financially distressed as early as 9/13/2006.

The claims filed suggest combined with Wescott's testimony suggest that Wescott continued to borrow money and pursue investors through at least April of 2011 (see claim #23).

In his 341 hearing on 5/09/2012 Wescott concedes that he has been operating with borrowed money:

**Wescott:** "*I am talking to companies about taking a job, you know, whatever I could do to try and actually make money as opposed to borrow it.  I think we could all agree that that would be a good step forward in my life.*"   (**Sup. Exhibit D-128**)

On 5/09/2012 Wescott indicated that he would like to continue to borrow money to develop Latin American property (**Sup. Exhibit D-119)** if that property reverts to his control.

### XIII.  Conclusion:

It is my opinion, based upon the evidence outlined above and in the April Report, that the Debtors have been uncooperative, have engaged in extensive financial activities that have not been adequately documented or disclosed, and have failed to explain satisfactorily or provide documents to explain satisfactorily the loss of assets or deficiency of assets to meet the Debtors' liabilities and have not adequately disclosed the use of debt proceeds.  Further, the documents suggest that the Debtors have made attempts to transfer assets out of the reach of creditors and to conceal assets and to conceal assets and transfers from the Trustee by withholding documents and information.

Yours truly,

*Jay D Crom*
Jay D. Crom



**Exhibits to the Supplemental (Sup.) Report:**
Sup. Exhibit A - Jay D. Crom, CPA - Resume and Experience
Sup. Exhibit B - BCC Chart of Wescott, Stevens, and related entity accounts
Sup. Exhibit C - Stephens' Personal Credit Card Statements from Storage Unit
Sup. Exhibit D - Deposition Transcripts – various dates
Sup. Exhibit E - Newforth Partners, LLC - Monette Stephens Bio
Sup. Exhibit F - Newforth Partners, LLC - LinkedIn Profile
Sup. Exhibit G - Monette Stephens - LinkedIn Resume
Sup. Exhibit H - Atlas Consulting, LLC - SBA Loan Application 5/24/2007
Sup. Exhibit I - IRS Installment Agreement Application 2009
Sup. Exhibit J - Atlas Consulting, LLC - Wells Fargo Bank Statements Acct x2818
Sup. Exhibit K - Atlas Consulting, LLC - US Bank Statements Acct x8331
Sup. Exhibit L - Atlas Consulting, LLC - Agreement to close on Piper Aircraft 2/25/2011
Sup. Exhibit M - Stephens Oct 2008 CC stmt showing $7,675 pmt to IRS
Sup. Exhibit N - Stephens Feb 2009 CC stmt showing $15k pmt to Andregg Geomatics
Sup. Exhibit O - 2010 Cash Deposits to Stephens personal Wells Fargo x5321
Sup. Exhibit P - Receipt for approx $3,000 in US Postal Money orders 3/22/2010
Sup. Exhibit Q - $100k Promissory Note signed by Stephens 4/15/2008
Sup. Exhibit R - Pook Snook Dook, LP agreement to split Rainforest Note in two (2010)
Sup. Exhibit S - Pook Snook Dook, LP agree to receive a discounted payoff on Note (2011)
Sup. Exhibit T - Reliant et al complaint against Wescott and Stephens 1/27/2012
Sop. Exhibit U - Wescott Personal Balance Sheet 4/30/2009
Sup. Exhibit V - Letter from Wescott to WaMu re making zero money 2/10/2009
Sup. Exhibit W - Email from Donecker to Trustee alleging fraud 2/22/2012
Sup. Exhibit X - Claims #19 & 22 alleging fraud
Sup. Exhibit Y - Letter from GMAC re past due on 853 Ashbury 2nd Mortgage 9/13/06

**Selected Email Exhibits to the Supplemental (Sup.) Report:**
Sup. Exhibit AA - Email - Wescott thanking investors for dinner 10/06/2007
Sup. Exhibit BB - Emails 4/2/2009 Stephens re past due credit cards
Sup. Exhibit CC - Emails 5/22/2009 Stephens re expensive Caviar
Sup. Exhibit DD - Emails 3/6/2009 Stephens re transferring funds
Sup. Exhibit EE - Emails 2/10/2010 Stephens re paying bills if we can
Sup. Exhibit FF - Emails 2/08/2010 Stephens re Carl signing checks
Sup. Exhibit GG - Emails 5/26/2009 Gina re making deposits to ATMs
Sup. Exhibit HH - Emails 8/4/2010 extra cash getting to accounts & credit card not working
Sup. Exhibit II - Emails 8/05/2010 Wescott re dropping in $1k cash
Sup. Exhibit JJ - Emails 8/06/2010 Wescott re how much do we have in USA
Sup. Exhibit KK - Emails 8/3/201 Stephens re pay credit card to use at Paris Hotel
Sup. Exhibit LL - Emails 8/6/2010 re little funds available
Sup. Exhibit MM - Emails 12/17/2009 Stephens re credit card suspended
Sup. Exhibit NN - Emails 12/10/2009 Stephens re past due medical bills
Sup. Exhibit OO - Emails 9/21/2009 Stephens re past due Amex
Sup. Exhibit PP - Emails 1/23/2010 Gina Perry asks about her $46k+
Sup. Exhibit QQ - Emails 7/06/2010 Gina Perry asks about her $40k+