---

Page 182

1     IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2          IN AND FOR THE COUNTY OF SAN FRANCISCO

3

FREDERICK C. FIECHTER,
4   Individual,                    )
                                   )
5          Plaintiff,              )
                                   )
6          vs.            ) Case No. CGC-10-496091
                                   )
7   CARL WESCOTT, an individual;   )
    162 GLEN COURT, LLC, a         )
8   business of unknown form; and  )
    DOES 1 through 25, inclusive,  )
9                                  )
           Defendants.             )
10  _____)
                                   )
11  CARL A. WESCOTT,               )
                                   )
12         Cross-Complainant,      )
                                   )
13         vs.                     )
                                   )
14  FREDERICK C. FIECHTER and      )
    ROES 1-20,                     )
15                                 )
           Cross-Defendants.       )
16  _____)

17

18          DEPOSITION OF MONETTE STEPHENS

19                    VOLUME III

20        Held at Guy Kornblum & Associates

21             1388 Sutter, Suite 820

22            San Francisco, California

23            Friday, July 1, 2011

24

25     Reported By: RICK GALTEN, CSR # 13202

---

Page 183

1   APPEARANCES:

2

3              For the Plaintiff and Cross-Defendant
               Frederick C. Fiechter:
4
               Guy Kornblum & Associates
5              1388 Sutter Street
               Suite 820
6              San Francisco, California  94109
               (415) 440-7800
7              BY:  David M. Zeff, Esq.
               and Mr. Berris
8

9

10             For the Defendant and Cross-Complainant
               Carl A. Wescott; Counsel for Defendant
11             Monette Stephens:

12             Roberts & Elliot LLP
               150 Almaden Blvd.
13             Suite 950
               San Jose, California 95113
14             (408) 275-9800
               jroberts@robertselliot.com
15             BY:  James Roberts, Esq.

16

17

18

19

20

21

22                    --o0o--

23

24

25

---

Page 184

1

2                   INDEX OF EXAMINATION
3

4   185     Examination by Mr. Zeff
5

6                    INDEX OF EXHIBITS
7

8   Exhibit No.        Description              Page
9   31     Renotice of Taking Deposition        186
10  32     Notice of Trustee's Sales
           (One page, double-sided)             216
11

12  33     Letter from Chase Home Finance LLC
           Dated April 5, 2011 (four pages)     217

13  34     Letter from Chase Home Finance LLC
           Dated February 21, 2011 (one page)   218
14

15  35     Notice of Default and Election to
           Sell under Deed of Trust
           (Three pages, double-sided)          219
16

17  36     Document regarding Foreclosure on
           Santa Barbara Property (three pages)
           (Retained by Counsel to be Faxed to
18         Barkley later)                       220

19  37     Letter from Chase Home Finance LLC
           Dated February 25, 2011
20         (Three pages)                        221

21

22

23

24

25                    --o0o--

---

Page 185

1          BE IT REMEMBERED THAT, pursuant to Notice and on

2     Friday, July 1, 2011, commencing at the hour of 10:00

3     a.m., at 1388 Sutter Street, Suite 820, San Francisco,

4     California, before me, RICK GALTEN, a Certified

5     Shorthand Reporter for the State of California, there

6     appeared

7               MONETTE STEPHENS,

8     Called as a witness by the Plaintiff, and who, having

9     been first duly sworn, was thereupon examined and

10    testified as hereinafter set forth.

11               --o0o--

12             EXAMINATION

13       BY MR. ZEFF: Q.  Ms. Stephens, thank you for

14    coming.  Your counsel, Mr. Roberts, advised me that you

15    were going to leave after one hour; is that accurate?

16    A.   Yeah, I have a meeting today, business I have to

17    go to.

18    Q.   Okay.  Mr. Roberts and I did not have any

19    agreement on truncating the deposition in that way.  And

20    either we'll agree that you come back another day to

21    finish this up or we'll have to go to court and ask the

22    judge to make appropriate orders because I just want it

23    clear we didn't agree to that.

24       Do we know -- we don't even know what the last

25    exhibit is.  Okay.  Let's wait.

---

Case: 12-03148  Sub Exhibit D - 341 Hearing and Deposition Transcripts  D-1 of 228
43

Page 186

(10:04-10:07)

1    Did you bring any documents here today in
2    response to the deposition subpoena?
3         MR. ROBERTS: Let the record show that she's
4    handed a folder with some documents in it to Counsel.
5         (Off the record.)
6         MR. ZEFF: The record will reflect that
7    Ms. Stephens and her counsel produced a folder of
8    documents I would say not more than a half an inch
9    thick, and we're having copies made of those. I will
10   ask that the reporter mark as 31 the Renotice of Taking
11   Deposition of Monette Stephens and Request to Produce
12   Documents and Things.
13        (Whereupon, Exhibit 31 was marked for
14        identification.)
15        MR. ZEFF: Q. Ms. Stephens, please look at
16   Exhibit 31 and tell me if you've seen it before today.
17   A.   I think it's familiar, yes.
18   Q.   Okay. Did you make a search for documents that
19   are described in Request Numbers 1 through 21 of Exhibit
20   31?
21   A.   Yeah.
22   Q.   And were there any documents that you looked for
23   in response to the document request that you couldn't
24   find?
25        MR. ROBERTS: Question's vague and ambiguous.

Page 187

(10:07-10:08)

1    You can answer.
2         THE WITNESS: I've found some documents relating
3    to the Santa Barbara house, so I brought those.
4         MR. ZEFF: Q. Okay. You didn't bring a
5    transmutation agreement between you and your husband,
6    did you?
7    A.   No.
8    Q.   Do you have a copy of that in your possession,
9    custody or control?
10   A.   No.
11   Q.   Have you ever seen one before?
12   A.   Yes.
13   Q.   Okay. Did you ask your husband for a copy of it
14   before you came here today?
15   A.   No.
16        MR. ROBERTS: Just note for the record she
17   answered before I had an opportunity to object. And I
18   am objecting. And the objection is the spousal
19   communication privilege, and I move to strike her
20   answer.
21        MR. ZEFF: Q. Do you understand that in
22   responding to these document requests, you have a duty
23   to make inquiry of people, such as your husband and your
24   lawyer, for any pertinent documents they may have?
25        MR. ROBERTS: That question would call for a

Page 188

(10:08-10:09)

1    legal conclusion on her part. Makes legal assumptions
2    on her part.
3         MR. ZEFF: That's an objections?
4         MR. ROBERTS: That's an objection.
5         MR. ZEFF: Q.   You can still answer because it
6    asks for your understanding and not for a legal conclusion.
7    What was your -- do you have an understanding that you
8    had a duty to request documents from people that you
9    could get documents from in order to respond to this
10   document request?
11   A.   I am not clear on that. I don't know.
12   Q.   Did you make any inquiry of any person to obtain
13   documents that are described in the -- Exhibit 31?
14        MR. ROBERTS: I would object to that question to
15   the extent that it includes inquiry as to communications
16   with her husband and/or her counsel and attorney/client
17   privilege and also the spousal communication privilege.
18   You're instructed to answer that question,
19   excluding any communications with your attorney or your
20   husband.
21        MR. ZEFF: Well, Counsel, just to meet and
22   confer with you on that, I'm not asking for the
23   substance of the communication. I'm asking if such a
24   communication took place, yes or no.
25        MR. ROBERTS: Well, I understand that argument.

Page 189

(10:09-10:11)

1    The problem is that your answer -- your question
2    implies in itself the substance. If you ask the
3    question another way, then that objection might not
4    apply. But the way you asked the question,
5    unfortunately, implies the substance of it in the
6    question itself. So the objection stands, the
7    instruction stands.
8         MR. ZEFF: Q. Ms. Stephens, without disclosing
9    to me the content of any communication you had with
10   any -- your husband or your lawyer, did you ask any
11   person to provide you with documents that are responsive
12   to the documents requested in Exhibit 31?
13        THE WITNESS: Can we meet for a minute?
14        MR. ROBERTS: Sure. Take a break for a moment.
15        (Off the record.)
16        MR. ZEFF: Back on the record.
17   Q.   Ms. Stephens, are you ready to answer that
18   question?
19   A.   Yes, I am.
20        MR. ZEFF: Okay. I would ask that the reporter
21   include time stamps on the record so we know how much of
22   this hour we're losing with client conferences.
23        Would you please re-ask the question
24   Mr. Reporter.
25        (Reporter read back.)

Page 190

(10:11-10:12)

1  THE WITNESS: Excluding any conversations I had
2  with my husband and my attorneys, no.
3  MR. ZEFF: Q. Did you ask your husband to
4  provide you with documents that are responsive to
5  Exhibit 31?
6  MR. ROBERTS: I would again object to that
7  question on the grounds of the spousal communication
8  privilege. She's instructed not an answer.
9  MR. ZEFF: Q. Did you seek to obtain documents
10  responsive to Exhibit 31 from either your husband or
11  your attorney?
12  A.  Excluding any conversations that I've had with
13  my attorneys or my husband, no.
14  Q.  I'm not asking you what communications you had.
15  I'm asking you: Did you obtain any documents from your
16  husband or your attorneys in response to the document
17  request --
18  A.  No, I didn't.
19  Q.  -- Exhibit 31?
20  A.  No, I didn't.
21  Q.  Okay. Did you make any effort to do so?
22  A.  Excluding any conversations that I've had with
23  my husband and/or attorneys, I did not speak with anyone
24  else, no.
25  Q.  I'm -- that's not a responsive answer, and I

Page 191

(10:12-10:15)

1  don't think there's a privilege to that question.
2  Counsel, if you can't instruct your witness to
3  answer, we're going to have to go to court over it.
4  MR. ROBERTS: Okay.
5  (Reporter read back.)
6  MR. ZEFF: I think she already answered that.
7  MR. ROBERTS: I'm going to try to help you, so
8  I'm going to take a break.
9  MR. ZEFF: Okay.
10  MR. ROBERTS: I'd -- I don't want to go through
11  this any more than you do, so give me a sec, okay.
12  (Off the record.)
13  MR. ZEFF: Back on the record.
14  Q.  Did you seek to obtain any documents responsive
15  to Exhibit 31 from your husband?
16  A.  I made requests for the documents from all my
17  available sources, and I did not receive any documents.
18  Q.  Okay. That's it.
19  And those available sources include your husband
20  and your attorney, correct?
21  A.  Those available sources include my husband.
22  Q.  Okay. Did you make a request of your attorney
23  for that --
24  A.  No.
25  Q.  -- well -- you didn't.

Page 192

(10:15-10:17)

1  Let's look at the document request in Exhibit
2  31. And I apologize that I don't have the documents
3  that you brought in front of me because they're being
4  copied. So you can clarify if I make an error here.
5  Are any of the documents you brought here today
6  responsive to Request Number 1?
7  A.  No.
8  Q.  Are any of the documents you brought here today
9  responsive to Request Number 2?
10  A.  No.
11  Q.  Are any of the documents you brought here today
12  responsive to Request Number 4?
13  A.  No.
14  Q.  You may not know the answer to this, but do you
15  know which document requests in Exhibit 31 the documents
16  you brought here today are responsive to?
17  A.  I believe they are responsive to Request Number
18  3.
19  Q.  Okay. Good. Are they responsive to any other
20  requests, to your knowledge?
21  A.  No.
22  Q.  Okay. Looking at Request Number 7, it asks for:
23  "Any prenuptial or postnuptial agreements entered into
24  between you and Defendant relating to division of any
25  real or personal property."

Page 193

(10:18-10:19)

1  Have you -- you have never produced any such
2  documents. Have you ever had any in your possession,
3  custody or control?
4  A.  Not to my knowledge.
5  Q.  Do you have any knowledge as to whether or not
6  your husband has ever had such documents in his
7  possession, custody or control?
8  A.  I don't know.
9  Q.  Okay. Do you recall whether or not you ever
10  executed any prenuptial or postnuptial agreements with
11  your husband relating to the division of any real or
12  personal property?
13  MR. ROBERTS: That would call for a legal
14  conclusion on her part and legal opinion.
15  THE WITNESS: I don't know.
16  MR. ZEFF: Q. Did you ever execute a
17  promissory note with Colin Wiel?
18  A.  I believe so, yeah.
19  Q.  Do you know if Mr. Wiel ever executed a
20  promissory note to you?
21  A.  I don't know.
22  Q.  What note did you execute to Mr. Wiel?
23  A.  I don't remember.
24  Q.  Do you recall when you did that?
25  A.  I don't remember.

Page 194

(10:19-10:20)

1   Q.   Has Mr. Wiel made any payments to you for any
2        reason in the last five years?
3   A.   I don't remember.
4   Q.   Have you made any payments to Mr. Wiel in the
5        last five years?
6   A.   I don't know.
7        MR. ROBERTS: Now, Counsel, I'm a little
8        confused. I thought that at the last deposition session
9        that you -- what was left was that you had not completed
10       the deposition and you wanted another session because of
11       documents she had not produced within her possession.
12       So now we're trying to expand this deposition
13       beyond the scope of that?
14       MR. ZEFF: Well, Counsel, let me address that.
15       She failed to produce documents that were responsive to
16       requests in two previous Deposition Notices.
17       MR. ROBERTS: Yes.
18       MR. ZEFF: And we found out during the
19       deposition that such documents existed. And we told her
20       that she would have to come back and bring those
21       documents.
22       MR. ROBERTS: Okay.
23       MR. ZEFF: But in the interim we took Mr. Wiel's
24       deposition, and we have in front of us here 239 or more
25       pages of documents that she should have had or produced

Page 195

(10:20-10:21)

1        and we're going to have to ask her questions about that.
2        MR. ROBERTS: Well, I don't know how you get to
3        "she should have had or produced." She can only produce
4        those documents within her possession, custody or
5        control. Of course, you're only entitled to depose a
6        natural person once. And you did that.
7        And you extended this deposition for the purpose
8        of an inquiry on an assertion that you needed to ask her
9        about documents that were within her possession, custody
10       or control, and you've expanded beyond that. Now she's
11       here for an hour. I'll let you go for that one-hour
12       period, and then we'll address whether or not it's
13       appropriate for you to go further on these items after
14       that.
15       MR. ZEFF: Thank you.
16       MR. ROBERTS: You're welcome.
17       MR. ZEFF: Q. Do you know what Pook Snook Dook
18       LP is?
19   A.   I believe it's a -- a trust that was set up.
20   Q.   Okay. Do you have any role with Pook Snook Dook
21       LP?
22   A.   I don't know what my role is exactly.
23   Q.   Have you ever heard of Ivy League Charter LLC?
24   A.   No, I have not.
25   Q.   Okay. Do you have any role in Ivy League

Page 196

(10:21-10:22)

1        Charter LLC that you know of?
2   A.   Not that I'm aware of.
3   Q.   "Pook," "Snook" and "Dook" are the nicknames you
4        and your husband use for your children, correct?
5   A.   Yes.
6   Q.   Have you ever signed any documents on behalf of
7        Pook Snook Dook LP?
8   A.   I -- I think so, yes.
9   Q.   Okay. Did you bring any with you today?
10  A.   No.
11  Q.   Is there a reason why you didn't?
12  A.   I don't have any.
13  Q.   Do you know who does?
14  A.   I don't know who does.
15  Q.   When you've signed documents relating to Pook
16       Snook Dook LP, who presented them to you?
17  A.   My husband.
18  Q.   Okay. Did you ask your husband to provide you
19       with documents pertaining to Pook Snook Dook LP before
20       you came here today?
21       MR. ROBERTS: She's already -- that's been asked
22       and answered. And I really don't want to get into this
23       whole thing over communication privileges. She told you
24       she tried to obtain them from all sources and that she's
25       provided you everything that she has.

Page 197

(10:22-10:23)

1        MR. ZEFF: Q. Did you ever transfer any funds
2        to Pook Snook Dook LP?
3   A.   I don't know.
4   Q.   Did you ever receive funds from Rainforest
5        Capital that you put into Pook Snook Dook LP?
6   A.   I don't know.
7   Q.   Did you ever receive any funds from Colin Wiel
8        that you put into Pook Snook Dook LP?
9   A.   I don't recall.
10  Q.   Okay. Do you know who created Pook Snook Dook
11       LP?
12  A.   No, I do not.
13  Q.   Do you know who created Ivy League Charter LLC?
14  A.   No.
15  Q.   Please look at what's been marked as Exhibit 6
16       in the Wiel deposition, which is WEIL Bates numbers 1
17       through 35.
18       MR. ROBERTS: Are we remarking these or are we
19       having some kind of agreement that those numbers will
20       apply in this? Whatever works.
21       MR. ZEFF: Well, they're already marked
22       exhibits, so -- and they have Bates numbers, so I'm just
23       going to refer to them as the exhibit number and the
24       Bates number.
25       MR. ROBERTS: Why don't we just agree that -- so

Page 198

(10:23-10:24)

1 why don't we just refer to them as having an "A" in
2 front of them because you already have a set of 1
3 through 31, right, in this deposition? Is that correct?
4 And now you're handing her a number what?
5     MR. ZEFF: Well, this WEIL Number 6.
6     MR. ROBERTS: WEIL, oh, sorry. So, okay, so
7 WEIL Number 6, and we'll agree that those documents that
8 are in the Wiel are stipulated to be part of this
9 deposition transcript to the extent required.
10     MR. ZEFF: Appreciate that.
11     MR. ROBERTS: You're welcome.
12     MR. ZEFF: Yeah, and I can refer to them just as
13 Bates numbers. That way --
14     MR. ROBERTS: That -- that's fine. Well, why
15 don't you call Wiel Number whatever.
16     MR. ZEFF: Well, this is WEIL Number 6, and
17 we'll refer to the page numbers by the Bates numbers.
18     MR. ROBERTS: Okay.
19     MR. ZEFF: Q. Have you ever seen the first
20 page of WEIL Number 6 before?
21 A.  No.
22 Q.   On June 2, 2010, did you ever receive $6,250
23 from Rainforest Capital?
24 A.  I don't know.
25 Q.   Do you know if Pook Snook Dook LP received the

Page 200

(10:25-10:26)

1 A.  I don't know.
2 Q.   Do you have any knowledge as to why there may
3 have been a promissory note between Pook Snook Dook LP
4 and Rainforest Capital?
5 A.  I don't recall.
6 Q.   Do you have any reason to believe, as you sit
7 here today, that the payments made by Rainforest Capital
8 shown on the first page of WEIL Exhibit 6 did not take
9 place?
10     MR. ROBERTS: Calls for speculation.
11     THE WITNESS: I don't know. I assume this is
12 valid.
13     MR. ZEFF: I don't want you to assume anything.
14 Q.   I'm just asking you if you have any reason to
15 believe that they -- it is not valid.
16     MR. ROBERTS: Same objection.
17     THE WITNESS: I don't know.
18     MR. ZEFF: Q.  Do you have any reason to
19 believe that the payments reflected on Exhibit 6, Page
20 1, were in fact made?
21     MR. ROBERTS: Same objection. It calls for
22 speculation, and it's vague and ambiguous.
23     MR. ZEFF: Q.  You can answer.
24 A.  I don't know.
25 Q.   Did you ever see evidence of a wire transfer

Page 199

(10:24-10:25)

1 payments reflected on the first page of WEIL Exhibit 6?
2 A.  I don't know.
3 Q.   Have you ever received any checks from
4 Rainforest Capital?
5 A.  I don't know.
6 Q.   Have you ever received any checks from Colin
7 Wiel?
8 A.  I don't know.
9 Q.   Did you ever see any wire transfers from
10 Rainforest Capital?
11 A.  I didn't -- no, I didn't -- I don't have any
12 recollection of that.
13 Q.   Do you have any understanding as to why Mr. Wiel
14 would be making payments to Pook Snook Dook LP?
15 A.  Well, I remember there was a promissory note
16 between -- between Rainforest Capital and -- I don't
17 remember who, but someone. Either Pook or me. I'm not
18 sure.
19 Q.   Do you know whether or not, prior to there being
20 a promissory note between Rainforest Capital and you,
21 there was a promissory note between Rainforest Capital
22 and your husband, Carl Wescott?
23 A.  I don't have knowledge of that. I don't know.
24 Q.   Do you have any knowledge as to why there became
25 a promissory note between you and Rainforest Capital?

Page 201

(10:26-10:28)

1 from Rainforest Capital to either you or Pook Snook Dook
2 LP?
3 A.  I don't usually look at the checking accounts.
4 I don't look at the accounts. So I didn't -- I haven't
5 noticed any of this.
6 Q.   Do you have a checking account for Pook Snook
7 Dook LP in your possession, custody or control?
8 A.  I'm not sure.
9 Q.   Have you seen one in the last three months?
10 A.  I haven't seen one recently, no.
11 Q.   Okay. When was the last time you saw any kind
12 of a bank account for Pook Snook Dook LP?
13 A.  I don't know.
14 Q.   Okay. Have you ever seen one? Ever?
15 A.  I'm not sure.
16 Q.   Please look at what's been marked as Exhibit 7
17 in the Wiel deposition. It's WEIL Bates numbers 36
18 through 59.
19     Have you ever seen Exhibit 7 to the Wiel
20 deposition before?
21 A.  It looks familiar, yes.
22 Q.   When is the last time you saw it before today?
23 A.  I don't remember.
24 Q.   Is that your signature on Page 15 of Exhibit 7?
25 A.  It looks like my signature, yes.

Page 202

(10:28-10:29)

1  Q.  And whose signature is above yours; do you know?
2  A.  It looks like my husband's signature.
3  Q.  Okay. Did you prepare this document?
4  A.  No, I did not.
5  Q.  Do you know who did?
6  A.  I assume the attorneys listed did it.
7  Q.  Okay. I don't want you to assume anything. If
8  you know, you know.
9  A.  I don't know who prepared the document.
10  Q.  Okay. Do you know why this document was
11  prepared?
12  A.  It was, I assume, prepared for estate planning
13  purposes.
14  Q.  Okay. I don't want you to assume anything. If
15  you know, tell us. If you don't know, tell us you don't
16  know.
17  A.  I understand that it was done for estate
18  planning purposes.
19  Q.  Okay. Where did you get that understanding
20  from?
21  A.  From my husband and the attorneys. And I don't
22  remember exactly from who.
23  Q.  Okay. Looking at Exhibit 7, it has two exhibits
24  to it, Exhibit A and Exhibit B.
25      Do you see those?

