somebody in Panama?

MR. WESCOTT: Correct.

MS. BARNIER: And to pay off this debt, you transferred the property to him?

MR. WESCOTT: Correct.

MS. BARNIER: When did you transfer the property to him?

MR. WESCOTT: In 2010 was the initial signing of that.

MS. BARNIER: So as of today on your schedules, Panama Properties does not own -- you do not have any -- let me rephrase that.

As of the date of your schedules, you do not own any property in Panama. Is that correct?

MR. WESCOTT: I believe that's the case. Yes.

MS. BARNIER: Your answer confuses me. I don't understand --

MR. WESCOTT: I will just say yes.

MS. BARNIER: You do not own any property in Panama.

MR. WESCOTT: That's correct.

MS. BARNIER: Do any of the entities that you control own any property in Panama?

MR. WESCOTT: No.

MS. BARNIER: Do you share any interests --

MR. WESCOTT: No.

MS. BARNIER: You got to let me finish the question. Do you share any interest in any property with anyone in Panama?

MR. WESCOTT: No.

MS. BARNIER: Then why did you put it on your schedules?

MR. WESCOTT: That's as of 2010. If the question asks, I believe --

MS. BARNIER: Transfers, and then -- but you transferred to Freddy-whatever sometime in 2011 to pay for a debt.

MR. WESCOTT: It is 2010, I think. But yes.

MS. BARNIER: After February, you did that?

MR. WESCOTT: Correct.

UNIDENTIFIED SPEAKER: Counsel, can I ask some questions about Panama?

MS. BARNIER: Absolutely.

UNIDENTIFIED SPEAKER: What was the debt that you were paying of for the transfer of the property?

MR. WESCOTT: It was related to --

UNIDENTIFIED SPEAKER: How much money?

MR. WESCOTT: 200 something thousand I think was the amount.

UNIDENTIFIED SPEAKER: You said there were two

Panama properties. Did you call one of the Panama properties the Bayano property?

MR. WESCOTT: They are both in the Bayano. The ones we are speaking of now are both near Lake Bayano, so we refer to them as Bayano properties. Yes.

UNIDENTIFIED SPEAKER: Was there another Panama property you had at one point, Centro Madrono?

MR. WESCOTT: Yes. Those are the ones that Colin Weil bought, his entity.

UNIDENTIFIED SPEAKER: So Colin Weil bought the Centro Madrona properties?

MR. WESCOTT: Yeah. There were a bunch of them.

UNIDENTIFIED SPEAKER: How large was that, in hectars or in acres?

MR. WESCOTT: I don't have the exact amount. I have it. I can get it to you.

UNIDENTIFIED SPEAKER: Give me an estimate.

MR. WESCOTT: Let me just guess. Probably at least a thousand hectars.

UNIDENTIFIED SPEAKER: Okay.

MR. WESCOTT: Fairly large. At least, you know, more than 2,500 acres is my best guess.

UNIDENTIFIED SPEAKER: What was the transfer with Colin, what was the transaction amount, the dollar

amount?

MR. WESCOTT: That was the one I explained that was three million before credits, two point five seven million after credits.

UNIDENTIFIED SPEAKER: The other property, the Bayano properties, I guess the ones we are talking about that are in the transfer here, how many acres was that?

MR. WESCOTT: I think it is somewhere between one hundred and 200 hectars, and that would be between one hundred and -- I'm sorry, 250 and 500 acres.

UNIDENTIFIED SPEAKER: Was it ever as many as 7500 acres?

MR. WESCOTT: I was in a purchase contract to purchase 7500 acres, and had made some payments, and they defaulted on the deal.

UNIDENTIFIED SPEAKER: You never owned the 7500?

MR. WESCOTT: The 7500 was a series of properties together, so we had an interest in it, and a purchase contract. When we did the deal, they were (inaudible) which is untitled land, the idea behind the contract was that the sellers were getting them titled. When the sellers did have them titled, we did not have the money to finalize the payments.

UNIDENTIFIED SPEAKER: So you never owned the

Case: 12-03148 Doc# 81-3 Filed: 09/30/13 Entered: 09/30/13 15:33:51 Page 1 of 38
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-24 of 228

properties?

MR. WESCOTT: We had an interest in the contract, but we never -- we completed part of it but not all of it.

UNIDENTIFIED SPEAKER: The part you completed was four hundred acres, something of that nature?

MR. WESCOTT: Something of that nature.

UNIDENTIFIED SPEAKER: That's the value that I guess was transferred for, what did you say, 200,000, between one hundred and 200,000 dollars?

MR. WESCOTT: Something like that. Roughly 200,000.

UNIDENTIFIED SPEAKER: That's all I need for that. Thank you.

UNIDENTIFIED SPEAKER: Can I ask a question?

MS. BARNIER: Absolutely.

UNIDENTIFIED SPEAKER: Freddy, who owed the money to Freddy, you did?

MR. WESCOTT: I owed the money.

UNIDENTIFIED SPEAKER: And he was paid after the transfer?

MR. WESCOTT: I'm sorry?

UNIDENTIFIED SPEAKER: Was this the transfer you got received the Panama properties in the transfer, and you paid Freddy with some of the property?

MR. WESCOTT: No, no, no. I owed the money from -- so the Freddy debt was related to a transaction in Guatemala in -- at least a couple years before that. And I had been unable to pay the debt, and he finally agreed to take property for it sometime in 2010.

UNIDENTIFIED SPEAKER: Who owned the property that you, at the time you -- before you gave it to Freddy, who held title to that property?

MR. WESCOTT: I believe that was -- let me think. I think it might have been Unexpected Development LLC. I believe that's the case.

UNIDENTIFIED SPEAKER: Maybe I can just go back one.

MS. BARNIER: Absolutely. You might identify yourself --

MR. WEAVER: My name is Robert Weaver. I represent Mr. Victor.

You talked about this property in Hacienda Aqua Dulce, I guess in Ecuador. There was some problems with squatters. Was that the squatters problem?

MR. WESCOTT: Correct.

MR. WEAVER: When did the squatter litigation start, do you know?

MR. WESCOTT: I don't know the exact date. I first learned about it in I would guess 2000 -- I'm not

sure.

I don't know when the litigation started, but I learned about it a couple years ago.

MR. WEAVER: When did you learn about the squatters?

MR. WESCOTT: The squatters I learned about before the purchase of the property, and part of the deal with the sellers was they were going to clean up the squatters.

And there were also two intruders on the property that had false deeds. So it was -- as part of the contract, actually to amendment of the contract the sellers, the Wadells, were supposed to clean all that up.

MR. WEAVER: Have you ever been involved in squatter litigation in Mexico before?

MR. WESCOTT: Not in Mexico no.

MR. WEAVER: In other places in South America?

MR. WESCOTT: I was not directly involved in this litigation. This was my first experience with squatters, yeah.

MR. WEAVER: Is the squatter litigation filed by the squatters or by the government?

MR. WESCOTT: My understanding is the squatters made a filing because they have been there for a long

time, and they have some sort of right. And so they made a filing and filed a lawsuit to try to get the property after I had done this deal with the Wadells.

I don't believe that -- well, I don't know. I am not -- I have never seen the actual lawsuit but I've been told about it. And I am not an Ecuadorian attorney so I probably should not waste our time with my opinions, but am I answering your questions?

MR. WEAVER: Yeah. Okay.

MS. BARNIER: I am going to go about another 15 minutes, Counsel so you know, you look a little tired to me right now, and we can then continue this in April 4th but before we go there you mentioned the Pook -- I am sorry, the Pook Snook Duke limited partnership. And you stated that was a nicknames for your three children.

And this is a copy that I have, and you executed this in June of 2010. Is that correct?

MR. WESCOTT: I believe it was June 5th. That's correct.

MS. BARNIER: June 5th, 2010. Okay.

And so I just want to ask what is in this trust at this point. You have a promissory note payable in the installment from Rain Forest Capital. It says the promissory note is for 564,877 dollars. Is that correct?

MR. WESCOTT: Yes. My guess of 500,000 or more was accurate.

MS. BARNIER: Is that money in that trust today?

MR. WESCOTT: No, it is not.

MS. BARNIER: Does Rain Forest Capital still owe that money?

MR. WESCOTT: No.

MS. BARNIER: So if the promissory note was in the trust, where is the money?

MR. WESCOTT: Well, we borrowed moneys from the trust, and it has been spent, essentially.

MS. BARNIER: How much money did you borrow from the trust?

MR. WESCOTT: I'm not sure of the exact amount, but --

MS. BARNIER: So is there any -- how much cash is in the trust?

MR. WESCOTT: Less than a thousand dollars.

MS. STEPHENS: I don't know.

MR. WEAVER: I'm sorry?

MR. WESCOTT: Less than a thousand dollars. Probably less than one hundred dollars. We can -- let's say less than a thousand to make sure we are accurate.

MR. WEAVER: This is the Pook Snook Duke trust?

MS. BARNIER: Yes. Actually, I don't have it as a trust. I have it --

MR. WESCOTT: It is a limited partnership.

MR. WEAVER: That's why I asked.

MS. BARNIER: I don't have a trust as to it. That's the documents you said you were going to get.

MS. STEPHENS: I don't know that we have a trust for that. I don't remember doing a trust. I remember this, and I remember the Stephens family whatever Wescott Stephens trust. That's all I remember.

MS. BARNIER: So the money was paid into the trust, and then you borrowed against the trust.

THE WITNESS: Correct.

MS. BARNIER: Not the trust. I will get it right.

MR. WESCOTT: The limited partnership.

MS. BARNIER: You borrowed against that limited partnership, and there's now less than a thousand dollars.

Then you also transferred in a -- your one percent general partner interest in the Wescott Stephens family trust? Is that -- I'm sorry, this is the one, I don't quite understand how you did this. It says designation of beneficiary, so you transferred your interest in the trust into this LLC. Is that what you

were doing here?

MS. STEPHENS: You know, I did that as part of the estate plan with the attorneys, and it was all explained to me at the time why it was being set up that way. So it has been a couple years. So I don't understand why things were set up the way they were exactly, at the time I understood, at the time it was explained to me from the attorneys that were setting up the limited partnership and the trust.

MS. BARNIER: So did you go down to Phoenix, Arizona to execute this?

MR. WESCOTT: No.

MS. STEPHENS: No. We executed it here. We did everything on the phone.

MS. BARNIER: You did everything on the phone with them.

This actually says it was done in Santa Barbara, according to the notary. Is that right?

MS. STEPHENS: We were probably in Santa Barbara at the time. I used to live in Santa Barbara prior to us getting married, and we were at our home in Santa Barbara at the time when we executed that.

MS. BARNIER: Okay. So what other assets are in this LLC?

MR. WESCOTT: Which LLC?

MS. STEPHENS: The Pook Snook Duke.

MS. BARNIER: Limited partnership. I apologize. I keep wanted to call it -- the Pook Snook Duke limited partnership, it says that a -- let me just see if these are still there: A 200,000 dollar membership interest in Rain Forest Capital LLC, is that still a part of it?

MR. WESCOTT: Correct.

MS. BARNIER: What value does that have?

MR. WESCOTT: We talked about this one before. Originally it was worth 200,000. I think it is worth close to zero given the five million dollars of debt it has and its inability to raise capital.

MS. BARNIER: Do you also believe that, Ms. Stephens?

MS. STEPHENS: Yeah. I mean, I was -- every meeting I have been in with my husband and Colin, I have been -- I have just been listening to what they have said. I have not been actively involved.

MS. BARNIER: Whose handwriting is this that filled out this document?

MS. STEPHENS: That was my handwriting.

MS. BARNIER: Okay. So what, forgive if I am not reading it correct, Catamount Ventures LP interest, what is that?

MS. STEPHENS: Catamount is a, is a --
MR. WESCOTT: A private equity form.
MS. STEPHENS: A private equity firm that invests in companies.
MS. BARNIER: How much interest do you have in that?
MS. STEPHENS: I am not really sure.
Do you know what the interest is? I don't know.
MR. WESCOTT: I believe it is valued above 100,000 dollars, somewhere in that range now.
MS. STEPHENS: Somewhere in that range.
MS. BARNIER: Who runs Catamount Ventures?
MR. WESCOTT: Jed Smith.
MS. BARNIER: J-E-D. Where is he located?
THE WITNESS: In San Francisco. I believe it is 400 Pacific Avenue.
MS. BARNIER: And then what is the name of his company?
THE WITNESS: Catamount Ventures.
MS. BARNIER: That is what he, he runs it as the managing --
MS. STEPHENS: Director.
MS. BARNIER: Director?
MR. WESCOTT: Yeah. Usually when you have

private equity, you have a general partner and a limited partner. He has got a company that is the general partner that is probably called Catamount Venture something or other.
MS. BARNIER: How much money did you put into that Catamount Ventures?
MR. WESCOTT: Originally, it was 150,000 dollars. I believe that we split with my father 50/50.
MS. BARNIER: When you say split with your father --
THE WITNESS: He contributed 75,000. We contributed 75,000.
MS. BARNIER: What do you think it is worth today?
MR. WESCOTT: Well, the most recent statement from Catamount Ventures I believe says more than 100,000. Our interest in that is probably more than 50,000. It is in -- there's a couple companies left that it holds that are ill-liquid, it has a value based on accounting that I believe is more than 100,000. So our share is worth probably more than 50,000.
MS. BARNIER: Then it says Fidelity AP4 LP interest. Is that -- what interest is that?
MS. STEPHENS: Fidelity Capital is another investment that we had with -- is Cap 4 still around, or

did they --
MR. WESCOTT: Yeah.
MS. STEPHENS: Okay.
MS. BARNIER: Who is the --
MS. STEPHENS: Joe Sherman.
MS. BARNIER: Joe Shoeman?
MS. STEPHENS: Sherman.
MS. BARNIER: Where is he located?
MR. WESCOTT: They're in San Francisco as well.
MS. BARNIER: What is the name of his firm?
MR. WESCOTT: The Reliant Group.
MS. BARNIER: How much do you think that is worth?
MR. WESCOTT: I believe one of them is worth something like 100,000. They are both worth more than 100,000 dollars, I believe.
MS. BARNIER: Keep going. Then there's also Fidelity Cap 5, what is that worth?
MR. WESCOTT: That's what I was -- there is one of the two we were just talking about.
MS. BARNIER: You are combining them to say this terms of what --
MS. STEPHENS: No one was worth --
MR. WESCOTT: I believe there was two separate ones, I believe each individually is worth more than

100,000. I think together they are worth more than 200,000.
MS. BARNIER: Also what about Cap 6 then.
THE WITNESS: Cap 6 we sold.
MS. BARNIER: When did you sell that?
MR. WESCOTT: 2010.
MS. STEPHENS: Yeah.
THE WITNESS: Essentially we were not able to make our capital call on it, so my understanding is Joe Sherman made the capital call for us, and then he helped us find a buyer of our very limited interest. We made, I think, one our initial payment, our first capital call, and we defaulted and he was able the get us our money back, or whatever we paid.
MS. BARNIER: That was in 2010 you got your money back?
MR. WESCOTT: I'm guessing. Yes.
MS. BARNIER: What debts does this limited partnership owe?
MR. WESCOTT: The Reliant Capital?
MS. BARNIER: Pook Snook Duke limited partnership, does it owe any money to anybody?
MR. WESCOTT: No.
UNIDENTIFIED SPEAKER: If you don't mind, are there other assets contained in the limited partnership

other than the ones we have talked about?

