Page 13

in the process of buying a property for him, from him.
MS. BARNIER: From him.
MR. WESCOTT: From him. And I had -- anyways, he had asked for the loan.
MS. BARNIER: What were the terms of the loan?
MR. WESCOTT: It was supposed to be an interest free loan, payable within three months.
MS. BARNIER: Did you ever receive any payments?
MR. WESCOTT: No.
MS. BARNIER: What was the consideration for the loan?
MR. WESCOTT: Didn't we go over that? Cash, checks.
MS. BARNIER: No. I'm sorry. I won't use that term. Consideration means something different.
MR. WESCOTT: Okay. What is it.
MS. BARNIER: I will let your counsel explain to you.
In terms, you have loaned Mr. Gatoni 60 thousand dollars, what did you receive for that loan?
MR. WESCOTT: I didn't receive anything.
MS. BARNIER: So you made this loan for the goodness of your heart?
MR. WESCOTT: For the person, the relationship.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 14

Yeah.
MS. BARNIER: Then you listed Mr. Carter Rankin owing you 42 thousand dollars. Is that correct?
MR. WESCOTT: That's correct.
MS. BARNIER: Why does he owe you 42 thousand dollars?
MR. WESCOTT: Because I lent him money.
MS. BARNIER: When was that?
MR. WESCOTT: I could look up the year, but I would say approximately 2008.
MS. BARNIER: Was that loan secured by anything?
MR. WESCOTT: No, it was not.
MS. BARNIER: Did you receive a promissory note?
MR. WESCOTT: I believe I have a signed agreement.
MS. BARNIER: Counsel, I will need a copy of that signed agreement.
What was the purpose of the loan to Mr. Rankin?
MR. WESCOTT: He wanted to attend real estate related school, I think it is called Nuvo Riche, and he was working for me at the time, and --
MS. BARNIER: He was an employee?
MR. WESCOTT: He was a contractor.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 15

MS. BARNIER: What services did he provide for you?
MR. WESCOTT: He was in marketing and sales.
MS. BARNIER: For which company of yours?
MR. WESCOTT: Sycamore, which has since gone out of business.
MS. BARNIER: Did Mr. Rankin ever pay you anything on that 42 thousand dollars?
MR. WESCOTT: I believe he did make a payment or two, 500 dollars a thousand dollars, something like that. Some very small payments at the beginning an then --
MS. BARNIER: Did you ever sue him for the money?
MR. WESCOTT: I have not.
MS. BARNIER: Why not?
MR. WESCOTT: I don't believe he has any assets.
MS. BARNIER: Racki, says you -- owes you 105,000 dollars in debt. Why does he owe you that money?
MR. WESCOTT: Let me see. I sold him a property, which was 4175 West Dry Creek Road.
MS. BARNIER: Why does he still owe you 105,000 dollars then, you sold him a property?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 16

MR. WESCOTT: I sold him a property, he defaulted on the deal.
MS. BARNIER: On the deal or the loan?
MR. WESCOTT: On the deal.
MS. BARNIER: So he --
MR. WESCOTT: I got -- I took the property back, but he had agreed that he was still going to pay me $105,000. In fact, I believe I have checks that he postdated to that effect, used to, for the 105,000. However those checks are not good.
MS. BARNIER: So let me understand what happened. So you went into a contract with Mr. Racki to -- he was to purchase 4175 West Dry Creek Road. Is what in Healdsburg?
MR. WESCOTT: That's in Healdsburg.
MS. BARNIER: He then backed out of the sale?
MR. WESCOTT: No. I think originally it was a wrap deal, then we did actually effectuate the wrap. And we did close escrow approximately 2005 or 2006. Public records would have the exact date. And it was a seller finance deal and installment sale that he defaulted on. So, subsequently, I would guess in 2006, 2007, somewhere around there, again public records would have the exact date, I got the property back.
MS. BARNIER: What happened to the property

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

4 (Pages 13 to 16)

Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-82 of 228

Page 17

after you got it back?

MR. WESCOTT: It has been foreclosed.

MS. BARNIER: Did you have a written agreement with Mr. Racki?

MR. WESCOTT: Yes, I did.

MS. BARNIER: Counsel, I am going to need a copy of that.

Now, you also listed Going On Networks owes 194 thousand dollars for unpaid work. Is that correct?

MR. WESCOTT: Uh-huh.

MS. BARNIER: What was the nature of your work for Going On Networks?

MR. WESCOTT: I was the CTO.

MS. BARNIER: Why were you not paid?

MR. WESCOTT: I was part of the compensation agreement, it was a start up, we did not have capital, I agreed to defer my compensation.

MS. BARNIER: Did you ever sue Going On Networks for your compensation?

MR. WESCOTT: No. I did file a claim with the -- I believe it is the State Labor Board, and the Labor Board would not hear my claim because it is a little more complicated than the usual thing that they take a look at. So they essentially said they would not look at it, and that I should sue, I should take it up

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 18

in federal court.

MS. BARNIER: Did you?

MR. WESCOTT: I have not.

MS. BARNIER: Do you have a copy of that agreement that you made with Going On Networks?

MR. WESCOTT: I have a lot of different files related to Going On Networks that I could provide that are relative to the various compensation that I should have received.

MS. BARNIER: All I'm asking for is information regarding to the compensation you should have received. So any documents regarding to the agreement you had with Going On Networks, any e-mails you received from them regarding compensation, that is what I would be requesting.

MR. WESCOTT: We could provide that.

MS. BARNIER: Okay. Jeremy Key you listed owing you $436,000. Why does he owe you $436,000?

MR. WESCOTT: Unpaid payments on property.

MS. BARNIER: Why didn't you collect against Mr. Key?

MR. WESCOTT: I attempted to collect.

MS. BARNIER: What happened?

MR. WESCOTT: He was later and later with his payments and essentially there got to be a point where

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 19

he stopped returning my phone calls and stopped meeting with me.

MS. BARNIER: These are payment on properties that you sold to him?

MR. WESCOTT: Correct. Was one of them is 20195 Sweet Water Springs Road. That particular case, it is a second deed of trust for $425,000. So I was collecting interest payments on that that were later and later.

I also rented him a property later on which is 5760 Chamise Road.

MS. BARNIER: 57 --

MR. WESCOTT: 5760 Chamise Road -- 5760 Chamise Road has been foreclosed. 20115 Sweet Water Springs Road, I'm not sure what has happened but I know payments on the first were not made for years, and I believe there's litigation between Mr. Key and the Bay View I think is the holder of the first on that one.

MS. BARNIER: I am sorry you gave the address but not the city. What city is it in?

MR. WESCOTT: Healdsburg. I think 20195 is a, it is -- it is a Guerneville address for some things and a Healdsburg address for others.

MS. BARNIER: You held the second on that property?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 20

MR. WESCOTT: I held the second on that property.

MS. BARNIER: Do you still hold the second on that property?

MR. WESCOTT: I'm not sure, if the property has not been foreclosed then we technically would have a second that is worthless in my opinion. If it has been foreclosed, then I think it would have been wiped out at the auction.

MS. BARNIER: Is it held in your name alone?

MR. WESCOTT: Correct. I think either my name or might be Monette and I, but it is a personal deed of trust on a property that was personally owned.

MS. BARNIER: You listed 7950 Hearst Road LLC with a debt from a Jeremy Smite in the amount of 64 thousand.

MR. WESCOTT: Smith.

MS. BARNIER: Smith sorry. What was of that debt for?

MR. WESCOTT: Unpaid property payments.

MS. BARNIER: On what property?

MR. WESCOTT: 7950 Hearst Road in Willits, California.

MS. BARNIER: Did you hold a first or a second?

MR. WESCOTT: That one, there is a chronology

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

5 (Pages 17 to 20)

Case: 12-03148 Doc# 81-4 Filed: 09/30/13 Entered: 09/30/13 15:33:51 Page 2 of 37
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-83 of 228

Page 21

there. I -- with regard to Mr. Smith, I did originally hold a second.

MS. BARNIER: Do you still hold the second?

MR. WESCOTT: No.

MS. BARNIER: Who holds the second?

MR. WESCOTT: Well, the second that I originally held has been paid off. I believe it was for 800 thousand dollars.

MS. BARNIER: When was that paid off?

MR. WESCOTT: Public records would show the exact date, but I would guess somewhere in the 2009-ish time frame.

MS. BARNIER: So you received 800 thousand dollars on your second deed of trust in 2009. Is that correct?

MR. WESCOTT: Yeah. I think maybe 2010. I am not -- I would have to look, and look at the dates.

MS. BARNIER: That would be reflected on the taxes that you just shared, wouldn't it?

MR. WESCOTT: I -- there's no, it is not on the 2010 taxes, so I don't think it hit in the year 2010. I am pretty sure it is not. So we would have to look up the date.

MS. BARNIER: So do you have any documents regarding this payoff?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 22

MR. WESCOTT: Yes. There was done through escrow, I don't recall where the escrow was. But there was a deed of trust, everything was recorded, and so I actually was paid off on the second.

MS. BARNIER: You said there is some complications to this story. What else would there be?

MR. WESCOTT: Well, if you would like, I can try to give you the chronology to the best of my memory.

MS. BARNIER: All I'm interested is you held any other interest? Does Hearst Road LLC hold any other interest?

MR. WESCOTT: No, but Hearst Road LLC has a claim against -- we ended up taking this property back, too, and the LLC has a claim against the current owners of the property.

MS. BARNIER: For what?

MR. WESCOTT: That's reflected separately in the schedules.

MS. BARNIER: What is the basis of the claim?

MR. WESCOTT: Essentially the sellers agreed to allow the assumption of the loan that I believe I personally had on the property after I took it back that I had assumed from Jeremy Smith's loan. And then -- after we had made, you know, payments to them and caught up the property taxes, per my agreement with the

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 23

sellers, and the servicer, they then refused to do the assumption.

Consequently, I stopped making payments, and they foreclosed on the property.

MS. BARNIER: Help me out here. I am a little confused on this property, because you said you held a second, and this -- this is just now I want to make sure. Were you the managing member of Hearst Road LLC?

MR. WESCOTT: I still am the managing member of Hearst Road LLC.

MS. BARNIER: That LLC is still active?

MR. WESCOTT: It has not paid its fees, but it is still active, if it has not been revoked by the state. Yes.

MS. BARNIER: So you said that in 2009 or 2010 your second was paid off in the amount of 800 thousand dollars. So if your second was paid off, why would you have any interest in this property?

MR. WESCOTT: Jeremy Smith then subsequently defaulted on his loan with the first and he asked me if I was interested in taking the property back, and I signed an agreement with him to take the property back. He grant deeded it to me, and then I subsequently worked out a deal with the holders of the first to assume the loan personally, and that is all prior to what I just

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 24

told you about the LLC then taking over the property and negotiating an assumption.

MS. BARNIER: So why does -- does Mr. Smith still owe you 64 thousand dollars?

MR. WESCOTT: I would have to look at records, but I believe to the best of my knowledge that he was behind that much in his payments to me. I'm not sure if it was on the second or some other deal, but I do know at the time that I took the property back, he owed me 64 thousand dollars, and he agreed to pay it.

MS. BARNIER: Do you have a writing to that effect?

MR. WESCOTT: I don't think I have that in writing.

MS. BARNIER: So it was just a verbal agreement he was going to pay you back the 64 thousand dollars?

MR. WESCOTT: Correct, but obviously there would be things in writing prior regarding whatever the debt was from. I actually don't recall if that's unpaid payments on the second, or on -- related to a different property, but I think it is on the second. I have to look back at my records.

MS. BARNIER: Mr. Wescott, I really am confused here. Sorry. You told me the second was paid off.

MR. WESCOTT: The principal amount of the

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

6 (Pages 21 to 24)

Case: 12-03148 Doc# 81-4 Filed: 08/30/13 Entered: 08/30/13 15:33:51 Page 3 of 37
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-84 of 228

second was paid off, which I believe was 800,000 dollars, and obviously it is a matter of public record what the exact amount, and date was but I believe it is 800,000, and I believe it was paid off --

MS. BARNIER: Let me make sure I understand. So you received a payment of 800,000 dollars, but there was still moneys owed on the second. Is that correct?

MR. WESCOTT: I believe he was behind on the actual interest payments, but I got the principal paid off.

MS. BARNIER: Did you have an agreement to that effect? That is how the money was to be applied?

MR. WESCOTT: I think I did it for the benefit of the close. In other words --

MS. BARNIER: Do you have any documents regarding this transaction?

MR. WESCOTT: It was done through escrow, so I believe it was through Financial Title. I think they are out of business, but --

MS. BARNIER: That was not my question, sir. My question was do you --

MR. WESCOTT: Somewhere I believe there are some documents to that effect, yes.

MS. BARNIER: Do you know where those documents are?

MR. WESCOTT: We can look for them.

MS. BARNIER: I will need those documents as well.

Then you also claim that is it Carachi am I saying his last name right?

MR. WESCOTT: Tony Carachi.

MS. BARNIER: Tony Carachi owes you almost 300 thousand dollars. What was the basis of the debt?

MR. WESCOTT: I believe that was a second deed of trust on 120 Marin View Avenue in Mill Valley. He subsequently defaulted on both the first and the second. The property was foreclosed, has since been resold, and --

MS. BARNIER: Going back to the 800,000 dollars. What did you do with the proceeds if you received it in either 2009, 2010, what did you do with the 800,000 dollars?

MR. WESCOTT: I'm not sure, exactly.

MS. BARNIER: Well, did you put it in the bank?

MR. WESCOTT: Yeah, no, it went into the bank from there --

MS. BARNIER: Which bank did the moneys?

MR. WESCOTT: Probably Wells Fargo is the likely one.

MS. BARNIER: So you deposited the 800,000

dollars into your branch at Wells Fargo. Is that accurate?

MR. WESCOTT: It was probably wired.

MS. BARNIER: Probably wired. Okay. Into your personal account?

MR. WESCOTT: That would be, yes, I believe that to be the case.

MS. BARNIER: Did Hearst Road LLC have a checking account?

MR. WESCOTT: Nope.

MS. BARNIER: Was Hearst Road LLC properly formed?

MR. WESCOTT: Yes.

MS. BARNIER: So you took the 800,000 dollars. Do you know what you did with the proceeds?

MR. WESCOTT: Bank records would show that. I doubt there was one single thing that was done with the 800,000 dollars. I would suspect it was two or more things.

MS. BARNIER: Then you list Unexpected Development, which is -- is that a corporation?

MR. WESCOTT: There is an LLC Unexpected Development, which is a Delaware LLC. Which schedule are you talking about?

MS. BARNIER: I am still just --

MR. WESCOTT: Schedule B?

MS. BARNIER: Let's keep going.

MR. ISON: Attachment 1 to schedule B, you are on, right?

MS. BARNIER: I can go all over the place, so don't worry about it. It is Unexpected Development. It is your -- let's see, Page 2 of your document on personal property B, Item 21, that's --

MR. WESCOTT: We are on Item 16, that's why.

MS. BARNIER: Item 21. I am jumping here.

MR. ISON: I will be on that in a minute, ma'am.

MS. BARNIER: You claim that Unexpected Development LLC, is that a LLC that you are a managing member of?

MR. WESCOTT: I want to look at the basis for this. Personal property. Here we go. Let's see. That refers to --

MS. BARNIER: Hang on. Answer my question first. The question is: Are you the managing member of Unexpected Development LLC?

MR. WESCOTT: I am the managing member of Unexpected Development LLC, a Delaware LLC. That is correct.

MS. BARNIER: Why does Steve Bonilla owe you --

I believe it is -- why does he owe money?
MR. WESCOTT: Essentially I signed with LLC signed a partnership deal with Steve Bonilla to develop property. And a property was acquired in Guatemala. And actually it was a company that was acquired in Guatemala that owned a property with a bank loan. There was -- entitlements were not granted on this property, per an appraisal that was done sometime in the last few years, I am not sure of the exact date.
MS. STEPHENS: Short answer.
MS. BARNIER: If you do not mind, Ms. Stephens, I understand, but he is getting there, I assume.
MR. WESCOTT: It would be difficult to explain why the LLC is owed money without the chronology.
MS. BARNIER: I understand. I am listening.
MR. WESCOTT: So, you know, I believe at one point there was something like two point seven million dollars of equity in that property. The -- when we hit the wall financially and started having severe cash problems and were unable to make payments, I stopped paying the mortgage on this property, and that property subsequently was in foreclosure.
And I went to Guatemala to try and negotiate with the bank and save the property and so on. But Steve Bonilla refused, I am not sure -- essentially,

would not -- would not provide the shares that he held for this entity, which would have allowed me to try to save the property. So that is the basis for my claim.
MS. BARNIER: So that property in Guatemala has been transferred to someone else at this point?
MR. WESCOTT: I believe it has been foreclosed on. I don't know if he stole the shares, if it was all fraud to begin with, I'm not really sure what happened exactly. But I do know that he refused to provide shares that I believe existed in this entity.
MS. BARNIER: Now, you said you hit the wall financially. When was that?
MR. WESCOTT: Well, certainly in 2010 in August, we stopped paying, you know, our various mortgages, and that would be a pretty good hit-the-wall point.
MS. BARNIER: Now, you also make a claim against Reliant Group for libel and breach of fiduciary duty. What is the basis of that claim?
MR. WESCOTT: So Joe Sherman, who is I think the principal shareholder, he is the, you know, the CEO, the key executive at Reliant Group, publicly posted personal information about us. We were investors in his company, and I believe he has a fiduciary duty to us not to post public -- I'm sorry, personal private

information about us, his investors.
Furthermore, he should certainly not be posting untrue information about us.
MS. BARNIER: Did you sue Mr. Sherman for the libel?
MR. WESCOTT: Not yet. I believe that all of this is currently a property of the estate and essentially there's a lot of claims here that I did not have the money to pursue with attorneys.
MS. BARNIER: Did you consult any attorneys on any of these matters?
MR. WESCOTT: I did consultant an attorney on -- hang on. Maybe we should go through the whole list here. I have talked to, let's see. On the 7950 Hearst Road matter, and on the 11385 East Road matter, and on the Okabama Homes LLC matter.
MS. BARNIER: What did they advise you?
MR. WESCOTT: Well, I am not done with the list.
MS. BARNIER: No. In general --
MR. WESCOTT: Essentially, I have -- attorneys were more than willing to take up the lawsuits if I could give them a retainer and start paying them.
MS. BARNIER: Now, you also said you have a breach of fiduciary duty against Paul Roseler. What is

the basis of that lawsuit?
MR. WESCOTT: It is also -- it is -- so, it is related to the same investment. Paul Roseler is --
MS. BARNIER: Which investment, you said same investment?
MR. WESCOTT: The same investment in Kipling Capital. Paul Roseler and his company, Kipling Capital, are -- I believe they are technically a broker dealer. They are the investment bank that you know helped sell this investment to us. There was a point, I can't recall the exact date, when we again were having financial difficulties, and wanted to resell our interest in those investments, and Paul Roseler represented that he could, you know, within a reasonable time frame get us a good price on that investment.
Ultimately he did not do very much, and basically eventually said that at most he could get us 50 percent or less of what it was worth. And I think that whenever there is a broker dealer, there's a potential for conflict of interest. In this case, I believe he was really representing more the interest of another investor who would get a really good deal on our investment rather than our interest.
MS. BARNIER: You still hold the investment in Kipling Capital?

