## Page 161

1 taxes, property taxes, legal fees, et cetera. I believe
2 that that amount is at least four or five hundred
3 thousand dollars.
4         I think, yes, well, that's -- that would be a
5 good guess, there's at least four or 500,000 dollars if
6 not more. I also took a loan of another 500,000 dollars
7 on that property in May 2011. So if you add that, not
8 including loans to me, there's more than a million
9 dollars owed.
10         MR. WEAVER: Livery took the loan for 500,000?
11         MR. WESCOTT: I personally and Livery took it.
12 Yes.
13         MR. WEAVER: What happened to that money?
14         MR. WESCOTT: That money was used to save the
15 property from a foreclosure proceeding. It was,
16 basically it was seller financing on the property, and
17 when the sellers were not paid, they sued and
18 foreclosed, and so other moneys were borrowed to try to
19 save the property from the foreclosure process.
20         MR. WEAVER: Have the sellers been paid in full
21 at this point?
22         MR. WESCOTT: The original sellers have been
23 paid in full at this point.
24         MR. WEAVER: So as I understand, the only debt
25 is to attorneys and to tax liens, any other debt on that

Audio Recording of: 341 Meeting  ~ 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

## Page 162

1 property other than the debt that you say you have
2 that's unsecured?
3         MR. WESCOTT: Well, I just mentioned the
4 500,000, so that is part of the million dollars total
5 not including debt to me.
6         MR. WEAVER: Who did you borrow the 500,000
7 from?
8         MR. WESCOTT: From Michael Palmer.
9         MR. WEAVER: I don't know -- there's a deed of
10 trust or some sort of secured interest that is in
11 existence.
12         MR. WESCOTT: It was secured in a document that
13 is part of the loan document.
14         MR. WEAVER: We have looked at at least from
15 two days ago, we got some appraisal on some properties.
16 Has there ever been an appraisal on this Hundred Hectars
17 in Uruguay?
18         MR. WESCOTT: There has.
19         MR. WEAVER: When was that date done?
20         MR. WESCOTT: I don't recall exactly. I think
21 it was some time last year, that appraisal assumed all
22 entitlements in place and the money to put in
23 infrastructure.
24         MR. WEAVER: And you never had that?
25         MR. WESCOTT: Correct.

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

## Page 163

1         MR. WEAVER: Do you have a copy of that
2 appraisal?
3         MR. WESCOTT: I do.
4         MR. WEAVER: Can we get a copy of that also?
5         MR. WESCOTT: Sure.
6         MS. BARNIER: So given how much money is owed
7 by Livery SA on this property, what are your plans for
8 it?
9         MR. WESCOTT: I don't know. Isn't everything
10 we owned as of January 17th, 2012, currently property of
11 the -- is the right word estate?
12         MS. BARNIER: You are absolutely right,
13 bankruptcy estate. So my question is that given this
14 amount of money as the bankruptcy case closes, and I am
15 attorney your attorney has explained this to you that
16 all properties then would revert back to you as the
17 debtors, what are your plans for it if that happens?
18         MR. WESCOTT: If that happens, I would try to
19 develop it.
20         MS. BARNIER: With what moneys borrowed from
21 new?
22         MR. WESCOTT: Hopefully, obviously it is going
23 to be harder for me to borrow money now than before, and
24 I don't know that I can do that. I would seek to take
25 equity investment, debt investment, and, you know, it

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

## Page 164

1 was always been my goal to develop that property. I
2 believe the highest and best use for that property would
3 be to develop it. But, of course, it takes significant
4 time and money to do that.
5         And I am also at a capital challenge for while.
6         MS. BARNIER: I think you explained to
7 Mr. Weaver that you got a million dollars in sales from
8 the lots you sold in between 2008 and 2009. Is that
9 correct?
10         MR. WESCOTT: More than a million dollars I
11 believe. That's correct.
12         MS. BARNIER: What did you do with the money?
13         MR. WESCOTT: Again, it is -- not trying to be
14 evasive. I can't tell you exactly where every dollar
15 went, but in general those moneys were partially used,
16 so I'd loan money to Livery. Some of them were repaid
17 loans to us that we used for our personal living. Some
18 of those moneys that came back to us then were used to
19 try and save properties, at least through August 2010,
20 when we were still paying mortgages.
21         Some of the moneys went to try to save other
22 properties and businesses. In general, what I've been
23 doing -- what I was doing through August, July or August
24 2010 is trying to keep all my properties current, keep
25 my credit good. Once I realized that wasn't happening,

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Case: 12-03148  Sub Exhibit D - 341 Hearing and Deposition Transcripts:51  D-119 of 228
47

1  then we tried to keep as many of the properties -- well,
2  really keep as many of the businesses going as possible,
3  and ultimately we failed in most of the properties, and
4  we have -- most of the businesses.
5      MS. BARNIER: Let me make sure I understand
6  this. I think you explained earlier that you did not
7  make any payments on the California properties, which
8  your wife owned, but you made payments on the properties
9  in Latin America which you owned. Have I got that
10  right?
11      MR. WESCOTT: I made a payment on Hacienda Palo
12  Alto on the property owned by the SA in 2011, that's
13  correct.
14      MS. BARNIER: But no payments on anything owned
15  in California in 2011?
16      MR. WESCOTT: Let me think. Anything in
17  California. I should probably -- I should probably look
18  at the whole list, but I don't recall anything.
19  Correct.
20      MS. BARNIER: Do you have Quickbooks records
21  that is going to reflect this at all?
22      MR. WESCOTT: I have Quickbook records for
23  People Bridge Inc that are current through 2009 and
24  possibly into part of 2010.
25      MS. BARNIER: What about Livery SA?

1      MR. WESCOTT: No.
2      MS. BARNIER: How do you keep records on Livery
3  SA?
4      MR. WESCOTT: I have -- I don't have very good
5  records on Livery SA.
6      MS. BARNIER: Whatever records you do have of
7  Livery SA, I'd like a copy of for 2009, 2010, 2011
8  through 2012, including the improvements that you have
9  made, that should be reflected in that.
10      MR. WESCOTT: There are no improvements.
11      MS. BARNIER: There on no improvements. So the
12  500,000 dollars just paid off the moneys that were owed
13  that you borrowed from Michael Palmer?
14      MR. WESCOTT: Correct.
15      MS. BARNIER: Where does he live?
16      MR. WESCOTT: In Santa Barbara.
17      MS. BARNIER: Sorry, Mr. Weaver.
18      MR. WEAVER: If the property has no value, why
19  did you borrow 500,000 dollars to payoff the secured
20  financing?
21      MR. WESCOTT: Well, I believed at the time that
22  I -- at the time I was not planning to file bankruptcy
23  obviously. I was essentially -- my goal has been to
24  develop these properties, that I have, and my goal at
25  the time was to try and pull in the money from somewhere

1  to actually put in the infrastructure and continue the
2  development.
3      MR. WEAVER: Do you produce any promotional
4  materials concerning this particular property in
5  Uruguay?
6      MR. WESCOTT: I did in the past. Once I -- I
7  have not marketed it for a long time because, frankly,
8  there's a perception, you know, once you don't put
9  infrastructure in, there's a perception that you have a
10  failed project. And there is really no point in doing
11  any marketing on this property until infrastructure goes
12  in. And even the website I didn't bother paying the
13  fees for, that went down because until there is
14  infrastructure that starts to go in, there is nothing
15  that I think can reasonably be done to any, or in good
16  faith with regard to that property.
17      MR. WEAVER: How many people did you sell lots
18  to? I think you said there were several lots sold, but
19  I have no idea.
20      MR. WESCOTT: No. I think there were more than
21  ten that were sold. Somewhere between ten and 20. I
22  had other deals that were reserved that never closed.
23  So I believe the closed sales are between ten and 20,
24  and I believe the total reservations or deals we never
25  entered into was between 20 and 30, but many of those

1  never closed. People pulled out, et cetera.
2      MR. WEAVER: You did not take deposits that you
3  still have on those reservations on the 20 to 30?
4      MR. WESCOTT: That is correct. Just to
5  clarify: On one, there was a bulk lot sale that I put
6  together with an Argentinian buyer where he was going to
7  buy ten lots, and I got half of the money for those
8  lots, which I think was something like 170 thousand
9  dollars. But we did not close the sale, and he has seen
10  that no infrastructure is going in, so he, rather than
11  consummating the sale, wants to be repaid his 170
12  thousand dollars and I did not include that amount in
13  the other numbers we're talking about.
14      MR. WEAVER: You have not paid him the 170?
15      MR. WESCOTT: No. Technically, I am in default
16  with every single one of those buyers, and per the
17  contracts I signed with them, every single one of those
18  buyers has a right to their money back and 20 percent
19  more plus one point three percent default interest per
20  month. So if you add all that together, that's probably
21  somewhere between one and two million dollars that's
22  also owed to the buyers of those properties.
23      MR. WEAVER: Do you have a standard purchase
24  agreement you use on the purchases of the lots?
25      MR. WESCOTT: Correct.

Case: 12-03148 Sup Exhibit D - 341 Hearing and Deposition/Transcripts:51 D-120 of 228

47

1    MR. WEAVER: Can we get a copy of that also?

2    MR. WESCOTT: Yes, you may. Several buyers

3  have indicated that they are going to sue, and we will

4  see what happens.

5    MS. BARNIER: Do you have all those people

6  listed on your schedules?

7    MR. WESCOTT: No. They have not actually sued

8  yet.

9    MS. BARNIER: I was wondering if the moneys

10  owed them that you just described, because you are

11  already in default, was that listed in your schedule?

12    MR. WESCOTT: No. Livery SA owns it, and I

13  believe the value of Livery SA is essentially zero

14  partially because of the millions of dollars of

15  liability so I just list the value of Livery SA as zero.

16  Does that make sense?

17    MS. BARNIER: Yep.

18    MR. WESCOTT: Okay.

19    MR. WEAVER: I am going to go back and try to

20  hit some things that I have questions on, rather than go

21  into a lot of stuff because we are going late, and we

22  are going to be back here anyway.

23    Early on this morning, you were testifying

24  about Going On Networks that owes you some money, and

25  that was a startup company. Is that company still

1  alive, still in business?

2    MR. WESCOTT: Yeah, it is. Much to my

3  surprise. In fact, I mistakenly I thought that company

4  was out business, and I think I even wrote off, and I

5  have to correct -- I forget what year the stock, because

6  I thought they had gone out of business. And I was

7  surprised to learn that Going On Networks had raised six

8  million dollars, I think it was some time last year, of

9  course they did not tell me; I learned about it through

10  a third party.

11    I contacted the company, said, hey, you have

12  got the money now, will you pay me, and they said no.

13    That's when I filed the claim. I'm sorry.

14  What was the original question that I'm not answering

15  and giving you lots of information about not answering

16  your question?

17    MR. WEAVER: Whether Going On Networks is still

18  in business.

19    MR. WESCOTT: They are still in business. Yes.

20  Answer to that is yes.

21    MR. WEAVER: Do you have an equity interest in

22  that business?

23    MR. WESCOTT: The stock that I have a small

24  amount of common stock which I believe is worthless

25  because my understanding is the they did a cram down

1  ram, so I believe I had 60 thousand shares of Going On

2  Networks that I thought actually were worthless that I

3  wrote off on my taxes, that I still believe are

4  worthless even though the company raised money because

5  of preferences, and you know how they work, right.

6    MR. WEAVER: Where is Going On Networks

7  located?

8    MR. WESCOTT: Actually in San Francisco.

9    MR. WEAVER: What does it do?

10    MR. WESCOTT: It is a provider -- it was

11  originally a provider of social media network creation

12  tools that are easy to use and has pivoted into a

13  provider of online software for education, which is

14  based on social media.

15    MR. WEAVER: There was also some questions

16  about Steve Bonilla who owes you I think two million

17  dollars.

18    MR. WESCOTT: He doesn't owe me --

19    MR. WEAVER: Two million dollars in stock or

20  something of value?

21    MR. WESCOTT: He does not owe me money except

22  that I believe he has significant liability, and I have

23  a claim -- I really I think the LLC has a claim against

24  him for what we were talking about earlier today.

25    MR. WEAVER: I think what your testimony was

1  two million dollar equity loss because of the theft of

2  shares.

3    MR. WESCOTT: Correct. Now, it was lost for a

4  lot of different reasons also my inability to pay and so

5  on. But at the time I thought we could have saved it he

6  did not cooperate. I don't know where the shares are.

7  I assume they exist. I filed a police report over the

8  missing shares, and he has liability for his actions.

9    MR. WEAVER: Did you pay for the shares?

10    MR. WESCOTT: I paid for the -- yes.

11    MR. WEAVER: What did you pay for the shares?

12    MR. WESCOTT: I believe it was 300 thousand

13  dollars in cash, if I recall correctly. Then I assumed

14  debt of a total of something like 1.7 or $1.8 million.

15  Again, when I say I, it is really the LLC.

16    MR. WEAVER: Unexpected Development.

17    MR. WESCOTT: Unexpected Development LLC,

18  correct.

19    MR. WEAVER: When was the 300 thousand dollars

20  paid and the debt incurred?

21    MR. WESCOTT: I would guess approximately 2008.

22    MR. WEAVER: When did you find out about this

23  theft by Mr. Bonilla?

24    MR. WESCOTT: I believe that was more like 2010

25  or 2011, but I think it was '10.

Case: 12-03148 Sup Exhibit D - 341 Hearing and Deposition/Transcripts 5 D-121 of 228

47

1    MR. WEAVER: I think you said that Joe Sherman
2  made some false statements, some libelous statements
3  against you?
4       MR. WESCOTT: Yes.
5       MR. WEAVER: What did he say that was libelous?
6       MR. WESCOTT: Again, he is the -- he posted
7  some information online, which is incorrect about us and
8  but he -- so the reasons for the claim are, Number 1, as
9  a fiduciary in an investment company, I believe he has
10 to, certain standards he has to make, keep to, and I
11 believe that FINRA requires him to keep our investor and
12 personal information confidential, which he has not
13 done, and he also posted some incorrect information as
14 to our trust and children online.
15      MR. WEAVER: What did he post online?
16      MR. WESCOTT: I can't tell you the exact
17 phrase.
18      MS. STEPHENS: Carl, I don't think you are
19 supposed to --
20      MR. WEAVER: You can just give me a general
21 idea as to what it is he said that was incorrect that
22 you think is libelous.
23      MS. STEPHENS: Carl - can we take a break?
24      MR. WESCOTT: I don't recall the exact
25 statement.

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

1    MR. WEAVER: I am not asking for the exact
2  statement.
3       MS. STEPHENS: I'd like to take a break.
4       MR. WEAVER: I think we should take a break.
5       MS. BARNIER: Sure.
6       MR. WEAVER: That's a good idea.
7       MS. BARNIER: We are back on the record after
8  the debtors and their counsel have taken a break, and
9  they have now informing us there is new information
10 regarding the libel suit that Mr. Wescott has alleged.
11 And that information is?
12      MR. WESCOTT: I've been reminded that we signed
13 a confidentiality agreement regarding this entire
14 matter. So I should probably uphold --
15      UNIDENTIFIED SPEAKER: Can we get a copy of
16 that, please? They usually have a provision in there
17 that they can be -- the information can be given out in
18 light of a court order or court process, and I think
19 this would cover that. But if we could get a copy.
20      MS. STEPHENS: There is no lawsuit here.
21      MR. WESCOTT: Then if you'd like to get a court
22 order --
23      MS. BARNIER: Excuse me, Ms. Stephens. I
24 understand this is upsetting to you. I am not trying to
25 upset you here. But it was listed as an asset, it says

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

1    there is a potential lawsuit. Now you come back and say
2  no there is not. So my question is was the matter
3  settled?
4       MS. STEPHENS: It was resolved.
5       MS. BARNIER: It was resolved.
6       MS. STEPHENS: It was resolved between the
7  parties.
8       MS. BARNIER: It was resolved between the
9  parties. So, Mr. Wescott, why do you still think you
10 have an action?
11      MR. WESCOTT: It was resolved after January 17,
12 2012.
13      MS. BARNIER: So you need to amend the
14 schedules also for that?
15      MS. STEPHENS: Yes.
16      MR. WESCOTT: Isn't it supposed to be a
17 snapshot as of January 17, 2012?
18      MS. BARNIER: Not when you have potential
19 lawsuits or potential assets, and there are no longer
20 such that has to be amended to reflect that, it is not
21 no longer there.
22      MR. WESCOTT: We will take --
23      MS. BARNIER: Did you sign this agreement,
24 Mr. Wescott?
25      MR. WESCOTT: Yes, I believe I did. The

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

1    confidentiality agreement you are talking about, right?
2       The settlement, whatever you want to call it.
3       MR. WEAVER: Did you get approval of the
4  Trustee to settle a case that that you listed as an
5  asset in this bankruptcy case?
6       MR. WESCOTT: What we really settled was the
7  reverse.
8       MS. STEPHENS: Carl, I just don't think you
9  should talk about it.
10      MS. BARNIER: Unfortunately, Mr. Weaver has got
11 a great question. I understand -- we are not asking for
12 the terms of it, but it was listed as an asset. You are
13 now explaining that you settled a matter or resolved it
14 in somehow, the trustee was not notified of it, counsel
15 was not notified of it. So do you want to answer
16 Mr. Weaver's question?
17      MS. STEPHENS: Can I answer?
18      MR. WESCOTT: Go ahead.
19      MS. STEPHENS: I am sorry, just because this
20 was based on two people not seeing eye to eye. We never
21 filed a lawsuit against them. We resolved the matter
22 and signed a confidentiality agreement associated with
23 it basically to leave each other alone. Is that
24 accurate?
25      MR. WESCOTT: I don't recall the exact wording

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Case: 12-03148 Sup Exhibit D - 341 Hearing and Deposition/Transcripts:51 D-122 of 228
47

Page 177

1  of the agreement.
2      MS. BARNIER: I'm going to have to ask to see a
3  copy of it, because you did list it as an asset. You
4  have now resolved it on your own. I need to see a copy
5  of it.
6      Can you provide that? Mr. Ison, do you have a
7  copy of it?
8      MR. ISON: No, I don't.
9      MS. BARNIER: Did you have attorneys represent
10 you in this matter?
11     MR. WESCOTT: Joe Sherman had an attorney. He
12 was threatening to sue us, and -- but we did not have
13 our own counsel.
14     MS. BARNIER: Did you advise Mr. Ison that you
15 were doing this settlement?
16     MS. STEPHENS: It wasn't a settlement.
17     MS. BARNIER: That's probably a legal term, and
18 I might use it that term in that way. But whenever
19 someone says: I have a legal action, I think I can sue,
20 and we agree and sit down and sign something that says
21 no, we are each going to go our own ways, that's a
22 settlement. That means I have agreed to do something
23 and you have agreed to do something, the terms of a
24 settlement.
25     So you had an action. You have now resolved

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 178

1  it. You did not tell the bankruptcy Trustee, which your
2  counsel would advise you that anything you enter into,
3  you have to advise her of, you sell any property, you
4  take any actions, you have to tell the Trustee.
5      So I am going to ask for a copy of it. If you
6  want to ask your counsel to get you a protective order
7  that it only goes to the Trustee and me, you can do
8  that. Would that satisfy you, Ms. Stephens? So you are
9  going to have to ask Mr. Williams, it seems like
10 Mr. Wescott does not seem as concerned, you are going to
11 have to get a protective order as to this one
12 confidentiality, and that is going to be produced.
13     Does that make you feel better? You need to
14 say yes.
15     MS. STEPHENS: Yes. I will discuss it.
16     MS. BARNIER: Okay. But, okay. I'm sorry,
17 Mr. Weaver.
18     MR. WEAVER: That's fine. Any other disputes
19 that you have resolved since filing the bankruptcy that
20 we do not know about?
21     MR. WESCOTT: You are talking about with my
22 list of claims here?
23     MR. WEAVER: Any disputes you have resolved
24 after filing this bankruptcy.
25     MR. WESCOTT: I resolved a lot of disputes, but

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 179

1  they are probably not worth listed here.
2      MS. BARNIER: Any disputes over money?
3      MR. WESCOTT: I'd like to look at the list of
4  claims that I listed, because what I think is germane to
5  this discussion is for those claims that to add to a
6  significant amount are they still there or are they not.
7  I believe that there is nothing been resolved on the
8  rest of them, but I'd like to look at the list.
9      UNIDENTIFIED SPEAKER: Is this the list you are
10 talking about?
11     MR. WESCOTT: Yes. No. That's the list of
12 assets. I want the list of claims and lawsuits that I
13 may have, which I believe is Item 21 on Form 7 -- oh,
14 no. Ten days transfers. I think it is 21. No, that's
15 personal property. I can't remember the numbers.
16 Whatever the claims or lawsuits is. Here we go. No.
17 Yes. That's it, I think.
18     Yes. So that's just debts, probably. Your
19 only concern would be lawsuit type claims --
20     MR. WEAVER: I'm concerned with everything.
21     MR. WESCOTT: Okay. Well, the debts I
22 believe --
23     MR. WEAVER: I am not concerned with them, but
24 the Trustee is certainly concerned with anything you
25 have resolved that the Trustee has not approved.

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 180

1      MR. WESCOTT: None of these have been resolved.
2      MR. WEAVER: "These" being what?
3      MR. WESCOTT: This list here of the debts.
4      MS. BARNIER: Are you calling them receivable
5  debts, is that what you are calling them.
6      MR. WESCOTT: Yes, eight point six seven one
7  million dollars of debt owed to me, that is all still
8  there obviously. I want to look at this separate list
9  of lawsuits and claims, which I believe potentially
10 totals more than ten million or whatever it says. I
11 believe those are all still there as well, the rest of
12 them. I don't know -- do you have that list handy?
13     MS. BARNIER: I do. Is this what you are
14 referring to?
15     MR. WESCOTT: Yeah.
16     MS. BARNIER: I suggest next time we do this
17 that everybody come in with paper. This might be a
18 little faster since --
19     MR. ISON: I always like this.
20     MS. BARNIER: I'm sure you do, but given that
21 you cannot find it, and your client cannot find it.
22     MR. ISON: It is right here.
23     MS. BARNIER: Great. Then why does he need
24 mine?
25     MR. ISON: Oh, which -- which copy is it?

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

45 (Pages 177 to 180)

1    MR. WESCOTT: Now that I know there is no wi-fi
2    here we will bring in something so we can reference this
3    as well.
4    MS. BARNIER: It is document 25, Number 2, it
5    is labeled under personal property, B, schedule B, he
6    called it Form 6, Attachment 2. How does that help?
7    MR. WESCOTT: Can I just look at your document,
8    let's make this easy. Thank you.
9    Yes. These are all still claims that have some
10   validity. Is it going to be worth investing lots of
11   legal fees on --
12   MS. STEPHENS: Don't give them their opinion,
13   Carl. Just yes or no.
14   MS. BARNIER: So you have not settled any of
15   these disputes. Is that correct?
16   MR. WESCOTT: I have not.
17   MS. BARNIER: Are there any other disputes that
18   you believe you might have that have not been listed
19   here?
20   MR. WESCOTT: Not of any significant value, no.
21   MS. BARNIER: Not my question.
22   MS. STEPHENS: Yes or no.
23   MR. WESCOTT: I have got a lot of disputes that
24   probably have no value to the estate.
25   MS. BARNIER: One more time, we will try it,

1    maybe I will just have your wife answer the questions
2    for you, that may be easier.
3    MR. WESCOTT: That may be easier.
4    MS. BARNIER: Are there any other disputes that
5    you have that may be of any value to the estate that are
6    not listed on your Schedule B?
7    MR. WESCOTT: No.
8    MS. BARNIER: Okay.
9    MR. WEAVER: Let me go back on -- you indicated
10   there was one appraisal on this Livery property in
11   Uruguay in 2011. I assume that was in conjunction with
12   the loan you received, the 500,000?
13   MR. WESCOTT: No.
14   MR. WEAVER: What was it for?
15   MR. WESCOTT: At that time, I was still hoping
16   to develop the property.
17   MR. WEAVER: What did you do with the appraisal
18   when you got it?
19   MR. WESCOTT: I read it.
20   MR. WEAVER: What did you anticipate doing with
21   it?
22   MR. WESCOTT: I was hoping that I could raise
23   money for the development using the appraisal.
24   MR. WEAVER: Did you show the appraisal to
25   anybody?