Page 203

(10:29-10:30)

1  A.  Mm-hmm.
2  Q.  Is that a "yes"?
3  A.  Yes.
4  Q.  Okay. Did you review those Exhibits A and B to
5  Exhibit 7 before you signed Exhibit 7?
6  A.  I don't remember.
7  Q.  Okay. Do you know if you made any effort to
8  determine if the valuations for the assets reflected on
9  Exhibits A and B were accurate?
10  A.  No, I don't remember.
11  Q.  Do you have any understanding as to why your
12  husband took all the foreign properties and you took all
13  the domestic properties?
14  A.  I don't remember.
15  Q.  Okay. Did you look into whether or not the
16  domestic properties that you were receiving under this
17  transmutation agreement had any equity in them before
18  you signed the document?
19  A.  I don't recall.
20  Q.  Do you have any evidence, as you sit here today,
21  that any of the domestic real estate properties that you
22  took under Exhibit 7, the transmutation agreement, had
23  any equity at the time you took them?
24  A.  I don't -- I don't know.
25  Q.  Okay. What was -- were you given any

Page 204

(10:30-10:31)

1  consideration for entering into Exhibit 7?
2      MR. ROBERTS: That calls for a legal conclusion,
3  legal opinion from a lay witness.
4      MR. ZEFF: I'll rephrase it.
5  Q.  Did you have any understanding as to whether or
6  not you received anything of value in exchange for
7  executing Exhibit 7?
8  A.  I don't -- I don't recall. I don't know.
9  Q.  Were you aware that this lawsuit by Mr. Fiechter
10  against your husband had been filed at the time you
11  executed Exhibit 7?
12  A.  No. I don't have any knowledge -- I don't have
13  any knowledge of that at this time.
14  Q.  Did anyone tell you that one reason that Exhibit
15  7 was presented to you for signature was that -- because
16  Mr. Fiechter had sued your husband?
17      MR. ROBERTS: Well, to the extent that that
18  calls for communications with attorneys or her husband,
19  I would object on the grounds of attorney/client
20  privilege and spousal communication privilege. And I
21  would object and instruct her to answer the question
22  excepting those two.
23      THE WITNESS: Excepting any conversations I had
24  with --
25      MR. ROBERTS: With your husband or your

Page 205

(10:31-10:32)

1  attorneys.
2      THE WITNESS: With my husband or my attorneys, I
3  had no knowledge of that.
4      MR. ZEFF: Q. Okay. Did you have any
5  understanding from any source that the reason Exhibit 7
6  was created was to avoid judgment collection in this
7  action by Mr. Fiechter?
8      MR. ROBERTS: Same objection. Same instruction.
9      THE WITNESS: I -- other than any communications
10  I've had with my husband and/or my attorneys, I have
11  not -- I don't know of any.
12      MR. ZEFF: Q. Okay. My question goes not to
13  communications, but your understanding.
14      Did you have any understanding --
15  A.  I said I had no --
16  Q.  No, no, no, don't argue with me, and let me
17  finish my question.
18      At the time you executed Exhibit 7, did you have
19  any understanding in your mind -- and I'm not asking you
20  from whom and I'm not asking you how you got it -- did
21  you have any understanding in your mind that part of the
22  reason for your executing Exhibit 7 was to help avoid
23  judgment execution in this action by Mr. Fiechter?
24  A.  I believe this document was 10 days or 12 days
25  before I had a baby. I have three kids five and under.

Page 206

(10:32-10:34)

1 I was not aware of what was going on, and I did not sign
2 this document for the reasons you've stated.
3 Q. You had no understanding --
4 A. I had no understanding.
5 Q. Okay. Please look at Exhibit 8 to the Wiel
6 deposition, which is WEIL Bates Number 60 through 63.
7 Is that your signature on the first page of
8 Exhibit 8?
9 A. Yes, it is.
10 Q. And whose signature is that to the right of
11 yours? That's also your signature, right?
12 A. I think they're both my signatures, yes.
13 Q. And so you signed as an assignor, correct?
14 A. It looks like it, yes.
15 Q. Okay. What were you assigning; do you know?
16 A. I assume I was signing the promissory note. And
17 an installment for Rainforest Capital.
18 Q. Okay. Who prepared -- who presented this
19 document to you for signature?
20 A. I don't remember.
21 Q. Where did you sign it; do you recall?
22 A. I believe I signed it at a notary's office or a
23 notary.
24 Q. Why did you sign Exhibit 8 to the --
25 A. I was assuming we were putting this into the

Page 207

(10:34-10:35)

1 trust for our estate planning.
2 Q. Okay. At the time you were a general partner of
3 Pook Snook Dook Limited Partnership?
4 A. I don't remember, I don't know.
5 Q. Are you that general partner now?
6 A. I don't know.
7 Q. How did you become the general partner of Pook
8 Snook Dook Limited Partnership?
9 MR. ROBERTS: It assumes facts. She just told
10 you she didn't know if she ever was.
11 MR. ZEFF: Q. Okay. Is it your practice to
12 sign documents in the capacity of general partner of a
13 limited partnership not knowing whether or not you are
14 the limited partner -- general partner?
15 A. I was under the understanding that this was
16 being done as part of our overall estate planning which
17 had been going on for about three years.
18 MR. ZEFF: Move to strike the answer as
19 nonresponsive.
20 Please read it back, the question.
21 (Reporter read back.)
22 MR. ZEFF: Let me rephrase it.
23 MR. ROBERTS: The question's argumentative and
24 designed to vex and annoy.
25 MR. ZEFF: Let me rephrase it.

Page 208

(10:35-10:36)

1 Q. Is it your practice to sign documents in a
2 capacity on behalf of an entity and not know whether or
3 not you are indeed in that capacity on behalf of that
4 entity?
5 MR. ROBERTS: Question is argumentative and
6 designed to vex and annoy. Assumes facts, calls for
7 speculation. It's compound.
8 Go ahead and answer, if you can.
9 THE WITNESS: When I signed these documents, I
10 was under the understanding that I was signing these
11 documents in a legal way and that the structure of the
12 partnership was -- that I was signing it in a legal way.
13 So it is my practice to do things in a legal way
14 to the best of my knowledge and understanding.
15 MR. ZEFF: Q. Okay. So at the time you signed
16 Exhibit 8, you knew you were the general partner of Pook
17 Snook Dook Limited?
18 A. I don't remember what I knew at that time.
19 Q. Okay. Did you ever know prior to today that you
20 were the general partner of Pook Snook Dook Limited
21 Partnership?
22 A. I don't --
23 MR. ROBERTS: Asked and answered.
24 MR. ZEFF: Q. You can answer it again. In
25 fact, you have to answer it again.

Page 209

(10:36-10:38)

1 A. I -- I don't know -- I don't recall today when
2 and what I knew on June 24th, 2010.
3 Q. Do you know how you became the general partner
4 of Pook Snook Dook Limited?
5 A. I believe that these partnerships, et cetera,
6 were developed or designed or whatever as part of our
7 overall estate planning which had been ongoing for
8 several years.
9 Q. What estate planning was done prior to June 24,
10 2010?
11 A. I don't remember.
12 Q. Do you have any documents that show that there
13 was family estate planning being done three years before
14 June of 2010?
15 A. I don't recall.
16 Q. Have you ever seen any such documents?
17 A. We had started to do estate planning after our
18 first son was born, and we started doing them using some
19 kind of software package. I can't remember what. And
20 so we went through several iterations of that. And then
21 around the time that we had our second son and then I
22 got pregnant with our third child, my husband decided
23 that we needed more extensive estate planning and was
24 working on that then. So that was probably between --
25 our older son's three and a half, so -- I mean, our

(10:38-10:39)

1    middle son's three and a half.  So around three, three
2    and a half years ago.
3    Q.    That software package was being used at your
4    house on Ashbury Street?
5    A.    I don't know if it was being used at our house
6    or in my husband's office.
7    Q.    Okay.  Did you ever -- did you ever work on that
8    software package?
9    A.    Yes.
10   Q.    Where did you work on it?
11   A.    I worked on it on a laptop that my husband had.
12   Q.    Okay.  And do you still have that laptop?
13   A.    No, I don't think so.  I don't know.
14   Q.    Did you keep any copies of the software?
15   A.    I don't know if I still have the -- I don't
16   know.
17   Q.    Did you make a search for it before coming here
18   today?
19   A.    I don't have copies of that software anymore.
20   Q.    Question is:  Did you make any search for the
21   software before coming here today?
22   A.    I looked for that software a while ago because I
23   was going to give it to somebody to use, and I couldn't
24   find it.  So I remember that I don't have the software
25   package because I was looking for it.

(10:39-10:40)

1    Q.    Did you make a request for that -- of that --
2    for that software package from your husband?
3         MR. ROBERTS: Objection again.  Attorney --
4    spousal communication privilege.
5         MR. ZEFF: Q.  Did Pook Snook Dook Limited
6    Partnership pay you anything for transferring the
7    promissory note from Rainforest from you to them?
8    A.    I have no idea.  I don't know.
9    Q.    How did you obtain the right to payment on a
10   promissory note from Rainforest Capital reflected on
11   Exhibit 8?
12        MR. ROBERTS: Calls for a legal opinion and
13   legal conclusion from a lay witness.
14        MR. ZEFF: Q.  You can answer.  You have to
15   answer.
16   A.    I don't know.
17   Q.    You don't know?  Do you have any idea as to --
18   did you pay anyone anything for the right to receive
19   promissory payments on the Rainforest promissory note?
20   A.    Everything that was done I thought was being
21   done with respect to the overall estate planning.  So I
22   don't know.  I was not -- I didn't make those decisions.
23        MR. ZEFF: Move to strike the answer as
24   nonresponsive.  I think that can be answered "yes" or
25   "no."

(10:40-10:42)

1         Will you please re-ask the question,
2    Mr. Reporter.
3         (Reporter read back.)
4         MR. ROBERTS: I'm sorry, read that again.
5         MR. ZEFF: I'll rephrase it.
6    Q.    Did you give anyone anything of value in
7    exchange for your receiving the right to obtain payments
8    from the Rainforest promissory note?
9         MR. ROBERTS: Question calls for legal opinion
10   and a legal conclusion from a lay witness.
11        MR. ZEFF: Q.  You can answer.
12   A.    I don't know.
13   Q.    Please turn to WEIL Exhibit 9, which is Bates
14   Number 64 through 67.
15        Is that your signature on WEIL Page 65?
16   A.    Yeah.
17   Q.    Okay.  Where did you sign this document?
18   A.    I don't have any -- I don't know.  I don't
19   remember.
20   Q.    Do you know who prepared this document?
21   A.    No.  I don't know.
22   Q.    Do you know who presented it to you for
23   signature?
24   A.    I don't remember.  It was probably my husband,
25   but I don't remember.

(10:42-10:43)

1    Q.    Okay.
2    A.    I don't remember when this was handed to me.
3    Q.    Do you recall ever receiving payments from
4    Rainforest Capital on a promissory note after you signed
5    Exhibit 9?
6    A.    I don't remember.  I don't recall.
7    Q.    Okay.  If you received any payments from
8    Rainforest Capital under this document, which is Exhibit
9    9, do you know what you did with them?
10        MR. ROBERTS: Calls for speculation.
11        THE WITNESS: I don't remember.  I don't know.
12        MR. ZEFF: Q.  Did you give anyone anything of
13   value in exchange for your receiving the right under
14   Exhibit 9 to have payments made to you by Rainforest
15   Capital?
16        MR. ROBERTS: Calls for legal opinion and a
17   legal conclusion from a lay witness.
18        THE WITNESS: I don't know.
19        MR. ZEFF: Q.  Did anyone tell you why Exhibit
20   9 was being executed?
21   A.    My understanding was all of these legal
22   documents were responsive to our estate planning.
23   Q.    How did you obtain that understanding?
24        MR. ROBERTS: Asked and answered.
25        THE WITNESS: I don't know.

Page 214

(10:43-10:44)

1       MR. ZEFF: Q. Did you talk to Mr. Wiel about
2   why the promissory note to your husband was being split
3   into -- that the three notes described in -- strike
4   that.
5       Did you ever talk to Mr. Wiel about why the
6   three notes described in Exhibit 9 were turned into two
7   notes of which you were being made a payee?
8   A.   I don't have any recollection.
9   Q.   Did you pay Mr. Wiel anything in order to obtain
10   the right to obtain payment from him on the promissory
11   notes?
12   A.   I don't have a recollection of that.
13   Q.   Do you recall receiving any payment -- off the
14   record.
15       (Off the record.)
16       MR. ZEFF: Q. Do you have any recollection
17   of receiving any --
18       MR. ROBERTS: Excuse me a moment. We've been
19   going for 45 minutes and the number of documents to be
20   copied were not very many, and you haven't yet asked any
21   questions about what was supposedly the ostensible --
22   the ostensible purpose for this continued deposition.
23   So all I can tell you is she's here for an hour today.
24   We'll have an opportunity to discuss whether you're
25   going to be able to do this again, but as of right now,

Page 215

(10:44-10:46)

1   you haven't done what you said you were going to do here
2   today.
3       So go ahead, keep going.
4       MR. ZEFF: I did have another question in mind
5   before you -- your soliloquy, and I'm going to try and
6   retrieve it.
7       MR. ROBERTS: Okay.
8       MR. ZEFF: Q. Do you have any recollection of
9   receiving any payments from either Wiel or Rainforest
10   Capital after you executed Exhibit 9?
11   A.   I don't have any recollection of that, no.
12       MR. ZEFF: Well, we've just got back the copies
13   of the documents that you produced here today and,
14   unfortunately, they are not copied the way I wanted them
15   copied because I didn't tell anybody. They're now a
16   bunch of different exhibits that we can't possibly get
17   through in 15 minutes. And I did tell you I did not
18   agree that this deposition would only be an hour long.
19   So either we're going to agree that you're going to come
20   back and go over these or I'll go to court and see a
21   judge.
22       The only thing I can suggest is that we just
23   have the reporter mark these in order right now and -- I
24   mean, I was going to mark them as a group, but then they
25   divided them up. So I just think we ought to mark them

Page 216

(10:46-10:47)

1   in order and just have her identify them in order as
2   long as she can do it.
3       MR. ROBERTS: Okay. The problem is now you got
4   the originals on top, so I suppose -- I suppose at the
5   end of this session when she leaves we can go through
6   and pull the originals out.
7       MR. ZEFF: That's fine with me.
8       Mr. Reporter, why don't you just -- let's start
9   with Exhibit 32 and mark them consecutively. Or maybe
10   I'll mark them and then we can at least ask about them.
11       (Reporter interruption.)
12       MR. ZEFF: Actually, and as I ask them, you can
13   keep the originals.
14       MR. ROBERTS: That'd be great.
15       MR. ZEFF: So here's 32. And we'll mark this at
16   32.
17       (Whereupon, Exhibit 32 was marked for
18   identification.)
19       MR. ZEFF: Q. Ms. Stephens, is Exhibit 32 a
20   document you brought with you today?
21   A.   Yes, I believe it is.
22   Q.   Okay. And was this a document that you keep in
23   the ordinary course of your business?
24       MR. ROBERTS: Assumes facts. Vague and
25   ambiguous.

Page 217

(10:47-10:48)

1       Go ahead.
2       THE WITNESS: It's a document that came to the
3   house about the Santa Barbara house.
4       MR. ZEFF: Q. Okay. This is the Santa Barbara
5   house that you had previously owned yourself?
6   A.   I own the house myself, yes.
7   Q.   Okay. And it's in foreclosure; is that correct?
8   A.   It's in foreclosure.
9   Q.   Okay. Was any community property ever expended
10   on this Santa Barbara property?
11       MR. ROBERTS: Calls for a legal conclusion and
12   legal opinion from a lay witness.
13       THE WITNESS: Not to my -- I don't know.
14       MR. ZEFF: Q. Do you know if Mr. Wescott ever
15   listed the Santa Barbara property as an asset of his
16   own?
17   A.   I don't know.
18   Q.   Did you ever see any documents where he did
19   that?
20   A.   I don't remember. I don't know.
21       MR. ZEFF: Okay. Let's mark as Exhibit 30 --
22   please look as what's been marked as Exhibit 33.
23       (Whereupon, Exhibit 33 was marked for
24   identification.)
25       MR. ZEFF: Q. Is that a document you produced

Page 218

(10:48-10:49)

1    here today?
2    A.    Yes.
3    Q.    What is it?
4    A.    It's a document from the bank saying that they
5    are going to foreclose on the house.
6    Q.    This also relates to the Santa Barbara property?
7    A.    Yeah.
8    Q.    It's a letter from Chase dated April 5, 2010 --
9    11; is that correct?
10   A.    Yeah.
11   Q.    Has that foreclosure been completed, to your
12   knowledge?
13   A.    I don't know.
14   Q.    Where did -- did you receive Exhibit 33 at the
15   Carol Avenue property or at your home in San Francisco?
16   A.    I don't remember.
17         MR. ZEFF: Please look at Exhibit 34.
18         (Whereupon, Exhibit 34 was marked for
19         identification.)
20         MR. ZEFF: Q.  Is that a document you produced
21   here today?
22   A.    Yes, to my knowledge.
23   Q.    And is that a letter you received from Chase
24   Home Finance on or about -- after February 21, 2011?
25   A.    Yes.

Page 219

(10:49-10:51)

1    Q.    Does this letter relate, again, to the
2    Santa Barbara property, to your knowledge?
3    A.    Yes.
4          (Reporter interruption.)
5          (Whereupon, Exhibit 35 was marked for
6          identification.)
7          MR. ZEFF: Please look at Exhibit 35.  There's
8    something screwed up about this.
9    Q.    Is that a document you produced here today?
10   A.    Yes.
11   Q.    It's dated February 4, 2011.  And it is
12   entitled: "Important Notice of Default and Election to
13   Sell Under Deed of Trust"?
14   A.    Yeah.
15   Q.    Where did you receive this document, if you
16   know?
17   A.    I don't recall.
18   Q.    There's a -- the third page of Exhibit 35 is
19   a -- looks like a copy of an envelope to Atlas
20   Consulting LLC.
21         Do you see that?
22   A.    Yeah.
23   Q.    Okay.  Are you the managing member of Atlas
24   Consulting LLC?
25   A.    Uh-huh.

Page 220

(10:51-10:53)

1    Q.    Who other members are there -- what other
2    members are there?
3    A.    I don't -- I think I'm the only member at this
4    point.
5    Q.    Who -- were there prior members before this
6    point?
7    A.    Yeah, at one point my husband was a member, I
8    believe.  I'm not sure if he -- I don't think he is.
9    Q.    Okay.
10   A.    My father was a member and a previous business
11   colleague at one point was a member.
12   Q.    And this Notice of Default, which is Exhibit 35,
13   again, relates to your -- the Santa Barbara residence?
14   A.    Mm-hmm.
15   Q.    Okay.  Please look at what's been marked as
16   Exhibit 36.
17         (Whereupon, Exhibit 36 was marked for
18         identification.)
19         MR. ZEFF: Q.  That is a three-page document
20   you produced here today, correct?
21   A.    Yeah.
22   Q.    Again, is that a document you received in
23   connection with this foreclosure of your home in
24   Santa Barbara?
25   A.    Yeah.

Page 221

(10:53-10:54)

1          (Whereupon, Exhibit 37 was marked for
2          identification.)
3          MR. ZEFF: Look at Exhibit 37, please.  It's a
4    document dated February 25, 2011, that you produced here
5    today.
6          THE WITNESS: Yeah.
7          MR. ZEFF: Q.  And did you receive this
8    document at your home in San Francisco?
9    A.    I don't recall, but it has the San Francisco
10   address on it, so I assume so.
11   Q.    Okay.  And again, do you understand Exhibit 37
12   to relate to the foreclosure on your property in
13   Santa Barbara?
14   A.    Yeah.
15         MR. ZEFF: Okay.  Counsel, I'm going to show you
16   the remaining documents that were copied.  And they all
17   look to be duplicates of 35 and 36.
18         MR. ROBERTS: Okay.
19         MR. ZEFF: I don't know why we would need to
20   deal with them.
21         MR. ROBERTS: Okay.
22         MR. ZEFF: Q.  Other than what your counsel is
23   looking at and -- well, okay.
24         MR. ZEFF: When Ms. Stephens leaves against my
25   better wishes and desires, Counsel and I can go over

Page 222

(10:54-10:56)

1   whether or not those documents that she brought that
2   appear to be duplicates should be part of this record or
3   not.
4       Please look at WEIL 195, which is a document
5   previously produced by Mr. Wiel at his deposition.
6   Q.   Is that your signature on WEIL Page 195?
7   A.   I believe so, yes.
8   Q.   Okay.
9   Q.   And please look at WEIL 196.
10      Are those your signatures on that document?
11  A.   I believe so, yeah.
12  Q.   And WEIL 197. Are those your signatures on that
13  document?
14  A.   I believe so, yeah.
15  Q.   Okay. Where did you sign those documents, 195,
16  196 and 197?
17  A.   It says in San Francisco, California.
18  Q.   Do you have any recollection of signing those
19  documents, which are WEIL 195 through 197?
20  A.   I don't remember.
21  Q.   Do you recall who prepared them?
22  A.   I don't know.
23  Q.   Okay. Did anyone tell you why you were signing
24  those documents?
25  A.   I was under the understanding that this was for

Page 223

(10:56-10:57)

1   estate planning purposes.
2   Q.   Did anyone give you anything of value that you
3   know of in exchange for signing the documents which are
4   WEIL Exhibits 195, 196 and 197?
5   A.   I believe that they were part of the estate
6   planning, which -- and I just -- I don't know.
7   Q.   WEIL 195 refers to a $200,000 membership
8   interest in Rainforest Capital LLC.
9       Do you see that?
10  A.   Mm-hmm.
11  Q.   Did you receive that membership interest?
12  A.   I don't know.
13  Q.   Okay. Did you own it at the time you signed
14  WEIL 195?
15  A.   I don't recall. I don't know.
16  Q.   Okay. Do you have any documents that would
17  indicate whether or not you owned a $200,000 membership
18  interest in Rainforest Capital LLC as of September 4,
19  2010?
20  A.   I don't -- I don't know that I have anything.
21  No, I don't, not to my knowledge.
22  Q.   Then there's a document called: "Catamount
23  Ventures LP Interest."
24      Do you see that on Exhibit -- on WEIL 195?
25  A.   Mm-hmm.

Page 224

(10:57-10:58)

1   Q.   Did you own that interest at the time you signed
2   this document?
3   A.   I don't know.
4   Q.   Did you have any documents in September of 2010
5   that indicated you owned an interest in Catamount
6   Ventures LP?
7   A.   I don't remember.
8   Q.   In September of 2010, did you own any interest
9   in Fidelity Cap IV LP?
10  A.   I can't remember.
11  Q.   What is Fidelity Cap IV LP; do you know?
12      MR. ROBERTS: Calls for legal opinion and legal
13  conclusion from a lay witness. The question's vague and
14  ambiguous.
15      THE WITNESS: It's -- it's some type of a fund.
16      MR. ZEFF: Q. Okay. Are you the person that
17  invested in that fund or did someone else invest in it?
18  A.   I believe I invested in that.
19  Q.   You did. Was it money from separate property or
20  community property; do you know?
21      MR. ROBERTS: Calls for legal opinion and a
22  legal conclusion from a lay witness.
23      THE WITNESS: I don't remember.
24      MR. ZEFF: Q. Okay. What year did you invest
25  in Fidelity Cap IV LP?

Page 225

(10:58-10:59)

1   A.   I don't remember.
2   Q.   Did you invest in Fidelity Cap V LP?
3   A.   I -- I believe so, I'm not sure.
4   Q.   What year did you do that?
5   A.   I don't remember.
6   Q.   Okay. Isn't it true that all of these interests
7   that are shown on WEIL 195 were originally in your
8   husband's name?
9   A.   No, that is not true.
10  Q.   Which ones were originally in your name?
11  A.   I don't remember.
12  Q.   Okay. Do you have any documents that would show
13  which of these investments were in your name when they
14  were first purchased?
15  A.   I don't have those documents, no.
16  Q.   Who does?
17  A.   I don't know.
18  Q.   Do you know -- you transferred these interests
19  to Pook Snook Dook Limited Partnership, correct?
20  A.   I don't know. I assume so based on these
21  documents here. It looks like that was -- according to
22  there.
23  Q.   So basically was it your understanding, when you
24  signed WEIL 195, that you were transferring assets that
25  you owned to your children?