MR. WESCOTT: I don't believe so. May I see the list, please?

UNIDENTIFIED SPEAKER: That list is just one transfer of those --

MR. WESCOTT: No, no, no. There's a list, there's a multiple list of all the ones.

UNIDENTIFIED SPEAKER: Right. That is one bill of transfer. Have there been other bills of transfer that have gone?

MR. WESCOTT: I believe -- there's one more item that I believe we transferred to. And, again, you will have to apologize, it is hard to keep the limited partners of the trust straight. It is probably to the limited partnership, which was a second, it is the note associated with a deed of trust for a property in Cobb, Lake County.

UNIDENTIFIED SPEAKER: Cobb.

MS. BARNIER: C-O-B -- yeah.

Where is that property located? In Cobb, I know Cobb is pretty small.

MR. WESCOTT: It is 9570 -- it has two addresses. 9575 Entiry Drive is one of the addresses. The other address is 9576 Carolyn Drive.

MS. BARNIER: What is located on those

properties?

MR. WESCOTT: There's a house. It is a three, it is actually a triple lot, and there is a crappy house on it.

MS. BARNIER: How much is it worth?

MR. WESCOTT: Well, there's a house down the street that I noticed, or I was told about recently, that is on sale for 99,000 right now. So it is probably worth a lot less than it used to be. This property is one that I originally sold way back when for 399, but with all the foreclosures, there is a lot of much lower priced, I am sure you know that prices have come down substantially.

MS. BARNIER: What is the secured debt on this property?

MR. WESCOTT: What is the secured debt?

MS. BARNIER: Yeah.

MR. WESCOTT: There's a first -- at least was, was, I don't know what has happened since we were last involved, but there used to be a first mortgage by Citi Mortgage, CitiGroup, Citibank.

MS. STEPHENS: Has this been foreclosed on, Carl?

MR. WESCOTT: No. It has not been foreclosed on.

MS. BARNIER: There's a first of how much?

MR. WESCOTT: Something on the order of 120,000 dollars.

MS. BARNIER: I'm sorry. I know you told me the address, I am going slow nine five seven five -- what was the street?

MS. STEPHENS: Venturi.

MS. BARNIER: V-E-N-T-U-R-I?

MR. WESCOTT: Yep.

MS. BARNIER: So everything we have gone over, that is all the properties that are owned by the limited partnership of Pook Snook Duke. Is that correct?

MR. WESCOTT: I believe that to be the case.

MS. BARNIER: All right. I would like to stop for now. I have -- unless, I have got some attorneys here, if there are any other questions anybody would like to ask right now, go ahead. If you identify yourself, that would be great.

MR. WEAVER: I have got some questions. I identified myself as Rob Weaver, representing Mr. Victor.

I do have on your schedules, you identified an entity that you have an interest in of Pook Snook Duke trust. So I assume that you identified that entity because there is such an entity.

MR. WESCOTT: That's probably the trust that we could not think of, were not sure about. Yes.

MR. WEAVER: I'm going to call it PSD for my ease.

MR. WESCOTT: Sure.

MR. WEAVER: The PSD trust, what was transferred into the PSD trust?

MR. WESCOTT: I'm not sure. I believe we had one trust that was revocable and one trust at that was irrevocable, and --

MS. STEPHENS: A trust or limited partnership?

MR. WESCOTT: The trusts.

And I do not know if anything was transferred into it.

MR. WEAVER: So you have a revocable trust, which I know is a family trust is revocable because I have seen a copy of it.

The Pook Snook Duke trust I presume is the irrevocable trust.

MR. WESCOTT: I believe so.

MR. WEAVER: And there is a partnership, limited partnership that we just went through, the PSD limited.

MR. WESCOTT: Right.

MR. WEAVER: Is all that part of your estate

planning?

MR. WESCOTT: That's correct.

MR. WEAVER: Do you have a master estate plan as to why this was all set up and how everything works together?

MR. WESCOTT: I don't know if that is the name of the document, but we consulted with attorneys at the time. We started setting this up and researching it in 2007 and completed the process in 2010. I am happy to put you in touch with the attorneys.

MR. WEAVER: These are the attorneys in Arizona?

MR. WESCOTT: Correct. Laudnell and Laudnell.

MR. WEAVER: You started going with them in 2007 I think because you were interviewing other attorneys, and you were having a cash crunch and these are the people that did it on the come, so to speak.

MR. WESCOTT: Yeah, it was later in 2007 that we actually hired them.

MR. WEAVER: When did you have the crash crunch?

MR. WESCOTT: My cash crunch, I think, started -- well, it really depends on exactly how I define it, but essentially we -- mostly because of the change, couple different things. After September 2008

when Lehman Brothers fell and the commercial credit market went away and a lot of people were affected, I think that is when it really started getting more challenging.

MR. WEAVER: Your crunch started in 2008 with Lehman Brothers?

MR. WESCOTT: I am just saying that things got more challenging in the real estate world, the commercial credit markets going away.

But, yeah, certainly in 2009, things deteriorated further for us. And in 2010 is when they got really bad, and that's when we stopped paying a lot of mortgages and so on and so forth.

MR. WEAVER: Did the attorneys you hired in Arizona put together some sort of asset protection plan for you also?

MR. WESCOTT: I believe so.

MR. WEAVER: Was that part of this family plan you are talking about, this estate planning, or was that something separate?

MR. WESCOTT: It is --

MS. STEPHENS: I think it was all part of the estate planning.

MR. WESCOTT: Yeah.

MS. BARNIER: Do you have all those documents?

MR. WESCOTT: We do.

MS. BARNIER: Could you please provide all that?

MR. WESCOTT: Sure.

MS. BARNIER: Let's go through it. So we want the asset protection plan, right? Is that how you termed it?

MR. WESCOTT: I don't know what specifically that means.

MS. BARNIER: Okay. Let's go, and so the trust --

MR. WESCOTT: There's two, what we know about is two trusts and a limited partnership. So we will get you all those documents.

MR. WEAVER: You also said there was a master asset protection plan that these attorneys prepared for you, and the same thing with an estate planning --

MR. WESCOTT: No, I didn't say that.

MS. STEPHENS: No, he did not say that. He did not say that.

MS. BARNIER: Okay. That's what I thought I heard you say.

MR. WESCOTT: That's what you said.

MS. STEPHENS: That's what he said. He said is there a master --

MR. WESCOTT: He asked if there is a master plan, and I don't think there was a master plan.

MS. STEPHENS: You asked if there was a master plan, then you used the word asset protection plan.

MS. BARNIER: So when you consulted these attorneys, did you consult them for the sole purpose of just setting up the family trust, the Pook Snook Duke trust, which there seems to be ambiguity; your wife does not think it exists, you think it exists, and the LLP. Is that the only three things that they did for you?

MR. WESCOTT: That's correct.

MS. STEPHENS: When we had our first child, we decided we needed to do some estate planning. At the time, their client, Charles Victor, gave us copies of his will and his estate planning to help us -- at the time my husband was friends with this guy, put together our estate planning and gave us some examples. At the time we started doing our estate planning, we talked to several different people.

Initially, I was involved with it more directly because I was trying to find us attorneys and people to help us do that. Then I got pregnant with our second child, and I handed the reigns to my husband, and that is when he did it. But our intent from the beginning was to do estate planning, to set up trusts for the

benefit of our children, and to set up durable power of attorney and to set up health care, you know, directives, et cetera.

MS. BARNIER: I understand that. I'm going to jump back in, because I forgot to ask one thing earlier. So we talked about what you put into the LLP. What did you fund into the family trust?

MS. STEPHENS: I don't remember what we funded. By that point, all this time, during this time period was when I had the second and third child, and I was pretty heads-down.

MR. WESCOTT: I think our intent was to also put some properties into whatever the right entity was but since we stopped paying our mortgages and let them all go to foreclosure, there was not anything further that we were going to transfer.

MS. BARNIER: So you never transferred any property into the family trust?

MS. STEPHENS: I don't know if we ever did or not.

MR. WESCOTT: I don't think so.

MS. STEPHENS: Our intent was to do this, and again this sort of coincided with my husband's business not -- we thought we were doing well.

MR. WESCOTT: Actually, you know what, I

realize there is one more property we forgot about that we did transfer, and I have to apologize, I don't know which of the entities we're talking about it was transferred into.

I believe, so there's the property 9501 Lane Drive, which we sold our interest in long ago, but I believe that the -- let's see.

MS. STEPHENS: I don't know if it is in one of the trusts.

MR. WESCOTT: I think there is an LLC that owns the property before our sale, and I believe that was transferred to one of these three entities. Is my best, that's my belief.

MS. BARNIER: Which LLC owned this property?

MR. WESCOTT: 9501 Lane Drive, comma, LLC.

MS. BARNIER: Where was the property located?

MR. WESCOTT: In Ukiah.

MS. BARNIER: So you sold that property. Do you remember when?

MR. WESCOTT: I think I did the initial deal for it in 2007 or so. Maybe eight.

MS. BARNIER: And you took the proceeds from that and funded -- you put the funds into the family trust?

MR. WESCOTT: No. We actually -- what I

believe we did, because we sold the property in a wrap deal, so there was, you know, (inaudible) so there were staggered payments.

The property -- oh, I believe the LLC that owns the property was what was transferred to one of the trusts or limited partnerships.

MS. STEPHENS: I don't remember any of that.

MS. BARNIER: So the LLC was, the LLC interest, actually, I'm sorry 9501 Lane LLC was put into the trust. And whatever the trust, whatever the LLC owned, the now it is part of the trust?

MR. WESCOTT: That is correct. It was part of the trust.

MS. BARNIER: So were the proceeds from the sale of the property then put into the trust?

MR. WESCOTT: I believe the property was sold and all the equity was sold prior to the transfer.

MS. BARNIER: So the LLC is in there but at this point does the LLC have any value in 2010?

MR. WESCOTT: I believe the LLC has -- well, with the secured debt on the property, probably not. The reason that we trans -- part of the reason we transferred to the trust is that when we originally did a transfer, our lender, which was Luther Burbank, objected to the transfer, and they invoked the

due-on-sale clause, and they asked us to transfer -- initially they asked us to transfer the property back, and I think a lot of small banks are seeking ways to regain their capital.

And after talking to them and explaining what we were doing with our estate and retirement planning, they were fine with the property being held and, again, they either wanted an irrevocable or revocable, and I forget which. And, again, I could look back at the e-mails and forward that so you can see what they wanted. But we transferred, as I recall, the LLC into one of the trusts.

MS. BARNIER: And you could provide me with that documentation?

MR. WESCOTT: Yes.

MS. BARNIER: Okay. Mr. Weaver, I am going to let somebody else, I think somebody else has got some questions, too, if you can hold on a little bit.

MS. DANA ADRIAN: My name is Dana Adrian, and I represent Old Republic.

You are familiar with Two Long Horn Ridge Road LLC?

MR. WESCOTT: I am.

MS. DANA ADRIAN: Are you the sole member of that?

MR. WESCOTT: No.

MS. BARNIER: I need to ask you to speak up. Do you want to come on down here so the recorder picks it up. I don't want -- if we have to have it transcribed, I don't want the transcriber going "I can't hear you."

Thanks.

MS. DANA ADRIAN: Who are the members of that LLC?

MR. WESCOTT: I believe the member of that LLC is Gunvor SA. In fact, I believe that is the sole -- there was only one member, which is the managing member, and that's Gunvor SA.

MS. DANA ADRIAN: "SA" that is a type of entity in Latin America?

MR. WESCOTT: It is a corporation. It's like a C corp. It is not a flow-through entity; it is a like a C corp.

MS. DANA ADRIAN: Does Gunvor have any other assets?

MR. WESCOTT: No.

MS. DANA ADRIAN: Two Long Horn Ridge Road LLC, when was that formed?

MR. WESCOTT: I believe it was formed last year in approximately February -- January, February in the

beginning of the year. So I guess that would be January or February 2011.

MS. DANA ADRIAN: Does the LLC have any assets?

MR. WESCOTT: The asset that the LLC has is a claim against Old Republic for 283 grand, something like that. It used to own a property, which the LLC purchased. And as I am sure you are quite familiar with the details of this case, we -- Old Republic was used as the title insurance company, and there was a deed that Old Republic had not found at the time of the purchase for 250,000 dollars, that was not in the preliminary title report or anything else.

Shortly after purchasing the property, we received a balloon payment notice from the holder of that 250,000 dollar, I believe was the original amount before interest, note. And so that property went to foreclosure from that individual or entity that had the note, and we lost the property because of Old Republic's errors, and that is why we are suing each other.

MS. DANA ADRIAN: The 283 thousand dollars is that how you value your claim against Old Republic?

MR. WESCOTT: It is my understanding from talking to my attorney, my lay person thinking would be that we should be owed 600,000, but my attorney has explained to me --

MR. ISON: You do not have to tell him what your attorney told you.

MR. WESCOTT: That's true. That's privileged information.

Anyways --

MS. STEPHENS: Just answer the bare minimum.

MR. WESCOTT: What's the question? Can you repeat the question?

MS. DANA ADRIAN: Sure. What do you value your claim against Old Republic?

MR. WESCOTT: 283, 290, something like that. Whatever was in the legal papers.

MS. DANA ADRIAN: How do you -- how did you determine that value?

MR. WESCOTT: My attorney actually determined the value.

MS. DANA ADRIAN: Did the LLC pay any moneys for the property for the Two Long Horn Ridge Road?

MR. WESCOTT: The LLC acquired the property in a heavily debt-laden transaction. So essentially we took the entire purchase price of the property as debt, including assumed debt, and assumed unpaid property taxes.

MS. DANA ADRIAN: So the answer to my question is that you did not --

MR. WESCOTT: It is a minimal amount of money that was paid.

MS. DANA ADRIAN: At the time that the LLC purchased the Two Long Horn Ridge property, did the LLC have any other assets or debts?

MR. WESCOTT: No. It was formed solely for the purpose of this transaction.

MS. DANA ADRIAN: And you had attempted to sell the Two Long Horn Ridge property. Is that right?

MR. WESCOTT: That's correct. Actually had sold it. I signed a contract to sell it. That was before we learned of the deed of trust that Old Republic did not find in its title research and before the foreclosure proceedings. And, of course, my buyer pulled out when he learned the property was being foreclosed upon.

MS. DANA ADRIAN: Who was the buyer?

MR. WESCOTT: The buyer is another LLC or SA. I cannot give you the name, but I was told that was for 700 thousand and change.

MS. DANA ADRIAN: Who was the member of that SA or LLC?

MR. WESCOTT: Let me get you that information. I don't remember the --

MS. DANA ADRIAN: An Eric something?