Case: 12-03148 Doc# 81-4 Filed: 08/30/13 Entered: 08/30/13 15:33:51 Page 5 of 37
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-86 of 228

MR. WESCOTT: One of them we -- we do not personally hold those, no.
MS. BARNIER: Who holds the interest in Kipling.
MR. WESCOTT: So there were three, well Kipling is a broker dealer so we actually never had an investment in Kipling.
MS. BARNIER: What deals did you ask then Mr. Roseler to broker for you or what interest?
MR. WESCOTT: There were three holdings in the Reliant Group that are colloquially known as Fidelity Capital, or the Reliant Group Funds four, five and six. And we had asked for -- we were trying to sell four, five, and six.
MS. BARNIER: You also state there you have an illegal foreclosure action against Empire Mortgage in the amount of 204 thousand. What is an illegal foreclosure?
MR. WESCOTT: It is a foreclosure without actual basis in fact or law, just at least for my lay person definition.
MS. BARNIER: You wrote it, so that is why I am asking what you thought it was.
MR. WESCOTT: I'm not an attorney, but --
MS. BARNIER: Which property did they foreclose

on?
MR. WESCOTT: 4175 West Dry Creek Road.
MS. BARNIER: How much were they owed?
MR. WESCOTT: Something like on the approximate order of eight or nine hundred thousand dollars. Public records would show the --
MS. BARNIER: Do they hold the first?
MR. WESCOTT: They held the first.
MS. BARNIER: I think you testified earlier that you had stopped paying on the first. Is that correct?
MR. WESCOTT: That is correct.
MS. BARNIER: So why was it illegal for them to foreclose?
MR. WESCOTT: I stopped paying after they had made false claims about my payments. They had said that -- in fact, they said that I missed a particular month's payment. I then showed evidence I had made that payment. Then they claimed a missed a different month, and they did this five different times on five different months payments, they finally said we don't know which payment you missed, but you missed a payment. So we got into a dispute, and I stopped paying the mortgage.
MS. BARNIER: You have a lawsuit against Antoine, is it Habis, and Emma Andrade.

MR. WESCOTT: I don't have a lawsuit. We have claims.
MS. BARNIER: What is your claim against them?
MR. WESCOTT: So Mr. Habis had represented that urbanization permits were granted on a particular property in Ecuador, and even signed paperwork to that effect. And I subsequently discovered that that was not true.
MS. BARNIER: Which property in Ecuador was this?
MR. WESCOTT: This is the one known as Hacienda de Palo Alto.
MS. BARNIER: Now, you provided a copy of your 2011 taxes. Is that correct?
MR. WESCOTT: That's correct.
MS. BARNIER: When did you file them?
MR. WESCOTT: We filed the state ones this morning.
MS. BARNIER: Did you pay any federal income taxes in 2011?
MR. WESCOTT: I don't believe so. You mean for tax year 2010?
MS. BARNIER: Yes.
MR. WESCOTT: I do not believer so.
MS. BARNIER: Do you owe any taxes?

MR. WESCOTT: No, we do not.
MS. BARNIER: Do you owe any state income taxes for 2010?
MR. WESCOTT: Well, we don't believe we do, because we filed a tax return showing zero liability. However, we were so late in doing so, that the state made their own assessment, and decided a number on our taxes, and we got a letter from the state saying we owe taxes, even though we have later filed showing that we have zero liability. So I am not sure --
MS. BARNIER: How much does the state say you owe?
MR. WESCOTT: It is less than 2000 dollars, I believe.
MS. BARNIER: When do you plan to file your federal income tax return?
MR. WESCOTT: As soon as possible and hopefully within a couple of weeks. You are talking about for 2010 now?
MS. BARNIER: I just asked when do you plan to file your federal income taxes for 2011. We are in 2012.
MR. WESCOTT: I thought you meant for 2010.
MS. BARNIER: I asked that question earlier.
MR. WESCOTT: We have extension through October

Page 37

15th, 2012, so as soon as possible but no later than then.

MS. BARNIER: I'd like to see a copy of the extension, Counsel.

Now turning to Schedule F, on one of your secured creditors you listed a debt to City in the amount of 412,000 dollars is disputed. Why is that disputed?

MR. WESCOTT: I'm not sure. Can we look at the --

MS. BARNIER: Schedule F. Let me show it to physically, would that probably be faster?

MR. WESCOTT: Yeah.

MS. BARNIER: There is a reason paper is still good. You know.

MR. WESCOTT: It is. It is portable. So much for the paperless office.

MS. BARNIER: Right there. See it?

MR. WESCOTT: Yeah. I think that that is an error.

MS. BARNIER: It is not disputed?

MR. WESCOTT: I think that is an error. It should not be disputed. I believe this is related to a first mortgage on 555 Fourth Street, Number 411. If I remember the address correctly.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 38

MS. BARNIER: You list a number of disputes with Citibank, for 412 --

MR. WESCOTT: That's, I believe that is an error.

MS. BARNIER: That's an error. So --

MR. WESCOTT: All of them the 412, we do not dispute. That's an error on my part.

MS. BARNIER: Okay. Is that going to be corrected then, Counsel?

MR. ISON: It better be.

MR. WESCOTT: I will correct it with you.

MS. STEPHENS: Make a note of it so we make sure we know --

MS. BARNIER: You also said the one to Dan is it Limle, Limle? Dan Limle.

MR. WESCOTT: Correct.

MS. BARNIER: In the amount you disputed also in the amount of, you --

MR. WESCOTT: Actually, isn't that doesn't that go with this?

MS. BARNIER: I'm sorry. These are done unusually so forgive me while I go through these. It is always unusual to have the debtors prepare the schedules. That is, I have not seen that done before.

Let's go. Darion Hamon you say is disputed in

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 39

the amount, the amount of the claim I believe you is that him or her?

MR. WESCOTT: It is a him.

MS. BARNIER: In the amount of 82 thousand dollars?

MR. WESCOTT: Correct.

MS. BARNIER: You say that is disputed. The basis of the dispute?

MR. WESCOTT: The basis of the dispute is I borrowed money from Darion, but it was at a usurious rate, and I don't recall the exact rate, but it is probably somewhere between 15 and 20 percent. So he has provided a balance due of something like 82 thousand dollars, but I believe if we cap it at the ten percent maximum allowed by California law, that it would be a lower amount.

MR. ISON: Actually, if it is usurious, you do not owe any interest.

MS. BARNIER: First you have to prove that it is usurious, but we will keep going. I just want to know about disputed claims. Doug Gladstone, you say --

UNIDENTIFIED SPEAKER: Can I go back? I don't want to interrupt.

MS. BARNIER: You may interrupt.

UNIDENTIFIED SPEAKER: Next to that 82 thousand

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 40

under notes there's 51 thousand 50 bucks, and I don't quite understand what your notes mean, just because this is an unusual way to identify.

MR. WESCOTT: Sure. What this means here is that I believe the actual amount as of January 17, 2012 is somewhere around, if not exactly, that number.

MS. BARNIER: Going on. Doug Gladstone, you say is disputed in the amount of 99 thousand dollars.

MR. WESCOTT: For the same reason.

MS. BARNIER: You believe you owe him 84 thousand. Is that correct?

MR. WESCOTT: Correct.

MS. BARNIER: Then to Frederick Ficher and Mary Yeates, am I saying that -- is that the debtors, I'm sorry, the creditors?

MR. WESCOTT: Yes.

MS. BARNIER: You claim there is -- they tell you that owe them two point one million dollars, and you claim it is one point two. Is that correct?

MR. WESCOTT: That's correct. There's actually litigation concerning those events, the whole case.

MS. BARNIER: Once again, also Regina Perry you claim the actual amount should be 13,000 dollars and her claim is 24. Why is that why it is disputed?

MR. WESCOTT: Same reason.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

10 (Pages 37 to 40)

Case: 12-03148 Doc# 81-4 Filed 09/30/13 Entered 09/30/13 15:33:51 Page 7 of 37
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-88 of 228

MS. BARNIER: You put an interesting comment throughout this which is "clearing personal liability," what does that mean?

MR. WESCOTT: Correct. So I am not an attorney but I will tell you what my understanding is, which is that if there is potential liability that we have, there is not necessarily a dollar debt, but there may be liability that we could have related to a business deal, I have put those individuals or entities on our list, discharging any potential claim that they may have. Does that make sense?

MS. BARNIER: In other words, you listed every possible creditor you might have?

MR. WESCOTT: Correct. Thank you.

MS. BARNIER: Now, if you could turn to your schedule I, and let's go to Schedule J. If you both remember this, Ms. Stephens, do you remember this document?

MS. STEPHENS: I don't specifically. I remember -- I don't remember it specifically. No.

MR. WESCOTT: I think I and J is our budget and --

MS. STEPHENS: Okay.

MS. BARNIER: Your expenditures.

MR. WILLIAMS: Are you showing her I now?

MS. BARNIER: I'm showing her J. Does this refresh your memory that you filled this out?

MS. STEPHENS: I believe my husband filled it out, and I --

MS. BARNIER: Did you review it?

MS. STEPHENS: -- reviewed it with him. Yeah.

MS. BARNIER: So earlier you testified, I believe, Mr. Wescott, that you did not pay any mortgage owing on your home in 2011. Is that correct?

MR. WESCOTT: That's correct.

MS. BARNIER: Did you -- when did you stop paying your mortgage?

MR. WESCOTT: Approximately August 2010.

MS. BARNIER: Now, you state on your, for your water and sewer bill for your home in San Francisco that it is $450 a month. Is that accurate?

MR. WESCOTT: That sounds high.

MS. STEPHENS: That sounds high, that might have been for like --

MR. WESCOTT: Other utilities included.

MS. BARNIER: Sorry. This is very specific. If you look at it, it says water and sewer $450. So that is why I'm asking is that accurate?

MS. STEPHENS: I don't -- it might have been for one month. I ballparked what we paid. I think --

we had some leaks in our plumbing, so I think it was what I had paid. I just took it off of a monthly bill.

MS. BARNIER: So one month you paid $450 for water and sewer.

MS. STEPHENS: Yeah.

MS. BARNIER: What is your average bill?

MS. STEPHENS: I think it is about 300 dollars, on average.

MS. BARNIER: Then you also put down under utilities, other, 300 dollars. What other utilities do you pay that is 300 dollars a month?

MS. STEPHENS: Was there phone on there?

MS. BARNIER: Phone you have separate already. Telephone is 300. Then you have other. See that, 300 dollars a month. What is that for?

MR. ISON: Under D.

MS. BARNIER: Two.

MR. ISON: 2D shows internet, satellite, DVR.

MS. BARNIER: Really? Does not show on my schedules printed off the docket, I don't have anything. There is nothing else included there.

MS. STEPHENS: We also have trash, and --

MS. BARNIER: I'm just asking. You guys put down 300 dollars. There is no explanation.

MR. WESCOTT: Internet satellite.

MS. STEPHENS: That's what, yeah, internet, satellite, DVR.

MS. BARNIER: Your internet costs you 300 dollars a month?

MS. STEPHENS: Our internet costs over one hundred, internet and satellite.

MS. BARNIER: The package. So it is about one hundred dollars?

MS. STEPHENS: No. It is like 150 dollars, the package for the Internet and the satellite. I am not sure exactly.

MS. BARNIER: 300, that is inaccurate, and 150 would be accurate?

MS. STEPHENS: And I think I put trash in there, too.

MS. BARNIER: Doesn't ask for that under utilities. You put your trash bill?

MS. STEPHENS: I put it --

MS. BARNIER: Your trash bill is 150 dollars a month, I know San Francisco is expensive but I have not heard that one.

MS. STEPHENS: No. I put together, you know, an average of what we were --

MS. BARNIER: I understand. So my question to you is: On a monthly basis, so you pay 150 dollars a

Case: 12-03148 Doc# 81-4 Filed: 09/30/13 Entered: 09/30/13 15:38:51 Page 8 of 37
Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-89 of 228

Page 45

month for your internet connection. And how much do you pay for garbage?

MS. STEPHENS: I don't know, offhand.

MS. BARNIER: Do you think it is 150 dollars a month you pay for garbage?

MS. STEPHENS: I don't know what that whole number is.

MS. BARNIER: Well, according to Mr. Ison, it says Internet.

MR. ISON: I have some notes that say internet, DVR.

MS. STEPHENS: Okay. It is probably the internet and DVR. I don't remember what I put in there specifically.

MS. BARNIER: I understand.

MR. ISON: And satellite.

MS. STEPHENS: And satellite.

MS. BARNIER: Let me remind both of you. You signed these schedules under penalty of perjury. If you want to make changes to them is the reason for my questions. So let's go back.

So do you -- so you just testified or explained you spend 150 dollars a month on Internet DVR connections. Is that accurate?

MS. STEPHENS: I don't know off the top of my

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 46

head exactly how much I spend every month on that.

MS. BARNIER: Who pays the bills?

MS. STEPHENS: I usually end up paying the bills, yeah.

MR. WESCOTT: Maybe the best thing for us to do is we will look at the actual bills again, and obviously would be happy to provide those to you, or the amounts, you know.

MS. BARNIER: I would suggest to you --

MR. WESCOTT: I believe it is accurate, but if it is inaccurate --

MS. BARNIER: So far your testimony does not support the 300 dollars. If you have other information that supports it, that would be great. But at this point, it does not support it, and you did sign them under penalty of perjury. Let's go on down.

Home maintenance, you said you paid 500 dollars a month on home maintenance. You did not pay -- you stopped paying your mortgage in 2010. Why would you still pay for home maintenance of 500 dollars a month on a home that you were not keeping?

MS. STEPHENS: Well, things get broken. I mean, I had to fix various things.

MR. WESCOTT: Our garage door.

MS. STEPHENS: Our garage door was broken.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 47

There is various things that, you know, I mean, I --

MS. BARNIER: So garage door was broken. What else did you have to pay?

MS. STEPHENS: Gardening, cleaning, those types of things.

MS. BARNIER: It is very specific here. Number 3, if you -- let me show it to you, Ms. Stephens, I believe Mr. Wescott has it in front of him. Says home maintenance, repairs and upkeep.

MS. STEPHENS: Yeah.

MS. BARNIER: So you are claiming that you have a gardener?

MS. STEPHENS: No. We just pay people when we need, you know, gardening, and I'll usually pay someone to clean up the yard, et cetera.

MR. WESCOTT: I think that that includes 3910 Carol Avenue, and that might be also why the numbers are what they are.

MS. STEPHENS: Oh, yeah.

MS. BARNIER: 3910 Carol Avenue. 3910 Carol Avenue is your property in Santa Barbara. Is that correct?

MS. STEPHENS: Yeah.

MS. BARNIER: So why would that be included in this?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 48

MS. STEPHENS: We have continued to maintain that property as well.

MS. BARNIER: Okay. Let's go back over this. I think there is some confusion on all parts here. Not me, but you. Okay.

MR. WESCOTT: No. It is coming back.

MS. BARNIER: It is coming back. Okay. This is just for your home on Ashbury. Does everybody understand that?

MR. WESCOTT: Then we might have filled it out incorrectly.

MS. BARNIER: So it sounds like it needs to be amended. Does that sound correct to you, Mr. Wescott?

MR. WESCOTT: Yes, it does.

MS. BARNIER: It is going to be amended and we are going to see a new Schedule J.

MR. WESCOTT: Just to be clear. We are only going to list 853 Ashbury Street expenses on there rather than both.

MS. BARNIER: Talk to your counsel about that one, but he should be able to advise you how this should be filled out.

It says here that you spend three thousand dollars a month on food. Is that correct?

MS. STEPHENS: I don't know.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

12 (Pages 45 to 48)

Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-90 of 228

Page 49

MS. BARNIER: You don't know. You put it down, Ms. Stephens, not me. So is three thousand dollars a month on food for a family -- two adults and three children under the age of six. Is that correct?

MR. WESCOTT: I think that that is correct.

MS. BARNIER: Where do you shop?

MS. STEPHENS: I shop at Whole Foods and Trader Joe's.

MS. BARNIER: So it is your testimony that -- how often do you go shopping?

MS. STEPHENS: I usually go shopping two to three times a week.

MS. BARNIER: What is your average bill when you go shopping?

MS. STEPHENS: 100 to 150 dollars.

MS. BARNIER: Every time you shop you spend 150 dollars, two to three times a week?

MS. STEPHENS: I usually spend anywhere from it is 100 to 150 dollars once or twice a week, then I usually have some smaller things.

MS. BARNIER: Okay.

MS. STEPHENS: And then we factored in, you know, eating out and doing, you know, that was what I thought -- didn't we put that together?

MS. BARNIER: How often do you eat out?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 50

MS. STEPHENS: It just depends, several times a week sometimes.

MS. BARNIER: Where do you go?