1    MR. WESCOTT: I'm sure I've shared it with at
2    least a few individuals, I have to think back to who
3    they were. You know, I think I did provide a copy to
4    Michael Palmer, I just don't know what the sequence of
5    events was.
6    MR. WEAVER: Any appraisals that you are aware
7    of on one hundred acres before the 2011 appraisal?
8    MR. WESCOTT: No.
9    MR. WEAVER: That's the first and only one you
10   are aware of?
11   MR. WESCOTT: Correct.
12   MR. WEAVER: When the property was originally
13   purchased, was an appraisal done on the property?
14   MR. WESCOTT: No.
15   MR. WEAVER: How did you determine the value?
16   MR. WESCOTT: By looking around at the market.
17   I spent eight months looking at every beach property
18   available, or property close to the beach in Uruguay,
19   and started to understand a little bit about the market.
20   This would seem like a reasonable deal.
21   MR. WEAVER: You paid one point two million for
22   that property, as I recall.
23   MR. WESCOTT: Correct, not including closing
24   costs, attorneys fees, et cetera.
25   MR. WEAVER: Where did that money come from?

1    MR. WESCOTT: Part of it came -- I provided all
2    of it. Part of it was borrowed.
3    MR. WEAVER: Borrowed from whom?
4    MR. WESCOTT: I'd have to look back at the -- I
5    believe actually some of it was borrowed from your
6    client.
7    MR. WEAVER: But you are one hundred percent
8    owner of Livery SA. Is that correct?
9    MR. WESCOTT: That is correct.
10   MR. WEAVER: There's not a one percent owner
11   for a local person, like this is on this other property?
12   MR. WESCOTT: No. I don't believe that is the
13   case.
14   MR. WEAVER: By you, I mean Carl Wescott not
15   one of the entities.
16   MR. WESCOTT: Correct.
17   MR. WEAVER: You are still the sole owner with
18   the exception of the lots that have been sold?
19   MR. WESCOTT: That is correct. Now, Michael
20   Palmer is threatening to initiate a lawsuit and, you
21   know, wants the property signed over to him per the
22   terms of our loan agreement.
23   MR. WEAVER: Is he listed as one of the
24   creditors in the schedules?
25   MS. BARNIER: I did not see him but I might be

Case: 12-03148   Sub Exhibit D - 341 Hearing and Deposition Transcripts   D-124 of 228
47

Page 185

1  mistaken. Is he listed?
2        MR. WESCOTT: He is not listed.
3        MS. BARNIER: There is another amendment that
4  needs to be made, it sounds like.
5        MR. WESCOTT: It is -- I was thinking of it as
6  a Livery SA obligation.
7        MS. BARNIER: I thought you just explained that
8  he plans to sue you for the money.
9        MR. WESCOTT: Sue the entity, sue whoever.
10       MR. WEAVER: You are one hundred percent owner
11  of Livery?
12       MR. WESCOTT: That is correct.
13       MS. BARNIER: How do you know Mr. Palmer?
14       MR. WESCOTT: I met him years ago in Santa
15  Barbara.
16       MS. BARNIER: Is he a personal friend?
17       MR. WESCOTT: Yeah. I would call him a friend.
18  I met him through Monette originally seven years ago.
19       MS. BARNIER: Is Mr. Palmer a personal friend
20  of yours, Ms. Stephens?
21       MS. STEPHENS: He is. We were business
22  colleagues years ago, and realized we both lived in
23  Santa Barbara, even though we were working up here.
24       MS. BARNIER: Go ahead. Sorry.
25       MR. WEAVER: We got, by e-mail, the Trustee's

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 186

1  attorney was kind enough to send us copies a day or two
2  ago on various appraisals, and I have one appraisal of
3  the Glenn Court property. Do you have any other
4  appraisals of the Glenn Court property that you can
5  provide?
6        MR. WESCOTT: We had two we actually provided,
7  both of which I believe to be fraudulent and created by
8  your client. I'm sorry. There is a third one. The
9  same appraiser who appraised the property one point five
10  million for Mr. Ficter, who gave me that appraisal as
11  part of the property, as soon as we closed, and I went
12  ahead to get a bank loan, reappraised the same property
13  a few months later for 880 thousand dollars. That is
14  when I realized there was fraud involved in the sale of
15  that property by your client.
16       MR. WEAVER: You have that appraisal?
17       MR. WESCOTT: I have a copy of that somewhere.
18  Yes.
19       MR. WEAVER: Can we get a copy of the 880
20  thousand dollar appraisal.
21       MR. WESCOTT: I'll try to dig it up.
22  Absolutely.
23       MR. WEAVER: Did you have a loan appraisal when
24  you borrowed money against that property?
25       MR. WESCOTT: That's what that was, I used that

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 187

1  appraisal for the loan.
2        MR. WEAVER: Did you tell my client that the
3  property appraised at 880 thousand dollars?
4        MR. WESCOTT: Correct.
5        MR. WEAVER: When you got the loan?
6        MR. WESCOTT: I told him, yes, once I got the
7  appraisal, because I immediately informed your client,
8  and he said he was going the adjust the deal and make it
9  fair.
10       MR. WEAVER: How did you inform him?
11       MR. WESCOTT: In person, I think I e-mailed him
12  first and then talked to him in person.
13       MR. WEAVER: Can we got a copy of the e-mail
14  too?
15       MR. WESCOTT: Yeah, I'll look for that.
16       MR. WEAVER: And he said he was going to adjust
17  the loan, is that in an e-mail or is what --
18       MR. WESCOTT: He said that verbally. That is
19  what he represented for a few months.
20       MR. WEAVER: When did this happen?
21       MR. WESCOTT: In 2010, I believe it was.
22       MR. WEAVER: Roughly what month?
23       MR. WESCOTT: I believe it was February 25 or
24  so the property was deeded. I believe it was April or
25  so that we had the appraisal. So I believe it was April

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 188

1  through July or so that he said he was going to make it
2  right.
3        MR. WEAVER: When did you get the financing on
4  the property?
5        MR. WESCOTT: Somewhere in there, I would guess
6  around May or so.
7        MR. WEAVER: The property was eventually lost,
8  right?
9        MR. WESCOTT: That's correct.
10       MR. WEAVER: What happened?
11       MR. WESCOTT: It is foreclosed.
12       MR. WEAVER: Did you transfer a deed in lieu or
13  did you allow the sale to go through?
14       MR. WESCOTT: No. It was foreclosed.
15       MR. WEAVER: Do you know what the sale was?
16       MR. WESCOTT: I believe that is in our file,
17  schedules, approximately somewhere in 2011. Probably in
18  Q 1 or Q 2 but the date is in the schedules.
19       MR. WEAVER: Did you ever make any payments on
20  the loan that you took out in May 2010?
21       MR. WESCOTT: I did.
22       MR. WEAVER: How many?
23       MR. WESCOTT: I'm not sure of the exact number
24  but I would guess three or four, essentially, you know,
25  all of our loans, somewhere around July or August we

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Case: 12-03148  Sup. Exhibit D - 341 Hearing and Deposition Transcripts  D-125 of 225
47

1    stopped paying, and this is one of them.
2        MR. WEAVER: So as I understand: On the
3    (inaudible) property, you got one appraisal, that's it?
4        MR. WESCOTT: That's correct.
5        MR. WEAVER: And you are aware of three
6    appraisals on the Glenn Court property?
7        MR. WESCOTT: Correct, two of which were
8    provided by Mr. Ficter to me and one I got myself after
9    the fact.
10       MR. WEAVER: Two we have, and then there's the
11   one for the 880 thousand that you are going to provide?
12       MR. WESCOTT: Correct.
13       MR. WEAVER: The Gunvor SA, what other interest
14   does it have?
15       MR. WESCOTT: The main thing that it owns, if
16   memory serves, is 2 Longhorn Ridge Road LLC. And the
17   main asset of that LLC used to be a property and now is
18   a claim against Old Republic.
19       MR. WEAVER: Okay. It is also the general
20   partner of Ivy Partners, as I understand.
21       MR. ISON: I think it is the managing member or
22   the general partner, yeah. But I don't think there's
23   much value in its position, there.
24       MR. WEAVER: Does Gunvor have an interest in
25   Livery LLC or Livery SA?

1        MR. WESCOTT: No.
2        MR. WEAVER: Again, you are the sole owner of
3    Gunvor?
4        MR. WESCOTT: I am the sole owner of both of
5    those SAs.
6        MR. WEAVER: I have got nothing. Michael.
7        UNIDENTIFIED SPEAKER: Just a few, I'm a little
8    confused. The East Road LLC.
9        MR. WESCOTT: Is that a complete name? Are you
10   talking about 11385 East Road LLC?
11       UNIDENTIFIED SPEAKER: Did that have a separate
12   bank account?
13       MR. WESCOTT: You know, it used to have one
14   years ago, correct.
15       UNIDENTIFIED SPEAKER: Laterally it didn't?
16       MR. WESCOTT: Excuse me?
17       UNIDENTIFIED SPEAKER: After a while it stopped
18   having its own bank account?
19       MR. WESCOTT: It has not had an account in a
20   long time, I would think a couple years.
21       UNIDENTIFIED SPEAKER: What's the status of
22   that property?
23       MR. WESCOTT: It was foreclosed. 2010.
24       UNIDENTIFIED SPEAKER: 2010. The 7950 Hearst
25   Road, Willits.

1        MR. WESCOTT: Foreclosed.
2        UNIDENTIFIED SPEAKER: It was transferred to a
3    7958 Hearst Road LLC.
4        MR. WESCOTT: Correct. I transferred it to the
5    LLC, correct.
6        UNIDENTIFIED SPEAKER: What did you receive
7    from the LLC for the transfer?
8        MR. WESCOTT: It is a disregarded entity.
9        UNIDENTIFIED SPEAKER: I'm sorry?
10       MR. WESCOTT: The LLC is a disregarded entity.
11   And so this -- the same percentage of beneficial
12   ownership was owned by the grantor and the grantee in
13   that transaction. So it was essentially a transfer to
14   my own LLC for liability and other reasons.
15       UNIDENTIFIED SPEAKER: Right. So you did not
16   receive anything?
17       MR. WESCOTT: Correct. Well, I personally
18   owned the property beforehand. Afterwards, I owned the
19   LLC that owned the property. There's no change in the
20   value that I personally had. I just then owned it
21   through the LLC.
22       So my attorney explained to me that when you do
23   that, there's no cash consideration, and you write on
24   the deed something about some code, I think it is 11292
25   or whatever it is.

1        UNIDENTIFIED SPEAKER: That's for transfer
2    taxes purposes.
3        MR. WESCOTT: Correct.
4        UNIDENTIFIED SPEAKER: Who is your attorney on
5    that one?
6        MR. WESCOTT: I believe that was Klueger and
7    Stein that did the grant deeds.
8        UNIDENTIFIED SPEAKER: When was that, you did
9    that transfer after you had stopped paying payments on
10   the mortgage?
11       MR. WESCOTT: No. Actually, I just realized it
12   was -- that it wasn't, that actually was Monette's
13   property, and was transferred into her LLC, the LLC was
14   owned by her. But, no. The payments were made, I
15   believe, through -- well, I think through August 2010.
16   I think the transfer was before that. I think you have
17   the information in the schedules, but I think it was
18   more like June that we effectuated that.
19       UNIDENTIFIED SPEAKER: You said it goes to
20   Monette's LLC. Is she the managing member of 7950
21   Hearst Road LLC?
22       MR. WESCOTT: She was at the time of the
23   transfer, correct. And she probably still is. I'm
24   trying to think. Yes.
25       UNIDENTIFIED SPEAKER: Okay. And you

## Page 193

1  transferred -- but it says here that you transferred.
2  Did you have an interest in that property at any time?
3  MR. WESCOTT: I did. I owned that property
4  through -- I believe it is, assuming that I got it back
5  from Jeremy before February 2010, I believe I owned it
6  as of February 13, 2010. I can't remember all the
7  dates.
8  UNIDENTIFIED SPEAKER: Transferring here in
9  November of 2010.
10  MR. WESCOTT: To the LLC.
11  UNIDENTIFIED SPEAKER: Yes. All right. So
12  Monette owned the LLC.
13  MR. WESCOTT: I believe that's the case.
14  UNIDENTIFIED SPEAKER: But you transferred the
15  property. So what did you receive from Monette for that
16  transfer?
17  MR. WESCOTT: I didn't receive anything. I
18  think I clarified in my earlier testimony that I believe
19  it went from her personally owning it to the LLC that
20  she was the managing member of and owner of.
21  UNIDENTIFIED SPEAKER: Was that an income
22  generating property?
23  MR. WESCOTT: It was, at different times. That
24  property had been sold in a wrap deal for two point two
25  five million dollars, and a 391 thousand dollar down

## Page 194

1  payment was taken. And then there was a series of -- it
2  was supposed to be an installment sale with interest
3  payments and principal paydowns, but no cash payments
4  were ever received by the buyers, whose names were Cody
5  Bassett and Andre Especialli.
6  So it was sold at a wrap. Money was taken.
7  But monthly payments were not made by them.
8  UNIDENTIFIED SPEAKER: Was that -- by income
9  producing, did it generate rent of any kind?
10  MR. WESCOTT: Well, technically it wasn't rent.
11  Technically there were supposed to be interest payments.
12  UNIDENTIFIED SPEAKER: Okay.
13  MR. WESCOTT: It was supposed to generate
14  income, and it did generate income in the past.
15  UNIDENTIFIED SPEAKER: What was the property
16  used for?
17  MR. WESCOTT: It was a residence. When I first
18  sold the property -- again, I lease optioned it to
19  Jeremy Smith way back when, and he was making payments
20  until he closed on the purchase. At that point, it was
21  an income-producing property.
22  UNIDENTIFIED SPEAKER: Okay. I think I will
23  hold off on the bulk of these, but on -- do you still
24  own -- do you have any interest in the, what is it, 3033
25  Shattock property?

## Page 195

1  MR. WESCOTT: I believe that property was
2  foreclosed as well.
3  UNIDENTIFIED SPEAKER: When was that
4  foreclosed?
5  MR. WESCOTT: It should be in the schedules,
6  but I would guess in 2011 sometime, probably in Q 2 but
7  that's just a total guess, I believe the date is in
8  schedules.
9  UNIDENTIFIED SPEAKER: And that was a rental
10  property before the foreclosure, right?
11  MR. WESCOTT: That is correct.
12  UNIDENTIFIED SPEAKER: How much were you
13  receiving from the 3033 Shattock property per month?
14  MR. WESCOTT: It was supposed to be seven
15  thousand -- roughly 7400 dollars, I believe a month and
16  I believe a four or five year lease was signed.
17  UNIDENTIFIED SPEAKER: How many payments did
18  you get?
19  MR. WESCOTT: I -- they were behind on their
20  rent and getting further and further behind. We just
21  did -- if I had wi-fi I could tell you what we received
22  in 2010, we just finished the bookkeeping on that, but I
23  know they were behind on their payments and I cannot
24  recall the exact amount.
25  UNIDENTIFIED SPEAKER: So I will hold off until

## Page 196

1  next time when you have got more information. Thank
2  you.
3  MR. WEAVER: I have just two areas I want to
4  hit before I forget about it, like I did last time. Do
5  you have an interest in a company called AWE Inc?
6  MR. WESCOTT: I was supposed to be a
7  shareholder of that company, and -- but we I talked with
8  the principal, basically I planned to be a partner --
9  MS. STEPHENS: Yes or no.
10  MR. WESCOTT: I do not.
11  MR. WEAVER: Have you ever had an interest in
12  AWE Inc?
13  MR. WESCOTT: No.
14  MR. WEAVER: What was AWE Inc doing? What
15  was --
16  MR. WESCOTT: AWE Inc was intending to develop
17  property overseas.
18  MR. WEAVER: Is it still in existence?
19  MR. WESCOTT: I believe it is. It is owned by
20  Mark Chason.
21  MR. WEAVER: Are they developing property
22  overseas?
23  MR. WESCOTT: I don't think he is doing
24  anything. He is -- I don't think he is doing anything.
25  MR. WEAVER: Did you make any capital

Case: 12-03148  Sup. Exhibit D - 341 Hearing and Deposition Transcripts: 5 D-127 of 225
47

Page 197

1 contribution to AWE Inc.?
2       MR. WESCOTT: Nope.
3       MR. WEAVER: Any of your entities that we have
4 talked about or listed in your schedule make a
5 contribution?
6       MR. WESCOTT: No.
7       MR. WEAVER: Kid of the same questions about a
8 company called Tourwrist, T-O-U-R-W-R-I-S-T. Do you
9 have an interest in Tourwrist?
10      MR. WESCOTT: I do not.
11      MR. WEAVER: Have you ever had an interest in
12 Tourwrist?
13      MR. WESCOTT: No.
14      MR. WEAVER: Have you ever received any income
15 from Tourwrist?
16      MR. WESCOTT: I have not.
17      MR. WEAVER: Does Tourwrist owe you any money?
18      MR. WESCOTT: No.
19      MR. WEAVER: Have you ever been an advisor of
20 Tourwrist?
21      MR. WESCOTT: I am an advisor to Tourwrist.
22      MR. WEAVER: What do you do as an advisor?
23      MR. WESCOTT: I advise the company. I am on
24 the board of advisors.
25      MR. WEAVER: Do you expect to receive any

Page 198

1 compensation for that in some fashion?
2       MR. WESCOTT: I do expect compensation for it,
3 and we are finalizing those negotiations.
4       MR. WEAVER: What does Tourwrist do?
5       MR. WESCOTT: Tourwrist is a maker of online
6 and mobile panoramic photography-related software.
7       MR. WEAVER: You say you are finalizing
8 negotiations right now. Who is doing that for you? Are
9 you doing it directly? You have an attorney or you have
10 an advisor?
11      MR. WESCOTT: I am dealing with the company's
12 attorney who is Ed Vorick.
13      MR. WEAVER: Where is the company located?
14      MR. WESCOTT: In San -- well, it used to be
15 located in Tampa. I believe its corporate address is
16 probably South San Francisco right now. I'm not sure.
17      MR. WEAVER: Do you have any agreements with
18 Tourwrist for what you are doing?
19      MR. WESCOTT: We are negotiating that.
20      MR. WEAVER: Do you have any agreements in the
21 past, written agreements or oral agreements, where they
22 promised to do something for you in exchange for your
23 capacity as an advisor to Tourwrist?
24      MR. WESCOTT: Our intent is that I will become
25 an owner of that company, and I think it is worth

Page 199

1 mentioning that I am trying to find new sources of
2 income. I am talking to companies about taking a job,
3 you know, whatever I could do to try and actually make
4 money as opposed to borrow it. I think we could all
5 agree that that would be a good step forward in my life.
6       MR. WEAVER: When did you start providing
7 services as an advisor to Tourwrist?
8       MR. WESCOTT: Informally last year, but it did
9 not really heat up until this year.
10      MR. WEAVER: Last year being when in 2011?
11      MR. WESCOTT: Late 2011. In other words, I met
12 the founder and owner, I think it was in August or
13 September, and I made some introductions for him, but --
14      MS. BARNIER: What's the name of the attorney
15 that you are dealing with?
16      MR. WESCOTT: Reid McBride, I think. Reid
17 McBride.
18      MS. BARNIER: What firm is he with?
19      MR. WESCOTT: Orrick.
20      MR. WEAVER: Who is the founder that you met
21 with?
22      MR. WESCOTT: Charles Armstrong.
23      MR. WEAVER: Is he in South San Francisco?
24      MR. WESCOTT: Yeah. He lives in South of San
25 Francisco or South San Francisco, that is why I am

Page 200

1 saying that the company address may be there because the
2 company has no office, and I believe the company address
3 might be at his apartment. It might still be in Tampa,
4 Florida. I'm not sure.
5       MR. WEAVER: Does Tourwrist have a website?
6       MR. WESCOTT: It does. Tourwrist.com.
7       MR. WEAVER: T-O-U-R-W-R-I-S-T?
8       MR. WESCOTT: Yep.
9       MR. WEAVER: Do you know if there are other
10 shareholders for Tourwrist?
11      MR. WESCOTT: I believe there are.
12      MR. WEAVER: What is the capitalization of the
13 company?
14      MR. WESCOTT: It has never raised any equity.
15      MR. WEAVER: What is your expectation as to an
16 equity interest?
17      MR. WESCOTT: I don't know. I just was offered
18 point three percent of a different company to be an
19 advisor, and I'm probably going to take that, so --
20      MR. WEAVER: So there's another company. What
21 is the other company?
22      MR. WESCOTT: Called Vidquick. This is all
23 post, you know, if I get a new job now, and I believe
24 that, assuming we finalize this process, I believe that
25 I keep the income that I generate.

50 (Pages 197 to 200)

# Page 201

1    MR. ISON: Carl, answer the question.
2    MS. BARNIER: Just answer yes or no.
3    MR. WESCOTT: What's the question?
4    MR. WEAVER: What's the name of the other
5    company?
6    MR. WESCOTT: It is called Vidquick, but I
7    would appreciate if you do not interfere with my efforts
8    to get a new job and income.
9    MR. WEAVER: What does Vidquick do?
10   MR. WESCOTT: They make an online video
11   service.
12   MR. WEAVER: Where is Vidquick located?
13   MR. WESCOTT: I don't know but probably in Palo
14   Alto.
15   MR. WEAVER: What are you going to do for
16   Vidquick?
17   MR. WESCOTT: I am doing discussions to be on
18   the board of advisors.
19   MR. WEAVER: With a shareholder position being
20   promised?
21   MR. WESCOTT: I have an expectation that I will
22   get some options in the company. That's correct.
23   MR. WEAVER: And any payment of income, any
24   kind of payment for services other than that?
25   MR. WESCOTT: No. But if we were to do that,

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

# Page 202

1    it would obviously be post January 17th.
2    MR. ISON: You are not here to argue your case.
3    MR. WESCOTT: Okay. I just am getting the
4    sense that you are going to be attacking my new sources
5    of revenue, and I do not feel that that is right.
6    MR. WEAVER: Any other companies you are in
7    negotiation with as an advisor?
8    MR. WESCOTT: As an advisor, no. No companies.
9    MR. WEAVER: As a shareholder?
10   MR. WESCOTT: No.
11   MR. WEAVER: As a member?
12   MR. WESCOTT: I am talking to multiple
13   companies about taking a job, and I don't think it is --
14   is it really --
15   MS. STEPHENS: There's no companies now, Carl,
16   so just say no.
17   MR. WESCOTT: There's no companies now, but I
18   would like to find a job or something that generates
19   income.
20   MR. WEAVER: You still have an expectation to
21   stay in the U.S.?
22   MR. WESCOTT: Correct.
23   MR. WEAVER: In the Bay Area?
24   MR. WESCOTT: The jobs I'm looking for are
25   here.