Page 226

(10:59-11:00)

1   A.   It was my understanding that I was doing this as
2   part of our overall estate planning, yes.
3   Q.   Okay. And were any of -- did your Pook Snook
4   Dook -- was Pook Snook Dook Limited Partnership an
5   estate planning vehicle for your family?
6   A.   I believe it is.
7   Q.   Okay. And what is the purpose of Pook Snook
8   Dook Limited Partnership?
9   A.   I believe it's for estate planning purposes.
10   Q.   And by that, do you mean you're putting money
11   away for your children?
12   A.   I assume so, yes.
13   Q.   Okay. And where does that money come from?
14   Does it come from you individually?
15   A.   I assume it comes from me and my husband and --
16   Q.   Okay. Pook Snook Dook Limited Partnership is a
17   limited partnership, though, not a trust, correct?
18       MR. ROBERTS: Calls for a legal opinion and a
19   legal conclusion from a lay witness.
20       MR. ZEFF: Q. What's your understanding of
21   that?
22   A.   To be honest, it all confuses me. I don't
23   really understand. I know there's a partnership. I
24   know there's a trust. I'm not really -- I haven't
25   really looked into it. And I don't really understand

Page 227

(11:00-11:01)

1   all of it in detail.
2   Q.   Is it accurate to say you signed these documents
3   including WEIL 195, 196 and 197 without understanding
4   what you were doing when you signed them?
5   A.   At the time that I signed them, I was under
6   the -- I understood what was going on. I just don't
7   remember at this point --
8   Q.   Okay. Do you --
9   A.   -- all of the details.
10   Q.   Do you remember any of the details, as you sit
11   here today?
12   A.   As I sit here today, my understanding is that
13   the trust and the LP -- the LLC were all -- and the
14   family trust was all designed for estate planning
15   purposes.
16   Q.   Is there a Stephens-Wescott family trust that
17   you know of?
18   A.   I don't know exactly, but it looks like there --
19   it says Stephens-Wescott Family Trust or
20   Wescott-Stephens Family Trust on this document here.
21   Q.   Okay. And have you ever seen such a trust
22   document before?
23   A.   I don't remember.
24   Q.   Do you know who the trustee is of that trust?
25   A.   I don't remember.

Page 228

(11:01-11:02)

1   Q.   Do you know what the assets are of that trust?
2   A.   I don't have -- remember what that was.
3   Q.   Do you know who's the custodian of the assets of
4   the trust in the Wescott-Stephens Family Trust?
5   A.   I don't remember.
6   Q.   Do you have any documents that relate to the
7   Wescott-Stephens Family Trust at all?
8   A.   Not in my possession, no.
9   Q.   Okay. When was the last time you saw any such
10   documents?
11   A.   I can't remember.
12   Q.   Who had them; do you know?
13   A.   I can't remember.
14   Q.   Have you been diagnosed with amnesia in the last
15   two years?
16       MR. ROBERTS: That's designed to vex and annoy.
17       MR. ZEFF: No, it's not.
18       MR. ROBERTS: It's harassing.
19       MR. ZEFF: Q. Have you been diagnosed with any
20   neurological problem in the last two years?
21   A.   No, not to my knowledge.
22   Q.   Okay. Looking at WEIL 197, it refers to a
23   Wescott-Stephens Family Trust dated June 2010.
24   Do you see that?
25   A.   Uh-huh.

Page 229

(11:02-11:09)

1   Q.   And in fact, by executing the document which is
2   WEIL 197, you designated that trust as a beneficiary; is
3   that correct?
4       MR. ROBERTS: Calls for a legal opinion and
5   legal conclusion from a lay witness.
6       MR. ZEFF: I'll rephrase the question.
7   Q.   What was your understanding of what you were
8   doing when you signed the document, which is WEIL 197?
9   A.   I was under the understanding that this was all
10   being done for estate planning purposes.
11   Q.   Okay. So --
12   A.   I have to go. I'm sorry. I was not under -- I
13   made a mistake today. And --
14       MR. ZEFF: Okay. I'll talk to your counsel
15   about when and where you'll reappear and under what
16   circumstances.
17       (Off the record.)
18       MR. ROBERTS: So Ms. Stephens has departed.
19   There's a remaining issue of whether she needs to come
20   back again. I will meet and confer with Counsel over
21   that issue. It appears to me that she came back for
22   the -- the purpose of providing documents. And we asked
23   about documents she brought. That appears to have been
24   accomplished.
25       And there appears to have been a whole series of

Page 230

(11:09-11:10)
1  questions on a completely new topic, all of which appear
2  to have been well exhausted on the topic as to which
3  they were addressed.
4      My client told me today she can only be here for
5  one hour.  It wasn't with my advice or consent, but
6  nonetheless, she does have rights and we'll address what
7  those rights may or may not be after I have a chance to
8  consult with her.
9      MR. ZEFF:  Well, since Counsel put that on the
10 record, let me just put on the record that we don't
11 agree with what Counsel said.  We are insisting that she
12 does come back.  We will meet and confer with him on
13 that.  And if necessary, we will make a petition to the
14 Court.
15     (Whereupon, proceedings concluded at 11:10 a.m.)
16             --oOo--
17     I have read the foregoing deposition
18 transcript and by signing hereafter, approve same.
19
20 Dated_____.
21
22
23             _____
                (Signature of Deponent)
24
25

Page 232

1      I have not, and shall not, offer or provide
2  any services or products to any party's attorney or
3  third party who is financing all or part of the action
4  without first offering same to all parties or their
5  attorneys attending the deposition and making same
6  available at the same time to all parties or their
7  attorneys.  (Civ. Proc. § 2025.320(b))
8      I shall not provide any service or product
9  consisting of the deposition officer's notations or
10 comments regarding the demeanor of any witness,
11 attorney, or party present at the deposition to any
12 party or any party's attorney or third party who is
13 financing all or part of the action, nor shall I collect
14 any personal identifying information about the witness
15 as a service or product to be provided to any party or
16 third party who is financing all or part of the action.
17 (Civ. Proc. § 2025.320(c))
18
19 Dated: JULY 14, 2011
20
21
22
23             _____
24
25

Page 231

1         DEPOSITION OFFICER'S CERTIFICATE
2
3  STATE OF CALIFORNIA      )
                             )  ss.
4  COUNTY OF SAN FRANCISCO  )
5
6      I, Rick Galten , hereby certify:
7      I am a duly qualified Certified Shorthand
8  Reporter, in the State of California, holder of
9  Certificate Number CSR 13202 issued by the Court
10 Reporters Board of California and which is in full force
11 and effect.  (Bus. & Prof. § 8016)
12     I am not financially interested in this action
13 and am not a relative or employee of any attorney of the
14 parties, or of any of the parties.  (Civ. Proc. §
15 2025.320(a))
16     I am authorized to administer oaths or
17 affirmations pursuant to California Code of Civil
18 Procedure, Section 2093(b) and prior to being examined,
19 the deponent was first placed under oath or affirmation
20 by me. (Civ. Proc. §§ 2025.320, 2025.540(a))
21     I am the deposition officer that
22 stenographically recorded the testimony in the foregoing
23 deposition and the foregoing transcript is a true
24 record of the testimony given.  (Civ. Proc. §
25 2025.540(a))

Page 233

1         DEPOSITION OFFICER'S CERTIFICATE
2            (Civ.Proc. § 2025.520(e))
3  STATE OF CALIFORNIA      )
                             )  ss.
4  COUNTY OF SAN FRANCISCO  )
5
6      I, Rick Galten , hereby certify:
7      I am the deposition officer that
8  stenographically recorded the testimony in the foregoing
9  deposition.
10     Written notice pursuant to Code of Civil
11 Procedure, Section 2025.520(a), having been sent, the
12 deponent took the following action within the allotted
13 period with respect to the transcript of the deposition:
14     (  ) In person, at the office of the
15 deposition officer, made the changes set forth on the
16 original of the transcript.  (The parties attending the
17 deposition have been notified of said changes.)
18     (  ) Approved the transcript by signing it.
19     (  ) Refused to approve the transcript by not
20 signing it.
21     (  ) By means of a signed letter, made the
22 changes and approved or refused to approve the
23 transcript as set forth therein.  (Said letter has been
24 attached to the original transcript and copies thereof
25 mailed to all parties attending the deposition.)

Page 234

1          ( ) Failed to approve the transcript within
2     the allotted time period.
3     Dated _____.
4                            _____
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

186:10,13,16,20;
188:13;189:12;190:5,10,
19;191:15;192:2,15;
198:3

**$**

**$200,000 (2)**
223:7,17
**$6,250 (1)**
198:22

**1**

**1 (6)**
185:2;186:19;192:6;
197:16;198:2;200:20
**10 (1)**
205:24
**10:00 (1)**
185:2
**11 (1)**
218:9
**12 (1)**
205:24
**1388 (1)**
185:3
**15 (2)**
201:24;215:17
**195 (11)**
222:4,6,15,19;223:4,7,
14,24;225:7,24;227:3
**196 (4)**
222:9,16;223:4;227:3
**197 (8)**
222:12,16,19;223:4;
227:3;228:22;229:2,8

**2**

**2 (2)**
192:9;198:22
**2010 (9)**
198:22;209:2,10,14;
218:8;223:19;224:4,8;
228:23
**2011 (4)**
185:2;218:24;219:11;
221:4
**21 (2)**
186:19;218:24
**239 (1)**
194:24
**24 (1)**
209:9
**24th (1)**
209:2
**25 (1)**
221:4

**3**

**3 (1)**
192:18
**30 (1)**
217:21
**31 (13)**

**32 (5)**
216:9,15,16,17,19
**33 (3)**
217:22,23;218:14
**34 (2)**
218:17,18
**35 (6)**
197:17;219:5,7,18;
220:12;221:17
**36 (4)**
201:17;220:16,17;
221:17
**37 (3)**
221:1,3,11

**4**

**4 (3)**
192:12;219:11;223:18
**45 (1)**
214:19

**5**

**5 (1)**
218:8
**59 (1)**
201:18

**6**

**6 (8)**
197:15;198:5,7,16,20;
199:1;200:8,19
**60 (1)**
206:6
**63 (1)**
206:6
**64 (1)**
212:14
**65 (1)**
212:15
**67 (1)**
212:14

**7**

**7 (15)**
192:22;201:16,19,24;
202:23;203:5,5,22;
204:1,7,11,15;205:5,18,
22

**8**

**8 (5)**
206:5,8,24;208:16;
211:11
**820 (1)**

185:3

**9**

**9 (7)**
212:13;213:5,9,14,20;
214:6;215:10

**A**

**able (1)**
214:25
**above (1)**
202:1
**accomplished (1)**
229:24
**according (1)**
225:21
**account (2)**
201:6,12
**accounts (2)**
201:3,4
**accurate (3)**
185:15;203:9;227:2
**action (2)**
205:7,23
**Actually (1)**
216:12
**address (3)**
194:14;195:12;221:10
**advised (1)**
185:14
**again (11)**
190:6;208:24,25;
211:3;212:4;214:25;
219:1;220:13,22;
221:11;229:20
**against (2)**
204:10;221:24
**ago (2)**
210:2,22
**agree (6)**
185:20,23;197:25;
198:7;215:18,19
**agreement (5)**
185:19;187:5;197:19;
203:17,22
**agreements (2)**
192:23;193:10
**ahead (3)**
208:8;215:3;217:1
**ambiguous (4)**
186:25;200:22;
216:25;224:14
**amnesia (1)**
228:14
**and/or (3)**
188:16;190:23;205:10
**annoy (3)**
207:24;208:6;228:16
**answered (6)**
187:17;191:6;196:22;
208:23;211:24;213:24

**anymore (1)**
210:19
**apologize (1)**
192:2
**appear (1)**
222:2
**appeared (1)**
185:6
**appears (3)**
229:21,23,25
**apply (2)**
189:4;197:20
**Appreciate (1)**
198:10
**appropriate (2)**
185:22;195:13
**April (1)**
218:8
**argue (1)**
205:16
**argument (1)**
188:25
**argumentative (2)**
207:23;208:5
**around (2)**
209:21;210:1
**Ashbury (1)**
210:4
**assertion (1)**
195:8
**asset (1)**
217:15
**assets (4)**
203:8;225:24;228:1,3
**assigning (1)**
206:15
**assignor (1)**
206:13
**assume (11)**
200:11,13;202:6,7,12,
14;206:16;221:10;
225:20;226:12,15
**assumes (3)**
207:9;208:6;216:24
**assuming (1)**
206:25
**assumptions (1)**
188:1
**Atlas (2)**
219:19,23
**attorney (5)**
188:19;190:11;
191:20,22;211:3
**attorney/client (2)**
188:16;204:19
**attorneys (10)**
190:2,13,16,23;202:6,
21;204:18;205:1,2,10
**available (3)**
191:17,19,21
**Avenue (1)**
218:15
**avoid (2)**

205:6,22
**aware (3)**
196:2;204:9;206:1
**away (1)**
226:11

**B**

**baby (1)**
205:25
**back (13)**
185:20;189:16,25;
191:5,13;194:20;207:20,
21;212:3;215:12,20;
229:20,21
**bank (2)**
201:12;218:4
**Barbara (10)**
187:3;217:3,4,10,15;
218:6;219:2;220:13,24;
221:13
**based (1)**
225:20
**basically (1)**
225:23
**Bates (8)**
197:16,22,24;198:13,
17;201:17;206:6;212:13
**became (2)**
199:24;209:3
**become (1)**
207:7
**behalf (3)**
196:6;208:2,3
**beneficiary (1)**
229:2
**best (1)**
208:14
**better (1)**
221:25
**beyond (2)**
194:13;195:10
**born (1)**
209:18
**both (1)**
206:12
**break (2)**
189:14;191:8
**bring (4)**
186:1;187:4;194:20;
196:9
**brought (9)**
187:3;192:3,5,8,11,16;
216:20;222:1;229:23
**bunch (1)**
215:16
**business (3)**
185:16;216:23;220:10

**C**

**California (3)**
185:4,5;222:17

Case: 12-0314 Sup. Exhibit D - 34th Hearing and Deposition Transcripts D-15 of 228
of 43

call (3)
187:25;193:13;198:15
Called (2)
185:8;223:22
Calls (14)
200:10,21;204:2,18;
208:6;211:12;212:9;
213:10,16;217:11;
224:12,21;226:18;229:4
came (4)
187:14;196:20;217:2;
229:21
can (19)
187:1;188:5;189:13;
192:4;195:3;198:12;
200:23;208:8,24;211:14,
24;212:11;214:23;
215:22;216:2,5,10,12;
221:25
Cap (4)
224:9,11,25;225:2
capacity (3)
207:12;208:2,3
Capital (19)
197:5;198:23;199:4,
10,16,20,21,25;200:4,7;
201:1;206:17;211:10;
213:4,8,15;215:10;
223:8,18
Carl (1)
199:22
Carol (1)
218:15
Catamount (2)
223:22;224:5
Certified (1)
185:4
cetera (1)
209:5
Charter (3)
195:23;196:1;197:13
Chase (2)
218:8,23
checking (2)
201:3,6
checks (2)
199:3,6
child (1)
209:22
children (3)
196:4;225:25;226:11
circumstances (1)
229:16
clarify (1)
192:4
clear (2)
185:23;188:11
client (1)
189:22
Colin (3)
193:17;197:7;199:6
colleague (1)
220:11

collection (1)
205:6
coming (3)
185:14;210:17,21
commencing (1)
185:2
communication (9)
187:19;188:17,23,24;
189:9;190:7;196:23;
204:20;211:4
communications (6)
188:15,19;190:14;
204:18;205:9,13
community (2)
217:9;224:20
completed (2)
194:9;218:11
compound (1)
208:7
conclusion (12)
188:1,6;193:14;204:2;
211:13;212:10;213:17;
217:11;224:13,22;
226:19;229:5
confer (2)
188:22;229:20
conferences (1)
189:22
confused (1)
194:8
confuses (1)
226:22
connection (1)
220:23
consecutively (1)
216:9
consideration (1)
204:1
Consulting (2)
219:20,24
content (1)
189:9
continued (1)
214:22
control (6)
187:9;193:3,7;195:5,
10;201:7
conversations (4)
190:1,12,22;204:23
copied (5)
192:4;214:20;215:14,
15;221:16
copies (4)
186:9;210:14,19;
215:12
copy (3)
187:8,13;219:19
counsel (13)
185:14;186:4,7;
188:16,21;191:2;194:7,
14;221:15,22,25;229:14,
20
course (2)

195:5;216:23
court (3)
185:21;191:3;215:20
created (3)
197:10,13;205:6
custodian (1)
228:3
custody (6)
187:9;193:3,7;195:4,
9;201:7

**D**

dated (4)
218:8;219:11;221:4;
228:23
day (1)
185:20
days (2)
205:24,24
deal (1)
221:20
decided (1)
209:22
decisions (1)
211:22
Deed (1)
219:13
Default (2)
219:12;220:12
Defendant (1)
192:24
departed (1)
229:18
depose (1)
195:5
deposition (19)
185:19;186:2,11;
194:8,10,12,16,19,24;
195:7;197:16;198:3,9;
201:17,20;206:6;
214:22;215:18;222:5
described (4)
186:19;188:13;214:3,
6
designated (1)
229:2
designed (5)
207:24;208:6;209:6;
227:14;228:16
desires (1)
221:25
detail (1)
227:1
details (2)
227:9,10
determine (1)
203:8
developed (1)
209:6
diagnosed (2)
228:14,19
different (1)

215:16
disclosing (1)
189:8
discuss (1)
214:24
divided (1)
215:25
division (2)
192:24;193:11
document (37)
186:23;187:22;
188:10;190:16;192:1,
15;202:3,9,10;203:18;
205:24;206:2,19;212:17,
20;213:8;216:20,22;
217:2,25;218:4,20;
219:9,15;220:19,22;
221:4,8;222:4,10,13;
223:22;224:2;227:20,
22;229:1,8
documents (63)
186:1,4,8,12,18,22;
187:2,24;188:8,9,13;
189:11,12;190:4,9,15;
191:14,16,17;192:2,5,8,
11,15;193:2,6;194:11,
15,19,21,25;195:4,9;
196:6,15,19;198:7;
207:12;208:1,9,11;
209:12,16;213:22;
214:19;215:13;217:18;
221:16;222:1,15,19,24;
223:3,16;224:4;225:12,
15,21;227:2;228:6,10;
229:22,23
domestic (3)
203:13,16,21
done (8)
202:17;207:16;209:9,
13;211:20,21;215:1;
229:10
Dook (27)
195:17,20;196:3,7,16,
19;197:2,5,8,10;198:25;
199:14;200:3;201:1,7,
12;207:3,8;208:17,20;
209:4;211:5;225:19;
226:4,4,8,16
duly (1)
185:9
duplicates (2)
221:17;222:2
during (1)
194:18
duty (2)
187:22;188:8

**E**

effort (2)
190:21;203:7
either (6)
185:20;190:10;

199:17;201:1;215:9,19
Election (1)
219:12
else (2)
190:24;224:17
end (1)
216:5
entered (1)
192:23
entering (1)
204:1
entitled (2)
195:5;219:12
entity (2)
208:2,4
envelope (1)
219:19
equity (2)
203:17,23
error (1)
192:4
estate (19)
202:12,17;203:21;
207:1,16;209:7,9,13,17,
23;211:21;213:22;
223:1,5;226:2,5,9;
227:14;229:10
et (1)
209:5
even (1)
185:24
evidence (2)
200:25;203:20
exactly (3)
195:22;202:22;227:18
EXAMINATION (1)
185:12
examined (1)
185:9
excepting (2)
204:22,23
exchange (4)
204:6;212:7;213:13;
223:3
excluding (4)
188:19;190:1,12,22
Excuse (1)
214:18
execute (2)
193:16,22
executed (6)
193:10,19;204:11;
205:18;213:20;215:10
executing (3)
204:7;205:22;229:1
execution (1)
205:23
exhibit (64)
185:25;186:13,16,19;
188:13;189:12;190:5,10,
19;191:15;192:1,15;
197:15,23;199:1;200:8,
19;201:16,19,24;202:23,

Case: 12-0314  Sup Exhibit D - 34  Hearing and Deposition Transcripts  13:51  D-16 of 228
of 43

24,24;203:5,5,22;204:1,
7,11,14;205:5,18,22;
206:5,8,24;208:16;
211:11;212:13;213:5,8,
14,19;214:6;215:10;
216:9,17,19;217:21,22,
23;218:14,17,18;219:5,
7,18;220:12,16,17;
221:1,3,11;223:24
**exhibits (6)**
197:22;202:23;203:4,
9;215:16;223:4
**existed (1)**
194:19
**expand (1)**
194:12
**expanded (1)**
195:10
**expended (1)**
217:9
**extended (1)**
195:7
**extensive (1)**
209:23
**extent (3)**
188:15;198:9;204:17

**F**

**fact (3)**
200:20;208:25;229:1
**facts (3)**
207:9;208:6;216:24
**failed (1)**
194:15
**familiar (2)**
186:17;201:21
**family (9)**
209:13;226:5;227:14,
16,19,20;228:4,7,23
**father (1)**
220:10
**February (3)**
218:24;219:11;221:4
**Fidelity (4)**
224:9,11,25;225:2
**Fiechter (4)**
204:9,16;205:7,23
**filed (1)**
204:10
**Finance (1)**
218:24
**find (2)**
186:24;210:24
**fine (2)**
198:14;216:7
**finish (2)**
185:21;205:17
**first (7)**
185:9;198:19;199:1;
200:8;206:7;209:18;
225:14
**five (3)**

194:2,5;205:25
**folder (2)**
186:4,7
**foreclose (1)**
218:5
**foreclosure (5)**
217:7,8;218:11;
220:23;221:12
**foreign (1)**
203:12
**forth (1)**
185:10
**found (2)**
187:2;194:18
**Francisco (5)**
185:3;218:15;221:8,9;
222:17
**Friday (1)**
185:2
**front (3)**
192:3;194:24;198:2
**fund (2)**
224:15,17
**funds (3)**
197:1,4,7
**further (1)**
195:13

**G**

**GALTEN (1)**
185:4
**general (8)**
207:2,5,7,12,14;
208:16,20;209:3
**given (1)**
203:25
**goes (1)**
205:12
**Good (1)**
192:19
**great (1)**
216:14
**grounds (2)**
190:7;204:19
**group (1)**
215:24

**H**

**half (4)**
186:8;209:25;210:1,2
**handed (2)**
186:4;213:2
**handing (1)**
198:4
**harassing (1)**
228:18
**heard (1)**
195:23
**help (2)**
191:7;205:22
**hereinafter (1)**

185:10
**here's (1)**
216:15
**home (4)**
218:15,24;220:23;
221:8
**honest (1)**
226:22
**hour (6)**
185:2,15;189:22;
195:11;214:23;215:18
**house (8)**
187:3;210:4,5;217:3,
3,5,6;218:5
**husband (36)**
187:5,13,23;188:16,
20;189:10;190:2,3,10,
13,16,23;191:15,19,21;
193:6,11;196:4,17,18;
199:22;202:21;203:12;
204:10,16,18,25;205:2,
10;209:22;210:11;
211:2;212:24;214:2;
220:7;226:15
**husband's (3)**
202:2;210:6;225:8

**I**

**idea (2)**
211:8,17
**identification (7)**
186:14;216:18;
217:24;218:19;219:6;
220:18;221:2
**identify (1)**
216:1
**implies (2)**
189:2,5
**Important (1)**
219:12
**inch (1)**
186:8
**include (3)**
189:21;191:19,21
**includes (1)**
188:15
**including (1)**
227:3
**indeed (1)**
208:3
**indicate (1)**
223:17
**indicated (1)**
224:5
**individually (1)**
226:14
**inquiry (4)**
187:23;188:12,15;
195:8
**installment (1)**
206:17
**instruct (2)**

191:2;204:21
**instructed (2)**
188:18;190:8
**instruction (2)**
189:7;205:8
**interest (7)**
223:8,11,18,23;224:1,
5,8
**interests (2)**
225:6,18
**interim (1)**
194:23
**interruption (2)**
216:11;219:4
**into (10)**
192:23;196:22;197:5,
8;203:15;204:1;206:25;
214:3,6;226:25
**invest (3)**
224:17,24;225:2
**invested (2)**
224:17,18
**investments (1)**
225:13
**issue (2)**
229:19,21
**items (1)**
195:13
**iterations (1)**
209:20
**IV (3)**
224:9,11,25
**Ivy (3)**
195:23,25;197:13

**J**

**judge (2)**
185:22;215:21
**judgment (2)**
205:6,23
**July (1)**
185:2
**June (5)**
198:22;209:2,9,14;
228:23

**K**

**keep (4)**
210:14;215:3;216:13,
22
**kids (1)**
205:25
**kind (3)**
197:19;201:11;209:19
**knew (3)**
208:16,18;209:2
**knowing (1)**
207:13
**knowledge (15)**
192:20;193:4,5;
199:23,24;200:2;204:12,