Page 121

MR. WESCOTT: Eric. Correct.
MS. DANA ADRIAN: You don't recall his last name?
MR. WESCOTT: I don't recall his last name.
MS. BARNIER: Would you also give me that information also, and to the Trustee.
MR. WESCOTT: Sure.
MS. DANA ADRIAN: That's all the questions I have.
MS. BARNIER: Mr. Weaver.
MR. WESCOTT: I'm sorry. What is it that I am getting you a copy of?
MS. DANA ADRIAN: If you could get me a copy of the purchase agreement, and the name.
MR. WESCOTT: The purchase agreement on the sale of the property that then was aborted, correct?
MS. DANA ADRIAN: Yes.
MR. WESCOTT: Okay.
MS. DANA ADRIAN: And name of the buyer.
MR. WESCOTT: Okay.
MS. BARNIER: And the lawsuit, who filed the lawsuit on your behalf?
MR. WESCOTT: Actually, I believe Old Republic sued us first, and we responded.
MS. BARNIER: So you have a cross-complaint

Page 122

against Old Republic?
MR. WESCOTT: We have a cross-complaint for the 283.
MS. BARNIER: Who is representing you in the cross complaint.
MR. WESCOTT: Mr. Ison.
MS. BARNIER: Could you also send me a copy of the complaint and cross complaint?
MR. ISON: Cross complaint, complaint, and answer.
MS. BARNIER: Okay. And that was filed in which county?
MS. DANA ADRIAN: Here in San Francisco.
MS. BARNIER: Okay.
MR. WEAVER: Let me just do a follow up on some of the questions you were asked concerning the property south of the border that I think we did not hit the property in Nicaragua, one hundred percent interest in Unexpected Development. What is that property?
MR. WESCOTT: That is the property in Granada, I believe it is 20 Manzana. Something like that.
MR. WEAVER: What is the value of that?
MR. WESCOTT: Probably, I think we paid something like 150 originally. The Nicaraguan real estate is down like 50 like California so maybe 75 ish.

Page 123

MR. WEAVER: You paid 150,000?
MR. WESCOTT: Approximately, yes.
MR. WEAVER: Is there any debt secured against it?
MR. WESCOTT: There is no secured debt. There is something like 80 grand owed to various, actually there may be some secured debt now, which would be because we have not paid property taxes or anything else, I don't know if they have effectuated any sort of lien. But there is something like 80 thousand dollars owed to various people that are over in Nicaragua.
MR. WEAVER: You have got a complex financial life.
MR. WESCOTT: I do.
MR. WEAVER: Very complex, and I don't know how you keep track of it as much as you do.
Do you keep records on Quickbooks or some other accounting type of document retention or anything like that that we can look at?
MR. WESCOTT: Yeah, I had a bookkeeper, Gina Perry, who was the one through some time in 2010 whose responsibility it was to keep track of all the international properties. And she did do the books for certain entities in California, for example, for People Bridge, and Quickbooks, but for the overseas stuff she

Page 124

put together spreadsheets.
MR. WEAVER: What kind of software did she use for the spreadsheets?
MR. WESCOTT: Excel.
MR. WEAVER: Do you still have the underlying data for that?
MR. WESCOTT: I have what was on her computer.
MR. WEAVER: Do you still have that computer.
MR. WESCOTT: I don't think I have the computer, but I have the -- she might actually have the computer.
MR. WEAVER: What do you have?
MR. WESCOTT: I have, I can send you the spreadsheets that she most recently sent.
MR. WEAVER: Those are in some sort of electronic database?
MR. WESCOTT: They are in Excel.
MR. WEAVER: Okay.
UNIDENTIFIED SPEAKER: I'm sorry?
MR. WESCOTT: They are in Excel.
MR. WEAVER: Don't destroy those. We are probably going to want to see those at some point in time.
MR. WESCOTT: Okay.
UNIDENTIFIED SPEAKER: What about any --

Case: 12-03148 Doc# 81-3 Filed: 09/30/13 Entered: 09/30/13 15:33:51 Page 9 of 38
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-52 of 228

MS. STEPHENS: (Inaudible).
MR. WESCOTT: Yes.
MS. STEPHENS: Don't say you are sending him anything.
MS. BARNIER: It has to go through your attorney.
MS. STEPHENS: It has to go through our attorney.
MS. BARNIER: And then you send it --
MR. WEAVER: You are not going send it to me --
MS. BARNIER: You are going to send it to the trustee.
MR. WESCOTT: I think we are sending it to Mr. Ison, and he is sending it to you.
MS. BARNIER: So you want to put this on the list. You are going to send all the spreadsheets you have in Excel, and that's the format you have them in right now?
MR. WESCOTT: That is correct.
MS. BARNIER: And then you also just explained that your bookkeeper may have underlying information, and I read your account of what the bookkeeper had done. You gave an address for her where you believe she is. Is that still current? You believe she is at that address?

MR. WESCOTT: The address that I have for her is a different employer where she works, and that I believe, which one is on there?
MS. BARNIER: I remember seeing it on your schedules. I don't remember the address.
MR. WESCOTT: When we mailed her, related to all this, we got a bounce-back. So I do know she works for a company called Amarkana Inc, I think the address we provided is care of Amarkana Inc.
MS. BARNIER: Amarkana.
MR. WESCOTT: A-M-A-R-K-A-N-A.
MR. MICHAEL BROKI: That is the address? This is Michael Broki.
That is the address you provided?
MS. BARNIER: And is she there, do you know, Mr. Broki?
MR. MICHAEL BROKI: I don't know.
MS. BARNIER: You don't have a home address for her?
MR. WESCOTT: I don't. I believe she moved to South San Francisco, but I don't know the address.
MR. WEAVER: Is she a CPA or bookkeeper?
MR. WESCOTT: She is a bookkeeper.
MR. WEAVER: After 2010, how have you maintained the records and kept track of money in, money

out?
MR. WESCOTT: We have not really. Again, we have been in a fairly dire financial situation. We just recently had a new bookkeeper help us with some bookkeeping, and that is how we got our 2009 taxes done is with his help. So we have a new bookkeeper now and we have -- so anyways, yes.
MR. WEAVER: Now, I think you indicated that you transferred property into the one of the trusts, perhaps, and the limited partnership. But I didn't see in the schedules any kind of a transfer of property into any of those.
MR. WESCOTT: Which one are you talking about specifically?
MR. WEAVER: Let's talk about Pook Snook Duke limited partnership. I saw nothing in the schedules after the transfers.
MR. WESCOTT: Yeah. I -- let's see. Actually, I think that is in there. Which property specifically are you talking about?
MR. WEAVER: I don't know. I am looking at the properties that were transferred into the Pook Snook Duke limited.
MR. WESCOTT: Pook Snook Duke limited, is that the one that is 9501 Lane Drive LLC? I think that is

listed in there.
MR. WEAVER: But it does not show it goes into the limited partnership.
MR. WESCOTT: What does it show?
MR. WEAVER: That's the problem. We have a difficult time looking at these schedules because we are showing lots of properties, but we don't know where they are.
MR. WESCOTT: Isn't it -- well, again, you may not have -- if it is showing, if it is showing it being transferred to a different entity --
MR. WEAVER: It does not show it being transferred to a different entity. That's my problem.
Let's kind of start out with the list I have. You have got as your Attachment 3 regarding 10 A, transfers in the last two years.
MR. WESCOTT: Correct.
MR. WEAVER: And the first part of that are transfers to Monnette Stephens which I understand a lot of these are part of the transmutation agreement.
MR. WESCOTT: Correct.
MR. WEAVER: So the first asset listed is a fourth deed of trust from Bradshaw Urban Development LLC. Has that been subsequently transferred after 2010 or what happened to it?

Case: 12-03143 Doc# 81-3 Filed: 08/30/13 Entered: 08/30/13 15:53:51 Page 10 of 38
Sup. Exhibit 3 - 341 Hearing and Deposition Transcripts D-53 of 228

MR. WESCOTT: No. I believe that property is foreclosed.

MR. WEAVER: That was not listed on the foreclosure list, I do not believe, which you also provided.

MR. WESCOTT: I think the foreclosure list -- I don't know. Can we look at it together?

MS. STEPHENS: Carl -- I mean --

MR. WESCOTT: Without looking at the document, it is hard for me to say exactly what was on it.

MR. WEAVER: Tell me what happened to the fourth deed of trust from Bradshaw Urban.

MR. WESCOTT: Has not been transferred since. And I believe it is valueless. It is stacked behind approximately 15 million dollars of debt, and I believe the property has been foreclosed. It would be a matter of public record.

MR. WEAVER: The senior property -- the senior debt foreclosed and squeezed out your fourth position?

MR. WESCOTT: I believe that is the case.

MR. WEAVER: Okay. The next item listed is one hundred percent membership interest in 11385 East RAOD, maybe it is a typo, LLC.

MR. WESCOTT: Yes.

MR. WEAVER: Owns property in East Potter --

MR. WESCOTT: That property was foreclosed.

MR. WEAVER: When was that foreclosure?

MR. WESCOTT: I believe in 2010. There's a whole schedule of forecloses, I believe it is on there, isn't it.

MR. WEAVER: No, it is not.

Next item is a property on 7950 Hearst Road, Willits. Has that been foreclosed?

MR. WESCOTT: 7950, yes, it has.

MR. WEAVER: When was that foreclosure? I am sorry. I got that date. 5-4-11. Was that an income-generating property?

MR. WESCOTT: It was.

MR. WEAVER: Was the income more than the debt on the property?

MR. WESCOTT: The debt, no. It generated 391 thousand dollars of income in, I think in 2009. And subsequently, it generated -- I'm not sure of the exact amount, but once we conclude our, in the next month we will have the exact amount. A much smaller number in 2010.

And the amount of the debt on the property I believe was in the 800 thousands. So the answer is no.

MR. WEAVER: Do you know what the mortgage payments were?

MR. WESCOTT: The mortgage payments were something like nine grand a month. 89 something, I believe, something like that.

MR. WEAVER: Is this a residential property or what is this?

MR. WESCOTT: Yes.

MR. WEAVER: It says it is five parcels. Were all five parcels lost?

MR. WESCOTT: Correct. I believe it is actually, you know, country property. There were originally five parcels -- yes, they are -- I actually split them with certificates of compliance, but there are still five parcels. The county screwed up and somehow created nine, but they screwed it up. There should be five parcels, even though I have -- had eight or nine APNs because of the mistake by the county.

MR. WEAVER: These had houses on them?

MR. WESCOTT: There was one house.

MR. WEAVER: That was where the rent was being generated?

MR. WESCOTT: Correct.

MR. WEAVER: Any other income from that property than that one renter?

MR. WESCOTT: No.

MR. WEAVER: How much were they paying in rent?

MR. WESCOTT: They were supposed to pay -- I have to look at the document, but I think something like twelve or thirteen grand a month, and they stopped paying.

MR. WEAVER: Did you evict them?

MR. WESCOTT: I'm sorry?

MR. WEAVER: Did you evict them?

MR. WESCOTT: Well, they moved out.

MR. WEAVER: Did you find another renter?

MR. WESCOTT: No, I did not.

MR. WEAVER: Did you try to find another renter?

MR. WESCOTT: Not really. The property was getting near foreclosure, and so the short answer is no.

MR. WEAVER: Okay. The 30901 Sherwood Road in Willits, that was also an income-generating property, correct?

MR. WESCOTT: I leased it and never got a payment.

MR. WEAVER: You never got a payment?

MR. WESCOTT: That's correct. Actually that's not quite true. I believe I got one payment of something like six thousand dollars.

MR. WEAVER: That got foreclosed, looks like in 2011 also.

Case: 12-03143 Doc# 81-3 Filed: 08/30/13 Entered: 08/30/13 15:33:51 Page 11 of 38
Supp Exhibit D - 341 Hearing and Deposition Transcripts D-54 of 228

MR. WESCOTT: Yes.
MR. WEAVER: The 9501 Lane Drive in Ukiah, I think we talked about that a little bit before, so I am going to go back and look at the notes.
MR. WESCOTT: Okay.
MR. WEAVER: The 5760 Chamise Road in Healdsburg. That was an income-generating property?
MR. WESCOTT: That's correct.
MR. WEAVER: And that was foreclosed?
THE WITNESS: Correct.
MR. WEAVER: What happened there?
MR. WESCOTT: We stopped making payments on all our properties in July 2010 and the lender foreclosed on the property.
MR. WEAVER: Were you continuing to generate income from the property?
MR. WESCOTT: Some. Not very much. The tenant stopped paying.
MR. WEAVER: Again, another residential property?
MR. WESCOTT: Correct.
MR. WEAVER: When did the tenant stop paying?
MR. WESCOTT: In general, with all these properties, the tenants started getting behind more and more until they just stopped at a certain point.

MR. WEAVER: When did all that start?
MR. WESCOTT: 2010.
MR. WEAVER: That is what happened in the Healdsburg property in 2010, they stopped making payments, or got further and further behind?
MR. WESCOTT: Correct.
MR. WEAVER: 2009, they were paying on a regular basis?
MR. WESCOTT: Correct.
MR. WEAVER: Next property looks like it was foreclosed 5700 Robinson Creek in Ukiah. That was an income-generating property?
MR. WESCOTT: I'm sorry. Could you say the address again?
MR. WEAVER: 5700 Robinson Creek in Ukiah.
MR. WESCOTT: Correct.
MR. WEAVER: That was a residential rental also?
MR. WESCOTT: Can we take a short break so I can get some water?
MR. WEAVER: Sure.
MR. WESCOTT: Thank you for the break.
MS. BARNIER: All right.
MR. WESCOTT: I think we were talking about 5700 Robinson Creek.

MR. WEAVER: Yes.
MS. BARNIER: Back on the record.
MR. WEAVER: That has been foreclosed on also as I understand.
MR. WESCOTT: I believe so.
MR. WEAVER: When did the tenant stop making payments or start getting behind on Robinson Creek?
MR. WESCOTT: Starting in 2010 or 2011.
MR. WEAVER: You have also got a property, 1720 Nistruth Road in Cazadero. You indicate at least on your schedule you believe it was foreclosed. Have you determined whether it was foreclosed on yet or not?
MR. WESCOTT: No. I have not and if I am -- I have not.
MR. WEAVER: Is there a reason you would not know it was foreclosed?
MR. WESCOTT: Well, I e-mailed, I checked county records, and I could not find anything, but this is another property that has multiple addresses.
I also -- I e-mailed with the Bay Sierra, which is the entity that had the debt, and they indicated that they were planning to foreclose, but I e-mailed them again and did not get a response.
MR. WEAVER: Have you ever received a notice of sale?

MR. WESCOTT: I have not.
UNIDENTIFIED SPEAKER: Do you have an APN number, or could you provide us --
MR. WESCOTT: I could provide an APN number on that one.
UNIDENTIFIED SPEAKER: The address.
MR. WESCOTT: Sure. Just to give you some more context there: The deed of trust that is on it, which was cross-collateral elsewhere, was 600,000 dollars, and the property was purchased -- never purchased, it was sold for more than about 400,000. There is no equity in that property, just so you know. It is vacant land, too.
MR. WEAVER: There's a list of properties that were shares of Sunrise Development, which owns --
MR. WESCOTT: Surprise, yes.
MR. WEAVER: I'm sorry, yeah, Surprise. One hundred percent membership interest in AYSS Ministorage.
THE WITNESS: Correct.
MR. WEAVER: What has happened with that asset, if anything?
MR. WESCOTT: Well, I don't know that -- let's see. The lender on it is Commercial Capital, they are in bankruptcy. They are suing me, by the way. That's part of the 11 point five million. I am trying to

Page 137

remember the sequence of events.

There was a receiver that took over the property, and I am not sure -- does it list it as being foreclosed?

MR. WEAVER: No.

MR. WESCOTT: Okay. I am not sure.

MR. WEAVER: What is the value of that membership interest?

MR. WESCOTT: Well, I think we value it at zero when we have always valued it at zero because the debt of the property is more than it's worth.