MS. STEPHENS: Restaurants.

MS. BARNIER: What kind of restaurants?

MS. STEPHENS: I -- I don't know. We don't go to the same restaurant that often.

MS. BARNIER: Do you eat in the city?

MS. STEPHENS: Yeah, we eat in the city.

MS. BARNIER: Do you eat within six blocks of your home?

MS. STEPHENS: Well, if we are going out, it just depends, whether we are eating at our house or not.

MS. BARNIER: So before you filed in the month of December, where did you go eat at restaurants?

MS. STEPHENS: I don't know. Do you know?

MS. BARNIER: Can you remember?

MR. WESCOTT: I can't recall but obviously anything that we paid, you know, December, December 2000 --

MS. BARNIER: I would suggest to you, just doing this for a very long time, that three thousand dollars a month for two adults and three kids under the age of five is amazing.

You donate 200 dollars a month to charities.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 51

What charities do you donate to?

MS. STEPHENS: You know, I don't -- I think we should amend that schedule, because --

MS. BARNIER: There's just too many inaccuracies right now. Is that --

MR. WESCOTT: Well, I think that the Schedule J is backwards-looking, and some of those numbers are based on the past. Obviously, our expenses have been greatly reduced over time. So if we did a forward-looking statement or an update based on our current lifestyle, a lot of these numbers would be lower.

Does that make sense?

MS. BARNIER: It does. Here is the headache, Mr. Wescott, and I think we have explained this, or I have tried to explain it, I don't know if your counsels have explained it well. It is a snapshot for the last six months average of what you are spending so that is what we are trying to determine here of what your expenses were so that we can get some accurate numbers. And so far I am not feeling comfortable with the testimony today based on the representations you have made and signed under penalty of perjury.

Let me keep going. You claim that you -- excuse me, Mr. Wescott. I want to move along. You guys

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 52

were late. We have got other attorneys here that want to ask questions. I have got a lot of ground to cover. So let's just keep going. You have already said you are going to amend this, so I will wait to see that.

When do you expect to get accurate numbers to your counsel so he can get this on file?

MR. ISON: I think that he was trying to clarify his testimony, which is, of course, something he is allowed to do. And you mentioned that this was supposed to be an average of six months.

MR. WESCOTT: We don't see that on there. Can you show us where that says that? It says pro rate based on --

MS. BARNIER: Counsel, I am going to suggest that you -- Counsel, I am going to suggest you advise your own debtors the best way to proceed. I have just taken their testimony. They have explained that they have some -- there may be some issues. I understand -- I have not heard from Mr. Williams yet, but I just heard both of the debtors say that needs to be amended. I just asked a very simple question: When do you think that this amendment will be done?

MS. STEPHENS: Friday.

MS. BARNIER: Terrific. We will see it on Friday along with the other amended schedules.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

13 (Pages 49 to 52)

Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-9 Page 228

It says you pay for private school for your two sons of almost three thousand dollars a month. What schools do your sons attend?
MS. STEPHENS: The Le Sai Francal.
MS. BARNIER: How much is that tuition? This is for your three year old, or I'm sorry you have a six year old?
MS. STEPHENS: Six and four. Yes.
MS. BARNIER: And they both attend?
MS. STEPHENS: Yeah.
MS. BARNIER: That's three thousand a month for the both of them?
MS. STEPHENS: M-hm.
MR. WILLIAMS: Is that a yes?
MS. STEPHENS: Yes.
MR. WESCOTT: That actually says 29.
MS. STEPHENS: It is 29 whatever but, yeah.
MS. BARNIER: We will be very accurate here, just as accurate as you have been in your schedules.
And do you pay that monthly?
MS. STEPHENS: We were. We are done for the school year.
MS. BARNIER: When did you make the last payment?
MS. STEPHENS: I think in April.

MS. BARNIER: How much did you pay in April?
MS. STEPHENS: That amount.
MS. BARNIER: You are paid 2989 in April?
MS. STEPHENS: M-hm.
MS. BARNIER: Did you pay 2989 in March?
MS. STEPHENS: M-hm.
MS. BARNIER: You need to answer yes. I'm sorry.
MS. STEPHENS: Yes.
MS. BARNIER: Did you pay 2989 in February?
MS. STEPHENS: Yes.
MS. BARNIER: Did you pay 2989 in January?
MS. STEPHENS: Yes.
MS. BARNIER: What was the source of the funds?
MS. STEPHENS: We had been borrowing money, and I -- I mean, I don't know where we actually got our funds over the last six months, aside from the money that I borrowed from my father. I borrowed 13,000 dollars from my dad at the beginning of the year.
MS. BARNIER: Is it your testimony today that 13,000 dollars you borrowed from your father paid for your two sons' tuitions at the private school?
MS. STEPHENS: It paid for that and other expenses.
MS. BARNIER: What bank account are you using

to pay these expenses?
MS. STEPHENS: I am using a variety, we have several bank accounts, and I am not sure which one I am using to pay that expense, or have paid that expense with.
MS. BARNIER: Let's go back, then, to your Schedule B and you listed four bank accounts: Wells Fargo, U.S. Bank, Montecito Bank and Trust, California Bank and Trust. Are all those accounts still open?
MS. STEPHENS: Yes.
MS. BARNIER: I'd like -- what is not listed here, Counsel, is the last four digits of those bank accounts, which should be on here so that we can clarify for those.
I would like bank statements and checks from those four banks from 2010 through 2011. Are these joint signature accounts?
MR. WESCOTT: Can we go back a moment? When we had --
MS. BARNIER: Can we answer my question. Are these joint signature accounts?
MR. WESCOTT: I don't know which accounts you are talking about. I think there's a multitude of accounts and some probably are and some probably aren't. Would you like to list them one by one?

MS. BARNIER: Mr. Wescott, once again, under penalty of perjury, you signed these schedules. You listed four bank accounts that you have. You have Wells Fargo Bank, U.S. Bank, Montecito Bank and Trust, California Bank and Trust. Are these accurate?
MR. WESCOTT: They are accurate as of the filing date. Is that correct. I believe Wells Fargo subsequently shut down -- I am not sure if it is this account, but once they got the filing, at least they did my personal account.
MS. STEPHENS: Yeah.
MR. WESCOTT: Which I think is the one we are -- is it the joint account here?
MS. STEPHENS: Some of them are joint and some of them are individual.
MS. BARNIER: U.S. Bank, joint or individual?
MS. STEPHENS: Joint, I believe.
MS. BARNIER: Montecito Bank, joint or individual?
MS. STEPHENS: Individual.
MS. BARNIER: Is that your bank account?
California Bank and Trust, joint or individual?
MS. STEPHENS: Individual.
MS. BARNIER: That is yours?
MS. STEPHENS: Yeah.

Page 61

MS. BARNIER: Why isn't this account listed?
MR. WESCOTT: It is not personally held.
MS. BARNIER: Okay. How much money have you loaned Mr. Wescott from Atlas Consulting since the filing of the bankruptcy?
MS. STEPHENS: I didn't have --
MR. WESCOTT: I think that is zero.
MS. BARNIER: I'm sorry. You just testified that you have made loans back and forth from Atlas -- "we." So you -- but Ms. Stephens controls it, so you would have to sign the check. Is that correct?
MS. STEPHENS: He is a manager or a, you know, he has signing authority on Atlas Consulting bank accounts.
MS. BARNIER: How can he have signing authority if he is not a member of the LLC?
MS. STEPHENS: You can have a manager be a member. I mean, a manager be on the bank accounts. He is a manager of Atlas.
MS. BARNIER: I'm sorry. So you are the managing member, and he is a manager of Atlas LLC. Is that correct?
MS. STEPHENS: I believe so.
MS. BARNIER: Is that reflected on the LLC agreement?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 62

MS. STEPHENS: I don't think so.
MS. BARNIER: So you have just done this in your own capacity as a managing member, allowed him to be a manager. Is that right?
MS. STEPHENS: Yeah.
MS. BARNIER: Do you have those specific powers in your LLC to do that?
MS. STEPHENS: I assume so.
MS. BARNIER: Since the filing of the bankruptcy approximately how much money have you taken from Atlas Consulting LLC?
MS. STEPHENS: There was really no money in Atlas Consulting LLC. We have just used it as -- I mean, he has loaned money to it and we have used money, that is how money -- that is how we have been managing our money.
MR. WESCOTT: We are just --
MS. BARNIER: Excuse me. I am sorry, Mr. Wescott.
So I thought you explained that you pay bills, personal bills from Atlas Consulting LLC. Is that correct?
MS. STEPHENS: Yeah.
MS. BARNIER: What did you pay?
MS. STEPHENS: I will provide you bank

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 63

statements.
MS. BARNIER: I'd like bank statements -- Mr. Williams, I'd like -- since she is the managing member, I would like bank statements for 2010, 2011, and I'd like the checks.
MR. WESCOTT: Now, we did go over some of the bank-related things at one of our previous 341 meetings, and I had explained that since Wells Fargo shut down a number of accounts they wanted a bunch of money to provide that.
MS. BARNIER: You explained that Mr. Wescott --
MR. WESCOTT: You said you were going to get them yourself. Is that a misunderstanding?
MS. BARNIER: You have many misunderstandings, Mr. Wescott. But I can --
MR. ISON: You know, we can proceed a little better without the comments.
MS. BARNIER: Instruct your client to answer questions and not put in additional information. Thank you.
Going back to Atlas Consulting --
MR. ISON: -- put in additional information? I'm not even sure what that means. His answering questions requires information.
MS. BARNIER: Mr. Ison, if I may continue, we

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 64

can get this done a lot faster.
So Atlas Consulting LLC, I would also like a copy of the LLC papers in terms of its formation.
MS. STEPHENS: Okay.
MS. BARNIER: And any papers regarding how it is held. So you are going to provide me 2010, 2011, and 2012 bank statements and checks for Atlas Consulting.
As long as we are on Atlas Consulting, who -- where is Atlas Consulting bank statement? Is that at Wells Fargo?
MS. STEPHENS: I have a bank, Wells Fargo and U.S. Bank and California Bank and Trust.
MS. BARNIER: I understand that part. You explained that part. But where is Atlas Consulting LLC bank account?
MS. STEPHENS: I have Atlas Consulting bank accounts at those banks.
MS. BARNIER: So you have two banks accounts. One is at Wells Fargo.
MS. STEPHENS: One is at U.S. Bank and Trust, and one is at California Bank and Trust.
MS. BARNIER: So when you listed these two --
MS. STEPHENS: And one is at Montecito Bank and Trust. Those are my personal bank accounts. These are my Atlas bank accounts.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

16 (Pages 61 to 64)

Case: 12-03143 Doc# 81-4 Filed: 08/30/13 Entered: 08/30/13 15:03:51 Page 12 of 37
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-93 of 228

MS. BARNIER: So the only bank account that you have, Mr. Wescott, is at U.S. Bank?

MR. WESCOTT: The only -- I have --

MS. STEPHENS: I think we still have a Wells Fargo account.

MR. WESCOTT: Okay. I'm not sure.

MS. BARNIER: Sorry. I just got conflicting testimony here. So you said the Wells Fargo Bank account was closed. Is that not accurate?

MR. WESCOTT: They closed down pretty much all of my accounts when they got the bankruptcy filing. I do not believe that I personally -- I could be wrong -- have a bank account with Wells Fargo any more. But, again, I could wrong. They shut down pretty much everything for me.

MS. BARNIER: So could you please provide the bank -- the account numbers on these?

MR. WESCOTT: We actually provided the last four numbers of those accounts and the statements for January, I believe it was, when we -- those were submitted by e-mail to the Trustee.

MS. BARNIER: How about you submit them again, because -- both submit them again since you have my e-mail. So one more time.

MR. WESCOTT: -- can you provide them to the

Trustee again?

MR. ISON: So you are looking for the last four of the bank accounts?

MR. WESCOTT: The last four listed in schet form it is the schedule seven form seven whatever it is the statement of financial affairs, then the actual statements were required to be provided at the -- a week before the first 341 meeting; I provided them in e-mail to you, you provided them to e-mail to the Trustee.

MS. BARNIER: I don't believe they were provided to the Trustee, but I could be incorrect. We will find out.

MR. WESCOTT: Can you please provide them to the Trustee?

UNIDENTIFIED SPEAKER: Can I ask a question? How many Wells Fargo accounts were there?

MR. WESCOTT: I have had dozens of Wells Fargo accounts over the years.

UNIDENTIFIED SPEAKER: Okay. But at the time of the filing, how many accounts did you have?

MR. WESCOTT: I'm not sure of the exact number.

UNIDENTIFIED SPEAKER: Can we get all the accounts that you had at that time?

MR. WESCOTT: From me personally?

UNIDENTIFIED SPEAKER: Personally, and I would

like any business that you are a managing member of.

MR. ISON: Well, that's a different issue.

MS. BARNIER: We'll get there if you want. But it is actually included on the 2004 exam that judge Montali signed the order to produce so we will go back over that again one more time because --

At the time of filing, Mr. Wescott, did you have a Wells Fargo Bank account in your personal name?

MR. WESCOTT: I'm not sure. It appears that I did --

MS. BARNIER: Excuse me. Where do you currently bank?

MR. WESCOTT: I actually don't bank anymore.

MS. BARNIER: So you have no bank account?

MR. WESCOTT: I do not believe I have my Wells Fargo personal bank account anymore. I believe they shut it down. However, I will check later today and see if my recollection is correct or incorrect.

MS. BARNIER: So my question was: You do not use a bank account as of since the filing of the bankruptcy?

MR. WESCOTT: I do not have a personal bank account that I use. That is correct.

MS. BARNIER: Okay. Do you have a bank account -- what about the number of LLCs that you own, do they

have bank accounts?

MR. WESCOTT: Atlas Consulting LLC has a bank account.

MS. BARNIER: Do you use that bank account?

MR. WESCOTT: There have been loans back and forth between us personally and Atlas Consulting. Yes.

MS. BARNIER: Now, who is the managing member of Atlas Consulting?

MR. WESCOTT: Monette.

MS. BARNIER: What is your ownership of Atlas Consulting?

MR. WESCOTT: I'm not sure.

MS. BARNIER: In your transmutation agreement, wasn't this one of the assets that Ms. Stephens received?

MR. WESCOTT: That's true, so it should be zero, shouldn't it.

MS. BARNIER: So you control Atlas Consulting. Is that correct?

MS. STEPHENS: That's correct.

MS. BARNIER: Have you made any loans to Mr. Wescott from Atlas Consulting since the bankruptcy has been filed?

MS. STEPHENS: We have used that account for paying bills and for managing moneys.

Page 65

MS. BARNIER: Do you have any other bank accounts that you are the managing member for in an LLC?
MS. STEPHENS: No.
MS. BARNIER: These are the only --
MS. STEPHENS: These are my only bank accounts.
MS. BARNIER: Mr. Wescott, do you have any bank accounts for any LLCs that you are the managing member of?
MR. WESCOTT: No.
MS. BARNIER: They have all been closed?
MR. WESCOTT: I believe so.
MS. BARNIER: Going back to your --
UNIDENTIFIED SPEAKER: Jean, will you also ask about the partnerships, limited partnerships for bank accounts and trusts and bank accounts because we have Puke Snook Duke and family trusts and --
MS. BARNIER: I was going to go there Mr. Wade, I am happy to let you jump in and ask those questions.
UNIDENTIFIED SPEAKER: Okay. Have you paid any bills, Puke Snook Duke, the limited partnership, does this have a bank account?
MR. WESCOTT: Yes. I believe it does.
UNIDENTIFIED SPEAKER: Who is that bank account with Wells Fargo?
MR. WESCOTT: Wells Fargo, that's correct.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 66

UNIDENTIFIED SPEAKER: Have you paid any personal bills in the last year from the Puke Snook Duke Wells Fargo account?
MR. WESCOTT: No, but we have made loans from there.
UNIDENTIFIED SPEAKER: Who have the loans gone to?
MR. WESCOTT: To us personally.
UNIDENTIFIED SPEAKER: Where is that Wells Fargo account located, what is the branch that you work with.
MR. WESCOTT: I think it is the Haight Street branch, I don't know the exact address.
UNIDENTIFIED SPEAKER: Do you know what the total amount of the loans are?
MR. WESCOTT: No, I do not.
UNIDENTIFIED SPEAKER: The same question with -- you listed the Puke Snook Duke trust, have payments been made from Puke Snook Duke trust for your personal bills?
MR. WESCOTT: No. I -- I believe it is only the LP that had a bank account and not the trust. I could have it backwards, but --
MS. BARNIER: Let me back up, then. I will jump back in. Ms. Stephens, are you the managing member

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 67

of the LP, for the Puke Snook Duke LP?
MR. WESCOTT: LPs do not have managing members.
MS. BARNIER: Back up. I will rephrase my question, then.
Who controls the LP?
MS. STEPHENS: I don't know.
MS. BARNIER: You do not control it?
MS. STEPHENS: I don't know what -- I know one of them, I am a general partner of, and I don't know which one. I have not looked at the paperwork in a long time.
MS. BARNIER: So when you say one of them, are you referring to the trust?
MS. STEPHENS: And the --
MS. BARNIER: The LP?
MS. STEPHENS: Yeah.
MS. BARNIER: So you are not sure if you are a --
MS. STEPHENS: I believe I am a general partner of one of them.
MR. WESCOTT: Of the partnership, I believe.
MS. STEPHENS: Of the partnership. I don't remember.
MS. BARNIER: So, Mr. Wescott, are you a general partner of the LP?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 68

MR. WESCOTT: I don't believe so, but I'm not one hundred percent sure.
MS. BARNIER: So when you made the borrowings, who actually authorized the borrowings, was that you, Ms. Stephens, or you, Mr. Wescott?
MS. STEPHENS: I don't remember.
MS. BARNIER: Have you borrowed money in the last six months from the LP?
MR. WESCOTT: I believe we have.
MS. BARNIER: Who made those loans?
MS. STEPHENS: I think we discussed it together. So I don't know what -- I don't remember.
MS. BARNIER: Who signed the check to make the loan?
MS. STEPHENS: I don't think there was a check.
MR. WESCOTT: I don't think there's any checks associated with that.
MS. STEPHENS: Bank transfer.
MS. BARNIER: It was the bank transfer. Who made the bank transfer?
MR. WESCOTT: Well, I have certainly gone to the bank and withdrawn money from that account for those loans.
MS. BARNIER: How much have you borrowed in the last year?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

17 (Pages 65 to 68)

Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-95 of 228

Page 69

MR. WESCOTT: I'm not sure.