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

# Page 203

1    MR. WEAVER: Do you have any planned trips as
2    we sit here today to South America?
3    MR. WESCOTT: Yes. I'm going to Ecuador on
4    Saturday.
5    MS. BARNIER: How are you going to pay for that
6    trip since your you are turning over the --
7    MR. WESCOTT: I already paid for it.
8    MS. BARNIER: With what moneys?
9    MR. WESCOTT: With the flight certificates.
10   MS. BARNIER: But that's property of the
11   bankruptcy estate.
12   MR. WESCOTT: It is my understanding that that
13   is non-transferable.
14   MS. BARNIER: It is property -- it is property
15   of the bankruptcy estate. You are going to have to turn
16   it over. That's already been explained. If you want me
17   to go into court and get a turnover order, I can do
18   that, but it is property of the bankruptcy estate.
19   MS. STEPHENS: That's --
20   MR. WESCOTT: Any questions on that, Mr. Ison,
21   right.
22   MR. ISON: You are asking me a question?
23   MS. BARNIER: I'm asking you a question.
24   MR. ISON: I am not under oath and I am not
25   here to be testifying.

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

# Page 204

1    MS. BARNIER: I understand that, Mr. Ison. I
2    am just trying to elicit your support in explaining to
3    your client that if they were pre-petition, which he had
4    them, which he has explained they were, it belongs to
5    the bankruptcy estate. I understand his position. He
6    does not believe they are transferable and he believes
7    that they belong to him. Is that his position? Is that
8    your position they belong to you?
9    MR. WESCOTT: They are valueless to anybody
10   else at this point.
11   MS. BARNIER: That's your opinion, correct?
12   MR. WESCOTT: That is my opinion.
13   MS. BARNIER: Great. Okay. I have already
14   gone through this one more time. I want to make it real
15   clear: They need to be transferred over and sent to the
16   Trustee. Any questions on that one?
17   MR. WESCOTT: Sure, but there is two --
18   MR. ISON: You are not here to argue. Do you
19   understand what she is saying?
20   MR. WESCOTT: I understand what she is saying,
21   and I already offered to send over the pins and
22   certificates that I do have.
23   MS. BARNIER: And the one that you have already
24   redeemed that you have paid for also belongs to the
25   bankruptcy estate. So if you are planning on

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Case: 12-0314 Sup D Exhibit D - 341 Hearing and Deposition Transcripts D-129 of 228

1   travelling, you are going to have to raise your own cash
2   to do that, from whatever sources you have.
3       MR. WESCOTT: Are you suggesting that I should
4   cancel the current trip?
5       MS. BARNIER: You may do whatever you wish,
6   sir.
7       MR. WESCOTT: It will have no value if I do.
8   It is a non-refundable ticket. I'm trying to understand
9   what I should be doing here.
10      MS. BARNIER: You can talk to your counsel
11   about what you should do. I am saying it is an asset of
12   the bankruptcy estate, it belongs to the bankruptcy
13   estate. It could be released to you later on. But at
14   the time of filing, it belongs to the bankruptcy estate.
15   I have made it real clear, you know. So you can turn it
16   over. So I guess that would mean it still belongs, even
17   if you redeemed it, it still belongs to the bankruptcy
18   estate.
19      MR. WESCOTT: Okay. I'll provide the numbers.
20      MR. ISON: These flight credits you've been
21   using for travel, when did you buy those flight credits?
22      MR. WESCOTT: In August -- well, I don't know
23   when I bought them, but I think they were appraised
24   around June but they were for a trip last August.
25      MS. STEPHENS: They weren't credits. They were

1   for a refund, you decided I'll save this ticket and use
2   it at a later date. Is that right?
3      MS. STEPHENS: Well, you cannot get a refund.
4      MR. WESCOTT: The tickets are -- generally, I
5   buy non-refundable tickets because refundable tickets
6   cost a lot more money. So here is my understanding: I
7   purchase a flight. I don't take that flight. If I do
8   not call ahead of time, it immediately has no value. If
9   I call ahead of time, I can pay a change fee, and I and
10   I alone can use that flight. Sometimes there's
11   restrictions on where you can go. It has to be the same
12   trip sometimes.
13      So I am calling that flight credit. It is a
14   non-refundable non-transferable thing.
15      MS. BARNIER: So you like the term flight
16   credit. What your wife just explained that happened in
17   June of 2011. That happened, you were not able to go on
18   a trip. So you had one flight credit. Is that right?
19      MR. WESCOTT: Yeah. The majority of this comes
20   from one ticket from, that was bought around June that I
21   think was going to be taken in August.
22      MS. BARNIER: How much did you pay for the
23   ticket?
24      MR. WESCOTT: It was I think four thousand
25   dollars, something like that.

1   from flights that he did not take that he had already
2   bought tickets for, and he is using the flight, the
3   tickets that he had already bought.
4      MR. WESCOTT: They are non-transferable flight
5   credits.
6      MS. BARNIER: That's Mr. Weaver's question.
7   When did you buy those tickets?
8      MR. WESCOTT: In June -- approximately June
9   2011, I believe. It was for a trip that was going to be
10   taken in August 2011.
11      MS. BARNIER: Mr. Wescott, you have already
12   testified that you have taken, I believe four trips
13   right? So you had one trip that you did not take, so
14   that would be one trip. So how did you get these for
15   the other three trips?
16      MR. WESCOTT: What do you mean how did I get
17   these?
18      MS. BARNIER: Well, help me out here. Maybe
19   I'm misunderstanding the nature of these. What your
20   wife just explained is that you received, I am going to
21   call it a voucher, that just seems easier to me, you do
22   not like that term, you can call it ticket, whatever you
23   want to call it. That you got these because you did not
24   go on a trip you said, hey I cannot go on the trip, so
25   it still lies there with you, right. Instead of asking

1      MS. BARNIER: So for four thousand dollar
2   ticket, what airline?
3      MR. WESCOTT: Used to be Continental. Now
4   United after the merger.
5      MS. BARNIER: So you bought one four thousand
6   dollar ticket, you could not go. And so now you have
7   managed to take three trips, four trips on the one four
8   thousand dollar ticket?
9      MR. WESCOTT: Yeah. And I have taken, I think
10   at least four trips on that. When I -- I went to
11   Honduras, for example, which normally costs 500
12   something dollars round trip to go to Honduras. The
13   short answer is yes.
14      MS. BARNIER: So did you fly economy to
15   Honduras?
16      MR. WESCOTT: Correct. I always fly economy.
17   And I always by the cheapest ticket and I almost always
18   get upgraded because of --
19      MS. STEPHENS: Just --
20      MR. WESCOTT: Yes, I bought the cheapest
21   economy ticket in every case.
22      MS. BARNIER: Have you been upgraded?
23      MR. WESCOTT: I've been upgraded almost every
24   time.
25      MS. BARNIER: Why were you upgraded?

Case: 12-0314 Sup Exhibit D - 341 Hearing and Deposition Transcripts 3:5 D-130 of 228 of 47

Page 209

1     MR. WESCOTT: Because of, that's the way they
2  do it if you have status of the airline.
3         MS. STEPHENS: Because he flies a lot.
4         MS. BARNIER: You have status with the airline.
5         MS. STEPHENS: With now United. That's
6  correct.
7         MR. BARNIER: With United now, so you get
8  upgraded. On what basis do they decide that?
9         MR. WESCOTT: Basically, what they do is, as I
10 understand it, I am not an employee of the airline, but
11 my understanding is they try and sell every business
12 class seats that they can. Then in order of status to
13 those who pay for upgrades, they will do that, and post
14 merger you can either do that regional upgrades --
15        MS. STEPHENS: Carl, she does not need to know
16 all the details.
17        MR. WESCOTT: No. She asked me the question,
18 and, frankly, your understanding is wrong, and I'm
19 trying to correct it.
20        Would you like the information?
21        MS. BARNIER: Absolutely. I like being
22 corrected by Stanford grads.
23        MR. WESCOTT: So once they've gone through the
24 list in order of status for everybody that pays for the
25 upgrade, if there is any seats remaining, then they

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 210

1  upgrade people in order of status, and there is tie
2  breakers for the remaining seats for free upgrades.
3         MS. BARNIER: And it is your understanding you
4  get upgraded because you have flown so many times with
5  United Airlines?
6         MR. WESCOTT: What is now United. That's
7  correct. To get this, correct.
8         MS. BARNIER: So it is your understanding that
9  of that -- so how much was your ticket to Honduras, 500
10 dollars. Is that what you said?
11        MR. WESCOTT: Something like that.
12        MS. BARNIER: That was round trip?
13        MR. WESCOTT: Correct, 500 something including
14 taxes.
15        MS. BARNIER: And your next ticket, after where
16 did you go, to Ecuador wasn't that right?
17        MR. WESCOTT: Well, the two trips I took prior
18 to the 341 meeting that you asked for the boarding
19 passes for were I think were Ecuador and Honduras, and I
20 provided those. And I believe in both of those cases, I
21 was upgraded on most of the legs, if that is what you
22 are asking.
23        MS. BARNIER: No. My question was how much did
24 you pay for the ticket?
25        MR. WESCOTT: I don't recall what the other

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 211

1  ticket was, but it was also under a thousand dollars.
2  Generally it is pretty cheap -- ironically it usually
3  costs more money to fly within the U.S. than it does to
4  fly to South America or Central America.
5         MS. BARNIER: Let's just stick with the
6  question. Real simple. You flew to Honduras, one time,
7  that ticket, round trip you paid 500 dollars?
8         MR. WESCOTT: I believe 500 something dollars,
9  that's usually what it is.
10        MS. BARNIER: Then you flew twice to Ecuador.
11 Is that right?
12        MR. WESCOTT: I think I have only flown once to
13 Ecuador this year.
14        MS. BARNIER: You paid a thousand dollars for
15 that ticket?
16        MR. WESCOTT: I think I paid under a thousand
17 dollars for that ticket.
18        MS. BARNIER: How much did you pay?
19        MR. WESCOTT: I'm not sure.
20        MS. BARNIER: What other flights have you
21 taken?
22        MR. WESCOTT: I have been to Honduras again
23 since then, and I also went to Argentina and Uruguay and
24 back.
25        MS. BARNIER: Were the Honduras and Uruguay

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 212

1  trips separate or together?
2         MR. WESCOTT: Separate trips.
3         MS. BARNIER: One trip to Honduras. How much
4  did you pay for that ticket.
5         MR. WESCOTT: Probably the same sort of 500,
6  you know, four something plus taxes, 500 something. I
7  would guess. That's what it usually is.
8         MS. BARNIER: Your trip to Uruguay through
9  Argentina, how much did you pay for that?
10        MR. WESCOTT: I am not sure of the exact
11 amount. But I believe it was on the order of a thousand
12 dollars.
13        MS. BARNIER: Those were all round trip,
14 correct?
15        MR. WESCOTT: Correct, with taxes.
16        UNIDENTIFIED SPEAKER: How about your trip to
17 Arizona for Opening Day?
18        MR. WESCOTT: I think I used -- did I use miles
19 for that? No. That was -- let me think. Was that a
20 miles? Yeah. I used miles for that.
21        MS. BARNIER: Which airline did you use miles
22 on?
23        MR. WESCOTT: On United.
24        UNIDENTIFIED SPEAKER: How many miles do you
25 still have with United?

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Case: 12-0314  Sup DExhibit-D - 341 Hearing and Deposition Transcripts 3:5D-13 Page 228
of 47

| Page 213 | | Page 215 |
|---|---|---|

Page 213

1   MR. WESCOTT: I'm not sure.
2       UNIDENTIFIED SPEAKER: More than 100,000?
3   MR. WESCOTT: More than 100,000.
4       UNIDENTIFIED SPEAKER: More than a million?
5   MR. WESCOTT: No.
6       UNIDENTIFIED SPEAKER: Can we get some
7   information on the miles that you have banked with
8   United and any other airline?
9       MR. WESCOTT: Sure. I believe those are
10  non-transferable too, but I'd be happy to provide the
11  information.
12      MS. BARNIER: Just for the record, I only
13  received one that your attorney forwarded to me on the
14  trips that you have taken so far.
15      MR. WESCOTT: Correct. What I sent was on one
16  of them, there's the boarding passes, and the other I
17  had an e-mail from United that they could not generate
18  the boarding passes I had at that time. So on that one,
19  as I explained to Mr. Ison I believe I used a mobile
20  boarding pass on my phone that I no longer have a copy
21  of.
22      MS. BARNIER: Let's make this clearer because
23  you and I seem to be talking cross purposes over this.
24  So you still have, I believe, one of the credits. So do
25  you have any information on the credit that you still

Page 214

1   have?
2       MR. WESCOTT: Yes. I'll e-mail that.
3       MS. BARNIER: Do you want to send that to your
4   for document request, I would like all information on
5   the credits that you will have on your United or
6   Continental or any other airline that you may have used.
7       MR. WESCOTT: It is only on United, and it is
8   post merger. There is just one.
9       UNIDENTIFIED SPEAKER: You indicated that you
10  have to give some advance notice so you do not lose the
11  credit. How much advance notice do you have to give?
12      MR. WESCOTT: I think it is an hour.
13      UNIDENTIFIED SPEAKER: So you have plenty of
14  time to cancel the flight that you have got scheduled
15  right now?
16      MR. WESCOTT: That is correct.
17      MS. BARNIER: Where were you planning on going?
18      MR. WESCOTT: I was planning on going to
19  Ecuador.
20      MS. BARNIER: For what purpose?
21      MR. WESCOTT: To try and find some deals to
22  make some money with.
23      MS. BARNIER: Are there people in Ecuador who
24  are willing to invest in these properties with you?
25      MR. WESCOTT: I won't know until I try to put a

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 215

1   deal together. Generally, you cannot present something
2   to an investor until you have something put together.
3       MS. BARNIER: Are they Ecuadorian investors
4   that you are asking for money from?
5       MR. WESCOTT: No. I don't -- for the most part
6   I don't know too many Ecuadorians who have money.
7       MS. BARNIER: So they are United States
8   citizens that you are looking to put a package together
9   for?
10      MR. WESCOTT: Yeah. If I am able to succeed,
11  it would be mostly with North American, European
12  investors. Probably mostly North American.
13      MS. BARNIER: Okay. All right. So the Trustee
14  has already indicated this is going to be continued at
15  9:30, June 20th. And we will have the schedules amended
16  and filed, and the documents produced from today, plus
17  the 2004 exam order that is coming up.
18      Thank you.
19      (End of recording)
20      -oOo-
21
22
23
24
25

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

Page 216

1   State of California
2   County of Sonoma
3
4
5
6
7
8       CERTIFICATE OF TRANSCRIBER
9
10
11      I hereby certify that the foregoing
12  transcription in the within-entitled cause was
13  transcribed by me, CHRISTINE GOODIN, a Certified
14  Shorthand Reporter and disinterested person, and was
15  thereafter transcribed into typewriting.
16
17
18      Dated: June 18, 2012
19
20
21
22
23      Christine Goodin
24
25

Audio Recording of: 341 Meeting  - 5/9/2012
West Coast Reporters, Inc. * 415-472-2361

54 (Pages 213 to 216)

Case: 12-0314Sup. Exhibit D - 341 Hearing and Deposition Transcripts 3:5D-132 pg 228
of 47

# In Re: Carl Wescott

## No. 12-30143 DM

## Audio Recording of: 341 Meeting

## June 20, 2012



117 Paul Drive, Suite A
San Rafael, CA 94903
(800) 979-2361

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

In Re:
CARL ALEXANDER WESCOTT and
MONETTE ROSEMARIE STEPHENS

Debtors.                    No. 12-30143 DM
_____/

TRANSCRIPT OF AUDIO RECORDING OF 341 MEETING
June 20, 2012
_____

TRANSCRIBED BY:  CHRISTINE GOODIN

WEST COAST REPORTERS
117 PAUL DRIVE, SUITE A
SAN RAFAEL, CALIFORNIA 94903
(800) 979-2361 * 1 (415) 472-2361
                                        1

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

```
                          -oOo-
1        TRUSTEE HOSKINS:  All right.  Good morning.
2    Today is Wednesday, June 20th, 2012, approximately 9:30
3    a.m.  My name is Janina Hoskins.  I am the Chapter 7
4    Trustee appointed to the case of Monette Rosemarie
5    Stephens and Carl Alexander Wescott, Case Number 12 dash
6    30143.
7        This is a continued meeting of creditors.  Both
8    debtors are present.
9        Would you please raise your right hands?
10   (Debtors sworn)
11       TRUSTEE HOSKINS:  Thank you.  Would you each
12   state your full names for the record.
13       MS. STEPHENS:  Monette Rosemarie Stephens.
14       MR. WESCOTT:  And Carl Alexander Wescott.
15       TRUSTEE HOSKINS:  Thank you.  Counsel is
16   present, and she will be handling the examination today.
17   I'll be in the next room if any issues come up.
18       MS. BARNIER:  Thank you.
19       So let's start with the glaring couple issues.
20   Number 1, earlier in April, you, both of you maintained
21   you had to have separate counsel; you had separate
22   interests at the time, and you delayed the proceedings
23   until you got separate counsel.  And now you have joint
24   counsel.
25
```

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1   Is that correct?
2        MR. WESCOTT:  That is correct.
3        MS. BARNIER:  So you no longer have separate
4   interests?
5        MR. WESCOTT:  We're not sure.  We are mostly
6   aligned.
7        MS. BARNIER:  In reviewing the e-mails that
8   your previous counsel sent to me, he said that you had
9   proceeded with divorce proceedings.
10       Is that accurate, Mr. Wescott?
11       MR. WESCOTT:  We had proceeded with legal
12  separation, or with separation.
13       MS. BARNIER:  And so have you filed for legal
14  separation?
15       MR. WESCOTT:  No.  We actually haven't.
16       MS. BARNIER:  Do you plan to file for legal
17  separation?
18       MS. STEPHENS:  We have both been talking to
19  counsel who have recommended that we get through this
20  bankruptcy.  So first thing's first.
21       MS. BARNIER:  So you are not going to separate
22  during, while the bankruptcy is pending.  Is that --
23       MS. STEPHENS:  Well, we've been separated, like
24  we have been trying to figure that out, actually.  We
25  have three very young kids.  We are trying to figure

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1   out --
2        MR. WESCOTT:  I don't think we can fully
3   predict the future.
4        MS. BARNIER:  Well, I -- the reason for my
5   questions is:  I don't want to be in another situation
6   where you come back and say:  Oh, gee, our interests
7   have separated again, and we need another delay.  So
8   that's the reason I am probing so hard as to these
9   questions.
10       Are you still living in the same house
11  together?
12       MS. STEPHENS:  I am moving my stuff to Santa
13  Barbara.  I have been -- I am hoping to find a place in
14  Southern California sometime this summer.
15       MS. BARNIER:  When do you plan to leave the
16  area?
17       MS. STEPHENS:  I have not determined that yet.
18  I will be available for whatever we need to do.  It is
19  my goal to cooperate with the Court in trying to get
20  this thing -- get through this process.
21       MS. BARNIER:  Okay.  And so are you going to
22  return to the home that you own in Santa Barbara?
23       MS. STEPHENS:  We currently still have that
24  place.  It is in foreclosure.  If I can -- I have been
25  looking for a job.  If I can try and stay there, I would

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Case: 12-03143    Sup. Exhibit D - 341 Hearing and Deposition Transcripts 3    D-135 of 228
of 47

## Page 5

1 like to stay there, but I don't know if that's possible.
2 But I have family in Southern California, so I
3 have somewhere to stay if I need to.
4 MS. BARNIER: You say you have been looking for
5 a job, Ms. Stephens. Are you looking for a job in the
6 Santa Barbara area?
7 MS. STEPHENS: I have been looking for work. I
8 consult. I have not been really working since the kids,
9 you know, I have done a couple small things since I had
10 kids. But I am looking here, I am looking -- most of
11 what I do can be done remotely with some amount of
12 travel.
13 So, I mean, travel in terms of, you know,
14 between here. So between here and I am looking in both
15 Southern California and the Bay Area. Yes.
16 MS. BARNIER: Are you currently employed?
17 MS. STEPHENS: No, I am not.
18 MS. BARNIER: Do you have any prospect of any
19 jobs that you have been promised as a consultant?
20 MS. STEPHENS: I have been meeting with people
21 pretty regularly, and -- but I don't have any offers as
22 of yet.
23 MS. BARNIER: Mr. Wescott, when you last were
24 here in April, you testified that you had applied at a
25 number of different places and expected to be employed

## Page 7

1 MS. BARNIER: So Bernard Moon has offered you a
2 consulting position. Is that correct?
3 MR. WESCOTT: It is an advisory position.
4 MS. BARNIER: An advisory. What income will
5 you be receiving?
6 MR. WESCOTT: I'll be paid in stock or options.
7 MS. BARNIER: Paid in stock.
8 MR. WESCOTT: Yeah.
9 MS. BARNIER: Okay.
10 MR. WESCOTT: That's not --
11 MS. BARNIER: Okay. So at this time, do you
12 have any job that is producing cash income?
13 MR. WESCOTT: I do not. I am working on that.
14 MS. BARNIER: Could you take out your wallet,
15 please.
16 MR. WESCOTT: Sure.
17 MS. BARNIER: And if you would do the same,
18 Ms. Stephens. If you would take out the cash in it. If
19 you count out loud the cash for me, please.
20 MR. WESCOTT: Something like 200 dollars, as
21 you will see.
22 MS. BARNIER: Ms. Stephens, if you would do the
23 same, please.
24 MR. WESCOTT: 40, 60, 80, 100 -- 120 -- 139, I
25 believe.

## Page 6

1 shortly. Are you employed?
2 MR. WESCOTT: I am not employed as a full-time
3 employee by any company.
4 MS. BARNIER: Okay. Are you a part-time
5 employee of any company?
6 MR. WESCOTT: I am an advisor to -- to --
7 actually, we have not signed the paperwork yet. But I'm
8 expecting to be an advisor to a company called Vidquik.
9 MS. BARNIER: Could you spell that?
10 MS. STEPHENS: V-I-D-Q-U-I-K.
11 MS. BARNIER: Where are they located?
12 MR. WESCOTT: Here in the Northern California.
13 MS. BARNIER: Specifically where are they
14 located?
15 MR. WESCOTT: There's no office. So I think it
16 has an address in Palo Alto, but people work out of
17 their homes. It is a tech company.
18 MS. BARNIER: And what's the principal of the
19 company?
20 MR. WESCOTT: There's actually multiple.
21 MS. BARNIER: Who is the president?
22 MR. WESCOTT: I believe it is Bernard Moon.
23 MS. BARNIER: Is that who you have been dealing
24 with?
25 MR. WESCOTT: Yeah.

## Page 8

1 MS. BARNIER: 139 dollars in cash?
2 MR. WESCOTT: Uh-huh.
3 MS. BARNIER: Ms. Stephens, how much do you
4 have in your wallet?
5 MS. STEPHENS: Five dollars.
6 MS. BARNIER: Five dollars. Could you leave
7 your wallet out, please. I'm not quite done.
8 MR. WESCOTT: Okay.
9 MS. BARNIER: So you have $139 in cash, and I
10 believe you testified that you had no income as of
11 January.
12 MR. WESCOTT: Correct.
13 MS. BARNIER: So what is the source of the 139
14 dollars cash?
15 MR. WESCOTT: I have been continuing to borrow
16 money, including from my mother.
17 MS. BARNIER: So you have borrowed money from
18 your mother. How much money from your mother?
19 MR. WESCOTT: Five grand from my mother.
20 MS. BARNIER: Five thousand dollars from your
21 mother. Anyone else?
22 MR. WESCOTT: Yeah.
23 MS. STEPHENS: 10,000 dollars from his father.
24 MS. BARNIER: 10,000 dollars from your father.
25 MS. STEPHENS: From Carl's father.