13;205:3;208:14;
218:12,22;219:2;
223:21;228:21

**L**

**laptop (2)**
210:11,12
**last (10)**
185:24;194:2,5,8;
201:9,11,22;228:9,14,20
**lawsuit (1)**
204:9
**lawyer (2)**
187:24;189:10
**lay (9)**
204:3;211:13;212:10;
213:17;217:12;224:13,
22;226:19;229:5
**League (3)**
195:23,25;197:13
**least (1)**
216:10
**leave (1)**
185:15
**leaves (2)**
216:5;221:24
**left (1)**
194:9
**legal (27)**
188:1,1,6;193:13,14;
204:2,3;208:11,12,13;
211:12,13;212:9,10;
213:16,17,21;217:11,12;
224:12,12,21,22;226:18,
19;229:4,5
**letter (3)**
218:8,23;219:1
**Limited (13)**
207:3,8,13,14;208:17,
20;209:4;211:5;225:19;
226:4,8,16,17
**listed (2)**
202:6;217:15
**little (1)**
194:7
**LLC (8)**
195:23;196:1;197:13;
219:20,24;223:8,18;
227:13
**long (2)**
215:18;216:2
**look (16)**
186:15;192:1;197:15;
201:3,4,16;203:15;
206:5;217:22;218:17;
219:7;220:15;221:3,17;
222:4,9
**looked (3)**
186:22;210:22;226:25
**Looking (5)**
192:22;202:23;
210:25;221:23;228:22

**looks (7)**
201:21,25;202:2;
206:14;219:19;225:21;
227:18
**losing (1)**
189:22
**LP (22)**
195:18,21;196:7,16,
19;197:2,5,8,11;198:25;
199:14;200:3;201:2,7,
12;223:23;224:6,9,11,
25;225:2;227:13

**M**

**Makes (1)**
188:1
**making (1)**
199:14
**managing (1)**
219:23
**many (1)**
214:20
**mark (8)**
186:10;215:23,24,25;
216:9,10,15;217:21
**marked (12)**
186:13;197:15,21;
201:16;216:17;217:22,
23;218:18;219:5;
220:15,17;221:1
**may (3)**
187:24;192:14;200:2
**maybe (1)**
216:9
**mean (3)**
209:25;215:24;226:10
**meet (3)**
188:21;189:13;229:20
**meeting (1)**
185:16
**member (5)**
219:23;220:3,7,10,11
**members (3)**
220:1,2,5
**membership (3)**
223:7,11,17
**middle (1)**
210:1
**might (1)**
189:3
**mind (3)**
205:19,21;215:4
**minute (1)**
189:13
**minutes (2)**
214:19;215:17
**mistake (1)**
229:13
**Mm-hmm (4)**
203:1;220:14;223:10,
25
**moment (2)**

189:14;214:18
**MONETTE (2)**
185:7;186:11
**money (3)**
224:19;226:10,13
**months (1)**
201:9
**more (4)**
186:8;191:11;194:24;
209:23
**move (3)**
187:19;207:18;211:23
**much (1)**
189:21
**myself (1)**
217:6

**N**

**name (3)**
225:8,10,13
**natural (1)**
195:6
**need (1)**
221:19
**needed (2)**
195:8;209:23
**needs (1)**
229:19
**neurological (1)**
228:20
**nicknames (1)**
196:3
**nonresponsive (2)**
207:19;211:24
**notary (1)**
206:23
**notary's (1)**
206:22
**note (16)**
187:16;193:17,20,22;
199:15,20,21,25;200:3;
206:16;211:7,10,19;
212:8;213:4;214:2
**notes (4)**
214:3,6,7,11
**Notice (3)**
185:1;219:12;220:12
**noticed (1)**
201:5
**Notices (1)**
194:16
**Number (16)**
192:6,9,12,17,22;
197:23,24;198:4,5,7,15,
16,20;206:6;212:14;
214:19
**Numbers (8)**
186:19;197:16,19,22;
198:13,17,17;201:17

**O**

**o0o- (1)**
185:11
**object (5)**
187:17;188:14;190:6;
204:19,21
**objecting (1)**
187:18
**objection (8)**
187:18;188:4;189:3,6;
200:16,21;205:8;211:3
**objections (1)**
188:3
**obtain (10)**
188:12;190:9,15;
191:14;196:24;211:9;
212:7;213:23;214:9,10
**Off (6)**
186:5;189:15;191:12;
214:13,15;229:17
**office (2)**
206:22;210:6
**older (1)**
209:25
**once (1)**
195:6
**one (8)**
185:15;187:11;201:9,
10,14;204:14;220:7,11
**one-hour (1)**
195:11
**ones (1)**
225:10
**ongoing (1)**
209:7
**only (5)**
195:3,5;215:18,22;
220:3
**opinion (10)**
193:14;204:3;211:12;
212:9;213:16;217:12;
224:12,21;226:18;229:4
**opportunity (2)**
187:17;214:24
**order (5)**
188:9;214:9;215:23;
216:1,1
**orders (1)**
185:22
**ordinary (1)**
216:23
**originally (2)**
225:7,10
**originals (3)**
216:4,6,13
**ostensible (2)**
214:21,22
**ought (1)**
215:25
**out (2)**
194:18;216:6
**over (5)**
191:3;196:23;215:20;
221:25;229:20

**overall (4)**
207:16;209:7;211:21;
226:2
**own (5)**
217:6,16;223:13;
224:1,8
**owned (4)**
217:5;223:17;224:5;
225:25

**P**

**package (5)**
209:19;210:3,8,25;
211:2
**page (10)**
198:17,20;199:1;
200:8,19;201:24;206:7;
212:15;219:18;222:6
**pages (1)**
194:25
**part (10)**
188:1,2;193:14;198:8;
205:21;207:16;209:6;
222:2;223:5;226:2
**partner (9)**
207:2,5,7,12,14,14;
208:16,20;209:3
**Partnership (12)**
207:3,8,13;208:12,21;
211:6;225:19;226:4,8,
16,17,23
**partnerships (1)**
209:5
**pay (3)**
211:6,18;214:9
**payee (1)**
214:7
**payment (3)**
211:9;214:10,13
**payments (12)**
194:1,4;199:1,14;
200:7,19;211:19;212:7;
213:3,7,14;215:9
**people (2)**
187:23;188:8
**period (1)**
195:12
**person (4)**
188:12;189:11;195:6;
224:16
**personal (2)**
192:25;193:12
**pertaining (1)**
196:19
**pertinent (1)**
187:24
**place (2)**
188:24;200:9
**Plaintiff (1)**
185:8
**planning (18)**
202:12,18;207:1,16;

209:7,9,13,17,23;
211:21;213:22;223:1,6;
226:2,5,9;227:14;229:10
**please (15)**
186:15;189:23;
197:15;201:16;206:5;
207:20;212:1,13;
217:22;218:17;219:7;
220:15;221:3;222:4,9
**point (5)**
220:4,6,7,11;227:7
**Pook (28)**
195:17,20;196:3,7,15,
19;197:2,5,8,10;198:25;
199:14,17;200:3;201:1,
6,12;207:3,7;208:16,20;
209:4;211:5;225:19;
226:3,4,7,16
**possession (8)**
187:8;193:2,7;194:11;
195:4,9;201:7;228:8
**possibly (1)**
215:16
**postnuptial (2)**
192:23;193:10
**practice (3)**
207:11;208:1,13
**pregnant (1)**
209:22
**prenuptial (2)**
192:23;193:10
**prepare (1)**
202:3
**prepared (6)**
202:9,11,12;206:18;
212:20;222:21
**presented (4)**
196:16;204:15;
206:18;212:22
**previous (2)**
194:16;220:10
**previously (2)**
217:5;222:5
**prior (4)**
199:19;208:19;209:9;
220:5
**privilege (8)**
187:19;188:17,17;
190:8;191:1;204:20,20;
211:4
**privileges (1)**
196:23
**probably (2)**
209:24;212:24
**problem (3)**
189:1;216:3;228:20
**Produce (3)**
186:11;194:15;195:3
**produced (12)**
186:7;193:1;194:11,
25;195:3;215:13;
217:25;218:20;219:9;
220:20;221:4;222:5

Case: 12-0314 Sup Exhibit D - 34 to Hearing and Deposition Transcripts 3:51 D-18 of 228
of 43

**promissory (16)**
193:17,20;199:15,20,
21,25;200:3;206:16;
211:7,10,19,19;212:8;
213:4;214:2,10
**properties (4)**
203:12,13,16,21
**property (11)**
192:25;193:12;217:9,
10,15;218:6,15;219:2;
221:12;224:19,20
**provide (3)**
189:11;190:4;196:18
**provided (1)**
196:25
**providing (1)**
229:22
**pull (1)**
216:6
**purchased (1)**
225:14
**purpose (4)**
195:7;214:22;226:7;
229:22
**purposes (6)**
202:13,18;223:1;
226:9;227:15;229:10
**pursuant (1)**
185:1
**put (2)**
197:5,8
**putting (2)**
206:25;226:10

**Q**

**Question's (3)**
186:25;207:23;224:13

**R**

**Rainforest (22)**
197:4;198:23;199:4,
10,16,20,21,25;200:4,7;
201:1;206:17;211:7,10,
19;212:8;213:4,8,14;
215:9;223:8,18
**read (6)**
189:25;191:5;207:20,
21;212:3,4
**ready (1)**
189:17
**real (3)**
192:25;193:11;203:21
**really (5)**
196:22;226:23,24,25,
25
**reappear (1)**
229:15
**re-ask (2)**
189:23;212:1
**reason (8)**
194:2;196:11;200:6,

14,18;204:14;205:5,22
**reasons (1)**
206:2
**recall (16)**
193:9,24;197:9;200:5;
203:19;204:8;206:21;
209:1,15;213:3,6;
214:13;219:17;221:9;
222:21;223:15
**receive (9)**
191:17;197:4,7;
198:22;211:18;218:14;
219:15;221:7;223:11
**received (7)**
198:25;199:3,6;204:6;
213:7;218:23;220:22
**receiving (7)**
203:16;212:7;213:3,
13;214:13,17;215:9
**recently (1)**
201:10
**recollection (7)**
199:12;214:8,12,16;
215:8,11;222:18
**record (13)**
186:3,5,6;187:16;
189:15,16,21;191:12,13;
214:14,15;222:2;229:17
**refer (4)**
197:23;198:1,12,17
**refers (2)**
223:7;228:22
**reflect (1)**
186:6
**reflected (4)**
199:1;200:19;203:8;
211:10
**relate (3)**
219:1;221:12;228:6
**relates (2)**
218:6;220:13
**relating (4)**
187:2;192:24;193:11;
196:15
**remaining (2)**
221:16;229:19
**remarking (1)**
197:18
**remember (39)**
193:23,25;194:3;
199:15,17;201:23;
202:22;203:6,10,14;
206:20;207:4;208:18;
209:11,19;210:24;
212:19,24,25;213:2,6,
11;217:20;218:16;
222:20;224:7,10,23;
225:1,5,11;227:7,10,23,
25;228:2,5,11,13
**REMEMBERED (1)**
185:1
**Renotice (1)**
186:10

**rephrase (5)**
204:4;207:22,25;
212:5;229:6
**Reporter (13)**
185:5;186:10;189:20,
24,25;191:5;207:21;
212:2,3;215:23;216:8,
11;219:4
**Request (14)**
186:11,19,23;188:8,
10;190:17;191:22;
192:1,6,9,12,17,22;
211:1
**requested (1)**
189:12
**requests (5)**
187:22;191:16;
192:15,20;194:16
**required (1)**
198:9
**residence (1)**
220:13
**respect (1)**
211:21
**respond (1)**
188:9
**responding (1)**
187:22
**response (3)**
186:2,23;190:16
**responsive (13)**
189:11;190:4,10,25;
191:14;192:6,9,12,16,
17,19;194:15;213:22
**retrieve (1)**
215:6
**review (1)**
203:4
**RICK (1)**
185:4
**right (10)**
198:3;206:10,11;
211:9,18;212:7;213:13;
214:10,25;215:23
**Roberts (60)**
185:14,18;186:3,25;
187:16,25;188:4,14,25;
189:14;190:6;191:4,7,
10;193:13;194:7,17,22;
195:2,16;196:21;197:18,
25;198:6,11,14,18;
200:10,16,21;204:2,17,
25;205:8;207:9,23;
208:5,23;211:3,12;
212:4,9;213:10,16,24;
214:18;215:7;216:3,14,
24;217:11;221:18,21;
224:12,21;226:18;
228:16,18;229:4,18
**role (3)**
195:20,22,25

**S**

**Same (4)**
200:16,21;205:8,8
**San (5)**
185:3;218:15;221:8,9;
222:17
**Santa (10)**
187:3;217:3,4,10,15;
218:6;219:2;220:13,24;
221:13
**saw (3)**
201:11,22;228:9
**saying (1)**
218:4
**scope (1)**
194:13
**screwed (1)**
219:8
**search (3)**
186:18;210:17,20
**sec (1)**
191:11
**second (1)**
209:21
**seek (2)**
190:9;191:14
**Sell (1)**
219:13
**separate (1)**
224:19
**September (3)**
223:18;224:4,8
**series (1)**
229:25
**session (3)**
194:8,10;216:5
**set (3)**
185:10;195:19;198:2
**several (2)**
209:8,20
**Shorthand (1)**
185:5
**show (4)**
186:3;209:12;221:15;
225:12
**shown (2)**
200:8;225:7
**sign (7)**
206:1,21,24;207:12;
208:1;212:17;222:15
**signature (12)**
201:24,25;202:1,2;
204:15;206:7,10,11,19;
212:15,23;222:6
**signatures (3)**
206:12;222:10,12
**signed (16)**
196:6,15;203:5,18;
206:13,22;208:9,15;
213:4;223:13;224:1;
225:24;227:2,4,5;229:8

**signing (6)**
206:16;208:10,12;
222:18,23;223:3
**sit (4)**
200:6;203:20;227:10,
12
**Snook (27)**
195:17,20;196:3,7,16,
19;197:2,5,8,10;198:25;
199:14;200:3;201:1,6,
12;207:3,8;208:17,20;
209:4;211:5;225:19;
226:3,4,7,16
**software (9)**
209:19;210:3,8,14,19,
21,22,24;211:2
**soliloquy (1)**
215:5
**somebody (1)**
210:23
**someone (2)**
199:17;224:17
**son (2)**
209:18,21
**son's (2)**
209:25;210:1
**sorry (3)**
198:6;212:4;229:12
**source (1)**
205:5
**sources (4)**
191:17,19,21;196:24
**speak (3)**
190:23
**speculation (4)**
200:10,22;208:7;
213:10
**split (1)**
214:2
**spousal (5)**
187:18;188:17;190:7;
204:20;211:4
**stamps (1)**
189:21
**stands (2)**
189:6,7
**start (1)**
216:8
**started (2)**
209:17,18
**State (1)**
185:5
**stated (1)**
206:2
**STEPHENS (10)**
185:7,13;186:7,11,15;
189:8,17;216:19;
221:24;229:18
**Stephens-Wescott (2)**
227:16,19
**still (3)**
188:5;210:12,15
**stipulated (1)**

---

Case: 12-03140 Sup. Doc Exhibit D - 34th Hearing and Deposition Transcripts 3:51 D-19 Page 228 of 43

198:8
**Street (2)**
185:3;210:4
**strike (4)**
187:19;207:18;
211:23;214:3
**structure (1)**
208:11
**subpoena (1)**
186:2
**substance (3)**
188:23;189:2,5
**sued (1)**
204:16
**suggest (1)**
215:22
**Suite (1)**
185:3
**suppose (2)**
216:4,4
**supposedly (1)**
214:21
**Sure (6)**
189:14;199:18;201:8,
15;220:8;225:3
**Sutter (1)**
185:3
**sworn (1)**
185:9

**T**

**talk (3)**
214:1,5;229:14
**testified (1)**
185:10
**That'd (1)**
216:14
**thereupon (1)**
185:9
**thick (1)**
186:9
**third (2)**
209:22;219:18
**though (1)**
226:17
**thought (2)**
194:8;211:20
**three (10)**
201:9;205:25;207:17;
209:13,25;210:1,1,1;
214:3,6
**three-page (1)**
220:19
**today (29)**
185:16;186:1,16;
187:14;192:5,8,11,16;
196:9,20;200:7;201:22;
203:20;208:19;209:1;
210:18,21;214:23;215:2,
13;216:20;218:1,21;
219:9;220:20;221:5;
227:11,12;229:13

**told (3)**
194:19;196:23;207:9
**took (6)**
188:24;194:23;
203:12,12,22,23
**top (1)**
216:4
**transcript (1)**
198:9
**transfer (2)**
197:1;200:25
**transferred (1)**
225:18
**transferring (2)**
211:6;225:24
**transfers (1)**
199:9
**transmutation (3)**
187:5;203:17,22
**tried (1)**
196:24
**true (2)**
225:6,9
**truncating (1)**
185:19
**trust (18)**
195:19;207:1;219:13;
226:17,24;227:13,14,16,
19,20,21,24;228:1,4,4,7,
23;229:2
**trustee (1)**
227:24
**try (2)**
191:7;215:5
**trying (1)**
194:12
**turn (1)**
212:13
**turned (1)**
214:6
**two (6)**
194:16;202:23;
204:22;214:6;228:15,20
**type (1)**
224:15

**U**

**under (13)**
203:16,22;205:25;
207:15;208:10;213:8,
13;219:13;222:25;
227:5;229:9,12,15
**understood (1)**
227:6
**unfortunately (2)**
189:5;215:14
**up (4)**
185:21;195:19;
215:25;219:8
**use (2)**
196:4;210:23
**used (2)**

210:3,5
**using (1)**
209:18
**usually (1)**
201:3

**V**

**vague (4)**
186:25;200:22;
216:24;224:13
**valid (2)**
200:12,15
**valuations (1)**
203:8
**value (4)**
204:6;212:6;213:13;
223:2
**vehicle (1)**
226:5
**Ventures (2)**
223:23;224:6
**vex (3)**
207:24;208:6;228:16

**W**

**wait (1)**
185:25
**way (8)**
185:19;189:3,4;
198:13;208:11,12,13;
215:14
**WEIL (27)**
197:16;198:5,6,7,16,
20;199:1;200:8;201:17;
206:6;212:13,15;222:4,
6,9,12,19;223:4,7,14,24;
225:7,24;227:3;228:22;
229:2,8
**welcome (2)**
195:16;198:11
**Wescott (2)**
199:22;217:14
**Wescott-Stephens (4)**
227:20;228:4,7,23
**what's (5)**
197:15;201:16;
217:22;220:15;226:20
**Whereupon (7)**
186:13;216:17;
217:23;218:18;219:5;
220:17;221:1
**whole (2)**
196:23;229:25
**who's (1)**
228:3
**whose (2)**
202:1;206:10
**Wiel (19)**
193:17,19,22;194:1,4;
197:7,16;198:8,15;
199:7,13;201:17,19;

206:5;214:1,5,9;215:9;
222:5
**Wiel's (1)**
194:23
**wire (2)**
199:9;200:25
**wishes (1)**
221:25
**within (3)**
194:11;195:4,9
**without (2)**
189:8;227:3
**witness (29)**
185:8;187:2;189:13;
190:1;191:2;193:15;
200:11,17;204:3,23;
205:2,9;208:9;211:13;
212:10;213:11,17,18,25;
217:2,12,13;221:6;
224:13,15,22,23;226:19;
229:5
**work (2)**
210:7,10
**worked (1)**
210:11
**working (1)**
209:24
**works (1)**
197:20

**Y**

**year (2)**
224:24;225:4
**years (8)**
194:2,5;207:17;209:8,
13;210:2;228:15,20

**Z**

**ZEFF (78)**
185:13;186:6,15;
187:4,21;188:3,5,21;
189:8,16,20;190:3,9;
191:6,9,13;193:16;
194:14,18,23;195:15,17;
197:1,21;198:5,10,12,
16,19;200:13,18,23;
204:4;205:4,12;207:11,
18,22,25;208:15,24;
211:5,14,23;212:5,11;
213:12,19;214:1,16;
215:4,8,12;216:7,12,15,
19;217:4,14,21,25;
218:17,20;219:7;
220:19;221:3,7,15,19,
22,24;224:16,24;226:20;
228:17,19;229:6,14

Case: 12-03148 Doc# 75-4 Filed: 06/16/14 Entered: 06/16/14 13:51:46 Page 20 of 23
Sup. Exhibit D - 34th Hearing and Deposition Transcripts D-20 of 228
of 43

*CERTIFIED TRANSCRIPT OF:*

**In Re: Matter of Wescott**

**12-30143 DM**

**TRANSCRIPTION 341 MEETING RE: WESTCOTT 03/21/12**
**Volume 1**

**Job Date: 10/18/2012**

**Reported by: Christine Goodin**



**117 Paul Drive, Suite A**
**San Rafael, CA 94903-2010**

**Main Office: 415-472-2361  Fax: 415-472-2371**
**depos@westcoastreporters.com    www.westcoastreporters.com**

Page 1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

In Re:
CARL ALEXANDER WESCOTT, and
MONNETTE ROSEMARY STEPHENS,
    Debtors.          No. 12-30143
_____/

TRANSCRIPT OF AUDIO RECORDING OF 341 MEETING
March 21, 2012

TRANSCRIBED BY: CHRISTINE GOODIN

WEST COAST REPORTERS
117 PAUL DRIVE, SUITE A
SAN RAFAEL, CALIFORNIA 94903
1 (800) 979-2361 * 1 (415) 472-2361

Page 2

1        --oOo--
2        THE TRUSTEE: We are back on the record in the
3   case of Stephens and Wescott. This is Case Number 12
4   dash 30143. My name is Janina Hoskins. I am the
5   Chapter 7 Trustee. The Debtors were previously sworn in
6   in the original 341 meeting room.
7        And would you each, please, state your name
8   again for the record. Starting with you, ma'am.
9        MS. STEPHENS: Monnette Rosemary Stephens.
10       THE TRUSTEE: And your name?
11       MR. WESCOTT: Carl Alexander Wescott.
12       THE TRUSTEE: As Debtors do you understand you
13  are testifying under penalty of perjury this morning?
14       MR. WESCOTT: That's correct.
15       MS. STEPHENS: Yes.
16       THE TRUSTEE: My counsel, Ms. Barnier -- and I
17  have a CPA present, through Mr. Wade -- they will be
18  asking questions. You are obligated to respond to their
19  questions to the best of your ability. If you need to
20  ask questions of the counsel, you do have the ability to
21  do that, but we will have the ability to make note of
22  that on the record.
23       We do have creditors present, and you are
24  obligated to respond to their questions as well.
25       To the extent that we need a continued date for

Page 3

1   any reason in this matter, Ms. Barnier has my authority
2   to continue this Examination to my next calendar date,
3   which is April 4th, and I will allow her to determine
4   what time works best for everyone.
5        All right. And I will be in the next room if
6   there are any issues. Thank you.
7        MS. BARNIER: Thank you.
8        Good morning, Mr. Wescott.
9        MR. WESCOTT: Good morning.
10       MS. BARNIER: You testified earlier that you
11  met with your attorney in Honduras last week. What is
12  the name of your attorney in Honduras?
13       MR. WESCOTT: Gary Araujo.
14       MS. BARNIER: Could you please spell that last
15  name?
16       MR. WESCOTT: It is A-R-A-U-J-O, I believe.
17       MS. BARNIER: And what is his address?
18       MR. WESCOTT: I don't know.
19       MS. BARNIER: Do you have that information?
20       MR. WESCOTT: No.
21       MS. BARNIER: Well, how did you know where to
22  meet him, if you don't know his address?
23       MR. WESCOTT: Cell phone.
24       MS. BARNIER: He has a cell phone?
25       MR. WESCOTT: Yeah.