MR. WEAVER: When did you acquire the property, when was the property acquired by you or one of your entities?

MR. WESCOTT: I believe it was September 2008.

MR. WEAVER: So it has always been valued at zero, is what you are telling me?

MR. WESCOTT: Correct. At the time of purchase of that property, we took on more debt than the acquisition price. Same thing on the other one, Delhi.

MR. WEAVER: I have got one another here Atwater Development. What is the story with Atwater?

MR. WESCOTT: So Atwater purchased a, some vacant land in Atwater, which was intended to be developed for retail. And we -- there was no

Page 138

entitlements that have been granted on the property. And, let's see. I think we had -- I don't remember the exact percentage interest, but I think you have it there.

MR. WEAVER: It says 50 percent.

MR. WESCOTT: Okay. That sounds about right. We borrowed money -- and that is actually the cross collateralized, is it -- yes. That was, the Bay Sierra was the lender on that one, and they cross collateralized (inaudible) That is the 600 K. We borrowed 600,000 dollars at the time of acquisition, and some of that money, a lot of that money was used for entitlements and engineering and entitlements.

MR. WEAVER: What was the acquisition cost?

MS. STEPHENS: If you don't know --

MR. WESCOTT: I don't know.

MR. WEAVER: I have a 91 percent membership interest in Bradshaw Urban Development.

MR. WESCOTT: Yep.

MR. WEAVER: Is that still viable? Is it still alive?

MR. WESCOTT: I mean, the LLC exists. That is, that was an apartment development project. That is the one that is in Sacramento on Bradshaw Road. And I believe that one has foreclosed, too, but --

Page 139

MR. WEAVER: Do you know when that was foreclosed?

MR. WESCOTT: I don't have a date.

MR. WEAVER: Was that an income-generating property?

MR. WESCOTT: No. It is vacant land.

MR. WEAVER: I see you indicated 91 percent. I have got other documents you gave to my client indicating he was 95.5 percent member interest. Did you sell a membership interest out in that at some point in time?

MR. WESCOTT: No. We added one because we originally had a 91 percent membership interest, and then took half of the other nine percent later on.

The other nine percent was owned by SDHC LLC, and we exercised an option to acquire half of SDHC, and that is why the ownership interest went up from 91 --

MR. WEAVER: That was some time after 2010?

MR. WESCOTT: I don't know the exact date.

MR. WEAVER: I'm just looking here on the transfer dates of 2010, and the property transferred was 91 percent. So I assume if it went up to 95, it was after 2010.

MR. WESCOTT: Separately there is obviously interest of HTSC as well. So it just kind of depends

Page 140

how you list it, if you list them together or not.

MR. WEAVER: Also have an indication of a 91 percent interest in an Oroville Industrial Park LLC.

MR. WESCOTT: Yep.

MR. WEAVER: Looks like it has substantial value. Is that still something that is owned by you or your wife?

MR. WESCOTT: No, it is not.

MR. WEAVER: What happened to that?

MR. WESCOTT: The LLC still exists, and -- let's see. We -- so this is property that we acquired in Oroville, it is about 200 acres. We actually got that one entitled with a unanimous vote from the Council. 200 acres of industrial park. It is vacant land. And then we were struggling to finance the building, tried to float a bond, tried to borrow money.

We did create a significant value in the property, I think we had it appraised for 18 million dollars after we got the entitlements. But in a world where you can't borrow money, land that has lots of debt on it and payments is no longer viable. No longer an asset. It is a liability. So I forget what the payments were. We stopped making the payments.

The lender on that one was Alliance Financial had the first, which I believe was something like five

Page 141

million, whatever the exact amount is there. There's a second in favor of one of Mike Gill's companies, which I believe was called Gold Line, 300 million dollars. Or so over eight million dollars of debt on the property.

At one point it was appraised for 18 million dollars something like that. But --

MR. WEAVER: When was the appraisal?

MR. WESCOTT: I don't know but --

MR. WEAVER: How many years ago?

MR. WESCOTT: Probably, I would guess around the 2009 year is my best guess.

MR. WEAVER: Who appraised it?

MR. WESCOTT: I don't remember, but -- I was not the person who hired the appraisal.

MR. WEAVER: Who hired the appraiser.

MR. WESCOTT: Sunett Singal.

MS. STEPHENS: Spell that name for me.

MR. WESCOTT: S-u-n-e-t-t. S-i-n-g-a-l.

MR. WEAVER: One more time?

MR. WESCOTT: I am sorry. S-u-n-e-t-t S-i-n-g-a-l.

MR. WEAVER: Do you know how to get ahold of Sunett?

UNIDENTIFIED SPEAKER: Just Google him.

MR. WESCOTT: There's a lot of information

Page 142

about him. I have a cell phone number.

MR. WEAVER: You have a cell phone number off the top of your head.

MR. WESCOTT: 916-213-5272, it is a number I used to call often.

UNIDENTIFIED SPEAKER: One more time.

MR. WESCOTT: 916-213-5272. It's a number I used to call often.

MR. WEAVER: That's been foreclosed and that is no longer --

MR. WESCOTT: Actually, well just go on.

MR. WEAVER: Go ahead.

MR. WESCOTT: No.

MR. WEAVER: Actually what?

MR. WESCOTT: Let's move on.

MR. WEAVER: Do you or your wife have any interest any more in the Oroville industrial park?

MR. WESCOTT: No, we don't.

What I was about to say is actually I suspect that -- you can see a lot of information on the Internet, that there is some fraudulent things that were going on with Sunett as well, and --

MS. STEPHENS: Don't speculate.

MR. WESCOTT: All right.

MR. WEAVER: The Venturi Drive Cobb I think we

Page 143

went through that before, I am not going to deal with that.

The Rain Forest Capital, I think we also went through that.

You still receiving money on the second or, I think it is the second on 3886 Noriega?

MR. WESCOTT: No. That -- wasn't that property foreclosed long ago? That was my old office. People Bridge used to get it, and the payments stopped. I could give you the exact date but --

MS. STEPHENS: You can provide that date to our attorney.

MR. WESCOTT: Yeah. I don't recall exactly when. I think probably in 2010.

MR. WEAVER: That's an office building?

MR. WESCOTT: It is actually a -- it is a four-unit, four-story building. The top three floors are residential. That address, 3886 is just the ground floor, commercial condo unit. There is three other addresses above it.

MR. WEAVER: This was just for the commercial condo unit?

MR. WESCOTT: Correct.

MR. WEAVER: You sold it, as I saw, in one of the title reports and took back a second.

Page 144

MR. WESCOTT: Correct. My company owned it and sold it, People Bridge.

MR. WEAVER: The buyer has now been foreclosed on?

MR. WESCOTT: I believe so. His name is Ramon Lim Koliak, or something like that. I won't be able to spell it correctly for you.

MR. WEAVER: Has he made any effort to make any further payments on the second deed?

MR. WESCOTT: No. He stopped making the payments long ago, long before the foreclosure. That is why the foreclosure happened.

I mean, he did not pay the first either. The first foreclosed, not us.

MR. WEAVER: At one point you owned a 2005 Lexus RX 330. What happened to the Lexus?

MR. WESCOTT: We used to have two, and I wrecked one, and we sold the other.

MS. STEPHENS: You wrecked that one.

MR. WESCOTT: I wrecked that one too before selling it.

MS. STEPHENS: Wrecked both cars. He is a really bad driver.

MR. WEAVER: That's why you have the license suspended.

Case: 12-03143 Doc# 81-3 Filed: 08/30/13 Entered: 08/30/13 15:33:51 Page 14 of 38
Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-57 of 228

MR. WESCOTT: That's why I don't have a driver's license.
MR. WEAVER: Both of those cars are gone?
MR. WESCOTT: Correct. Long gone.
MR. WEAVER: You also indicated you had an art collection worth 255,000 bucks at some point in time. What is that based on?
MR. WESCOTT: Was it really 255, or was it one something?
MR. WEAVER: 255.
MR. WESCOTT: You know, I used to have an extensive Filmore poster collection, and that is the majority of the value there.
MR. WEAVER: What happened to the collection?
MR. WESCOTT: Most of it we had some water damage in our house from a water heater. I sold part of it, and we still actually have some of it, it is listed in our -- we had a small, small amount remaining.
MR. WEAVER: What do you have remaining? How many posters?
MR. WESCOTT: I don't know. Couple, three dozen. Something like that.
MR. WEAVER: Any fine art, oil paintings? Etchings?
MR. WESCOTT: He had some art in our house. A

lot of it is more personal value.
MR. WEAVER: I don't care about family photographs.
MR. WESCOTT: No fine art.
MR. WEAVER: Sculpture, or anything like that?
MR. WESCOTT: No. I don't like sculpture.
MR. WEAVER: You also listed that you had jewelry worth 243 thousand dollars. What jewelry do you have?
MR. WESCOTT: That was mainly a diamond that was part of, that I bought for our wedding.
MR. WEAVER: Is that a wedding ring?
THE WITNESS: Well, the value of the diamond, I think.
MS. STEPHENS: The value of the diamond was not 240 thousand dollars.
MR. WESCOTT: I think it is worth at least one hundred something of that.
MR. WEAVER: What happened to the diamond? Do you still have it?
MS. STEPHENS: No. I lost it, actually, swimming.
MR. WEAVER: Any other jewelry, any watches, anything of that nature?
MR. WESCOTT: No watches. We have some minor

items.
UNIDENTIFIED SPEAKER: Do you know how many carats the diamond was?
MS. STEPHENS: It was, like, around three carats.
MR. WESCOTT: It was three point one four.
MS. BARNIER: I'm sorry. You said you lost your diamond ring?
MS. STEPHENS: I lost swimming, yeah.
MS. BARNIER: Did you have it insured?
MS. STEPHENS: No, I didn't. We did not have a personal insurance policy with our house; I thought we had.
MR. WESCOTT: We had -- to save money, we got a different policy that covered for fire, but did not cover contents, so --
MR. WEAVER: You did not have a special rider for art or for jewelry or anything of that with your insurance?
MS. STEPHENS: I didn't realize the ring was worth that much. I knew it was an expensive ring, but I didn't think it was over 100,000 dollars.
MS. BARNIER: So the ring was one hundred thousand, and you told these guys you had jewelry worth 240, what was the other jewelry that you had that was

worth the 140,000.
MR. WESCOTT: I think the diamond was worth one hundred something thousand.
MR. WEAVER: What about the rest of the jewelry?
MR. WESCOTT: I'm not sure. Let me look into that.
MS. STEPHENS: I don't wear jewelry. I have some smaller pieces that I got from my mother and my grandmother and some, you know, old pearls and stuff like that. But, I have -- you know, I mean, nothing is worth like over, you know, a couple thousands dollars.
MR. WEAVER: That's why I asked about watches because those are usually a big ticket item with men.
MR. WESCOTT: No. I never was a watch guy.
MR. WEAVER: You do not seem like a gold chain kind of guy either.
MR. WESCOTT: No.
MR. WEAVER: So no other jewelry you can tell me about that has a significant value other than the diamond?
MR. WESCOTT: That's the one piece that I think had the most value.
MS. BARNIER: So I'm confused. If you told these guys you had jewelry worth 240 the ring was worth

around one hundred, that's being generous, where does the other 140 come from?

MR. WESCOTT: Actually, like I said, I think the value of the diamond was in the hundreds -- in the hundreds, in other words, between one hundred and 200,000.

MR. WEAVER: Did you ever have your art collection appraised?

MR. WESCOTT: The Filmores, no.

MR. WEAVER: Did you purchase those, or just collect them over time? How did you --

MR. WESCOTT: I collected them over time, I mean, I purchased some of them.

MR. WEAVER: You are about the right age, you should have gotten some of them essentially for free.

MR. WESCOTT: Correct. I did go to shows at the Filmore. I did get a number of them, going to shows but the great majority of them I purchased.

MR. WEAVER: Did you ever have them appraised?

MR. WESCOTT: No, I didn't, but I used to have -- I think there is something, I had more than a thousand of the posters and some of them are quite valuable.

MR. WEAVER: These are all original posters?

MR. WESCOTT: Correct. Yeah. They started

doing them in the 60s, as I am sure you are aware.

MR. WEAVER: Wine collection. You still have a wine collection?

MR. WESCOTT: We have a little bit of wine left at the house but --

MR. WEAVER: What is left?

MR. WESCOTT: Maybe five or ten cases.

MR. WEAVER: What kind of wine?

MR. WESCOTT: Some pinot. Some cab.

MR. WEAVER: Domestic or --

MR. WESCOTT: Domestic.

MR. WEAVER: What winery is the pinot from?

MR. WESCOTT: Williams Same.

MR. WEAVER: Williams what?

MR. WESCOTT: Williams Same.

MR. WEAVER: Any particular year?

MR. WESCOTT: Probably mostly recent, I would guess, is what we have left.

MR. WEAVER: 208 and forward?

MR. WESCOTT: Something like that, we stopped buying our allocation obviously when the cash ran out.

MR. WEAVER: What cabs?

MR. WESCOTT: Some Rafinelli. I think from 2000, 2002.

MR. WEAVER: Any kind of vertical tasting kind

of collection or anything like that with any of these?

MR. WESCOTT: I have one vertical of Limerick Lane.

MR. WEAVER: What years?

MR. WESCOTT: Approximately 90 through approximately -- I'd have to look at them, but I think I have something like ten years.

MS. BARNIER: Those are all cabs?

MR. WESCOTT: Those are zins, actually.

MS. BARNIER: Oh, zins.

MR. WESCOTT: Yeah.

MR. WEAVER: You have to store any wine any place else?

MR. WESCOTT: No.

MR. WEAVER: Have you ever insured the wine?

MR. WESCOTT: No.

MR. WEAVER: You said a value at one point to my client of your wine in your collection at 74,000 dollars. Do you know how you reached that number?

MR. WESCOTT: Yeah, I mean, I am surprised the value was that low, I am sure we had more than that because we used to have over a thousand bottles in the cellar. But just based on purchase price, I am sure we had more than 74,000.

MR. WEAVER: Where do you purchase your wine?

MR. WESCOTT: Various places, we used to buy a lot of it from the wineries. That's the main way we used to purchase.

MR. WEAVER: In a wine club, or were you just a buyer?

MR. WESCOTT: We are in the Williams Same one, bunch of different lists, Rafinelli, there is probably five or six more. All California stuff.

MR. WEAVER: Okay. The Pook Snook Duke trust that --

MS. BARNIER: You want to go to the trust or the LLP?

MR. WEAVER: No. I am going to go to the trust that we are kind of unclear about. Who is the trustee for that, do you know?

MR. WESCOTT: I'm not sure. I don't know.

MR. WEAVER: What about the limited partnership, Pook Snook Duke limited, who is the trustee?

MR. WESCOTT: I believe that -- again, I'm not an attorney, and I will probably get this --

MS. STEPHENS: There is no trustee for a limited partnership.

MR. WEAVER: I'm sorry. Who was the general partner?

MR. WESCOTT: I don't know. I believe that the trust owns -- is the general, I forget, one of them is -- let me think. I think the limited partnership is the owner of the trust vice versa, but I could be wrong.

MR. WEAVER: I believe that you are going to get the trust documents and the partnership agreement, and we can kind of figure it out from there.

MS. BARNIER: And that's on your, we put that on the list, right?

MR. WESCOTT: We put that on the list.