MS. BARNIER: Can you make an approximation?

MR. WESCOTT: No, I cannot.

MS. BARNIER: I'm going to need the bank statements and checks for the LP. And have you borrowed any money from the trust?

MR. WESCOTT: I do not believe so.

MS. BARNIER: Ms. Stephens?

MS. STEPHENS: Not to my knowledge.

MS. BARNIER: So the only moneys that you have borrowed are from the LP. Is that correct?

MS. STEPHENS: To the best of my knowledge.

MS. BARNIER: Okay. Ms. Stephens, Mr. Wescott has testified he cannot remember how much he has borrowed in the last six months. Do you remember how much you have borrowed in the last six months?

MS. STEPHENS: No, I do not.

MS. BARNIER: More than 10,000 dollars?

MS. STEPHENS: I don't know.

MS. BARNIER: What did you use the money for?

MS. STEPHENS: Probably paying bills.

MR. WESCOTT: Bank records would show --

MS. BARNIER: Which bank records would show that?

MR. WESCOTT: Wells Fargo.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 70

MS. BARNIER: So it is your testimony today that the money that you borrowed from the Puke Snook Duke LP were transferred into your Wells Fargo account. Is that correct?

MR. WESCOTT: No.

MS. BARNIER: What accounts were it transferred into it?

MR. WESCOTT: I didn't say it was transferred into any accounts.

MS. BARNIER: Mr. Wescott, you just testified that you went to Wells Fargo and authorized the transfer. So what did you transfer it to then?

MR. WESCOTT: I don't believe I used the word transfer. That was your word.

MS. BARNIER: What did you do, Mr. Wescott?

MR. WESCOTT: So I believe, I believe -- again, bank records would show that I went in and withdrew cash and/or had cashier checks made.

MS. BARNIER: Do you have copies of those cashiers checks?

MR. WESCOTT: If there are any, then obviously the banks would have them, there would be records.

MS. BARNIER: No. You also get a copy of the cashier's check. Is that correct, Mr. Wescott?

MR. WESCOTT: When Wells Fargo issues a

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 71

cashier's check, there is two parts of it. There's a part that that you actually use and then there is the other part.

MS. STEPHENS: She is asking about that part.

MR. WESCOTT: Obviously we had them at one point. My records are in disarray, but somewhere I probably have the majority of any cashier's checks, the other part yes.

MS. BARNIER: So did you go -- did you take out, you would take out cash at certain times also from the LP?

MR. WESCOTT: That's what I have done as part of the loans in the past. There has not been much of that for a long time.

MS. BARNIER: And when you made these loans, did you sign a promissory note to the LP?

MR. WESCOTT: We have some documentation.

MS. BARNIER: Okay. I'd like copies of that documentation of loans made from the LP. And these were loans made to you individually?

MR. WESCOTT: Correct.

MS. BARNIER: What did you do with the cashier's checks that you received?

MR. WESCOTT: I don't know. I don't even recall which -- the time period you are talking about, I

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 72

do not recall if there are any cashier's checks. There are likely some. Since I don't recall if there are any, it is hard to say what they are. But, obviously, again bank records would show in the last six months from any cashier's checks that we got, the bank records would show what they were for.

MS. BARNIER: Have you taken out any money in the last four months?

MR. WESCOTT: Four months. That would be back this year. I believe so.

MS. BARNIER: In the last four months, how much money have you taken out?

MR. WESCOTT: It would -- I would guess something like five thousand dollars. But that is a complete guess, and obviously bank records would show the exact amount.

MS. BARNIER: So since it has been in last four months, these accounts are still active, correct?

MR. WESCOTT: That is correct. I believe the Puke Snook Duke limited partner account at Wells Fargo is still active.

MS. BARNIER: How about and since you are the general partner, about how much money is left in that account?

MS. STEPHENS: I don't know.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

18 (Pages 69 to 72)

Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-96 of 228

Page 73

MS. BARNIER: Mr. Wescott, do you know?
MR. WESCOTT: It would be a very small sum, somewhere less than one hundred dollars. Possibly less than ten.
MS. BARNIER: In the last four months, have you taken out cashier's checks?
MR. WESCOTT: In general?
MS. BARNIER: Any cashier's checks.
MR. WESCOTT: I believe so.
MS. BARNIER: Did you take out cashier's checks from -- in 2011 from this account?
MR. WESCOTT: I have -- 2011, I am certain I took out either cash or cashier's checks or both.
MS. BARNIER: Ms. Stephens, you are going to be providing those bank statements and the checks. Is that correct?
MS. STEPHENS: I will get you what I can. I can get you the bank statements. I don't believe I have the checks.
MS. BARNIER: Actually, Wells Fargo Online will let you go online and get them for free. So they are very generous that way. As long as it is online they are happy to do that.
MR. WESCOTT: That's only for accounts we still have. They won't do that for the shutdown ones.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 74

MS. BARNIER: Mr. Wescott, I understand that. But according to your testimony, this is a an open account.
MR. WESCOTT: Correct.
MS. BARNIER: Mr. Wescott, you are also going to provide even though it has been requested in the 2004 exam, I will make it very clear so there is no confusion on anyone's part as to the U.S. Bank, Montecito Bank, and California Bank and Trust, all bank accounts that you have at any of those banks, at any of those branches, you are going to provide to me a copy of 2010, 2011, and 2012 bank statements and checks.
Are we very clear on that? Counsel? Okay. Terrific.
Mr. Weaver, do you have any other questions on that?
MR. WEAVER: Yeah. You have also got the Wescott Stephens Family Trust, does that have a bank account?
MR. WESCOTT: I don't believe so.
MR. WEAVER: Has it had a bank account in the last year and a half?
MR. WESCOTT: I don't believe so.
MR. WEAVER: Ivy League Charges LLC, does that have a bank account?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 75

MR. WESCOTT: No. I don't believe so.
MR. WEAVER: Has it had a bank account in the last year and a half?
MR. WESCOTT: I don't believe it has ever had a bank account.
MR. WEAVER: Is it fully formed?
MR. WESCOTT: It is fully formed. I believe it is in good standing currently like most of my LLCs or former LLCs.
MR. WEAVER: Who was the managing member?
MR. WESCOTT: I believe I personally was the managing member of that. Actually, that one I think is -- that's not me personally, I don't believe. I will have to look that one up. I believe that is an SA.
MS. BARNIER: I'd like to direct the same questions to you, Ms. Stephens. Does the trust have a bank account?
MS. STEPHENS: Not to my knowledge.
MS. BARNIER: And you both are the trustees for the trust. Is that correct?
MS. STEPHENS: I think so.
MR. WESCOTT: I don't recall. I'd have to look at the paperwork.
MR. WEAVER: Who are the other members of Ivy League Charities?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 76

MR. WESCOTT: I believe there is only one.
MR. WEAVER: That would be you?
MR. WESCOTT: No. I just testified that it is not me personally.
MR. WEAVER: Who is the --
MR. WESCOTT: I believe it is either Livery SA or Gunvor SA. I believe it is Gunvor SA.
MR. WEAVER: Gunvor SA. Do you have a relationship with Gunvor SA?
MR. WESCOTT: Yes. I am the owner of Gunvor SA.
MS. BARNIER: Could you point out on your schedules where Gunvor SA as an asset is listed?
MR. WESCOTT: I think it is grouped in Item 35.
MS. BARNIER: Am I spelling it right, G-U-N-F-O-R?
MR. WESCOTT: V-O-R. It is in Item 35, is that, am I remembering the number correctly?
MS. BARNIER: It is not listed under personal property, which is where it would be listed. So where did you list it, Mr. Wescott?
MR. WESCOTT: I don't think this is the last one I sent you, is it?
MR. ISON: What do you mean by the last one, the one last night?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

19 (Pages 73 to 76)

Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-97 of 228

Page 77

MR. WESCOTT: No, the one in February.

MS. BARNIER: That's not on the schedules unfortunately because they have not been amended. So I don't see that. So is that going to be included in the schedules then, a listing of this?

MR. WESCOTT: I believe it has already been sent.

MS. BARNIER: I don't see it under personal property, Mr. Wescott. Here is the schedules I have that were printed out pursuant to what is loaded on the docket; there is nothing that I can find. If you can point it out to me, I am happy to look at it. I can tell you the LLCs that are listed, that is not one of them, or SAs.

So that is going to be amended and reflected on your schedules?

MR. WESCOTT: Yeah, I think it has already been listed --

MS. BARNIER: Your counsel just said he could not see it so let's keep going.

MR. ISON: I didn't see it here.

MS. BARNIER: Well, it is not on the schedules that were filed. That's all we can look at.

MR. ISON: I am looking at the --

MS. BARNIER: I can't look at anything that you

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 78

have not filed, Mr. Ison.

Mr. Weaver, you had some more questions?

MR. WEAVER: Couple other questions. Have you borrowed money from any other entities that you own or control that you have not mentioned?

MR. WESCOTT: I probably have. I have borrowed money from a lot of different sources, and I am sure that I have borrowed other money from other entities.

MR. WEAVER: Do you have some accounting that would indicate who you borrowed money from?

MR. WESCOTT: Where we are right now is that we have just completed the majority of our 2010 accounting. So we are doing our best to catch up. And, yes, we do have accounting or bookkeeping might be a better phrase for 2009, which we completed so that we can file our 2009 taxes. Now we have done a good part of 2010. We have not done all the entities yet for 2010. That's where we are.

MR. WEAVER: What were the sources of information that you are looking at to determine the loans that you have taken from entities that you own or control?

MR. WESCOTT: Paperwork.

MR. WEAVER: What paperwork?

MR. WESCOTT: Promissory notes, bank statements

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 79

of liquidable, et cetera.

MR. WEAVER: Where are those documents located?

MR. WESCOTT: They are located -- we were working yesterday with our bookkeeper at 853 Ashbury Street.

MR. WEAVER: Who is the bookkeeper you are working with?

MR. WESCOTT: Leo -- I am not going to pronounce his last name, can you pronounce his last name?

MS. STEPHENS: Zundahaus.

MR. WESCOTT: Zundahaus.

MR. WEAVER: Zundahaus.

MS. BARNIER: Jumping back to -- hang on, Mr. Weaver. We tried to serve him to get records that you claim that he had, and were unable to. The process server just could not seem to find him in any office, and unusual for this process server.

So in terms of records, we have requested Mr. Zundahous to provide those records. Are you going to direct Mr. Zundahous to provide those to us?

MS. STEPHENS: What records?

MS. BARNIER: Everything on that 2004 exam, he did not provide. We wanted to see any Quick -- do you keep your records on Quickbooks, Mr. Wescott?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 80

MR. WESCOTT: We have some Quickbooks, yes.

MS. BARNIER: And those have not yet been provided. When are you going to provide those?

MR. WESCOTT: I have not received a request for them yet.

MS. BARNIER: You should talk to your counsel about that. The 2004 exam, which you were properly served with, was filed three weeks ago. There's now an order from a judge to do it. Those documents were requested. They were also requested at the first meeting of creditors.

I am just -- you might want to take a look and talk to your counsel about the lack of ability to get documents for it.

MR. WESCOTT: I have Quickbooks files that I can provide. Absolutely.

MS. BARNIER: Are you working with your accountant in Santa Rosa?

MR. WESCOTT: Not anymore.

MS. BARNIER: He also tried to evade service. Are you going to direct him to turn over all records that he has?

MR. WESCOTT: I don't think he is going to listen to anything I say.

MS. BARNIER: Why not?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

20 (Pages 77 to 80)

Case: 12-03143 Doc# 81-4 Filed: 08/30/13 Entered: 08/30/13 15:03:51 Page 17 of 37
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-98 of 228

MR. WESCOTT: Well, I threatened to sue him because he screwed up two of our taxes, so we are not on the best of terms right now.

MS. BARNIER: Let me go back to your schedules. Assuming that your schedules were correct, I will just make that assumption, that you have expenses of 11,511 dollars a month. So for the year, your expenses were 138,132 dollars. You testified earlier that you had an income, or moneys coming in, of 500,000 dollars in 2011. What happened to the remainder of the 350,000? Actually, 361,868 dollars?

MR. WESCOTT: It is not a simple question, but we could look at the bank statements for the answer.

MS. BARNIER: Mr. Wescott, you just told me that you cannot get your bank statements, so there's more than 350,000 dollars that you cannot explain what happened to. My question is: It is a lot of money. What did you spend the money on?

MR. WESCOTT: I'm sure that part of it was for bills that -- the business investments paying for the bills of various entities. I am sure part of it was our personal bills. And, again, it is hard to say exactly what, where every dollar went without looking at the bank statements.

MS. BARNIER: I'm not asking for every dollar.

There is 350,000 dollars.

MR. WESCOTT: I don't know.

MS. BARNIER: You have no idea where that money went?

MR. WESCOTT: I do not recall.

MS. BARNIER: Ms. Stephens, do you know where that 350,000 dollars was spent?

MS. STEPHENS: No. Money has been very tight for a very long time.

MS. BARNIER: Excuse me, Counsel, counsel we can only hear one recording at a time and Ms. Stephens was speaking. You let her finish, if you want to talk to your client later. Go ahead, sorry.

MS. STEPHENS: Oh, I said, I don't know, money has been very tight for a long time, and I have been paying the bills, and that's pretty much all I see.

MS. BARNIER: So let me ask you a question: Is it accurate that you and your husband received moneys of 500,000 dollars in 2011?

MS. STEPHENS: I don't manage what comes in. All I've managed in 2011 in terms of money that came in was either money I borrowed from my dad or money that I got with one consulting project that I had.

MS. BARNIER: Okay.

MS. STEPHENS: Other than that, I have not --

MR. WESCOTT: I can speak to that, though.

MS. BARNIER: If you would, please. If you would.

I'm sorry. So how did you -- so the only moneys you had in 2011 -- let me make sure I understand -- moneys you borrowed from your family?

MS. STEPHENS: And money that I made doing my consulting, I worked for two months.

MS. BARNIER: That the when you testified you made about 35,000 dollars. Is that right?

MS. STEPHENS: I think it was 39.

MS. BARNIER: So during 2011, you did not have access to the 500,000 dollars that was paid?

MS. STEPHENS: Carl manages all of our -- Carl managed the money.

MS. BARNIER: Did he give you any money?

MS. STEPHENS: He would put money in the bank account when we needed it.

MS. BARNIER: Which bank account did he put money into?

MS. STEPHENS: I don't remember, either personal or we would loan money to Atlas to pay bills.

MS. BARNIER: So, Mr. Wescott, how were you paid that 500,000 dollars?

MR. WESCOTT: I believe the majority of that --

which time period are you talking about?

MS. BARNIER: 2011.

MR. WESCOTT: 2011. I would want to go back and look. Again, there's -- we are, our financial situation is complicated, and I would like to look at the records, so I can provide you accurate answers.

MS. BARNIER: I'm just asking what bank account did you put the payments in?

MR. WESCOTT: Most of that would have been Wells Fargo. That's been our main bank for years.

MS. BARNIER: Okay. And when you -- did you receive the payments in the form of checks?

MR. WESCOTT: I can answer 2010 much better right now having just completed a bunch of bookkeeping for it. 2011, again, I am not going to be able to give you a very good answer right here right now.

MS. BARNIER: So did you get wires, the money was wired?

MR. WESCOTT: Some money has been received by wire. Some money has been received by check. That's correct.

MS. BARNIER: Okay. That 500,000 dollars was the total payment that you were owed by -- forgive me I just went blank on the entity that paid you that 500,000.

MR. WESCOTT: I think the majority of that was related to Rain Forest Capital.

MS. BARNIER: Did you receive moneys from any other source in 2011 besides Rain Forest?

MR. WESCOTT: I believe we did.

MS. BARNIER: Who would that be from?

MR. WESCOTT: I'd have to think about that. 2011, we got some rent for different properties.

MS. BARNIER: You testified --

MR. WESCOTT: We and our LLCs. 2011 or 2010?

MS. BARNIER: 2011.

MR. WESCOTT: I think we still got some rent or property payments, but probably a very small amount at that point.

MS. BARNIER: According to your SOFA, you received less than 10,000 dollars. Is that accurate?

MR. WESCOTT: I think that's accurate. But we received a lot more rent in 2010 and in prior years.

MS. BARNIER: We are talking about 2011.

MR. WESCOTT: Correct.

MS. BARNIER: So you got 500 -- so how much did Rain Forest pay you?

MR. WESCOTT: I believe, again to the best of my recollection, you are talking about 2011 now?

MS. BARNIER: All my questions are 2011.

MR. WESCOTT: I believe it was a few hundred thousand dollars. In fact, let me think. I believe it was 300-something thousand dollars.

MS. BARNIER: So approximately 300 thousand dollars was from Rain Forest. And did that -- was that the totality of the money that they owed you?

MR. WESCOTT: Whatever what we received in 2011, and I believe it was in April -- again, to the best of my recollection was the final payment due by Rain Forest Capital. That's correct.

MS. BARNIER: So for the approximately other 200 hundred thousand dollars you received 2011, what was the source of those moneys?

MS. STEPHENS: I don't recall off the top of my head. I would guess it is a combination of a little bit of rent, some interest payments. There -- that would be -- let me think. What else would they be. I'd have to look back at the records.

MS. BARNIER: Turning to your statement of financial affairs, you said that there are records at 5670 Chamise Road in Healdsburg. Is that correct?

MR. WESCOTT: Yeah.

MS. BARNIER: What records are there?

MR. WESCOTT: I have some corporate documents there, and some boxes of stuff at the house, below the

house, there's a storage area there.