Page 9

1   MS. BARNIER: Carl's father. Okay.
2   Have you borrowed any money, Ms. Stephens?
3   MS. STEPHENS: I borrowed the money from his
4   father.
5   MS. BARNIER: You borrowed the money. So you
6   received the 10,000 dollars. Okay.
7   And you received five thousand dollars from
8   your mother. Is that correct?
9   MR. WESCOTT: That's correct.
10  MS. STEPHENS: I borrowed the money from your
11  mother, actually.
12  MS. BARNIER: So, Ms. Stephens, you received
13  also the five thousand dollars --
14  MS. STEPHENS: He did not receive it
15  separately. His mother gave me money, or gave it to.
16  MS. BARNIER: To you, for the kids.
17  So you borrowed 15,000 dollars from
18  Mr. Wescott's parents to support your children. Is that
19  accurate?
20  MS. STEPHENS: That's pretty accurate.
21  MS. BARNIER: So, Mr. Wescott, you have not had
22  any sources of cash because your wife just testified
23  that the cash you borrowed went to the support of your
24  children. So once again I'll ask the question: Where
25  did the 139 dollars cash come from?

Page 10

1   MR. WESCOTT: You cannot tell which dollar came
2   from where; cash is commingled but --
3   MS. STEPHENS: We have been commingling the
4   money that have been -- we are still using the same
5   money.
6   MR. WESCOTT: I borrowed money from other
7   sources as well.
8   MS. BARNIER: Let's keep going then,
9   Mr. Wescott, because that was the testimony, that was
10  the questioning. Let's be forthcoming. Who else have
11  you borrowed money from?
12  MR. WESCOTT: So I borrowed five thousand
13  dollars from my friend Paul.
14  MS. BARNIER: Paul who?
15  MR. WESCOTT: Paul Lieb, L-I-E-B. And --
16  MS. BARNIER: Did you sign a note for that?
17  MR. WESCOTT: I did.
18  MS. BARNIER: Do you have a copy of that note?
19  MR. WESCOTT: I have one, yes.
20  MS. BARNIER: Where is it?
21  MR. WESCOTT: I don't know. Probably at the
22  house, I'm not sure.
23  MS. BARNIER: Counsel, I'd like to see a copy
24  of that note.
25  Who else have you borrowed money from?

Page 11

1   MR. WESCOTT: My friend Eric.
2   MS. BARNIER: Eric who?
3   MR. WESCOTT: Garbocci.
4   MS. BARNIER: Spell the last name please.
5   MR. WESCOTT: G-A-R-B-O-C-C-I.
6   MS. BARNIER: How much have you borrowed since
7   January from Mr. Garbocci?
8   MR. WESCOTT: Ten grand.
9   MS. BARNIER: Do you have a note for that?
10  MR. WESCOTT: I do not.
11  MS. BARNIER: Where does Mr. Garbocci live?
12  MR. WESCOTT: In Ukiah.
13  MS. BARNIER: What's his address?
14  MR. WESCOTT: I don't know.
15  MS. BARNIER: Can you provide that.
16  MR. WESCOTT: Yep.
17  MS. BARNIER: Can you provide a phone number?
18  MR. WESCOTT: Yeah, I think so.
19  MS. BARNIER: Okay. Counsel, I am going to ask
20  for that information as well.
21  So is it your testimony today that the 139
22  thou -- excuse me, the $139 cash that you have is a
23  result of the money you borrowed from Paul Lieb and Eric
24  Garbocci?
25  MR. WESCOTT: And/or my parents, yes. I mean,

Page 12

1   again, cash is something that gets commingled. You
2   cannot determine where -- when you put it in an
3   account -- so I guess the short answer is no.
4   MS. STEPHENS: Just short answers.
5   MS. BARNIER: When you put it into an account,
6   which account did you put it into?
7   MS. STEPHENS: I put it into the Atlas
8   Consulting account.
9   MS. BARNIER: Where was the five thousand
10  dollars deposited?
11  MS. STEPHENS: Into that account, too, I think.
12  MR. WESCOTT: It was.
13  MS. BARNIER: And the 10,000 dollars from
14  Mr. Garbocci?
15  MS. STEPHENS: I don't know.
16  MS. BARNIER: What account was that deposited
17  into?
18  MR. WESCOTT: Multiple places.
19  MS. BARNIER: Name them.
20  MR. WESCOTT: I think mostly in the Atlas
21  Consulting account.
22  MS. BARNIER: How much of it into Atlas
23  Consulting?
24  MR. WESCOTT: I'm not sure.
25  MS. BARNIER: What other accounts was it

|  | Page 13 |
|---|---|
| 1 | deposited into? |
| 2 | MR. WESCOTT: That's the only one I can think |
| 3 | of. |
| 4 | MS. BARNIER: You just testified multiple |
| 5 | accounts, may I remind you, under penalty of perjury. |
| 6 | Let's start again. You testified the majority went into |
| 7 | Atlas Consulting. What other accounts did you put the |
| 8 | 10,000 dollars into? |
| 9 | MR. WESCOTT: I'm not sure. |
| 10 | MS. BARNIER: You don't know where you put the |
| 11 | money? |
| 12 | MR. WESCOTT: I don't know where I put that |
| 13 | money. |
| 14 | MS. BARNIER: How much money went into Atlas |
| 15 | Consulting, Ms. Stephens, from that 10,000 dollars? |
| 16 | MS. STEPHENS: I don't know. |
| 17 | MS. BARNIER: It is your account, isn't it? |
| 18 | MS. STEPHENS: Well, he has fiduciary access to |
| 19 | that account. |
| 20 | MS. BARNIER: He is a signatore on that |
| 21 | account. |
| 22 | MS. STEPHENS: Yes, he is listed as the CEO on |
| 23 | the Atlas account. |
| 24 | MS. BARNIER: That was not my question. He is |
| 25 | a signatore on the account? |

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

|  | Page 15 |
|---|---|
| 1 | bill, sir. I am asking you where the 139 dollars came |
| 2 | from. |
| 3 | MR. WESCOTT: I'm not sure. |
| 4 | MS. BARNIER: Did your wife give you the money? |
| 5 | MR. WESCOTT: I'm not sure. I have -- we can |
| 6 | count the number of bills in my wallet -- no, if we want |
| 7 | to get precise here, there are 15 separate bills here. |
| 8 | I do not know where each of these separate 15 bills came |
| 9 | from. |
| 10 | MS. STEPHENS: Okay. |
| 11 | MS. BARNIER: That was not my question, |
| 12 | Mr. Wescott. We will try it again since you obviously |
| 13 | don't understand the question. |
| 14 | MR. WESCOTT: I don't understand the question. |
| 15 | MS. BARNIER: Okay. I get that. I asked you: |
| 16 | You have $139 cash in your wallet, and I asked you where |
| 17 | you received the cash, and you have testified you don't |
| 18 | know. Is that accurate? |
| 19 | MR. WESCOTT: I have no idea. |
| 20 | MS. BARNIER: Now, on your amended SOFAs, which |
| 21 | were filed on June 18th, it states: In February 2011, |
| 22 | CW -- I believe that means you -- moved to Ecuador. It |
| 23 | goes on to say, "CW still has his place there." What |
| 24 | place is that? |
| 25 | MR. WESCOTT: I have -- the address is on |

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

|  | Page 14 |
|---|---|
| 1 | MS. STEPHENS: We have several Atlas accounts |
| 2 | which I provided to you, and he is a signatore on some, |
| 3 | on at least -- |
| 4 | MR. WESCOTT: I think just the Wells Fargo one. |
| 5 | MS. STEPHENS: I think maybe the U.S. Bank too. |
| 6 | MR. WESCOTT: I guess we're not sure. |
| 7 | MS. STEPHENS: -- he has access to. |
| 8 | MS. BARNIER: Do you have an ATM on those |
| 9 | accounts? |
| 10 | MR. WESCOTT: I do. |
| 11 | MS. BARNIER: So you have an ATM account to the |
| 12 | Atlas Consulting bank account for U.S. Bank. Is that |
| 13 | right? |
| 14 | MR. WESCOTT: No, for Wells Fargo. |
| 15 | MS. BARNIER: Just for Wells Fargo? |
| 16 | MR. WESCOTT: Correct. |
| 17 | MS. BARNIER: So when you withdrew that cash |
| 18 | that you have, 139 dollars, did you take it out of an |
| 19 | ATM? |
| 20 | MR. WESCOTT: I'm not sure. |
| 21 | MS. BARNIER: You have no idea where that cash |
| 22 | came from? |
| 23 | MR. WESCOTT: I can't tell you exactly where |
| 24 | every single dollar, every single bill -- |
| 25 | MS. BARNIER: I'm not asking for every single |

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

|  | Page 16 |
|---|---|
| 1 | there. |
| 2 | MS. BARNIER: No, it is not, sir. |
| 3 | MR. WESCOTT: Okay. I can provide the address. |
| 4 | I don't have it memorized. |
| 5 | MS. BARNIER: You have a place in Ecuador? |
| 6 | MR. WESCOTT: That is correct. |
| 7 | MS. BARNIER: Do you own a home Ecuador? |
| 8 | MR. WESCOTT: No, I do not. |
| 9 | MS. BARNIER: Do you own any property in |
| 10 | Ecuador where you reside? |
| 11 | MR. WESCOTT: No. |
| 12 | MS. BARNIER: So what does that statement mean, |
| 13 | "CW still has his place there"? |
| 14 | MR. WESCOTT: My company rents a place there |
| 15 | that both has an office and a home component. |
| 16 | MS. BARNIER: Which company is that? |
| 17 | MR. WESCOTT: That is Hacienda Palo Alto SA. |
| 18 | I'm not currently living there, but -- |
| 19 | MS. BARNIER: Hacienda -- forgive me, Hacienda |
| 20 | Palo Alto SA rents an office and a home on your behalf? |
| 21 | MR. WESCOTT: Correct. |
| 22 | MS. BARNIER: And you do not know the address? |
| 23 | MR. WESCOTT: I -- it does not have a numbered |
| 24 | address. It has a street-based address. I can guess, |
| 25 | but I rather not get it wrong. It is on the Malicon. |

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

4  (Pages 13 to 16)

Case: 12-0314 Sup D Exhibit D - 341 Hearing and Deposition Transcripts 3:5 D-138 of 228
of 47

| Page 17 | Page 19 |
|---|---|
| 1    MS. BARNIER: Does it have, does that office | 1    relevant papers. |
| 2  have a phone number? | 2         MS. BARNIER: Where would they be? |
| 3         MR. WESCOTT: There are two phone numbers. I | 3         MR. WESCOTT: I am not sure. I think they |
| 4  don't know what they are. But there's two phone lines | 4  might be here. They might be in Ecuador. |
| 5  there. | 5         As you know, we have many bankers boxes of |
| 6         MS. BARNIER: Two phone lines there. Is one | 6  papers that have a lot of files, and they are not very |
| 7  your personal phone line? | 7  well organized, but you are welcome to peruse them at |
| 8         MR. WESCOTT: Nope. | 8  your leisure. |
| 9         MS. BARNIER: They are both for the business? | 9         MS. BARNIER: I'm sure your counsel is going to |
| 10        MR. WESCOTT: Correct. | 10  advise you that there is case law as to the point that |
| 11        MS. BARNIER: Anyone else reside there? | 11  it is not the Trustee's job or her counsel's job to go |
| 12        MR. WESCOTT: Nope. | 12  through your records in an attempt; it is your job to |
| 13        MS. BARNIER: And what is the purpose of | 13  provide the information. But I'll let you have that |
| 14  Hacienda Palo Alto SA? | 14  conversation with your counsel. |
| 15        MR. WESCOTT: It is a company that is intended, | 15        MR. WESCOTT: Okay. |
| 16  or was intended, to develop real estate. | 16        MS. BARNIER: On May 9th. |
| 17        MS. BARNIER: What is your ownership of | 17        MR. WEAVER: Jean, can I ask a question? Or |
| 18  Hacienda Palo Alto SA? | 18  ask you to ask a question? |
| 19        MR. WESCOTT: I believe it is 99 percent. | 19        MS. BARNIER: Sure. It is Mr. Weaver speaking. |
| 20        MS. BARNIER: You believe, or you know? | 20        MR. WEAVER: What city is this office and home |
| 21        MR. WESCOTT: I believe. | 21  located in in Ecuador? |
| 22        MS. BARNIER: Do you have the incorporation | 22        MR. WESCOTT: Bahia de Caraques |
| 23  papers to Hacienda Palo Alto SA? | 23        MR. WEAVER: Can you spell that for us? |
| 24        MR. WESCOTT: I don't. | 24        MR. WESCOTT: B-A-H-I-A space D-E space |
| 25        MS. BARNIER: Where are they? | 25  C-A-R-A-Q-U-E-S, sometimes spelled with a "Z." |

| Page 18 | Page 20 |
|---|---|
| 1    MR. WESCOTT: They are probably in Ecuador. | 1         MR. WEAVER: Okay. And does Hacienda Palo Alto |
| 2  They might be here. I'm not sure. | 2  SA have a website? |
| 3         MS. BARNIER: Who is the other one percent | 3         MR. WESCOTT: It does. |
| 4  owner? | 4         MR. WEAVER: What is the website? |
| 5         MR. WESCOTT: I believe it is Alexandra | 5         MR. WESCOTT: WWW dot Hacienda de Palo |
| 6  Andrade. | 6  Alto.com. |
| 7         MS. BARNIER: Who is he? | 7         MR. WEAVER: Thank you. |
| 8         MR. WESCOTT: It is a she. | 8         MS. BARNIER: So on May 9th, Mr. Wescott, you |
| 9         MS. BARNIER: She. | 9  testified that your amended schedules would be filed on |
| 10        MR. WESCOTT: She is one of my former | 10  Friday, May 11th. Do you remember that? |
| 11  attorneys. | 11        MR. WESCOTT: I believe that Neil Ison said it |
| 12        MS. BARNIER: When you say former, why do you | 12  would be filed by the following Monday. |
| 13  say former? | 13        MS. BARNIER: Actually, it was Friday. I could |
| 14        MR. WESCOTT: Because she left the law firm | 14  read the testimony to you, and you responded with |
| 15  that I used to employ, and I have actually since moved | 15  "great," you said that. They were not filed until June |
| 16  on from that law firm, so there's two levels of "former" | 16  18th. Why not? |
| 17  in there. | 17        MR. WESCOTT: So it is my understanding that |
| 18        MS. BARNIER: So what benefits does your former | 18  that week we had -- we were going to work on it, and |
| 19  attorney as a one percent owner receive? | 19  make sure that Neil got them filed. But I believe, if |
| 20        MR. WESCOTT: She is a shareholder. | 20  I'm not mistaken, that you went and did an exparte |
| 21        MS. BARNIER: How many shares are there in | 21  motion to compel us to produce reams of documentation |
| 22  Hacienda Palo Alto SA? | 22  that week, am I correct? So we worked on that instead |
| 23        MR. WESCOTT: I'm not sure. | 23  all week because we had a court order that we had to do |
| 24        MS. BARNIER: Where would you find that out? | 24  that. So Neil advised me that it was best to comply |
| 25        MR. WESCOTT: I could -- I would look for the | 25  first with the court order, even though it is going to |

Case: 12-0314  Sup. Exhibit D - 341 Hearing and Deposition Transcripts  3:5  D-139 of 228
of 47

1 push back his promises to you.
2 We have subsequently changed attorneys, and we
3 now have them filed. I think they got filed pretty
4 quickly after we brought Ms. Smart and Mr. Greg on. I
5 will note we had this conversation before. I did
6 actually provided updated schedules to Mr. Ison in
7 February, and I believe he had brain surgery and other
8 issues. But I think you will have fairly rapid handling
9 of your requests, filings from this point on, and I
10 think, I hope your --
11 MS. STEPHENS: Stop.
12 MS. BARNIER: Let me make sure. So it was
13 because the Judge ordered documents to be produced is
14 the reason that you did not file amended schedules and
15 had to get new counsel. Am I summing it up correctly?
16 MR. WESCOTT: No, that's not correct.
17 MS. BARNIER: Okay.
18 MR. WESCOTT: So I believe we had allocated
19 some time that week for me to review what I had already
20 sent to Neil, but at that particular week we had to
21 produce, I think there was a list of 37 different items
22 for one request -- I don't recall. This was an -- I
23 assume, by the way, that you received all the things
24 that I sent to Mr. Ison and Mr. Williams, the response
25 to the court order and your requests.

1 streams of income.
2 MS. BARNIER: How can you do that?
3 MR. WESCOTT: Well, I'd like to try and put a
4 deal together with some investor backing and try to
5 create an income stream based on that.
6 MS. BARNIER: So you are soliciting new
7 investors?
8 MR. WESCOTT: I'm giving it a shot. I'm
9 looking for a job. I'm looking for any way that I can
10 make money that I can.
11 MS. BARNIER: How did you pay for the trip to
12 Honduras?
13 MR. WESCOTT: You are talking about the actual
14 plane ticket?
15 MS. BARNIER: One more time: How did you pay
16 for your trip to Honduras?
17 MR. WESCOTT: I don't understand the question.
18 MS. BARNIER: Stanford grads, what can I say.
19 How did you pay -- did you pay cash to fly to
20 Honduras? Start with the plane flight. We will go very
21 slowly for you, Mr. Wescott, since it seems to be a
22 difficult question. Here we go: How did you pay for
23 the plane flight to Honduras?
24 MR. WESCOTT: I believe -- I am not sure. I
25 believe I used miles, I am pretty sure but we can look

1 MS. BARNIER: We will try this again, but it is
2 my turn to ask you questions. If your counsel has
3 questions, he can direct them to me. But keep going.
4 So back up. So you got a court order saying
5 produce the documents since they had not been produced.
6 And it is your testimony that you spent all your time
7 getting documents together?
8 MR. WESCOTT: Correct.
9 MS. BARNIER: That week. Well, that was about
10 more than four weeks ago. So what happened during the
11 other times?
12 MR. WESCOTT: You would have to ask that to
13 Mr. Ison. He has had the information since February.
14 MS. BARNIER: Okay. So where have you traveled
15 since May 9th?
16 MR. WESCOTT: Since May 9th. I believe -- I
17 have gone -- let's see now June 15th. I believe I have
18 gone to Honduras, and I believe I have gone to Ecuador.
19 MS. BARNIER: How many times?
20 MR. WESCOTT: I went to Ecuador once, and I am
21 not sure, I'd have to look back for Honduras. It might
22 be twice.
23 MS. BARNIER: What was the purpose of your
24 trips?
25 MR. WESCOTT: Just trying to produce new

1 back and look at the records.
2 MS. BARNIER: You used miles to fly to
3 Honduras?
4 MR. WESCOTT: Uh-huh.
5 MS. BARNIER: Where did you stay in Honduras?
6 MR. WESCOTT: I stayed at a hotel called La
7 Core de Lair.
8 MS. BARNIER: How did you pay for the hotel?
9 MR. WESCOTT: Either cash or debit card, I
10 don't recall.
11 MS. BARNIER: A debit card, which card does
12 that attach to?
13 MR. WESCOTT: The same one we have been talking
14 about.
15 MS. BARNIER: Say it again?
16 MR. WESCOTT: Wells Fargo debit card.
17 MS. BARNIER: The Wells Fargo debit card and
18 that account goes to the Atlas Consulting account?
19 MR. WESCOTT: Correct.
20 MS. BARNIER: And in Ecuador, how did you pay
21 for the air flight?
22 MR. WESCOTT: Again, I think I used miles. I
23 would have to look back, I'm not sure. I am not 100
24 percent sure. I don't know.
25 MS. BARNIER: When did you take the trip?

Case: 12-0314 Sup Exhibit D - 341 Hearing and Deposition Transcripts 3:5 D-140 pg 228
of 47

Page 25

1      MR. WESCOTT: I don't recall the exact dates.
2    I was there for about five days.
3      MS. BARNIER: So between May 9th and today is
4    June 20th, you do not remember how you paid for that
5    trip?
6      MR. WESCOTT: I don't recall but I think I used
7    miles.
8      MS. STEPHENS: Can I just stop here for a
9    second?
10     I know that you are frustrated, and it has been
11   a long road, and it has been a long road for us, too.
12   We're trying to be forthcoming. Carl is a very
13   disorganized person. And I just want you to know that
14   we are really trying to cooperate, we're not trying to
15   obfuscate, but this how he answers me about, you know,
16   "where did you put the mail today?" Okay.
17     MS. BARNIER: I can appreciate that he does
18   that, but unfortunately he is in now in a legal
19   proceeding.
20     MS. STEPHENS: I understand.
21     MS. BARNIER: And I am going to suggest to you
22   that if he does that in front of Judge Montali, and I
23   don't know the experience your counsel has in front of
24   Judge Montali, you will have a very exasperated judge,
25   very quickly. He does not -- I'm just telling you this,

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Page 26

1    Ms. Stephens. He does not suffer fools lightly. How is
2    that.
3      MR. WESCOTT: I really don't know and -- I
4    don't want to testify incorrectly under penalty of
5    perjury. So if I'm not one hundred percent sure, I am
6    going to say I don't know. Obviously there are records
7    that --
8      MS. BARNIER: So where did you stay in Ecuador?
9      MR. WESCOTT: I stayed at a hotel called Casa
10   Grande.
11     MS. BARNIER: How did you pay for that hotel?
12     MR. WESCOTT: Probably cash, possibly the debit
13   card, I'm not sure.
14     MS. BARNIER: Could you take out your wallet
15   one more time and put out the credit cards and debit
16   cards for me, please.
17     MR. WESCOTT: Sure. There is only one,
18   there's -- you have this. You have that.
19     MS. BARNIER: What are the rest of the cards?
20   Debit Visa card, is this also used as a credit card?
21   Let's go through them. I'm sorry. Hang on.
22     Oh, it won't work. Can I have all the cards,
23   please.
24     MR. WESCOTT: Sure.
25     MS. BARNIER: Are those the only credit cards

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Page 27

1    in your possession?
2      MR. WESCOTT: They are the only ones in my
3    possession.
4      MS. BARNIER: Do you have any other credit
5    cards located any place else?
6      MR. WESCOTT: I have, probably I have some
7    physical credit cards, but I don't believe they work.
8    Once I filed for bankruptcy, all of my credit cards shut
9    me down, or all of them to my knowledge.
10     MS. BARNIER: Now, your amended Statement of
11   Financial Affairs says that you have paid 2,326 for all
12   of your counsel regarding your bankruptcy. Is that
13   correct?
14     MR. WESCOTT: That was true as of January 17th,
15   the date of filing.
16     MS. BARNIER: Mr. Wescott, let me remind you,
17   you filed amended schedules, and you signed them under
18   penalty of perjury on June 18th. So is that statement
19   still correct, that you only paid 2,326 for bankruptcy?
20     MR. WESCOTT: It is my understanding, and in
21   discussions with counsel, that we are filing as of
22   January 17th, and that's the date and that is why we
23   filed the way we did. Perhaps we have done it
24   incorrectly, but that's what I been instructed to do.
25     So, yes, under penalty of perjury that

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Page 28

1    statement is true as of the date that it states it is
2    true.
3      MS. BARNIER: How much did you pay your current
4    counsel?
5      MR. WESCOTT: We have paid 2500 dollars.
6      MS. BARNIER: How did you pay that, in a check
7    or cash?
8      MS. STEPHENS: In a check from the Atlas
9    California Bank and Trust account.
10     MS. BARNIER: I'm sorry. Which bank is that?
11     MS. STEPHENS: The California Bank and Trust.
12     MS. BARNIER: California Banking Trust.
13     MR. WESCOTT: Are you done with these?
14     UNIDENTIFIED SPEAKER: Yes.
15     MR. WESCOTT: Are you done with these?
16     MS. BARNIER: Yes, I am. Thank you.
17     So, gentlemen, do you have any questions at
18   this point?
19     MR. WEAVER: Have you paid any moneys to
20   Mr. Hibbits law firm?
21     MS. STEPHENS: Yes, we have. We paid him a
22   thousand dollars.
23     MR. WEAVER: That's in addition to the 2500?
24     MS. STEPHENS: Yes, it is, from the same
25   account.