Page 4

1        MS. BARNIER: What is his cell phone?
2        MR. WESCOTT: I don't know.
3        MS. BARNIER: Do you have that information?
4        MR. WESCOTT: I do.
5        MS. BARNIER: Can you provide that information?
6        MR. WESCOTT: Obviously, yes.
7        MS. BARNIER: Okay. I am going to advise you
8   right now that we can make this go smoothly or more
9   difficult. I don't really appreciate somebody who is
10  not going to be helpful in this. And perhaps your
11  counsel has advised you that as a debtor, you have a
12  duty to assist the Trustee, her attorney, and her
13  accountant in answering and providing all information.
14  So let's --
15       MR. WESCOTT: Sure. I don't have his phone
16  number memorized.
17       MS. BARNIER: Okay. But you do have that
18  available and you can provide that.
19       Can I get that by tomorrow?
20       MR. WESCOTT: Sure.
21       MS. BARNIER: So your counsel, you are going to
22  e-mail me that cell phone number?
23       MR. ISON: I will. Do you have an e-mail
24  address?
25       MS. BARNIER: It is on all the papers but I

Case: 12-30143  Doc Exhibit D - 341 Hearing and Deposition Transcript 13:51  D-22 of 228
of 43

Page 5

1  will send it to you again.
2       What city is he located in.
3       MR. WESCOTT: San Pedro Sua.
4       MS. BARNIER: How much was your air fare to
5  Honduras?
6       MR. WESCOTT: I think it was something like 800
7  dollars. But, again, it was mostly flight credits that
8  we used to pay for it.
9       MS. BARNIER: So when you filed your case, you
10 claimed that you only had -- according to your
11 schedules -- approximately 25 dollars in your checking
12 account. Where did you get the cash to pay for the
13 hotel?
14      MR. WESCOTT: I am not sure, exactly. In other
15 words, cash is something that is commingled. We had
16 some cash listed at the time of our bankruptcy filing.
17      MS. BARNIER: So that was the cash that you
18 used to pay for it?
19      MR. WESCOTT: I'm not sure, because cash
20 between it is commingled, it is not something that where
21 I can verify that one dollar went to any particular
22 place.
23      MS. BARNIER: Not my question, sir. Let me ask
24 it one more time. Perhaps I am not being clear. Where
25 did you obtain the cash to pay for the hotel? You

Page 6

1  listed that you had less than a thousand dollars in your
2  account.
3       MR. WESCOTT: Yeah.
4       MS. BARNIER: Where did you get the cash to pay
5  for the hotel?
6       MR. WESCOTT: Well, it is also possible -- we
7  actually sold our vehicle before we filed our -- we had
8  a car, and so it is possible --
9       MS. STEPHENS: Should I --
10      MR. WESCOTT: I'm not sure exactly.
11      MS. BARNIER: Let's back up. You just heard
12 the Trustee ask you if there was any information you had
13 to change, and now you are informing me that you sold a
14 car. You did not tell her that.
15      MR. WESCOTT: It was sold before the filing.
16      MS. BARNIER: Your counsel looks a little
17 surprised by that information. But let's keep going.
18      MR. ISON: I disagree with your --
19      MS. BARNIER: Okay. So you sold a car. You
20 sold one car?
21      MR. WESCOTT: It was actually a company car.
22      MS. STEPHENS: No.
23      MS. BARNIER: Who owned the car?
24      MS. STEPHENS: It was Atlas Consulting.
25      MS. BARNIER: Atlas Consulting and they were on

Page 7

1  the pink slip?
2       MS. STEPHENS: Yeah.
3       MS. BARNIER: Who is the shareholders in Atlas
4  Consulting?
5       MS. STEPHENS: Myself and my father.
6       MS. BARNIER: Just you and your father. And
7  your father's name?
8       MS. STEPHENS: Austin Stevens.
9       MS. BARNIER: What type of car was it?
10      MS. STEPHENS: It was a BMW X5.
11      MS. BARNIER: How many miles?
12      MS. STEPHENS: Like, 69 or something, close to
13 70,000 miles.
14      MS. BARNIER: What year was it?
15      MS. STEPHENS: It was a 2000 and -- I'm not
16 sure -- six, I think. Or 2007.
17      MS. BARNIER: Who drove the car?
18      MS. STEPHENS: I did.
19      MS. BARNIER: Is it the only vehicle that the
20 two of you owned and operated?
21      MS. STEPHENS: Well, my husband had a car, but
22 it has been impounded, and it has not been -- he has not
23 driven it since last November.
24      MR. WESCOTT: Last November.
25      MS. BARNIER: Last November. Let me ask, just

Page 8

1  so you understand. This is likely that this will
2  transcribed. So just as if we had a Court Reporter
3  here, please don't try to talk over each other, and I
4  will try hard not to interrupt you also while we're
5  asking questions.
6       So, who bought the car?
7       MS. STEPHENS: My company bought the car.
8       MS. BARNIER: No. I am sorry. When you sold
9  the car just last week, who bought the car?
10      MS. STEPHENS: It was not just last week, this
11 was in January, I think, and it was sold to a
12 dealership, or whatever. It was traded in, and I traded
13 it in for a lease for a car that I am driving that is
14 owned by my business.
15      MR. WESCOTT: Or leased by the business.
16      MS. STEPHENS: That's leased by the business.
17      MS. BARNIER: And that's Atlas Company?
18      MS. STEPHENS: Atlas Consulting.
19      MS. BARNIER: Atlas Consulting. I'm sorry. Is
20 that a corporation registered in California?
21      MS. STEPHENS: Uh-huh, it is an LLC, and I do
22 different types of consulting around technology
23 companies. I've been trying to get -- we have three
24 kids that are two, four, and six. And as part of our
25 financial problems, I have tried to go back to work. I

Case: 12-0314  Sup Doc Exhibit D - 341 Hearing and Deposition Transcripts 3:51  D-23 of 228
of 43

Page 9

1 was able to work last summer for a month and a half, I
2 got a project, and then I have been looking for work
3 since then.
4     MS. BARNIER: What did the dealership offer you
5 for the trade-in on the 2007 BMW?
6     MS. STEPHENS: It was about 20,000 dollars.
7     MS. BARNIER: And, sir, you just stated that
8 your car was impounded. Why was your car impounded?
9     MR. WESCOTT: It was impounded because I was
10 driving on a suspended driver's license. That was in
11 November. I believe it was the 17th, somewhere around
12 there.
13     MS. BARNIER: Where is the car today?
14     MR. WESCOTT: It is still impounded.
15     MS. BARNIER: That's not my question.
16     MR. WESCOTT: It is Soladad, California, or
17 King City, somewhere around there. I think it is King
18 City.
19     MS. BARNIER: What type of car is it?
20     MR. WESCOTT: It is a 2002 Mercedes ML 320, I
21 believe.
22     MS. BARNIER: What do you think the value is?
23     MR. WESCOTT: Probably five grand. It has been
24 racking up 50 dollars a day of storage since November
25 17, so the current value to get it out is basically

Page 10

1 zero.
2     MS. BARNIER: So how did you get here today?
3     MR. WESCOTT: We drove.
4     MS. STEPHENS: We drove.
5     MS. BARNIER: You drove in the leased vehicle?
6     MS. STEPHENS: Yeah, in the leased vehicle.
7     MS. BARNIER: Is that the only vehicle at your
8 home in San Francisco right now?
9     MS. STEPHENS: It is the only vehicle we have
10 at this point.
11     MR. WESCOTT: It is actually here, not at our
12 home. We parked it a block away.
13     MS. BARNIER: You -- the Trustee asked you a
14 number of questions about the documents, and I have a
15 question for you. Since you, your attorney chose to do
16 them a little bit differently, I have to --
17     MS. STEPHENS: Can I ask you a question? How
18 are they different than normal? Like, I have never been
19 through this, and I thought we were just filling things
20 out. We went onto the website.
21     MS. BARNIER: Right. We will go through it.
22 This is why it is going to take a while to do it.
23     MS. STEPHENS: Okay.
24     MS. BARNIER: Unfortunately.
25     So did you remember seeing this document?

Page 11

1     MR. WESCOTT: Yes.
2     MS. BARNIER: Ma'am, did you remember seeing
3 this?
4     MR. WESCOTT: I can pull it up so she can see
5 it.
6     MS. STEPHENS: I don't remember. I mean, there
7 were -- and I am being honest.
8     MS. BARNIER: I understand.
9     MS. STEPHENS: I saw so many documents during
10 that time period, that I don't remember seeing this
11 document.
12     MS. BARNIER: Did you sign that document?
13     MS. STEPHENS: I don't know how many documents
14 we signed but we signed a lot of documents. So if we
15 did not sign this document -- I mean, everything that I
16 signed, I believe was provided to you.
17     MS. BARNIER: Okay. That's not my question.
18     MS. STEPHENS: I don't remember signing or not
19 signing this document because I don't remember what I
20 did or didn't sign specifically.
21     MS. BARNIER: Okay. Did your counsel give you
22 a copy of your bankruptcy schedules after you had signed
23 the documents?
24     MS. STEPHENS: Yeah, and I looked through them.
25     MS. BARNIER: That's all I wanted to know if he

Page 12

1 gave you a copy. That's okay.
2     So you don't remember if you signed. When you
3 signed all your documents -- and you are not sure what
4 you signed -- did you sign in the presence of your
5 attorney?
6     MS. STEPHENS: I don't know. We signed them --
7     MS. BARNIER: I'm sorry. That was not my
8 question. Did you sign -- of the documents that you did
9 sign, did you sign them in the presence of your
10 attorney?
11     MS. STEPHENS: No.
12     MS. BARNIER: So where did you sign them?
13     MS. STEPHENS: We signed them in our office at
14 home where we were preparing them.
15     MS. BARNIER: And then after you signed the
16 documents, how did you send them to him?
17     MS. STEPHENS: My husband handled that part of
18 it.
19     MR. WESCOTT: So maybe I should answer.
20     MS. BARNIER: Hold on. It is always easy to
21 just -- we got plenty of time here. Everybody is happy
22 to sit here and listen, so we are all good on this, and
23 there's a reason for my question.
24     So you signed them, and then you gave them to
25 your husband. Is that right?

Case: 12-03145   SupDExhibit D - 341 Hearing and Deposition Transcripts   D-24 of 22B
of 43

Page 13

1    MS. STEPHENS: Yeah.
2         MS. BARNIER: Whatever you signed. And then
3    you had a number of documents, and then you provided
4    them to your attorney. Is that right, sir?
5         MR. WESCOTT: Correct.
6         MS. BARNIER: How did you send them to him?
7         MR. WESCOTT: Most of them, if not all, were by
8    e-mail.
9         MS. BARNIER: Counsel, I'd like to see original
10   signatures. And as you know, under local rules there
11   has to be a signed document. And do you have that in
12   your offices?
13        MR. ISON: I don't have it with me, but I have
14   one.
15        MS. BARNIER: It is in your offices? Could you
16   Fed Ex it to me this afternoon so I can show the court
17   that it was done correctly.
18        MR. ISON: I will Fed Ex them to you tomorrow.
19        MS. BARNIER: Okay. Are you going back to your
20   office this afternoon?
21        MR. ISON: No.
22        MS. BARNIER: So here is also declarations
23   concerning your schedules. Do you remember signing
24   this?
25        MR. WESCOTT: I'm not sure about this one.

Page 14

1    Three six. I think we did sign it as part of a stack of
2    paperwork.
3         MS. BARNIER: You signed it. Do you remember
4    you signed -- you don't remember?
5         MR. WESCOTT: I'm not sure.
6         MS. STEPHENS: I don't remember. All these
7    documents look sort of similar to me.
8         MS. BARNIER: I understand. And this is a
9    statement of financial affairs, and it has a statement
10   of penalty of perjury. Do you remember signing this
11   document?
12        MR. WESCOTT: I remember signing I think that
13   one.
14        MS. BARNIER: This is attached, this all of it.
15   It goes with it. That's why we -- but you remember
16   signing this one?
17        MR. WESCOTT: I signed that document.
18        MS. BARNIER: Ma'am?
19        MS. STEPHENS: I don't remember.
20        MS. BARNIER: Okay. You did not file a Form
21   B22. Why not?
22        MR. WESCOTT: Is that the one which is the
23   means test versus consumer --
24        MS. BARNIER: It is.
25        MR. WESCOTT: I think on the original, in

Page 15

1    December, we filled it out, but I believe -- correct me
2    if I am wrong -- our debts were not primarily consumer
3    debts. We, I have a lot of mostly business related
4    debts, so I believe it did not apply.
5         MS. BARNIER: That was in December. When you
6    refiled in January with your wife, are you testifying
7    today that your debts are primarily business debts?
8         MR. WESCOTT: Absolutely.
9         MS. BARNIER: Thank you. Ma'am, is that the
10   same for you too, that your debts are primarily business
11   debts?
12        MS. STEPHENS: I do have some consumer debt.
13   We had some credit cards that were consumer debt that we
14   listed as part of that. But I believe the bulk of our
15   debts is his business debts.
16        MS. BARNIER: His business debts. Okay.
17        MS. STEPHENS: Our -- you know, the -- being a
18   married couple, I think it is community, which is why I
19   ended up having to be involved with this.
20        MS. BARNIER: I understand. How much money did
21   you pay your attorney for filing your bankruptcy?
22        MR. WESCOTT: We did a 2000 dollar retainer.
23        MS. BARNIER: How much have you paid him
24   through today?
25        MR. WESCOTT: That's it.

Page 16

1         MS. BARNIER: Has any other business entity you
2    were associated with paid your attorney?
3         MR. WESCOTT: No.
4         MS. BARNIER: Has anyone on your behalf paid
5    your attorney for your bankruptcy services?
6         MR. WESCOTT: No.
7         MS. BARNIER: You testified earlier, ma'am,
8    that you have three young children. Do you have help
9    that assists you with the three young children?
10        MS. STEPHENS: Not -- we don't have a nanny.
11   We get babysitters when we need a babysitter. So I have
12   a babysitter today with one of the kids. The other two
13   are in school.
14        MS. BARNIER: Mr. Wescott, you set up a trust
15   entitled "the Wescott Stephens Family Trust" in June 4th
16   2010, is that correct?
17        MR. WESCOTT: That's correct. That is the date
18   the documents were actually signed.
19        MS. BARNIER: Did you have a trust prior to
20   that trust?
21        MR. WESCOTT: I don't believe so. We started
22   working on our -- on the various, on all of that
23   planning. I think in 2007, there were a number of
24   different trusts that were formed. I don't know the
25   exact order, but they were all formed approximately the

Case: 12-0314 Sup D Exhibit D - 341 Hearing and Deposition Transcripts 3:51 D-25 of 228
of 43

Page 17

1 same time frame.
2     MS. BARNIER: Why did you select attorneys in
3 Arizona to prepare your trust?
4     MR. WESCOTT: You know, we interviewed a lot of
5 different attorneys, and I talked to a lot of different
6 attorneys, and they, frankly, one of the reasons we
7 chose them was they were willing to finance the -- there
8 were a lot of different reasons, they seemed look a good
9 fit, but most of the attorneys we talked to required
10 big, upfront retainers, and we have been in a major cash
11 crunch for a long period of time.
12     So the Laudnell Company seemed look a good fit
13 and they also were willing to finance.
14     MS. BARNIER: So they -- how much do you owe
15 them?
16     MR. WESCOTT: I think we are current with them
17 or fairly current through last year, at least.
18     MS. BARNIER: That's not my question. How much
19 do you totally owe them for doing the services they
20 provided?
21     MR. WESCOTT: Well, we paid them what was owed
22 for the initial services.
23     MS. BARNIER: How much was that?
24     MR. WESCOTT: I think it was something like
25 20,000 dollars.

Page 18

1     MS. BARNIER: So you paid them 20,000 dollars
2 cash?
3     MR. WESCOTT: No. It was financed over a time.
4 We paid something, a couple thousand a month, something
5 like that.
6     MS. BARNIER: Had you paid off that debt.
7     MR. WESCOTT: We paid off the initial work they
8 did but there's annual maintenance and so on that we
9 have not paid.
10     MS. BARNIER: How much do you owe them as of
11 today?
12     MR. WESCOTT: I'm not sure. It is a
13 relatively, I don't know.
14     MS. BARNIER: Less than 500 dollars.
15     MR. WESCOTT: We could ask them. We can find
16 out if you really want to know.
17     MS. BARNIER: Yeah. I'd like to know how much
18 they are owed.
19     Then did you pay them by checks? Did you write
20 a check to them every month to pay them?
21     MR. WESCOTT: You know, I think we mostly did
22 it -- it varied. Sometimes there were credit card
23 payments. Sometimes we wrote a check. Sometimes it was
24 cashier's check. There were many, many monthly
25 payments.

Page 19

1     MS. BARNIER: So that was in 2010, so you paid
2 them off in a year?
3     MR. WESCOTT: Something like that.
4     MS. BARNIER: What property did you put into
5 the trust?
6     MR. WESCOTT: Well, there were a number of
7 different trusts. I can't -- we have to look at the
8 documents.
9     MS. BARNIER: Let me back up then. So there is
10 other trusts besides the Wescott Stephens Family Trust?
11     MR. WESCOTT: Correct.
12     MS. BARNIER: Could you tell me the names of
13 those trusts?
14     MR. WESCOTT: Let's see. We have the Wescott
15 Stephens Family Trust. I think there is a Pook Snook
16 Duke Trust, but I'm not one hundred percent sure about
17 that. I know there is a Puke Snook Duke limited
18 partnership.
19     MS. STEPHENS: I know there's a limited
20 partnership, I don't know if there's a trust for the
21 Pook Snook Duke. I don't know what was, when was the
22 Wescott Stephens --
23     MR. WESCOTT: We can get that information. I
24 don't have those documents in front of me.
25     MS. BARNIER: To the best of your recollection,

Page 20

1 how many trusts do you have?
2     MR. WESCOTT: No more --
3     MS. STEPHENS: I think we only have two at
4 most.
5     MR. WESCOTT: Something like two.
6     MS. STEPHENS: The Stephens Wescott and then
7 the Pook Snook Duke, but that was a limited partnership
8 for -- you know, when we set up the retirement estate
9 planning for our kids, you know, so that if something
10 happened to our kids, or to us, there would be, you
11 know, someone to take care of the kids and a trustee
12 and, you know, assets.
13     MS. BARNIER: The standard trust -- for your
14 kids. I understand that.
15     MS. STEPHENS: And that we named Pook Snook
16 Duke, and we have Wescott Stephens Family Trust was kind
17 of our family trust. They set up two trusts, or two, I
18 think there were two entities.
19     MS. BARNIER: Okay.
20     MS. STEPHENS: I don't really know what -- I
21 don't remember what --
22     MS. BARNIER: Your husband think there's is
23 three, and you think there is two.
24     Can you e-mail your attorney all the trust
25 information, and then can you provide that to me?

Case: 12-0314 Sup Exhibit D - 341 Hearing and Deposition Transcripts 3:51 D-26 of 228
of 43

Page 21

1   MR. ISON: Yes.
2      MS. BARNIER: So do you remember the name of
3  the other trust?
4      MR. WESCOTT: I think -- again, when I said
5  three, I was thinking including the limited partnership.
6  I believe the name of the limited partnership is the
7  Pook Snook Duke Limited Partnership.
8      MS. BARNIER: Okay. That's one. And the
9  Wescott Stephens Family Trust is one, and you believe
10 there is a third. What is the name of the third?
11     MR. WESCOTT: I'm not sure.
12     MS. STEPHENS: Was there a limited partnership
13 for the Wescott Stephens?
14     MR. WESCOTT: I don't think so.
15     MS. STEPHENS: Okay. There might only be two.
16     MR. WESCOTT: Rather than speculate, why don't
17 we get the information from the attorneys.
18     MS. STEPHENS: I don't remember three.
19     MS. BARNIER: Let's go back to my original
20 question. Which was: For the Wescott Stephens family
21 trust, what did you put into that trust?
22     MS. STEPHENS: What did we -- we put some --
23 unfortunately, a lot of the assets that we had, we were
24 going to set aside for estate planning have been, have
25 gone.

Page 22

1      MS. BARNIER: When you say "gone," what do you
2  mine by gone?
3      MS. STEPHENS: They have -- we had --
4      MR. WESCOTT: We used to own a lot --
5      MS. BARNIER: One at a time.
6      MR. WESCOTT: Just gonna grab a pen.
7      MS. STEPHENS: We owned real estate, and the
8  real estate had debt against it, and when we were not
9  able to pay our debt, we let it go to foreclosure.
10     MS. BARNIER: So you did fund the trust?
11     MS. STEPHENS: Yeah. I think we funded the
12 trust, and I think a lot of the assets are, have been
13 foreclosed on.
14     MS. BARNIER: Can I get a copy of what you
15 funded in -- I believe in your trust it probably is like
16 an Exhibit A is usually how it is done. It could be
17 Exhibit B. I don't know.
18     MR. WESCOTT: Absolutely.
19     MS. BARNIER: So can you get me -- send that to
20 your attorney, and he is going to provide that to me of
21 what is in the Wescott Family Trust.
22     And then, what is in the -- forgive me if I
23 mess up the name of this, the Pook Snook --
24     MS. STEPHENS: Duke. It is our nicknames for
25 our kids.

Page 23

1      MS. BARNIER: What is in that trust?
2      MR. WESCOTT: I think the best thing to do is
3  to send you an e-mail with the information because we
4  cannot remember what is in what.
5      MS. BARNIER: Okay. I don't want you to list
6  for me what you think it is. I would like to see the
7  actual document, just to be very clear. That is what I
8  am expecting to get.
9      MR. WESCOTT: Easy enough.
10     MR. ISON: So you are looking for the document
11 that establishes the trust, including the exhibits
12 listing how it was funded.
13     MS. BARNIER: Right, and all the property that
14 was transferred into it.
15     MR. ISON: Okay.
16     MS. BARNIER: And the document signing saying
17 that this property has now been transferred into the
18 trust. All right.
19     MR. ISON: Right.
20     MS. BARNIER: Because of their foreclosure
21 actions, that always makes it a little more difficult if
22 a property is in a trust to foreclose on. Sometimes.
23     So, to date, in 2012, individually how much
24 money have you earned since January 1st?
25     MR. WESCOTT: Individually.

Page 24

1      MS. BARNIER: Mr. Wescott, just you first. How
2  much money have you earned since January 1st?
3      MR. WESCOTT: I don't think I have earned any
4  money personally.
5      MS. BARNIER: Okay. And you?
6      MS. STEPHENS: I haven't worked since January
7  1st.
8      MS. BARNIER: And how much money have you
9  received from the operation of your businesses?
10     MR. WESCOTT: Since January 1st. I don't think
11 anything either from operation of businesses.
12     MS. BARNIER: And you, ma'am?
13     MS. STEPHENS: I haven't -- I mean, I -- I paid
14 a bunch of bills with the money that we received from
15 the car that we were -- expenses against the business.
16     So I don't -- I haven't, I haven't been
17 working, so all the money that I worked, we had last
18 year we pretty much used last jeer.
19     MS. BARNIER: Let me go back to the sale of the
20 car since you mentioned that. So the dealership gave
21 you 20,000 dollars for the car. Is that right?
22     MS. STEPHENS: Yeah.
23     MS. BARNIER: And then you at the same
24 dealership got a new lease. Is that correct?
25     MS. STEPHENS: Yeah.