MS. BARNIER: Okay.

MR. WEAVER: I have got nothing further right now because we are getting late.

MS. BARNIER: You had two questions you wanted to ask, Michael?

UNIDENTIFIED SPEAKER: I am going to three.

MS. BARNIER: Three.

UNIDENTIFIED SPEAKER: In your schedules, you mentioned some records stored at Chamise Road.

MR. WESCOTT: Correct.

MR. WEAVER: Did you get ahold of those?

MR. WESCOTT: No.

MR. WEAVER: They are still there?

MR. WESCOTT: I have no idea. We had furniture at the house too so we were trying to get access. My

tenant who stopped paying, it is behind a locked gate, and anyway we were not able to --

UNIDENTIFIED SPEAKER: That property was foreclosed on?

MR. WESCOTT: That's correct.

UNIDENTIFIED SPEAKER: Do you know who owns it now?

MR. WESCOTT: I believe it is owned by Chase.

UNIDENTIFIED SPEAKER: There is this entity Vilcaboma Homes LLC.

MR. WESCOTT: Correct.

UNIDENTIFIED SPEAKER: Not actually formed due to JS objections.

MR. WESCOTT: Correct.

UNIDENTIFIED SPEAKER: JS being Joe Simonetta.

MR. WESCOTT: Correct.

UNIDENTIFIED SPEAKER: So what was Vilcaboma Homes LLC meant to own?

MR. WESCOTT: Vilcaboma Homes LLC was meant to own the property in Ecuador and also the business of developing it. I signed a contract on behalf of Unexpected Development with Joe Simonetta as a partnership where we specified we were going to form that LLC. And after we signed the contract, after I hired an attorney to create the documents for it -- his

name is Arthur Silverman, four one five four six five -- gosh, I can't quite remember it. I can give you the number if you want to speak to him, through our attorney, of course.

Joe Simonetta asked us not to form the entity, and so we did not actually form it.

UNIDENTIFIED SPEAKER: So you agreed not to, eventually agreed not to form it. Was that to do with the Hacienda San Joaquin?

MR. WESCOTT: Correct.

UNIDENTIFIED SPEAKER: What percentage of Hacienda San Joaquin do you indirectly own through an entity?

MR. WESCOTT: I believe 50 percent, but it is a little bit more complicated than that. If you would like, I can explain.

It is roughly 50 percent, however there is some properties that Joe excluded from the deal. So we have a 50 percent partnership on the great majority of all the individual lots that we created. There are some lots that were excluded from the deal. So you could argue there is less than 50 percent of the entire development. But we do have 50 percent of the part that is jointly owned.

UNIDENTIFIED SPEAKER: Do you contend that you

should have an interest in the (inaudible)?

MR. WESCOTT: I'm sorry. Can you repeat that?

UNIDENTIFIED SPEAKER: You mentioned he excluded some lots from the deal. Do you believe that you have a right to an interest in those ones he excluded?

MR. WESCOTT: No. Not in the ones that he excluded in our original paperwork.

UNIDENTIFIED SPEAKER: All right.

MR. WESCOTT: There were two lots that I believe we should have had an interest in that he subsequently sold, which were not in the original paperwork. That's why I am hesitating to just answer yes or no.

UNIDENTIFIED SPEAKER: So you think he should have given you some of the money from the sale.

MR. WESCOTT: Correct.

UNIDENTIFIED SPEAKER: All right. And what do you value this, the 50 percent interest in the Hacienda San Joaquin development?

MR. WESCOTT: Well, the best way to value it would be to hire an appraiser, but I would think it currently valued in the low hundreds of thousands, because most of the properties, the great majority of them has been sold and the cash has already come in. So

there's just a small, relatively small number of lots that are left.

UNIDENTIFIED SPEAKER: When was these properties sold?

MR. WESCOTT: Starting in 2006 or 2007 is when we entered the market.

UNIDENTIFIED SPEAKER: Okay. And how long did those sales go on for?

MR. WESCOTT: They were probably still ongoing today. I mean, there's at least ten lots that were unsold when I last got a report on it.

UNIDENTIFIED SPEAKER: So how much income did you or your entities derive from those sales in 2010, 2011?

MR. WESCOTT: None.

UNIDENTIFIED SPEAKER: None. There were no sales in 2010, 2011?

MR. WESCOTT: Well, you asked whether I or my entities had generated income. So there were sales that were realized, and that I think Joe Simonetta realized. Joe Simonetta have had a falling out in our partnership. The properties are titled his name. I foolishly persuaded him to start a bigger development project, so we were attending to fund that when the wheels started falling off.

UNIDENTIFIED SPEAKER: Okay. But on the Hacienda San Joaquin development right now, so there were sales made by --

MR. WESCOTT: Actually, I'd like to amend my answer if I may. There may have been some sales that we derived income from in early 2010, and I can look at the records.

UNIDENTIFIED SPEAKER: All right. But you think there there may have been additional sales that you perhaps believe you should have derived income from and Mr. Simonetta did not give you --

MR. WESCOTT: He does not have the same viewpoint that I do.

UNIDENTIFIED SPEAKER: All right. So there's a dispute on that.

MR. WESCOTT: Correct.

UNIDENTIFIED SPEAKER: The other developments that you are involved, were involved with him in --

MR. WESCOTT: There are just those two that are with him, and they are both neighboring properties.

UNIDENTIFIED SPEAKER: Did we talk about that one earlier? We did?

MR. WESCOTT: Hacienda San Joaquin, we have talked about it a few times. But if you have any further questions --

UNIDENTIFIED SPEAKER: I have one more question, and that -- you refer to, at the property swap, the 27 million valuation.

MR. WESCOTT: Yep.

UNIDENTIFIED SPEAKER: Do you have appraisals relating to those values?

MR. WESCOTT: Every one of the values that was in that was based on either an appraisal or a purchase offer or a purchase contract.

UNIDENTIFIED SPEAKER: Could I ask that those documents be provided to the trustee's attorney, please.

MR. WESCOTT: Sure. We have -- I am sure the majority of them easily obtainable, and some we will have to dig a little. But absolutely. Let me add it to the list.

UNIDENTIFIED SPEAKER: I'll hold off for now because I understand that many of my questions may be resolved through your amended schedules.

MR. WESCOTT: Through a deluge of information.

MS. BARNIER: All right. So --

MR. WEAVER: I would like a couple follow-up just because I have got some questions about where you currently reside.

You listed on your schedules that it looks like your residence is in Ecuador.

MR. WESCOTT: I moved to Ecuador in February 2010, and I moved, or was it 2010 or 2011. Last year. And I moved back -- I mean, throughout 2010, I -- I'm sorry, 2011, you know, I obviously there were times that I did go back and forth.

But I resided in Ecuador starting in February, and then late last year I moved back to California as my primary residence and legal domicile and so on.

MS. BARNIER: I'm sorry. I need those dates real specific because they do pertain to bankruptcy.

So February 2011, you moved and set up residence in Ecuador?

MR. WESCOTT: That is correct.

MS. BARNIER: And your wife maintained her residence in San Francisco? Is that correct?

MS. STEPHENS: That's correct.

MS. BARNIER: And then you -- were you legally separated at the time?

MS. STEPHENS: We were not legally separated.

MS. BARNIER: Did you consider yourselves separated at that time?

MS. STEPHENS: That's a difficult question.

MS. BARNIER: It goes to interests of property, so that is the reason I am asking the question.

As of February 2011, did you intend to

Case: 12-03143 Doc# 81-3 Filed: 08/30/13 Entered: 08/30/13 15:03:51 Page 18 of 38
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-61 of 228

separate?

MS. STEPHENS: We had discussed separation, but we have not ever made that determination.

MS. BARNIER: Okay. And so then, I am sorry, sir, then you moved back to San Francisco in what date?

MR. WESCOTT: From February through June I was living in Ecuador and spending the majority of my time there.

From June through October or November -- I think November -- I was spending the majority of my time in California.

MS. BARNIER: Did you still consider, though, the time in June through November your residence was in Ecuador?

MR. WESCOTT: I think my legal domicile was in Ecuador. But I spent the majority of my time going back six months in California.

MS. BARNIER: Then you took up permanent legal residence in California in December of two --

MR. WESCOTT: I don't know permanent anything is, but, yes I am here now.

MS. BARNIER: In December of 2011 is when you permanently returned and intended to make California your residence?

MR. WESCOTT: That's correct. And in, starting

in November, I was here the majority of my time. And we spent part of November with the holidays in Santa Barbara, and then late November, early December I've been pretty much here for the most part, the great majority of the time and living here, residing here, legal domicile here.

MS. BARNIER: Ms. Stephens, your residence, your legal domicile has always been California?

Okay. Thank you.

MR. WEAVER: So that is different than what you put on your schedule where you said it was your legal domicile beginning February 2011. So your legal domicile now you consider to be California?

MR. WESCOTT: That is correct.

MR. WEAVER: And it also indicates in your schedules that you maintain a premises in Ecuador. Where is that premises?

MR. WESCOTT: In Bahia. Bahia de Caraquez.

MS. BARNIER: Could you spell that?

MR. WESCOTT: B-A-H-I-A, space, D-E, space C-A-R-A-Q-U-E-Z.

MS. BARNIER: What city is that near?

MR. WESCOTT: That's the city.

MS. BARNIER: That is the city. What is it near? It is not a common name.

MR. WESCOTT: It is the largest city that is in the area that it is in. It is a city of just 25 thousand. But there is -- it is an hour north of Monta, which is a much larger city, I think the fourth largest in Ecuador, like 280,000, 300,000 people.

MS. BARNIER: Do you own a home there?

MR. WESCOTT: We own property there through the entity, just north of there that is where Cabuyal is, but the place in Bahia is rented.

MS. BARNIER: What is your rent there?

MR. WESCOTT: 200 dollars a month.

MS. BARNIER: Are you current on your rent?

MR. WESCOTT: I am not.

MR. WEAVER: When you went to Honduras I guess in the last couple weeks, did you also go to the Ecuador location?

MR. WESCOTT: I went to Ecuador separately once this year. That was before Honduras, correct.

MR. WEAVER: How long ago was that?

MR. WESCOTT: That was fairly recent as well, it was -- where are we now, March 20, 21st. I believe it was early March. March, if I think about it I can give you the exact dates.

March, I believe it was March 3rd through March 9th.

MR. WEAVER: Of 2012.

MR. WESCOTT: 2012.

MR. WEAVER: That was a separate trip from the one to Honduras?

MR. WESCOTT: That is correct.

MR. WEAVER: So you went to Ecuador. You came back. You went to Honduras. You came back.

MR. WESCOTT: Correct.

MR. WEAVER: How did you fly to Ecuador, what did you use for money?

MR. WESCOTT: I went on Continental, we had some -- we actually, it was mainly flight credits.

MR. WEAVER: Did you stay in a hotel or stay in your rental --

MR. WESCOTT: I stayed at my place for part of the time and I stayed in a hotel in Kita.

MR. WEAVER: How did you pay for the hotel in Kita?

MR. WESCOTT: I think that that was on a debit card, I believe.

MS. STEPHENS: We borrowed money from my parents at the beginning of the year.

MS. BARNIER: Do you intend to continue to keep your residence in California?

MR. WESCOTT: I do.

MS. BARNIER: You don't have any plans to move to Ecuador?

MR. WESCOTT: I was thinking earlier that that might be happening, and I had some desire for that to happen, but I think we are going to be here, most likely for as far as we can see.

MR. WEAVER: Do you have any plans if your place on Ashbury gets foreclosed?

MR. WESCOTT: We -- obviously, we need to get a new place to live, and we do not expect -- I think the motion for relief of stay is tomorrow; that will be granted. We are not planning to oppose it and so --

MS. STEPHENS: We may move in with my parents. They are in L.A.

MR. WEAVER: They are in L.A.

MS. STEPHENS: That's a consideration.

MR. WEAVER: By LA, you mean Los Angeles not just Southern California like some San Franciscans call it?

MS. STEPHENS: They live in Northridge.

MS. BARNIER: Okay. So we are going to conclude now. I am going to check on the date with the Trustee. I will e-mail counsel and all the rest of counsels and let them know. We will continue this.

Caveat, you are going to have the 2010 tax

returns prepared and done a week beforehand and to us, and the schedules will be amended at least a week before that date.

I believe it will be around April 21st, I am --

MR. WESCOTT: So we would have it done by the 14th then.

MS. BARNIER: Yes. Everyone is agreed. We got agreement on that? Counsel, is that reasonable?

MR. ISON: Yes, that sounds well.

MR. WESCOTT: I will give it my best.

UNIDENTIFIED SPEAKER: I'm not holding up anybody.

MS. BARNIER: I understand. All right. Thank you so much everyone for coming.

MR. WESCOTT: Thank you.

(End of recording)

---oOo---

State of California )
)
County of Sonoma )

CERTIFICATE OF TRANSCRIBER

I hereby certify that the foregoing transcription in the within-entitled cause was transcribed by me, CHRISTINE GOODIN, a Certified Shorthand Reporter and disinterested person, and was thereafter transcribed into typewriting.

Dated:

______________________
Christine Goodin

# In Re: Carl Wescott

# No. 12-30143 DM

# Audio Recording of: 341 Meeting

## April 18, 2012

117 Paul Drive, Suite A
San Rafael, CA 94903
(800) 979-2361

Page 1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

In Re:
CARL ALEXANDER WESCOTT and
MONETTE ROSEMARIE STEPHENS

Debtors. No. 12-30143 DM
______________________________/

TRANSCRIPT OF AUDIO RECORDING OF 341 MEETING
April 18, 2012

TRANSCRIBED BY: CHRISTINE GOODIN

WEST COAST REPORTERS
117 PAUL DRIVE, SUITE A
SAN RAFAEL, CALIFORNIA 94903

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 2

-oOo-

THE TRUSTEE: Good morning. This is Janina Hoskins. We are on the record in the matter of Carl Alexander Wescott and Monette Rosemarie Stephens. This is Case Number 12 dash 30143. This is a continued meeting of creditors. Today is Wednesday, April 18th, 2012 at approximately 9:35 a.m.

Mr. Wescott and Ms. Stephens, would you please raise your right hands?

(Parties sworn)

THE TRUSTEE: Thank you. I need you to each state your full name again, starting with, you ma'am.

MS. STEPHENS: Monette Rosemarie Stephens.

THE TRUSTEE: All right. Mr. Wescott.

MR. WESCOTT: Carl Alexander Wescott.

THE TRUSTEE: Some of the documents requested from the prior examination have been provided to the accountant's office but --

MS. BARNIER: That's not true. We got them from a subpoena.

THE TRUSTEE: Okay. We got documents from a subpoena. It was continued last time for additional questioning and documents, which we have not received.

I have a couple of quick questions to get started with. I expect there will be some statements on

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 3

the record, and then Ms. Barnier will go through a few issues.

Do either of you own any season tickets to the San Francisco Giants?

MR. WESCOTT: No.

MR. ISON: I think we need to make a statement on the record now.

THE TRUSTEE: Okay.

MR. ISON: Which is: I am appearing here today as an officer of the court, and my obligation is to continue representing my clients until dismissed by the court or by voluntary agreement of the parties. I was informed on April the 12th that the parties had separated. There are now conflicting interests between two parties, my two clients, which makes it impossible for me to either advisor or represent them under the Code of Professional Responsibility.