MS. BARNIER: Who owns Chamise Road?

MR. WESCOTT: I believe it is currently owned by Chase.

MS. BARNIER: Did you own it at one time?

MR. WESCOTT: I did.

MS. BARNIER: Why did you leave the records there?

MR. WESCOTT: We used to live there part-time, and so -- and had a storage area, so it was a convenient and free option to store records in.

MS. BARNIER: And you said corporate records. What corporate records?

MR. WESCOTT: I have got boxes of records there.

MS. BARNIER: Can you be more specific?

MR. WESCOTT: I don't know exactly what is there.

MS. BARNIER: Do you still have a key to the property?

MR. WESCOTT: I -- yeah, we have keys to the property.

MS. BARNIER: Do you plan to go get those records to provide to the Trustee?

MR. WESCOTT: I tried to -- I hired somebody to

try and go get both furniture and other things we own at the house and the records, it is behind a locked gate, there's -- our former tenant was very threatening and has firearms. So without his cooperation, I don't think that is going to happen. I'm not sure if he is there anymore.

MS. BARNIER: So why is Mr. Gatoni suing you?

MR. WESCOTT: Mr. Gatoni is suing me, it is an unlawful detainer related to the 1462 Booneville Road property.

MS. BARNIER: Why is Mr. Warren suing you?

MR. WESCOTT: Mr. Warren?

MS. BARNIER: I believe that was one of the ones that you listed on your SOFA, statement of financial affairs. Maybe I spelled it wrong.

MR. WESCOTT: I don't believe there's a Mr. Warren suing me. Although if there, is I'd like to know about it.

MS. BARNIER: I take that back. No. I'm sorry. Mr. Lawnsdale is suing you. Is that correct?

MR. WESCOTT: That is correct.

MS. BARNIER: Okay. And you have a stipulated -- Mr. Kirk has a stipulated judgment in the amount of a million-four. Is that right?

MR. WESCOTT: That is correct.

Case: 12-03143 Doc# 81-4 Filed: 08/30/13 Entered: 08/30/13 15:33:51 Page 19 of 37
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-100 of 228

Page 89

MS. BARNIER: The -- oh, I'm sorry. It is Warren, that is what you have down here in Mendocino, it says Gatoni and Warren versus Wescott.

MR. WESCOTT: I never met -- I believe the name is Justin Warren. The name didn't mean anything because I never met him. I believe he is the brother-in-law of David Gatoni, and they coown -- they are both on title for that 1462 Booneville Road property, or were.

MS. BARNIER: Okay. Now you also 2 Long Ridge Ridge, excuse me, is that an LP or LLC?

MR. WESCOTT: Two Longhorn Ridge Road is an LLC.

MS. BARNIER: Are you the managing member?

MR. WESCOTT: I am not.

MS. BARNIER: Who is?

MR. WESCOTT: I believe it is Gunvor SA. It is an SA. I believe it is Gunvor.

MS. BARNIER: You are the --

MR. WESCOTT: Owner of that.

MS. BARNIER: Gunvor SA.

MS. STEPHENS: Are you leaving?

UNIDENTIFIED SPEAKER: No.

MS. BARNIER: And you brought lawsuit against them, is that right, against Old Republic Title?

MR. WESCOTT: No, they actually sued me.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 90

MS. BARNIER: This was a counter suit that you filed?

MR. WESCOTT: Correct.

MS. BARNIER: What was the basis of the counter suit?

MR. WESCOTT: Well, the -- would you like the chronology, which might be the easiest way to impart the information?

MS. BARNIER: I know some --

MS. STEPHENS: As simple as possible.

MR. WESCOTT: Basically, it is a title claim.

MS. BARNIER: Okay. Who represents 2 Longhorn Ridge in this action?

MR. WESCOTT: Mr. Ison, here.

MS. BARNIER: What is the status of the lawsuit?

MR. ISON: They filed a document known as a Indication of Bankruptcy, I think. And it is just been put on hold pending the Trustee's decision on whether to abandon the asset.

MS. BARNIER: So, Mr. Wescott, what were your -- the damages of 2 Longhorn Ridge that were suffered?

MR. WESCOTT: I believe that the damages would be different than the claim.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 91

MS. BARNIER: I understand that. That's not the question. The question is, that is why I'm asking it that way, I understand what the claim is. I'm asking what were your damages in this?

MR. WESCOTT: I don't know the legal definition. So can you, do you want to --

MR. ISON: It does call for a legal conclusion. You can give your understanding.

MR. WESCOTT: I am happy to speak as a lay person, but I don't --

MS. BARNIER: Let me put it a different way: How much money do you think you are entitled to for what Old Republic did? How is that?

MR. WESCOTT: Okay. Well, I have discovered that my lay person understanding of the law is not what I think it should be. I thought I should be entitled to 600,000 dollars or whatever the value of my policy is, and/or any money that I would have lost as a result of their screwing up my title policy and the research associated with that.

However, Mr. Ison here --

MR. ISON: You do not need to tell them what I advised you of.

MR. WESCOTT: All right. That was my lay person understanding of what I thought the law should be

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 92

prior to conferring with counsel.

MS. BARNIER: Okay. Now, in February 2010, you and your wife transferred interest in properties. Is that correct?

MR. WESCOTT: That is correct.

MS. BARNIER: That was in -- and then, if I summed it up briefly. She received all of the California properties and you received all the Latin American properties. Is that correct?

MR. WESCOTT: That's pretty close. Yes.

MS. BARNIER: Ms. Stephens, is that also your understanding of what, the transmutation agreement, was that you received all the California properties and Mr. Wescott received all the properties in Latin America?

MS. STEPHENS: That's right.

MR. WESCOTT: I believe there was at least one property in Nevada that she received the interest in and so on. But what you are saying is roughly correct.

MS. BARNIER: And you determined that the value at the time, in February of 2010, that each side received a value of 27 million dollars. Is that also correct?

I will start with Ms. Stephens this time. Is that correct?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

23 (Pages 89 to 92)

Case: 12-031418 Doc# 81-4 Filed: 08/30/12 Entered: 08/30/12 15:33:50 Page 20 of 37
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-101 of 228

Page 93

MS. STEPHENS: I was not involved with valuing the properties.

MS. BARNIER: Did you agree the properties, that the properties you --

MS. STEPHENS: I agreed with the -- I mean, I agreed with the estimate, or whatever it was. You know.

MS. BARNIER: The outline of the properties and their value, you looked it over?

MS. STEPHENS: Yeah. I looked it over, at a high level. I did not do any detailed assessment, nor did I have separate, you know -- nor did I have anybody look it over. I took --

MS. BARNIER: Did you rely on Mr. Wescott's word that that is what the values were?

MS. STEPHENS: Yes.

MS. BARNIER: When you drafted that transmutation agreement, Ms. Stephens, did you have separate counsel represent you?

MS. STEPHENS: No.

MS. BARNIER: Who prepared that transmutation agreement?

MS. STEPHENS: I don't remember. I was, like, nine months pregnant at the time. I've been pregnant six times in the last seven years, so --

MS. BARNIER: Mr. Wescott, how did you

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 94

determine the value of the properties in California worth 27 million dollars?

MR. WESCOTT: In each case, there was an associated appraisal or purchase offer or some other basis like that. And those are among the documents that were requested at, I believe it was our first 341 meeting. I apologize for the delay, but recently I have provided.

MS. BARNIER: I only have two appraisals. That is all I have received so far. Are there more?

UNIDENTIFIED SPEAKER: There are more. They are hard to take down. They don't add up to 27 million, let alone 54.

MS. BARNIER: Mr. Wescott, so my question coming back is: How did you come up to the number of 27 million dollars?

MR. WESCOTT: I provided actually a detailed spreadsheet of how I came up with that value, and I provided that to Mr. Ison here.

MS. BARNIER: Okay. You also believe the properties in Latin America are worth 27 million dollars as of February 2010?

MR. WESCOTT: As of February 2010, that was my best guess of value at the time. That is correct.

MS. BARNIER: Who prepared the transmutation

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 95

agreement?

MR. WESCOTT: Bob Klueger.

MS. BARNIER: Can you spell his last name for me?

MR. WESCOTT: K-L-U-E-G-E-R.

MS. BARNIER: Where is Mr. Klueger's office?

MR. ISON: He is in L.A.

MS. BARNIER: Los Angeles. Which firm is he with?

MR. WESCOTT: Klueger & Stein.

MS. BARNIER: Now, when you attached that transmutation agreement, I did not see a signature page with it. Do you have a signature page?

MR. WESCOTT: We did sign a transmutation agreement, yes. We actually -- yes.

MS. BARNIER: Does he have a copy of it?

MR. WESCOTT: I imagine he does.

MS. BARNIER: I'd like to see a signed copy of that, dated. And did Mr. Klueger represent both of you in this -- represent you and your wife in this transmutation agreement?

MR. WESCOTT: Essentially. I was the one who took the lead at that point on various things including our estate and retirement planning, and I took the lead with Mr. Klueger. He did explain, we had a phone

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 96

conference with my wife Monette, and he did explain that it might be a good idea to have Monette get separate counsel. However, due to our financial challenges at the time, we --

MS. BARNIER: What did you pay Mr. Klueger to draft that?

MR. WESCOTT: I don't recall, but I believe -- I'd have to, I want to look back. Do you want a range that I believe is accurate?

MS. BARNIER: Did you pay him more than five thousand dollars?

MR. WESCOTT: Yes.

MS. BARNIER: 10,000 dollars?

MR. WESCOTT: Somewhere in that range. I believe it was either eight or 14 thousand. I think it was 8 thousand dollars, but that's the best of my recollection.

MS. BARNIER: Ms. Stephens, I know you were pregnant at this time, so it is hard for me to believe you were travelling, did you ever meet with Mr. Klueger?

MS. STEPHENS: No.

MS. BARNIER: You spoke to him on the phone?

MS. STEPHENS: Yes.

MS. BARNIER: How did Mr. Klueger know that you were Monette Stephens if he never met you?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

24 (Pages 93 to 96)

Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-102 of 228

MS. STEPHENS: I don't know.

MS. BARNIER: So, Mr. Wescott, you said that you drove this, that's my term, transmutation agreement, that you initiated it. Why?

MR. WESCOTT: Mainly, there were really two driving factors. One was that we had been working on our estate and retirement planning for a few years, and we were trying to figure out how to best set up, you know, the right trust and so on for our kids.

The other factor was that I had been spending a lot of time out of the country and that is where some of my business interests were. And we didn't always -- given that our marriage was not perfect, it seemed that given that I was overseas a lot of the time, and when I was in California it seemed that it was also a good idea to make it easy for Monette, if something were to happen to me, that she would have access to the U.S. properties, or that if we separated in the future.

MS. BARNIER: But isn't it accurate to say that the vast majority of all the California properties have been lost in foreclosure?

MR. WESCOTT: That has happened since then. That is correct.

MS. BARNIER: So, Ms. Stephens got all the properties that went into foreclosure, and you retained

the properties that still have value. Is that accurate?

MR. WESCOTT: At the time -- that's not entirely accurate, but --

MS. BARNIER: As of today, what do you think the value of your holdings in Latin America are?

MR. WESCOTT: Pretty close to zero.

MS. BARNIER: You believe the properties have no value at all?

MR. WESCOTT: No. I think there are some properties that have value, but there's also debt associated with almost every property. We have lost some to foreclosure and so on and so forth.

MS. BARNIER: Ms. Stephens, you acquired the San Francisco Giants seat licenses in that transmutation agreement. Is that right?

MS. STEPHENS: I believe so.

MS. BARNIER: What was their value in 2010?

MS. STEPHENS: I don't know. I never managed those assets.

MS. BARNIER: Did your husband manage those assets?

MS. STEPHENS: He continued to manage those assets.

MS. BARNIER: Even though you received them in this transmutation agreement?

MS. STEPHENS: That's correct.

MS. BARNIER: Okay.

And so, Mr. Wescott, what was the value of the San Francisco seat licenses in 2010?

MR. WESCOTT: I believe somewhere on the order of a half million dollars.

MS. BARNIER: What did you do with them?

MR. WESCOTT: All of them were sold.

MS. BARNIER: Do you have -- when did you acquire them?

MR. WESCOTT: They were acquired, there were a number of different ones. The first one was acquired by a corporate entity in 2000 and then by me individually in 2002. The rest were acquired between 2002 and 2010.

MS. BARNIER: When was the last time you sold one?

MR. WESCOTT: You know, I provided a spreadsheet that was provided -- the majority, if not all of them, were sold by -- in fact, I think all of them were sold by either the Giants or the San Francisco Giants Seats License Marketplace. And I provided a spreadsheet that was provided to me by the marketplace with all the exact sale amounts and dates.

But to the best of my recollection, it would have been I believe early 2011. Or February, March,

April I would guess.

MS. BARNIER: I have not received that document. So if you can ask your counsel to forward it, that would be great. So what -- you said they were worth about 500,000 dollars in 2010. Given the Giants winning season, they must have been even worth more in 2011, right?

MR. WESCOTT: No. I think they were worth around that, I think we ended up selling them for somewhere in that ballpark range as well.

MS. BARNIER: So you received 500,000 dollars between 2010 and 2011 from the sale of the licenses?

MS. STEPHENS: Didn't you owe money on the licenses, though?

MR. WESCOTT: No.

MS. STEPHENS: Didn't you have to pay for those?

MR. WESCOTT: Well, you have to pay for the tickets. The licenses give you the right to buy the tickets.

I believe what we received for them was certainly hundreds of thousands of dollars and again I provided -- Mr. Ison here will forward you the spreadsheet I provided with all of the exact numbers.

MS. BARNIER: So you received almost 500,000

dollars according to your testimony and you started selling them in 2010. Is that right?

MR. WESCOTT: That's correct.

MS. BARNIER: So between 2010 --

MR. WESCOTT: That's not correct. I believe there were some that I sold prior, there were seat licenses that I had that I also sold between 2002 and 2010.

MS. BARNIER: How many seat licenses did you own in 2010?

MR. WESCOTT: I believe 24. But that's the best guess. Something on that order in 2009 or 2010.

MS. BARNIER: You just testified that it was the Giants who sold them for you?

MR. WESCOTT: The majority of them were sold by the San Francisco Giants seat market license place, that is actually a partnership with the Giants operated by a company that is in Houston, Texas.

MS. BARNIER: What about the minority of them?

MR. WESCOTT: The minority were sold by the Giants themselves.

MS. BARNIER: So when you sold those, who did you sell them to?

MR. WESCOTT: Always clients of the Giants. I sell them directly to the Giants and/or the seat license

marketplace sold them and they act as broker and they try to keep you separate from the actual buyer, so I don't know who the buyers all are.

MS. BARNIER: You have that documentation regarding those sales?

MR. WESCOTT: I provided it to Mr. Ison in an e-mail, if you can point it to me I am happy to resend it and, yes, we're happy to provide that.

MS. BARNIER: Besides just the spreadsheet, you also have the documentation of the actual sales agreement and the sales price?

MR. WESCOTT: Yeah. We should have the majority of that. At one point we had all of it, we should be able to dig most of that up over time.

MS. BARNIER: Okay. And help me out here. I am a little confused on this one. If Ms. Stephens received it in the transmutation agreement, why were you selling it?

MR. WESCOTT: Because I know a lot -- I am a fan of baseball, and she's not as into baseball, and so I was the one who had the most knowledge as to what these things were worth and --

MS. BARNIER: Let me try the question a different way.

MR. WESCOTT: Sure.

MS. BARNIER: Did she own them in 2010?

MR. WESCOTT: She did.

MS. BARNIER: Why did you sell them rather than Ms. Stephens sell them? It does not matter if you are a fan or not. It is like selling a house. Right?

MR. WESCOTT: Sure. I was more knowledgeable as to the parties involved, the value of the seat licenses and so on.

MS. BARNIER: Where was the money deposited?

MR. WESCOTT: I believe in most or all of those cases that we -- it went to Wells Fargo.

MS. BARNIER: Would that be your personal account it went into?

MR. WESCOTT: I'm not sure, but obviously bank records would show that.

MS. BARNIER: Did any of the money go into any of Ms. Stephens' bank accounts?

MR. WESCOTT: I believe in most cases, if not all -- I'm not sure, actually. We should look at the bank statements.

MS. BARNIER: Ms. Stephens, the 500,000 dollars, how much was deposited into your bank accounts?

MS. STEPHENS: I have no idea. We had a joint, we have joint, or we had a joint bank account, I don't know if it is still active. So, and Carl -- I had

babies. I mean, I have been entirely -- in the last seven years, I had three kids, three miscarriages, my mother's been in the hospital three times, I have two parents in their 80s, for heart procedures, and my father shattered his shoulder this year and has been in the hospital.

Carl has managed our -- the initial intent, I believe, was that eventually I would manage the California assets, and he would manage the overseas assets.

MS. BARNIER: So it would be accurate to say that given all the personal issues you were dealing with, that you allowed --

MS. STEPHENS: He continued to manage, I continued to have him manage all of our personal and --

MS. BARNIER: You want to take a minute?

MR. WESCOTT: Why don't we take a break.

MS. BARNIER: Again, everybody just hold on, if we can. It is up to Ms. Stephens. Would you like to take a break, Ms. Stephens?

MS. STEPHENS: Yes, please.

MS. BARNIER: Let's take a five minute break. Let's make it five minute so we can hopefully --

We are back on the record after taking a break. So you said you -- now, how much did you have to pay to

Case: 12-03143 Doc# 81-4 Filed: 08/30/13 Entered: 08/30/13 15:03:51 Page 23 of 37
Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-104 of 228

Page 105

get the tickets in 2010, if I understand how this works correctly?

MR. WESCOTT: Actually, I might not -- sorry. It was collectively more than 100,000 dollars, I believe.

MS. BARNIER: Do you need to take a break, Mr. Wescott?

MR. WESCOTT: Yes, I do.

MS. BARNIER: Back on the record. Mr. -- why don't you ask the questions regarding the Giants tickets for me.

UNIDENTIFIED SPEAKER: Why did you have 24 seat licenses?