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Case: 12-0314 SupDExhibit D - 34th Hearing and Deposition Transcript 3:5D-14 1 agt 228
of 47

1    MR. WESCOTT: I think we paid him 1500.
2        MS. STEPHENS: I'm sorry. I don't remember
3    exactly whether it was -- it was 1500. My husband is
4    correct.
5        MR. WEAVER: Since we have not seen the
6    financial disclosures, what are the hourly rates these
7    attorneys are charging you?
8        MS. STEPHENS: I don't know.
9        MR. WESCOTT: I think it is 300 dollars for
10   Howard and Edward.
11       MS. BARNIER: Mr. Hibbits is charging 300
12   dollars an hour?
13       MR. WESCOTT: That's correct.
14       MS. BARNIER: What's the purpose of Mr. Hibbits
15   employment?
16       MR. WESCOTT: He is going to do the adversarial
17   cases.
18       MS. BARNIER: He is going to defend you on the
19   adversarial cases?
20       MR. WESCOTT: Correct.
21       MS. STEPHENS: He also gave us a fixed --
22       MR. WESCOTT: It is kind of a fixed hourly
23   arrangement for part of it.
24       MS. STEPHENS: Yeah, for the first part, he
25   said he would fix the first part, and then after a

Audio Recording of: 341 Meeting   - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1    certain part would be an hourly. So getting the answers
2    filed and amended and the discovery, not the discovery,
3    the disclosures, whatever they are called.
4        MR. WESCOTT: Everything but the discovery is
5    time-bounded.
6        MS. STEPHENS: Yeah. So he basically gave us a
7    fixed amount for getting the case set up.
8        MR. WESCOTT: Which works out to about thirteen
9    hours per case.
10       MS. BARNIER: So he is going to represent you
11   in -- I believe there's -- how many adversarial
12   proceedings do you have at the moment, three?
13       MR. WESCOTT: Well, depends, yeah.
14       MS. BARNIER: You have three.
15       MS. STEPHENS: Just straight forward, Carl.
16       MS. BARNIER: So he is going to defend you in
17   all three?
18       MR. WEAVER: What's the fixed amount that he is
19   going to charge you for representing you on all these
20   three, and what is the earmark as to when he is going to
21   start charging you hourly?
22       MR. WESCOTT: The deposition and discovery part
23   is the big unknown, where we don't know how long it is
24   going to take; that is all hourly.
25       MR. WEAVER: The 15 is for all three cases?

Audio Recording of: 341 Meeting   - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1    MR. WESCOTT: The 1500 gets us to the status
2    conference on all three cases, which is June 29th.
3        MR. WEAVER: Did he take a guarantee from
4    somebody else to pay any additional fees?
5        MR. WESCOTT: A guarantee, I don't know what
6    you are talking --
7        MR. WEAVER: Anybody else agree to pay him?
8        MR. WESCOTT: No.
9        MR. WEAVER: Did you give him any security
10   interest in any assets or real estate, anything of that
11   nature?
12       MR. WESCOTT: No.
13       MR. WEAVER: Nobody cosigned to pay him?
14       MR. WESCOTT: No.
15       MR. WEAVER: Same questions with your current
16   attorneys, I guess the Smart firm.
17       MR. WESCOTT: Same answers.
18       MR. WEAVER: What is the hourly rate?
19       MR. WESCOTT: I don't know. We actually
20   haven't signed a fee agreement yet. Is that correct? I
21   have not signed one.
22       MS. STEPHENS: We had agreed on the 2500 dollar
23   retainer.
24       MR. WESCOTT: Correct.
25       MS. BARNIER: Counsel, I'm going to represent

Audio Recording of: 341 Meeting   - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1    to you that the amended schedules are incomplete,
2    inaccurate, and bluntly shocking. Your firm received,
3    according to these debtors, 2500 dollars, and it is not
4    reflected on the SOFA. Amended schedules mean, Counsel,
5    as of the date of the filing they are accurate.
6        Furthermore, Counsel, I am going to -- the
7    hearing will still be on for Friday, just so you know.
8    I have the motion on to compel amendments.
9        In looking at the revised schedules, it is --
10   no one can determine the interest of what Mr. Wescott or
11   Ms. Stephens holds in all their various companies. And,
12   in fact, the last filing seems to contradict everything
13   else they have filed, because it now says in a number of
14   companies are all community property, so it is unable to
15   tell.
16       So I am going to continue this until after we
17   get a ruling from the Judge on Friday as to what your
18   clients need to do. And I will put on the record,
19   Counsel, that your clients just testified that they have
20   not signed a fee agreement, which you and I both know is
21   a violation of State Bar Rules. So I am sure the Judge
22   will be interested to also hear that.
23       I don't have any further questions --
24       MR. WEAVER: Let me have one we did not cover.
25   Other than Guatemala and Honduras, did you travel any

Audio Recording of: 341 Meeting   - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Case: 12-03145    SupDExhibit D - 341 Hearing and Deposition Transcripts    5D-142    of 228
of 47

1    place else?
2        MR. WESCOTT: I didn't state that I traveled to
3    Guatemala.
4        MR. WEAVER: I'm sorry. Ecuador and Honduras.
5    Other than Ecuador and Honduras, did you travel
6    anyplace else?
7        MR. WESCOTT: No.
8        MR. WEAVER: Any place domestically that you
9    traveled during this period of time since the last 341
10   hearing?
11       MR. WESCOTT: Since the last 341 hearing, I
12   have traveled around the Bay Area, and I have also
13   traveled to Las Vegas.
14       MR. WEAVER: How did you get to Las Vegas?
15       MR. WESCOTT: On a plane.
16       MR. WEAVER: Okay. Did you go to Southern
17   California at all?
18       MR. WESCOTT: I think we did. I don't recall
19   if that was before May 9th, though. I think I was there
20   in April, and I just don't recall -- actually, I was
21   there actually during Memorial Day Weekend, which I
22   guess is after May 9th. So thank you for reminding me.
23   Yes.
24       MR. WEAVER: "There" being where?
25       MR. WESCOTT: There being Santa Barbara.

1        MR. WEAVER: At the last 341 there was some
2    questions and some directions from the Trustee's counsel
3    concerning use of travel vouchers, and you had planned a
4    plane trip I think the Saturday after the last 341. Did
5    you use the travel vouchers that you had?
6        MR. WESCOTT: A couple things. First of all --
7        MS. BARNIER: Excuse me, that is a yes or no
8    question. Yes, I used them. No, I did not use them.
9        MS. STEPHENS: You did not go on that trip, I
10   don't think.
11       MR. WESCOTT: Actually, that's not true. I'd
12   like to clarify several things, if I may.
13       MS. STEPHENS: You do not need to clarify.
14   Just yes or no.
15       MR. WESCOTT: I would actually like to clarify.
16   There are several related facts here.
17       MR. WEAVER: I would just a yes or no.
18       MR. WESCOTT: Yes. The answer is yes.
19       MR. WEAVER: How did you pay for that trip?
20       MR. WESCOTT: With that voucher, I went. It is
21   listed as an exempt asset on our revised schedules.
22       MR. WEAVER: Do you recall the Trustee's
23   attorney told you it was not exempt and directed you not
24   to use that because it was an asset of the estate. Do
25   you remember that?

1        MR. WESCOTT: I do remember that.
2        MR. WEAVER: That's all I have.
3        MR. WESCOTT: I would like to clarify we had
4    five other, four other, five other tickets that we had
5    bought that we cancelled per your request, and that
6    Monette and kids ended up driving rather than flying for
7    that same time period. But that's what I wanted to
8    clarify.
9        MS. BARNIER: So, no, it does not list travel
10   vouchers, but that's okay, we will let your counsel take
11   care of that.
12       Counsel, do you have any questions for me,
13   anything that needs to be clarified?
14       MR. WADE: I have one question regarding
15   records. For the record, Austin Wade Bacheki Crom,
16   Trustee's counsel.
17       You mentioned that you had several boxes of
18   paper records. Which entities are those records for?
19       MR. WESCOTT: All of them.
20       MR. WADE: All of them.
21       MR. WESCOTT: I think there is a letter that
22   Neil Ison wrote in response to discovery, or a number of
23   questions, and we provided what we could easily find the
24   digital copies of, and easily find analog copies of.
25   And the rest, I believe, is a whole letter -- which if

1    you do not have a copy of, I think we can dig it up and
2    get it to you.
3        MS. BARNIER: Mr. Ison's letter was there is
4    hundreds of boxes and the trustee is free to go through
5    them if she wishes, I believe in essence that is what it
6    says. Is that true, Mr. Wescott?
7        MR. WESCOTT: I'd want to look at the letter.
8    Do you have a copy of that?
9        MR. WADE: I have not seen a copy.
10       MR. WESCOTT: Do you want a second copy?
11       MS. BARNIER: It is an unnecessary letter.
12   Just what you want is --
13       MR. WADE: Just approximately how many boxes
14   are we talking about? Approximately, ball park.
15       MR. WESCOTT: Collectively?
16       MR. WADE: Yes.
17       MR. WESCOTT: Probably about 150 bankers boxes.
18       MS. BARNIER: They are all located in your
19   home?
20       MR. WESCOTT: No, they are in different
21   locations.
22       MR. WADE: Do those boxes include personal
23   financial records, like bank statements?
24       MR. WESCOTT: It has all sorts of stuff.
25       MR. WADE: Okay. In one of our previous 341

9 (Pages 33 to 36)

Case: 12-03145   Sup D Exhibit D - 341 Hearing and Deposition Transcripts 3:5   D-143 of 228
of 47

1    meetings, you mentioned that you had no personal bank
2    statements.
3        MR. WESCOTT: Well, I don't have any that are
4    organized in any one particular place. I used to just
5    go online with Wells Fargo and get digital access to
6    anything I needed, then when I filed bankruptcy they
7    shut down access to all my accounts. So but there is
8    probably some bank statements in there that are old.
9        MR. WADE: We'd like to see those.
10       MR. WESCOTT: All right, well, come on by.
11       MS. BARNIER: Whoa, let's stop this right now.
12   This is not a come on by, shake down, hello, how are
13   you. You need to talk to your -- now that you have new
14   counsel, perhaps they are going to explain to you that
15   there is a really great part in the bankruptcy code, and
16   your wife has alluded to it, but it seems to elude you,
17   Mr. Wescott, which is it is your duty to cooperate and
18   provide the records. It is not your duty to say: Here
19   they are, oh, they are all over the place.
20       You have had specific requests for certain
21   documents and including -- I asked your counsel, I
22   e-mailed you, and I will ask counsel if you have it: Do
23   you have the incorporation agreements to the Honduran
24   property that I asked that you bring today?
25       UNIDENTIFIED SPEAKER: I reviewed the e-mail I

Audio Recording of: 341 Meeting  ~ 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1    saw the e-mail, I spoke with my clients, and they inform
2    me they do not know where the documents are.
3        MS. BARNIER: A nice courtesy would have been
4    to send that back as an e-mail instead of me spending my
5    time on it.
6        So you don't have any idea -- so you have a
7    number of incorporations in Latin America and South
8    America. Do you have any of those documents for the
9    incorporation of those?
10       MR. WESCOTT: You know, I came across -- I was
11   looking for some things, and I came across, there's a
12   Nicaraguan entity Unexpected Development SA, I found
13   those the other night.
14       MS. BARNIER: That was part of the request to
15   be produced. So you have one, Unexpected Development.
16       MR. WESCOTT: Correct. I found that.
17       MS. BARNIER: Have you looked at all,
18   Mr. Wescott --
19       MR. WESCOTT: I have.
20       MS. BARNIER: -- for -- if I can finish my
21   question.
22       MR. WESCOTT: Sure.
23       MS. BARNIER: -- I'd appreciate -- anything
24   else you want to add while we wait?
25       MR. WESCOTT: No, that's all right.

Audio Recording of: 341 Meeting  ~ 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1        MS. BARNIER: Did you look for the
2    incorporation documents for the property that owns Light
3    Foot SA, or Light foot Ventures?
4        MR. WESCOTT: I believe that was part of either
5    the request of 37 documents that the --
6        MS. STEPHENS: Did you look or not?
7        MR. WESCOTT: Yes I looked back then.
8        Absolutely. And we provided whatever we have, and I
9    would have to go back and look and see what we provided;
10   I don't recall. Does anybody here recall?
11       MS. BARNIER: So your counsel just said that he
12   asked you, and you said, told him --
13       MR. WESCOTT: I have no idea where they are,
14   that's correct.
15       MS. BARNIER: You have no idea where they are.
16   So to back up again: Did you look for a second time
17   after your counsel said, "The Trustee's counsel is
18   requesting a specific document," did you look a second
19   time?
20       MR. WESCOTT: I did look through one set of
21   bankers boxes that I thought they might be in, yes,
22   that's where I came across the Nicaraguan entity I just
23   testified about it.
24       MS. BARNIER: When did you do that?
25       MR. WESCOTT: Couple nights ago, I think it

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1    was. It was over the last two days.
2        MS. BARNIER: So once again, anything else you
3    want?
4        MR. WADE: Going --
5        MS. BARNIER: We're just better off to get a
6    court order from the judge, you tell him exactly what
7    you want, they have already said they are going to send
8    stuff over, we don't get it. Just get the order one
9    more time and we will work on it, Austin. So there is
10   just no point in wasting your time.
11       I understand what you are doing. This is the
12   way we normally do it, we make requests and we ask for
13   documents and we get them. And we do not get anything.
14   I don't want you to waste your time and my time.
15       MR. WEAVER: Jean, I have a few.
16       MS. BARNIER: Sure. This is Mr. Weaver
17   speaking.
18       MR. WEAVER: I have not had a real chance to go
19   through the amended schedule, but I note that it sounds
20   like you have requested a summary of the San Francisco
21   Giants sales of your seat licenses, and they were
22   provided to the Trustee.
23       Have the seat licenses sales been provided to
24   the Trustee?
25       MR. WESCOTT: I provided that spreadsheet to my

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Case: 12-0314 Sup Exhibit D - 341 Hearing and Deposition Transcript 3:5 D-144 of 228
of 47

1  former attorney and I presume he provided them to you,
2  did he not?
3        MS. BARNIER: He did not. And the other thing
4  is I am not really interested in the spreadsheet; I need
5  the original documents. The spreadsheet is what you
6  prepared.
7        MR. WESCOTT: No. Actually the Giants prepared
8  it.
9        MS. BARNIER: The Giants prepared it.
10       MR. WESCOTT: Yeah.
11       MS. BARNIER: So do you still have that
12 document?
13       MR. WESCOTT: Yes, I do.
14       MS. BARNIER: Can you forward it to your
15 counsel, and you can send it to me?
16       MR. WESCOTT: Yes, I will.
17       Let me ask a question, just to try to be
18 helpful. We sent -- there's a list of 37 items -- no,
19 no, no I want to resolve this.
20       MS. BARNIER: You really should talk to your
21 counsel about it. It is a better way to deal with it.
22 I am sure he has a seen the requests for document. I am
23 sure he has seen what's produced.
24       MS. STEPHENS: We sent everything to Mr. Ison,
25 and if he did not send it to you, I can send it to our

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1  new counsel for him to send it to you.
2        MS. BARNIER: He needs to review all of it.
3  I don't know, have you had an opportunity, sir,
4  to look through the order to compel the production of
5  documents?
6        UNIDENTIFIED SPEAKER: We are still coming up
7  to speed on the entire file.
8        MS. BARNIER: Is that a yes or a no?  No, I
9  have not had an opportunity --
10       UNIDENTIFIED SPEAKER: I don't recall seeing
11 it, no.
12       MS. BARNIER: So you have not seen the court
13 order yet on that.
14       UNIDENTIFIED SPEAKER: I don't recall no.
15       MS. BARNIER: I just asked if you had an
16 opportunity. I know you are very short, that's why I am
17 asking the question. I am saying if you have not had an
18 opportunity, that's fine. I need to know.
19       Has Mr. Ison sent you any documents?
20       UNIDENTIFIED SPEAKER: I have not received
21 anything directly from Mr. Ison, that I can recall.
22       MR. WEAVER: I just have a couple more
23 questions concerning the Giants tickets, and I guess a
24 couple on Hacienda Palo Alto.
25       You sold your tickets through Stub Hub, would

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1  that be fair to say?
2        MR. WESCOTT: Which tickets?
3        MR. WEAVER: The Giants tickets, when you were
4  selling individual tickets.
5        MR. WESCOTT: When I was selling individual
6  tickets, I sold some of them through Stub Hub. That's
7  correct.
8        MR. WEAVER: What other source did you use for
9  selling the tickets?
10       MR. WESCOTT: Double Play, Ebay, mailing lists,
11 et cetera.
12       MR. WEAVER: Do you still have access to Double
13 Play or Stub Hub.
14       MR. WESCOTT: Double Play has been shut down.
15       MR. WEAVER: Okay.
16       MR. WESCOTT: Stub Hub, I have an account on
17 which is basically unused, yes.
18       MR. WEAVER: You can get access to that account
19 to see the sales transactions in the last couple years,
20 isn't that true?
21       MR. WESCOTT: I'm not sure.
22       MR. WEAVER: Could you try to do that for us?
23       MR. WESCOTT: I can do that.
24       So can you be more specific -- I don't know
25 what to do. Can you be more specific?

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1        MR. WEAVER: I want the history of sales of
2  your San Francisco Giants as reflected by your Stub Hub
3  account during the last two years.
4        MR. WESCOTT: Last two years. Okay.
5        MR. WEAVER: Would that be fair?
6        MS. BARNIER: Sounds good to me.
7        MR. WEAVER: Hacienda Palo Alto you said is
8  paying rents for this office and home. What is the
9  source of its assets to pay rent? Where does it get its
10 money?
11       MR. WESCOTT: Well, last time I testified that
12 we were not current on rent. What I have since done is
13 sublet the office, and somebody else is now paying the
14 rent -- actually sublet is probably the wrong technical
15 term; it has a legal meaning. I have someone else is
16 now in there and paying the expenses and the rent
17 because I'm not using that facility right now. We are
18 sharing it. We have not signed the sublease agreement.
19       MS. BARNIER: As long as we're reviewing --
20       MR. WEAVER: I'm just confused you said when
21 you were in Ecuador, that's where you live.
22       MR. WESCOTT: In February 2011, which is more
23 than a year ago, that is where I lived then. On my most
24 recent trip, I stayed in a hotel because I subleased
25 that building out to somebody else. Is that helpful?

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

11 (Pages 41 to 44)

1   MR. WEAVER: How much are you receiving under
2   the sublease?
3       MR. WESCOTT: 200 dollars a month.
4       MS. STEPHENS: You are not receiving it, are
5   you?
6       MR. WESCOTT: He is paying it directly to.
7       MS. STEPHENS: It is being paid directly.
8   Somebody else has assumed the lease.
9       MR. WESCOTT: They have not assumed the lease.
10      MS. STEPHENS: Somebody else is paying for that
11  place.
12      MS. BARNIER: So last time we met you also said
13  that your bookkeeper was going to hand over all of his
14  records. Do you remember that?
15      MR. WESCOTT: I don't recall that.
16      MS. BARNIER: Do you want to take a break and
17  I'll pull the testimony out of it where you said you
18  will cooperate, he does our records, he is preparing our
19  taxes and --
20      MR. WESCOTT: If that's helpful.
21      MS. BARNIER: We still have not received those.
22  So does he have everything, does he use Quickbooks?
23      MR. WESCOTT: He does use Quickbooks, and
24  actually we sent the Quickbooks files onto Mr. Ison some
25  time ago. Did you not receive those?

1   for -- I believe it was People Bridge, or I think it was
2   People Bridge, and there was not much in there after
3   2009. It was a pretty old Quickbooks file. Which
4   entities have Quickbooks files?
5       MS. STEPHENS: I sent you the Atlas Consulting
6   one.
7       MR. WESCOTT: You sent --
8       MS. STEPHENS: I sent it to -- Brian should
9   have provided that on the --
10      MS. BARNIER: Brian did not provide anything.
11      MS. STEPHENS: He did not give you the --
12      MS. BARNIER: Nope.
13      MS. STEPHENS: Flash drive or whatever it was?
14  I thought -- he said he had put everything on a flash
15  drive, which was sent to your office.
16      MS. BARNIER: The only thing that we received
17  on that flash drive was what you just heard Austin
18  testify to, was that --
19      MS. STEPHENS: I was under the impression that
20  I had given all, I had sent him all of that material,
21  and it contained the Atlas Quickbooks, which I think was
22  reconciled through December of 2010, although there were
23  some -- with, you know, whatever.
24  Our life is falling apart, okay. And we are
25  trying to do what we can, and things -- we are behind

1       MS. BARNIER: Well, they were out of date and
2   the other problem is that they were not current. What
3   you testified to in May -- and Ms. Stephens did also --
4   is that your bookkeeper is keeping your accounts, still
5   working with you.
6       Is that correct?
7       MR. WESCOTT: He is working on our personal
8   finances.
9       MS. STEPHENS: But I do have to say, we are not
10  current. So I do not believe -- we have not finished
11  our -- we have not worked on our 2011 taxes yet, as we
12  got an extension, and we are trying to get him to do it.
13  His father has been having health issues. I've been
14  trying to get him to come to our house so that we can
15  get going on our 2011s for you.
16      MS. BARNIER: Okay. Are the Quickbooks records
17  at your home?
18      MS. STEPHENS: I sent what I had, which was I
19  think reconciled up through 2000 -- the end, you know,
20  it was reconciled, I believe through 2010; I'm not sure.
21  But for our 2010 taxes, we have not done our 2011 taxes.
22  So our Quickbook files are not current.
23      And I don't think that Leo has anything that's
24  more current than what we sent.
25      MR. WADE: We received one Quickbook file

1   schedule. We probably filed this bankruptcy way too
2   soon. We were not prepared. We were not well-advised.
3   I gave everything that I had and that I could find, and
4   that I could find online to Brian.
5       MS. BARNIER: Okay. I hate to do this to you,
6   but given that that counsel is no longer involved, I
7   cannot make requests of him. So can you -- we did not
8   receive it.
9       So can you please provide your new counsel the
10  records, and we would like to see even the raw data in
11  the Quickbooks. Even if it has not been reconciled,
12  whatever information has been inputted.
13      MS. STEPHENS: There has not been anything
14  input past --
15      MR. WADE: Which entities have Quickbooks
16  files? So do you have personal Quicken?
17      MR. WESCOTT: No.
18      MS. BARNIER: So Atlas Quickbooks has -- I'm
19  sorry, Atlas has Quickbooks. Do you have Quickbooks for
20  your personal use?
21      MS. STEPHENS: No. I think we just put -- I
22  don't know. I don't think we have -- we don't have
23  Quickbooks for our personal use, and I do not know what
24  was being used --
25      MR. WESCOTT: By Leo, Turbotax.