Case: 12-0314 Sup Exhibit D - 341 Hearing and Deposition Transcripts 3:51 D-27 of 228
of 43

Page 25

1      MS. BARNIER: What is the payment of your lease
2  on that car?
3      MS. STEPHENS: 736 dollars, and it is actually
4  in my father's name. My father leased the car for us.
5      MR. WESCOTT: Or he cosigned.
6      MS. STEPHENS: He did not cosign. It is in his
7  name.
8      MS. BARNIER: The car is in your father's name?
9      MS. STEPHENS: It is in the business and my
10  father's name.
11      MS. BARNIER: Your name is not on the pink
12  slip?
13      MS. STEPHENS: Huh-uh.
14      MS. BARNIER: I need you to answer audibly.
15      MS. STEPHENS: No, it is not. They would
16  not -- because of, you know, our financial situation,
17  they wouldn't --
18      MS. BARNIER: Who makes the payment on the car?
19      MS. STEPHENS: So far, we have made the payment
20  on the car from the money from the sale of the other
21  car, and as a business expense.
22      MS. BARNIER: How much money do you have left
23  from the sale of the car?
24      MS. STEPHENS: We are -- I think our accounts
25  were down to 16 dollars yesterday. So we have used it

Page 26

1  all. We used the last thousand dollars on my husband's,
2  on some business expenses for travelling.
3      MS. STEPHENS: So you don't have any cash. Is
4  that correct?
5      MS. STEPHENS: I have about 500 dollars cash.
6      MS. BARNIER: You got three kids to feed. How
7  do you plan to --
8      MS. STEPHENS: I have three kids to feed, and
9  my husband says he is going to start bringing in some
10  money, so --
11      MS. BARNIER: Did he tell you how?
12      MS. STEPHENS: I borrowed some money from my
13  father.
14      MS. BARNIER: You borrowed money from your
15  father at this point.
16      MS. STEPHENS: Yeah.
17      MS. BARNIER: Did you ever borrow money from
18  your father before?
19      MS. STEPHENS: Before this year? No.
20      MS. BARNIER: Individually, how much money did
21  you make in 2011?
22      I'll start with your husband. Give you a
23  minute.
24      MR. WESCOTT: Are you talking about personal
25  income?

Page 27

1      MS. BARNIER: Personal income that you made in
2  2011.
3      MR. WESCOTT: There was no income that I made
4  personally working consulting. And I actually don't
5  have the exact number -- obviously, there was money that
6  was taken in by businesses. We have not filed our 2011
7  taxes yet.
8      MS. BARNIER: When do you plan to file those?
9      MR. WESCOTT: Well, we just filed 2009
10  yesterday. We are working on 2010 now. It is my hope
11  that we get that done within a month or so, and then we
12  will move on to 2011.
13      MS. BARNIER: Who is your accountant?
14      MR. WESCOTT: Well, we cannot afford an
15  accountant anymore. We had an accountant named Steve
16  Haggard. He did our taxes through 2008. He is based in
17  Santa Rosa. I do actually have his phone number
18  memorized, if you want it, which is 707 -- actually, I
19  don't. But if you Google him, you will find him. Steve
20  Haggard CPA dot com.
21      MS. BARNIER: Is that H-A-G-G-A-R-T?
22      MS. STEPHENS: A-R-D.
23      MS. BARNIER: K-A-R-D?
24      MS. STEPHENS: A-R-D.
25      MS. BARNIER: You said he is no longer

Page 28

1  preparing your taxes?
2      MR. WESCOTT: Correct.
3      MS. BARNIER: So who is doing them now?
4      MR. WESCOTT: We filed them ourselves using
5  Turbo Tax, the ones we filed yesterday.
6      MS. BARNIER: And you expect to get the 2000
7  taxes on in a month?
8      MR. WESCOTT: 2010?
9      MS. BARNIER: Yes.
10      MR. WESCOTT: I will work diligently to get it
11  done as quickly as possible. And my estimate is that it
12  will take at least four weeks.
13      MS. BARNIER: Counsel, I'd like a copy of those
14  once they are filed of federal and state taxes.
15      And then let's go back to -- so how much money
16  did you earn from your businesses in 2010?
17      MR. WESCOTT: I don't have the exact number.
18  We did have to put a number on our Statement of
19  Financial Affairs Form 7, and we estimated that using
20  help from our bookkeeper. But I don't have that
21  information in front of me.
22      MS. BARNIER: You combined them, is what you
23  did, which is not what the instruction says to do. I
24  don't know why your counsel chose to do it that way, but
25  what it says specifically is "year by year." So you

Case: 12-03145   Sup Exhibit D - 341 Hearing and Deposition Transcript 3:51   D-28 of 228
of 43

Page 29

1 said for a total of the two years you made 949 thousand
2 dollars. So what was the sources of that income?
3     MR. WESCOTT: That was mainly from sales of
4 property.
5     MS. BARNIER: Which properties did you sell?
6     MR. WESCOTT: That was mainly -- I believe that
7 was mainly coming from Rain Forest Capital, selling Via
8 Aventura, we call it.
9     It should be noted that there is a revised
10 Form 7.
11     MS. BARNIER: What do you mean a "revised" Form
12 7?
13     MR. WESCOTT: We provided updated information
14 to our attorney.
15     MS. BARNIER: When did you provide that
16 information?
17     MR. WESCOTT: In early February. Well, we
18 provided a bunch of information between February 2nd and
19 February 19th.
20     MS. BARNIER: So it is six weeks later and we
21 are still dealing with the original schedules. Is that
22 correct? Do you know why they have not been updated?
23     MR. WESCOTT: I don't know.
24     MS. BARNIER: Counsel, you got a reason why
25 they have not been updated in six weeks?

Page 30

1     MR. ISON: Yeah, I had surgery, brain surgery
2 on February 14. I have been at low or no activity, and
3 that's why we kicked over this hearing the first time.
4 My first time out making any appearance is right here
5 right now.
6     MS. BARNIER: Counsel, I am sympathetic but is
7 there a reason you did not transfer this case to another
8 attorney?
9     MR. ISON: First of all, I don't think my
10 clients can afford another attorney. I have been paid a
11 retainer fee for this already. And second of all, I
12 figured -- the original estimate was two to four week of
13 no or low activity. I have had some collateral problem
14 since then.
15     I have an appointment on April 11th. Depending
16 on what the results of the 11th I am either going to
17 stop practicing or I'll be okay.
18     MS. BARNIER: I wish you all the best in that.
19 But it puts the Trustee and her counsel in a difficult
20 position.
21     So given your work schedule now, when do you
22 anticipate will you be filing amended schedules?
23     MR. ISON: I can probably do that within a
24 couple days now. You sent me everything I needed last
25 night, right, so --

Page 31

1     MR. WESCOTT: Early this morning.
2     MS. ISON: Early this morning.
3     MS. BARNIER: I did not see -- so Rain Forest
4 Capital is going to show up on the amended schedules?
5     MR. WESCOTT: Well, it shows up elsewhere. In
6 the amendment we did, we did not know to specifically
7 break down the years, so we just provided a new number.
8     MS. BARNIER: What is your interest in Rain
9 Forest Capital?
10     MR. WESCOTT: We have a membership interest
11 that was originally valued at 200,000 dollars. My
12 estimate of its currents value is basically zero but --
13     MS. BARNIER: Why do you think it is only worth
14 zero today?
15     MR. WESCOTT: Because several different
16 factors. Number 1, Rain Forest Capital never was able
17 to raise the capital it intended to raise for its
18 project. Number 2, Rain Forest Capital has, as I
19 understand it, over five million dollars of debt that
20 would precede any other interest.
21     And there's a bunch of other reasons but those
22 would be two good ones to begin with.
23     MS. BARNIER: So if Rain Forest Capital was in
24 such financial trouble, how were they able to pay you?
25     MR. WESCOTT: Rain Forest Capital was formed

Page 32

1 and funded by someone else as the managing member. His
2 name is Colin Weil.
3     MS. BARNIER: Colin Weil, is that W-H-E-E-L?
4     MR. WESCOTT: W-E-I-L. And I can't tell you
5 exactly how he funded it, but --
6     MS. BARNIER: Was he making the payments to
7 you?
8     MR. WESCOTT: Correct.
9     MS. BARNIER: What were you being paid for?
10     MR. WESCOTT: For the sale of property.
11     MS. BARNIER: And where did you sell property?
12     MR. WESCOTT: It was property in Panama.
13     MS. BARNIER: How much were you owed on the
14 sale of property in Panama?
15     MR. WESCOTT: The total deal that we did was
16 three million dollars. Of that amount, 25 thousand
17 dollars was a credit for attorney fees; 400,000 dollars
18 was payments to be made directly to property holders.
19     So our part of the deal, I believe, was 2.575
20 million.
21     MS. BARNIER: Are you still owed money by Rain
22 Forest Capital?
23     MR. WESCOTT: We are not. We did that deal
24 originally 2007, and started it, and payments were made
25 over time.

Case: 12-0314    Sup. Exhibit D - 341 Hearing and Deposition Transcripts    D-29 of 228
of 43

Page 33

1        MS. BARNIER: So since 2007, they have paid you
2 approximately how much money?
3        MR. WESCOTT: It would have been 2000 --
4 2,575,000. However, since we also borrowed money at the
5 time, we took off the interest that we owed from
6 payments that were made, and so we actually received, I
7 would guess, something like 2.3, 2.4 million over the
8 four years, I guess it would be.
9        MS. BARNIER: Were those proceeds deposited
10 into your personal checking account?
11        MR. WESCOTT: Most of it was wired, and I think
12 most of the original payments came to us personally.
13        MS. BARNIER: The payments went into your
14 personal checking account?
15        MR. WESCOTT: I believe that's the case.
16        MS. BARNIER: Counsel, we are going to need to
17 get copies of bank statements. I know you provided one,
18 but we're going to need copies of bank statements going
19 back through 2008 for all the person --
20        MR. ISON: For all entities, or --
21        MS. BARNIER: We will just start with personal
22 for right now, and then we will go to entities in just a
23 little bit but. Right now let's ask for personal.
24        MR. WESCOTT: There is one issue there. Once
25 we filed bankruptcy, Wells Fargo shut down all our

Page 34

1 accounts, and we do not have any way of obtaining those
2 statements without funding.
3        MS. BARNIER: Do you still have money in the
4 accounts?
5        MR. WESCOTT: No.
6        MS. BARNIER: So there is zero balance?
7        MR. WESCOTT: There is zero. And they won't
8 give us copies of everything without us paying lots of
9 money. So if someone here would like to fund that, we
10 can easily do that.
11        MS. BARNIER: There's actually a way to do it,
12 but we will assist you in that matter.
13        MR. WESCOTT: Great.
14        MS. BARNIER: Without paying for it.
15        MR. WESCOTT: Great. Thank you.
16        MS. BARNIER: My question to you, then, is:
17 Why do you owe Wells Fargo money?
18        MR. WESCOTT: I did not say we owed Wells Fargo
19 money. Actually we owe Wells Fargo -- on the checking
20 accounts, we do not owe them money. At the time of our
21 filing, there was at least one credit card with a
22 balance and in the 30s of thousands. There was a line
23 of credit in the balance of 50,000 something. But the
24 checking accounts, we did not owe money on.
25        MS. BARNIER: What branch did you bank at?

Page 35

1        MR. WESCOTT: We set up the accounts originally
2 at Geary and 19th in 1999. As you know, Wells Fargo is
3 the master of cross-selling, so we had a lot of accounts
4 over time. The one that we went to most frequently was
5 on Haight Street.
6        MS. BARNIER: On Haight Street?
7        MR. WESCOTT: Uh-huh.
8        MS. BARNIER: Do you know the address there?
9        MR. WESCOTT: I don't have it memorized.
10        MS. BARNIER: What is the cross street.
11        MS. STEPHENS: Cole.
12        MR. WESCOTT: Cole or Clayton.
13        MS. BARNIER: Cole or Clayton.
14        You stated you have some rental income. Are
15 you still receiving rental income?
16        MR. WESCOTT: No.
17        MS. BARNIER: Why not?
18        MR. WESCOTT: We don't have properties anymore
19 that we used to rent.
20        MS. STEPHENS: Those properties all went to
21 foreclosure.
22        MS. BARNIER: When did they go to foreclosure?
23        MS. STEPHENS: I'm not sure.
24        MR. WESCOTT: We actually provided a schedule
25 of foreclosures in our filing. But most of them were

Page 36

1 foreclosed in 2010 and 2011. I believe there is one or
2 two that aren't -- other than our house, which obviously
3 we would not get rental income on, I believe there is a
4 couple that were in the final stages recently. I don't
5 know. But we have a little schedule that we provided, I
6 thought isn't that part of the filing --
7        MS. BARNIER: It is an interesting filing, so
8 unfortunately we have to spend a lot of time going
9 through stuff because it was not done --
10        MR. WESCOTT: Okay. We have all the
11 information.
12        MS. BARNIER: So you are not receiving any
13 rental income, and you have not received any since
14 January. Is that correct?
15        MS. STEPHENS: Not to my knowledge. I don't --
16 I never really worked. I mean, we were --
17        MR. WESCOTT: I can answer the question.
18        MS. STEPHENS: Okay.
19        MR. WESCOTT: We have no -- we have received
20 that rental income this year.
21        MS. BARNIER: Does anybody owe you rental
22 income?
23        MR. WESCOTT: Yes.
24        MS. BARNIER: Are people still residing in
25 these properties?

Case: 12-0314 Sup D Exhibit D - 341 Hearing and Deposition Transcripts 3:51 D-30 of 228
of 43

Page 37

1     MR. WESCOTT: No. We mostly lost them to
2 foreclosure, but I believe -- we can look at one of the
3 schedules for the exact number, but I think I was owed
4 over a million dollars by various tenants, and they are
5 listed in my filings.
6     MS. BARNIER: Who is Jim Motter?
7     MR. WESCOTT: Jim Motter is a friend of mine,
8 somebody that I know.
9     MS. BARNIER: And why did you pay Jim Motter,
10 as opposed to all the other creditors you owe?
11    MR. WESCOTT: I think we made a small payment
12 to him. Really, I don't have a good explanation for
13 that, but we owe Jim Motter I think one hundred -- over
14 100,000 dollars.
15    MS. BARNIER: How much did you pay him on his
16 debt?
17    MR. WESCOTT: We used to be paying him 2500
18 dollars every two months.
19    MS. BARNIER: When you say "used to," when was
20 the last date that you paid him that?
21    MR. WESCOTT: We have not made a payment this
22 year, I don't believe. So sometime last year. I think
23 it was listed in the filings the exact date. It might
24 have been October. It is listed in my filings. I don't
25 recall the exact date.

Page 38

1     MS. BARNIER: How much money do you owe your
2 mother?
3     MR. WESCOTT: 70 something thousand,
4 approximately.
5     MS. BARNIER: And you made payments to your
6 mother. Is that right?
7     MR. WESCOTT: I made some payments to my
8 mother, that's correct.
9     MS. BARNIER: In the last two years, how much
10 have you paid your mom?
11    MR. WESCOTT: You want me to just guess?
12    MS. BARNIER: Approximately.
13    MR. WESCOTT: Approximately five thousand
14 dollars, something like that.
15    MS. BARNIER: Now, you have a number of
16 lawsuits that were filed against you, and I just have
17 some quick questions because this is going to -- one of
18 them that was filed by Victor, am I saying his name
19 right?
20    MR. WESCOTT: Victor.
21    MS. BARNIER: It says it was withdrawn.
22    MR. WESCOTT: I believe his attorneys are here.
23    MS. BARNIER: Victor. Thank you.
24    I am going ahead and let you ask some questions
25 right now. This is your client? No?

Page 39

1     UNIDENTIFIED SPEAKER: This is my attorney.
2     MS. BARNIER: Reverse. Sorry. Mr. Victor. If
3 you have questions right now, go ahead, because I'd like
4 to hear a little about this lawsuit and what the status
5 is.
6     UNIDENTIFIED SPEAKER: I don't know that we
7 have any questions about the lawsuit at this point.
8     MS. BARNIER: Do you have questions for the
9 Debtor?
10    UNIDENTIFIED SPEAKER: I have a lot of
11 questions for the debtor, but they about the schedules.
12    MS. BARNIER: You want me to keep going? I
13 will keep going. All right.
14    So you have a stipulated judgment of a
15 million-four from David Kirk. Is that correct?
16    MR. WESCOTT: That is correct.
17    MS. BARNIER: Okay. And that was in -- did you
18 sign this stipulation in July 2010?
19    MR. WESCOTT: I don't know if it was July, but
20 I think so. When was it, do you remember? July.
21 August.
22    MS. BARNIER: The case was filed in July of
23 2010. Is that right?
24    MR. WESCOTT: Right. It was much more recently
25 that we settled. I think it was more like October,

Page 40

1 November.
2     MS. STEPHENS: Yeah. The last -- in 2011, like
3 the fall. It was like October, November.
4     MR. WESCOTT: Are you the attorneys for
5 Mr. Kirk?
6     UNIDENTIFIED SPEAKER: No.
7     MS. STEPHENS: He is with Victor.
8     MR. WESCOTT: You are as well. Are the
9 attorneys for Mr. Kirk present? No.
10    MS. BARNIER: So as I am looking at the -- are
11 these dates accurate, then, as to what you provided?
12 This is a document that you attached -- Attachment 1 as
13 to lawsuits.
14    MR. WESCOTT: Correct.
15    MS. BARNIER: So it says the filing dates. So
16 did you give your attorney the complaints so that he
17 could prepare the filing dates?
18    MR. WESCOTT: I provided the filing dates, and
19 I took them off the -- well, most of them are in San
20 Francisco Superior Court. I went to the online system
21 and I cut and pasted the dates from San Francisco
22 Superior Court online system into that spreadsheet.
23    MS. BARNIER: Who prepared this document?
24    MR. WESCOTT: I did.
25    MS. BARNIER: Did you review it with your

Case: 12-03141   SupDExhibit-D - 34th Hearing and Deposition Transcripts 3:51 D-31of 228
of 43

Page 41

1 attorney before it was filed?

2      MR. WESCOTT: Well, yes.

3      MS. BARNIER: So you have some cases that were

4 dismissed: A Drilling Citibank, why were those cases

5 dismissed?

6      MR. WESCOTT: I'm not sure. I think they

7 realized that it was fruitless to spend a lot of

8 attorney money pursuing us, since we are bankrupt, and I

9 think they began to realize our financial condition.

10 But that's just mere speculation on my part. You'd have

11 to ask the plaintiffs or their attorneys.

12      MS. BARNIER: You owe an HOA money also. Is

13 that right, what property is that?

14      MR. WESCOTT: I believe that is 555 Fourth

15 Street. I believe there is other HOA moneys that are

16 owed as well, but that is one that I think is five

17 thousand dollars that they —

18      MS. BARNIER: It is in San Francisco?

19      MR. WESCOTT: That's correct.

20      MS. BARNIER: And then Lawnsdale filed in

21 August of 2010, and it does not say what these lawsuits

22 were for.

23      MR. WESCOTT: I'd be happy to give you my take

24 on --

25      MS. BARNIER: What did they say the lawsuit --

Page 42

1 they said, what they are suing you for, what did they

2 say?

3      MR. WESCOTT: Sure. Mr. Lawnsdale, I think it

4 was originally at 375 or 400,000 dollar loan that was

5 made, that some payments were made on, and when we got

6 into our cash crunch we stopped being able to pay most

7 of our obligations. So he is one of many parties that

8 has sued us. Most of the lawsuits are about lack of

9 payments for debt in most cases.

10      MS. BARNIER: Now you have one guarantee you

11 were sued on, and the judgment was entered for Quality

12 Housing Solutions in the amount of a million-three.

13      MR. WESCOTT: Correct.

14      MS. BARNIER: That is for a personal guarantee

15 you signed?

16      MR. WESCOTT: That is correct.

17      MS. BARNIER: Did you sign any other

18 guarantees?

19      MR. WESCOTT: I think so. Yes.

20      MS. BARNIER: Are those listed in your

21 schedules?

22      MR. WESCOTT: Well, I think most of them are,

23 have already -- I think there was, there were guarantees

24 for Mr. Victor, for example. I'd have to think, but I

25 think I signed some other guarantees.

Page 43

1      Oh, real estate loans, I think most of those

2 are non-recourse but there probably are some cases where

3 we signed guarantees. Yes. I signed personal

4 guarantees on a mini storage second on two loans that

5 total 11.5 million dollars that we were more recently

6 served on after the filing, even after we listed this

7 particular set of creditors and their plaintiffs. It is

8 actually Commercial Capital. They are bankrupt as well.

9 They are a Colorado company.

10      So I owe 11.5 million dollars on those

11 guarantees. And if you look through, you will see there

12 is many, many, many tens of millions of dollars that I

13 owed, and there were some personal guarantees involved.

14 Absolutely.

15      MS. BARNIER: Are these all the lawsuits?

16      MR. WESCOTT: Those are all the lawsuits that I

17 am aware of.

18      MS. BARNIER: Did you hire counsel for any of

19 these lawsuits to defend you?

20      MR. WESCOTT: Yes.

21      MS. BARNIER: Who did you hire?

22      MR. WESCOTT: Initially for some of the

23 lawsuits in 2010, we could not, you know, quite honestly

24 afford the best representation. And so we initially

25 hired Noel Knight to represent us, who I don't think did

Page 44

1 a very good job for us in many ways.

2      MS. BARNIER: Is that --

3      MR. WESCOTT: K-N-I-G-H-T. He is based in

4 Oakland. I don't know his phone number by heart.

5      MS. BARNIER: Okay. Which cases did he

6 represent you on?

7      MR. WESCOTT: I think initially on Victor,

8 Lawnsdale, Kirk, and there might be one more.

9      UNIDENTIFIED SPEAKER: Quality Housing.

10      MR. WESCOTT: That's true. Thank you. And I

11 assume that you are the attorney for Quality Housing.

12      UNIDENTIFIED SPEAKER: I am.

13      MS. BARNIER: Now, your Statement of Financial

14 Affairs, did you prepare this document?

15      MR. WESCOTT: I did.

16      MS. BARNIER: Why didn't your attorney prepare

17 this document?

18      MR. WESCOTT: Well, I was -- we have a very

19 complicated set of financial affairs, as you have seen.

20 So essentially it was my job to try and amass all of the

21 information to provide for him so that we can make this

22 filing, since he does not know all the details. He

23 knows a lot now, but at the beginning of this process I

24 am probably the person that knows the most about the

25 various and sundry affairs.