I, therefore, appear here today to make that statement on the record, and to state that my clients have sought, and yet not obtained, independent counsel to represent them in their conflicting interests.

THE TRUSTEE: Well, we do intend to go forward, even if they had separated pre petition, and one spouse files all of the community property assets and quasi community property assets go into the bankruptcy estate

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 4

anyway. To the extent that they have separate issues that is really subsumed by the bankruptcy estate because the bankruptcy estate takes control of all of the marital and quasi marital assets and obligations.

So those issues, from my perspective, really only apply to post-petition assets, liabilities, and obligations.

So I understand your statement on the record, and if the debtors do intend to obtain separate counsel, they may --

MR. WESCOTT: That's the case.

THE TRUSTEE: -- they may do so, but at this point in time you are still counsel of record.

MR. ISON: I am the counsel of record but I am unable to act --

MR. WESCOTT: Correct. I'd like to have an attorney who represents me and my interests, and I am seeking that -- I will talk to some of them.

I am not prepared to testify today until I have an attorney representing me and my interests.

THE TRUSTEE: Okay. We are still going to go ahead and ask the questions. Because you filed a petition, you have -- this has stalled out long enough. Bankruptcy documents should have been filed. It is then sufficient time to obtain counsel. All of the assets

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

1 (Pages 1 to 4)

Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-67 of 228

Case: 12-03143 Doc# 81-3 Filed: 08/30/13 Entered: 08/30/13 15:53:51 Page 24 of 38

Page 5

come into the bankruptcy estate. From my perspective, whatever disputes you have or conflicts that you may have with your wife do not impact the assets of the bankruptcy estate because all of the assets come into the estate once the case is filed.

All right.

(Parties speaking over each other)

MR. WESCOTT: My question is going to be I am not going to testify until I have counsel.

THE TRUSTEE: Let me --- I am going to go ahead and ask questions that I started with this morning.

MS. BARNIER: Before we do, let's just ask the question. Counsel, what are the conflicting interests? Maybe that's going to solve it, and we will not ask on those questions, and debtors will be able to answer. Where are the conflicting areas?

MR. ISON: The conflicting areas are a matter of attorney-client privilege. I am unable to, and unwilling to, disclose the nature of the conflict without a court order.

MS. BARNIER: Okay. And, Counsel, have you yet filed your motion to withdraw as --

MR. ISON: I have not. I found out April the 12th.

MS. BARNIER: Well, that's been six days, seven

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 6

days. So when do you plan to file your motion to withdraw as counsel?

MR. WESCOTT: Actually, we have a procedural question.

MS. BARNIER: Hold on. That's on him.

MR. ISON: I don't know when I am going to file. I may not have to file if they receive independent counsel, I will simply dismiss or be discharged by stipulation of each of the parties.

MS. BARNIER: Have you asked your clients when they will obtain their own counsel, what dates?

MR. ISON: Are you asking me what communications I had with my client?

MS. BARNIER: No, sir. I am asking you what dates they have told you that they will have new counsel by. That's not asking you for privilege; that's just asking for dates.

MR. ISON: Well, I doubt if it isn't asking for privileged information.

MS. BARNIER: You can go look at the case law.

MR. ISON: I have no knowledge of what date they intend to get new counsel.

MS. BARNIER: So it is your statement today, counsel, that your clients have instructed you not to answer, or not to answer any information or provide any

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 7

information? Do I have that correct?

MR. ISON: What you have is questioning me, and I am not under subpoena, nor I'm under oath.

MS. BARNIER: I understand that. I am just asking you what your instructions were, you put that in an e-mail to me saying that when I asked you why the schedules had not been amended per your agreement they would be done, I just want to make it very clear that it is your clients who have instructed you not to amend the schedules. Is that correct?

MR. ISON: The record speaks for itself. My e-mail speaks for itself. I am not prepared here to be cross examined.

MS. BARNIER: Not cross examining you, sir. I am just asking the questions of why things did not happen.

So your e-mail -- that is going to speak for yourself and for the court record?

MR. ISON: Whatever the record, and whatever the status of the evidence is, that's what it is.

MS. BARNIER: Okay. So, all right. Well, then let's ask the debtor since you cannot answer. What are the conflicting interests that you believe you have to have independent counsel for?

MR. WESCOTT: I'm not prepared to discuss that

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 8

today, but I will tell you that we both have been in discussions with attorneys and will tell you that we intend to hire new ones, and as soon as we have them we will be happy to speak about all this.

MS. BARNIER: When do you anticipate having them?

MR. WESCOTT: In the near future. I have meetings and appointments later this week with attorneys, and I hope to hire one soon.

MS. BARNIER: Can you tell me the source of income to hire an attorney?

MR. WESCOTT: I expect to borrow more money.

MS. BARNIER: From whom?

MR. WESCOTT: Probably from our parents.

MS. BARNIER: That would be your parents, or your wife's parents?

MR. WESCOTT: We will see. We will see -- I can't predict the future but it will probably be our -- for me personally, I don't believe her parents are going to loan me any more money. So it will probably be my parents on my side.

THE TRUSTEE: Jean, I'm going to let you handle this. I am going to handle the rest of the matters. If you need a continued date, I am not going to go past May 9th.

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

2 (Pages 5 to 8)

Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-68 of 228

Case: 12-03143 Doc# 81-3 Filed: 08/30/13 Entered: 08/30/13 15:53:51 Page 25 of 38

MS. BARNIER: We will have to go May 9th.

Given that you have informed your client you have separated, have you filed formal papers as a separation?

MR. WESCOTT: Not yet. We are also in discussions with attorneys on that as well.

MS. BARNIER: Where are you residing as of now?

MR. WESCOTT: I am still residing at the Ashbury house, but I am intending to move out. Actually, the at that house is being auctioned tomorrow. But I am looking at places later today and tomorrow.

MS. BARNIER: And how are you going to pay for that?

MR. WESCOTT: Same. Same answer. I intend to borrow money --

MS. BARNIER: Borrow money.

MR. WESCOTT: -- from my parents, if that is what it takes, and that is probably what it is going to take.

MS. BARNIER: Okay. So you are testifying you are not going to cooperate with the Trustee today because you are believe you need independent counsel?

MR. WESCOTT: I would not put it that way. My intent as you have seen from my testimony last time we were here, I do intend to cooperate with this whole

proceeding. I just want to have counsel, that is my right, and I am going to stand up for my rights.

MS. BARNIER: You do have counsel, sir.

MR. WESCOTT: I want to have counsel that represents my interest. Our interests are no longer aligned, and we do not have -- I don't have counsel that represents my interests. So I don't know how many times I need to state this, but I am going to get counsel that represents my interest. Thank you.

MS. BARNIER: Let me explain something that perhaps your counsel who doesn't do a lot of bankruptcy may not have explained to you.

MR. WESCOTT: Okay.

MS. BARNIER: At the date you filed is a snapshot, it's almost like it is frozen in time. And that is your assets and liabilities. What you do post petition as to your separation does not impact that or affect that.

Now, perhaps counsel has not explained that to you, but I will put that on the record for you, and I can let Judge Montall explain that to you.

MR. WESCOTT: That I do understand.

MS. BARNIER: You do understand that. Okay. Terrific.

So if you understand that, then help me

understand, because I will be very honest with you: This appears to just be a, as the Trustee already said, an effort on your part and your wife's part to delay the proceedings.

So explain to me, if you will, why you feel the need for separate counsel post petition. And I understand for the divorce; that would make sense.

MR. WESCOTT: Like I said, I want counsel to represent my interests, and I am not prepared to speak further on this. You can ask me the questions as many times as you would like, but I would like to get counsel to represent my interest. That is my right.

Are you suggesting that you are attempting to forbid me from having an attorney to represent myself?

MS. BARNIER: You have an attorney. That is the issue.

MR. WESCOTT: I want an attorney represents my rights.

MS. BARNIER: So have you fired your attorney to represent you at this point?

MR. WESCOTT: I have not yet done so. Quite honestly, what we would like to do, we are both in discussions with new attorneys. There is a chance that one of us if we can get permission of the other might continue to retain Mr. Ison. And given our financial

situation, I think that might be best.

But certainly, until we figure out who our attorney or attorneys are, I am not prepared to dismiss Mr. Ison.

MS. BARNIER: Okay. So going forward, what date have you -- so we are going to continue this, the Trustee just said May 9.

MR. WESCOTT: Let's do May 9.

MS. BARNIER: You will have new counsel by then?

MR. WESCOTT: I will have new counsel by then.

MS. BARNIER: Okay. I do have some specific questions that I do believe you can answer without benefit of counsel, just for information purposes. So let's try that and see if it works and we will let other people ask some questions.

Actually, Ms. Stephens, this goes to you: I did not see any licenses listed on your SOFA that you have. Do you have any, are you licensed?

MS. STEPHENS: I have a driver's license.

MS. BARNIER: Did you ever have any licenses?

MS. STEPHENS: I have registrations, NSD registrations, but they are not licenses.

MS. BARNIER: Okay. You call them registrations. All right.

Page 13

What are you registered in?

MS. STEPHENS: Well, I am no longer with my firm, and my licenses will be lapsing, or my registrations with FINRA 7, 24 and 63.

MS. BARNIER: I'm sorry. FIN --

MS. STEPHENS: FINRA, 7, 24, and 63 were my registrations.

MS. BARNIER: And how long were you with them?

MS. STEPHENS: With my firm?

MS. BARNIER: Yes.

MS. STEPHENS: I was with my firm -- well, I was with my firm from 2003, I think, until I had my child, my -- our first child, and then I went to a part-time status and never really working full time with them until after 2006, I think. I had -- I worked for a few months after my first child was born in 2005.

So, but the firm actually ceased to exist in December of 2011. So I was still technically a partner with the firm until 2011, but the firm was not -- I mean, the firm ceased to exist. We shut a New Forth down in 2011.

MS. BARNIER: What was the purpose of FINRA?

MS. STEPHENS: FINRA is the federal -- I'm not sure what the registration stands for. It is the organization that you have to register with to be in

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 14

investment banking and broker dealer, that kind of thing.

MS. BARNIER: Okay. I apologize. So everyone is sympathetic: I have an 86 year old mother who is not using all her facilities, so filing taxes has become a huge issue. So all of a sudden I am getting phone calls like mad. I apologize.

So going back, then. So help me with the registration, because I don't quite understand what you had. You had a registration, so that with the SEC, is that right?

MS. STEPHENS: Uh-huh.

MS. BARNIER: And what were you able to do with that registration?

MS. STEPHENS: It is -- I'm not sure I should be answering questions like this without an attorney present.

MS. BARNIER: All I'm asking you is about your license, the registration that you held. I am not asking about any of your investments. I am not asking you about your separate property. I am just asking you what your license allowed you to do, or your registration, excuse me.

MS. STEPHENS: It allows people the 7, 24 and 63, I believe, allows people to sell securities.

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 15

MS. BARNIER: Okay. And did you sell securities?

MS. STEPHENS: I personally did not sell securities. No. But I was a partner at a firm that sold other companies.

MS. BARNIER: What was the name of that company?

MS. STEPHENS: New Forth Partners.

MS. BARNIER: N-E-W-F-O-R-T-H, one word?

MS. STEPHENS: M-hm.

MS. BARNIER: And you said you were a partner there?

MS. STEPHENS: Yeah.

MS. BARNIER: And did you found that company?

MS. STEPHENS: I was one of the cofounders. Yes.

MS. BARNIER: Who was the other cofounder.

MS. STEPHENS: There were four other, there was Trisha Salinero, Chris Williams --

MS. BARNIER: Would you spell Salinero for me?

MR. WESCOTT: S-A-L-I-N-E-R-O.

MS. BARNIER: I-N-E-R-O. And Chris --

MS. STEPHENS: Chris Williams. This is all a matter of public record.

MS. BARNIER: That's fine. And who else. You

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 16

said there were four.

MS. STEPHENS: Robert Hoffer.

MS. BARNIER: Is that H-O-F-F-E-R?

MS. STEPHENS: M-hm, and Steven Kuhn.

MS. BARNIER: How do I spell Kuhn?

MS. STEPHENS: K-U-H-N.

MS. BARNIER: I'm sorry?

MS. STEPHENS: K-U-H-N.

MS. BARNIER: K-U-H-N. How long did you have the registration from?

MS. STEPHENS: I don't remember the exact date.

MS. BARNIER: That you, but it is going to lapse or it has lapsed?

MS. STEPHENS: I am not sure if it has lapsed. The firm is no longer in existence, so it was tied, it is tied to the firm.

MS. BARNIER: I see. Okay. I do have some requests.

MR. WESCOTT: I just need to step out for one moment.

MS. BARNIER: Then we need to stop.

We're back on the record.

I do have -- as to some of the information you testified about last time, I do have a question pertaining to documents and asking to be produced. You

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

4 (Pages 13 to 16)

Case: 12-03143 Doc# 81-3 Filed: 08/30/13 Entered: 08/30/13 15:53:51 Page 27 of 38
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-70 of 228

testified that when you flew after the bankruptcy filing to Ecuador and Honduras that you used frequent flyer miles. Is that correct?

MR. WESCOTT: I used a flight credits mostly.

MS. BARNIER: Flight credit. How is that different than frequent flyer miles?

MR. WESCOTT: I'm not going to answer any further questions after this one until I have an attorney but just so you know flight credits are something -- it is based on a previous purchase. They are non-transferable. I used -- I had purchased a previous ticket, so I had a credit with the airline.

MS. BARNIER: I see. Okay.

MR. WESCOTT: Frequent flyer miles are something you accumulate so you can then use.

MS. BARNIER: I see. So this is a request for documents. You might want to write this one down for you to provide. I'd like to see copies -- I'm sure you did it all electronically -- of your boarding passes, or information, as to all the flights that you have taken --

(Inaudible)

MS. BARNIER: So if you could print those out and provide them, you can -- since your counsel is no longer acting in your interest, you can send them to me

directly. I can give you my e-mail, and you can just scan and send them, that would probably be the fastest way.

MS. STEPHENS: I have your email.

MS. BARNIER: Terrific. So I will be looking for those. Any flights that you have taken since.

MR. ISON: I will caution you to accept the statements made by counsel. I am acting in your interest, to the extent I am allowed to do so.

MR. WESCOTT: Sure. It is actually my intent to provide them through new counsel, I do have most of those, and I can obtain the rest.

MS. BARNIER: Counsel, you can't have it both ways. You can't interject it and then say -- excuse me. Could I ask that you maybe pay attention to what's going on here, because this is pretty annoying. You cannot have it both ways --

MR. ISON: May I ask you to be a little bit more courteous.

MS. BARNIER: No, sir. Because what you have done is -- all you have done is made these proceedings more difficult. You did say on the record last time that you were going to amend the schedules. I courteously offered you to two weeks to do it in, it wasn't done, and now you come back and say I can't do it

because my clients now instruct me three weeks or four weeks after I was supposed to have it done.

So, yes, sir, no, I am being respectful, but I don't need to be courteous to you, sir. So I would appreciate if you would pay attention to these proceedings, sir.

So you are going to provide those documents?

MR. WESCOTT: That is my intent.

MS. BARNIER: All right. So what you have testified is you are not going to answer any questions today?

MR. WESCOTT: I can give the answer that if you want to ask questions I will answer most of them or probably all of them with the same statement I have made.