MR. WESCOTT: They were an investment.

UNIDENTIFIED SPEAKER: Did you sell seats or give seats away, or what did you do with the --

MR. WESCOTT: I sold seats. It is something I used to make money with earlier in the decade, and then I started losing a lot of money later in the decade -- the decade being 2000 to 2010.

UNIDENTIFIED SPEAKER: In 2010, you sold seats?

MR. WESCOTT: In 2010 and 2011, I sold the last of the -- yes, seats that we had yes.

UNIDENTIFIED SPEAKER: I'm talking about the actual seats themselves for particular games.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 106

MR. WESCOTT: That's correct. The majority of them. Yes.

UNIDENTIFIED SPEAKER: You sold them using, I assume, the Giants Ticketron, or whatever that system is they have got, that you go online to the Giants and sell.

MR. WESCOTT: You know, they had a system used to be called Double Play, they discontinued that, I don't remember exactly what year, but Stub Hub did a deal with Major League Baseball to become the sole official provider for those services, I don't recall the exact year, whenever that happened it went from the majority being on Double Play to the majority being on Stub Hub.

UNIDENTIFIED SPEAKER: That's where you sold your seats?

MR. WESCOTT: The majority of them.

UNIDENTIFIED SPEAKER: How did you take payment when you sold your seats?

MR. WESCOTT: Stub Hub was -- they gave you the option, multiple options, I would take checks.

UNIDENTIFIED SPEAKER: So you received checks from the sale of particular seats in 2010 that you had renewed the season license on, or paid the season ticket on?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 107

MR. WESCOTT: Yeah. Basically the -- that's correct. I could not -- what I worked out with the Giants was monthly payments on the amounts for the seats. And then as I sold them, I would make those -- again, it is complicated, so it is not dollar for dollar, but to the best of my ability I would pay the Giants monthly payments. I was behind in the payments for them, but I used the stub hub sales of the seats to provide the majority of the money that went to the Giants.

UNIDENTIFIED SPEAKER: Who was your seat rep at the Giants?

MR. WESCOTT: It used to be Rocky Coplick, and then I believe I had -- he was one of the ones that I had.

UNIDENTIFIED SPEAKER: Anybody else?

MR. WESCOTT: I'll try to remember their names. Rocky was the last one. I had Joe, I can't remember his last name. I had Joe somebody or other earlier.

UNIDENTIFIED SPEAKER: Did you have Greg?

MR. WESCOTT: No. Greg who?

UNIDENTIFIED SPEAKER: There are only six guys who are seat reps.

MR. WESCOTT: No. I didn't have Greg. I thought Greg as a manager or VP or something. I have

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 108

talked to him.

UNIDENTIFIED SPEAKER: So you had an arrangement where you paid on a monthly basis?

MR. WESCOTT: At least in 2009 and 2010 I believe so. Yeah.

UNIDENTIFIED SPEAKER: When did you make the last payment in 2010?

MR. WESCOTT: Actually, I was -- here was the terrible part, because this was an investment I made, I was so behind in the payments in 2010 that the Giants did not allow me to buy my post season tickets that year, I did not have the money for it, so they won potential bonanza that could have been reaped there, I did not reap.

So to answer your question: I believe the last payment for 2010 I believe I made somewhere approximately December 2010, and part of that I did through the sale of Charter Seat Licenses.

UNIDENTIFIED SPEAKER: Do you have some guarantee or something with the Giants for the 100,000 dollars worth of tickets you were buying?

UNIDENTIFIED SPEAKER: You know, I don't -- I think it was all done by e-mail, so if I recall correctly, most of this happened by e-mail and I proposed a payment plan, and they accepted, the written

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

27 (Pages 105 to 108)

Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-105 of 228


Page 109

communications were almost entirely done by e-mail.

UNIDENTIFIED SPEAKER: Who was it that accepted a payment plan, would that be Rocky or somebody else?

MR. WESCOTT: I think it was Rocky in 2010. It might have been somebody else in the year before.

UNIDENTIFIED SPEAKER: Did you make any money on top of paying for the season tickets?

MR. WESCOTT: No. I lost money. I made money I think in 2002 through 2005, rough years, and then I lost money -- whenever the Giants started to suck and did not have the All Star game any more, I lost money every year. Even 2010.

UNIDENTIFIED SPEAKER: When you sold your season license, did you bring your ticket price or the cost of your tickets up to zero at that point?

MR. WESCOTT: I don't understand the question. I lost money on the CSLs as well, if that's what you are asking.

UNIDENTIFIED SPEAKER: I know from when you purchased them, but did you owe any money on the seat licenses to the Giants at that point, aside from a commission or something of that nature?

MR. WESCOTT: I don't understand the question.

UNIDENTIFIED SPEAKER: Well, you were not paying the season ticket price in full, you had some

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 110

special deal with the Giants.

MR. WESCOTT: I see what you are saying. The CSL, the charter seat licenses, no, there was no payment plan on those. Those were actually owned.

UNIDENTIFIED SPEAKER: You don't understand. When you sold the season license, did the Giants say: You still owe us some money on this monthly deal --

MR. WESCOTT: Right, right, right, right, right, they would not even allow me to sell them without -- I believe there was an agreement signed then because I owed them money on the tickets they were not going to even allow me to sell the CSLs until I reached an agreement with them that all the money that, or the majority of the money that came in for us would go to pay the back amounts I owed for the tickets.

Does that make sense.

UNIDENTIFIED SPEAKER: How much did you owe on the back amounts for tickets?

MR. WESCOTT: Rough numbers, somewhere between 50 and 100 grand, I think. A significant amount.

UNIDENTIFIED SPEAKER: Okay. Do you know the price for the season tickets that you had for these 24 seats? I think you said was 100,000 bucks.

MR. ISON: Collectively, it was more than 100,000 dollars, correct. Each seat has a different

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 111

price.

UNIDENTIFIED SPEAKER: Collectively more than 100,000 dollars?

MR. WESCOTT: Correct.

UNIDENTIFIED SPEAKER: As you sold seats, you paid the Giants?

MR. WESCOTT: Correct.

UNIDENTIFIED SPEAKER: You had a monthly agreement you are supposed to pay them a minimum amount, I assume, to the Giants?

MR. WESCOTT: I think we broke it into six payments.

UNIDENTIFIED SPEAKER: Six equal payments?

MR. WESCOTT: Yes.

UNIDENTIFIED SPEAKER: You made some payments to the Giants as you sold seats?

MR. WESCOTT: I made some payments to the Giants. Correct.

UNIDENTIFIED SPEAKER: All right. So it wasn't 100,000 dollars you owed when you sold the seat licenses; it was something less than that?

MR. WESCOTT: I would say it was probably between 50 and 100 K, yes. The collective amount between the 24 seats was more than 100 K. I did not give you an exact number, and I don't know what the

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 112

exact number is. I think one of the years -- I'm sorry?

UNIDENTIFIED SPEAKER: You had a bill from the Giants for the seats?

MR. WESCOTT: Yeah, they provide invoices. If it is helpful, I believe in one of the years, which might have been 2010, I think my monthly payment was supposed to be 22 grand. And if that is correct, then that would imply that my number for that year, the total was 132,000, I believe if I'm doing the math right. Correct.

So at least for one of the years I believe those are the numbers, if that's helpful.

UNIDENTIFIED SPEAKER: Did the Giants send you a statement as you paid the, made the payments?

MR. WESCOTT: On at least a couple times, they -- they did not send statements when I made the payments, but when I was behind, obviously a couple times they gave me something that accounting generated and told me what I was behind or what I owed. Yes.

UNIDENTIFIED SPEAKER: Do you still have those statements?

MR. WESCOTT: Somewhere, yeah. I believe so. I believe I can dig some of those up, over time.

UNIDENTIFIED SPEAKER: I don't have any other questions about the Giants.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

28 (Pages 109 to 112)

Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-106 of 228

Page 113

MS. BARNIER: Counsel, I'd like -- do you still have copies of e-mails exchanges between and you the Giants?

MR. WESCOTT: I have back up of e-mails, depends on the year that you are talking about.

MS. BARNIER: I'd like for 2010 and 2011 copies of the e-mails between you and the Giants, and I'd like a copy --

MR. WESCOTT: All of them? Or just the ones that are relevant to what we are discussing here?

MS. BARNIER: Relevant to the sale of the tickets.

MR. WESCOTT: Okay.

MS. BARNIER: And the license, and the license.

UNIDENTIFIED SPEAKER: And the purchase of the tickets.

MS. BARNIER: And the purchase.

UNIDENTIFIED SPEAKER: When did you last go to a Giants game?

MR. WESCOTT: I have not been this year. Actually, that's not true. I went to opening day in Phoenix this year. I have been to one game this year.

But last year, I am sure I went to a game probably even in September. August or September.

UNIDENTIFIED SPEAKER: So you went to opening

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 114

game in Phoenix?

MR. WESCOTT: That's correct.

UNIDENTIFIED SPEAKER: And that's the only game you've been to?

MR. WESCOTT: That's the only Giants game I've been to this year.

UNIDENTIFIED SPEAKER: How did you get there, who paid for that?

MR. WESCOTT: I have a friend who has got season tickets there.

MS. BARNIER: What's the name of the friend?

MR. WESCOTT: Ike Schneider.

MS. BARNIER: I'm sorry?

MR. WESCOTT: Ike Schneider.

MS. BARNIER: Ike. I-K-E.

MR. WESCOTT: He is a Diamond Backs fan. I-K-E, S-H-N-I-E-D-E-R.

MS. BARNIER: Going back to your schedules. You say that Brad Oldenbrook owes you money for the sale of property in Ecuador. Is that correct?

MR. WESCOTT: I don't think so.

MS. BARNIER: Did you receive any payments from Mr. Oldenbrook in 2010?

MR. WESCOTT: Yeah, I think you have it reversed, that I owed him money. I want to look at the

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 115

actual schedule. By the way, at some point when it is appropriate I want to clarify some of my previous information.

MS. BARNIER: Sure.

MR. WESCOTT: Can you show me what you are looking at?

MS. BARNIER: For Mr. Oldenbrook.

MR. WESCOTT: Yeah.

MS. BARNIER: Did you go into an agreement with Mr. Oldenbrook over in Ecuador?

MR. WESCOTT: Well, we did the agreement here.

MS. BARNIER: Do you have an agreement with Mr. Oldenbrook regarding property in Ecuador?

MR. WESCOTT: That's correct. I'd like to look at the associated --

MS. BARNIER: At this point, I don't find it right off the top, and I want to keep going in terms of it.

So it is your opinion that you owe him money, is that correct?

MR. WESCOTT: As I recall, he lent me money, and the terms of our deal, if I did not -- if I -- if I didn't pay him back that he would, it would be secured with property in Ecuador.

MS. BARNIER: So you lent Mr. Oldenbrook money?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 116

MR. WESCOTT: No. He lent me money, and then that converted into a purchase, because I defaulted on paying back his loan.

MS. BARNIER: How much did he loan you?

MR. WESCOTT: 50 grand.

MS. BARNIER: When did he loan you the money?

MR. WESCOTT: I don't recall the exact date. I think it -- doesn't it say in the associated filing?

MS. BARNIER: Did he loan it to you in 2010?

MR. WESCOTT: I believe that is correct, but that is -- 2010 plus or minus a year, whatever it says in the schedule.

MS. BARNIER: Then you pledged, you gave him a deed of -- a deed on property in Ecuador?

MR. WESCOTT: Yeah. I well, I signed -- I signed a power of attorney, so that that particular property could be transferred to him. Correct.

MS. BARNIER: Is that the normal way to transfer property in Ecuador is to sign a power of attorney?

MR. WESCOTT: Well, you have to have a -- in Ecuador, you have to have a notarized signature for anything to be legal, in fact there's -- U.S. law allows things to be legal without a notarized signature on any agreement. So often when you are buying or selling

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

29 (Pages 113 to 116)

Case: 12-03143 Doc# 81-4 Filed: 08/30/13 Entered: 08/30/13 15:33:51 Page 26 of 37
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-107 of 228

Page 117

property, whether it is real property or not real property, in countries in Latin America if you are not physically present, your attorney, if you have a power of attorney there, will sign for you in the purchase or sale.

MS. BARNIER: So what is the Delhi Mini Storage?

MR. WESCOTT: Delhi Mini Storage -- well, there is Delhi Mini Storage, I believe I am getting the name right, comma LLC, which is an LLC that was owned by Surprise Development Inc, and that LLC owned a mini storage, which was in the town of Delhi, California.

MS. BARNIER: Where is Delhi?

MR. WESCOTT: It is in Central California, south of Sacramento, I think it is along Highway 99, if I remember correctly. I've been there a few times. It is near Madeira and Livingston and --

MS. BARNIER: They owned a entity Delhi Mini LLC owned a mini storage, is that right?

MR. WESCOTT: That's correct.

MS. BARNIER: What happened to that mini storage?

MR. WESCOTT: It was foreclosed, I believe.

MS. BARNIER: Are you the managing member of Surprise Development?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 118

MR. WESCOTT: Surprise Development is a corporation and corporations do not have managing members. I was the president, CEO, and sole shareholder, although to clarify there was also an option out that was never exercised on part of the Surprise Development shares of Surprise Development, comma, Inc.

MS. BARNIER: What about the mini storage unit owned by A-Y-S-S?

MR. WESCOTT: Yeah. A-Y -- A-Y-S-S that stands for At Your Service Storage was also in a neighboring town there; I think it was in Atwater. And that was another subsidiary of -- another LLC that was a subsidiary of Surprise Development Inc, and both of those cases, by the way that you are bringing up, Surprise Development Inc was the managing member of the LLC that it owned by the majority of or one hundred percent of -- I think one hundred percent of both of those cases, if I'm not mistaken.

MS. BARNIER: What happened to that mini storage unit?

MR. WESCOTT: Also, I believe, foreclosed. The lender -- it took a long time, the lender on that was Commercial Capital, they went into bankruptcy themselves. But at least one of those two, I think it

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 119

was A-Y-S-S was put into receivership somewhere around 2010, probably. And I believe that property has been foreclosed, and is probably owned by the estate of the bankruptcy. I don't know the right term for it but --

MS. BARNIER: So I know we covered this a little bit, I just want to make sure I have this correct. You had an Arizona firm prepare your trust and the Puke Duke Snook LP. Is that correct?

MR. WESCOTT: I believe their attorneys were in Arizona and Florida, correct.

MS. BARNIER: What's the name of the firm that did that work for you?

MR. WESCOTT: Laudmell and Laudmell.

MS. BARNIER: Who, what attorney did the work for you?

MR. WESCOTT: There were multiple attorneys that worked on it. One of them -- I can't recall all of their names, but the Laudmells are at least two if not more brothers were some of the attorneys at that firm. And I believe they personally worked on those files. I believe there is a Colleta Anderson, I believe her name is, and there were others at the firm that I talked to at well whose names temporarily escape me that also worked on.

MS. BARNIER: Did you travel to Arizona to meet

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 120

with the law firm?

MR. WESCOTT: No, I did not.

MS. BARNIER: So how were -- all arrangements were made by telephone?

MR. WESCOTT: Phone, e-mail, mail. Yes.

MS. BARNIER: Why did you choose an Arizona firm to do this work?

MR. WESCOTT: I think we talked about this at the first 341 meeting. They seemed like they were, were a good firm for the job and, frankly, they were the one who also allowed me -- you know, did not require the big hefty upfront retainer, allowed me to make monthly payments to pay them over time.

MS. BARNIER: I'm sorry. Help he out there. I thought you said you paid them 20,000 dollars to help prepare the trust and the LP. Is that correct?

MR. WESCOTT: No. I think we paid them around that amount of money, somewhere between 20 and 25 thousand dollars for a whole set of things that they did related to our estate and retirement planning, also to our medical powers of attorney. And among the work that they did include the trust and -- I'm sorry, what was the --

MS. BARNIER: The LP.

MR. WESCOTT: The LP were two of the things

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

30 (Pages 117 to 120)

Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-108 of 228

Page 121

that were part of a broad range of services and documents that they provided.

MS. BARNIER: So they --

MR. WESCOTT: Or created.

MS. BARNIER: So they prepared the trust, they prepared the LP. You also said medical, what -- what power --

MR. WESCOTT: All of our, some of the basic life, planning, medical, powers of attorney, I think --

MS. BARNIER: Durable power.

MR. WESCOTT: Durable powers of attorney.

MS. BARNIER: What else did they prepare for you?

MR. WESCOTT: You know, I think we've got the documents, but there were multiple trusts and at least one partnership related to our estate and retirement planning, and also the -- again, the -- oh, our will, will and medical powers attorney, that sort of thing.

MS. BARNIER: You said multiple trusts. We have only seen one trust which is the Wescott Family Trust, I believe. What other trust did they prepare?

MR. WESCOTT: I believe there's at least two. I think there's the Wescott-Stephens Family Trust and there's also the Puke Snook Duke Trust I believe are the two. There's at least one that was revocable and at

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 122

least one that was irrevocable. So that is to the best of my recollection. There may be more, but there is at least those two.

MS. BARNIER: I don't have a copy. I have a copy of the Wescott Family Trust, but I don't have a copy of the Puke Snook trust. Can I get --

MR. WESCOTT: I believe that's the name of it and yes we'd be happy to provide whatever we have.

MS. BARNIER: Those are the two trusts. And are you and your wife the trustees of the Puke Snook trust?

MR. WESCOTT: I am not sure, but we have got the paperwork we provide, you it will be clear. I don't recall.

MS. BARNIER: You just testified you made payments to this law firm doing the work. What kind of a period of time did you make those payments?

MR. WESCOTT: It was supposed be over something like six months, and it took longer, I think it took closer to a year to pay them in full.

MS. BARNIER: When was the last time you paid them?

MR. WESCOTT: Approximately late 2010, early 2011. Somewhere around there.

MS. BARNIER: Now, when you -- my understanding

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 123

of the Puke Snook LP is that you transferred the interest that you held in certain securities into the LP. Do I have that right?

MR. WESCOTT: At least one security which would have been membership units of Rain Forest Capital, if you would call that a security, yes.