12 (Pages 45 to 48)

1     MS. BARNIER: That's just to prepare taxes.
2     MR. WADE: So which entities have Quickbooks,
3  you said Atlas Consulting?
4     MR. WESCOTT: People Bridge used to.
5     MR. WADE: People Bridge. What about Surprise
6  Development?
7     MR. WESCOTT: I'm not sure. I don't think
8  there was ever very much done with Surprise stuff.
9     MS. BARNIER: Where would any Quickbooks
10 records be?
11    MS. STEPHENS: All I have is the Atlas one,
12 which I sent to Brian.
13    MR. WESCOTT: And there is People Bridge as
14 well, which you have.
15    MS. BARNIER: So it is your explanation that
16 those are the only two entities that have a Quickbooks
17 file?
18    MR. WESCOTT: Correct.
19    MR. WADE: You've never used Quicken for your
20 personal finances?
21    MR. WESCOTT: I used it briefly, maybe five or
22 six years ago to try it out, and I might have used it
23 for a month or so.
24    MS. BARNIER: Do you have bank statements for
25 any of your other entities?

1     MS. STEPHENS: I gave you all the bank
2  statements, or I gave Brian all the bank statements that
3  I had. I went online. You did not get any of those?
4     MS. BARNIER: We got some of the bank
5  statements; some of them are missing. But we did not
6  get a Quickbooks. So the bank statements, so that is
7  for Atlas, so you provided those, Ms. Stephens. So for
8  any of the other entities, is there Quickbooks for
9  anything else?
10    MR. WESCOTT: No.
11    MS. BARNIER: So how did you keep records on
12 how much money was going in and out?
13    MR. WESCOTT: Gina Perry, when she worked for
14 me, used to keep spreadsheets.
15    MS. BARNIER: Gina Perry stopped working for
16 you in 2010?
17    MR. WESCOTT: Correct. We don't really have
18 much in the way of records since then that is in an
19 organized fashion.
20    MS. BARNIER: You have previously testified on
21 May 9th as to your income, and I would note that your
22 SOFA is still incorrect as it groups income, and it says
23 "about"; it has not been corrected yet.
24    MR. WESCOTT: Well, we have not done the
25 accounting for that.

1     MS. BARNIER: All it is how much money did you
2  get in, Mr. Wescott.
3     MR. WESCOTT: I don't know. A million dollars
4  we list in there is the best guess. When we are done
5  with the accounting from 2010 and 2011, we will be able
6  to provide a more precise answer.
7     MS. BARNIER: Okay. So let me ask you a
8  different question. So you received about a million
9  dollars in 2011 and 2010. Is that accurate?
10    MR. WESCOTT: Yeah. I think it was for the
11 two -- whatever it states on Statement of Financial
12 Affairs, I think it might have actually stated in the
13 two years prior to the filing. Whatever it states on
14 there.
15    MS. BARNIER: Well, the two years prior to
16 filing, you filed in January of 2012.
17    MR. WESCOTT: So it would be 2010, 2011.
18    MS. BARNIER: 2012 (sic). So you believe that
19 you received income of approximately a million dollars
20 for those two years?
21    MR. WESCOTT: Correct.
22    MS. BARNIER: Your now amended schedules say
23 that your expenses are about, I believe, 7600 dollars a
24 month. Okay. Right? Is that what it said, Mr.
25 Wescott?

1     MR. WESCOTT: You are talking about Schedule J,
2  I believe it is.
3     MS. BARNIER: Just whatever your expenses were.
4  It says about 7600 a month.
5     So we're talking about 76 times twelve. 7600.
6  So we're looking at maybe 125,000 dollars a year in
7  expenses, 150,000 at the most. 150,000 dollars a year
8  in expenses, so 300,000 dollars that would be spent in
9  the last two years. Where did the 700,000 dollars go?
10    MR. WESCOTT: I am not sure but, I am not sure
11 which particular dollars you are talking about. I think
12 most of it went to try and save properties, to try and
13 make payments on things.
14    MS. STEPHENS: I think we are talking about two
15 different things. I think Carl's unclear.
16    The 500,000, whatever, the -- the money, the
17 income, I don't know if that was income to us, or he is
18 lumping in income that came in to businesses that came
19 in to -- I mean, and that was offset against other
20 expenses.
21    MS. BARNIER: All I can do is go on what you
22 guys signed on your SOFA, and your counsel is here, and
23 it says: You made approximately a million dollars, and
24 that's what Mr. Wescott just explained, between 2010 and
25 2011. That's you, personally. It does not say anything

Page 53

1 about the businesses. Does not say what payments went
2 to them and, that was not the question. The million
3 dollars came in to the two of you.
4 You now have filed amended schedules that say
5 your expenses are about 7600 dollars a month.
6 MS. STEPHENS: Okay. But you were asking at
7 the last meeting when we went through Schedule J, you
8 asked me if I was still spending that amount of money
9 on -- I was unclear as to how to fill out Schedule J. I
10 mean, if it is what we used to spend, we used to spend
11 more money prior to us having financial difficulties.
12 So we were paying for a number of things. In Schedule
13 J, I thought that was basically what our budget is.
14 MR. WESCOTT: Current.
15 MS. STEPHENS: Currently, and our current
16 budget is much lower than it used to be. So we used to
17 spend a lot of money on going out to dinner, things for
18 the house, different things like that.
19 MS. BARNIER: Ms. Stephens, you are asking me
20 how to fill out a form. And the problem is is that I am
21 a little dismayed to hear that you filled out the form
22 because, in my experience as a bankruptcy practitioner,
23 it is the attorneys who fill out the form and you verify
24 that it is correct.
25 But, however, I am still trying to get back to

Audio Recording of: 341 Meeting - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Page 54

1 the question: On your Statement of Affairs that both of
2 you signed, as amended, it still says that you made
3 approximately a million dollars in 2010, 2011. It does
4 not say anything about money going to businesses; it
5 does say very clearly on that statement, and you have
6 testified, Mr. Wescott, you think that is correct.
7 So my question is: There is at least 700,000
8 dollars that is not in a savings account, it is not in a
9 business, it is not a property free and clear. So my
10 question is: Where did the 700,000 dollars go that you
11 got?
12 MR. WESCOTT: I think that bank statements
13 would be the best -- if you really wanted an exact
14 answer to dollar and pending and date, I think looking
15 at the bank statements would be the best way to
16 determine that.
17 MS. BARNIER: Mr. Wescott, you have testified
18 that you cannot provide those because when you declared
19 bankruptcy the accounts were closed. So once again,
20 Mr. Wescott, I'm going to ask just generally, you do not
21 have to give me cents, dollars, I'm just looking --
22 700,000 dollars, for most debtors, is a lot of money.
23 Where did the money go?
24 MR. WESCOTT: I would guess that the majority
25 of it went to try and save my collapsing businesses and

Audio Recording of: 341 Meeting - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Page 55

1 collapsing properties.
2 MS. BARNIER: Okay. That's all you can do is a
3 guess. You have no idea?
4 MR. WESCOTT: Well, I know our monthly out used
5 to be one hundred grand a month. When we stopped paying
6 our mortgages, I think it was mid 2010, so for the first
7 six months of 2010 we had something like 100,000 dollar
8 monthly nut. I think it was around June, July that we
9 hit the, totally hit the wall and were unable to pay any
10 more and stopped paying all of our mortgages and
11 everything else.
12 So I would guess, at least for money received
13 in the first half of 2010, I would guess that the great,
14 great, great majority of it that came in went to pay
15 mortgages while we were trying to save all of our --
16 keep our properties, keep our businesses going.
17 Is that helpful?
18 MS. BARNIER: Absolutely.
19 Anyone else?
20 MR. WEAVER: I'm still confused about records
21 and accounting and things of that nature. Let me just
22 ask, just concerning one of the properties, since it is
23 something you have identified as at least at one point
24 having a pretty significant value. What records do you
25 have concerning the project -- I think you called it the

Audio Recording of: 341 Meeting - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Page 56

1 One Hundred Hectare Roca, Uruguay? Is there electronic
2 database on that, are there paper documents, are there
3 other records concerning investors or purchases or sales
4 or permits or anything of that nature concerning that
5 project?
6 MR. WESCOTT: There are -- yes, there are such
7 records.
8 MR. WEAVER: What records do you have?
9 MR. WESCOTT: What records do I have. I think
10 we provided everything that we had digitally to
11 Mr. Ison. The paper records are not very well
12 organized.
13 MR. WEAVER: I don't care if they are organized
14 or not. There are paper records. Where are the paper
15 records?
16 MR. WESCOTT: They would be distributed between
17 here and probably the office in Ecuador, possibly.
18 MR. WEAVER: And you still have control of
19 those records?
20 MR. WESCOTT: I have control of the ones that
21 are at our house. Absolutely.
22 MR. WEAVER: What about the ones that are in
23 Uruguay?
24 MS. BARNIER: Ecuador.
25 MR. WEAVER: Ecuador, I'm sorry. I don't

Audio Recording of: 341 Meeting - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Case: 12-0314 Sup Exhibit D - 341 Hearing and Deposition Transcripts 3:5 D-148 of 228

1    travel as much as Mr. Wescott, so I lose track of the
2    countries.
3            MR. WESCOTT: I know if I were to go there, I
4    would be able to look at records, absolutely.
5            MS. BARNIER: But, Mr. Wescott, you had a court
6    order to produce those records. You just testified you
7    were in Ecuador, were there for five days. Why didn't
8    you got the records and bring them back?
9            MR. WESCOTT: I'm not sure which records you
10   are talking about.
11           MR. WEAVER: I'm talking about the ones in
12   Uruguay.
13           MS. BARNIER: I'm talking about -- you were
14   asked to produce records about Ecuador. You just
15   testified the records for Uruguay are in Ecuador, why
16   didn't you bring those back, it's pursuant to the court
17   order.
18           MR. WESCOTT: I did not actually testify to
19   that effect.
20           MS. BARNIER: I'm sorry. Whoa, whoa, whoa. I
21   don't want to go past this. Mr. Weaver asked you where
22   the records were for the properties in Uruguay, and
23   didn't you just explain that they are in the office in
24   Ecuador?
25           MR. WESCOTT: No, I did not.

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1            MS. BARNIER: Where are the records for the
2    properties in Uruguay?
3            MR. WESCOTT: I don't know. But we did, we had
4    a court order, and we produced everything that we had
5    and sent it to Mr. Ison. Everything we had in digital
6    format, we e-mailed, and I believe it went to you on a
7    flash drive or memory stick or something. And
8    everything we had in paper format, we provided, I don't
9    know how he got that to you. I don't know what -- I
10   don't recall what, if any, questions were actually even
11   relevant to that.
12           MS. BARNIER: Are there any records in the
13   Ecuador property, pursuant to that order?
14           MR. WESCOTT: In the Ecuador property?
15           MS. BARNIER: Located.
16           MR. WESCOTT: I don't believe so.
17           MR. WEAVER: What about the Uruguay property?
18           MR. WESCOTT: I don't understand the question.
19           MR. WEAVER: Any records that were produced
20   concerning the Uruguay property?
21           MR. WESCOTT: You know what, let me go look
22   back and look at the court order again, see what we were
23   asked to produce, and see what, if anything, we produced
24   on that.
25           MR. WEAVER: I'm sure you'll amend that and

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1    request the Uruguay property.
2            MS. BARNIER: We have to do another one.
3            Anything else at this point? So we will
4    continue it to July 25th, 9:30. Hopefully, that will be
5    the last one. I will be looking forward to the amended
6    schedules, so they will be accurate.
7            MR. WESCOTT: Can I ask a question? I don't
8    think it has to be on the record.
9            MS. BARNIER: Sure. We are concluding. Then
10   we are going to go off the record because Mr. Wescott
11   has a question.
12           (End of recording)
13                   -oOo-
14
15
16
17
18
19
20
21
22
23
24
25

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

1    State of California
2    County of Sonoma
3
4
5
6
7
8            CERTIFICATE OF TRANSCRIBER
9
10
11           I hereby certify that the foregoing
12   transcription in the within-entitled cause was
13   transcribed by me, CHRISTINE GOODIN, a Certified
14   Shorthand Reporter and disinterested person, and was
15   thereafter transcribed into typewriting.
16
17
18                   Dated: July 31, 2012
19
20
21
22
23                   Christine Goodin
24
25

Audio Recording of: 341 Meeting  - 6/20/2012
West Coast Reporters, Inc. * 415-472-2361

Case: 12-0314  Sup Exhibit D - 341 Hearing and Deposition Transcripts 3:5 D-149 gt 228
of 47

*CERTIFIED TRANSCRIPT OF:*

**In Re: Matter of Wescott**

**12-30143 DM (CHAPTER 7)**

**MONETTE ROSEMARIE STEPHENS**
**Volume 1**

**Job Date: 03/15/2013**

**Reported by: Kim Elwell**



**117 Paul Drive, Suite A**
**San Rafael, CA 94903-2010**

**Main Office: 415-472-2361  Fax: 415-472-2371**
**depos@westcoastreporters.com    www.westcoastreporters.com**

Page 1

```
BEFORE THE UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


In re:               Case No. 12-30143 DM

CARL ALEXANDER WESCOTT and
MONETTE ROSEMARIE STEPHENS,

     Debtors.
_____/

JANINA M. HOSKINS, TRUSTEE IN
BANKRUPTCY OF THE ESTATE OF
CARL ALEXANDER WESCOTT and
MONETTE ROSEMARIE STEPHENS,

     Plaintiff,

     vs.

CARL ALEXANDER WESCOTT and
MONETTE ROSEMARIE STEPHENS,

     Defendants.
_____/


             Deposition of

     MONETTE ROSEMARIE STEPHENS

             Volume I
             Pages 1-213


          Friday, March 15, 2013


     NOTICING ATTORNEY: JEAN BARNIER

REPORTED BY: KIMBERLY K. ELWELL, CSR NO. 12980
```

Page 2

```
1              INDEX
2  EXAMINATION BY:                      PAGE
3  MS. BARNIER                      6
4
5              EXHIBITS
6  PLAINTIFF'S   DESCRIPTION           PAGE
7    1   California Secretary of State    23
         Corporate Filing, Newforth
8        Partners, LLC
9    2   Newforth Partners, LLC          32
         Website page entitled
10       "Experience Matters"
11   3   Newforth Partners, LLC          33
         Website page entitled
12       "Monette Stephens - Managing
         Director"
13
     4   Complaint, Frederick C. Fiechter  50
14       vs. Carl Wescott, et al.
15   5   Designation of Beneficiary       55
16   6   Agreement to Split Rainforest    62
         Capital Note in to Two Notes
17
     7   Agreement to Pay Off Rainforest  63
18       Capital Note Early
19   8   Pook Snook Dook Limited          67
         Partnership Wells Fargo Bank
20       Statements
21   9   Wells Fargo Bank Withdrawal      90
         Receipts
22
     10  Transmutation Agreement of Carl  100
23       Wescott and Monette Stephens
24   11  California Secretary of State    107
         Corporate Filing, Atlas
25       Consulting, LLC
```

Page 3

```
1              E X H I B I T S
               (continued)
2
3  PLAINTIFF'S   DESCRIPTION           PAGE
4    12  Atlas Consulting, LLC Balance    111
         Sheet
5
     13  Atlas Consulting, LLC US Bank    121
6        Business Statements
7    14  Atlas Consulting, LLC US Bank    122
         Business Statements
8
     15  Atlas Consulting, LLC Wells Fargo  124
9        Business Account Application
10   16  Atlas Consulting, LLC Wells Fargo  130
         Bank Statements
11
     17  Atlas Consulting, LLC Wells Fargo  138
12       Bank Statements
13   18  Photocopies of checks from Atlas   148
         Consulting, LLC to Carl Wescott
14       and Larissa Silva
15   19  Photocopies of checks from         150
         LL Organization, Inc. to
16       Atlas Consulting, LLC
17   20  Photocopies of money orders       151
18   21  Deposit receipts            153
19   22  Photocopies of money orders       156
20   23  Escrow Agreement            160
21   24  String of e-mails           163
22   25  String of e-mails           166
23   26  String of e-mails           167
24   27  E-mail                 168
25   28  E-mail with attachment          168
```

Page 4

```
1              E X H I B I T S
               (continued)
2
3  PLAINTIFF'S   DESCRIPTION           PAGE
4    29  Carl Westcott Balance Sheet     170
         9/30/08
5
     30  Straight Note            180
6
     31  Atlas Consulting, LLC Wells Fargo  181
7        Bank Statement
8    32  Deed Record for San Francisco    188
         County
9
     33  Deed Record for Santa Barbara    191
10       County
11   34  String of e-mails           199
12   35  2010 1099-INTs           204
13   36  Authorization to Close Escrow    206
14
15     QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
16           Page  Line
17            6   6
              7   8
18
19     QUESTIONS REQUESTED TO BE CERTIFIED
20  Page 6, Line 6: "Question: Ms. Stephens, why you did
    you keep your name when you married Carl Westcott?"
21
22            --oOo--
23
24
25
```

Case: 12-03143  Sup Exhibit D - 34th Hearing and Deposition Transcripts D-152 of 228
of 47

Page 5

1  Pursuant to Notice of Deposition and on Friday,
2  March 15, 2013, commencing at the hour of 9:43 a.m. at
3  the law offices of MacConaghy & Barnier, PLC, 645 First
4  Street West, Suite D, Sonoma, California, before me,
5  KIMBERLY K. ELWELL, a Certified Shorthand Reporter and
6  Deposition Officer of the State of California, there
7  personally appeared
8    MONETTE ROSEMARIE STEPHENS,
9  called as a witness by the Plaintiff, who having been
10 duly sworn by me, was examined and testified as
11 hereinafter set forth.
12        --oOo--
13        APPEARANCES
14 For the Plaintiff:
15   JEAN BARNIER, Attorney at Law
     MacCONAGHY & BARNIER, PLC
16   645 First Street West
     Suite D
17   Sonoma, California 95476
     (707) 935-3205
18
   For the Defendants:
19
     SHEILA GROPPER NELSON, Attorney at Law
20   LAW OFFICE OF SHEILA GROPPER NELSON
     55 Francisco Street
21   Sixth Floor
     San Francisco, California 94133
22   (415) 362-2221
23 Also Present:
24 JANINA M. HOSKINS, Plaintiff
25        --oOo--

Page 6

1        MONETTE STEPHENS,
2  after being sworn by the Certified Shorthand
3      Reporter, testified as follows:
4
5      EXAMINATION BY MS. BARNIER
6   Q.  Ms. Stephens, why you did you keep your name
7  when you married Carl Westcott?
8      MS. GROPPER NELSON: I am going to object to
9  the question based on relevance and on her right to
10 privacy and I am actually going to direct her not to
11 respond.
12      MS. BARNIER: On what basis?
13      MS. GROPPER NELSON: On her right to --
14 constitutional right to privacy.
15      MS. BARNIER: Okay. So let me advise,
16 Counsel, Ms. Stephens what will happen.
17      If you could mark that, please.
18      MS. BARNIER: I will go into court, tell Judge
19 Montali that your counsel has instructed you not to
20 answer a question of why you kept your name as your
21 constitutional right to privacy. He will have a
22 hearing on it. If I am successful, which I believe I
23 will be, you will have to come back. So just so you
24 understand in terms of -- that's what will happen. So
25 you --

Page 7

1      MS. GROPPER NELSON: And for the record, we
2  appreciate Ms. Barnier giving my client --
3      MS. BARNIER: I wasn't --
4      MS. GROPPER NELSON: -- legal advice.
5      MS. BARNIER: I wasn't. It was directed to
6  you, Counsel, just so that she understood.
7  BY MS. BARNIER:
8   Q.  Ms. Stephens, in your opinion, what does it
9  say about a married woman who doesn't take her
10 husband's name?
11      MS. GROPPER NELSON: I am going to object to
12 the question as being argumentative and lacking in
13 relevance to the subject matter of this deposition and
14 I am going to direct the witness not to respond based
15 upon her right to privacy and that it involves a legal
16 opinion and, therefore, I am going to direct her not to
17 respond.
18      Counsel, I am --
19      MS. BARNIER: Let me restate the question.
20      MS. GROPPER NELSON: I am going to say
21 something for the record at this point.
22      We are here to cooperate with the Trustee and
23 to proceed with this action as efficiently as possible,
24 and these questions are argumentative in nature and do
25 not go to the subject matter of the case. If you want

Page 8

1  to make a question that is relevant to the subject
2  matter of the case, then objections will not be lodged.
3      MS. BARNIER: And so you are instructing her
4  not to answer on what basis, Counsel?
5      MS. GROPPER NELSON: Read the record, please.
6      (The record was read back as requested.)
7      (Discussion held off the record while the
8  reporter was reviewing her stenographic notes.)
9      MS. BARNIER: Why don't you read my question,
10 too.
11      (The record was read back as follows:
12      "Question: Ms. Stephens, in your opinion,
13      what does it say about a married woman who
14      doesn't take her husband's name?")
15      MS. BARNIER: Let's go back on the record.
16      I asked her her opinion. What legal opinion
17 is involved in that?
18      MS. GROPPER NELSON: I am not going to get
19 into it with you. We can discuss it with the court.
20      MS. BARNIER: All right.
21 BY MS. BARNIER:
22   Q.  When did you graduate from high school?
23   A.  I don't remember exactly.
24   Q.  The year?
25   A.  1981, I believe.