Case: 12-0314 Sup Exhibit D - 341 Hearing and Deposition Transcripts 3:51 D-32 of 228
of 43

**Page 45**

1    MS. BARNIER: So you are the reason we all get
2  to sit here and go through so slowly instead of using
3  the bankruptcy forms, you created your own. Okay.
4        MR. WESCOTT: Well, we have -- in many cases,
5  what we had did not fit on the forms.
6        MS. BARNIER: Actually, big secret: These
7  forms expand, and -- but you have to have the software
8  to do it, which I doubt you would.
9        MR. WESCOTT: No, I don't.
10       MS. BARNIER: So it makes life a lot easier for
11  everybody. But we will do it your way.
12       MR. WESCOTT: I did it the best I could.
13       MS. BARNIER: Unfortunately it is going to take
14  a lot longer because did you that.
15       MR. WESCOTT: That's fine.
16       MS. BARNIER: All right. So you still have, we
17  went over income a little bit, and you kind of dodged
18  that one. So it says on this that you had a income
19  of -- in the two years prior to that of close to a
20  million dollars.
21       MR. WESCOTT: Right.
22       MS. BARNIER: Do you now remember how much you
23  made before?
24       MR. WESCOTT: Well, and part of it was the
25  definition of "income." It was my -- I'm sorry. It was

**Page 46**

1  my lay person belief that income meant income earned
2  through a job or consulting. And that after creating
3  the initial version, I looked online and I saw that the
4  federal definition of "income" includes capital gains.
5        MS. BARNIER: Did you ask your attorney as to
6  advice as to what was income?
7        MR. WESCOTT: No, I did not.
8        MS. BARNIER: I --
9        MR. WESCOTT: Actually, I think I did e-mail.
10       MS. BARNIER: I would suggest to you Judge
11  Montali, I am sure your attorney will say, takes a dim
12  view of people who play games with that kind of
13  information.
14       MR. WESCOTT: I'm not trying to play games. I
15  am just trying to provide all the information as best I
16  can.
17       MS. BARNIER: So how much money did you make in
18  2011?
19       MR. WESCOTT: That is probably one that we
20  should probably follow up with e-mail. I will tell you
21  that in our updated --
22       MS. BARNIER: Here is an easy answer: Yes, it
23  is this amount. No, it is this amount. I don't know.
24       MR. WESCOTT: I don't know.
25       MS. BARNIER: How much money did you make in

**Page 47**

1  2010?
2        MR. WESCOTT: I don't know.
3        MS. BARNIER: Ms. Stephens, how much money did
4  you make in 2011?
5        MS. STEPHENS: 48,000 dollars, I believe.
6        MR. ISON: 2011?
7        MS. STEPHENS: No. Wait. I'm sorry. I
8  can't -- I billed 48,000 dollars on a client gig, but I
9  think I only made -- like, I brought home, because I
10  think 10,000, about 10,000 or 9,000 went to -- so about
11  40,000 dollars. So 39 or 40,000 dollars was how much I
12  made.
13       MS. BARNIER: When you say nine or 10,000
14  dollars what do you mean?
15       MS. STEPHENS: So I, I got a contract I had
16  somebody at the old company I used to work for working
17  on that contract, and so I paid him out of the total
18  amount I billed. So I believe the entire contract was
19  for 48, but I think my take-home was 39 or 38, yeah.
20       MS. BARNIER: How about for 2010, did you make
21  any money?
22       MS. STEPHENS: I don't believe I made any
23  money -- I didn't work in 2010.
24       MS. BARNIER: Okay.
25       MS. STEPHENS: Some of our combined assets in

**Page 48**

1  capital gains probably came through me, or us, but I
2  don't know what that number is.
3        MS. BARNIER: Okay. Now, you answered on one
4  of your questions that there is a potential turnover for
5  PB and SB stock. So let's start with real basics. What
6  is PB?
7        MR. WESCOTT: PB is People Bridge Incorporated.
8        MS. BARNIER: I'm sorry?
9        MR. WESCOTT: People Bridge Incorporated.
10       MS. BARNIER: People Bridge Incorporated.
11       MR. WESCOTT: Correct.
12       MS. BARNIER: Was that listed on your schedules
13  anywhere?
14       MR. WESCOTT: I believe it was.
15       MS. BARNIER: Do you have a copy of your
16  schedules in front of you?
17       MR. WESCOTT: I don't have the full schedules,
18  but I have here Form 6, Schedule B, Question 35, first
19  company listed -- oh, that's the one you are reading
20  from.
21       MS. BARNIER: Well, I am looking at your
22  Schedule B, personal property.
23       MR. WESCOTT: I think it is summarized in
24  Number 35.
25       MS. BARNIER: So this is a separate sheet that

Case: 12-0314 Sup Exhibit D - 341 Hearing and Deposition Transcripts 3:51 D-33 of 228
of 43

Page 49

1 you have attached. And help me find it, because I don't
2 see --
3        MR. WESCOTT: I believe, first of all --
4        MS. BARNIER: It says "receivables" that I see
5 on this that you attached.
6        MR. WESCOTT: That's not the -- well, there's a
7 lot of different attachments.
8        So it is my belief -- and we can look at the
9 actual schedules, that People Bridge would have been
10 listed at least twice. The first Item 18 is nature --
11 nature of business and location.
12        MS. BARNIER: Let's just start with personal
13 property. We will do it the real old fashioned way, the
14 way debtors like to do it.
15        Take a look. And, Counsel, I think you -- show
16 me where your interest is listed on that, personal
17 property, one, two, three. There we go.
18        MR. WESCOTT: I believe it is under 35, here.
19        MS. BARNIER: So you did not list it -- it says
20 right here -- so it is an interest in a company. Is
21 that correct? Is that stock you own?
22        MR. WESCOTT: Correct. I may not no longer own
23 it.
24        Are you Dan Behrs, by chance?
25        UNIDENTIFIED SPEAKER: I am.

Page 50

1        MR. WESCOTT: Great. I know there was an ex
2 parte hearing.
3        UNIDENTIFIED SPEAKER: It was never granted.
4 You are still the owner as far as we know.
5        MR. WESCOTT: That is unfortunate.
6        MS. BARNIER: So People Bridge, what do you
7 think the worth is?
8        MR. WESCOTT: Zero, possibly negative. People
9 Bridge owes at least 50,000 dollars, has no assets.
10        The one minor thing of any value within People
11 Bridge that I will -- that I sought to retain, I think
12 it is an exemption, is I have a real estate license that
13 is an officer license held by that S corp. I should
14 probably form a new entity and get a new license.
15        UNIDENTIFIED SPEAKER: Counsel, I need to take
16 a break for about five minutes.
17        MS. BARNIER: Sure.
18        MS. STEPHENS: I need to use the bathroom.
19        MS. BARNIER: Do you know where it is? Walk
20 out, and it is the first, like, open hallway as you walk
21 out on your left-hand side, passed the doorways. Let me
22 make sure you guys get your --
23        MR. WESCOTT: Thank you.
24        MS. BARNIER: Pass those back.
25        MS. STEPHENS: Thank you.

Page 51

1        MS. BARNIER: Mr. Wescott, do you mind stepping
2 out? Because I'd like to talk to the accountant.
3        MR. WESCOTT: Okay. Sure.
4        MS. BARNIER: I'm going to let it keep going
5 because I'm scared to death if I turn it off, i won't
6 record again. Because I was not listening to Anita when
7 she told me.
8        UNIDENTIFIED SPEAKER: I'm Rob Weaver, by the
9 way.
10        MS. BARNIER: Nice to meet you.
11        (Discussion off the record, Break)
12        MS. BARNIER: So we were talking about People
13 Bridge, and you say it has a debt of 50,000 dollars.
14        MR. WESCOTT: It had a line of credit.
15        MS. BARNIER: Line of credit to whom?
16        MR. WESCOTT: I forget if it is Chase or Wells
17 Fargo. I think it was 53,000 dollars originally.
18        MS. BARNIER: Okay. And as to People Bridge,
19 do you own all of that company? You are the sole --
20        MR. WESCOTT: I do.
21        MS. BARNIER: You are the sole shareholder?
22        MR. WESCOTT: That's correct.
23        MS. BARNIER: You are the president, correct?
24        MR. WESCOTT: I am.
25        MS. BARNIER: Are there any other officers?

Page 52

1        MR. WESCOTT: No.
2        MS. BARNIER: Was that listed on your
3 schedules?
4        MR. WESCOTT: I believe so. I believe it is
5 listed twice. Once there's a part of the schedules that
6 are nature and location of business, I believe it is
7 Part 18 of either Form 7 or 6.
8        And then I believe Item 35 on personal
9 property, which is, what, Item 21 in Schedule 6, B 6.
10        MS. BARNIER: You spent a lot of time
11 memorizing all the numbers.
12        MR. WESCOTT: I know them now.
13        MS. BARNIER: Counsel, I'm going to ask you to
14 do this. Let's do it the right way so if we have to
15 appear in front of --
16        MR. ISON: He is coughing. I can't hear you.
17        MS. BARNIER: I understand. Let's do it the
18 right way. So if you would be so kind, 13, stocks and
19 interest incorporated and unincorporated, business
20 itemized, could you please list on thirteen on the
21 schedules all the companies and the percentage of stocks
22 that any of the debtors own, so that Judge Montali won't
23 have to look at it, and try and guess as to what
24 everybody owns.
25        So it is Line 13, stock and interest, business,

Case: 12-0314  Sup D Exhibit D - 341 Hearing and Deposition Transcripts 3:51  D-34 of 22B
of 43

Page 53

1 it just says "itemized" so if you could do that. He has
2 one here, two here, but we are looking for all of them.
3 Okay.
4 We can get that -- as long as you are going to
5 amend the schedules, might as well amend them and make
6 it right and put them there because that is where they
7 do belong.
8 So let's go on --
9 MR. WESCOTT: Excuse me. I am sorry.
10 MS. BARNIER: You need to get some water.
11 MR. WESCOTT: I should just get some water.
12 MS. BARNIER: I actually have a cough drop
13 believe it or not.
14 MR. WESCOTT: That would be amazing. Thank you
15 so much.
16 MS. BARNIER: You are welcome.
17 So you also said SD stock has a potential
18 turnover. What is SD stock?
19 MR. WESCOTT: Surprise Development
20 Incorporated.
21 MS. BARNIER: What is Surprise Development?
22 MR. WESCOTT: Excuse me one moment.
23 It is a California S corp.
24 MS. BARNIER: What does it own?
25 MR. WESCOTT: I think something like twelve or

Page 54

1 thirteen LLC subsidiaries. That's my best guess.
2 MS. BARNIER: Who is the president of Surprise
3 Development?
4 MR. WESCOTT: I am.
5 MS. BARNIER: Any other officers?
6 MR. WESCOTT: No.
7 MS. BARNIER: What are the assets of the
8 corporation?
9 MR. WESCOTT: Essentially zero. It has the --
10 each of those LLC subsidiaries held property. I believe
11 the total debt on those properties was in the tens of
12 millions of dollars. I believe almost all, if not all
13 of those properties have now been foreclosed.
14 MS. BARNIER: Are the properties all located in
15 the United States?
16 MR. WESCOTT: All in California.
17 MS. BARNIER: All in California. Any other
18 shareholders in Surprise Development Inc.?
19 MR. WESCOTT: Well, there was Sunett Singal had
20 a 50 percent option in the company, but he did not
21 exercise his option.
22 MS. BARNIER: My question was he also a share
23 holder in this corporation?
24 MR. WESCOTT: No. He just had an option.
25 MS. BARNIER: Were you the sole shareholder?

Page 55

1 MR. WESCOTT: I am the sole shareholder.
2 That's correct.
3 MS. BARNIER: Any other -- so you so far told
4 me you have shares in Going On Networks. You have
5 shares in Santa Barbara Technology Group. You are the
6 sole shareholder of People Bridge. You are the sole
7 shareholder of Surprise Development Inc. Any other
8 companies that are you a shareholder in?
9 MR. WESCOTT: Yes, absolutely. I believe I
10 will summarize on that one, that is Item 18, which when
11 I list here is People Bridge Inc., which we just went
12 over; Surprise Development Inc., which we just went
13 over; Chula Gante Investments Incorporated.
14 MS. BARNIER: You want to spell that one?
15 Which attachment did you put this on?
16 MR. WESCOTT: Well, again, everything should
17 show up in both -- I am actually looking at Question 35
18 of the spreadsheet summary, but I think it should also
19 show up in Item 18.
20 MS. BARNIER: It should be on Schedule B, but
21 we will start with personal property. You own it, you
22 got to put down everything you own.
23 You testified to the Trustee that you did, but
24 we are now finding out you did not. So all of this has
25 got to be amended so it is correct. So all those

Page 56

1 companies that you own interest in have got to be listed
2 in -- I am sure your counsel has great software, it will
3 expand, you can list them, and you will tell us if you
4 are one hundred percent owner, 50 percent owner, if you
5 only have a one percent interest, and if your wife has
6 any shares that she is a shareholder of any corporation,
7 any company, she needs to do the same thing.
8 Am I real clear on that?
9 MR. WESCOTT: You are. What I actually
10 testified is that -- I did not testify that we listed
11 all of it. I testified that we completed it to the best
12 of our ability in January, and then we followed up with
13 additions.
14 MS. BARNIER: That no one knows about because
15 your counsel has not had an opportunity to do it.
16 Just so you guys understand this, because they
17 are going to be -- they wont' be filed. We will have to
18 do this again in April. I was hoping we would not, but
19 you are going to have to come back. And until
20 everything gets through, you may not get your discharge,
21 you do not get the case closed, so we have a ways to go.
22 On one of the -- I'll tell you one of the
23 things that confuses me between your I and J statement,
24 you state that both of you were receiving income of
25 17,000 dollars a month. Who are you receiving 17,000

Case: 12-0314SupDExhibit-D - 34t-Hearing and Deposition Transcript 3:51 D-35 of 228
of 43

Page 57

1  dollars a month from?
2      MS. STEPHENS: I don't know what you mean by
3  that.
4      MR. WESCOTT: I think that that is -- which
5  schedule is that on? I think what we did is we took a
6  number of months back last year, and we looked at the
7  total income that we had received, and then we divided
8  it by the number of months, and it was 17,000.
9      MS. BARNIER: Who paid you that money?
10     MR. WESCOTT: I think the majority of it was
11  coming from Rain Forest Capital.
12     MS. BARNIER: How much money did Rain Forest
13  Capital pay you in 2011?
14     MR. WESCOTT: I don't have the exact number.
15     MS. BARNIER: More than 250,000 dollars?
16     MR. WESCOTT: Rain Forest Capital paid more
17  than 250,000 dollars in 2011. That is correct.
18     MS. BARNIER: More than 300,000 dollars?
19     MR. WESCOTT: Yes. I believe -- yes, probably
20  more than 500,000 dollars.
21     MS. BARNIER: More than 500,000 dollars in
22  2011?
23     MR. WESCOTT: Yeah, I'm fairly positive but I
24  can get the exact number, obviously.
25     MS. BARNIER: So you had an income of 500,000

Page 58

1  dollars in 2011, at least, right?
2      MR. WESCOTT: Well, I said Rain Forest Capital
3  paid over 500,000 dollars.
4      MS. BARNIER: To you personally.
5      MR. WESCOTT: No. The Rain Forest Capital paid
6  some money to us personally and some money to Pook Snook
7  Duke to one of those entities, I believe.
8      MS. BARNIER: So you directed them to pay into
9  one of the LLCs that you set up in June of 2011? Is
10  that right?
11     MR. WESCOTT: I believe we transferred the Rain
12  Forest Capital note into one of the trusts entities,
13  trust or limited partnership. So Rain Forest Capital
14  made at least one payment, at least one large payment to
15  one of those entities.
16     MS. BARNIER: How much?
17     MR. WESCOTT: I don't have the exact number.
18     MS. BARNIER: More than 100,000?
19     MR. WESCOTT: More than 100,000.
20     MS. BARNIER: More than 200,000?
21     MR. WESCOTT: I don't know. We can get the
22  exact information, obviously.
23     MS. BARNIER: Okay. I will need that exact
24  information.
25     So you listed a number of people who owe you

Page 59

1  money.
2      MR. WESCOTT: That's correct.
3      MS. BARNIER: How much money does Commercial
4  Creditors owe you?
5      MR. WESCOTT: Commercial Capital, you mean?
6      MS. BARNIER: Could be Commercial Capital. I'm
7  just trying to figure out from your schedules.
8      MR. WESCOTT: Commercial Capital I actually owe
9  11.5 million dollars to, approximately.
10     MS. BARNIER: They owe you, or you owe them?
11     MR. WESCOTT: I owe them.
12     MS. BARNIER: My question is different. Who
13  owes you money that is collectible? Let's try that one.
14     MR. WESCOTT: I don't think any -- I have over
15  ten million dollars owed to me, and I don't believe -- I
16  think the great majority of it is not collectible. I
17  have tried to collect it; I have not been successful.
18     I don't actually have that one with me. But it
19  is in one of the schedules, if we want to look at it
20  together, I'd be happy to talk about each individual
21  person or entity that owes and what the situation is.
22     MS. BARNIER: You don't have that one with you.
23  Tell you what: When we come back in April, why don't
24  you look that one over, and you come back and be able to
25  testify as to what you think is collectible and your

Page 60

1  reasons why.
2      MS. STEPHENS: I mean, can other people collect
3  it? Like, I mean, they are not --
4      MS. BARNIER: Let me explain something about
5  bankruptcy that I don't think maybe your attorney has
6  not explained. Everything you own, unless you exempt
7  it, belongs to your bankruptcy estate.
8      MS. STEPHENS: Okay. So --
9      MS. BARNIER: I'm going to start right now.
10  Let's be real clear about this. The Honduras property
11  belongs to the bankruptcy estate. You may not sell it,
12  sir.
13     Now, you might get -- you know, maybe the
14  Trustee is going to come to you and say "I want your
15  help, and we will pay your money for it" but it belongs
16  to the bankruptcy estate.
17     So if you take any acts to sell that property
18  during the bankruptcy, then it is an automatic
19  violation, and you will lose your discharge.
20     Do you understand what it means if you lose
21  your discharge? Has your attorney explained it to you?
22     MR. WESCOTT: Absolutely.
23     MS. BARNIER: It means you are liable for all
24  the debts, and all these creditors will be very happy
25  because then they can come after you regardless, and you

Case: 12-0314  SupDExhiBit D - 341 Hearing and Deposition Transcripts  D-36 of 228
of 43

*TRANSCRIPTION 341 MEETING RE: WESTCOTT 03/21/12*

## Page 61

1 cannot file for another eight years, all right. Just so
2 we understand. I want to make it real clear. So we may
3 ask you about the Honduras property and ask for your
4 assistance and selling it, but if the property is sold,
5 it is for the benefit of your unsecured creditors.
6     MR. WESCOTT: Sure. I understand that.
7     MS. BARNIER: Okay. So why did you go down
8 there, then, to try to sell it?
9     MR. WESCOTT: I didn't actually go down to try
10 to sell it. I went down to try to establish new sources
11 of income.
12     MS. BARNIER: What's a new source of income
13 that you would establish in Honduras?
14     MR. WESCOTT: I am a real estate developer, so
15 I would like to try and buy some property with some
16 investors and try and develop it.
17     MS. BARNIER: After owing investors, I believe
18 it is close to 36 million dollars, you have new -- well,
19 that's what you listed. 36 million dollars.
20     Do you owe more than that?
21     MR. WESCOTT: Well, I don't think that
22 includes -- does that include the 11 point five million
23 from the recent lawsuit?
24     MS. BARNIER: I don't know, sir. I am not the
25 attorney who filled your schedules out. So you owe at

## Page 62

1 least 36 million dollars?
2     MS. STEPHENS: Yeah. What you know is what you
3 want to talk about here.
4     MR. WESCOTT: I'm trying to understand the
5 question.
6     MS. BARNIER: If you do not understand the
7 question, just tell me "I don't understand your
8 question, Ms. Barnier, could you please rephrase it."
9     MR. WESCOTT: I don't have the numbers in front
10 of me, but I don't believe the 11.5 million is included
11 in the 36, just so you know.
12     The total we had was at least 60 million
13 dollars before.
14     MS. BARNIER: You believe approximately --
15     MR. WESCOTT: 30, 40, 50, 60. Whatever it is.
16     MS. BARNIER: You seem kind of cavalier about
17 owing all these people all this money.
18     MR. WESCOTT: You know, it has been, we went
19 through, yeah, at this point we are -- we are -- it has
20 been a tough few years, and we are looking forward to
21 moving on after we are done with all this and trying to
22 establish a new life.
23     MS. BARNIER: That was not my comment, though.
24 My question with you was you seem very cavalier about
25 owing --

## Page 63

1     MR. WESCOTT: I don't know the exact amount.
2     MS. BARNIER: One more time. I have to tell
3 you, I used to teach middle school, you kind of remind
4 me of middle school boys a bit. You are not answering
5 the question. I you seem cavalier about owing this
6 amount of money to unsecured creditors. Do you feel
7 cavalier about this?
8     MR. WESCOTT: No. I don't feel cavalier. I
9 just don't know the exact amount.
10     MS. BARNIER: Now, you prepared this document
11 as to transfers. Is that correct?
12     MR. WESCOTT: That is correct.
13     MS. BARNIER: Are these the only properties you
14 have transferred?
15     MR. WESCOTT: There's actually five sub
16 attachments. But, yes, the -- what -- that is one of
17 the attachments, and these are all the properties I
18 transferred in one action in I think it was February
19 13th, 2010.
20     And some of those properties were transferred
21 again, there's a different schedule for that. There are
22 multiple parts to that item.
23     MS. BARNIER: So these are properties -- let me
24 make sure I understand -- that your wife had an interest
25 in. Is that correct? And you agreed to transfer to

## Page 64

1 yourself? Is that right?
2     MR. WESCOTT: We did the transmutation
3 agreement.
4     MS. BARNIER: I understand that. My question
5 was: These are properties that she had an interest in,
6 and she transferred all of these properties to you?
7     MR. WESCOTT: The way I would put it is that we
8 both had an interest in them, because it was, you know,
9 we were married in the State of California, community
10 property state, and we transferred some of our assets
11 that were community assets, we did an inter-spousal,
12 tax-free exchange.
13     MS. BARNIER: Did you have an attorney advise
14 you on that?
15     MR. WESCOTT: Yes, we did.
16     MS. BARNIER: What was the name of the
17 attorney?
18     MR. WESCOTT: Bob Klueger.
19     MS. BARNIER: Where is he located.
20     MR. WESCOTT: In L.A.
21     MS. BARNIER: Can you spell his last name for
22 me?
23     MR. WESCOTT: K-L-U-E-G-E-R.
24     MS. BARNIER: How much did he charge you to do
25 this?

Case: 12-0314 Sup Exhibit D - 341 Hearing and Deposition Transcripts 3:51 D-37 of 228

Page 65

1    MR. WESCOTT: I think it was eight thousand
2  dollars, something like that.
3        MS. BARNIER: Did you only have one attorney?
4        MR. WESCOTT: For that particular item, yes. I
5  mean, he has a firm. He probably had people working
6  under him.
7        MS. BARNIER: Ms. Stephens, did you consult
8  your own attorney when you made this transmutation
9  agreement?
10        MS. STEPHENS: No, I did not.
11        MS. BARNIER: Now, according to your Schedule
12  J, you do not have a mortgage payment. Is that correct?
13        MR. WESCOTT: We have a mortgage payment we are
14  not making.
15        MS. BARNIER: How much is your mortgage
16  payment?
17        MR. WESCOTT: It is something like 13,000
18  dollars a month. We have not paid it since July 2010.
19  That house.
20        Actually, there's a motion tomorrow for relief
21  a stay, then it will go to trustee sale probably next
22  week or very soon.
23        MS. BARNIER: So you listed expenses of 11,511
24  dollars a month. Do you remember that both of you?
25        MR. WESCOTT: Yes.

Page 66

1        MS. BARNIER: Is that accurate, that is what
2  your expenses are?
3        MR. WESCOTT: That's our current expenses.
4        They are going to go up when we need to get a new place
5  to live.
6        MS. BARNIER: I understand that. But as of the
7  filing date, that is what your expenses were were,
8  11,500 dollars a month. Which comes out to basically
9  120,000 dollars a years. Am I pretty close?
10        MR. WESCOTT: Yep.
11        MS. BARNIER: And you just testified that you
12  had received at least 500,000 dollars, some may have
13  gone into this trust, but you had received -- so you had
14  expenses of 120,000, and an income of at least 350,000,
15  what did you do with the remaining 200,000?
16        MR. WESCOTT: First of all, the expenses that
17  we currently have are much lower than they used to be,
18  the 11,000 that is current.
19        We could provide all the bank statements, we
20  have a lot of different accounts so it is not easy to
21  just answer with one specific answer. But we can show
22  all of the bank statements and we can figure out where
23  every dollar went.
24        MS. BARNIER: Because you are going to need to.
25  So you are going to provide all those bank statements.