MS. BARNIER: Let's ask a different question. How did you come to the value of the property in Honduras?

MR. WESCOTT: Like I said, I will -- I am not answering questions without my attorney, and I am happy to answer questions with my new attorney. I am happy to cooperate with the proceedings --

MS. BARNIER: No, no. Let me explain to you very -- I hope your counsel -- Mr. Ison, did you advise your clients as to their duties to the Trustee?

MR. ISON: Are you asking me what communications --

THE TRUSTEE: No, sir.

MR. ISON: You are asking what I told my clients. That is called attorney-client privilege, and code -- of I am sure you are aware of that, right?

MS. BARNIER: All I asked was a yes-or-no question. I did not ask --

MR. ISON: -- the answer is I am not answering that question on the basis of attorney client privilege.

MS. BARNIER: You should go read then attorney-client privilege. I am not asking for per se the communications, sir. All I asked is if you did communicate with them, that is a yes-or-no question, regarding their duties to the Trustee. That is not bound by attorney-client privilege.

Attorney-client privilege, sir, in case you have not read the cases recently, which is my guess, says that you cannot communicate what was said. All I asked is if you did explain to them their duties to cooperate with the Trustee.

MR. ISON: I am not asking -- I am not answering questions until you subpoena me or get a court order. Is that clear?

MS. BARNIER: Very clear. Easily done.

Case: 12-03143 Doc# 81-3 Filed: 08/30/13 Entered: 08/30/13 15:33:51 Page 28 of 38
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-7 Page 28

Did you --

MR. ISON: (Inaudible).

MS. BARNIER: All right. So you are not going to answer any questions to the valuations of properties?

MR. WESCOTT: I'm not going to answer that today. I will be happy to answer that on May 9th with my new counsel.

MS. BARNIER: Okay. Do you have any questions that you would now like to ask, Mr. Weaver?

MALE SPEAKER: The only question I'd like to ask why we are here two months after the first scheduled 341, and we still do not even have schedules in this case, three months, four months after the initial bankruptcy that was filed by Mr. Wescott that was allowed to lapse and terminate. It is wasting my client's time, wasting my client's money. You are represented by counsel. He has not withdrawn yet. You have not terminated him. I don't know why we are here without questions being answered.

MR. WESCOTT: I don't know why we are here either.

MALE SPEAKER: You filed the bankruptcy. We did not file the bankruptcy. That is why you are here.

You said there's an auction of the house tomorrow. Who is auctioning the house?

MR. WESCOTT: I believe that to be the case. We received a letter that that was the case. I have not doubled checked.

MALE SPEAKER: Do you know where that is going to occur?

MR. WESCOTT: I do not know the specifics. I believe it is tomorrow. It should be a matter of public record.

MALE SPEAKER: It is personal record, too. You received a notice of sale, I assume.

MR. WESCOTT: Actually, I am not going to answer any further questions. I don't think we actually received one in the mail, and just -- it is not actually necessary for a lender to re-notice within one year of the previous notice.

We did receive a previous one, and that is -- I am not going to answer any of your further questions today. Happy to answer them on May 9th with counsel.

MALE SPEAKER: It is just a waste of time, just a waste of more money. I can sit here and I can ask 100 questions and have the same answer.

MS. BARNIER: Right. I understand.

Mr. Brooks, you had a question?

MALE SPEAKER: Yes, please. At the last meeting, counsel was to keep a list of the documents

that were requested. And as I recall, Mr. Wescott and Ms. Stephens agreed to produce all of them. I would like those documents be produced, because they have not been produced as of yet. And if there is a new counsel retained, I would like the assurance of counsel that he will provide new counsel with that list.

Is that agreeable, sir? Excuse me, sir? I am talking to you.

MR. ISON: Are you talking to me?

MALE SPEAKER: I'm talking to you.

MR. ISON: I am sorry. I thought you were talking to Mr. --

MALE SPEAKER: No. I'm not talking to your client. I'm talking to you. Do I have your assurance you will provide new counsel, if there be new counsel, with that list?

MR. ISON: You have my assurance I will act in consistency with the Code of Professional Responsibility, which I understand to be to turn over all files and other information I have to new counsel, or to the client upon their request at my own cost.

MALE SPEAKER: Not at your request. I would like it --

MR. ISON: I am sorry?

MALE SPEAKER: I would like you to provide it

to new counsel, even if they do not request it. Thank you.

MS. BARNIER: So this hearing is now --

MALE SPEAKER: One more question. You indicated at the last hearing that you were going to provide those documents to your counsel. Did you ever provide those documents to your counsel?

MR. WESCOTT: I provided some. We said we were going to provide everything by April 14th. And before that, we have had a change in our situation. So, again, I suggest that we continue this to May 9th, and then we can make a much better use of our time on that day.

MALE SPEAKER: What did you provide by April 14th?

MR. WESCOTT: I will be prepared to answer that on May 9th. It is a subset of the documents. I don't have the folder that is in front of me. But I did provide a subset of them. I am prepared to provide the rest of the rest of my ability to new counsel, and to provide those.

MALE SPEAKER: Do you remember anything you provided to your counsel?

MR. WESCOTT: Let's not waste any time. I am not going to answer any more of your questions --

MALE SPEAKER: I want to know what documents

you provided to your counsel.

MR. WESCOTT: Why don't you ask me on May 9th.

MS. BARNIER: That's not a privileged question. It does not go to a conflict. So let's try it this way --

MR. WESCOTT: I'm not going to answer any more questions today without new counsel. I have made that very clear.

MS. BARNIER: Mr. Ison, can you help us on this one. Documents are just a matter of request, whether it is new counsel or old counsel, can you please tell us what documents the debtors provided to you, per the agreement that they were going to make that happen? Can you tell us what they provided?

MR. ISON: No, I cannot.

MS. BARNIER: Why not, sir?

MR. ISON: I don't have to tell you why not. But I think you are pretty well aware of why not.

MS. BARNIER: All I asked, sir, is what documents were provided. We're not asking for privilege. We are not asking for communications. The documents need to be provided in order to cooperate with the Trustee. I am just asking what documents were provided.

MR. ISON: If documents were provided, there

may be subject to, in my opinion, exclusion or privilege. So if I tell you what documents I had, I must, at that time, also tell you whether those documents are privileged or not.

MS. BARNIER: Actually --

MR. ISON: It is a matter of opinion to be decided by some judge at some point if you disagree.

MALE SPEAKER: Could you tell us which ones are privileged?

MR. ISON: I could, but I am not prepared to do it at this point in time, and I am not even saying I was provided with any documents. That's communications between my client and myself and that is covered by the attorney-client privilege.

MALE SPEAKER: Your client has already testified he provided you some documents, so I think that that is irrelevant. You just won't tell us what he has provided you, and he won't tell us what he provided you.

MR. WESCOTT: I suggest we continue this to May 9th and not waste any more time today, and let's make good use of our time on May 9th.

THE TRUSTEE: Well, I suspect, sir, that we are going to have more of the same because your counsel won't turn over -- here is the headache. You guys are

going to keep coming back. I don't know if you enjoy doing this, but I don't particularly like spending my time coming back here all the time. And the problem is we got to question you about those documents. So until the documents are provided, and we cannot get them a day beforehand because that does not give us any time to review them, or me any time, or the accountant any time.

So what we need is documents that are provided on a timely basis, as your counsel agreed to do, and now refuses, refuses. You have refused to turn over any documents. You just said you were not going to. How am I misstating what you said?

That is what you said, "I am not going to turn over any documents at this time." Which part did I miss? No? Thank you.

So until the documents are turned over, we all get to keep coming back. So we will do it the old-fashioned way.

MALE SPEAKER: After the auction tomorrow, what is your residence going to be if you move out of the Ashbury property?

MR. WESCOTT: I'm not sure yet. I am not going to answer any more questions today.

MALE SPEAKER: How do we contact you if you are not represented by counsel?

MR. WESCOTT: You can use the current -- that's a good question. You can use the current address. Obviously when we no longer own it, we will have a little time to move out.

MS. BARNIER: Ms. Stephens, where do you plan to reside?

MS. STEPHENS: Until we are removed from the house, there, then I will probably move either to our Santa Barbara house or my parents.

MS. BARNIER: I'm sorry. Santa Barbara house. I'm sorry, I don't remember seeing on the schedules a Santa Barbara house on the schedules. Can you help me out, a Santa Barbara house?

MS. STEPHENS: It is in foreclosure as well. We only have it for a few more months.

MR. WESCOTT: Here is probably the best way to approach this. Right now my address is 853 Ashbury and I believe I have a duty to provide you a new address, should I move, and I do intend to move, and at such point I have a new address, I will immediately provide the new address to the relevant parties.

I believe I will have a new attorney before I have a new address, so I don't know how it works, but I presume my attorney will actually be the one providing that new address, if relevant. I think it is relevant.

Case: 12-03143 Doc# 81-3 Filed: 08/30/13 Entered: 08/30/13 15:53:51 Page 30 of 38
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-73 of 228

Page 29

MALE SPEAKER: Do you intend to move outside of the U.S.?

MR. WESCOTT: No.

MALE SPEAKER: Do you intend to stay in California?

MR. WESCOTT: Yes.

MALE SPEAKER: San Francisco?

MR. WESCOTT: Not sure. Anyways, why don't we continue this on May 9th.

MALE SPEAKER: Could I ask a couple question?

MS. BARNIER: Absolutely.

MALE SPEAKER: You referred to the Santa Barbara house. Is that 3910 Carole Avenue?

MS. STEPHENS: Yes.

MS. BARNIER: Who currently owns that property?

MS. STEPHENS: The house is currently owned by our consulting business, or my consulting business, Atlas Consulting. We were going to turn that into a rental property.

MR. WESCOTT: I don't believe that's the case, by the way.

MS. STEPHENS: That's not the case. Okay. I don't know exactly where things are at right now.

MALE SPEAKER: And this foreclosure proceeding, you said you only had the house for another few months.

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 30

What do you base that on?

MS. STEPHENS: I think I should probably have counsel to talk to you.

MALE SPEAKER: When was the foreclosure proceeding filed?

MS. STEPHENS: Shouldn't I have counsel as well?

MALE SPEAKER: You have counsel, ma'am.

There was a foreclosure proceeding that was noticed back in 2011. Is that the same foreclosure proceeding you were referring to now?

MS. STEPHENS: Yes.

MALE SPEAKER: That was back in May of 2011. Isn't that correct?

MS. STEPHENS: I don't remember.

MALE SPEAKER: What is the current sale date for that property?

MS. STEPHENS: I don't know.

MALE SPEAKER: You -- what did you, you used to own that property yourself, didn't you?

MS. STEPHENS: That was a property that I owned before we got married, yes.

MALE SPEAKER: Correct. When did you first acquire that property?

MS. STEPHENS: I don't remember.

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 31

MALE SPEAKER: Before you were married?

MS. STEPHENS: Before Carl and I were married, yes.

MALE SPEAKER: Then you put it in to Atlas Consulting?

MS. STEPHENS: Yes.

MALE SPEAKER: How much did you receive from Atlas Consulting for that property?

MS. STEPHENS: I don't --

MALE SPEAKER: Would "nothing" be appropriate? Less than ten dollars?

MS. STEPHENS: It was part of our estate planning. I don't -- I don't want to answer that question without counsel.

MALE SPEAKER: What date did you transfer that property into Atlas Consulting?

MS. STEPHENS: I don't remember.

MALE SPEAKER: When was your estate planning done?

MS. STEPHENS: I think I should have counsel before I answer any more questions.

MS. BARNIER: It is just a date question. No one is asking for information on -- all he asked is when was it done. That's pretty basic.

MS. STEPHENS: I don't remember.

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 32

MS. BARNIER: If you do not remember, that's fine. But answer the question as to when -- we're not asking for anything privileged, it is just dates.

MR. ISON: I would caution you to accept as true, or an accurate statement of law anything that anybody says in here. Including myself.

MS. BARNIER: Including yourself, Counsel. Well, that is reassuring.

MALE SPEAKER: I have here a printout from the public record reflects a transaction date of October 27, 2010, grant deed from Monette R. Stephens to Atlas Consulting LLC, the type of transaction was a nominal amount. That refresh your recollection as the date of the transfer?

MS. STEPHENS: I don't remember. I really don't remember.

MALE SPEAKER: Okay. In the documents you filed in this proceeding, you include transfers between your husband and yourself, and that was done -- was that done in November of 2010?

MS. STEPHENS: I don't remember.

MALE SPEAKER: You don't remember. And who were your counsel on your estate planning?

MS. STEPHENS: I'm not comfortable answering any more of his questions.

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

8 (Pages 29 to 32)

Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-74 of 228

Page 33

MS. BARNIER: I understand you are not comfortable. It is simply a question of who. It is not asking for any divisions of property, et cetera. He just asked who was your counsel. That's a just flat out fact question.

You do not think that is a fact question, sir? Who was counsel?

(Parties speaking over each other)

MR. ISON: -- fact question not a proper question. They are saying they want to be represented by counsel. Why is that difficult to understand?

MALE SPEAKER: They are represented.

MR. WESCOTT: I want to be represented by counsel that represents my rights personally.

MALE SPEAKER: I'm asking your wife, sir.

Who is responsible for the winding down of the New Forth partnership you referred to, ma'am? Is it you?

MS. STEPHENS: No. It is not me.

MALE SPEAKER: Which partner was responsible?

MS. STEPHENS: I'm sorry I am uncomfortable answering these questions. I would like to have counsel, my own have counsel present.

MALE SPEAKER: Well, ma'am, your attorney here said he represents you. So you are represented by

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 34

counsel.

MR. ISON: Is that a legal argument, sir?

MALE SPEAKER: No, sir. It is a factual statement.

MALE SPEAKER: You either represent these two people or you do not represent them. They can terminate you right now, they are not represented. You can withdraw right now, and they are not represented. You are here, and you represent them. Period.

MR. ISON: I can't withdraw right now. I need either permission of the client or the permission of the court.

MALE SPEAKER: They can fire you right now.

MALE SPEAKER: They can fire you right now.

MR. ISON: They could. They have chose not to.

MALE SPEAKER: So they are represented by counsel.

MALE SPEAKER: You can't have it both ways.

MR. WESCOTT: I am represented by counsel.

MR. ISON: However, represented by counsel who is confronted with a conflict of interest where I do not have consistent instructions from my two clients. Therefore, I am paralyzed to act. I am however an officer of the court and that is why I am here.

MS. BARNIER: Except then that allows you to

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 35

advise them on answering questions. They may have a conflict. This is simply an information-gathering process.

MR. ISON: How do I advise somebody if they have conflicting interests?

MALE SPEAKER: Because as of the date of the filing of the bankruptcy, sir, they were not separated. We are trying to get information relating to that date. So I don't understand how this post filing alleged conflict affects the ability to file schedules that relate to a date prior to the conflict arising.

MR. ISON: I'm sorry to say you do not understand it.

MALE SPEAKER: No, I don't.

MR. ISON: I can try to explain it.

MALE SPEAKER: Please do.

MR. ISON: They have a right to counsel representing their individual interests. They do not have that counsel here today. They are refusing to answer questions until they have that counsel, whether the questions are factual or not.

MS. BARNIER: So are you instructing them not to answer that, sir? Is that what I understand?

MR. ISON: You do not understand the simple language that I just got through using? Did I just say

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 36

I am instructing them not to answer?