MS. BARNIER: Okay.

MR. WESCOTT: Also some notes.

MS. BARNIER: Some notes, and then what about the securities held by Catamont, and weren't they also transferred in?

MR. WESCOTT: Correct, those were transferred, I believe, to -- I believe it is the limited partnership.

MS. BARNIER: Into the limited partnership. Now, so when you transferred those interests, did you send the law firm the security interest themselves? Did you say: Here is the all the paperwork?

MR. WESCOTT: We provided paperwork to them, correct.

MS. BARNIER: And that included the securities so they could record it?

MR. WESCOTT: When you say the securities, I don't know what you mean, but you want me to describe the process?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 124

MS. BARNIER: Sure.

MR. WESCOTT: So we provided information about what we, those different assets that we were transferring. We also had a sheet of paper -- I think when we transfer them, we notarized something to that effect if I recall correctly. And we also had a sheet of paper that, in a folder, that kept track of the assets that were held in the limited partnership. So --

MS. BARNIER: Did you transfer any other interests into the limited partnership?

MR. WESCOTT: We could look at that, but I believe it was, the best of my recollection, the Catamont holding, of which 50 percent is ours. I believe the Reliant Capital four and five. There was a note and the Rain Forest Capital membership units, I believe that is the list. I may be forgetting something but I think that is all of it.

MS. BARNIER: So when you made these transfers, and you provided information to the law firm, the Laudmell and Laudmell, what paperwork did you have to send them?

MR. WESCOTT: I believe that what we did is we notarized things related to the transfer, and I think we sent them a scan of that. I think we might have sent

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

31 (Pages 121 to 124)

Case: 12-03143 Doc# 81-4 Filed: 08/30/13 Entered: 08/30/13 15:53:51 Page 28 of 37
Supp. Exhibit 4 - 341 Hearing and Deposition Transcripts D-109 of 228

Page 125

them background information on those assets, too.

MS. BARNIER: Then they prepared the assignments. Is that what they did?

MR. WESCOTT: They gave us the form for the assignment that we filled in, and then took to a notary.

MS. BARNIER: So now let me make sure I have this of all the trusts and the LPs right and which one owns which, and you may have to help me out here.

MR. WESCOTT: I'm not sure we're going to be able to answer that well without the documents but we'll do our best.

MS. BARNIER: Okay. So the Puke Snook Trust, tell me what that owns.

MR. WESCOTT: You know, I think the best way to handle this would be to provide you the paperwork to bring it, or to have it in front of us when we answer these questions. I think the answers to all your questions will also be apparent in the actual paperwork.

MS. BARNIER: Okay.

MR. WESCOTT: Because I don't recall exactly what owned what. I can tell you what my guess, if that's helpful.

MS. BARNIER: That's all right. You are probably right. Let's look at the documents and that will make it clear for everybody.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 126

So after you made the transfers into the LP and the trust, were your assets greater than your liabilities at that time?

MR. WESCOTT: You mean in the LP itself?

MS. BARNIER: No. I mean overall. All of -- you personally, your personal assets and assets of your wife --

MR. WESCOTT: At that time I believe our assets significantly exceeded our liabilities.

MS. BARNIER: That would be in June of 2010.

MR. WESCOTT: In February through June of 2010, for that entire period and more, our assets greatly exceeded our liabilities. That's correct.

MS. BARNIER: How much did you believe at the time that your assets were worth in February of 2010?

MR. WESCOTT: In February of 2010, we believe they were worth approximately 54 million dollars.

MS. BARNIER: How much did you think your liabilities were?

MR. WESCOTT: Actually, just to clarify: The 54 million dollars I believe was net equity, to the best of our knowledge and belief at the time. There would be a higher number that would have been the total value, and there would have been a number -- I believe there was tens of millions of dollars of debt total at that

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 127

time, and I cannot give you an exact number.

MS. BARNIER: You think owed more than 20 million?

MR. WESCOTT: We owed more than 20 million.

MS. BARNIER: More than 30 million?

MR. WESCOTT: Probably.

MS. BARNIER: More than 40 million?

MR. WESCOTT: Again, just to clarify on that. What I am doing here is adding debt owed by entities that we owned. I am taking the whole --

MS. BARNIER: You have to. Yes, that's what it means. You do not get to separate out the entities unfortunately.

MR. WESCOTT: Sometimes when we file things we are just giving what we had personally, and that's when we think that is the appropriate context, and sometimes I'm adding it all up.

MS. BARNIER: I'm adding it all up. So of all the assets owned by any corporation, any LPs, any LLCs, and you individually, it sounds like what you believed as of the end of 2010 that you and your wife had a net value of 54 million dollars?

MR. WESCOTT: Yeah, that we probably had a total of at least 80-ish, at our best guess in value and tens of millions of dollars in debt for net equity.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 128

MS. BARNIER: You are jumping ahead of me. So then liabilities, how much did you owe in June of 2010?

MR. WESCOTT: I am not sure, but I don't think the number changed very much from February.

MS. BARNIER: So when we were going through numbers, you said it was more than 40 million. Is that right?

MR. WESCOTT: I believe the 40 million number, you are talking about for the testimony or the last 341?

MS. BARNIER: Yeah.

MR. WESCOTT: That includes judgments and liability from lawsuits, and that number is greater than the debt that we had to lenders.

MS. BARNIER: Right. You have to include everything. So going back to everything: In June of 2010, how much were your liabilities?

MR. WESCOTT: You know, in the information that I provided for the basis of value, that spreadsheet, I showed the believed value and the debt at the time, and what I didn't do is add them up all separately, but it would be pretty easy to take that spreadsheet out of the assets, out of the liabilities. I will give you a rough guess. I believe that we had more than 30 million dollars of debt certainly at that time. And, again, I'm including all the debt. Surprise Development alone

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

32 (Pages 125 to 128)

Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-110 of 228

probably had, including its LLC subsidiaries, 20 plus or 30 plus million dollars of debt.

MS. BARNIER: Where are you currently residing?

MR. WESCOTT: I am still at 853 Ashbury.

MS. BARNIER: Okay. And have you filed for divorce?

MR. WESCOTT: We have not filed for divorce.

MS. BARNIER: I am just asking you personally. Have you filed for divorce?

MR. WESCOTT: I have not filed for divorce.

MS. BARNIER: Have you filed papers to legally separate?

MR. WESCOTT: I have not done that yet.

MS. BARNIER: Miss Stephens, have you filed papers, divorce papers?

MS. STEPHENS: No.

MS. BARNIER: Have you filed papers to legally separate?

MS. STEPHENS: No.

MS. BARNIER: Have you consulted with a divorce attorney?

MS. STEPHENS: No.

MS. BARNIER: Have you consulted with a divorce attorney?

MR. WESCOTT: I have.

MS. BARNIER: Ms. Stephens, going back to Atlas Consulting. Do you keep Quickbooks for Atlas Consulting?

MS. STEPHENS: I do. It has only been reconciled through the end of 2010.

MS. BARNIER: I made that request for the checks and the bank statements. I'd also like a copy of the Quickbooks.

MS. STEPHENS: I actually provided Neal, but Brian with a P&L and balance sheet from December 2010, but I don't think I got it to them in time to give it to you today.

MS. BARNIER: Can you also get me a copy of the Quickbooks then, and you can forward that?

UNIDENTIFIED SPEAKER: Absolutely.

MS. BARNIER: Ms. Stephens, besides Atlas, let's make sure I have this correct, are there any other LLCs, LPs, or corporations as of today that you have an interest in?

MS. STEPHENS: I have a very, very, very small minority interest in the Santa Barbara Technology Group, and I provided the K 1 for that. I don't have any paperwork or anything else associated with that.

I think my K 1 states I made like 11 dollars, or I have like 11 dollars in my account. I was a

partner in New Forth Partners, and we shut that down in December of 2011. I provided -- I don't keep any of the records. I have not been an active member of -- I have not been working really since I had my first child, I have done a couple projects here and there. And I provided the K ones as well for 2010 and 2011.

MS. BARNIER: Mr. Wescott, are there any other LLCs, LPs, or corporations or partnerships that you have an interest in?

MR. WESCOTT: Other than?

MS. BARNIER: Well, where do you want to start?

MR. WESCOTT: For the most recent, I think it is Item 35 or line Item 35 under personal property, which I don't believe you have yet for -- I think it is Form B lists all of the corporations, LLCs --

MR. ISON: LPs.

MR. WESCOTT: Yeah, partnerships. All of them are listed there, and there is none that I had as of January 7 -- 17th, 2012 that are not listed there, to the best of my knowledge.

MS. BARNIER: And that's going to be reflected on your amended schedules that you are --

MR. WESCOTT: That's correct.

MS. BARNIER: That you are going to get on by Friday?

MR. WESCOTT: That's correct.

MR. ISON: I think I might want to put that over till Monday, give me the weekend, because we are getting a larger and larger cache of documents that I need to do.

MS. BARNIER: We are not asking about documents. I did not ask that. I just asked for amended schedules.

MR. ISON: But, for instance, the Gunvor one I think you are going to have to --

MR. WESCOTT: I think it is in what I sent you, but I will double check. If it is not, I will have it to you tonight. A revised one.

By the way, I'd like to just clarify one thing regarding past testimony, which if I may.

MS. BARNIER: Sure.

MR. WESCOTT: So you were asking a series of questions about where certain moneys went, and I several times said I don't know. I just wanted to clarify that I am not trying to be evasive. I don't want to give you wrong information under penalty of perjury. I can give you the general categories that those went to. I just can't tell you without looking at the statements exactly where every dollar went on every date.

MS. BARNIER: That was not my question that I

Case: 12-03143 Doc# 81-4 Filed: 08/30/13 Entered: 08/30/13 15:33:51 Page 30 of 37
Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-1 Page 223

Page 133

phrased to you when we were going over that. My quéstion to yu was there is 360,000 dollars that does not show on your expenses. My question was: Where did the 360,000 dollars go, and you said, as you just said, I don't know.

MR. WESCOTT: Correct. That's only because of what I explained. I can give you more -- basically, in 2000 and -- in the last couple years, money that has come in I have used to try and save properties and to try to save my businesses for the most part not successfully.

So I would guess that the great majority of the difference in any moneys that had went to trying to save properties and trying to keep my businesses going.

MS. BARNIER: So which properties did you make payments on in 2011?

MR. WESCOTT: 2011, I don't believe we made any payments on California properties. However, I have made payments on property in Ecuador, and I think the majority of moneys coming in -- I'm sorry, which year were we talking about?

MS. BARNIER: Only on 2011.

MR. WESCOTT: In 2011, the majority -- I believe the majority of the money that I have that came in that is not in the personal categories we talked

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 134

about went to Ecuador for property-related and business things there.

MS. BARNIER: So it would be your explanation that the bulk of the 350,000 dollars went into properties in Ecuador in 2011. Is that accurate?

MR. WESCOTT: Yes, that is accurate.

MS. BARNIER: Which property specifically did it go into in Ecuador?

MR. WESCOTT: The bulk of it went to Hacienda Palo Alto.

MS. BARNIER: You are going to have to refresh my memory. Which one is Hacienda Palo Alto, and do you have a partnership on that one?

MR. WESCOTT: That one is owned by an SA, and I own the SA.

MS. BARNIER: What is the name of the SA?

MR. WESCOTT: Hacienda Palo Alto, comma, SA.

MS. BARNIER: Do you have any other partners in that SA?

MR. WESCOTT: I think technically there is a one percent partner, which is sort of common practice and/or I at least used to have a one percent shareholder and her name was Alejandra Andrade, and she was one of my attorneys; she is also the daughter of the local governor.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 135

MS. BARNIER: So Alajandra --

MR. WESCOTT: Alajandra -- again, I'm not going. Her full name, you know in Latin America they have got four names, mothers and fathers.

MS. BARNIER: Can you send me her full name?

MR. WESCOTT: I can send you her full name.

MS. BARNIER: She is the attorney who represented you?

MR. WESCOTT: She was at the law firm which is on Brauda y Associado, and Associates.

MS. BARNIER: So in the last year for the 300 roughly 350,000 dollars, what improvements did you make to the property?

MR. WESCOTT: The majority of that money actually went to the purchase of the property. I started the purchase of that property in roughly 2006, 2007, and it was finally completed and deeded, I believe, in May 2011.

MS. BARNIER: How much do you owe on that property now?

MR. WESCOTT: You are just talking about secured?

MS. BARNIER: That's all, that's all it means to me. When somebody owes something on property, it has got to be secured.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 136

MR. WESCOTT: I owe a lot of money on a lot of different things, and it is not all secured. But I believe that secured is something like 205 thousand dollars.

MS. BARNIER: Who owns it?

MR. WESCOTT: Who owns the debt?

MS. BARNIER: Who has the note?

MR. WESCOTT: Horizon Equities LLC.

MS. BARNIER: Where are they located?

MR. WESCOTT: In -- I think it is, I'm not sure which country it is in.

MS. BARNIER: Do you make payments to thei

MR. WESCOTT: I have made, yes is the short answer.

MS. BARNIER: When was the last time you made a payment to them?

MR. WESCOTT: Sometime in the last two months.

MS. BARNIER: What did you use for funds to make in the last two months, where did you get the moneys?

MR. WESCOTT: Well, we've been borrowing money, and that's been the major source of our money. I'd have to look back at the statements to see exactly what went where. But almost all the money we have had this year we have borrowed.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

34 (Pages 133 to 136)

Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-112 of 228

MS. BARNIER: When you say borrowed, you borrowed from the LP?

MR. WESCOTT: No. We have not borrowed very much from the LP this year. We borrowed some money from Monette's father.

MS. BARNIER: How much money?

MR. WESCOTT: I'm not sure.

MS. STEPHENS: I think 13,000.

MS. BARNIER: 13,000 dollars.

MR. WESCOTT: I think it was more than that.

MS. STEPHENS: I don't --

MR. WESCOTT: I think this was 20 K in one.

MS. STEPHENS: Okay.

MR. WESCOTT: I think it is more. I believe it is tens of thousands of dollars.

MS. BARNIER: So you think it is like closer to 30,000 dollars that you have borrowed from Monette's father?

MR. WESCOTT: Well, I didn't do it personally but it was on our behalf.

MS. STEPHENS: I don't remember. I think we might have borrowed money at the end of last year and then again this year. So some in 2010.

MS. BARNIER: Overall, how much money did you borrow from your dad?

MS. STEPHENS: It was probably between 20 and 30,000 dollars.

MS. BARNIER: Okay. Anybody else that you've borrowed money from in 2011?

MR. WESCOTT: 2011, I think we borrowed money from a lot of people and I would have to --

MS. BARNIER: It is not listed on your schedules anywhere. I didn't see that -- is it listed and I didn't see it? You can take a look and show me where you have got --

MR. WESCOTT: Isn't there a lot of debt listed on our schedules?

MS. BARNIER: There's a ton of debt listed on your schedules, but that does not mean you borrowed money from people for your personal living. That's what you are saying I borrowed money to live on, is that what I'm hearing you say?

MR. WESCOTT: Most recently, almost all of our money that we have been living on has been borrowed. That's correct.

MS. BARNIER: Who did you borrow it from, you got 30,000 from Monette's dad, who else did you borrow money from?

MR. WESCOTT: I borrowed money from a friend of mine as well.

MS. BARNIER: Who is that?

MR. WESCOTT: Let's see. Actually, I borrowed money from multiple people, but I borrowed money from Melissa Cartiff, and I borrowed money from Henry Petris.

MS. BARNIER: Is that Cartiff C-A-R-D-I-F-F?

MR. WESCOTT: Correct.

MS. BARNIER: Where does she live?

MR. WESCOTT: In San Francisco.

MS. BARNIER: How much money did you borrow from her?

MR. WESCOTT: I believe it is 20 or 20 something thousand dollars.

MS. BARNIER: What were the terms of the agreement?

MR. WESCOTT: It is a one-year note.

MS. BARNIER: Why would she loan you 20,000 dollars when you are in bankruptcy?

MR. WESCOTT: I've known her for a long time, and I have loaned her money before; she has loaned me money before.

MS. BARNIER: What interest rate are you paying her at?

MR. WESCOTT: I don't recall, but it is at least ten percent.

MS. BARNIER: When is -- when did you borrow

the money from her?

MR. WESCOTT: I'm not sure of the exact date, but I would guess, what is it now, it is May. I would get March probably, around there.

MS. BARNIER: March of 2012?

MR. WESCOTT: Correct.

MS. BARNIER: Who is the other person you borrowed money from?

MR. WESCOTT: Henry Petris.

MS. BARNIER: P-E-T-R-I-S.

MR. WESCOTT: P-E-T-R-I-S.

MS. BARNIER: Where does he live?

MR. WESCOTT: In San Francisco.

MS. BARNIER: How much money did you borrow from him?

MR. WESCOTT: I think it was eleven thousand dollars.

MS. BARNIER: When did you borrow that money?

MR. WESCOTT: I would guess approximately April.

MS. BARNIER: Of 2012?

MR. WESCOTT: Correct.

MS. BARNIER: So you are going to amend your schedules to list all the LPs, LCs, and corporations that you either control or have an interest in. Is that

Page 141

correct?

MR. WESCOTT: I believe I have already done that.

MS. BARNIER: When I say that, I say amend, nothing has been filed, so I can only go --

MR. WESCOTT: Collectively yes we are going to do that.

MS. BARNIER: Since the filing in January, Mr. Wescott, I will start with Ms. Stephens first, have you travel outside the United States?

MS. STEPHENS: No.

MS. BARNIER: Have you, Mr. Wescott?

MR. WESCOTT: Yes.

MS. BARNIER: Where have you traveled and when?

MR. WESCOTT: I made a bunch of trips. As of the first meeting, we talked about the two trips I made back then and were Ecuador and Honduras. At the second 341 meeting, you requested the boarding passes, and I provided the boarding passes for one of those and information about the second.

Since then, I have traveled to Honduras a number of times. I don't know if I have been back to Ecuador. I was recently in Argentina and Uruguay.