Case: 12-0314 Sup D Exhibit D - 34t Hearing and Deposition Transcript 3:5 D-153 of 228
of 47

Page 9

| | |
|---|---|
| 1 | Q. You graduated from high school in 1981? |
| 2 | A. Let me think. Yeah. |
| 3 | Q. And what high school was that? |
| 4 | A. James Monroe High School. |
| 5 | Q. And where is that located? |
| 6 | A. In Los Angeles. |
| 7 | Q. Los Angeles proper? |
| 8 | A. It's in the San Fernando Valley. |
| 9 | Q. What was your GPA from high school? |
| 10 | A. I think 3.7 or something close to that. |
| 11 | Q. What were your SAT scores? |
| 12 | A. I don't remember. |
| 13 | Q. What college did you attend? |
| 14 | A. I went to UCSB. |
| 15 | Q. And when did you begin UCSB? |
| 16 | A. The following fall after I graduated from high |
| 17 | school. |
| 18 | Q. In 1981? |
| 19 | A. Yeah, I believe it was 1981. I really don't |
| 20 | remember whether it was -- yeah. I don't remember the |
| 21 | year I graduated. I'm sorry. |
| 22 | Q. From high school? |
| 23 | A. No. |
| 24 | Q. Oh. And what year did you -- I didn't ask |
| 25 | you. |

Page 10

| | |
|---|---|
| 1 | And what year did you graduate from college? |
| 2 | A. Four years later. |
| 3 | Q. So you graduated in June of 1985, would that |
| 4 | be accurate? |
| 5 | A. If I remember correctly that I graduated from |
| 6 | high school in 1981, then it would have been June of |
| 7 | 1985, yes. |
| 8 | Q. How did you pay for your college education? |
| 9 | MS. GROPPER NELSON: I am going to object to |
| 10 | relevance. |
| 11 | BY MS. BARNIER: |
| 12 | Q. She gets to make objections, but unless she |
| 13 | instructs you not to answer, you have to answer the |
| 14 | question. |
| 15 | A. My father paid -- or my parents. |
| 16 | Q. What was your major in college? |
| 17 | A. Computer science. |
| 18 | Q. And did you receive your B.A. in computer |
| 19 | science? |
| 20 | A. No. |
| 21 | Q. What is your B.A. in? |
| 22 | A. I don't have a B.A. |
| 23 | Q. So did you -- I'm sorry, when you said you |
| 24 | graduated, then you did not receive a degree? |
| 25 | A. No, I received a degree. |

Page 11

| | |
|---|---|
| 1 | Q. Okay. What is your degree in? |
| 2 | A. My degree is in computer science. |
| 3 | Q. Okay. And did you have a minor? |
| 4 | A. I did not have a minor. |
| 5 | Q. What was your GPA from college? |
| 6 | A. I don't remember. |
| 7 | Q. After graduation from college, what did you |
| 8 | do? |
| 9 | A. I worked. |
| 10 | Q. And who did you work for? |
| 11 | A. Digital Sound Corporation. |
| 12 | Q. And what was your title? |
| 13 | A. Member of the technical staff. |
| 14 | Q. And what were your responsibilities? |
| 15 | A. I was a software engineer. |
| 16 | Q. And what did you do in that capacity? |
| 17 | A. I wrote software. |
| 18 | Q. How long were you there? |
| 19 | A. Four or five years. |
| 20 | Q. At the end of your employment with Digital |
| 21 | Sound, what was your title? |
| 22 | A. Member of the technical staff. |
| 23 | Q. Did you have any supervisory duties? |
| 24 | A. Yeah. |
| 25 | Q. And what were they? |

Page 12

| | |
|---|---|
| 1 | A. I managed some summer students that were |
| 2 | doing -- writing software at the time. |
| 3 | Q. And when you say working as a software |
| 4 | engineer, could you be specific as to exactly what you |
| 5 | were doing? |
| 6 | A. I wrote software, I designed software, I |
| 7 | developed technical specs, I managed a timeline as to |
| 8 | when things were going to get done. |
| 9 | Q. And then after you left that job, what did you |
| 10 | do? |
| 11 | A. I started consulting. My first husband was |
| 12 | ill and he was in the hospital during that time period |
| 13 | and so I started doing project work. |
| 14 | Q. And how long did you do the project work? |
| 15 | A. For most of the rest of my career. |
| 16 | Q. Okay. So you said it was four to five -- let |
| 17 | me see if I have the timeline correctly. |
| 18 | You graduated in 1985 from college, you worked |
| 19 | for approximately five years for Digital Sound. So |
| 20 | that takes us to about 1990; is that correct? |
| 21 | A. That -- I don't remember the exact dates, but |
| 22 | I worked for Digital Sound during the time that my |
| 23 | husband was ill, for the first part of it. |
| 24 | Q. You don't remember the year that you left |
| 25 | Digital Sound? |

Case: 12-0314   Sup. Ct. Exhibit D - 34th Hearing and Deposition Transcripts 3:5   D-154   of 228
of 47

| Page 13 | Page 15 |
|---|---|
| 1    A. No. | 1    Q. And when was that? |
| 2    Q. And then you said you went to -- you started | 2    A. I taught classes at UC Santa Barbara over, I |
| 3    to work as a consultant. What companies did you | 3    believe, about an eight-year period off and on as a |
| 4    consult for? | 4    lecturer. |
| 5    A. I consulted for various software companies | 5    Q. And what courses did you teach? |
| 6    during that time period. I consulted for a company | 6    A. I taught computer science courses. |
| 7    called Advanced Computer Communication. | 7    Q. And to what level were you teaching? |
| 8    Q. Anyone else? | 8    A. I taught lower division and upper division |
| 9    A. I consulted for a number of start-up companies | 9    courses. |
| 10   that have since been purchased and, to be honest, I | 10   Q. So since graduating from college to your last |
| 11   don't remember their names. | 11   employment, how many years have you worked? |
| 12   Q. Did you get stock in exchange for working at | 12   A. I started working probably in 1985 or '86, and |
| 13   those start-up companies? | 13   I worked until my oldest son was -- after he was born, |
| 14   A. Not during that time, no. | 14   I started to taper off work. So until about 2005. |
| 15   Q. Did you ever receive stock from any of the | 15   Q. So it is about a 20-year period of work. |
| 16   companies that you consulted for? | 16      During that time -- |
| 17   A. No. | 17   A. Uh-huh. |
| 18   Q. Did you continue your education past a B.S. | 18   Q. -- did you work in any other field besides the |
| 19   degree? | 19   computer industry? |
| 20   A. Yes. | 20   A. I worked in the computer industry my entire |
| 21   Q. And what education did you get? | 21   career. |
| 22   A. I got a master's degree in computer science. | 22   Q. I need to back up and I probably should have |
| 23   Q. And where was that from? | 23   made you some admonitions here. |
| 24   A. That was from UCSB. | 24      Have you ever had your deposition taken |
| 25   Q. And when did you receive your master's degree? | 25   before? |

| Page 14 | Page 16 |
|---|---|
| 1    A. I don't remember which year it was. | 1    A. Yes, I have. |
| 2    Q. Did you go back to school right away after | 2    Q. And when was that? |
| 3    completing your B.A. [sic]? | 3    A. I had my deposition taken -- I don't remember |
| 4    A. I took a year off. So it was probably three | 4    when, but a couple years ago, I believe, in -- yeah, I |
| 5    years after I finished my bachelor's degree. | 5    believe about two years ago. |
| 6    Q. So you were working and getting your master's | 6    Q. And was that the only time you have had it |
| 7    at the same time? | 7    taken? |
| 8    A. Yes. | 8    A. I think I had my deposition taken once before |
| 9    Q. Besides working as a consultant and working at | 9    when I was doing expert analysis on a litigation case |
| 10   Digital Sound, have you had any other occupations? | 10   for software. |
| 11   A. I worked as a technology manager at a company | 11   Q. Let me just go through it in case you have |
| 12   called Software.com. | 12   forgotten the rules. |
| 13   Q. And what were your responsibilities there? | 13      As you already have figured out, it is being |
| 14   A. I managed a team of software developers, I | 14   recorded. The recorder can only take down one person |
| 15   managed a product line, I did technical presentations | 15   talking at a time. Let me finish my question before |
| 16   when the company was raising money, I managed people, I | 16   you start answering and I will try very hard to extend |
| 17   managed timelines, I managed projects. I wrote some | 17   the same courtesy. |
| 18   code, I believe, while I was there, although I don't | 18      If I ask you a question and you don't |
| 19   really remember how much code I wrote. | 19   understand it, please tell me and I will rephrase it. |
| 20   Q. How many people were you managing? | 20      Does all that make sense to you? |
| 21   A. During that time, I think there were between | 21   A. Yes. |
| 22   four and six people. | 22   Q. Okay. Are you taking any medications today |
| 23   Q. Did you ever work as an instructor at any time | 23   that would impair your ability to answer all questions |
| 24   in your life? | 24   truthfully? |
| 25   A. Yes. | 25   A. No. |

Case: 12-0314  SupDExhibit D - 34t Hearing and Deposition Transcripts 3:5D-155 of 228
of 47

Page 17

1    Q.  I also want to remind you that your testimony
2  is under penalty of perjury and perjury is punishable
3  by a jail term if you were found guilty of perjury.
4       So you explained earlier that you had your
5  deposition taken twice before.  Do I have that correct?
6    A.  To the best of my recollection.
7    Q.  And you explained that you had been an expert
8  witness; is that correct?
9    A.  I was an expert analyst.
10   Q.  What does that mean?
11   A.  It means I analyzed software and I analyzed
12  information, technical information for a software
13  litigation suit.
14   Q.  And what was the suit?
15   A.  I worked on several suits.  I worked on a case
16  that was on a D'RAM manufacturing process and that was
17  the one, I believe, that I was deposed on.
18       (The reporter asks for clarification.)
19  BY MS. BARNIER:
20   Q.  Is that D'RAM?
21   A.  Uh-huh.
22   Q.  You need to answer "yes" or "no."  That's the
23  other one I forgot to tell you.
24   A.  Oh, yes.
25   Q.  Okay.  Did you ever testify in court as an

Page 18

1  expert witness?
2    A.  Yes.
3    Q.  And when was that?
4    A.  I don't remember.
5       MS. GROPPER NELSON:  I am going to clarify the
6  record here.  She isn't saying that she was necessarily
7  an expert witness, she said she was an expert analyst
8  and we don't know that she was qualified as an expert
9  witness.  So that's assuming facts not in evidence.
10  BY MS. BARNIER:
11   Q.  What was the name of the case that you
12  testified in as an expert?
13       MS. GROPPER NELSON:  That's assuming facts not
14  in evidence.  I am going to request that the question
15  be re-asked.
16       MS. BARNIER:  Counsel, you don't have the
17  right to do that so let's keep going.
18       MS. GROPPER NELSON:  I am objecting to the
19  question as assuming facts not in evidence and I am
20  requesting that the question be rephrased.
21  BY MS. BARNIER:
22   Q.  Did you understand the question, Ms. Stephens?
23   A.  Could you re-ask me the question, please?
24   Q.  Sure.  What was the name of the case that you
25  testified in as an expert?

Page 19

1       MS. GROPPER NELSON:  I am going to object to
2  the question as assuming facts not in evidence and I am
3  going to ask that the question be rephrased.
4  BY MS. BARNIER:
5    Q.  Did you understand the question, Ms. Stephens?
6    A.  Can you rephrase the question, please?
7    Q.  Were you qualified as an expert at trial?
8    A.  I don't remember.
9    Q.  What does it mean to you to give testimony as
10  an expert analyst at trial?
11   A.  I was asked about the handshaking protocol
12  between clear to send and request to send.
13   Q.  And were you questioned by the plaintiff and
14  the defendant?
15   A.  I don't remember.
16   Q.  Do you remember the name of the judge in the
17  case?
18   A.  No.
19   Q.  Do you remember who was the plaintiff?
20   A.  I believe it was Hyundai.
21   Q.  Who hired you as an expert analyst?
22   A.  I was hired by one of the expert witnesses.
23  His name was John Kelly.
24   Q.  And he paid your bill?
25   A.  Yes.

Page 20

1    Q.  Your bill was not paid by a law firm?
2    A.  He paid me directly.
3    Q.  How much did he pay you?
4    A.  I don't remember.
5    Q.  And when was this?
6    A.  It was during the '90s.  I don't remember the
7  exact year.
8    Q.  How long were you on the stand?
9    A.  A few minutes.
10   Q.  Now, in April of 2012, you testified that you
11  had three FINRA licenses at your 341 hearing.  Do you
12  remember that?
13   A.  I don't believe they are licenses.
14   Q.  What do you call them?
15   A.  Registrations.
16   Q.  Okay.  And do you have three FINRA
17  registrations?
18   A.  No.
19   Q.  Did you have three FINRA registrations at the
20  time of the bankruptcy filing?
21   A.  No.
22   Q.  When did your FINRA registrations expire?
23   A.  My FINRA registrations were no longer
24  affiliated with an investment bank at the time of
25  the -- at the time we filed, but I think you have six

Case: 12-0314 Sup D Exhibit D - 341 Hearing and Deposition Transcripts 3:5 D-156 of 228
of 47

Page 21

1  months to reattach them to a firm and I never did.
2  Q. And what FINRA registrations did you have?
3  A. I had 7, 24 and 63.
4  Q. What is a FINRA 7?
5  A. I believe the FINRA 7 is a general investment
6  banking registration.
7  Q. Do you have to take a test to get a FINRA 7?
8  A. Yes.
9  Q. When did you take the test?
10 A. I don't remember.
11 Q. How long did you have -- or when was the first
12 time that you obtained your FINRA registrations?
13 A. It was in 2002 or 2003.
14 Q. And then what else? Do you have a FINRA 24 --
15 or did you have? Excuse me.
16 A. Yes.
17 Q. And what did a FINRA 24 allow you to do?
18 A. It is for being a -- you know, I don't
19 remember. I don't remember the differences and
20 subtleties associated with the different registrations
21 at this point.
22 Q. So why did you obtain -- let me just keep
23 going then.
24     So did you also have a Series 63 registration?
25 A. Yes, I did.

Page 22

1  Q. Why did you get those three FINRA
2  registrations?
3  A. Because I was working -- I cofounded and was
4  working with a firm called Newforth Partners. And as
5  one of the partners at Newforth Partners, we all had to
6  be registered, had to get the registrations.
7  Q. So did you have to take three tests to pass
8  all of those --
9  A. Yes, I did.
10 Q. Let me finish the question.
11 A. I apologize.
12 Q. That's okay.
13     So you took three tests. Did you pass each
14 test the first time?
15 A. Yes, I did.
16 Q. And I think you just referred to it. In March
17 of two-thousand- -- you formed Newforth Partners, LLC;
18 is that correct?
19 A. I was a partner with other people that formed
20 Newforth Partners, LLC, yes.
21 Q. And what was the purpose of the business?
22 A. To advise and manage and consult to software
23 companies pre- and post-transaction.
24 Q. And --
25 MS. BARNIER: Well, let mark this Exhibit 1.

Page 23

1      (Exhibit 1 was marked for identification.)
2  BY MS. BARNIER:
3  Q. And when you are done looking at that, if you
4  could pass it to the recorder so she can attach it.
5  MS. GROPPER NELSON: I would like a copy of
6  everything, please.
7  MS. BARNIER: You will get one when you get
8  the deposition. You can look at hers.
9  MS. GROPPER NELSON: I would like it during
10 the course of the deposition of my client. You are
11 obligated to do it under the federal rules.
12 MS. BARNIER: No, I am not.
13 MS. GROPPER NELSON: Yes, you are.
14 MS. BARNIER: Go pull it up, Sheila, and show
15 it --
16 MS. GROPPER NELSON: Federal Rule 30.
17 MS. BARNIER: -- to me.
18 Pull it out and show it to me.
19 BY MS. BARNIER:
20 Q. If you look at --
21 MS. GROPPER NELSON: Give me the Code.
22 MS. BARNIER: I don't have a Code with me.
23 BY MS. BARNIER:
24 Q. As you look at the --
25 MS. GROPPER NELSON: You have a Code here in

Page 24

1  your office. Look, you are making it more difficult
2  than it needs to be. You are obligated --
3  MS. BARNIER: Let's go off the record.
4  MS. GROPPER NELSON: -- to provide it to --
5  MS. BARNIER: Let's go off the record.
6  THE REPORTER: (To Ms. Gropper Nelson) Off
7  the record?
8  MS. GROPPER NELSON: No, keep this on the
9  record.
10 MS. BARNIER: Okay.
11 MS. GROPPER NELSON: You are obligated to
12 provide the exhibit to the witness for the witness's
13 examination and to counsel.
14 MS. BARNIER: You have it,
15 Ms. Nelson Gropper [sic]. Let's stay on.
16 I have provided a copy. You may look at it
17 with your counsel -- excuse me, with your client. You
18 have it in your hand right now. I would like to
19 proceed. If you have any objection --
20 MS. GROPPER NELSON: Is this the only copy,
21 Ms. Barnier?
22 MS. BARNIER: And for me.
23 MS. GROPPER NELSON: Okay. I want a copy and
24 I am asking you to provide it now. You had an
25 opportunity to get ready for this deposition and you

Case: 12-0314  Sup Exhibit D - 34 Hearing and Deposition Transcripts 3:5 D-157 of 228
of 47

Page 25

1  are doing this in an effort to play games. It is
2  unnecessary and it is extending the time of the
3  deposition. We can bring this all up with the judge
4  when we talk to him later today. I want to move this
5  forward. We want to cooperate.
6      You are not following the federal rules. You
7  didn't follow the federal rules when you noticed
8  Mr. Martin's deposition. You are obligated to meet and
9  confer with all parties who are interested in the
10 deposition. You didn't follow the --
11     MS. BARNIER: Let's go off the record --
12     MS. GROPPER NELSON: No, we are on the record.
13     MS. BARNIER: -- because this has nothing to
14 do with the --
15     MS. GROPPER NELSON: We are on the record.
16 You have done this repeatedly. It is
17 inappropriate, it is not professional. Provide copies
18 for my client and for me to proceed with this
19 deposition. We are not going to do it as to every
20 exhibit.
21     So we can take a break, you can take that big
22 pile of paper there, you can send it out for copying so
23 that I can have a copy during the course of the
24 deposition so that we can do this more smoothly. We
25 can proceed with this now, but we are not going to do

Page 26

1  this throughout the entire deposition.
2      MS. BARNIER: Are you done?
3      MS. GROPPER NELSON: I am for -- at this
4  moment.
5      MS. BARNIER: I would like to move forward.
6  You have a copy that you can review. You will be able
7  to look at all the exhibits when you get your copy of
8  the deposition. That's my understanding of the rules.
9  You and I have a different interpretation, but I am
10 sure you can bring it up to Judge Montali.
11     So can we please go forward?
12     MS. GROPPER NELSON: We are going to go
13 forward in the following way: We will proceed, but we
14 are not going to do this with every exhibit this
15 afternoon and morning. So I would request and I am
16 advising you to start copying those exhibits, because I
17 am not going to sit here with multiple-page exhibits.
18 This is a one-page exhibit. I am not going to sit here
19 with multiple-page exhibits and have this discussion as
20 to each exhibit. You are impeding --
21     MS. BARNIER: Are you refusing to go --
22     MS. GROPPER NELSON: You are impeding the
23 smooth flow of this deposition, Ms. Barnier, and it is
24 not beneficial to the Trustee, the Court or my client.
25 You are wasting time and money.

Page 27

1      Now, we can proceed as to this one-page
2  document, but if it is a multiple-page document, I am
3  entitled to have a separate copy.
4      MS. BARNIER: And as I have stated earlier on
5  the record, that's your opinion and so --
6      MS. GROPPER NELSON: It is not my opinion, it
7  is the Code.
8      MS. BARNIER: -- you have made your --
9      MS. GROPPER NELSON: It is not my opinion, it
10 is the Code. It is the Federal Rules of Civil
11 Procedure that are incorporated into the Federal Rules
12 of Bankruptcy Procedure and the adverse proceeding.
13 This isn't a 2004. This is a deposition pursuant to
14 the Federal Rules of Bankruptcy and Civil Procedure,
15 and I am entitled to copies of the documents that are
16 presented to the witness for examination.
17     MS. BARNIER: And you have a copy in front
18 of --
19     MS. GROPPER NELSON: No, I am entitled to a
20 separate copy.
21     MS. BARNIER: That's not my reading of the
22 Code. We have a choice to --
23     MS. GROPPER NELSON: Do you have a Code book
24 here?
25     MS. BARNIER: Ms. Nelson Gropper, we have a

Page 28

1  choice --
2      MS. GROPPER NELSON: We do have a choice, and
3  you can either do it pursuant to the Bankruptcy Code
4  and the Civil Procedure Code or not do it. So we will
5  discuss it. We will proceed with this, but we are not
6  going to do this with multiple-page documents
7  throughout this deposition. So you can squirm over
8  there and cross your arms and play games, but it ain't
9  going to work.
10     MS. BARNIER: Are you done?
11     MS. GROPPER NELSON: For now.
12     (Brief pause in the proceedings at 10:11 a.m.)
13     MS. BARNIER: Ms. Nelson Gropper, if I could
14 please have your attention instead of you hiding behind
15 a piece of paper.
16     MS. GROPPER NELSON: I am reading the
17 document, Ms. Barnier. You said to me that I had it
18 available for review right now, which is what I am
19 doing.
20     MS. BARNIER: All right. We will play your
21 game. Would you please hand that to the witness?
22     MS. GROPPER NELSON: When I am finished
23 reading it.
24     MS. BARNIER: No, here is your copy, because
25 it goes -- it needs to be in for the court reporter.

Case: 12-03145  Sup D Exhibit D - 34t Hearing and Deposition Transcript 3:5 D-158 of 228
of 47

Page 29

1  Can you do that?
2        MS. GROPPER NELSON: When I am finished
3  reading it.
4        MS. BARNIER: They are the same, Sheila, for
5  God's sake. Let's move it.
6        MS. GROPPER NELSON: Stop talking to me in
7  that manner. It is inappropriate.
8        MS. BARNIER: Your condescension is
9  inappropriate. If you could --
10        MS. GROPPER NELSON: That may be what --
11        MS. BARNIER: -- let your client please look
12  at the document.
13        MS. GROPPER NELSON: When I am finished
14  reviewing it. I will be glad to move forward with
15  this.
16        MS. BARNIER: Could you please mark the time
17  that the attorney spent and how long she is taking to
18  read so that we can add it on to the seven hours?
19        (Brief pause in the proceedings at 10:13 a.m.)
20        MS. GROPPER NELSON: (To the witness) Take
21  your time.
22        (Brief pause in the proceedings at 10:13 a.m.)
23        THE WITNESS: Okay.
24  BY MS. BARNIER:
25     Q. In March of 2003, you cofounded Newforth

Page 30

1  Partners, LLC; is that correct?
2     A. Yes.
3     Q. What was the purpose of the business?
4        MS. GROPPER NELSON: Asked and answered.
5        MS. BARNIER: Sorry, I have forgotten because
6  you went on for so long.
7  BY MS. BARNIER:
8     Q. I'm sorry, could you please --
9        MS. GROPPER NELSON: Read the record, please.
10  Asked and answered.
11        MS. BARNIER: She can still repeat it.
12        MS. GROPPER NELSON: Asked and answered.
13  BY MS. BARNIER:
14     Q. What was your title?
15     A. Managing director.
16     Q. And what did your duties include?
17     A. I managed consulting processes.
18     Q. Could you be more specific than "managing
19  consulting processes"? What does that mean?
20     A. I managed client engagements, I worked with a
21  team of people, I did research and analysis, I
22  collected data, I managed people who were collecting
23  data. We produced reports.
24     Q. Did you meet with clients?
25     A. I did meet with clients.

Page 31

1     Q. How many clients did Newforth have over the
2  course of time that you were managing director?
3     A. I don't remember.
4     Q. More than ten?
5     A. I don't remember.
6     Q. Less than a hundred?
7     A. I don't remember.
8     Q. Did you bring any clients to Newforth?
9     A. I did bring clients to Newforth, yes.
10     Q. And how did you find your clients?
11     A. Through networking, through contacts that I
12  had in the industry.
13     Q. And what type of clients would be interested
14  in working with Newforth Partners?
15     A. Small and midsize software companies.
16     Q. Just software companies alone?
17     A. I was only ever involved with software
18  companies. I don't know if there were other companies,
19  other types of companies, but I worked exclusively with
20  software companies.
21     Q. And what --
22     A. Maybe some hard- -- actually, that's wrong.
23  Technology companies. There could have been hardware
24  companies. I don't remember any...
25     Q. What -- I'm sorry. You don't remember?

Page 32

1     A. To the best of my knowledge, it was software.
2  It was technology companies, mostly software.
3     Q. And what would be the value of those companies
4  that you brought to Newforth?
5     A. Companies were -- it just -- it depended on
6  where they were in their growth lifecycle. It could
7  have been anywhere from less than $1,000,000 of revenue
8  to, you know, five to ten million dollars in revenue.
9        MS. BARNIER: Okay. This will be Exhibit 2.
10        MS. GROPPER NELSON: Thank you.
11        (Exhibit 2 was marked for identification.)
12  BY MS. BARNIER:
13     Q. Have you seen this document before?
14     A. Yes.
15     Q. And it's on the Newforth website; is that
16  correct?
17     A. Yes.
18     Q. And is it an accurate statement regarding
19  Newforth?
20     A. To the best of my knowledge.
21     Q. Okay. And it's accurate that "Team members
22  have completed more than $8,000,000,000 in
23  transactions"?
24     A. I never verified that number, but I didn't put
25  it on there.