Page 67

1        Wells Fargo has some?
2        THE WITNESS: Wells Fargo has the great
3  majority of them.
4        MS. BARNIER: And they have told you they will
5  not allow you to get the bank statements?
6        MR. WESCOTT: Correct. They used to have a an
7  on line interface. And we had access to seven years of
8  our bank statements. When I did the bankruptcy filing,
9  they shut done my account, and now they want lots of
10  money to get copes of statements, any copies of the
11  checks, so --
12        MS. BARNIER: Did you take any of the cash and
13  spend it on money to purchase property in Latin America?
14        MR. WESCOTT: In 2011?
15        MS. BARNIER: 2011.
16        MR. WESCOTT: I don't think so. I don't recall
17  any purchases of property.
18        MS. BARNIER: Did you purchase any property in
19  Latin America in 2010?
20        MR. WESCOTT: Probably, yes.
21        MS. BARNIER: What did you purchase?
22        MR. WESCOTT: You know, we'd have to look back
23  in records to see exactly what was purchased when.
24  2010.
25        MS. BARNIER: Well if you look at the document

Page 68

1  on the transfer, does it refresh your memory of what you
2  purchased in 2010?
3        MR. WESCOTT: Those are transfers, not
4  purchases.
5        MS. BARNIER: I am wondering if this would
6  refresh your memory of any properties you purchased.
7        MR. WESCOTT: Well, those we owned obviously
8  before February 2010, so those would have been purchased
9  in almost all in 2009 and prior.
10        MS. BARNIER: So all of these were purchased in
11  2009?
12        MR. WESCOTT: And prior.
13        MS. BARNIER: And prior, 2008. 2007.
14        MR. WESCOTT: Going back to probably the 90s in
15  some cases. Most of them in the 2000s.
16        MS. BARNIER: Why don't we go through this
17  document. Do you have a Copy of it?
18        MR. WESCOTT: I think I do. It is the Form 7,
19  Attachment 3, item 10 A, Part 1?
20        MS. BARNIER: Yeah.
21        MR. WESCOTT: Okay.
22        MS. BARNIER: So of the two one-acre parcels in
23  Nicaragua, what is the value of that property?
24        MR. WESCOTT: Probably -- I don't know. Tens
25  of thousands.

Case: 12-0314 SupD Exhibit D - 341 Hearing and Deposition Transcripts 3:51 D-38 of 228
of 43

1  MS. BARNIER: Can you be more specific? Do you
2  own it in your name?
3          MR. WESCOTT: You know, we never actually -- I
4  paid money, but the transfer of title was never, I don't
5  think it was actually fully realized. I was planning to
6  buy it in my name.
7          MS. BARNIER: So who owns the property?
8          MR. WESCOTT: I'm not sure.
9          MS. BARNIER: Well, if you did not know who
10 owned it, how could you transfer it to your wife?
11         MR. WESCOTT: Well, I transferred the interest
12 that we had in it.
13         MS. BARNIER: What is the interest you hold in
14 this property?
15         MR. WESCOTT: On that particular property I
16 paid I think it was originally 35,000 dollars but we
17 could look up and get the exact amount. That was before
18 there was water and electricity coming to the property,
19 and I don't recall -- I know there was some problem with
20 the transfer of title related to, you know, we could --
21 I don't believe --
22         MS. STEPHENS: Have we written off that
23 property or not? I think that is what she is wanting to
24 know. Does that property still have value, Carl?
25         MR. WESCOTT: I think the properties have

1          MS. BARNIER: So it is in Baja?
2          MR. WESCOTT: It is in the Sea of Cortez.
3          MS. BARNIER: Sea of Cortez.
4          MS. STEPHENS: I don't think it is in Baja.
5          MR. WESCOTT: Arizona is over the top part
6  there. Baja is further west and south of there.
7          MS. BARNIER: So, and how is that interest
8  held?
9          MR. WESCOTT: So there's a gentleman name Ian
10 Harding that owns that house, and we actually signed
11 some simple paperwork that we have the 25, or actually
12 24.5 percent interest. At the time that I made that
13 investment, he said he was going to sell the house,
14 which he said was worth 400,000 dollars at the time that
15 we made the investment, he has -- my understanding been
16 trying to sell it and has not been able to sell it.
17         MS. BARNIER: What does he have the property
18 listed for?
19         MR. WESCOTT: It was listed for more than
20 400,000 then they dropped it to four. I was advising
21 him to drop it much lower, I am sure you are aware of
22 what is going in Puerta Vallarta Mexico, there's a lot
23 of violence, and a tough market right now.
24 But the last I talked to him I think he had it
25 listed for 399.

Page 70                                                                Page 72

1  value, yes.
2          MS. BARNIER: How much value does the property
3  have?
4          MR. WESCOTT: It is a pretty poor market in
5  Nicaragua, but probably on the order of what was paid
6  for it.
7          MS. BARNIER: How much debt is on the property?
8          MR. WESCOTT: Zero.
9          UNIDENTIFIED SPEAKER: How much was the --
10         MS. BARNIER: 35,000.
11         MR. WESCOTT: That's my best guess.
12         MS. BARNIER: What did you purchase it.
13         MR. WESCOTT: I would guess around 2006, 2007,
14 somewhere around then.
15         MS. BARNIER: Can I have all the documents
16 regarding the property in Nicaragua?
17 Is it in Oma Tepa?
18         MR. WESCOTT: It is in Oma Tepa.
19 What I can do is e-mail the person who I paid
20 for the property, and get the updated information for
21 you. Absolutely.
22         MS. BARNIER: Then you have a 25 percent
23 interest in a parcel with a house in Puerto Penascal.
24 Where is that near?
25         MR. WESCOTT: It is south of Arizona in Mexico.

1          MS. BARNIER: How far is -- you just made an
2  investment with him individually?
3          MR. WESCOTT: Correct.
4          MS. BARNIER: Do you have any papers to that
5  effect?
6          MR. WESCOTT: I do.
7          MS. BARNIER: Could you send those to your
8  attorney, and he can forward those to me?
9          MR. WESCOTT: Yeah. We can dig them up. If
10 not, I will e-mail Ian Harding. .
11         MS. BARNIER: How much did you pay Mr. Harding?
12         MR. WESCOTT: I think it was approximately 50
13 grand.
14         MS. BARNIER: What did he do with the money?
15         MR. WESCOTT: I have no idea. I think he had
16 debts of his own that he had to pay.
17         MS. BARNIER: And then you say that you own one
18 hundred hectars in Uruguay. Is that right?
19         MR. WESCOTT: That's correct.
20         MS. BARNIER: What did you plan to do with that
21 property?
22         MR. WESCOTT: I was planning to develop it.
23         MS. BARNIER: What is debts owed on that
24 property?
25         MR. WESCOTT: There is -- well, there's no

Case: 12-0314  SupD Exhibit D - 341 Hearing and Deposition Transcripts 3:51 D-39 of 228
of 43

Page 73

1 secured debt at the moment. If you do not count taxes,
2 property taxes, I believe there is probably about
3 400,000 dollars of liens from local taxes. Four or
4 five, something like that.
5       MS. BARNIER: What do you think the property is
6 worth?
7       MR. WESCOTT: It really depends if somebody
8 develops the infra structure.
9       MS. BARNIER: Right now, bare bones, as it is.
10       MR. WESCOTT: What we paid -- I will tell you
11 what we paid for the property, which will be an estimate
12 of the value. I believe it was one point two million
13 dollars. And if somebody were to put in millions of
14 dollars in infrastructure --
15       MS. STEPHENS: Carl, just tell her what --
16       MS. BARNIER: So you --
17       MS. STEPHENS: As is.
18       MR. WESCOTT: As is I think it is worth zero
19 right now.
20       MS. BARNIER: Why do you think that?
21       MR. WESCOTT: Because it is going to be lost to
22 -- we will see what happens, but there is property tax
23 liens on it. I am probably not going to put in the
24 infrastructure. There's millions of dollars that is
25 owed that is unsecured.

Page 74

1       MS. BARNIER: Back up. You explained that
2 part. You might want to take some direction from your
3 wife. We can move this along if you just answer the
4 question.
5       MS. STEPHENS: If it is worth something, or
6 not.
7       MR. WESCOTT: It is hard to say, depends on
8 whether --
9       MS. STEPHENS: Just say yes or no.
10       MS. BARNIER: As it is, as the property is
11 today.
12       MR. WESCOTT: As is property I think has no
13 value.
14       MS. BARNIER: What would it be worth, if you
15 were going to buy it, if you were going to purchase this
16 property, what would you pay for it?
17       MR. WESCOTT: Well, I did a deal last May --
18       MS. STEPHENS: We don't care. I'm sorry.
19 Just --
20       MR. WESCOTT: That's the most recent time. In
21 May, I did a deal related to it for 500,000 dollars.
22       MS. BARNIER: You think that would be a fair
23 market value today for this property?
24       MR. WESCOTT: That's what I was willing to do a
25 deal on it for in May. So something like that. Yes.

Page 75

1       MS. BARNIER: So in hectars, let's see how good
2 I am at this, is that about six thousand acres?
3       MR. WESCOTT: A hectar is two point four seven
4 acres.
5       MS. BARNIER: So that is about, so we are
6 looking at 2500 acres. 2400 acres.
7       MR. WESCOTT: 247.
8       MS. BARNIER: 247 acres. Okay.
9       What is Osha near?
10       MR. WESCOTT: It is east, it is its own
11 province. It goes all the way to Brazil. It is three
12 hours east of Monte Video.
13       MS. BARNIER: Then you own a property in
14 Honduras which we already talked about, right?
15       MR. WESCOTT: M-hm.
16       MS. BARNIER: That's free and clear?
17       MR. WESCOTT: That's correct.
18       MS. BARNIER: You said that you paid one point
19 two million also for that?
20       MR. WESCOTT: No. I said I paid a million 47
21 thousand for it.
22       MS. BARNIER: Then you also have -- do you hold
23 title to that, just in your name?
24       MR. WESCOTT: The Honduras property?
25       MS. BARNIER: Yes.

Page 76

1       MR. WESCOTT: It is owned by an entity called
2 Lightfoot something or other, which is owned by an
3 entity called Lightfoot something or another. I think
4 it is called Lightfoot Holding Company, and the other is
5 Lightfoot Investing, something like that.
6       MS. BARNIER: I think the Trustee already asked
7 you questions about Lightfoot, and you said you were
8 going to provide those documents, right?
9       MR. WESCOTT: I don't think she asked for that.
10       MS. BARNIER: I'll ask for them. I'd like all
11 the documents for Lightfoot Holding and Lightfoot
12 Investments. I believe those are the two.
13       MR. WESCOTT: I have those.
14       MR. ISON: It might be best if you could
15 summarize, in some form, and tell me what you want.
16       MS. BARNIER: Counsel, I'm going to tell you
17 the way it works. And this is -- if I sound a little
18 touchy, I am, because I don't like having to do this
19 because I should not have to be spending my time going
20 through schedules that the Debtor prepared and not
21 counsel. But that's just me.
22       So I am going to tell you what I need. You are
23 going to keep a list, and you are going to provide it.
24 If you do not, here is what will happen: Then what I
25 will do -- because I have already made a nice request

Case: 12-0314 Sup Exhibit D - 341 Hearing and Deposition Transcripts 3:51 D-40 of 228
of 43

Page 77

1  for it, I been very clear, your debtor is being very
2  cooperative, he is saying he has it, he is going to
3  provide it. Then what I will do is go into court and
4  get a motion to compel, which you probably don't want to
5  have to defend. So if you want to keep a list while we
6  are going, that would be great.
7        MR. ISON: I am doing my best to keep a list.
8        MS. BARNIER: Okay.
9        MR. ISON: I am not necessarily keeping a real
10  good list. So in order to make sure that we are on the
11  same page, I am requesting that you tell me.
12        MS. BARNIER: I am telling you every time. I
13  am looking up and saying "I need that document." Are
14  you expecting me to compile a list for you?
15        MR. ISON: I think that would be helpful.
16        MR. WESCOTT: I'd like to make a suggestion.
17  Obviously, it is your decision to make, but in the
18  interest of everyone's efficiency, given that we are,
19  have updated schedules we are filing, which we plan to
20  do correctly, per your instructions, it might be best --
21        MS. BARNIER: Why don't you keep a list, then,
22  and maybe you help your counsel and say, you know, "I
23  promised her I would get her these documents, and these
24  documents."
25        MR. WESCOTT: I will do that.

Page 78

1        MS. BARNIER: All right. So let's go on. You
2  have one hundred percent interest in Hacienda Palo Alto.
3  Where is that located?
4        MR. WESCOTT: On the coast of Ecuador.
5        MS. BARNIER: What is that property worth?
6        MR. WESCOTT: Well, we paid something like 800
7  thousand dollars for it. Somewhere in the eights.
8        MS. BARNIER: Which you say "we," who is we?
9        MR. WESCOTT: I guess it was the royal we. I
10  was thinking of my wife and I.
11        MS. BARNIER: So you paid 800 thousand dollars.
12  What is the property?
13        MR. WESCOTT: It is a 183.5 hectars, which is
14  maybe four hundred acres.
15        MS. BARNIER: Okay.
16        MR. WESCOTT: About 440 acres.
17        MS. BARNIER: And you paid 800 thousand. When
18  did you purchase it?
19        MR. WESCOTT: I originally did the deal for it
20  in 2006, in December, I believe. And then made a series
21  of payments over time. They are still -- the last
22  payment made was, I believe, May 9th of 2011.
23        MS. BARNIER: Who are you paying off on this
24  note?
25        MR. WESCOTT: Antoine Habis and his wife.

Page 79

1        MS. BARNIER: Can you spell that?
2        MR. WESCOTT: Yeah, A-N-T-O-I-N-E. H-A-B-I-S.
3  And his wife, Emma Andrade, I believe it is in the
4  schedules.
5        MS. BARNIER: They are in Ecuador?
6        MR. WESCOTT: They are in Ecuador.
7        MS. BARNIER: Is there any debt still owing on
8  this property?
9        MR. WESCOTT: There's lot of debt on the
10  property, but what is secured is only 284,000 plus
11  interest.
12        MS. BARNIER: What do you think the property is
13  worth today?
14        MR. WESCOTT: Probably somewhere on the order
15  of what we paid for it.
16        MS. BARNIER: Then there's taxes owing on it?
17        MR. WESCOTT: Actually, it is probably worth --
18  yeah there is taxes owing on it. It is probably worth
19  less than what we paid for it. We originally did a deal
20  to buy it for about 500,000 thousand. The sellers then
21  said they had obtained -- no, I want to explain the
22  situation.
23        And it turns out that that was fraudulent, that
24  is why they are listed in my other claims. So it is
25  probably worth about what the original deal was.

Page 80

1        MS. BARNIER: The 800 thousand.
2        MR. WESCOTT: The 500,000.
3        MS. BARNIER: You think it is worth 500,000
4  now.
5        MR. WESCOTT: Something like that.
6        MS. BARNIER: Try to be as specific as you can.
7  You are a real estate developer, you have expertise --
8        MR. WESCOTT: I'm giving you my best guess.
9  I'm not creating an appraisal.
10        MS. BARNIER: You believe it is worth 500,000
11  dollars.
12        MR. WESCOTT: Yes.
13        MS. BARNIER: Where is Hacienda Aqua Dulce?
14        MR. WESCOTT: There is actually two of them.
15        MS. BARNIER: Okay.
16        MR. WESCOTT: The one you are talking about,
17  can I see the schedule you are looking at?
18  It is not clear. Can I look at it more?
19  I believe -- yes. That is a property that is
20  also in Ecuador. And it is south of the Palo Alto
21  property. It is an area known as Cabuyal.
22        MS. BARNIER: Can you spell that for me?
23        MR. WESCOTT: C-A-B-U-Y-A-L.
24        MS. BARNIER: I'm sorry. I am really slow
25  today. C-A-B-U --

Case: 12-0314  Sup Exhibit D - 341 Hearing and Deposition Transcripts 3:51  D-41 of 228
of 43

**Page 81**

1    MR. WESCOTT: Y-A-L.

2    MS. BARNIER: And do you have any secured debt

3  on that property?

4    MR. WESCOTT: There's no secured debt on the

5  property.

6    MS. BARNIER: What do you think it is worth?

7    MR. WESCOTT: Probably close to a million

8  dollars if the squatter issues on it, and the lawsuits

9  with the squatters can be resolved.

10    MS. BARNIER: Is there a current lawsuit in

11  Ecuador with the squatters?

12    MR. WESCOTT: There are many.

13    MS. BARNIER: Many lawsuits filed by you?

14    MR. WESCOTT: No. Filed by the Wadell family,

15  who are the sellers of the property and current owners.

16    MS. BARNIER: I'm sorry. I am very confused.

17  You just said you owned it?

18    MR. WESCOTT: I didn't say I owned it.

19    MS. BARNIER: Okay. Now you really have me

20  confused. This says that you have one hundred percent

21  interest in Hacienda Aqua Dulce. Is that what it says?

22    MR. WESCOTT: One hundred percent interest in

23  Hacienda Aqua Dulce, right.

24    MS. BARNIER: What does that mean to you?

25    MR. WESCOTT: Whatever interest we have. I

**Page 82**

1  signed a contract to purchase it. We paid a down

2  payment of 386 or 300 something thousand dollars.

3  However, the sellers have been unable to transfer title

4  because they have been blocked and there's only a

5  partial payment; there is still 700 plus thousand

6  dollars owed on it.

7    After we signed the contract, but before they

8  were able to transfer title -- and it was a multi

9  payment deal -- the squatters, who have been on the

10  property for a long, long time filed a lawsuits against

11  the Wadells trying to claim the property. That has

12  blocked any ability to -- for them to transfer it.

13    I believe that the squatter issues can be

14  solved, and the property can be developed, it could be

15  worth a lot of money, but right now it is not worth a

16  lot of money.

17    MS. BARNIER: Okay. Do you have a copy of that

18  contract?

19    MR. WESCOTT: I can get one.

20    MS. BARNIER: Is there any reason why you did

21  not ask for the money to be refunded given that they

22  could not execute, per the sales agreement?

23    MR. WESCOTT: Well, there's two reasons.

24  Number 1, I still believe that I could make money

25  developing it.

**Page 83**

1  money, as I understand it that we paid and they put it

2  into the Stanford Bank, the guy who was on trial last

3  week who put the seven billion dollar Ponzi scheme, so

4  they lost the money.

5    MS. BARNIER: They told you that?

6    MR. WESCOTT: That's what they told me.

7    MS. BARNIER: When was the last time you talked

8  to them?

9    MR. WESCOTT: I saw them, I don't know, I

10  talked to them maybe two weeks ago.

11    MS. BARNIER: Did you explain to them that you

12  are in bankruptcy?

13    MR. WESCOTT: I have not explained that to them

14  yet.

15    MS. BARNIER: Could you also provide an address

16  for them?

17    MR. WESCOTT: Yes.

18    MS. BARNIER: So now you go on to say an

19  interest in Hacienda San Joaquin and Sun Rise. Where is

20  that located.

21    MR. WESCOTT: Ecuador.

22    MS. BARNIER: What did you pay for that

23  property?

24    MR. WESCOTT: My business partner, Joe

**Page 84**

1  Simonetta, paid -- I think it was one point two million

2  dollars on that one. Something like that.

3    MS. BARNIER: Are you a 50 percent owner in

4  that property?

5    MR. WESCOTT: My LLC is a 50 percent owner in

6  the development. The title is in the name of Joe

7  Simonetta.

8    MS. BARNIER: Which LLC owns that interest?

9    MR. WESCOTT: Unexpected Development.

10    MS. BARNIER: I'm sorry --

11    MR. WESCOTT: Unexpected Development.

12    MS. BARNIER: Unexpected Development.

13  And is that an LLC organized in California?

14    MR. WESCOTT: No.

15    MS. BARNIER: Where is it organized?

16    MR. WESCOTT: In Delaware.

17    MS. BARNIER: Who is the president of that LLC?

18    MR. WESCOTT: LLCs don't have presidents. It

19  has a managing member. It was me.

20    MS. BARNIER: You were the managing member?

21    MR. WESCOTT: That's correct.

22    MS. BARNIER: How many other shareholders do

23  you have?

24    MR. WESCOTT: Zero.

25    MS. BARNIER: Are you the only owner of this

Case: 12-03140   Sup D Exhibit D - 341 Hearing and Deposition Transcripts 3:51   D-42 of 228
of 43

Page 85

1  LLC?

2  MR. WESCOTT: Correct. I own all the

3  membership units, and I am the managing member.

4  MS. BARNIER: So explain to me again. What

5  interest does the LLC have in partnership with Joseph

6  Mineta.

7  MR. WESCOTT: It is Joe Simonetta.

8  MS. BARNIER: Why don't you spell his last

9  name.

10  MR. WESCOTT: S-I-M-O-N-E-T-T-A.

11  And we have -- the LLC Las a 50 percent

12  interest in that development.

13  MS. BARNIER: Then Visa Concepcion, where is

14  that located?

15  MR. WESCOTT: That's in Guatemala.

16  MS. BARNIER: What is that property worth

17  today?

18  MR. WESCOTT: I don't think it is -- I don't

19  know. It was being foreclosed on. There was a bank

20  loan on the property, and I believe it has been

21  foreclosed long ago.

22  MS. BARNIER: When was it foreclosed?

23  MR. WESCOTT: I don't know exactly. But it is

24  the process started over a year ago.

25  MS. BARNIER: Who started the foreclosure

Page 86

1  process?

2  MR. WESCOTT: There's a bank in Guatemala, and

3  I am trying to remember the name. It might be Bank

4  Cafe, or Ban Rual. I can get you that information.

5  MS. BARNIER: Then you list Panama Properties.

6  MR. WESCOTT: Yep.

7  MS. BARNIER: What is Panama Properties?

8  MR. WESCOTT: We owned some property in Panama,

9  which is east of Shapo. There is two different sets of

10  Panama properties that we owned. The first were the set

11  that were sold to Colin Weil, really Rain Forest

12  Capital.

13  There's another set that is about twelve miles

14  further east that we used to own.

15  MS. BARNIER: So Colin Weil bought one of the

16  Panama properties in, what, 2010?

17  MR. WESCOTT: We did the original deal in 2007.

18  MS. BARNIER: 2007.

19  MR. WESCOTT: Correct.

20  MS. BARNIER: He has paid you off for that

21  property, and you own one other property in Panama

22  Properties?

23  MR. WESCOTT: Yeah. The ones that Colin bought

24  were actually multiple properties together.

25  MS. BARNIER: I'm sorry. I couldn't hear. You

Page 87

1  your wife started coughing.

2  MS. STEPHENS: I'm sorry.

3  MS. BARNIER: That's okay.

4  MR. WESCOTT: There were multiple properties

5  that Colin bought that we had bought.

6  MS. BARNIER: Does -- do you still own any

7  properties in Panama Properties?

8  MR. WESCOTT: No.

9  MS. BARNIER: So when you made this transfer in

10  2010, there was nothing that was worthwhile to be

11  transferred?

12  MR. WESCOTT: Which transfer are you talking

13  about?

14  MS. BARNIER: The one you have listed, Panama

15  Properties?

16  MR. WESCOTT: No. We still had the interest

17  then. That's correct.

18  MS. BARNIER: I am sorry. I feel like we are

19  going around in circle here.

20  MR. WESCOTT: In 2010 in February when we did

21  that transfer, we had, I believe, something like one

22  hundred, 200 hectars of land in Panama. I can get you

23  the exact amount. And that is what was transferred at

24  that point.

25  MS. BARNIER: 200 hectars. What is that value

Page 88

1  today?

2  MR. WESCOTT: Somewhere between four hundred

3  and a thousand hectar, depending on --

4  MS. BARNIER: No. I said value. You said it

5  was 200 hectars. I said what is the value of that

6  property.

7  MR. WESCOTT: So, 200 hectars is probably

8  worth, am I doing the math right, close to one hundred

9  grand, yes. It is probably worth between one hundred

10  and 200,000 dollars.

11  MS. BARNIER: Does it have any secured debt on

12  it?

13  MR. WESCOTT: No.

14  MS. BARNIER: And it is held in the name of

15  Panama Properties?

16  MR. WESCOTT: It is currently owned by -- it

17  was transferred to pay off a debt.

18  MS. BARNIER: Transferred to whom?

19  MR. WESCOTT: To -- I think we have the

20  information. That one was transferred to Freddy -- I

21  want to make sure I get his name right. Why don't I get

22  you that information. In Latin America they usually

23  have four names, as you probably know. First middle

24  father mother.

25  MS. BARNIER: This was money you owed to

Case: 12-0314 SupDEshibit D - 341 Hearing and Deposition Transcripts 3:51 D-43 of 228 of 43