MS. BARNIER: I am just trying to make sure that we have a clean record here because every -- you either tell them not to answer because they do not have separate counsel, you tell us you represent them, and then you say "but don't answer," so I am just asking: Are you telling them not to answer any questions until they have their separate counsel?

MR. ISON: When did you hear me instruct them not to answer?

MALE SPEAKER: This morning on the record.

MR. ISON: The record speaks for itself.

MS. BARNIER: We're going to continue this 341 hearing until May 9th. You will advise the Trustee immediately once you obtain new counsel.

MR. WESCOTT: Correct.

MS. BARNIER: Does that include you, Ms. Stephens? You are also obtaining separate counsel?

MS. STEPHENS: I am currently looking for counsel, yes.

MS. BARNIER: And you plan to obtain new counsel?

MS. STEPHENS: It is my intention to get advice as to what I should be doing moving forward, and I will get new counsel or figure out how to move forward. I

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

9 (Pages 33 to 36)

Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-75 of 228

Page 37

don't know how we -- I mean, it is my intent to get coinsel, get new counsel.

MS. BARNIER: That was the question.

Thank you so much. We will be back at 9:30 on May 9th.

MS. BARNIER: This is Jean Barnier, attorney for the Trustee, and we back on the record.

MALE SPEAKER: We were supposed to get amended schedules before the conflict arose from your current counsel, we did not get those, they were not filed. Those are overdue. They are outstanding. And just for the record, I would like to state that I expect to get amended schedules so we have some idea what your estate is, the moment you get new counsel, or as soon as possible as new counsel, so we are not sitting back here on May 9th with no amended schedules and none of the documents that you promised to provide at the last 341.

MR. WESCOTT: I would like to state on the record that the first part of what you said is untrue. We actually promised to provide them on April 14.

MS. BARNIER: No, I'm sorry. You are mistaken. Your --

MR. WESCOTT: If you look back at the transcript from the last session, you will see that that is what we all agreed to.

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 38

MS. BARNIER: No. You said documents. Your counsel said he would have the schedules amended because what you testified to, Mr. Wescott, was that you had already provided the information to him in early February.

Am I refreshing your memory?

MR. WESCOTT: I provided some information.

MS. BARNIER: No. You testified that you had, and your counsel said "I have had brain surgery, and was unable to complete it," and so we offered him the extension -- by the way, counsel, let's go back on the record on this, you did state last time on the record that you might have to have more possible surgery. Are you now in a condition that if it happens that you can represent your clients?

MR. ISON: I suppose I can answer that. I had a further MRI on the 11th, and it turned out positive.

MS. BARNIER: I'm sorry.

MR. ISON: That means good. I have no further plans to have further surgery.

MS. BARNIER: So, and you learned that on the 11th?

MR. ISON: I learned it in the sense that the MRI was taken, they saw nothing, but the pathology report had not yet been issued. So in a sense, I

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 39

learned it on the 11th.

MS. BARNIER: On the 11th, we are referring to March 11?

MR. ISON: No, April 11.

MS. BARNIER: April 11. Okay. So April 11.

MR. ISON: The day before the other defense.

MS. BARNIER: And prior to that time you had no opportunity to amend the schedules based on the information your clients had provided. Is that correct?

MR. ISON: No. That's not correct.

MS. BARNIER: So could you explain for the record why the schedules were not amended?

MR. ISON: I could explain, but I'm not going to.

MS. BARNIER: Why not?

MR. ISON: Because attorney-client privilege.

MS. BARNIER: Thank you so much. This concludes this 341.

(End of recording)

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

Page 40

State of California
County of Sonoma

CERTIFICATE OF TRANSCRIBER

I hereby certify that the foregoing transcription in the within-entitled cause was transcribed by me, CHRISTINE GOODIN, a Certified Shorthand Reporter and disinterested person, and was thereafter transcribed into typewriting.

Dated: April 26, 2012

______________________
Christine Goodin

Audio Recording of: 341 Meeting - 4/18/2012
West Coast Reporters, Inc. * 415-472-2361

10 (Pages 37 to 40)

Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-76 of 228

# In Re: Carl Wescottt

# No. 12-30143 DM

# Audio Recording of: 341 Meeting

May 9, 2012

117 Paul Drive, Suite A
San Rafael, CA 94903
(800) 979-2361

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

In Re:
CARL ALEXANDER WESCOTT and
MONETTE ROSEMARIE STEPHENS

Debtors. No. 12-30143 DM

_______________________________/

TRANSCRIPT OF AUDIO RECORDING OF 341 MEETING
May 9, 2012

TRANSCRIBED BY: CHRISTINE GOODIN

WEST COAST REPORTERS

117 PAUL DRIVE, SUITE A

SAN RAFAEL, CALIFORNIA 94903

-oOo-

THE TRUSTEE: Good morning. This is Janina Hoskins. This morning is May the 9th. We have a continued examination on the Wescott and Stephens matter. Both of the debtors are present. I am going to have you raise your right hands again and swear you in.

(Debtors sworn)

MR. WILLIAMS: I need you each to state your full name, starting with you again, please.

MS. STEPHENS: Monette Rosemarie Stephens.

MR. WILLIAMS: Your full name.

MR. WESCOTT: Carl Alexander Wescott.

MR. WILLIAMS: And for the record the case number is case Number 12 dash 30143. Ms. Barnier is present as counsel for the estate and our accountant Mr. Wade is also present.

As in the past, any questions asked by any party in connection with this proceeding, all answers are under penalty of perjury. And I will be in the other room if any questions come up. Thank you.

MS. BARNIER: Thank you. Let's start with some housekeeping matters. Mr. Williams, you are now representing Ms. Stephens. Is that correct?

MR. WILLIAMS: Yes.

MS. BARNIER: I did not see your 2016

disclosure on the docket. Have you filed that?

MR. WILLIAMS: I have not.

MS. BARNIER: Can you tell me what your compensation is in the case is?

MR. WILLIAMS: I had a thousand dollar retainer and it was 75 dollars an hour.

MS. BARNIER: When do you plan to have your disclosure on?

MR. WILLIAMS: As soon as possible.

MS. BARNIER: Would that be today?

MR. WILLIAMS: Yes.

MS. BARNIER: The other housekeeping matter is that despite my request, I never got a signed copy of your -- the schedules or the SOFA. So I printed out, Mr. Wescott and Ms. Stephens, and provide you a pen, I do need a wet copy, is what they call it. So these are the schedules that you filed. And if you would be so kind as to sign and date them.

MR. WESCOTT: Okay. Can we have the schedules that are attached to it?

MS. BARNIER: Well, this --

MR. ISON: I can tell you that is what you signed with me, and then I --

MR. WESCOTT: Sure. So everything I sent to you is the same that you filed with the court, because I

didn't review what you filed I only, know what I sent you.

MR. ISON: That's true.

MR. WESCOTT: I am happy to certify what I sent you.

MR. ISON: That is, indeed, what I filed, what you sent me.

MR. WESCOTT: With no changes whatsoever. Even my asterisks and initial notes are in there?

MR. ISON: Everything.

MR. WESCOTT: Okay. Great. That's on the record, so I'll just sign.

MS. BARNIER: You sign over your name.

UNIDENTIFIED SPEAKER: Do you have any new schedules that were filed?

MS. BARNIER: No. We just don't have -- I never -- it is part of the bankruptcy rules that there are so be signed copies, and I never got them so we will do it the easy way.

Then also ask as to your SOFA.

MR. WESCOTT: I'm sorry. As to my what?

MS. BARNIER: Sorry, statement of financial affairs, that also needs to be signed.

MR. WESCOTT: That's Form 7, right?

MR. ISON: Again, for the record, the one you

Page 5

tendered to me is exactly the one I ECF filed with the bankruptcy court.

MR. WESCOTT: Okay. Great. Obviously, since then there have been some updates, and I guess we will get into that discussion in a moment. But here is this.

MS. BARNIER: Thank you. Ms. Stephens.

MS. STEPHENS: So why wasn't there a signed copy? I thought we signed these.

MR. ISON: You signed them for me, and I forgot to bring them.

MS. BARNIER: They were asked to be provided, they never were, so sometimes I do it myself. It is just to make sure.

Second issue for housekeeping: Mr. Ison, you represented at the first meeting of creditors that there were going to be amendments to the schedules. Is that still the case?

MR. ISON: That is still the case.

MS. BARNIER: When do you plan to have those filed? Because it has now been almost three months since that representation was made.

MR. ISON: I just last night, I think.

MR. WESCOTT: I'm going to take the blame, although we did provide updates in February, I only got him a complete new set last night and early this

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 6

morning. So you now have everything that has been updated, and we believe to be correct, and so I think you can possibly -- earlier or later this week, or as soon as possible, file those for the benefit of everyone.

MS. BARNIER: Mr. Williams, have you had an opportunity to review these revised schedules?

MR. WILLIAMS: I haven't.

MS. BARNIER: So, Counsel, there's just going to be a delay, since you -- Ms. Stephens now has her counsel.

MR. ISON: The revised schedules were produced last night, early this morning.

MS. BARNIER: I understand. That was not my question.

MR. ISON: I didn't understand the question.

MS. BARNIER: The question is, Mr. Williams says he has not had an the opportunity to review them. Given that Mr. Williams will have to have an opportunity when do you plan to have them on file?

MR. ISON: I don't think you are too booked right now, so it is a matter of --

MR. WILLIAMS: No.

MR. ISON: -- days.

MS. BARNIER: Let's be more specific. Are you

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 7

going to have them on by Friday?

MR. ISON: Yes.

MS. BARNIER: They will be filed by Friday.

MR. ISON: Friday, ECF.

MR. WESCOTT: Great.

MS. BARNIER: Second housekeeping issue. We had sent an e-mail to your counsel regarding an auctioneer needs to come to your house and got no response. I need to set a date that the auctioneer, if you can give me three dates that you would be available so that he can set that, and can up your -- what dates in the next week would work?

MS. STEPHENS: I was actually home, I didn't hear anybody ring the door bell, but I am in and out with the kids all day long. So can I get an actual time that the person is coming?

MS. BARNIER: It has got to be -- I can give you rough time, but I can't really pin him down. Are you still residing in the house?

MS. STEPHENS: Yeah.

MR. WESCOTT: I would suggest we do it the week after next, if possible.

MS. BARNIER: Next week, we have delayed this --

MR. WESCOTT: I'll be gone all next week so

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 8

have at it.

MS. STEPHENS: Okay. I don't have my schedule. Look at my calendar here and see. I could do Tuesday or Thursday morning.

MS. BARNIER: Tuesday or Thursday morning. Okay. I will e-mail your counsel.

Mr. Williams, I am going to ask that you shoot me an e-mail, since it is going to be Ms. Stephens, because I don't have a copy of your e-mail yet. My e-mail is on all the pleadings so pretty easy to find. And I will confirm which day with the auctioneer.

Okay. I'd like to go through the schedules and debtors I assume you have copies of your schedules with you.

MR. WESCOTT: (Inaudible).

MS. BARNIER: Okay. So starting on Schedule B.

MS. STEPHENS: I don't have a copy here.

MS. BARNIER: Counsel, you don't have your copy?

MR. WESCOTT: Is the wi-fi here secure?

MS. BARNIER: No idea.

MR. WESCOTT: Oh, okay.

MS. BARNIER: You are in a federal court building. I know that's the best I can tell you.

MR. WESCOTT: I would hope that it is, then.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

2 (Pages 5 to 8)

Case: 12-03143 Doc# 81-3 Filed: 08/30/13 Entered: 08/30/13 15:33:51 Page 37 of 38
Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-80 of 228

MS. BARNIER: Mr. Ison, do happen to have a copy of the schedules since your client has his, that Mr. Williams can look at?

MR. ISON: I can probably call them up on my computer and he can look at the computer.

MS. BARNIER: That would be great, if you can do that for Mr. Williams, because some of the questions do go to Ms. Stephens.

MR. ISON: Mr. Williams, would you submit your contact information?

MR. WILLIAMS: Absolutely.

MR. ISON: Which schedule -- I got them separately. So which schedule are you going to start with?

MS. BARNIER: Going on start with B.

MR. WESCOTT: We have four secure -- here is a very low signal smart fi I'm trying to get, let's see if it works. And I joined.

MS. STEPHENS: It is probably unlikely you can join a wireless network here, Carl.

MS. BARNIER: You don't have a copy any other way? You can only do it with your -- okay.

It is usually customary, Counsel, that you come to a hearing with the schedules. This is a little unusual.

MR. WESCOTT: Well, I'll take the blame on that one again with the updates just --

MS. BARNIER: It is not the updates, Mr. Wescott. Well, when you come to a 341 hearing, the debtors counsel is supposed to come with all papers filed in the case.

MR. WESCOTT: Okay. That's good to know. Thank you.

MS. BARNIER: For your counsel's edification.

MR. ISON: We have B, and then we have three attachments to B.

MS. BARNIER: That's correct. Starting with the attachments, 1462 Booneville Road LLC, who controls that?

MR. WESCOTT: Are you asking --

MS. BARNIER: Here is the thing, Counsel. You got two -- counsel, I am going to put questions out, you know, if one of you have knowledge, please feel free to answer because I don't know.

MR. WESCOTT: I'll probably be answering the majority of the ones, because the majority of things are ones I know about. 1462 Booneville Road is or was controlled by me.

MS. BARNIER: Are you the managing member of it?

MR. WESCOTT: Yes, I believe I am.

MS. BARNIER: Now, you listed that David Gatoni owes you 60 thousand dollars. Is that correct?

MR. WESCOTT: That's correct.

MS. BARNIER: Why does he owe you 60 thousand dollars?

MR. WESCOTT: Because I loaned him money.

MS. BARNIER: Was it secured by any property?

MR. WESCOTT: No, it is unsecured.

MS. BARNIER: Unsecured. Do you have a promissory note?

MR. WESCOTT: I do not.

MS. BARNIER: So you loaned Mr. Gatoni 60 thousand dollars, you do not have a promissory note, and it was not secured. What was the basis then for the loan?

MR. WESCOTT: Checks, consideration, cash consideration.

MS. BARNIER: So do you have copies of those checks?

MR. WESCOTT: I can bring those up.

MS. BARNIER: Does it say that it was a loan on those checks?

MR. WESCOTT: Probably not.

MS. BARNIER: Then what is your basis for that

it was a loan?

MR. WESCOTT: It actually was a loan. Period.

MS. BARNIER: So, Mr. Ison, I will need copies of the checks of the loan to Mr. Gatoni from 1462 Booneville Road LLC. Does 1462 Booneville Road LLC have its own checking account?

MR. WESCOTT: No. The LLC was actually -- trying to keep my LLCs straight. 1462. Yes. 1462 Booneville Road LLC, as per the asterisks there, and it was not actually formed. It was intended to be formed. So, no, it does not have a bank account.

MS. BARNIER: When did you make the loan to Mr. Gatoni?

MR. WESCOTT: I don't recall the exact date.

MS. BARNIER: What year?

MR. WESCOTT: Let's see. I believe it was 2010.

MS. BARNIER: What month?

MR. WESCOTT: Think. I'm still making sure about the year. Yes. I believe that's correct. I think it was in the months September through November.

MS. BARNIER: Why did you loan Mr. Gatoni 60 thousand dollars?

MR. WESCOTT: He asked me to make the loan. He had previously loaned me money. I had -- that LLC was