MS. BARNIER: Why were you in Argentina?

MR. WESCOTT: Argentina just a stop-over to

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 142

Uruguay.

MS. BARNIER: Why were you in Uruguay?

MR. WESCOTT: I was in Uruguay to try to negotiate for the purchase of a field development called Sugar Loaf.

MS. BARNIER: Where were you going to get the money to purchase this?

MR. WESCOTT: From investors.

MS. BARNIER: Which investors?

MR. WESCOTT: I'm not sure yet. It does not look like there's any deal to be done soon because the HOA for that entity has not even be formed. It is a big mess. Essentially, I'm trying to do whatever I can to generate new sources of income.

MS. BARNIER: Are you trying to do anything with the properties you currently own down there?

MR. WESCOTT: There is -- it is my understanding that I am allowed to operate my current businesses and that that is actually of benefit to the estate. And so, you know, I'm trying to keep Hacienda dePalo Alto alive.

MS. BARNIER: What are you doing on behalf of Hacienda de Palo Alto?

MR. WESCOTT: Well, just trying to, we actually had, trying to keep paying the rent on the office, we

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 143

were behind on that. But I -- you know, essentially trying to keep the business alive. It has payments it has to make.

MS. BARNIER: I'm sorry. What businesses?

MR. WESCOTT: Hacienda de Palo Alto SA.

MS. BARNIER: The only asset of Hacienda Palo Alto is the real property. Is that correct?

MR. WESCOTT: That's correct.

MS. BARNIER: What's the value of that real property as of today?

MR. WESCOTT: I'm not sure.

MS. BARNIER: Estimate, you are a real estate developer. That would be your area.

MR. WESCOTT: Well, it is does not have its urbanization permits, and so the value of the property is probably somewhere around what has been paid for it.

MS. BARNIER: So you think it is worth 350,000 dollars?

MR. WESCOTT: No. More than that has been paid for it. Over 800.

MS. STEPHENS: Do you want the value versus debt?

MS. BARNIER: Let's say I come to you and said: Mr. Wescott, I have got a bunch of money sitting here, I want to buy that property from you, what would be a fair

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 144

price for the sale of that property?

MR. WESCOTT: It would really depend. As you know, land is very liquid and land typically sits out there for a year or two unsold, so to sell land, raw land if you want to sell it within a reasonable time frame, you generally fire sale it. So I think there is --

MS. BARNIER: If we are going to fire sale, what is it worth today?

MR. WESCOTT: You'd get at least three or four hundred thousand. Depends on the time frame. If you want to fire sale it within a month, you probably would not get any money over the debt. If you want to fire sale it over three months, you might -- there's, you know, there is probably -- you might be able to get, you know, three, four hundred grand or more, and, you know, come out ahead of the secured debt.

MS. BARNIER: The secured debt right now is 220?

MR. WESCOTT: It is about 205, I think.

MS. BARNIER: 205.

MR. WESCOTT: If you add a year or two or more. The highest and best use for that property would be for somebody to put millions of dollars into it and develop a community there and sell it some day.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

36 (Pages 141 to 144)

Sup. Exhibit D - 341 Hearing and Deposition Transcripts D-114 of 228

Page 145

MS. BARNIER: So do you have any more vouchers left that you purchased that you had before the filing of the bankruptcy?

MR. WESCOTT: Vouchers?

MS. BARNIER: That's my term. I believe you use a different term for them.

MR. WESCOTT: You are talking about flight credits?

MS. BARNIER: Flight credits.

MR. WESCOTT: I have now used the great majority of the flight credits for the rest of the trips I've taken recently. I believe we have one or two left that are less than a thousand dollars.

MS. BARNIER: I am going to ask that you turn those over to the bankruptcy Trustee.

MR. WESCOTT: They are not transferable.

MS. BARNIER: It is amazing what bankruptcy trustees can do, I will tell you. So if you would please turn those over to the bankruptcy Trustee.

MR. WESCOTT: I will send you the pin for them.

MS. BARNIER: Actually, I'm going to ask that because it is an asset that if you have your counsel just send it directly to the Trustee, that she is sitting right back there, so she is aware of it, that you are going to send her that, so she can take a look

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 146

at that.

The house in Santa Barbara, I believe you own that. Is that right, Ms. Stephens, that's your separate property?

MS. STEPHENS: Yeah.

MS. BARNIER: That's -- Atlas hold that property?

MS. STEPHENS: Yeah.

MS. BARNIER: I believe you testified the last time that the house, there was as a foreclosure notice on. It that correct?

MS. STEPHENS: Yeah.

MS. BARNIER: What's the status of that sale?

MS. STEPHENS: It is still in that mode.

MS. BARNIER: Are you sure of that, Ms. Stephens? Because I called down there, and that's not what they said.

MS. STEPHENS: What did they say?

MR. WESCOTT: I noticed some paperwork that I saw last night that talked about a male (sic) second sale date. I don't know if that happened.

MS. BARNIER: I believe it was May 5th sale date, and it did not proceed. Were you aware of that?

MS. STEPHENS: No.

MS. BARNIER: Were you aware that the balance

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 147

was brought current on your behalf?

MS. STEPHENS: No.

MS. BARNIER: Okay. So it is your belief that the house is still going to be sold in foreclosure?

MS. STEPHENS: We were trying to figure out a way that potentially we could keep the house.

MS. BARNIER: How would you do that?

MS. STEPHENS: Well, I would like to -- I mean, the house is under water. It has got a first mortgage and a second mortgage on there.

MS. BARNIER: Who holds the first?

MS. STEPHENS: Chase holds the first.

MS. BARNIER: In the amount of how much?

MS. STEPHENS: I don't know.

MS. BARNIER: Who holds the second?

MR. WESCOTT: I think that's a Chase deal as well.

MS. STEPHENS: I think Chase holds a second also.

MS. BARNIER: Chase holds the first and the second. How much do you think the property is worth?

MS. STEPHENS: I think the property is worth maybe 600,000, 700,000 at the high end. 650. What do you think?

MR. WESCOTT: I would guess five or six.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 148

MS. STEPHENS: Let's say 600,000.

MS. BARNIER: What do you owe on the first and the second?

MS. STEPHENS: The first is -- I don't know.

MS. BARNIER: When was last time you made a payment on this property?

MR. WESCOTT: I think August 2010.

MS. STEPHENS: August 2010.

MR. WESCOTT: Or July.

MS. BARNIER: Given that there was money in the Atlas account, why didn't you pay it?

MS. STEPHENS: There was not money in the Atlas account.

MR. ISON: If it was secured, it might have been secured by the junior. Who is foreclosing, the first?

MS. STEPHENS: The first.

MS. BARNIER: Gentlemen, do you have any questions?

UNIDENTIFIED SPEAKER: A ton.

MS. BARNIER: I'm sorry? It is 12:30, is everyone okay to keep going?

UNIDENTIFIED SPEAKER: How long?

MS. BARNIER: I'm sorry?

UNIDENTIFIED SPEAKER: How long?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

37 (Pages 145 to 148)

Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-1 15 of 228

MS. BARNIER: Well, unfortunately, you know, and I hate to do this, because you have to produce so many documents, the schedules have to be amended, it has not been done, this is a three-month process, one of the longest ones I have seen, I have to say to you, Madam Trustee, unfortunately we're going to have to continue this because there is so much information coming forward on the schedules.

THE TRUSTEE: This is Janina Hoskins, for the record.

As my obligations as the Bankruptcy Trustee I cannot conclude the examination if there are material and substantial amendments that still have to be done and are not on file and my obligation to the creditors of the estate are to conclude an examination only after that has been done.

And I am not up for or interested in any surprises coming after if I conclude the examination and those things -- and I look at the schedules and there is something that comes up.

So I think there is some indication that those are going to be filed either Friday or Monday. And so at this point, the continued date would be June the 6th. Does that work for you Jean?

MS. BARNIER: It does not -- I need, I would

need July or late in June. Can you do the following one, June, what is your next one -- 20th.

THE TRUSTEE: 20th. So we can do June 20th. I can't conclude the examination without having a chance to review.

MS. BARNIER: Apparently, the information we have received is that the amendments will be fairly substantial.

THE TRUSTEE: Well, because the original documents are substantially lacking.

MR. WESCOTT: Actually, I would characterize it slightly differently. I don't think the schedules are significantly revised. However, there is a lot of documentation that we are getting you.

MS. BARNIER: It is not the documentation that we are talking about. We are talking about the schedules. The schedules have to be amended. You have already said that your Schedule J is not correct. You believe you have to make changes to it. You have already indicated that your Schedule B is not correct because you did not list all the corporations and LPs that you have interest in. Those are substantial changes, Mr. Wescott, that would revise, take time, need to be amended, and that would give the Trustee and her counsel an opportunity to look at them.

So, yes, they are substantial.

And I know Mr. Weaver would like to ask some questions, and since he has been very patient.

MR. WEAVER: I will try to keep it short. The problem I have got is the schedules are, to some extent, incomprehensible and completely incomplete. One of the things that you say is all the information is here, but on Schedule A, real property, lists one piece of property. You have already testified to multiple pieces of property that you own outside the U.S.

So, I mean, that's one of the problems we got and we are kind of shooting in the dark trying to find out what you have, what you don't have, and we can't determine that from the schedules.

MR. WESCOTT: Can I clarify that? There is only one piece of property that we personally own that is real property, and that is the one that was listed there. And it is my understanding that is how we should fill out the schedules. The rest of the properties that are owned by different entities would fall under, my understanding, correct me if I should do it differently, line Item 35 and whatever the schedule is, Form B.

MS. BARNIER: One of the headaches here is you prepared the schedules, is that right, Mr. Wescott?

MR. WESCOTT: I prepared the schedules to the

best of my ability. That's correct.

MS. BARNIER: Okay. And the normal procedure is that your attorney prepares the schedules, because he understands or she understands where the information is going to be prepared and perhaps counsel now for Ms. Stephens is going to jump in and he is going to fix the schedules, or Mr. Ison is now going to prepare the schedules so that they are accurate.

But that is a headache that Mr. Weaver points out that your understanding, unfortunately, as a lay person is not accurate. But I'll leave that to your counsel to advise you.

MR. WESCOTT: Okay.

MR. WEAVER: Earlier today there were questions about bank accounts in your name and names of entities that you control. I don't think there's any -- we asked about LLCs and corporations. Nobody asked about the SAs. And you have indicated there are at least two SAs out there you have got control over, one of them being Hacienda Palo Alto, and the other being a company called Gunvor SA.

MR. WESCOTT: Correct. There is one bank account that an SA has, and that is Uruguay, and this is with Banco Santander. It is listed on our IRS related filings, and whatever the heck it is, the FR, TDF stuff.

Page 153

But there is a bank account that Livery has in Uruguay at Banco Santender. It essentially has no money in it for a long period of time. It did have moneys in it in 2009 and 2010. And that is the only bank account that I have in control for any SA, if that's your question.

MR. WEAVER: Hacienda dePalo Alto does not have a bank account?

MR. WESCOTT: Does not have a bank account.

MS. BARNIER: Hang on. So do you have any bank accounts outside the United States?

MR. WESCOTT: There are two total. I have one personally that also has no money in it in Ecuador. It is with Banco Pichancha, and that one has had no -- essentially no money, less than one hundred dollars in it for more than a year.

MS. BARNIER: Since my Spanish is not probably as good as yours, do you want to spell it for me.

MR. WESCOTT: P-I-C-H-A-N-C-H-A, I believe it is.

MS. BARNIER: How long have you had the account there?

MR. WESCOTT: I believe it was opened in February 2011.

MS. BARNIER: How much money did you deposit in it February 2011?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 154

MR. WESCOTT: $156,000.

MS. BARNIER: What did you do with that money?

MR. WESCOTT: That money was I believe wired back to the U.S. as soon as possible thereafter.

MS. BARNIER: What account was it wired back into?

MR. WESCOTT: I don't recall.

MS. BARNIER: What was the source of the 156,000 thousand dollars.

MS. BARNIER: It came from Antoine Habis, and it was a property, it was a repayment back to me on the Hacienda Palo Alto deal.

MS. BARNIER: I believe didn't you say you were suing her for this transaction?

MR. WESCOTT: Yes, I am. I have not filed a lawsuit yet, but I have a claim. It is complicated. Would you like me to go through the chronology?

MS. BARNIER: I would not. You said there was one other bank account you had outside of the United States?

MR. WESCOTT: It is Livery SA one with Bank Santender. It is on the, I forget what you call it the F bar and TDF whatever the heck.

MS. BARNIER: I'm sorry. You said Banco, what is the name of the bank?

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 155

MR. WESCOTT: Banco Santender, which is a foreign bank. There is 14 Spanish banks in Uruguay. That's one of the 14.

MS. BARNIER: Could you spell.

MR. WESCOTT: B-A-N-C-O, S-A-N-T-A-N-D-E-R.

MS. BARNIER: How much money is in that account?

MR. WESCOTT: I believe less than one hundred dollars.

MS. BARNIER: How much money was in that account in 2011?

MR. WESCOTT: I believe for the entire year, I would have to look to make sure, less than one hundred dollars.

MS. BARNIER: Do you have the bank statements for these accounts?

MR. WESCOTT: I do.

MS. BARNIER: Could you please provide those for 2010 and 2011 through 2012?

MR. WESCOTT: Sure. 2010, '11, yes.

MS. BARNIER: When you opened them, I'm sorry when --

MR. WESCOTT: I think that one was opened in 2009. And I just last night I was looking at the set of statements to figure out what to fill out the IRS

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 156

paperwork for 2010, so I have those, and I can -- I'll forward them to you, you know.

MS. BARNIER: Forgive me, Mr. Weaver. Sorry.

MR. WEAVER: That's fine.

MS. BARNIER: Let's ply a little tag here. There you go.

MR. WEAVER: You are trying to sell some interest in something called Sugar Loaf in Uruguay?

MR. WESCOTT: No. I was trying to buy some interest in it, trying to develop new sources of income.

MR. WEAVER: Where were you going to get the money to buy an interest in --

MR. WESCOTT: I was going try to put a deal together and get it funded with investors.

MR. WEAVER: Sugar Loaf is not the same property you talked about last time, time before last in Uruguay, the Hundred Hectars?

MR. WESCOTT: No. That is called Laguna Tranquila.

MR. WEAVER: Laguna Tranquila.

On the schedules, you indicate that one hundred percent interest in Livery referencing that, what does Livery refer to?

MR. WESCOTT: Livery SA, which is an SA, referring to Uruguay.

Audio Recording of: 341 Meeting - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

39 (Pages 153 to 156)

Supp. Exhibit D - 341 Hearing and Deposition Transcripts D-1 Page 228

MR. WEAVER: So there's another SA in Uruguay?

MR. WESCOTT: Correct.

MR. WEAVER: That's Livery SA?

MR. WESCOTT: Correct.

MR. WEAVER: What is your interest in Livery SA?

MR. WESCOTT: It is one hundred percent, I think. Yeah.

MR. WEAVER: Does Livery SA have a bank account?

MR. WESCOTT: It is the one we just talked about.

MS. BARNIER: That's the one at Banco Santender?

MR. WESCOTT: Yes.

MS. BARNIER: 2009.

MR. WESCOTT: The only bank account I have.

MS. BARNIER: He says less than one hundred dollars in there.

MR. WEAVER: Not Livery?

MS. BARNIER: No, he said it was Livery. He testified -- am I right, Mr. Wescott, you explained it was Livery that has it, but you control Livery?

MR. WESCOTT: I control Livery.

MR. WEAVER: Is Livery the owner of the Uruguay

Hundred Hectars?

MR. WESCOT the short answer is yes.

MR. WEAVER: elop the Hundred Hectars?

MR. WESCOTT:

MR. WEAVER: D all?

MR. WESCOTT: It

MR. WEAVER: Wh

MR. WESCOTT: It h subdivision, the environment with that has expired, it is a federal environmental permit.

MR. WEAVER: Any kind of actual construction going on there?

MR. WESCOTT: No.

MR. WEAVER: Any roads?

MR. WESCOTT: No.

MR. WEAVER: Any infrastructure like electricity, or gasoline, or water?

MR. WESCOTT: Nothing. Nothing. Basically it would take a few million dollars to develop that property. I got bids for it years ago.

MR. WEAVER: Are you still trying to develop that property?

MR. WESCOTT: Well, I was until the bankruptcy filing.

MR. WEAVER: Have you taken any money from investors on that property?

MR. WESCOTT: You mean ever?

MR. WEAVER: Ever.

MR. WESCOTT: Well, I sold -- there's a residential subdivision. Livery SA sold some of the lots in that property to buyers in I would guess approximately 2008, 2009.

MR. WEAVER: How much money did it receive on those sales?

MR. WESCOTT: I'm not sure of the exact amount, but more than a million dollars.

MR. WEAVER: Do you have some subdivision approval, then, on the property?

MR. WESCOTT: That's correct.

MR. WEAVER: So they had fee title to those particular lots that were sold?

MR. WESCOTT: That's correct.

MR. WEAVER: Take any deposits on any sales on lots?

MR. WESCOTT: Well, again, not only deposits but there were closed sales.

MR. WEAVER: In addition to the closed sales,

any deposits?

MR. WESCOTT: I don't think so. No. I don't believe so.

MR. WEAVER: One of the things that you indicated last time you were here is there is millions of dollars owed on this project that is unsecured. Who is money owed to on the Uruguay project?

MR. WESCOTT: Let me think. You know what, the best thing for me to do is going to be to prepare a little schedule. We have not updated all the accounting, but I loaned money to Livery SA, and I was the main lender, personally. We have not done, brought all the bookkeeping current. We are still working on it, but I have loaned a substantial amount of money to Livery and had gotten some payments back and need to catch up all the bookkeeping to see exactly where we are.

MR. WEAVER: Anybody other than you ever lent money to Livery?

MR. WESCOTT: To Livery, no.

MR. WEAVER: Or to the project on the One Hundred Hectars.

MR. WESCOTT: No. I think it is worth noting that there is hundreds of thousands of dollars owed outside of what is owed to me, and that is for income