Case: 12-0314  Sup D Exhibit D - 34t Hearing and Deposition Transcripts 3:5 D-159  of 228
of 47

Page 33

1  Q. But to the best of your knowledge, this is an
2  accurate statement about Newforth Partners?
3     A. To the best of my knowledge.
4     MS. BARNIER: And this will be Exhibit 3.
5     I'm sorry, you need to hand those to the court
6  reporter.
7     THE WITNESS: Okay.
8     (Exhibit 3 was marked for identification.)
9  BY MS. BARNIER:
10    Q. Is that an accurate statement of your
11 background?
12    A. Yeah.
13    Q. How much money did you contribute to establish
14 Newforth Partners?
15    A. I don't remember.
16    Q. Did you contribute any money to establish
17 Newforth Partners?
18    A. Yes.
19    Q. Was it more than $25,000?
20    A. I don't remember.
21    Q. You cannot remember any sum at all? Was it
22 less than $100,000?
23    A. I don't remember the amount that we
24 contributed.
25    Q. You said, "we." I was asking you specifically

Page 34

1  how much --
2     A. Okay. There were multiple partners and when
3  there were capital calls, I contributed to the capital
4  calls. I don't remember the numbers.
5     Q. Okay. But I was asking when you founded
6  Newforth Partners, did you make a capital contribution?
7     A. Yes.
8     Q. Do you remember how much?
9     A. I don't remember how much it was.
10    Q. What was the source of the money that you used
11 for the capital contribution?
12    A. It was money that was in my bank account.
13    Q. And that would be money that you had earned as
14 income from previous employment?
15    A. From previous employment? Yeah.
16    Q. Before you married Carl Wescott, what was your
17 annual income?
18    A. My annual income was up and down because it
19 depended on how much consulting or what types of
20 projects I did during the course of the year.
21    Q. Okay. So in the year -- let's say you worked
22 20 years. So --
23    MS. GROPPER NELSON: I am going to object to
24 the question as being overly broad, vague and ambiguous
25 and would request that Ms. Barnier ask for specific

Page 35

1  years.
2     BY MS. BARNIER:
3     Q. The year before you married Carl -- but let's
4  back up.
5     What year did you marry Carl Wescott?
6     A. We were married in 2005.
7     Q. In 2005, what was your annual income?
8     A. I don't remember.
9     Q. 2004, what was your annual income?
10    A. I don't remember.
11    Q. So over the 20 -- let's go over the last ten
12 years, did you, on average, earn more than $100,000 a
13 year?
14    A. I believe so.
15    Q. Did you earn more than $200,000 a year?
16    A. I don't remember.
17    Q. Did you have any investments before you were
18 married?
19    A. I did.
20    Q. And what were they worth before you were
21 married?
22    A. I had IRAs and retirement funds before I was
23 married and I had -- I believe that when we got
24 married, my net worth was somewhere in the one and a
25 half to two million dollar range.

Page 36

1     Q. And did you manage your own portfolio?
2     A. No, I did not.
3     Q. Who managed your portfolio?
4     A. I had --
5     MS. GROPPER NELSON: I am going to object to
6  the question as vague and ambiguous as to time and
7  would request that Ms. Barnier be more specific in her
8  inquiry.
9     BY MS. BARNIER:
10    Q. Who managed your portfolio?
11    MS. GROPPER NELSON: I am going to object to
12 the question as being vague and ambiguous as to time
13 and request that Ms. Barnier be more specific in her
14 inquiry.
15    MS. BARNIER: Counsel, you may object to a
16 question all you want and it's on the record. And when
17 we go to trial, you can bring it up, but I do not need
18 to rephrase a question at your request. So let's keep
19 going, unless you are not getting the question.
20 BY MS. BARNIER:
21    Q. So before you married Carl Wescott, who
22 managed your portfolio?
23    A. I had some money at a company called SEI
24 Investments before I married Carl.
25    Q. Is that the -- the bulk of your portfolio was

Case: 12-03143 Sup D Exhibit D - 34t Hearing and Deposition Transcripts3:5 D-160 of 228
of 47

| Page 37 | Page 39 |
|---|---|

| Page 37 |
|---|
| 1  there? |
| 2     A. Yes. |
| 3     Q. And what did you do with your investments |
| 4  after you were married? |
| 5     A. Over the course of time, my husband took over |
| 6  managing my investments. |
| 7     Q. And what are your investments worth today? |
| 8     A. Probably zero. |
| 9     Q. So you don't have an IRA that has any value? |
| 10    A. No. |
| 11    Q. Did you borrow against your IRA? |
| 12    A. No. |
| 13    Q. In addition to your IRA, did you have any |
| 14  other investment funds? |
| 15    A. Yes. |
| 16    Q. And what was their value before you married |
| 17  Mr. Wescott? |
| 18    A. I gave you the full number of what my overall |
| 19  net worth was, and I don't know what the breakdown was |
| 20  between my IRA versus my other investments. They have |
| 21  all been liquidated. |
| 22    Q. And why were they liquidated? |
| 23    A. Carl wanted to manage them. |
| 24    Q. And why did you agree to that? |
| 25    A. Because he was a seasoned investor, he had |

| Page 39 |
|---|
| 1  in April and May of 2012? |
| 2     A. I don't remember. |
| 3     Q. Did you apply for any jobs in April or May of |
| 4  2012? |
| 5     A. I don't remember. |
| 6     Q. In June of 2012, you testified again at your |
| 7  341 hearing that you were looking for work. What |
| 8  employment have you found since June of 2012? |
| 9     A. I haven't found any employment since June of |
| 10  2012. |
| 11    Q. What has been the source of your income since |
| 12  you and your husband filed for bankruptcy in February |
| 13  of 2012? |
| 14    MS. GROPPER NELSON: I am going to object to |
| 15  the question as being an inaccurate statement as to the |
| 16  facts. |
| 17    MS. HOSKINS: January. |
| 18    MS. BARNIER: Well, it depends on which one |
| 19  you want to look at. |
| 20  BY MS. BARNIER: |
| 21    Q. In January of 2012. |
| 22    A. Could you rephrase your question, please? |
| 23    Q. What was the source of your income since you |
| 24  and your husband filed for bankruptcy in January of |
| 25  2012? |

| Page 38 | Page 40 |
|---|---|

| Page 38 |
|---|
| 1  made lots of money, I trusted him, I was married to |
| 2  him. |
| 3     Q. When did you stop being the managing director |
| 4  of Newforth? |
| 5     A. I stopped working full-time after the birth of |
| 6  my first child, but I remained a managing director at |
| 7  Newforth until it was -- until we stopped -- until the |
| 8  company basically ceased to exist at the end of 2011. |
| 9     Q. So in December of 2011, the company -- what |
| 10  happened to the company? |
| 11    A. My partners had pretty much all left except |
| 12  for Tricia Salinero, who then went to Woodside Capital |
| 13  with the remaining people who were still working at |
| 14  Newforth. |
| 15    Q. What happened to your capital contributions |
| 16  that you made to Newforth? |
| 17    A. They went away. |
| 18    Q. I don't understand. What do you mean "They |
| 19  went away"? |
| 20    A. We didn't -- she didn't give us -- there was |
| 21  nothing to distribute when the company ceased |
| 22  operations. |
| 23    Q. On March 21st, 2012, at your 341 hearing where |
| 24  you and your husband were present, you testified that |
| 25  you were looking for work. What jobs did you apply for |

| Page 40 |
|---|
| 1     A. It was a combination of monies that my husband |
| 2  brought to -- you know, brought in, as well as monies |
| 3  that I borrowed from my parents. |
| 4     Q. How much money have you borrowed from your |
| 5  parents? |
| 6     A. I don't remember the exact number. |
| 7     Q. More than $50,000? |
| 8     A. No, I don't believe so. |
| 9     Q. Less than $50,000? |
| 10    A. I believe that to be accurate. |
| 11    Q. And how much money has your husband brought in |
| 12  since the filing of the bankruptcy? |
| 13    A. I don't know. |
| 14    Q. How much money has your husband given you |
| 15  since the filing of the bankruptcy? |
| 16    A. My husband gives me money every month to pay |
| 17  the bills and I don't know how much. I haven't done |
| 18  a -- I haven't done a tally of that. |
| 19    Q. Now, at the last 341 hearing, your husband |
| 20  testified that he was not employed, and that was in |
| 21  June. Has he been employed since June? |
| 22    MS. GROPPER NELSON: I am going to object to |
| 23  the question as being vague and ambiguous, and if the |
| 24  witness understands the question, she is free to |
| 25  answer. |

Case: 12-0314 Sup D Exhibit D - 341 Hearing and Deposition Transcripts 3:5 D-16 Page 228 of 47

Page 41

1　　　THE WITNESS: I don't know what my husband is
2　doing for money right now.
3　BY MS. BARNIER:
4　　Q.　Does your husband have a job?
5　　A.　I don't know.
6　　Q.　Do you know if he applied for any jobs?
7　　A.　I don't know.
8　　Q.　So you explained earlier that your husband
9　gives you money to pay the bills. What's the source of
10　your husband's income since you and your husband filed
11　for bankruptcy?
12　　A.　I don't know.
13　　Q.　Do you ask your husband where he gets his
14　money?
15　　A.　Not generally, no.
16　　Q.　Could you be more specific? "Not generally,"
17　do you ever ask him, "Where did you get the money?"
18　　A.　No.
19　　Q.　You just take money from your husband?
20　　A.　My husband tells me when he brings in money
21　that he is going to be giving me money. I ask him if
22　he has money and I tell him how much money I need to
23　pay bills.
24　　Q.　And on average, how much money does your
25　husband -- how much money has your husband given you

Page 42

1　since the filing of the bankruptcy? Every month, how
2　much does he give you?
3　　A.　It depends.
4　　Q.　On what?
5　　A.　On various factors, what needs to get paid.
6　　Q.　So help me out here. I am a little confused.
7　So you say to him, "I need $10,000 this month"; is that
8　how it works and he gives you $10,000?
9　　　　MS. GROPPER NELSON: I am going to indicate
10　that there is no question on the table. If there is a
11　question, the witness can answer it.
12　BY MS. BARNIER:
13　　Q.　That was my question. If you ask for $10,000,
14　does he give you $10,000?
15　　A.　Not usually.
16　　Q.　So how much do you ask for?
17　　A.　I usually ask for specific bills. I usually
18　say, "We have these bills to pay this month" and he
19　tries to give me the money when it comes in. I pay a
20　lot of things late.
21　　Q.　Okay. But you never ask him where he got the
22　money?
23　　A.　Our marriage is difficult at best right now.
24　　Q.　And what does that mean?
25　　A.　It means that our conversations are very

Page 43

1　difficult and if I ask him too much about money, he
2　gets angry with me.
3　　Q.　And what happens when he gets angry?
4　　A.　He yells at me.
5　　Q.　At two of the 341 hearings, you and your
6　husband testified that you had planned to separate. Do
7　you still plan to separate?
8　　A.　We have been separate.
9　　Q.　Do you need a moment, Ms. Stephens?
10　　　　MS. GROPPER NELSON: I think she needs some
11　tissues and a moment.
12　　　　MS. BARNIER: The bathroom is right around the
13　corner. I don't have tissues here.
14　　　　(Brief pause in the proceedings at 10:31 a.m.)
15　BY MS. BARNIER:
16　　Q.　So you and your husband are -- do you want to
17　continue or do you want to stop? Do you need a break?
18　　A.　I am all right.
19　　Q.　I'm sorry?
20　　A.　Thank you.
21　　Q.　I'm sorry, I need to -- do you want to
22　continue or do you need a break?
23　　A.　We can continue.
24　　Q.　Okay. Are you and your husband currently
25　living separately?

Page 44

1　　A.　For the most part, yes.
2　　Q.　Where does your husband reside?
3　　A.　My husband's current residence, I believe, is
4　in Honduras.
5　　Q.　Where in Honduras?
6　　A.　I don't know.
7　　Q.　When your husband becomes angry with you, does
8　he still give you money when you request money to pay
9　your bills?
10　　A.　In general, yes.
11　　Q.　On June 20th, 2012, at your 341, you testified
12　that you planned to move to Southern California in the
13　summer of 2012. Do you still plan to move to Southern
14　California?
15　　A.　I don't know.
16　　Q.　Where did you currently reside?
17　　A.　We are still in our house on Ashbury Street,
18　the kids and I.
19　　Q.　And why didn't you move?
20　　A.　I looked for work over the summer in 2012 in
21　Southern California and I couldn't find any and I
22　thought I would have a better chance of finding work in
23　San Francisco.
24　　Q.　And then, I'm sorry, you said that your
25　husband gives you -- how does your husband give you the

Case: 12-0314 Sup D Exhibit D - 341 Hearing and Deposition Transcripts D-162 of 228
of 47

Page 45

1 money? Does he hand you cash?
2    A. Sometimes he hands me cash, sometimes he puts
3 it in my bank account, sometimes he gives me checks.
4    Q. And how often do you communicate with your
5 husband on a weekly basis?
6    A. We communicate regularly. I usually try to
7 have the kids speak with him at night on the phone if
8 he is not in the country, which is most of the time.
9    Q. What are the dates of your children's births?
10    A. October 12th, 2005, February 15th, 2008, and
11 February 25th, 2010.
12    Q. And so your oldest child now is eight; is that
13 right? Almost eight?
14    A. Seven and a half.
15    Q. Seven and a half.
16    And your second child is four?
17    A. Five.
18    Q. Five.
19    And your third child is three?
20    A. Three.
21    Q. Do your children attend school?
22    A. Yes, they do.
23    Q. And where do they attend school?
24    A. My two older children go to a French school
25 called Lycée Français.

Page 46

1    Q. And where is that located?
2    A. In San Francisco.
3    Q. And what is the monthly tuition for each of
4 your children?
5    A. It's about $1,500 a month.
6    Q. For each child?
7    A. Yeah.
8    Q. And do any of your children attend preschool?
9    A. My youngest child attends preschool.
10    Q. And what does that cost every month?
11    A. It's about the same.
12    Q. Since the filing of the bankruptcy, about how
13 many days a month on average is Carl Wescott at your
14 home in San Francisco?
15    A. I don't know.
16    Q. Does your husband have another residence in
17 San Francisco?
18    A. No.
19    Q. Do you have meals with Carl Wescott when he is
20 in San Francisco?
21    A. Sometimes.
22    Q. Does he have meals at your home on Ashbury
23 when he is in San Francisco?
24    A. Yes.
25    Q. Do you and your husband talk on the phone?

Page 47

1    A. Yes.
2    Q. How often?
3    A. Probably four to five times per week.
4    Q. What do you discuss?
5    A. Money, kids, the bankruptcy, divorce.
6    Q. Have you filed for divorce, Ms. Stephens?
7    A. No, I have not.
8    Q. Have you filed separation papers?
9    A. No, I have not.
10    Q. Has Mr. Wescott filed for divorce?
11    A. Not to my knowledge.
12    Q. Has Mr. Wescott filed for separation?
13    A. I don't think so. Not to my knowledge.
14    Q. In the month of December 2012, how many times
15 did you see your husband during the month?
16    A. I don't know.
17    Q. More than ten?
18    A. Yeah, probably around ten times.
19    Q. Was he at your home at Ashbury over Christmas?
20    A. No.
21    Q. In the month of January 2013, how many times
22 did you see your husband?
23    A. I saw him a handful of days in January. I
24 don't remember the exact number of days.
25    Q. By "a handful," do you mean less than ten?

Page 48

1    A. Yes.
2    Q. In the month of February 2013, how many times
3 did you see your husband?
4    A. I don't remember the exact number of days.
5    Q. Can you give an approximation? It was just
6 last month.
7    A. I know. Probably a similar number of days to
8 January.
9    Q. Less than ten?
10    A. I think so.
11    Q. And for this month, how many times have you
12 seen your husband?
13    A. I can't remember the total number of days.
14 Several times.
15    Q. So he has been in San Francisco in the last
16 three months a number of times?
17    A. Yes.
18    Q. And do you see him every time he is in
19 San Francisco?
20    A. No.
21    Q. If you don't see him, where does he stay?
22    A. Well, he usually stays at our house, at the
23 Ashbury house, and sometimes I am not there.
24    Q. If you are not there, who cares for your
25 children?

Page 49

1  A. The kids are usually with me. The kids are
2  always with me.
3  Q. And so if he is in the house and you are not,
4  where are you residing?
5  A. In the Santa Barbara house.
6  Q. Have you taken the kids -- do you travel
7  anyplace else besides Santa Barbara with your children?
8  A. We have gone -- we have gone to Tahoe.
9  Q. And when did you go to Tahoe with your
10  children?
11  A. In January.
12  Q. And for what purpose?
13  A. To go skiing.
14  Q. Where did you stay?
15  A. With friends.
16  Q. Where did you ski?
17  A. At Squaw.
18  Q. Where did you get the money to pay for the
19  lift tickets?
20  A. From my husband.
21  Q. How much money did you spend?
22  A. I don't remember.
23  Q. What's the price of a lift ticket at Squaw?
24  A. I don't remember.
25  Q. Did you pay cash?

Page 50

1  A. I don't remember.
2  Q. Do you still have any credit cards that you
3  are currently using since the filing of the bankruptcy?
4  A. All my credit cards have been canceled.
5  Q. So you are on a cash basis only?
6  A. Uh-huh.
7  (Exhibit 4 was marked for identification.)
8  MS. GROPPER NELSON: Thank you.
9  BY MS. BARNIER:
10  Q. In 2010, you were named as a defendant
11  before -- you don't need to look at the document yet.
12  I am not asking you to look at it.
13  A. Okay.
14  Q. Just hold on.
15  In October of 2010 -- okay. Can I ask
16  everybody not look at that so you can listen to my
17  question?
18  In October of 2010, you were named as a
19  defendant in a lawsuit brought by Frederick Fiechter;
20  is that correct?
21  A. Yes.
22  Q. Can you tell me why Mr. Fiechter was suing you
23  and your husband?
24  A. No.
25  Q. You don't know why you were sued?

Page 51

1  A. I don't know the details of why we were sued.
2  Q. No, I am asking why you were sued. Why were
3  you named as a defendant in the lawsuit?
4  A. Because my husband and I had signed an
5  agreement that had transferred assets into my name in
6  2010.
7  Q. And so that's why Mr. Fiechter named you in
8  the lawsuit, over that basis; is that correct?
9  A. That's my understanding.
10  Q. Okay. Do you know when the original lawsuit
11  against your husband was filed?
12  A. No, I do not.
13  Q. Would it refresh your memory if I suggested to
14  you it had been filed in 2009?
15  A. I don't -- I didn't -- I don't know when it
16  was filed.
17  Q. Did you and your husband discuss the lawsuit?
18  MS. GROPPER NELSON: I am going to ask -- I am
19  going to object to the question as being vague and
20  ambiguous.
21  THE WITNESS: Can you be more specific,
22  please?
23  BY MS. BARNIER:
24  Q. Did you ever talk about the lawsuit when you
25  were being sued by Mr. Fiechter?

Page 52

1  A. Yes, we discussed the lawsuit.
2  Q. And what did you discuss?
3  A. We discussed many things.
4  Q. Specifically about the lawsuit.
5  A. We discussed that he was being sued from
6  Frederick Fiechter and that he was hoping to settle
7  with him.
8  Q. Did you try to settle with Mr. Fiechter
9  separately?
10  A. No, I did not.
11  Q. Do you know Mr. Fiechter?
12  A. I have met him. I knew him. I don't -- I
13  haven't seen him in years.
14  Q. At the March 21st meeting of creditors -- if
15  you could hand that to the court reporter, that would
16  be great. Thank you -- your husband, with you present,
17  testified that the Rainforest Capital note was
18  transferred to the Pook Snook Dook LP. Is that a
19  correct statement?
20  A. I don't know. I assume so.
21  Q. You don't know if a note by Rainforest was
22  transferred to the Pook Snook Dook Trust?
23  A. Well, you said the Pook Snook Dook --
24  Q. Sorry.
25  A. -- LP.

Page 53

1  Q. Was a note transferred from Rainforest to
2  either the Pook Snook Dook LP or the Pook Snook Dook
3  Trust?
4      MS. GROPPER NELSON: I am going to object to
5  the question as being compound and complex.
6      THE WITNESS: I do not know -- I do not
7  remember exactly what and how things were transferred.
8  I do not have a clear recollection of the structure of
9  Pook Snook Dook.
10 BY MS. BARNIER:
11    Q. Who owned the Rainforest Capital note before
12 the transfer was made?
13    A. I believe that, at one point, I owned the
14 note.
15    Q. Do you know when that was?
16    A. I don't remember.
17    Q. So you owned the note. And then what happened
18 to the note?
19    A. I believe the note was transferred to the
20 trust as part of an overall estate planning that my
21 husband was managing.
22    Q. Who is Colin Wiel?
23    A. I believe he is the person who was running the
24 Rainforest Capital, LLC.
25    Q. Have you ever met Colin Wiel?

Page 54

1  A. Yes, I have.
2  Q. How many times?
3  A. Several times. His wife and him and Carl and
4  I went out and have done social activities together.
5  Q. Were you present at a meeting with Colin Wiel
6  when the Rainforest Capital note was transferred to
7  Pook Snook Dook?
8  A. I don't remember being present at a meeting
9  when things were transferred, no.
10 Q. Okay. What was your role in the Pook Snook
11 Dook LP?
12 A. I believe I was one of the general partners.
13 Q. Who was the other general partner?
14 A. I think my husband was.
15 Q. When did you stop paying the mortgage on your
16 home on Ashbury?
17 A. I don't remember.
18 Q. Your husband testified that you had stopped
19 paying it in mid-2010 at his 341 hearing. Would that
20 be a correct statement?
21 A. I can't remember when it stopped getting paid.
22 Q. You have no recollection of the year at all?
23 A. I believe it was sometime towards the end of
24 2010.
25 Q. And do you remember when the transfer of the

Page 55

1  Rainforest note that you owned at one time was made
2  to --
3  A. No, I don't remember.
4     MS. GROPPER NELSON: Let her finish the
5  question.
6     THE WITNESS: I'm sorry. I apologize.
7  BY MS. BARNIER:
8  Q. Your husband testified at the March 21st, 2012
9  341 exam that Rainforest paid the two of you and Pook
10 Snook Dook more than $500,000 in 2011. Is that
11 accurate?
12 A. I wasn't involved with -- with the payments on
13 the note. My husband was managing that. So I don't
14 remember when that was done.
15 Q. So he testified that you individually got
16 money and that Pook Snook [sic] got money. Do you have
17 any recollection of how much money you and your husband
18 got from Rainforest in 2011?
19 A. I don't. My husband was managing all of our
20 assets during that time period and I wasn't paying
21 attention to what he was doing.
22    (Exhibit 5 was marked for identification.)
23    MS. GROPPER NELSON: Thank you.
24 BY MS. BARNIER:
25 Q. This is Exhibit 5. Do you recognize this

Page 56

1  document?
2  A. Yes.
3  Q. And is that your signature?
4  A. It looks like my signature, yes.
5  Q. Do you remember signing this document?
6  A. I don't remember the date or anything, but I
7  do remember -- I do remember that we executed a lot of
8  the estate planning documents. I mean, I remember
9  doing our estate planning and executing these
10 documents.
11 Q. And what was the purpose of your estate
12 planning?
13 A. We were -- we had three young kids and my
14 husband wanted us to -- I mean, we both wanted to
15 develop an estate for the benefit for our family.
16 Q. So according to this document, you are a
17 one percent general partner in the Pook Snook Dook LP.
18 Was that your understanding?
19 A. That's what it says here.
20 Q. Okay. And if you turn to the second page, it
21 says the only asset of the limited partnership was a
22 promissory note from Rainforest Capital. Is that
23 correct?
24 A. That is all that is on this document.
25 Q. Well, I am asking you as a general -- you were

Case: 12-0314 SupD Exhibit D - 34t Hearing and Deposition Transcript 3:5D-165 of 228
of 47