Page 57

1 the general manager of it. Is that the only asset that
2 was --
3    A. I was a one percent general partner, and
4 during that time, my husband was managing all of our
5 assets. So I was deferring to him for the overall
6 structure of our estate.
7    Q. Did you have knowledge of what acts your
8 husband was taking with regards to setting up the
9 estate planning?
10    A. I basically did what he asked me to do as part
11 of the estate planning. I had a baby at the beginning
12 of 2010, in February. I had a toddler and a
13 preschooler during that time period and, I mean, I was
14 being a wife and a mother.
15       So did my husband tell me what he was doing in
16 terms of setting up estate planning for the benefit of
17 our family and our future? That's what I remember. Do
18 I remember specifics? I have to say I do not.
19    Q. So is it your testimony that your husband
20 would put a document in front of you, instruct you to
21 sign it and you did?
22    A. My husband was managing our overall estate
23 planning and, you know, to some extent, he would say,
24 "This is what we are doing. This is why we are doing
25 it," and I would say, "Oh, okay. That sounds fine."

Page 58

1    Q. That wasn't my question. My question was: If
2 your husband presented you with a document, did you
3 read it before you signed it?
4    A. In general, I looked through it. I can't tell
5 you that I remember the details of the documents that I
6 signed.
7    Q. That's not my question. I am asking you:
8 When you sign a document, do you read it before you
9 sign it?
10    A. In general, I read it before I sign it.
11    Q. Okay. Do you ask questions about what you are
12 signing?
13    A. Sometimes.
14    Q. You had attorneys helping you, setting up this
15 estate planning; is that correct?
16    A. That is correct.
17    Q. Did you talk to those attorneys at any time?
18    A. I don't remember speaking with the attorneys
19 directly during that time period.
20    Q. Did you have any questions about this estate
21 planning that your husband was executing?
22    A. No.
23    Q. As far as you knew, it conformed with all
24 regulations that you were aware of?
25    A. I assumed my husband was a sophisticated

Page 59

1 businessman and investor and money manager at that
2 time, and I trusted him.
3    Q. I understand that, but you also were a
4 sophisticated investor and had accumulated quite a fund
5 at a young age. You also appear very bright. Did you
6 question any of these documents as they were being
7 presented to you?
8       MS. GROPPER NELSON: I will object to the
9 question as assuming facts not in evidence as to
10 whether or not Ms. Stephens was a sophisticated
11 investor independent of the wealth that she brought
12 into the marriage, and I am going to advise the client
13 that if she understands the question, she is free to
14 answer it.
15       THE WITNESS: Could you please restate the
16 question?
17    BY MS. BARNIER:
18    Q. Ms. Stephens, before your marriage, at a young
19 age relatively, you accumulated approximately one and a
20 half to two million dollars on your own in your own
21 investments. Would you consider yourself a
22 sophisticated investor?
23    A. No, I would not.
24    Q. What makes a sophisticated investor?
25       MS. GROPPER NELSON: I am going to object to

Page 60

1 the question as asking for a legal conclusion as to
2 "sophisticated," Ms. Barnier. So you don't need to
3 worry about what I am objecting to.
4       THE WITNESS: Could you please restate the
5 question?
6    BY MS. BARNIER:
7    Q. In your opinion, what makes a sophisticated
8 investor?
9    A. Someone who is managing their own money.
10    Q. That's all? If you manage your own money, you
11 are --
12       MS. BARNIER: Could you please stop clicking
13 the pen, please? Thank you so much.
14    BY MS. BARNIER:
15    Q. That's all? If you manage your own money, in
16 your opinion, that's a sophisticated investor?
17    A. I believe there are many aspects of being a
18 sophisticated investor. I had other people manage my
19 money. I was lucky. I was working with companies that
20 made a fair amount of money, plus my real estate that I
21 had bought at a very young age, my house, had increased
22 in value dramatically.
23       I didn't ever really manage my own
24 investments. My husband started managing our
25 investments when we got married. Before that, I had an

Case: 12-03148 Sup. Exhibit D - 341 Hearing and Deposition/Transcripts: 51 D-186 of 225
37

Page 61

1 investment fund -- or an investment manager manage my
2 investors and I worked really hard. I was a
3 consultant. I worked really hard.
4    Q. What made you think Carl Wescott was a
5 sophisticated investor?
6    A. When we were -- got together, people told me
7 he was a sophisticated investor. People told me he
8 was -- had made a lot of money. He told me he had made
9 a lot of money through investing. So I assumed he was
10 a sophisticated investor.
11    Q. Who told you that he was a sophisticated
12 investor besides him telling you he was?
13    A. I don't remember anyone specifically saying he
14 was a sophisticated investor. There were a lot of his
15 friends and colleagues who would make comments about
16 Carl being very smart, Carl being savvy, Carl making
17 money, those types of things.
18    Q. And that was before you were married?
19    A. Yeah.
20    Q. Okay. Now, what was Carl Wescott's role in
21 the Pook Snook Dook Limited Partnership?
22    A. I don't remember. I don't know the details.
23    Q. What was the value of the promissory note -- I
24 am on the back of this -- that you assigned to the
25 Rainforest Capital --

Page 62

1    A. I don't know what the value was.
2    Q. Did it have any value in June of 2010 when you
3 signed this document?
4    A. I don't know.
5    Q. Did you ask what the value was?
6    A. No, I did not.
7    Q. How much money did you think you were
8 investing for your children into a -- the Pook Snook
9 Dook Trust and LP?
10    A. I didn't question it. I don't know. I just
11 assumed that this is what people did, they set up --
12 you know, when people have money, they set up trusts
13 and do estate planning. And during that same time, we
14 did Wills, we did directives, we did healthcare
15 directives and I just assumed this was part of it.
16    Q. You never asked how much money was going to be
17 put into the Pook Snook Dook Trust or LP?
18    A. I did not.
19    MS. BARNIER: This will be Exhibit 6.
20    (Exhibit 6 was marked for identification.)
21    MS. GROPPER NELSON: Thank you.
22    THE WITNESS: Okay.
23 BY MS. BARNIER:
24    Q. Do you recognize this document?
25    A. Yes, I recognize it.

Page 63

1    Q. Is that your signature on the bottom?
2    A. Yes, it is my signature.
3    Q. And this note says that's an agreement to
4 split the Rainforest Capital note into two notes; is
5 that correct?
6    A. That's what it says.
7    Q. And did you -- when did you -- did you sign
8 this document?
9    A. I don't remember when I signed it. It doesn't
10 look like it is dated.
11    Q. Okay. And why did you agree to split the note
12 into two notes?
13    A. It was what my husband said he and Colin had
14 decided to do with the note.
15    Q. Did you ask any questions as to why this was
16 done?
17    A. No.
18    MS. BARNIER: This will be --
19    MS. GROPPER NELSON: Thank you.
20    MS. BARNIER: -- Exhibit 7.
21    (Exhibit 7 was marked for identification.)
22    THE WITNESS: Okay.
23 BY MS. BARNIER:
24    Q. Do you recognize this document?
25    A. Actually, I do not recognize this document.

Page 64

1    Q. Is that your signature?
2    A. It looks like my signature.
3    Q. Do you remember signing this document?
4    A. No, I don't remember signing it.
5    MS. GROPPER NELSON: Actually, it doesn't look
6 like your signature.
7    THE WITNESS: It does look like my signature.
8    MS. GROPPER NELSON: Okay.
9 BY MS. BARNIER:
10    Q. But you don't know if it's your signature?
11    A. I don't remember signing this note.
12    Q. Okay. You don't remember agreeing to pay off
13 the Rainforest Capital note early?
14    A. I don't remember, no.
15    Q. Who drafted this document?
16    A. I don't know.
17    Q. Did you ask any questions about this document
18 when you signed it?
19    A. I don't remember.
20    Q. Now, this one says an agreement to pay off the
21 Rainforest Capital note early, but there were two
22 notes; isn't that correct?
23    A. I don't know.
24    Q. Well, let's go back and look at the last
25 exhibit. That is your signature as the general

Case: 12-03148 Sub Exhibit D - 341 Hearing and Deposition/Transcripts: 51 D-187 of 228

37

Page 65

1 partner?

2    A. Yes. It says that there were two notes here.

3    Q. Okay. So as to this --

4    A. My husband was managing this with Colin and --

5 and I know this sounds very -- I'm sorry, finish

6 your...

7    Q. Keep going. I didn't ask anything. It sounds

8 what?

9    A. It sounds very 1950's housewife. My husband

10 was managing our estate, he was our fiduciary and he

11 would explain things to me when he was doing them and I

12 signed it.

13    Q. So what did he tell you about agreeing to

14 discount the note?

15    A. I don't remember.

16    Q. You agreed to discount a note worth $564,000,

17 bearing interest at ten percent, to $356,000

18 approximately. Why would you agree to that?

19    A. I was not paying attention to what my husband

20 was doing and I assumed that he was managing all of our

21 assets however he had -- you know, according to his

22 plans.

23    Q. But you were the general partner of PSD,

24 according to this document; is that right?

25    A. According to that document, I am a general

Page 66

1 partner. It says "General partner," but I was a

2 general partner and I believe that the Wescott-Stevens

3 Trust was another general partner. And during that

4 time period, I had given my husband a fiduciary

5 authority on our finances.

6    Q. Did you give him Power of Attorney?

7    A. I don't remember.

8    Q. Well, did you ever sign a document saying that

9 he could sign on your behalf?

10    A. I actually think I have at some point.

11    Q. Okay. Could I get a copy of that document?

12    A. I have no idea where it would be.

13    Q. When do you think you signed such a document?

14    A. I don't remember.

15    Q. Do you think it's still in force?

16    A. I don't know.

17    Q. When did you establish a checking and savings

18 account for the Pook Snook Dook LP?

19    A. I did not establish that account.

20    Q. Did your husband establish an account for the

21 Pook Snook Dook LP?

22    A. I believe so.

23    Q. Who had authority to sign on the checking

24 account?

25    A. He did.

Page 67

1    Q. Did you have authority to sign on the checking

2 account?

3    A. No.

4    Q. You were a general partner, but you had no

5 authority over that account?

6    A. I did not have authority on that account.

7    Q. Did you --

8    MS. BARNIER: Well, let's go to Exhibit 8.

9    (Exhibit 8 was marked for identification.)

10    MS. BARNIER: And, Counsel, just for your

11 edification, we will be going through it page-by-page

12 so --

13    MS. GROPPER NELSON: Thank you.

14    MS. BARNIER: -- you don't need to. We can

15 start at the very beginning.

16    MS. GROPPER NELSON: That's fine.

17 BY MS. BARNIER:

18    Q. The very first page says "Pook Snook Dook

19 Limited Partnership" and the address is "1083

20 Mississippi Street."

21    What was 1083 Mississippi Street?

22    A. That was my husband's office.

23    Q. Did you ever go there?

24    A. Yeah.

25    Q. How often?

Page 68

1    A. Not very often.

2    Q. Why would you go there?

3    A. Usually to pick him up.

4    Q. Have you ever seen any of the bank statements

5 from the Pook Snook Dook Limited Partnership before?

6    A. Yes, I have.

7    Q. And when did you see them?

8    A. I don't know.

9    Q. Did your husband talk to you about how much

10 money was in the Pook Snook Dook Limited Partnership?

11    A. Not regularly, no. I don't --

12    Q. Generally -- I'm sorry. Generally, would he

13 talk to you about it?

14    A. We talked about it from time to time. I can't

15 give you specifics or details.

16    Q. Okay. So the first one is dated July 1st,

17 2010, and that would be a month after you had completed

18 all your estate planning for your children; is that

19 correct?

20    A. Can you rephrase the question, please?

21    Q. When did you complete all your estate planning

22 for your -- for the benefit of your children?

23    A. I don't remember the date that we finished

24 doing the estate planning.

25    Q. But the Pook Snook Dook Limited Partnership

Case: 12-03148 Sub Exhibit D - 341 Hearing and Deposition Transcripts: 5 D-188 of 225
37

Page 69

1 and Trust had been established in June of 2010, would
2 that be accurate?
3    A. I don't remember the dates.
4    Q. Do you want to go back to Exhibit -- I'm
5 sorry, I lost my numbers here.
6       MS. GROPPER NELSON: Let her ask a question.
7 BY MS. BARNIER:
8    Q. It's this document with your signature --
9    A. Okay.
10    Q. -- which is dated -- it says "June 24, 2010."
11    A. Uh-huh.
12    Q. Does that refresh your memory that the Pook
13 Snook Dook LP and Trust had been established by June
14 2010?
15    A. Yes.
16    Q. So that was my question. A month later, there
17 is a checking account statement for the Pook Snook Dook
18 Limited Partnership, correct?
19    A. Correct.
20    Q. If you could turn to page two of this
21 document, there is -- if you look at July 6, there is a
22 deposit of $6,250 from Rainforest Capital. Do you see
23 that?
24    A. Yes, I do.
25    Q. Okay. And then on the same day, there are a

Page 70

1 number of transfers that are made out from this
2 account. Do you see those?
3    A. Yes, I do.
4    Q. Okay. So can you tell me -- it says "Online
5 transfer to business checking loan" in the amount of
6 $2,324. Do you know what that was for?
7    A. Huh-uh, no.
8    Q. How about the next one, an online transfer
9 loan to Carl of $1,000? Do you know who that would be
10 to?
11    A. It says it is to Carl.
12    Q. So he loaned himself $1,000 from this account?
13    A. I don't know. I mean, it's a transfer. So he
14 transferred the money.
15    Q. And then go down to 7/29 and there is a
16 transfer, it looks like also to Carl, in the amount of
17 $2,500. Do you see that?
18    A. Uh-huh.
19    Q. So in July of 2010, your husband took out more
20 than $5,000 from the Pook Snook Dook LP. Can you tell
21 me what he did with the money?
22    A. No.
23    Q. If you turn to the next page, in August of
24 2010, there is another contribution from the
25 Rainforest -- I'm sorry, I am now on page four of it,

Page 71

1 dated -- I'm sorry -- August 2nd, another contribution
2 of $6,250. Was that the interest that was being paid
3 on the note from Rainforest Capital?
4    A. I don't know.
5    Q. Well, let's go back to the document that you
6 signed. It does say there are two notes and they are
7 going to bear ten percent interest. Is that why
8 Rainforest Capital was paying $6,250?
9    A. I don't know. I was not managing our finances
10 during that time period, I was taking care of young
11 kids.
12    Q. So if you were to look at the withdrawals, if
13 you see those --
14    A. I see them.
15    Q. -- there is a transfer to checking account
16 number 7024. Do you know what account that is?
17    A. Which one is 7024?
18    Q. I'm sorry, it is dated August 4th in the
19 amount of $4,900. Do you see that?
20       MS. GROPPER NELSON: It is right here.
21 BY MS. BARNIER:
22    Q. August 4th --
23    A. Oh, okay.
24    Q. -- a withdrawal of $4,900 and it said it went
25 into checking account -- the last four numbers are

Page 72

1 7024. Do you recognize the account 7024?
2    A. I believe that that was one of our Wells Fargo
3 accounts.
4    Q. Isn't that an Atlas Consulting account?
5    A. It could be. I don't remember the Atlas
6 account number.
7    Q. Okay. Did your husband transfer money from
8 the Pook Snook Dook Trust account into the Atlas
9 Consulting account?
10    A. I don't know what my husband did. I mean,
11 somebody did that. It's indicated by this bank
12 statement. The account was never set up with my --
13 with my name on it.
14    Q. Even though at one point the Rainforest note
15 was -- it belonged to you?
16    A. During 2010, 2011 and through 2012, my husband
17 had been managing our finances.
18    Q. Would it be accurate to say that you advocated
19 all responsibility to your husband for the finances?
20    A. That would -- that would be -- that would be
21 an accurate statement.
22    Q. Why did you do that?
23    A. I had three young kids. I wanted to be a wife
24 and a mother from as long as I can remember. I didn't
25 want to work when my kids were young. I wanted to be a

Case: 12-03148 Sup D Exhibit D - 341 Hearing and Deposition/Transcripts :51 D-169 of 228
37

Page 73

1  wife and a mother.
2  Q. How did you pay your own personal bills or did
3  Mr. Wescott pay off your bills?
4  A. I paid personal bills after his assistant
5  stopped working for him, but when he had an assistant
6  working for him, she did our household bills.
7  Q. So you would turn over the household bills to
8  who?
9  A. Well, the household bills, Carl would get them
10 and bring them to work.
11 Q. And so you had no idea if the bills were paid
12 or not?
13 A. For a period of time, I didn't do any bills.
14 Q. And what period of time would that be?
15 A. I can't remember the exact dates, but through
16 the end of 2010.
17 Q. Okay. If you could turn to the next page,
18 which is "5" on the bottom. It's September 2010.
19     On September 3rd, there is a deposit of
20 $100,000. Do you see that?
21 A. I see that.
22 Q. And then on September 13th, there is another
23 deposit of $100,000. Do you see that?
24 A. Yeah, uh-huh.
25 Q. Were you aware that the Pook Snook Dook Trust

Page 74

1  had received $200,000 from Rainforest?
2  A. I was not paying attention to what my husband
3  was doing during that time period and what monies were
4  coming in. I was letting him manage our finances.
5  Q. I understand that, but that wasn't my
6  question. My question is: Were you aware --
7  A. I don't remember. I really don't remember.
8  Q. Okay. And then on September 14th, there is a
9  transfer of $68,000. Do you see that?
10 A. Uh-huh.
11 Q. This time, the account number is spelled out,
12 which also ends in 7024. Was that -- were you aware of
13 the transfer of $68,000?
14 A. I don't remember. I mean, I don't -- I don't
15 remember. My husband was managing our finances during
16 that time period and running businesses and doing all
17 of his investments and I assumed he was managing it all
18 during that time. I mean, I didn't assume. He was
19 managing it all during that time.
20 Q. So if the Pook Snook Dook LP was set up for
21 estate planning purposes for your children, why is your
22 husband transferring money out of the account?
23 A. It was for the benefit of our family and I
24 assumed he was doing other investments with it, that he
25 was managing the money and that he was keeping track of

Page 75

1  things and that he was doing it for the benefit, you
2  know, of our family.
3  Q. So he could take money out of the LP and you
4  believe that the money was being invested. And then
5  what would happen with the money?
6  A. Then the money -- I don't know. I hadn't
7  questioned it during that time period.
8  Q. Did he tell you he was taking money out of the
9  Pook Snook Dook Trust LP account and -- what did he
10 tell you he was doing with it?
11 A. He told me he was doing investments, he was
12 running businesses and he was managing our funds.
13 Q. But if he is doing all that and making
14 investments, why would he transfer money to other
15 checking accounts that you controlled?
16 A. I don't know.
17 MS. GROPPER NELSON: I need a break.
18 THE WITNESS: I need to go to the bathroom.
19 MS. BARNIER: Can we take a ten-minute break?
20 MS. GROPPER NELSON: Uh-huh.
21 (Recess taken, 11:15 a.m. to 11:21 a.m.)
22 BY MS. BARNIER:
23 Q. If you can turn to page 19 of document 8 --
24 9 -- no, I'm sorry.
25 MS. BARNIER: What number am I on?

Page 76

1  THE REPORTER: It is Exhibit 8.
2  MS. GROPPER NELSON: Did you say "19"?
3  MS. BARNIER: 19, page 19, Bates-stamped page
4  19.
5  BY MS. BARNIER:
6  Q. There is a transfer, dated March 3rd, in the
7  amount of $13,210.37. Do you see that?
8  A. Uh-huh.
9  Q. Can you tell me who that transfer is made to?
10 A. No.
11 Q. Did you ever look at any of these bank
12 statements for the Pook Snook Dook LP?
13 A. I actually put together a stack of these bank
14 statements for you and at that point, I looked at them.
15 I didn't analyze them, but I looked at them.
16 Q. Was that the first time you had ever seen them
17 was when you put them together?
18 A. I don't know if it was the first time I ever
19 saw them. It was the first time I ever put them
20 together.
21 Q. But you have no idea who that transfer is to
22 of $13,000 on March 3rd; is that correct?
23 A. I have no idea who that is to.
24 Q. Now, if you could turn to Bates-stamped
25 page 22.

Case: 12-03148 Sup. Exhibit D - 341 Hearing and Deposition/Transcripts:51 D-170 of 228
37

Page 77

| | |
|---|---|
| 1 | A. Okay. |
| 2 | Q. And if you will look at the dates between |
| 3 | April 13th and April 21st. |
| 4 | A. Uh-huh. |
| 5 | Q. Do you see all those? And there is one, two, |
| 6 | three, four, five, six, seven, eight, nine, ten. |
| 7 | Nine withdrawals are made in a branch store. |
| 8 | Do you see that? |
| 9 | A. Yeah. |
| 10 | Q. Do you know anything about any of these |
| 11 | withdrawals? |
| 12 | A. I don't have any recollection of any of these. |
| 13 | I don't know what they are for. |
| 14 | Q. Okay. Because it totals more than $250,000. |
| 15 | Do you see that? |
| 16 | A. Uh-huh, I see the withdrawals. |
| 17 | Q. Did your husband tell you he was withdrawing |
| 18 | more than $250,000 in April of 2011? |
| 19 | A. I don't remember. I don't recall. |
| 20 | Q. What could your husband have done with the |
| 21 | money? |
| 22 | A. I don't know. |
| 23 | Q. Did he give you cash in April of 2011? |
| 24 | A. I don't remember. |
| 25 | Q. If you turn to 24 -- |

Page 78

| | |
|---|---|
| 1 | A. Uh-huh. |
| 2 | Q. -- dated May 3rd, a withdrawal made in a |
| 3 | branch store, $45,000 in May of 2011. Do you have any |
| 4 | knowledge of a withdrawal of $45,000? |
| 5 | A. No. |
| 6 | Q. Did your husband ever discuss this account |
| 7 | with you in 2011? |
| 8 | A. I don't remember any conversations about this |
| 9 | account specifically in 2011. |
| 10 | Q. When did you first learn that your mortgage |
| 11 | wasn't being paid? |
| 12 | A. I don't remember the date. |
| 13 | Q. Generally, you said that you knew that it |
| 14 | wasn't -- mid-2010 that you -- |
| 15 | A. Yeah. |
| 16 | Q. -- you weren't able to make the payments, but |
| 17 | when did you learn that the mortgage wasn't -- did you |
| 18 | learn in 2010 that the mortgage wasn't being paid? |
| 19 | A. Yes. |
| 20 | Q. If the mortgage wasn't being paid in 2010, why |
| 21 | would you transfer an asset that you owned of |
| 22 | Rainforest worth $500,000 into a trust or LP for your |
| 23 | children? |
| 24 | A. When we did the trust, we were still paying |
| 25 | our mortgage. |

Page 79

| | |
|---|---|
| 1 | Q. Well, you set up the trust in June of 2010; |
| 2 | isn't that right? |
| 3 | A. I believe the estate planning had started |
| 4 | close to a year earlier. |
| 5 | Q. So starting in 2009? |
| 6 | A. I believe my husband had started to look at |
| 7 | estate planning probably close to a year earlier. |
| 8 | Q. And you had also started looking into it? |
| 9 | A. I looked into estate planning -- actually, I |
| 10 | didn't look in -- I started looking at doing Wills and |
| 11 | those types of things after our first son was born, and |
| 12 | we did a Will using some kind of software package. And |
| 13 | during that time period, we had started talking about |
| 14 | doing estate planning and I never really got around to |
| 15 | doing much of it or any of it. And then my husband |
| 16 | took on the responsibility for our family to do the |
| 17 | estate planning. |
| 18 | Q. But you were being sued by Mr. Fiechter in the |
| 19 | middle of 2010, right? |
| 20 | A. I -- yes, we were being sued by Fiechter |
| 21 | during that time period, yes. |
| 22 | Q. Okay. And it looks like you don't have the |
| 23 | funds to pay the mortgage on your home where your |
| 24 | children lived in mid-2010; is that right? |
| 25 | A. At the time we were doing the estate planning, |

Page 80

| | |
|---|---|
| 1 | we were paying our bills. |
| 2 | Q. But you made the transfer to Pook Snook Dook |
| 3 | Trust, according to the bank statements, in June, July, |
| 4 | August. You are getting big payments from Rainforest |
| 5 | Capital. |
| 6 | A. Yeah. |
| 7 | Q. Why didn't you take that money to pay the |
| 8 | mortgage so your children would have a home? |
| 9 | A. I was trusting my husband to do our financial |
| 10 | management and he was using the money, I believe, to |
| 11 | manage his businesses and he needed those funds for |
| 12 | that and -- I don't know. I mean, to be honest, I |
| 13 | didn't ask him. |
| 14 | Q. I'm sorry, I am just confused. You knew the |
| 15 | mortgage wasn't being paid, right? |
| 16 | A. The mortgage, I knew -- |
| 17 | MS. GROPPER NELSON: Excuse me, there is no |
| 18 | question on the table. If you want to ask her a |
| 19 | question, please feel free to do so. If you want to |
| 20 | testify, do so, but ask her a direct question. |
| 21 | BY MS. BARNIER: |
| 22 | Q. You knew in mid-2010, as you already testified |
| 23 | to, that the mortgage wasn't being paid; is that |
| 24 | correct? |
| 25 | MS. GROPPER NELSON: That's a misstatement of |

Case: 12-03148Sup ExhibitD - 341 Hearing and DepositionTranscripts:5 D-171 of 228
37

Page 81

1   the record and if you want to go back and read the
2   record as to when she stated she first knew that the
3   mortgage wasn't being paid, please do so, but that is
4   not an accurate statement of the record.
5   BY MS. BARNIER:
6       Q.   Ms. Stephens, when did you first become aware
7   that your mortgage was in default?
8       A.   Towards the end of 2010.
9       Q.   And how did you become aware?
10      A.   My husband told me.
11      Q.   Who opens the mail at your house?
12      A.   During 2010? My husband did most of -- opened
13  most of the mail.
14      Q.   So if mail was addressed to you and your
15  husband, who opened it?
16      A.   Usually, my husband.
17      Q.   Mail addressed to you, who opened it?
18      A.   I don't remember. If it was personal, in
19  personal nature, it would be me. If it were bills,
20  during 2010, he was opening it.
21      Q.   Who picked up the mail at your house in 2010?
22      A.   I don't remember. Whoever was home at the
23  time.
24      Q.   And where is the mail delivered in your house?
25      A.   There is a mailbox outside the door.

Page 82

1       Q.   Would you pick the mail up and bring it in?
2       A.   Sometimes.
3       Q.   Did you ever look at the envelopes as they are
4   coming in in 2010?
5       A.   I don't remember specifically. I mean, if I
6   picked up a stack of mail, I would look at it.
7   Sometimes I would just take the stack and put it on his
8   desk or his chair.
9       Q.   And I'm sorry, you -- I am getting confused on
10  dates, because I think we have some different
11  testimony.
12          You first became aware that the mortgage was
13  in default in late 2010?
14      A.   Yes.
15      Q.   Did you talk your husband about not paying the
16  mortgage?
17      A.   Yeah, uh-huh.
18      Q.   And what did he tell you?
19      A.   He told me that he was going to try to work
20  out something with the bank.
21      Q.   And what did that mean?
22      A.   Well, our interest rate had jumped up and he
23  said that we were paying a tremendous amount in
24  interest and he was going to try to negotiate a lower
25  interest rate.

Page 83

1       Q.   And was he successful?
2       A.   No.
3       Q.   Did you fill out an application to negotiate a
4   lower interest rate?
5       A.   Yeah, I believe so.
6       Q.   Do you have a copy of that?
7       A.   No.
8       Q.   Did you sign on it, on the application?
9       A.   I don't remember. I -- I don't remember.
10      Q.   Now, in addition to the Rainforest Capital
11  note, were any other assets transferred into the
12  Pook Snook Dook LP and Trust?
13      A.   I don't remember.
14      Q.   Was the Fidelity Cap notes put into the Trust?
15      A.   Could you please be a little bit more
16  specific?
17      Q.   Did you and your husband own any securities
18  with Fidelity Cap or -- also known as Reliant Group?
19      A.   Yes.
20      Q.   What did you own?
21      A.   I believe that we owned Cap -- I don't
22  remember -- Cap 4, Cap 5 -- I can't remember which
23  ones -- Cap 6.
24      Q.   When did you purchase them?
25      A.   I don't remember.

Page 84

1       Q.   2010?
2       A.   You know, I really don't remember.
3       Q.   And were those interests in Reliant
4   transferred into the Pook Snook Dook LP and Trust?
5       A.   I believe so.
6       Q.   If you could turn to October 2011, which is
7   page 34, there is -- on October 26th, there is a
8   deposit -- actually, two deposits -- totaling $8,000.
9   Do you see that?
10      A.   Uh-huh.
11      Q.   Now, this is three months before --
12  approximately three to four months before you and your
13  husband are going to file for bankruptcy. Do you know
14  what the source of those funds were?
15      A.   No.
16      Q.   Okay. And then on October 28th, there is a
17  withdrawal of $4,500. Do you see that?
18      A.   Uh-huh.
19      Q.   Who made the withdrawal?
20      A.   I don't know.
21      Q.   Could anyone besides Carl Wescott make the
22  withdrawal?
23      A.   I didn't have fiduciary access or whatever --
24  I didn't have access to the account to withdraw money,
25  so he was the only person on this account.

Case: 12-03148  Sup. Exhibit D - 341 Hearing and Deposition Transcripts: 5  D-172 of 228
37

Page 85

1 Q. So he would be the only one who could withdraw
2 money?
3 A. Yeah.
4 Q. And then if you could turn to November 2011 --
5 A. Uh-huh.
6 Q. -- on page --
7 MS. GROPPER NELSON: What page is that?
8 BY MS. BARNIER:
9 Q. -- page 36, November 10th, there is three
10 different withdrawals made and they total approximately
11 $3,700. Do you see that?
12 A. Uh-huh.
13 Q. And they are transferred into checking account
14 5228. Do you know what account that is?
15 A. Not offhand, no.
16 Q. Did your husband ever transfer money from the
17 Pook Snook Dook LP into Atlas Consulting?
18 A. I don't know.
19 Q. Okay. Now, up until this time, all of the
20 statements, if you notice on the address, have been
21 going to 1083 Mississippi Street. Have you noticed
22 that?
23 A. Yeah.
24 Q. Okay. And then if you turn to page 37, they
25 are now being sent to Phoenix, Arizona -- do you see

Page 86

1 that -- as of December 2011?
2 A. Uh-huh.
3 Q. You need to say "yes" or "no." Sorry.
4 A. Sorry. Yes.
5 Q. Why -- who is at Cheery Lynn Road?
6 A. I don't know.
7 Q. You have no idea why the account was now being
8 mailed to Phoenix, Arizona?
9 A. No.
10 Q. And then if you could turn to December 6,
11 2011, on December 6, it says there is an online
12 transfer from Arnovick T. Who is Arnovick?
13 A. I don't know.
14 Q. Okay. And then on December 9th, there is a
15 payment from -- do you see that -- from Fidelity Cap of
16 $9,315?
17 A. Yeah.
18 Q. Were you aware that Fidelity Cap was
19 depositing these funds into this account?
20 A. I knew that Fidelity Cap was depositing money
21 into the account.
22 Q. How did you know that?
23 A. My husband would mention it or he would get
24 statements from Fidelity Capital saying that they were
25 depositing money. They would have distributions for --

Page 87

1 for the funds.
2 Q. So you looked at the statements from Fidelity;
3 is that right?
4 A. I don't remember looking at the statements. I
5 just remembering knowing about them making
6 distributions. I don't have specific recollections of
7 times or dates or statements.
8 Q. But did you know how much money you were
9 making from the Reliant Group?
10 A. I had an idea of the amount of money that was
11 coming in, yes.
12 Q. How much was that that you thought was coming
13 in?
14 A. I don't know. I don't remember specifics. I
15 just remember getting statements or seeing statements
16 or having my husband say, "Oh, they are paying us, you
17 know, X dollars this month."
18 Q. So let me make sure I understand. I'm sorry.
19 So you did look at the statements from Reliant
20 Group; is that right?
21 A. I have looked at statements. I don't know
22 that I regularly looked at statements, but I did look
23 at statements or I have looked at statements, yes.
24 Q. And you testified earlier that you -- it was
25 my words, I admit -- absconded the financial

Page 88

1 responsibility in 2010 and you were explaining that you
2 had young children and you were trying to be a good
3 wife and a mother.
4 MS. GROPPER NELSON: I am going to object. It
5 wasn't absconded. You said advocated earlier, so it is
6 a different word.
7 MS. BARNIER: Advocated then.
8 BY MS. BARNIER:
9 Q. Did you assume your responsibilities back in
10 2011?
11 A. No.
12 Q. In 2011, you were still allowing your husband
13 to make all the financial decisions?
14 A. He said he was going to be, you know, cleaning
15 things up and we would be getting back on our financial
16 track that he had been on before and I trusted him. I
17 let him continue to make the financial decisions, yes,
18 in 2011.
19 Q. And when did you realize that you and your
20 husband were in financial trouble?
21 A. I don't know exactly when I thought we were in
22 financial trouble. It was my understanding that my
23 husband was -- had lost a lot of our money and was
24 starting new businesses and/or managing -- you know,
25 doing various projects and was going to make money

Page 89

1  again. And he had made a lot of money in the past and
2  I trusted him.
3       He said he was going to clean up, you know,
4  the messes he had made. He said he had new business
5  ideas and that I should trust him.
6    Q. And when did you first become aware that your
7  husband filed for bankruptcy in December of 2011?
8    A. I believe I knew when he filed. He told me he
9  was filing for bankruptcy in 2011.
10   Q. And why was he filing for bankruptcy in 2011?
11   A. He had lost a lot of money and had a lot of
12 debt.
13   Q. He did or the two of you did?
14   A. The two of us did, we did, but he had been
15 doing most of the projects. A lot of the debts were
16 things that he had created or signed for and,
17 initially, he was just going to file for bankruptcy.
18   Q. And so then why did you decide that both of
19 you should file for bankruptcy?
20      MS. GROPPER NELSON: It assumes facts not in
21 evidence. You are asking if she decided something.
22      THE WITNESS: I don't remember exactly the
23 sequence of events.
24 BY MS. BARNIER:
25   Q. What prompted you to file for bankruptcy?

Page 90

1    A. My husband and our attorney at the time
2  suggested that it would be easier in the long run if we
3  both filed for bankruptcy in that people who were
4  coming after my husband would come after me
5  individually if he filed and I didn't.
6    Q. How much money do you and your husband owe
7  creditors?
8    A. I don't know.
9    Q. When you filled out your Schedules, did you
10 look at how much debt was listed?
11   A. Yeah. I don't remember what that number is.
12   Q. Did you help in the preparation of the
13 Schedules?
14   A. I gave him the amounts that I had made. I did
15 a short consulting project in 2011 and I provided
16 information about household bills that I knew about.
17      MS. BARNIER: Okay. This will be Exhibit 9.
18      (Exhibit 9 was marked for identification.)
19      MS. GROPPER NELSON: Thank you.
20 BY MS. BARNIER:
21   Q. The first one, which is marked number 1 on the
22 bottom, is dated November 22nd, 2010. Whose
23 handwriting is that?
24   A. I don't know.
25   Q. Do you know who withdrew $4,200 from the Pook

Page 91

1  Snook Dook Trust?
2    A. It says "Carl Wescott."
3    Q. Do you know if he received $4,200?
4    A. I don't know.
5    Q. Okay. And then the next day, do you recognize
6  the handwriting on page two?
7    A. I don't recognize the handwriting.
8    Q. And another $2,200 was withdrawn. Did your
9  husband ever tell you why he was taking out cash?
10   A. Huh-uh.
11   Q. You need to answer "yes" or "no." Sorry.
12   A. No.
13   Q. Were you aware that your husband was taking
14 cash out of the account?
15   A. I, to be honest, wasn't paying attention to
16 what my husband was doing.
17   Q. Did your husband give you cash in 2010?
18   A. I don't remember.
19   Q. If you could turn to page four, it is dated
20 March 5th, 2011, in the amount of $3,529.
21   A. Uh-huh.
22   Q. Do you have any knowledge of this withdrawal?
23   A. No.
24   Q. Keep going. On page five, it is made out to
25 Carl Wescott again, dated April 2nd, 2011, $2,000. Do

Page 92

1  you have any knowledge of this?
2    A. No.
3    Q. April 13th, 2011; we are about seven months
4  before you file for bankruptcy, and there is a -- do
5  you recognize the handwriting?
6    A. Huh-uh.
7    Q. Whose signature is that?
8    A. That looks like my husband's signature.
9    Q. And he takes out $5,000. Do you know what
10 happened to the $5,000?
11   A. No.
12   Q. Again, on April 13th, 2011. Do you recognize
13 the handwriting?
14   A. No.
15   Q. Is that your husband's signature?
16   A. It looks like it.
17   Q. The amount is $10,000. In April of 2011, was
18 your husband giving you cash?
19   A. I don't remember.
20   Q. And then April 13th, a cash withdrawal of
21 $11,000. And is that your husband's signature?
22   A. It looks like it.
23   Q. Did he tell you he had taken out, in the month
24 of April, this amount of cash?
25   A. I don't remember.

Page 93

1  Q. Going on, at the 13th, a withdrawal of
2  $13,449, page nine.
3  A. Uh-huh.
4  Q. Any memory of this amount being withdrawn?
5  A. Huh-uh.
6  Q. You need to answer "yes" or "no." Sorry.
7  A. No.
8  Q. Going on to April -- I believe that's the
9  15th, $4,500. Do you have any knowledge of this amount
10 being withdrawn?
11 A. No.
12 Q. April 15th, again, $15,000; is that your
13 husband's signature?
14 A. It looks like it.
15 Q. So in the month of April 2011, let's just go
16 back and add them up roughly. Keep going until April
17 19th. There is $20,000 -- excuse me, $200,000. And if
18 you turn to page 14, it says "Antoine Habis." Do you
19 know who Antoine Habis is?
20 A. No.
21 Q. You never met Antoine Habis?
22 A. No, I don't recall meeting Antoine Habis.
23 Q. If you keep going, another 10,000. So in the
24 month of April -- and I am adding very roughly. If you
25 want to correct me, that's all right -- I think more

Page 94

1  than $300,000 is taken out in the month of April.
2      Do you know what happened to the money?
3  A. No.
4  Q. Did your husband ever tell you he was taking
5  out $300,000?
6  A. He was doing business and I trusted that he
7  was going to be making money again.
8  Q. What kind of business did your husband do?
9  A. He did real estate development.
10 Q. Well, if he is doing real estate development,
11 why would he need $300,000 cash?
12 A. I don't know.
13 Q. Is it possible that your husband was selling
14 drugs during this time period and needed the cash?
15 A. What? Can you repeat that, please?
16 Q. Sure. Is it possible that your husband was
17 selling drugs and needed the cash to run his business?
18 A. I have absolutely no -- I don't have any
19 knowledge at all of that.
20 Q. Okay. On May 3rd, on page 16, there is a
21 withdrawal of $45,000. Do you see that?
22      Do you know what that cash was for?
23 A. No, I do not.
24 Q. If you will go to page 19 -- this is
25 approximately two months before the filing of the

Page 95

1  bankruptcy -- there is a withdrawal of $1,020. Do you
2  know what that cash was for?
3  A. No.
4  Q. December 9th, 2011, a cash withdrawal of
5  $2,445. Do you know what that was for?
6  A. No.
7  Q. Okay. Same day, another one for $3,000. Do
8  you know what that was for?
9  A. No.
10 Q. Page 23, December 20th, 2011, in the amount of
11 $1,010. Do you know what that one was for?
12 A. No.
13 Q. Did your husband give you any cash in 2011?
14 In December, excuse me.
15      Let me be more specific. December of 2011,
16 did your husband give you any cash?
17 A. I don't remember.
18 Q. And then when did you first learn how much was
19 in the Pook Snook Dook checking account when you filed
20 for bankruptcy?
21 A. I don't remember.
22 Q. Did your husband tell you that the money was
23 all gone out of the Pook Snook Dook Trust?
24 A. I have -- I don't remember what he told me
25 about Pook Snook Dook specifically.

Page 96

1  Q. And then if you turn to page 25, January 28,
2  2012 -- I think that's right after your filing -- he
3  takes out $300.
4      Do you remember receiving any cash from your
5  husband in January of 2012?
6  A. No.
7  Q. And then in February of 2012, there are a
8  number of transfers made out. That would be page 27,
9  28, 29.
10      Why would you take out separate cash
11 transactions -- or why did your husband, excuse me,
12 take out $600 one place, $250 another and $200 at
13 another place?
14 A  I don't know.
15 Q. What would your husband do with the cash?
16 A. I don't know.
17 Q. Did you ever see him with sums of cash in his
18 wallet?
19 A. Could you be more specific, please?
20 Q. When you filed for bankruptcy in January and
21 February 2012, did you ever see sums of cash in your
22 husband's wallet?
23 A. I don't remember. I don't remember.
24 Q. In January of 2012, did your husband give you
25 cash?

Case: 12-0314SupDExhibit D - 34t Hearing and Deposition Transcripts3:5D-175 of 228
of 37

Page 97

1   A.  I don't remember.
2   Q.  At the 341 hearing, your husband testified
3  that -- he said -- his quote was you and he borrowed
4  $500,000 from the Pook Snook Dook Trust.
5       Were you aware that you and your husband were
6  borrowing money from the Pook Snook Dook Trust?
7   A.  I was aware that the money from the Pook Snook
8  Dook Trust was being used by him to manage his business
9  entities.
10   Q.  Was it being used to pay your personal bills?
11   A.  I assume so.  I assume that was one of the
12  things that it was used for.
13   Q.  So you were one of the general managers of the
14  Pook Snook Dook LP.  Is it a true statement the money
15  was borrowed?
16   A.  I don't know.
17   Q.  Well, were there any notes prepared reflecting
18  that the money had been borrowed from the Pook Snook
19  Dook Trust LP?
20   A.  I -- I was under the -- I had given my husband
21  fiduciary responsibility for that, for all of our
22  investments and I assumed he was keeping track of what
23  he was doing.
24   Q.  To the best of your knowledge, were any notes
25  prepared showing that monies had been borrowed from the

Page 98

1  Pook Snook Dook Trust LP -- or excuse me, the LP, not
2  the Trust?
3   A.  I don't know.
4   Q.  Did you sign any notes reflecting that monies
5  had been borrowed from the Pook Snook Dook Trust
6  LP [sic]?
7   A.  I don't remember.
8   Q.  Do you have anything in your recollection --
9  anything in your records that would show that monies
10  had been borrowed from the Pook Snook Trust -- Trust --
11  it's a tongue twister, the Pook Snook Dook LP?
12   A.  I don't have anything, other than what I have
13  provided you guys.
14   Q.  Was it a true statement when your husband
15  testified that you and he had borrowed $500,000 from
16  the Pook Snook Dook Trust?
17   A.  I didn't make that statement.
18   Q.  I am just asking you if it was a true
19  statement when he made it.
20   A.  I believe that my husband was managing that
21  trust, as he was managing all of our assets.  And if
22  that's what he said, then that's what it was.
23   Q.  Well, he said you and he borrowed the money.
24  Was that an accurate statement?
25   A.  Can you be more specific?

Page 99

1   Q.  I am just saying, he testified at the 341
2  hearing when you were present that he -- his line
3  was -- he said that -- he testified that, "The two of
4  us borrowed $500,000 from the Pook Snook Dook Trust."
5  Is --
6     MS. GROPPER NELSON:  I am going to object to
7  the question as characterizing testimony.  And if there
8  is a transcript of the testimony to present to the
9  witness, she can review that and she can respond to
10  that, but your characterization of testimony would be
11  vague and ambiguous and we don't -- though I don't
12  intend to imply that you are not trying to characterize
13  the testimony carefully, we don't know what the
14  testimony was.
15  BY MS. BARNIER:
16   Q.  Were you present?  I know your attorney
17  wasn't.  Were you present at the 341 hearings that were
18  held with you and your husband?
19   A.  Yes, I was present.
20   Q.  Do you remember him testifying about borrowing
21  $500,000?
22   A.  I don't remember.
23     MS. BARNIER:  So if we can go to 12:30, that
24  would be --
25     MS. GROPPER NELSON:  Well, let's go off the

Page 100

1  record so we can discuss it.
2     MS. BARNIER:  Okay.
3     (Brief discussion held off the record,
4  11:55 a.m. to 11:57 a.m.)
5     MS. BARNIER:  So we are back on the record.
6  This will be Exhibit 10.
7     (Exhibit 10 was marked for identification.)
8     MS. GROPPER NELSON:  Thank you.
9  BY MR. BARNIER:
10   Q.  Do you recognize this document?
11   A.  Uh-huh, yes.
12   Q.  Can you turn -- and it is Bates-stamped 54 at
13  the bottom.
14   A.  Uh-huh.
15   Q.  As you look this document over, were these the
16  assets that you received as your separate property in
17  February of 2010 pursuant to this Transmutation
18  Agreement?
19   A.  Yeah, that's what the document says.
20   Q.  And is that what you received in February of
21  2010?
22   A.  Could you be more specific in your question?
23   Q.  It says on the top, "Monette's separate
24  property assets and debts as of approximately February
25  2010."

Page 101

1  My question is: Did you -- were all these
2  properties deeded to you?
3  A. I don't remember if they were deeded to me.
4  Q. So what about -- if you turn to page 58 of
5  this document, it says, "The following Deeds of Trust."
6  It says, "The amount shown represents the current
7  undiscounted, unpaid principal balance."
8  Did you ever receive any cash from your
9  separate property based on these notes?
10  A. No, not to my -- I don't remember. I don't
11  recall. I don't think so.
12  Q. Okay. Now, it says on this one in the middle
13  of the note, it says, "The Rainforest Capital
14  personally guaranteed note as of February 2010 was
15  worth $1,000,000." Do you see that?
16  A. Uh-huh.
17  Q. Does that refresh your memory as to the value
18  of the note in February 2010?
19  A. That's what is stated there, yes.
20  Q. So you received a note worth $1,000,000; is
21  that right? That was your separate property?
22  A. I don't recall exactly the details of how
23  things were separated.
24  Q. So in February 2010 --
25  A. In February 2010, I had a baby and I was

Page 102

1  relying on my husband to manage all of our finances
2  during that time period. And so...
3  Q. Well, Ms. Stephens, it says it is your
4  separate property here; isn't that right?
5  A. Yeah.
6  Q. What does it mean when it is your separate
7  property?
8  A. It -- it means separate property.
9  Q. So you would own it; is that right?
10  A. That's -- that's what it says.
11  Q. Okay. If you look at number 17 --
12  A. Uh-huh.
13  Q. -- it says, "All membership interest in Atlas
14  Consulting" -- and this is February 2010 -- "valued at
15  $100,000."
16  Was Atlas Consulting worth $100,000 in
17  February 2010?
18  A. I don't know. I don't remember. I don't why
19  that -- I mean, I don't remember why that was done.
20  Q. What about the 45 percent of Newforth Partners
21  valued at $400,000, was that accurate?
22  A. I believe the valuation of Newforth was based
23  on the previous 12 months' revenue.
24  Q. And what did you receive from Newforth then in
25  terms of a distribution in 2009?

Page 103

1  A. I don't remember what my distribution was in
2  2009.
3  Q. Did you receive any distributions from
4  Newforth?
5  A. I don't remember.
6  Q. It also says, "All the interest in the
7  San Francisco Giants seat licenses." Do you see that?
8  A. Yeah.
9  Q. That was your separate property, right?
10  A. Yeah, that's what it says.
11  Q. What happened to those licenses?
12  A. My husband managed all of that. He managed
13  all of the seat licenses, and I believe that we lost
14  most of them because we couldn't afford to pay them
15  when they needed to be renewed.
16  Q. So is it accurate to say that, even though it
17  was your separate property, you let your husband manage
18  all these properties?
19  A. Yeah.
20  Q. So why did you do the Transmutation Agreement
21  if he was still going to manage everything?
22  A. You know, I didn't really ask him. He told me
23  that it was part of our estate planning and he had --
24  you know, he was doing this with, you know, some
25  attorneys and I just -- I trusted him.

Page 104

1  Q. And so if you turn to page 59, it says, "As of
2  February 13th, 2010, there is no joint property"; is
3  that correct?
4  A. That's what it says.
5  Q. And when did you agree to do all this
6  transmutation?
7  A. I believe we signed it two days before I had
8  our second child -- or our third child. No, not two
9  days, a week or so. That's not my son's birthday.
10  That's -- it was -- I believe we signed it within two
11  weeks of my third son being born.
12  Q. And there is a number of real properties
13  listed on this that have very specific values.
14  A. Uh-huh.
15  Q. And your husband had testified that you had
16  appraisals of all these properties and we have only
17  received one. Do you have copies of appraisals for any
18  of these properties?
19  A. I don't have any copies.
20  Q. Do you remember seeing appraisals of these
21  properties when you made this agreement in February of
22  2010?
23  A. I don't recall.
24  Q. Who drafted this agreement?
25  A. I don't know. I -- one of the sets of

Case: 12-0314 Sup Doc Exhibit D - 34th Hearing and Deposition Transcripts 3-15 D-177 Page 228 of 37

Page 105

1 attorneys he was working with.
2    Q. Did you talk to an attorney regarding this
3 Transmutation Agreement?
4    A. Huh-uh.
5    Q. Why would you choose not to consult an
6 attorney regarding the division of property?
7    A. I figured my husband was managing it. He told
8 me that during -- that since he was in South America,
9 he was going to be managing the foreign entities and
10 that if something happened to him, then I would have
11 access to the domestic entities. I thought it was
12 for -- you know, I thought it was for the case that if
13 something happened to him that I would have access to
14 these properties and be able to, you know, sell them,
15 get money for them.
16    Q. You don't think you could have done that if
17 something happened to him and you were -- if you were
18 co-owners, you didn't think you could do that?
19    A. Well, I didn't -- I didn't really think it
20 through.
21    Q. What happened -- there is so many properties
22 listed here. Which ones do you still own?
23    A. I don't believe we own -- I mean, I believe
24 they are either all in -- or have been foreclosed on.
25    Q. What about on page 58, the notes? Besides the

Page 106

1 Rainforest, did you ever collect any money on any of
2 these notes?
3    A. I believe that they were transferred into --
4 you know, I think most of them were transferred into
5 Pook Snook Dook.
6    Q. These notes were transferred into Pook Snook
7 Dook?
8    A. I don't know. I mean, I think that -- it
9 says, "Monette Stephens transfers to Pook Snook Dook,"
10 PSD."
11    Q. Well, I am looking at page 58. I'm sorry,
12 which page are you looking at?
13    A. (Pointing.)
14    Q. So that was a separate one, but that -- I am
15 looking at page 58.
16    I am just asking you, on these notes, did you
17 ever receive any money?
18    A. I don't recall receiving money individually on
19 these.
20    Q. Would the monies have come to you since they
21 were your separate property or would they have gone to
22 your husband?
23    A. I don't -- I don't know.
24    MS. BARNIER: Okay. Let's do one more and
25 then let's stop. This will be Exhibit 11.

Page 107

1 BY MS. BARNIER:
2    Q. Who are the shareholders of Atlas Consulting?
3    A. Can you be more specific, please?
4    Q. How many shareholders are there in Atlas
5 Consulting?
6    A. Umm...
7    Q. Are you the sole shareholder of Atlas
8 Consulting?
9    A. I don't know how to answer that question. Can
10 you please rephrase it?
11    MS. BARNIER: Sure. Let's start with -- maybe
12 this will help. This will be Exhibit 11.
13    (Exhibit 11 was marked for identification.)
14    MS. GROPPER NELSON: Thank you.
15 BY MS. BARNIER:
16    Q. Did you form Atlas Consulting?
17    A. Originally, an old business partner of mine
18 formed Atlas Consulting with me.
19    Q. Okay. And that was -- according to this
20 document, was in February of 1998; is that correct?
21    MS. GROPPER NELSON: Let's see.
22    MS. BARNIER: It is in the middle.
23    MS. GROPPER NELSON: In the middle?
24    MS. BARNIER: The filing date.
25    THE WITNESS: Yes.

Page 108

1 BY MS. BARNIER:
2    Q. Is that accurate?
3    A. I believe so.
4    Q. Okay. And it says, "Registered agent" -- you
5 are the registered agent for Atlas Consulting; is that
6 correct?
7    A. Yes.
8    Q. And it says, "Officers" and it says that --
9 "Monette Stephens," and then it says, "Member, Manager
10 and Partner." What does that mean to you, that you are
11 the member, manager and partner?
12    A. I was the member, manager and partner of the
13 LLC.
14    Q. Okay. So do you own all of the shares in
15 Atlas Consulting?
16    MS. GROPPER NELSON: There are no shares in an
17 LLC, Ms. Barnier.
18    MS. BARNIER: I was just asking how she was
19 doing it.
20 BY MS. BARNIER:
21    Q. So you are just the manager of the LLC?
22    A. I am the managing member of the LLC.
23    Q. And who is Pruett [phonetic] Austin Stephens?
24    A. That is my father.
25    Q. And he is also a member of the -- of Atlas

Case: 12-0314 SupD Exhibit D - 34t Hearing and Deposition Transcripts 3:5 D-178 of 228
of 37

Page 109

1 Consulting?

2  A. He was a member of Atlas Consulting at one

3 point.

4  Q. And is he still?

5  A. I don't -- I don't -- I don't know if he

6 was -- if he still has -- if he still is or not.

7  Q. Is Carl Wescott a member of Atlas Consulting,

8 LLC?

9  A. No, he is not.

10  Q. Does he hold any interest in Atlas Consulting,

11 LLC?

12  A. I gave him fiduciary responsibility for Atlas

13 Consulting to manage it.

14  Q. What does that mean, that you "gave him

15 fiduciary responsibility"?

16  A. I let him manage our -- the business, Atlas

17 Consulting, while I was having kids. I wasn't -- I

18 gave him full access to all of my financial interests.

19  Q. Okay. But what was the purposes of Atlas

20 Consulting?

21  A. It was a consulting firm and we were, at some

22 point, also going to manage, you know, assets through

23 their real estate. We were going to manage the

24 Santa Barbara property as a rental through there.

25  Q. And when you say "we," who is "we"?

Page 110

1  A. Myself and my husband.

2  Q. And when you first formed the LLC back in

3 1998, what was the purpose of it?

4  A. Could you rephrase that?

5  Q. When you -- you formed the corporation in

6 1998?

7  A. Yeah.

8  Q. -- the LLC?

9  Why did you form the corporation -- the LLC?

10  MS. GROPPER NELSON: That's assuming facts.

11 That misstates the testimony. The testimony was that

12 someone formed Atlas in 1998, not Ms. Stephens. So if

13 she knows the answer to that question, she can answer

14 it.

15  THE WITNESS: It was to do consulting.

16 BY MS. BARNIER:

17  Q. What type of consulting?

18  A. Technical and business consulting.

19  Q. And did you ever do any technical and business

20 consulting through Atlas Consulting?

21  A. Yes.

22  Q. Was that the business name you used when you

23 were working as an independent contractor?

24  A. For part of the time, yeah.

25  Q. Did your husband ever use Atlas Consulting to

Page 111

1 do any consulting work?

2  A. I don't know.

3  Q. You don't know if he ever used the name Atlas

4 Consulting as an independent contractor with anyone?

5  A. I don't. I don't know.

6  Q. If you were the only manager of Atlas

7 Consulting, why would you give fiduciary responsibility

8 to your husband?

9  A. Because he was managing all of our finances.

10  MS. BARNIER: Okay. I am going to stop now,

11 instead of going on and --

12  MS. GROPPER NELSON: Do you want to come

13 back -- well, do you want to go on for five more

14 minutes?

15  MS. BARNIER: I think -- well, I can. Okay.

16 I will keep on going.

17  This would be Exhibit 12.

18  (Exhibit 12 was marked for identification.)

19  MS. GROPPER NELSON: Thank you.

20 BY MS. BARNIER:

21  Q. Who prepared this balance sheet at Atlas

22 Consulting, LLC?

23  A. I don't remember. I am assuming it was Leo,

24 but --

25  Q. Leo who?

Page 112

1  A. I can't remember if he did this one or not.

2 He did some -- I believe it was Leo.

3  Q. Leo who?

4  A. Zendejas [phonetic].

5  Q. And who is Leo Zendejas?

6  A. He is a bookkeeper that we have used over the

7 years.

8  Q. And did you supply the information to him to

9 prepare this balance sheet?

10  A. Yeah.

11  Q. And where did you obtain the information for

12 the balance sheet?

13  A. I took a -- I took bank statements and other

14 credit card statements and...

15  Q. Did you also prepare a balance sheet for 2011

16 for Atlas Consulting?

17  A. I don't know if that got completed, because

18 Leo basically stopped working for us because we weren't

19 paying him.

20  Q. So in 2010, in order to prepare this, you

21 reviewed all the Atlas Consulting bank statements; is

22 that correct?

23  A. You know, that is not correct. I didn't

24 review all the bank statements. I just gave them to

25 Leo and had him reconcile the books.

Case: 12-0314 Sup D Exhibit D - 34t Hearing and Deposition Transcripts 3:5 D-179 of 228
of 37

Page 113

1    Q. Did you review this balance sheet?
2    A. Yeah, I think I reviewed it at a high level.
3    Q. Who kept all the Atlas Consulting bank
4 statements?
5    A. I have them in my files.
6    Q. Did you review them on a monthly basis?
7    A. No, huh-uh.
8    Q. What did you do when a bank statement came in
9 to your home for Atlas Consulting? What would you do
10 with it?
11    A. I put it in a pile.
12    Q. You didn't look at them at all?
13    A. Sometimes I'd look at it, sometimes I'd just
14 put it in a pile.
15    During 2010, I had three very young kids and I
16 was not really -- I mean, I was not really on top of...
17    Q. But you weren't working during 2010, is that
18 right, outside of the home?
19    A. No.
20    Q. Okay. So there was no income coming in to
21 Atlas Consulting from your efforts; is that correct?
22    A. I don't -- I don't remember how -- yeah, I
23 don't know. It looks like...
24    Q. If you weren't employed in 2010, what would be
25 the source of funds for Atlas Consulting?

Page 114

1    A. I believe that we were loaning money to and
2 from the account, and I think that was one of the
3 things we told you in one of our first 341 meetings;
4 that we were using the Atlas bank account to pay bills,
5 because our other bank account had been attached by
6 one...
7    Q. In 2010, one of your accounts -- all of your
8 accounts had been attached or any of your accounts had
9 been attached in 2010?
10    A. I believe in 2010 Fiechter had attached our
11 personal bank account and Carl suggested we just use
12 the Atlas bank account to pay bills, and we loaned
13 money to and from and that if we -- you know, he just
14 said that we had to, you know, keep track of things --
15 or he was going to keep track of things for, you know,
16 tax purposes.
17    Q. But this is your business, isn't it?
18    A. Yeah, I am the managing member of Atlas
19 Consulting.
20    Q. And so if you weren't employed at that time
21 outside the home, what would be the source of the
22 income for Atlas Consulting?
23    MS. GROPPER NELSON: The question has been
24 asked and answered.
25    MS. BARNIER: She didn't answer it, though.

Page 115

1 She said they borrowed money and I am asking: What was
2 the source of income for Atlas Consulting?
3    MS. GROPPER NELSON: The question has been
4 asked and answered.
5    MS. BARNIER: It has not been answered,
6 Counsel. She said we borrowed money. I am asking, was
7 there any source of income for Atlas --
8    MS. GROPPER NELSON: That's a different
9 question, Ms. Barnier.
10 BY MS. BARNIER:
11    Q. Was there any source of income for Atlas
12 Consulting in 2010?
13    A. I don't remember.
14    Q. Did you earn any money in 2010?
15    A. I did not earn money in 2010.
16    Q. Did you earn money in 2011?
17    A. As a consultant, I earned money in 2011.
18    Q. How much money did you earn?
19    A. There was about $38,000.
20    Q. You just said, "As a consultant." Did you
21 earn money any other way besides working as a
22 consultant?
23    A. My husband was managing all of our investments
24 and all of our assets. So to be honest, I -- I don't
25 remember. I didn't manage our investments, he did.

Page 116

1 And so distributions, other types of income coming in
2 from the investments...
3    Q. But what would Atlas Consulting have owned
4 that would have produced dividends or income?
5    A. As I had told you, money was loaned personally
6 to Atlas Consulting and we used that bank account for
7 paying bills.
8    Q. Okay. So who loaned Atlas Consulting money?
9    A. My husband managed the money coming in and out
10 of the bank account.
11    Q. That wasn't my question. Who loaned --
12    A. I don't know. I mean, it was from my husband.
13 My husband managed our assets. My husband was the one
14 who made the decision what money was going to go where.
15 And during 2010, I was not -- I was not working. I was
16 not paying -- I mean, I wasn't paying attention to
17 where the money was coming from. You'd have to ask my
18 husband that question.
19    Q. Okay. But in 2010, did Atlas Consulting own
20 anything that would have produced income besides your
21 employment?
22    A. Not to my knowledge.
23    Q. And how did you know that your husband was
24 borrowing money to fund Atlas Consulting?
25    A. Could you please rephrase that question?

Case: 12-0314 SupD Exhibit D - 341 Hearing and Deposition Transcripts 3:5 D-180 of 228 of 37

Page 117

1  Q. How did you become aware that your husband was
2  borrowing money to put into the Atlas Consulting bank
3  accounts?
4  A. My husband put money into the bank accounts
5  and we used that money to pay bills.
6  Q. You used the term borrow, though. I guess I
7  am asking, where did he borrow the money from to put
8  into Atlas Consulting?
9  A. That's not -- could you please rephrase that?
10  Q. You explained that your husband and you
11  borrowed money and put it into Atlas Consulting.
12  A. That's not what I said.
13  Q. No? Okay. Explain then the term borrowed. I
14  don't understand how you are --
15      MS. GROPER NELSON: Can you read the record
16  back, please?
17      THE REPORTER: I have no clue what to read.
18      MS. GROPPER NELSON: Actually, I don't either.
19      THE REPORTER: Can you give me a term to
20  search for?
21      MS. BARNIER: She testified earlier that her
22  husband borrowed money to put into Atlas Consulting so
23  they could pay their bills.
24      THE REPORTER: Okay. Give me a minute to run
25  a search.

Page 118

1      MS. BARNIER: Sure.
2      (Discussion held off the record while the
3  reporter reviews her stenographic notes.)
4      (Luncheon recess taken, 12:25 p.m. to
5  1:52 p.m.)
6          AFTERNOON SESSION
7      MS. BARNIER: Back on the record.
8  BY MS. BARNIER:
9      Q. Ms. Stephens, I misspoke. You did not use the
10  word "borrowed," I did, according to the court
11  reporter. You used the word "loaned."
12      MS. BARNIER: So can you read that part back?
13      (The record was read back as follows:
14      "Question: In 2010, one of your accounts --
15      all of your accounts had been attached or any
16      of your accounts had been attached in 2010?
17      "Answer: I believe in 2010 Fiechter had
18      attached our personal bank account and Carl
19      suggested we just use the Atlas bank account
20      to pay bills, and we loaned money to and from
21      and that if we -- you know, he just said that
22      we had to, you know, keep track of things --
23      or he was going to keep track of things for,
24      you know, tax purposes.")
25      THE REPORTER: Do you want me to read back

Page 119

1  where we left off?
2      MS. BARNIER: No, that's okay.
3  BY MS. BARNIER:
4      Q. Ms. Stephens, what was the source of funds for
5  all of the accounts for Atlas?
6      A. I don't know.
7      Q. So would it have been monies obtained by your
8  husband?
9      A. My husband was managing all of our finances at
10  that time and I wasn't involved. I wasn't involved.
11      Q. You were not involved in Atlas Consulting at
12  all for 2010?
13      A. I wasn't managing -- I wasn't bringing money
14  in during that time. I was completely dependent on my
15  husband during that time period.
16      Q. Okay. So in 2010, how much money did your
17  husband earn?
18      A. I don't know.
19      Q. Did you file your income tax returns for 2010?
20      A. I believe they are being finalized.
21      Q. And who is finalizing them?
22      A. My husband.
23      Q. And when do you anticipate that you will be
24  filing your 2010 income tax return?
25      A. I would like to be done with them.

Page 120

1      Q. That wasn't my question. I was asking when do
2  you anticipate --
3      A. As soon as my husband finishes.
4      Q. And my question was more specific than that.
5  When do you anticipate that they will be filed?
6      A. I have not gotten a straight answer from my
7  husband about that. He has not given me a
8  confirmation. He has said he is working on it and it
9  will be done as soon as he can get it done.
10      Q. And what about your 2011 tax return?
11      A. The same thing.
12      Q. Okay. How many bank accounts did Atlas
13  Consulting have in 2010?
14      A. I think there was three.
15      Q. And how many in 2011?
16      A. I -- actually, I don't know if there were
17  three in 2010. I think there were three -- I think
18  there were two in 2010 and 2011.
19      Q. And how many in 2012?
20      A. In 2012, I think there were -- there were as
21  many as I provided you. I can't remember when we
22  opened the bank account at U.S. Bank. We were moving
23  from one bank to another bank and opened one either at
24  the end of 2011 or the beginning of 2012.
25      Q. And who is "we"?

Page 121

1   A. Carl and I, my husband and I.
2   Q. So you opened up the Atlas Consulting accounts
3   together?
4   A. Yes.
5   Q. And why would Atlas -- and were they the same
6   two accounts for 2010, 2011?
7   A. Yes.
8   Q. Okay. And why would Atlas Consulting need two
9   bank accounts?
10  A. We -- my husband actually had decided to
11  change banks.
12  Q. Change banks from?
13  A. From Wells Fargo to U.S. Bank.
14  Q. And when was that decision made?
15  A. I can't remember. Sometime in 2011 or the
16  early 2012 time period.
17      MS. BARNIER: This will be Exhibit 13.
18      (Exhibit 13 was marked for identification.)
19      MS. GROPPER NELSON: Thank you.
20  BY MS. BARNIER:
21  Q. This bank statement is from September 2011 at
22  U.S. Bank. Does that refresh your memory as to when
23  you opened up the account at U.S. Bank?
24  A. Yeah. I believe it was opened in -- whenever.
25  This was the first bank account. I provided you all

Page 122

1   the bank accounts I could find from the time that this
2   bank account was opened.
3   Q. And you opened the account with $100; is that
4   correct?
5   A. Whatever it says on here. I don't remember.
6   Q. Did you personally go in to U.S. Bank and open
7   this account?
8   A. I don't remember.
9   Q. And then if you could turn to the statement of
10  November 1st, 2011, which -- I'm sorry, these aren't
11  Bates-stamped -- it says that there was $25 in the
12  account as of November 2011. Did you deposit any other
13  sums into this account in 2011?
14  A. I don't remember.
15      MS. BARNIER: And then this would be
16  Exhibit 14.
17      (Exhibit 14 was marked for identification.)
18  BY MS. BARNIER:
19  Q. And this is dated January 2nd, 2012, through
20  January 31st, 2012. If you could turn -- and I'm
21  sorry, not all the pages were provided to us.
22      If you would turn to the third page of it, and
23  it is marked March 1st, 2012, to March 31st.
24  A. Uh-huh.
25  Q. Up until this time, there had only been $25 in

Page 123

1   the account. And in March, there are deposits of
2   $20,000; one of $17,500 and another one for 2,500.
3   What was the source of the deposit?
4   A. I don't know.
5   Q. Did you review this account in 2012 at all?
6   A. No, I did not review this account.
7   Q. If you could please turn to the second page of
8   March 1st through March 31st, there are the other -- it
9   is dated March 19th, a number of charges in Truckee and
10  Auburn. Were you in Truckee or Auburn in March of
11  2012?
12  A. I don't remember.
13  Q. Well, let's go back up to March 15th. Were
14  you in Santa Barbara on March 15th? Because there is
15  charges in Santa Barbara, a Visa purchase, it says.
16  A. I don't remember.
17  Q. So was your husband using this account?
18  A. Yeah, we were both listed on this account.
19  Q. And did you pay bills with this account?
20  A. Yes.
21  Q. So on March 15th, there is a purchase with a
22  PIN number to Rainbow Grocery. Did you make that
23  purchase for $41.50?
24  A. I don't remember.
25  Q. Do you remember making any purchases in

Page 124

1   Santa Barbara on March 15th?
2   A. I don't remember.
3   Q. If you turn to the next page, March 19th
4   through March 20th, there are purchases made for
5   Truckee and Vacaville. Were you in Truckee on
6   March 19th?
7   A. I don't remember.
8   Q. Was your husband in Truckee on March 19th?
9   A. I don't remember.
10  Q. And then if you would go down to the bottom,
11  there is electronic withdrawals of this account on
12  March 7th. Do you see that?
13  A. Yeah.
14  Q. In the amount of $3,000?
15  A. Uh-huh.
16  Q. Did you remove $3,000 on March 7th?
17  A. I really don't remember.
18  Q. What about on March 13th in the amount of
19  $4,300? Did you remove $4,300 from this account?
20  A. I don't remember.
21  Q. Did your husband give you cash during any of
22  these times in March of 2012?
23  A. I don't remember.
24      MS. BARNIER: This would be Exhibit 15.
25      (Exhibit 15 was marked for identification.)

Case: 12-03148  Sup Exhibit D - 34t Hearing and Deposition Transcripts 3:5 D-182  of 228
of 37

| Page 125 | Page 127 |
|---|---|
| 1    MS. GROPPER NELSON: Thank you. | 1  later? |
| 2  BY MS. BARNIER: | 2     A.  Yeah, and I was -- |
| 3     Q.  This is a business account application for | 3     Q.  Were you still physically incapacitated in |
| 4  Wells Fargo, dated November 19th, 2010.  Have you seen | 4  November of 2010? |
| 5  this document before? | 5     A.  I breastfed all three of my children for a |
| 6     A.  Yes. | 6  year or more, and I was very involved with my children |
| 7     Q.  Did you open the -- did you fill out this | 7  during that year, during that time period.  I have a |
| 8  application? | 8  child who is hearing-impaired and has developmental |
| 9     A.  I don't remember if I filled it out or if my | 9  issues that we have worked on.  I had my -- both my |
| 10  husband filled it out. | 10  parents have had some health issues.  My mother was in |
| 11     Q.  Okay.  And it says the business name is Atlas | 11  the hospital, I believe, three times in -- during that |
| 12  Consulting, LLC.  Do you see that? | 12  time period with heart problems.  I was completely |
| 13     A.  That is correct. | 13  involved with my family life during that time period. |
| 14     Q.  And it has your name and Mr. Wescott's name -- | 14     I had given my husband -- I mean, not given. |
| 15     A.  Yeah. | 15  My husband was managing all of our business and |
| 16     Q.  -- do you see that? | 16  financial activities. |
| 17     And so why would Mr. Wescott be a signator on | 17     Q.  When you say "business," what do you mean? |
| 18  your business? | 18     A.  He has -- he is a businessman.  That's how he |
| 19     A.  Because I had given him fiduciary control of | 19  makes money.  He has businesses and -- |
| 20  all of my personal and business assets during the time | 20     Q.  What -- I'm sorry.  What businesses does your |
| 21  period that I had young children. | 21  husband own? |
| 22     Q.  Did you put that into a writing, that he had | 22     A.  All of the businesses he has listed in his -- |
| 23  all fiduciary control of your assets in -- | 23  in the bankruptcy schedules.  He had been managing |
| 24     A.  I don't remember whether we did that or not. | 24  businesses and running -- managing our finances.  And I |
| 25     Q.  Did you tell him that he had fiduciary | 25  gave him -- I mean, I did not question what he was |

| Page 126 | Page 128 |
|---|---|
| 1  responsibility for all of your accounts? | 1  doing. |
| 2     A.  I don't remember having -- what -- exactly | 2     Q.  Okay.  So if you turn to the second page -- |
| 3  what we discussed. | 3  and I'm sorry, you don't remember who prepared this, if |
| 4     Q.  But you do remember that you gave him this | 4  you did or if your husband did; is that right? |
| 5  fiduciary responsibility for all the accounts; is that | 5     A.  I don't remember. |
| 6  correct? | 6     Q.  Okay.  And the -- it does say -- it says |
| 7     A.  We had -- he was managing all of our personal | 7  annual gross sales are 200,000 a year in 2010; is that |
| 8  and business finances during the time period that I had | 8  accurate? |
| 9  young children.  I had had a significant -- I almost | 9     A.  I don't -- I don't know.  When I -- I don't |
| 10  lost my second child.  I had a serious bleed during my | 10  know.  I don't -- I mean, it wasn't accurate in terms |
| 11  second pregnancy and I was hospitalized and I ended up | 11  of what we actually did in 2010. |
| 12  on bedrest. | 12     Q.  Okay.  Because it says "Year Sales Reported: |
| 13     And after my second child was born, I had a | 13  January 1st, 2010.  Annual sales, $200,000."  What |
| 14  significant time getting over -- or getting back on my | 14  would have been the annual gross sales in 2010? |
| 15  feet.  And then I unexpectedly got pregnant -- although | 15     A.  I don't know what that number was referring |
| 16  I am very happy, but I unexpectedly got pregnant with | 16  to.  I don't remember putting that number in there. |
| 17  my third child when I was 45, and I was in a high-risk | 17     Q.  And it says on the page three of four that you |
| 18  situation given my age, et cetera, during 2009 and | 18  are the managing director; is that correct? |
| 19  through my delivery in 2010. | 19     A.  That's my title, yes. |
| 20     Q.  And I'm sorry, when was your third child born | 20     Q.  And what's your husband's title?  He is the |
| 21  again?  I forgot. | 21  CEO of -- is that correct?  On the fourth page, it says |
| 22     A.  In 2010, February 25th and -- | 22  he is the CEO? |
| 23     Q.  Okay.  So this -- | 23     A.  That's his title, yes. |
| 24     A.  -- I was -- | 24     Q.  And what does he do as CEO for Atlas? |
| 25     Q.  -- is November 2010.  So about eight months | 25     A.  He -- whatever needs to be done.  I don't |

Case: 12-0314 SupDExhibit 0 - 34t Hearing and Deposition Transcripts 3:5D-183 of 228
of 37

Page 129

1  know. He manages our personal and business assets and
2  finances.
3     Q.  So you were paying all your personal bills
4  through Atlas Consulting in 2010?
5     A.  We ended up using that bank account, yes.
6     Q.  To pay all your personal expenses?
7     A.  I don't know if we paid all of our personal
8  expenses through there, but we paid -- we paid bills
9  using that account.
10    Q.  And did you -- now, you say "we" and I want to
11 make sure I understand.  Did you also pay bills from
12 this account, this bank account in 2010?
13    A.  Yes.
14    Q.  So how did you know how much money was in the
15 account?
16    A.  I would look at a balance or my husband would
17 tell me.
18    Q.  You said, "look at a balance."  How would you
19 look at the balance?
20    A.  I had online access.
21    Q.  How often would you look at the online access
22 to see how much money was in the account --
23    A.  I don't remember.
24    Q.  -- in 2010?
25    So given that your background is computer

Page 130

1  science, would you look at your account once a week?
2     A.  I don't regularly look at my accounts.
3     Q.  If you don't look at your accounts, how do you
4  know how much money is in there so you can write a
5  check?
6     A.  My husband would tell me.
7     Q.  So he would tell you how much money was in the
8  account?
9     A.  Either I would go online and look or he would
10 look if I needed to pay bills.
11    Q.  And my question is:  So when you go online,
12 how often would you go online to look at your account
13 on average in a month?
14    A.  I don't remember.
15    Q.  More than once a month?
16    A.  I don't know.
17    (Interruption at the door.)
18    MS. BARNIER:  We need to go off the record
19 because Greg has brought in the Order.
20    Is that all right, Sheila, if we go off?
21    MS. GROPPER NELSON:  (No audible response.)
22    (Recess taken, 2:09 p.m. to 2:12 p.m.)
23    (Exhibit 16 was marked for identification.)
24    THE REPORTER:  Back on?
25    MS. BARNIER:  Yes.

Page 131

1  BY MS. BARNIER:
2     Q.  Going to Exhibit 16, this is an account of
3  Atlas Consulting and it ends in 2812.  Is this account
4  still open?
5     A.  No, it has been closed.
6     Q.  When was it closed?
7     A.  Sometime during 2012, I believe.
8     Q.  Why did you close it?
9     A.  We stopped using it.
10    Q.  Okay.  If you could look in November, the
11 November statement in 2010, there is $100 in the
12 account.  Do you see that?
13    MS. GROPPER NELSON:  On the first page.
14    THE WITNESS:  Uh-huh.
15 BY MS. BARNIER:
16    Q.  And then if you would turn to the fourth page,
17 which is the December account, there is a deposit of
18 $44,000.  Do you see that?
19    On the very first page of December 2010, it
20 says a deposit of $44,000 roughly.  Do you see that?
21    A.  Uh-huh.
22    Q.  Do you remember depositing $44,000 into this
23 account --
24    A.  No.
25    Q.  -- in December of 2010?

Page 132

1     A.  I don't remember.
2     Q.  If you would turn to December 2nd, there is a
3  wire out.  Do you see that?
4     A.  Uh-huh.
5     Q.  In the amount of $25,000.  Why did you or your
6  husband wire out $25,000 in December of 2010 to
7  International Aircraft Title?
8     A.  I don't know.
9     Q.  When did you become aware that your account
10 had been depleted by $25,000?
11    A.  I don't know.
12    Q.  Did you ever become aware that $25,000 had
13 been wired out of your account in December of 2010?
14    A.  I was not managing our finances during this
15 time period and I -- I was not monitoring the accounts.
16    Q.  You didn't go online and look at your Wells
17 Fargo accounts?
18    A.  Can you be more specific as to which dates?
19    Q.  In December of 2010.
20    A.  I do not remember when or if I looked at the
21 accounts or if I made any note of monies being
22 transferred in and out of the accounts during December
23 of 2010.
24    My husband was managing our finances.  He was
25 doing his activities.  If I asked him what he was

Case: 12-03142   Doc# 53-5   Filed: 06/10/13   Entered: 06/10/13   Page 19
of 37

Page 133

1  doing, he would tell me that he was in charge of
2  handling this and, oftentimes, he would get angry with
3  me. I had three young kids. I believe my mom was in
4  the hospital in October, November with heart problems
5  and that was my focus. My focus was my family during
6  2010.
7     Q.  Well, let's look at some of the bills.
8        December 14th, there is a payment to Gap of
9  $300. Is it your normal routine to pay -- was the bill
10 from Gap your bill?
11    A.  I had a Gap credit card that was a Visa card.
12 So I do not know what -- I mean, which was used to buy
13 various items. It wasn't necessarily a bill from The
14 Gap.
15    Q.  Okay. Did you make the payment, though, on
16 the Visa bill?
17    A.  I don't remember.
18    Q.  What about on December 15th, 2010, the PG&E
19 bill? Who paid PG&E?
20    A.  It was often the case that I paid the house
21 bills.
22    Q.  Okay. And did you pay the house bills from
23 this account in 2010?
24    A.  I -- I don't remember.
25    Q.  Well, what other accounts would you have used

Page 134

1  to pay house bills?
2     A.  I don't know.
3     Q.  Did you have other accounts that you could
4  have used to pay house bills?
5     A.  I don't remember. I believe that my husband
6  suggested we use this account. This is where he was
7  putting the money, this is where he suggested I pay
8  things from and that's what I did.
9     Q.  Okay. So you paid bills from this account,
10 that was my question.
11       So did you pay PG&E in December -- was it your
12 routine to pay PG&E from this account?
13    A.  I don't remember.
14    Q.  When you paid bills on your accounts, did you
15 pay them electronically?
16    A.  Usually, yes.
17    Q.  And when you paid your bills electronically,
18 did you -- what information did you look at to pay your
19 bills?
20    A.  I would go into the Bill Pay on the service
21 that I would be paying and hit "Pay bill" and the bank
22 accounts were already set up as to which account it
23 would come out of.
24    Q.  And does your service that you use list the
25 amount of money in the account before you pay the bill?

Page 135

1     A.  No, it does not.
2     Q.  So let's go down to the last eight lines at --
3  dated 12/27, and on the same page that we are on as to
4  the wire transfer for $25,000. There are a number of
5  cash deposits made in Santa Barbara. Do you see that?
6     A.  I see that.
7     Q.  Did you make those cash deposits in
8  Santa Barbara?
9     A.  I don't remember.
10    Q.  Were you in Santa Barbara in December of 2010?
11    A.  I believe that we were there for the holidays.
12    Q.  Okay. So why -- if you don't remember making
13 the deposits, is it likely that your husband made the
14 deposits?
15    A.  Yeah.
16    Q.  So why would your husband be depositing cash
17 in the amount of $1,000, $900 into this account?
18    A.  I don't know.
19    Q.  When you went online to pay bills, did you
20 ever look at how much money had been deposited into the
21 accounts?
22    A.  No.
23    Q.  In December of 2010, did you -- did your
24 husband have large sums of cash on him?
25    A.  I don't know.

Page 136

1     Q.  Were you staying in the same house in December
2  of 2010 in Santa Barbara?
3     A.  Yes.
4     Q.  And what house that?
5     A.  It's the house at 3910 Carol Avenue.
6     Q.  Did your husband tell you he was depositing
7  cash into the Atlas Consulting account at Wells Fargo?
8     A.  I don't remember.
9     Q.  Did you ever learn that Atlas Consulting owned
10 an interest in an aircraft?
11    A.  No.
12    Q.  When did you first learn that Atlas Consulting
13 owned an interest in an aircraft?
14    A.  I don't believe Atlas Consulting owns an
15 interest in an aircraft.
16    Q.  Does any entity controlled by you or your
17 husband own interest in an aircraft?
18    A.  I don't know of any ownership of an aircraft.
19    Q.  Your husband never told you about an aircraft
20 that had been purchased?
21    A.  No.
22    Q.  When did you first learn that the $25,000 had
23 been wired out to International Aircraft Title?
24    A.  I believe Sheila mentioned it or it was in
25 some filing in the last few months. Before that, I did

Case: 12-0314 SupDExhibit D - 34t Hearing and Deposition Transcripts 3:5 D-185 of 228
of 37

Page 137

1 not have any knowledge of it.
2    Q. Did you ask your husband about it?
3    A. Yes, I did.
4    Q. What did he tell you?
5    A. He said that he never bought an aircraft.
6    Q. Did you ask him why the $25,000 was sent to
7 International Aircraft Title?
8    A. Yes, I did.
9    Q. And what did he tell you?
10    A. He told me he never bought an aircraft and
11 that he was doing, you know, some kind of payment. He
12 was not clear with me what it was about.
13    Q. Did you press him?
14    A. Every time I have tried to speak with him
15 about this, he has gotten very angry with me and told
16 me that he never bought an aircraft.
17    Q. Did he tell you that one of his other entities
18 owned an aircraft?
19    A. No, he said he never bought an aircraft.
20    Q. Staying on the same document, on
21 December 29th, 2011 --
22      MS. GROPPER NELSON: '10.
23      MS. BARNIER: I'm sorry, 2010.
24 BY MS. BARNIER:
25    Q. -- there is a -- on page three of four at the

Page 138

1 top is account 2818 at Wells Fargo. There is a
2 transfer to account ending in 1846 in the amount of
3 $12,000. What account is 1846, if you know?
4    A. I don't know.
5    Q. Is that another Atlas Consulting account?
6    A. Well, it says down here 1846 is Atlas
7 Consulting, Wells Fargo.
8    Q. But do you know?
9    A. No, I do not know.
10    Q. Any idea why $12,000 would have been moved
11 into another account?
12    A. No.
13      MS. BARNIER: This will be Exhibit 17.
14      (Exhibit 17 was marked for identification.)
15      MS. GROPPER NELSON: Thank you.
16 BY MS. BARNIER:
17    Q. If you would turn to -- so now we are in
18 January of 2011. So approximately $56,500 are
19 deposited on the 4th, 5th and 6th of January. Do you
20 see that?
21    A. Uh-huh.
22    Q. Where did those monies come from?
23    A. I don't know.
24    Q. But you -- did you pay your American Express
25 bill on January 5th?

Page 139

1    A. Yes.
2    Q. And would you have paid that bill online?
3    A. Yes.
4    Q. And would you have looked at this account to
5 see how much money was in the account?
6    A. Not necessarily.
7    Q. If you didn't know how much money was in the
8 account, how could you determine how much of the bill
9 you could pay?
10    A. My husband would have told me if there was
11 money in the account. If I hadn't -- I mean, I
12 don't -- I don't know. I mean, I wouldn't -- I don't
13 necessarily look at the account -- or I didn't
14 necessarily look at the account before I paid something
15 if Carl said, "There is money in the account. Go ahead
16 and pay."
17    Q. But as of January 2011, you know you are not
18 paying the mortgage, right?
19    A. Yes.
20    Q. And there is $56,000 in this account. Do you
21 think the mortgage could have been paid with this
22 money?
23      MS. GROPPER NELSON: I am going to object to
24 the question as argumentative.
25      THE WITNESS: My husband during that time

Page 140

1 period was making all financial decisions and if he
2 said he needed the money for other purposes, I didn't
3 question it. So I didn't question what wasn't and was
4 getting paid. He told me when I could pay things and I
5 did.
6 BY MS. BARNIER:
7    Q. And then if you turn to page three of four, on
8 January 26th, there is a transfer of $36,000 to an
9 account ending in 1846. Do you know why the money was
10 transferred?
11    A. No, I do not.
12    Q. When were the properties in California lost in
13 foreclosure?
14    A. Over a period of time. I don't know
15 specifics.
16    Q. Were most of them lost by 2010?
17    A. I don't know.
18    Q. Did you get Notices of Foreclosure Action
19 addressed to your home?
20    A. Yes.
21    Q. Were you aware that the properties were in
22 foreclosure, that --
23    A. Yes.
24    Q. -- the California -- excuse me. Let me be
25 more specific.

Case: 12-0314 SupD Exhibit D - 34 Hearing and Deposition Transcripts 3:5 D-186 of 228
of 37

| Page 141 | | Page 143 |
|---|---|---|

Page 141

1  Were you aware that the California properties
2  were in foreclosure in 2010?
3  A. Yes. Actually, I want to change that. I
4  don't know the dates to which I found out things were
5  in foreclosure. So I don't know if they were in
6  foreclosure in 2010.
7  Q. When did you first become aware that the
8  California properties that you owned, according to the
9  Transmutation Agreement, were in foreclosure?
10  A. I don't remember.
11  Q. If you could turn to February 2011 --
12  A. Uh-huh.
13  Q. -- in about the middle of the page, on
14  February 16th, there is a transfer to Banco Ceomercial.
15  Do you know what that bank is?
16  A. No.
17  Q. Do you know who Ulrich Zacharias is?
18  A. No.
19  Q. Do you have any idea why he would receive
20  $3,500 from Atlas Consulting?
21  A. I assume that my husband -- I don't know.
22  Q. And then on February 22nd, there is a
23  withdrawal made in a branch of $4,600, approximately.
24  Do you see that?
25  A. I see that, yes.

Page 143

1  Q. April of 2011, page two of four. April 13th,
2  there is a deposit of $10,000. Do you see that?
3  A. Uh-huh.
4  Q. Where did that money come from?
5  A. I don't know.
6  Q. But you were paying -- did you make the
7  Nordstrom bill payment on April 12th?
8  A. Again, I had a credit card through Nordstrom
9  that was a Visa card and I would use it for various
10  things. So I wasn't necessarily paying Nordstrom for
11  Nordstrom items, but I assume that I made the payment.
12  Q. And did you also make the payment to American
13  Express, the one before for $200?
14  A. I don't remember, but I assume so.
15  Q. And, also, another one -- there is two
16  payments to American Express for two different
17  accounts; is that correct? One ends in 5179 and
18  another one in 5137. Did you have two American Express
19  accounts at the time?
20  A. Yes.
21  Q. And you made those payments; is that correct?
22  A. I assume -- I don't know, but I assume so.
23  Q. And then if you go down to April 20th, there
24  is a payment of 1,566 to Lycée Français. Is that a
25  payment for your children's school?

Page 142

1  Q. Did you withdraw $4,600 in February of 2011?
2  A. I don't remember.
3  Q. And in March of 2011, on this page two of six,
4  March 1st through March 2nd, do you see the withdrawals
5  made in a branch store of approximately -- there is one
6  for $3,400, another one for 2,000, another one for 300.
7  Why was the money withdrawn?
8  A. I don't know.
9  Q. Did you withdraw the money?
10  A. I don't -- I don't know. I don't have a
11  recollection of it.
12  Q. Did your husband withdraw the money?
13  A. I don't know.
14  Q. Then, if you would turn to page three of six,
15  on March 7th, there is a wire to Hong Kong. Do you see
16  that? On March 7th, there is a number in the amount of
17  $2,000, a wire to Hong Kong and Shangh/BNF Hannes Unit.
18  Do you know what that is?
19  A. No.
20  Q. Any reason why $2,000 out of an Atlas
21  Consulting account would be wired to Hong Kong?
22  A. I don't know.
23  Q. Was your husband in Hong Kong in March of
24  2011?
25  A. I don't remember.

Page 144

1  A. Yes.
2  Q. And why do your children attend that school?
3  A. We are French.
4  Q. But why do you -- did you select that school?
5  A. Because we are French. I am French, my mother
6  is French. We speak French.
7  Q. And so you chose it because you wanted your
8  children to learn French; is that it?
9  A. It's a half a block from our house, it is a
10  good school, my son has -- my son needs a special
11  environment. It is an environment that works very well
12  with my son's needs.
13  Q. And how many years has your son been there?
14  A. Since he was three years old.
15  Q. And so his tuition yearly comes to about
16  20,000 a year; is that right?
17  It must be more than that; isn't it?
18  A. No.
19  Q. 20,000 a year?
20  A. Less than that.
21  Q. Is he on scholarship?
22  A. No.
23  Q. Have you applied for scholarship at the
24  school?
25  A. No.

Case: 12-0314 SupD Exhibit D - 34t d Hearing and Deposition Transcripts 3:5 D-187 of 228
of 37

Page 145

1    Q.   And then if you look at May 2011, page two of
2    four, there are a number of bills that were paid here.
3    Did you make these payments for these bills in May of
4    2011?
5        A.   I don't remember making those payments, but
6    they are generally the bills that I would pay.
7        Q.   And then if you could turn to August of 2011,
8    and that would be page two of four, there are
9    significant deposits made, including transfers into
10   this account. Do you see that?
11       A.   Uh-huh.
12       Q.   And it totals like -- between -- 11,000 done
13   on August 3rd and there are many done on August 12th.
14   It looks like it was approximately more than $30,000.
15   Do you know what the source of those funds were?
16       A.   No, I do not.
17       Q.   And then on August 12th, there is a payment to
18   Luther Burbank in the amount of $33,074.73. What was
19   that for?
20       A.   I don't know. I don't even see it.
21       Q.   I'm sorry, August 12th on page two of four.
22       A.   Oh, uh-huh. I don't know.
23       Q.   Did any of your California properties have a
24   loan with Luther Burbank?
25       A.   I can't -- I believe -- I think so, yes.

Page 146

1    Q.   And do you know which property had a loan with
2    Luther Burbank?
3        A.   I don't remember.
4        Q.   Did your husband tell you he was making a
5    payment of $33,000 to Luther Burbank in August of 2011?
6        A.   I don't remember.
7        Q.   September of 2011, page two of four, it is
8    about three months before the -- four months before the
9    filing of the bankruptcy. On September 6th and
10   September 29th, there are withdrawals made in a branch
11   that total more than $4,000. Did you make those
12   withdrawals?
13       A.   I don't remember.
14       Q.   Did you ever take sums of cash out of the
15   account 2818?
16       A.   I -- I -- I am sure I took money out of the
17   account. Yes, I took money out of the account.
18       Q.   Did you ever take more than $1,000 out of the
19   account at one time?
20       A.   I don't remember.
21       Q.   Moving to November of 2011, page two of four,
22   this is November 10th. There are a number of
23   account -- of transfers into this account from account
24   5228. Do you know which account is 5228?
25       A.   No, I don't.

Page 147

1    Q.   And do you know what the source of money would
2    have been in the other account?
3        A.   No.
4        Q.   But that would be a Wells Fargo account,
5    wouldn't it, since it is an online transfer; is that
6    correct?
7        A.   I don't know.
8        Q.   And then in December of 2011, page two of
9    four, there is a transaction on December 5th of $7,200.
10   Do you see that?
11       A.   Uh-huh.
12       Q.   What account was 5321?
13       A.   I don't remember.
14       Q.   And then there are two deposits totaling about
15   50 -- a little over $5,000 on December 9th and
16   December 13th. Do you see that?
17       A.   Uh-huh.
18       Q.   What was the source of that deposit?
19       A.   I don't know.
20       Q.   And you explained earlier that in 2010 you had
21   allowed your husband to take a fiduciary duty of all
22   your accounts. Did you -- when did you resume
23   responsibility for the Atlas Consulting accounts?
24       A.   I never did.
25       Q.   Did your husband ever tell you where he was

Page 148

1    obtaining the money to deposit into the Atlas
2    Consulting accounts?
3        A.   I don't remember.
4            MS. BARNIER: This will be Exhibit 18.
5            (Exhibit 18 was marked for identification.)
6            MS. GROPPER NELSON: Thank you.
7    BY MS. BARNIER:
8        Q.   There are four checks listed here dated
9    January 28, 2009 -- I'm sorry, excuse me, three checks.
10           MS. GROPPER NELSON: No, four.
11           MS. BARNIER: Well, there is four checks, but
12   that bear -- that are made out to Carl Wescott.
13           MS. GROPPER NELSON: Okay.
14   BY MS. BARNIER:
15       Q.   Is that your signature on these checks?
16       A.   Yes, it is.
17       Q.   And why would you write three checks to Carl
18   Wescott totaling $10,000 each?
19       A.   Because he asked me to.
20       Q.   Why didn't you just write a check for $30,000
21   to give him?
22       A.   I don't know.
23       Q.   So it's your recollection that he asked you
24   for three checks, $10,000 each?
25       A.   I don't remember, but I don't know why I would

Page 149

1  do it otherwise.
2  Q. What was he going to do with the money?
3  A. I don't remember.
4  Q. Did he tell you he was going to invest the
5  money?
6  A. I don't remember. My husband, during that
7  time period, was managing all of our investments and
8  managing all of our finances and I trusted him. He
9  was --
10  Q. Well --
11  A. -- an investor, he had businesses, he --
12  Q. If he was -- if you had given him fiduciary
13  duty, why did you have to write the checks?
14  A. I don't know.
15  Q. Would you describe your husband as a Svengali
16  type?
17  A. No.
18  This one was the Atlas Consulting account from
19  Montecito Bank and Trust and that was my account prior
20  to us getting married. And I -- yeah.
21  Q. But you were married in 2009, correct?
22  A. Yeah.
23  I don't know. I don't remember.
24  Q. You don't remember what? I'm sorry.
25  A. I don't remember why there were three checks

Page 150

1  versus one. I don't remember why.
2  Q. But he wasn't a signator on that account?
3  A. No.
4  Q. So he asked you for $30,000 and you gave him
5  $30,000?
6  A. I don't remember. I don't remember any
7  conversation or the exact -- you know, I don't remember
8  the time period.
9  Q. In 2009, was $30,000 a lot of money to you?
10  A. No.
11  Q. What's your definition of a lot of money?
12  A. Now?
13  Q. In 2009.
14  A. $100,000 maybe.
15  MS. BARNIER: This will be Exhibit 19.
16  (Exhibit 19 was marked for identification.)
17  BY MS. BARNIER:
18  Q. Do you recognize this check?
19  A. No.
20  Q. It's a check made out to Atlas Consulting,
21  LLC. There is two checks here dated January 5th, 2011,
22  and a check dated January 4th, 2011. Do you recognize
23  that handwriting?
24  A. No.
25  Q. Who is LL Organization, Inc.?

Page 151

1  A. I don't know who it is.
2  Q. Well, why would LL Organization, Inc. write
3  Atlas Consulting a check for $11,300?
4  A. I don't know.
5  Q. It says, "Commission" on it. Did you do any
6  work for LL Organization?
7  A. I don't know what this check was -- or these
8  checks. I don't know.
9  Q. On the second check in the amount of $30,000,
10  dated January 4th, 2011, do you recognize this
11  handwriting?
12  A. No.
13  Q. And you don't know why this organization would
14  write checks totaling $41,000 to Atlas Consulting?
15  A. No.
16  Q. Could this have been monies paid that your
17  husband did work for in 2011?
18  A. Yes.
19  Q. And what work could he have done for the
20  LL Organization?
21  A. I don't know. I don't know this organization.
22  MS. BARNIER: This will be Exhibit 20.
23  (Exhibit 20 was marked for identification.)
24  MS. GROPPER NELSON: Thank you.
25  ///

Page 152

1  BY MS. BARNIER:
2  Q. It's a postal money order in the amount of
3  $1,000 made out to Atlas Consulting. Who is Alex Koho?
4  A. I don't know.
5  Q. Why would this gentleman make out two money
6  orders in the amount of $2,000 each to Atlas
7  Consulting?
8  MS. GROPPER NELSON: It is $1,000 each.
9  MS. BARNIER: I'm sorry.
10  BY MS. BARNIER:
11  Q. $1,000 each, two $1,000. Do you know?
12  A. I don't know.
13  Q. Did your husband ever mention Alex Koho to
14  you?
15  A. I have never heard of the name.
16  Q. And those checks are dated January 4th,
17  2011 -- those money orders, excuse me.
18  On this same day, John Sanchez also wrote two
19  money orders to Atlas Consulting, LLC. Do you know who
20  John Sanchez is?
21  A. No.
22  Q. Any idea why someone would be taking out money
23  orders made out to Atlas Consulting?
24  A. No.
25  Q. And then if you could turn to the third one,

Page 153

1  also a money order made out to Atlas Consulting, LLC,
2  one is for $1,000 and one is for $700, also made on
3  January 4th, 2011. Do you know who Steven Chase is?
4     A. No.
5     Q. Any idea why these three gentlemen would be
6  paying Atlas Consulting, LLC money?
7     A. No, I do not.
8     Q. Did you do any work for any of these three
9  gentlemen?
10    A. I did not.
11    Q. Did your husband do work for any of these
12 three gentlemen?
13    A. I do not know.
14    MS. BARNIER: This will be Exhibit 21.
15    (Exhibit 21 was marked for identification.)
16    MS. GROPPER NELSON: Thank you.
17 BY MS. BARNIER:
18    Q. Same date, January 4th, 2011, that the other
19 money orders were done. There is a cash deposit of
20 $3,000 and it says, "Monette Stephens, $3,000."
21    Did you deposit $3,000 cash into this account
22 ending in 2818 in January of 2011?
23    A. I don't remember.
24    Q. Is that your handwriting?
25    A. No, that is not my handwriting.

Page 154

1     Q. Whose handwriting do you think it is?
2     A. I don't know. Maybe someone who works at the
3  bank.
4     Q. Why would someone use your name to deposit
5  $3,000 into the account?
6     A. Maybe they were depositing cash into that
7  account. I don't know.
8     Q. And then there is cash also -- which is the
9  receipt for the $3,000 done on the second page.
10    A. Uh-huh.
11    Q. And then if you turn, the next day,
12 January 5th, 2011, there is a check for $11,300. Do
13 you recognize this handwriting?
14    A. It looks a little like my husband's.
15    Q. Do you know where he would have obtained
16 $11,300 on January 5th, 2011?
17    A. No.
18    Q. Turning to the next page, dated November 29th,
19 2010, do you recognize the handwriting?
20    A. It looks a little bit like my husband's.
21    Q. Is that his signature on the left-hand side?
22    A. It doesn't look like it.
23    Q. This is a cash deposit of $8,000. Do you have
24 any idea where the cash deposit of $8,000 came from?
25    A. No, I don't.

Page 155

1     Q. And then there is a separate ticket, cash in
2  of -- on December 1st, 2010, of $15,550. Do you know
3  why $15,000 in cash would have been deposited into an
4  Atlas Consulting account?
5     A. No. My husband was in charge of all our
6  finances during that time period and I was not involved
7  with his business. I wasn't involved with any of his
8  businesses, and he was bringing in all of the money
9  during that time period. I was not working.
10    Q. So where would your husband have gotten 15 --
11 what business would have kicked out $15,000 in cash?
12    A. I don't know.
13    Q. And then on December -- I believe that's "11,"
14 but I am not -- 2011, do you see that? There's another
15 cash deposit of $8,100. Is that your --
16    MS. GROPPER NELSON: Actually, it looks like
17 December 1st, if you look at the --
18    MS. BARNIER: Down below? You are right,
19 December 1st.
20 BY MS. BARNIER:
21    Q. Do you see $8,100 of cash deposited again into
22 Atlas Consulting?
23    A. Yes, I see that.
24    Q. Is that your husband's handwriting?
25    A. It looks a little bit like it.

Page 156

1     Q. Okay. And then there is a cash in on
2  December 10th, 2010, in the amount of $27,783.37. Do
3  you see that?
4     A. I see that.
5     MS. GROPPER NELSON: Actually, it is
6  December 1st again.
7     MS. BARNIER: Oh, I am getting tired.
8     THE WITNESS: Yes.
9  BY MS. BARNIER:
10    Q. Where would your husband have obtained almost
11 $28,000 in cash to deposit into the Atlas checking
12 account?
13    A. I don't know.
14    Q. Turn to the last page, January 6, 2011. Is
15 that your husband's handwriting?
16    A. I don't know. It looks a little like it.
17    Q. And there is a deposit of $30,000 on
18 January 6, 2011. Any idea where he obtained that
19 money?
20    A. No.
21    MS. BARNIER: This will be Exhibit 22.
22    (Exhibit 22 was marked for identification.)
23    MS. GROPPER NELSON: Thank you.
24 BY MS. BARNIER:
25    Q. Do you recognize the handwriting on the first

Case: 12-0314 Sup D Exhibit D - 34th Hearing and Deposition Transcripts 3:5 D-190 of 228
of 37

Page 157

1 postal money order made out to Atlas Consulting?

2   A. It -- I don't know. No, I don't.

3   Q. And that's dated the 12th -- December 28th,

4 2010.

5     Same thing on the second one, the same date,

6 in the amount of $1,000 --

7   A. Uh-huh.

8   Q. -- made out to Atlas Consulting. Does that

9 look like your husband's handwriting?

10   A. You know, it could be.

11   Q. Why would your husband be getting money orders

12 to deposit into the Atlas Consulting account?

13   A. I have no idea.

14   Q. Did you ever ask him if he got money orders?

15   A. No.

16   Q. Was it his habit to carry money orders on his

17 person?

18   A. I don't know.

19   Q. Well, would he have money orders in his

20 wallet?

21   A. I don't look in his wallet.

22   Q. Did he ever use money orders to pay for items

23 when you were together?

24   A. I don't know. I don't recall. I don't

25 remember seeing him do that, no.

Page 158

1   Q. Did you ever see him cash any money orders?

2   A. I don't remember.

3   Q. If you were in a bank together or a store, did

4 he ever use a money order to pay for something?

5   A. I don't have any memory of that.

6   Q. Ms. Stephens, have you ever owned any property

7 outside of the United States?

8   A. I believe that at some point I was named on

9 some of my husband's investments overseas.

10   Q. And which ones were those?

11   A. I don't remember.

12   Q. Were you involved in a property called

13 Hacienda Palo Alto?

14   A. I don't think so.

15   Q. Your husband testified about Hacienda Palo

16 Alto. He said, "We paid something like 800,000 for

17 it."

18     And I asked him, I said, "Who is 'we'?"

19     And he said -- and his response is, "I guess

20 it was the royal 'we.' I was thinking of my wife and

21 I."

22     Does that refresh your memory that you owned

23 Hacienda Palo Alto?

24   A. I don't remember. I don't know. I don't

25 recall.

Page 159

1   Q. You don't remember owning any property outside

2 the United States?

3     MS. GROPPER NELSON: The question has been

4 asked and answered.

5     THE WITNESS: I don't remember owning Hacienda

6 Palo Alto.

7 BY MS. BARNIER:

8   Q. Did you own any property in Ecuador?

9   A. I believe I did own -- or I was named on

10 Vilcabamba when my husband first invested in that

11 property.

12   Q. How much did you pay for that property?

13   A. I don't remember. My husband bought it. I

14 think he put me on it and -- but I don't -- I don't

15 have -- I wasn't involved with the deal. I was never

16 down there. I was not involved with my husband's

17 business activities down there.

18   Q. Why would he put you on title?

19   A. I don't know.

20   Q. Did you ask him why he put you on title?

21   A. No.

22   Q. Did you ever sell any property outside of the

23 United States?

24   A. Can you be a little bit more specific?

25   Q. I am just asking, any property outside the

Page 160

1 United States. It could be Latin America. I am just

2 asking you if you ever sold any property outside of the

3 United States.

4     MS. GROPPER NELSON: You personally.

5     THE WITNESS: I have not personally sold any

6 property outside the United States, to my knowledge.

7     MS. BARNIER: This will be Exhibit 23.

8     (Exhibit 23 was marked for identification.)

9     MS. GROPPER NELSON: Thank you.

10 BY MS. BARNIER:

11   Q. Do you recognize this document?

12   A. No.

13   Q. Do you want to look at the initials at the

14 bottom of the page? It says "Seller," "CW" and "MS."

15 Do you see -- oh, on the first page. Hold on. Let's

16 stay in the same place.

17     Do you see that? Are those your initials?

18   A. Uh-huh.

19   Q. And this says this agreement was made on the

20 17th of October, 2009, among Chai and Cari Wescott and

21 Monette Stephens, the sellers. Does this refresh your

22 memory that you sold property outside the United

23 States?

24   A. No.

25   Q. Are those your initials on the bottom of this

Case: 12-0314 Sup Exhibit D - 34t Hearing and Deposition Transcripts 3:5 D-19 Page 228
of 37

| Page 161 | | Page 163 |

**Page 161**

1  page?

2  A. Yeah, uh-huh.

3  Q. Did you sign this document?

4  A. Let me look.

5  Q. On page nine is your signature?

6  A. That's my signature. It looks like my

7  signature.

8  Q. You have no memory of signing this document --

9  A. No.

10  Q. -- in 2009 to sell property?

11  Were you and Carl Wescott the owners of Lot

12  12A in Vilcabamba, Ecuador?

13  A. I was -- oh, okay. That was Vilcabamba. I

14  remember being -- for whatever reason, he included me

15  when he was doing the business in Vilcabamba, and that

16  was the one I said I remember being involved with -- I

17  mean, not being involved with but that I was on, and I

18  guess he sold it and I signed the paperwork.

19  Q. And what was -- what is Vilcabamba, Ecuador?

20  A. I have never been there. It was a project

21  that my husband was involved with.

22  Q. Well, it says you are the seller. So weren't

23  you also involved in it?

24  A. I was -- I was a co-borrower as his spouse.

25  He included me when he purchased this property.

**Page 162**

1  Q. How much did you and your husband pay for this

2  property?

3  A. I don't know. It says, "Purchase price." I

4  guess that's the sale price. I don't know.

5  Q. Did you ever talk about Vilcabamba, Ecuador?

6  A. Yeah. He was very excited about Vilcabamba,

7  Ecuador. He thought it was a beautiful place. He

8  thought there was a lot of potential there. He felt

9  that there was a lot of opportunities in that region.

10  Q. So do you still own more properties at

11  Vilcabamba, Ecuador?

12  A. Not to my knowledge.

13  Q. So this was the only lot that you owned?

14  A. I don't remember. I think all of those

15  properties -- I don't know.

16  Q. Was anyone else involved in the development at

17  Vilcabamba, Ecuador besides you and your husband?

18  A. My husband had a business partner down there.

19  His name was Joe something or other.

20  Q. Who is Joe Martin?

21  A. Joe Martin is someone my husband was doing

22  business with in Honduras.

23  Q. Do you know Joe Martin?

24  A. I believe I have met him and his wife once or

25  twice.

**Page 163**

1  Q. Were you ever present at any meetings with

2  Mr. Martin to discuss the Honduras development?

3  A. I don't recall being in any meetings. I

4  remember having dinner and a meal with him and his wife

5  around the time that they were going to move down there

6  and work with my husband down there.

7  Q. When you had that dinner, was the project in

8  Honduras discussed?

9  A. I don't remember exactly what was discussed at

10  that meeting.

11  Q. Who was present --

12  A. Not at that meeting, at that dinner.

13  Q. Who was present at that dinner?

14  A. I remember him and his wife being there -- I

15  can't remember her name -- and they were talking about

16  moving down there and working with my husband on

17  developing real estate down there.

18  Q. And what was discussed about the project?

19  A. I don't remember.

20  Q. And that was just one dinner, you said, that

21  you met with the Martins; is that right?

22  A. I can't remember if I met them once or twice.

23  Q. Once or twice.

24  MS. BARNIER: This will be Exhibit 24.

25  (Exhibit 24 was marked for identification.)

**Page 164**

1  MS. GROPPER NELSON: Thank you.

2  BY MS. BARNIER:

3  Q. This an e-mail sent from your husband to you,

4  Joe Martin and Leigh Whitefoot; is that correct?

5  A. Uh-huh.

6  Q. And do you remember receiving this e-mail?

7  A. No.

8  Q. Do you normally read your e-mails?

9  A. My husband sends lots of e-mails. If they are

10  about his business, I usually don't read them.

11  Q. Why would your husband include you on

12  information if you are not interested in his business?

13  A. I am his wife.

14  Q. Did he talk to you about this? The sellers

15  countered at $1,053,000. Did he talk to you about

16  purchasing the project in Honduras?

17  A. My husband is a very passionate person about

18  his deals. I don't remember specifically him talking

19  about this, but I remember him talking about Honduras

20  and being very excited about Honduras.

21  Q. And what did he say about it?

22  A. I don't remember what he said.

23  Q. And did he tell you where he was getting the

24  $1,000,000 to purchase the property?

25  A. Huh-uh.

Case: 12-0314 Sup  Exhibit D - 34th Hearing and Deposition Transcripts 3:5 D-192 of 228
of 37

Page 165

| | |
|---|---|
| 1 | Q. I'm sorry, you need to answer. |
| 2 | A. No. |
| 3 | Q. Did you ever ask him where he was getting the |
| 4 | money to purchase this $1,000,000 property in Honduras? |
| 5 | A. No. |
| 6 | Q. So did your husband routinely include you on |
| 7 | e-mails regarding properties that he was working on in |
| 8 | Latin America? |
| 9 | A. From time to time, yes. |
| 10 | Q. And did you read them regarding all the |
| 11 | properties in Latin America? |
| 12 | A. No. |
| 13 | Q. Why wouldn't you read them? |
| 14 | A. I didn't care. |
| 15 | MS. BARNIER: This will be Exhibit 25. Hold |
| 16 | on one second. |
| 17 | (Brief pause in the proceedings.) |
| 18 | MS. GROPPER NELSON: Do you need to take a |
| 19 | break? |
| 20 | THE WITNESS: I could use the restroom. |
| 21 | MS. BARNIER: Sure. |
| 22 | (Recess taken, 3:03 p.m. to 3:09 p.m.) |
| 23 | MS. BARNIER: All right. Back on the record. |
| 24 | Are you ready, Kim? |
| 25 | THE REPORTER: Yes, ma'am. |

Page 166

| | |
|---|---|
| 1 | MS. BARNIER: All right. This is Exhibit 25. |
| 2 | (Exhibit 25 was marked for identification.) |
| 3 | MS. GROPPER NELSON: Thank you. |
| 4 | BY MS. BARNIER: |
| 5 | Q. Now, you are CCed on this e-mail, dated 2009, |
| 6 | correct? |
| 7 | A. Yeah. |
| 8 | Q. And do you know who all these people are that |
| 9 | are CCed besides you? |
| 10 | A. I know Joe -- I don't know, but I know the |
| 11 | name Joe Simonetta. That's it. |
| 12 | Q. And this is regarding the sale of the property |
| 13 | that was originally done, correct? |
| 14 | A. Yes. |
| 15 | MS. GROPPER NELSON: Well, it looks like it |
| 16 | references back to -- |
| 17 | THE WITNESS: Yeah. |
| 18 | MS. GROPPER NELSON: -- document number 23. |
| 19 | BY MS. BARNIER: |
| 20 | Q. And so does your husband still e-mail you |
| 21 | about his businesses? |
| 22 | A. From time to time. Not as regularly as he |
| 23 | used to. |
| 24 | Q. So you would continue to get e-mails from him |
| 25 | in 2012, 2013 about his business activities? |

Page 167

| | |
|---|---|
| 1 | A. I don't recall getting any e-mails recently |
| 2 | about his business activities. |
| 3 | Q. What about during 2012? |
| 4 | A. I don't recall anything in 2012. |
| 5 | Q. Do you keep copies of the e-mails that he |
| 6 | sends you? |
| 7 | A. No. |
| 8 | Q. Do you delete everything that he sends you? |
| 9 | A. No, I just don't keep copies. I don't -- it |
| 10 | just depends. If it is something -- I mean, we -- if |
| 11 | it's something I need, I keep a copy of it. If I |
| 12 | don't, I delete it. |
| 13 | Q. Did you delete everything regarding businesses |
| 14 | in Latin America? |
| 15 | A. I don't have my computer anymore from this |
| 16 | time period. It died. My computer just crashed and I |
| 17 | lost a whole bunch of data. |
| 18 | MS. BARNIER: Here is Exhibit 26. |
| 19 | (Exhibit 26 was marked for identification.) |
| 20 | BY MS. BARNIER: |
| 21 | Q. What is Laguna Traquila -- or Tranquila? |
| 22 | A. It is one of his investments and one of his |
| 23 | projects that he had. I don't remember where it is. |
| 24 | Q. Is it possibly in Ecuador? |
| 25 | A. I can't remember where it is at. |

Page 168

| | |
|---|---|
| 1 | Q. Did your husband ever discuss this project |
| 2 | with you? |
| 3 | A. I don't remember. I remember the name. I |
| 4 | remember him talking about it, I just don't remember |
| 5 | specifics. |
| 6 | MS. BARNIER: This would be -- I'm sorry, I |
| 7 | gave you the wrong one -- 27. |
| 8 | (Exhibit 27 was marked for identification.) |
| 9 | MS. BARNIER: Here is 27. |
| 10 | MS. GROPPER NELSON: Thank you. |
| 11 | BY MS. BARNIER: |
| 12 | Q. Do you know who John Matthesen is, who is CCed |
| 13 | on this? |
| 14 | A. I have heard -- I have met him. I can't place |
| 15 | a face with the name, though. |
| 16 | Q. Were you at this luncheon? |
| 17 | A. It says -- I don't remember. It says |
| 18 | something about lunch, so I might have been. |
| 19 | Q. And what is "Agua Dulce"? |
| 20 | A. Again, it is one of his investments. I can't |
| 21 | remember which one it is, where it is at. |
| 22 | MS. BARNIER: And this would be 28. |
| 23 | (Exhibit 28 was marked for identification.) |
| 24 | BY MS. BARNIER: |
| 25 | Q. It says, "Monette's notarized document." Do |

Case: 12-0314 Sup D Exhibit D - 34t Hearing and Deposition Transcripts 3-5 D-193 of 228
of 37

Page 169

1  you see that?
2  A. Uh-huh.
3  Q. It is dated April 23rd, 2010.
4  A. Okay.
5  Q. If you would turn to the third page, is that
6  your signature?
7  A. Yeah.
8  Q. And then you also have this notarized; is that
9  correct?
10  A. Uh-huh.
11  Q. And what was the purpose of this document?
12  A. I don't know. I think Carl asked me to sign
13  it because they were selling some property that my name
14  was on.
15  Q. And how much money did he receive from this?
16  A. I don't know.
17  Q. So in --
18  A. My husband is very passionate about his
19  projects. I am not involved with his business. There
20  was a period of time where he was putting me on things
21  and then he stopped. And to be honest, the last few
22  years, I have been so immersed in my kids and all the
23  other things and our relationship has been fairly rocky
24  that I figured when the smoke cleared, I would get up,
25  brush myself off and move forward.

Page 170

1  Q. But this was in April of 2010.
2  A. Yeah. No, I know. I am saying, I don't
3  remember. It was a really busy, crazy time for me.
4      MS. BARNIER: This will be Exhibit 29.
5      (Exhibit 29 was marked for identification.)
6  BY MS. BARNIER:
7  Q. Do you recognize this document?
8  A. I remember being asked about this document at
9  the Fiechter deposition.
10  Q. So could you turn to page two of this
11  document?
12  A. Uh-huh.
13  Q. It says, "Carl Westcott and Monette Stephens
14  personally own the following property listed below."
15  And then it says there is an art collection and the
16  market value is $255,000.
17      What art did you and your husband own in
18  September of 2008?
19  A. I don't remember. I don't -- I mean, I don't
20  know. I didn't create this document. I wasn't
21  involved with creating this document. He had an
22  extensive poster collection.
23  Q. And it was worth $255,000?
24  A. I have no idea what the value of it was.
25  Q. And where was the poster collection?

Page 171

1  A. Some of it was in his office, some of it was
2  at our house, some of it got damaged when our water
3  heater broke.
4  Q. What happened to the pieces that weren't
5  damaged by the water heater?
6  A. I don't know.
7  Q. They are gone?
8  A. Yeah. I believe he told you he sold these.
9  Q. And do you know for a fact that he sold them?
10  A. I wasn't involved.
11  Q. Okay. It says "Wine collection in cellar."
12  What cellar is being referred to?
13  A. I don't know. I assume it is the garage.
14  Q. And did you have an extensive wine collection
15  in your garage?
16  A. He had one in the garage.
17  Q. How many boxes of wine were in the garage?
18  A. I don't know.
19  Q. More than ten?
20  A. Probably, yeah.
21  Q. More than 20?
22  A. I don't know how many. I wasn't involved
23  with -- I didn't -- I wasn't -- it was -- a big part of
24  his wine collection came pre-marriage.
25  Q. So you don't remember him buying much wine

Page 172

1  after you got married and --
2  A. Oh, he bought wine. He bought wine after we
3  were married, too, but I don't -- I wasn't -- I am not
4  a collector. I am not a wine collector.
5  Q. So what happened to the wine in the garage?
6  A. I believe he sold some of it when he started
7  having financial problems.
8  Q. Who did he sell it to?
9  A. I don't know.
10  Q. How did you know he sold it?
11  A. He said he sold it.
12  Q. How much of it did he sell?
13  A. I don't know.
14  Q. And then it says "Jewelry" worth $243,500.
15  Did you and your husband own jewelry worth $243,500 in
16  September of 2008?
17  A. Not to my knowledge.
18  Q. What jewelry did you own in September of 2008?
19  A. I am not a big jewelry person. I think I put
20  it all on the list, except for my wedding ring, which I
21  have since lost.
22  Q. So that was a diamond ring; is that right?
23  A. Yes.
24  Q. And your husband testified -- and I remember
25  there were some exchanges going back between the two of

Case: 12-0314  Sup  Exhibit D - 341 Hearing and Deposition Transcripts  D-194 of 228
of 37

Page 173

1  you as to the value of the diamond ring. Do you
2  remember that?
3      A.  Uh-huh.
4      Q.  And he testified he thought it was worth
5  between 100 and 200 thousand dollars. Do you remember
6  that?
7      A.  I don't remember how much he said.
8      Q.  Do you remember how much you said you thought
9  it was worth?
10      A.  I don't remember how much I said.
11      Q.  What do you think the diamond was worth before
12  you lost it?
13      A.  I have Googled three-carat diamonds over the
14  past year and they are usually in the 10 to 30 thousand
15  dollar range.
16      Q.  And where did he purchase it?
17      A.  He purchased it from a -- I don't know. It
18  was -- I mean, I think he said he purchased it through
19  someone in New York.
20      Q.  How did you lose it?
21      A.  I was in the ocean. I was swimming.
22      Q.  And the diamond fell out of the ring; is that
23  what happened when you --
24      A.  No, the ring fell off my finger. It wasn't
25  ever really very tight.

Page 174

1      Q.  So was it your custom to go swimming with an
2  expensive diamond ring on in the ocean?
3      A.  I -- yes.
4      Q.  Had you done it before?
5      A.  Yes.
6      Q.  So why do you think it came off this time?
7      A.  It was cold. My finger shrunk. I don't know.
8      Q.  And where were you swimming?
9      A.  In Mexico. I was bodysurfing.
10      Q.  Where in Mexico?
11      A.  South of Cabo San Lucas.
12      Q.  And when did you lose it?
13      A.  It was, I believe, in -- I think we were down
14  there June of 2011.
15      Q.  Where did you stay?
16      A.  We stayed at the Westin.
17      Q.  Did you have insurance for the ring?
18      A.  No.
19      Q.  Why not?
20      A.  We didn't.
21      Q.  Did you think that you would get insurance for
22  the ring?
23      A.  No.
24      Q.  Did your husband ever tell you how much the
25  ring was worth?

Page 175

1      A.  No.
2      Q.  Were you surprised when he testified at the
3  hearing that he thought it was worth more than
4  $100,000?
5      A.  Yeah.
6      Q.  Did he tell you how much he paid for it?
7      A.  No.
8      Q.  Now, you testified on March 1st that you
9  thought you had -- your house insurance covered the
10  ring. Do you remember that?
11      A.  No.
12      Q.  Are you aware that you have to have a special
13  insurance policy for expensive jewelry?
14      A.  I didn't think we had insurance for the ring.
15  I don't remember testifying that we did.
16      Q.  No, I didn't say you did. I am just asking
17  the question: Did you know that you had to have
18  special insurance to cover jewelry?
19      A.  I hadn't actually really ever thought about
20  it.
21      Q.  Is that the only piece of jewelry that you --
22  of any worth that you owned during your marriage?
23      A.  Of any substantial worth, anything more than a
24  few thousand dollars, yes.
25      Q.  And, I'm sorry, in your opinion, the ring --

Page 176

1  did you ever have the ring appraised after you --
2      A.  No.
3      Q.  -- were --
4          Okay. In March of 2012, you testified that
5  you borrowed money from your parents in the beginning
6  of the year.
7      A.  Uh-huh.
8      Q.  Do you remember how much money you borrowed
9  from your parents in 2012?
10      A.  I don't remember.
11      Q.  Did you sign a note to your parents of how
12  much you had borrowed?
13      A.  No.
14      Q.  Have you borrowed any money from your
15  husband's parents since filing for bankruptcy?
16      A.  Yes.
17      Q.  How much money have you borrowed from your
18  husband's parents?
19      A.  I have borrowed -- I borrowed $5,000 from his
20  mother and I borrowed at least $15,000 from his dad.
21      Q.  Are they divorced?
22      A.  Yeah.
23      Q.  How much money has your husband borrowed from
24  his parents?
25      A.  I don't know.

Case: 12-03143  SupDExhibit D - 34 Hearing and Deposition Transcripts  D-195  of 228
of 37

Page 177

1    Q. When did you borrow the money?
2    A. I don't remember specific dates. I borrowed
3 money from his mom in either May or June.
4    Q. Of 2012?
5    A. 2012. I borrowed money from his dad around
6 that same time, maybe a little bit later. I can't
7 remember dates or times.
8    Q. Have you paid them back?
9    A. No.
10    Q. Has your husband paid them back?
11    A. I don't know.
12    Q. Was your husband aware that you borrowed money
13 from his parents?
14    A. Yeah, he found out about it.
15    Q. You didn't tell him before you borrowed the
16 money that you were going to borrow money from his
17 parents?
18    A. No.
19    Q. Why not?
20    A. He would get mad at me.
21    Q. Why did you borrow the money?
22    A. Because I needed it.
23    Q. Why didn't you borrow the money from your
24 parents?
25    A. I had already borrowed money from my parents

Page 178

1 and my parents are on a fixed income.
2    Q. Now, the original Schedules that -- you
3 testified that you were paid monies of 900 -- almost
4 $950,000 in 2010 and 2011, and that was monies owed by
5 Rainforest Capital. Do you remember that?
6    A. I don't remember, no.
7    Q. You don't remember how much you put down on
8 your Schedules?
9    A. No, I don't.
10    Q. Is it accurate that you and your husband were
11 paid approximately $950,000 in 2010 and 2011?
12    A. My -- I relied on my husband's accounting
13 for -- for that.
14    Q. Did you review the Schedules and the Statement
15 of Affairs before you signed them the first time you
16 filed for bankruptcy?
17    A. I looked through them with my husband and I
18 assumed that everything that he put on there was
19 accurate.
20    Q. You do understand that you signed them under
21 penalty of perjury that they were accurate; is that
22 correct?
23    A. I trusted him and I assumed that he had done
24 all the accounting.
25    Q. Okay. So let's say that it was accurate and

Page 179

1 you relied on your husband, so it was approximately
2 $950,000 for 2010 and 2011. Do you remember what your
3 expenses were in 2011?
4    A. No.
5    Q. Were they -- were your expenses more than
6 $500,000?
7    MS. GROPPER NELSON: I am going to object to
8 the question as being ambiguous if you are asking about
9 her personal expenses versus their business expenses --
10 his business expenses.
11 BY MS. BARNIER:
12    Q. I am talking about the expenses you listed on
13 Schedule I.
14    A. Okay. I don't -- I don't recall Schedule I.
15 I don't have a memory of that.
16    Q. Do you remember listing all your -- how much
17 it cost you to live?
18    A. I remember listing that, yes.
19    Q. And do you remember at one of your 341
20 hearings I talked -- asked you how you could spend
21 $3,000 a month on groceries? Do you remember that?
22    A. I don't remember that.
23    Q. Okay. If your expenses that you listed on
24 Schedule I and J were less than a total of $949,000,
25 what happened to the rest of the money?

Page 180

1    A. I don't know.
2    Q. You have no idea where the money went?
3    A. My husband was in charge of managing our
4 finances. He was doing all of his business activities
5 and I assumed he used the money for whatever he was
6 doing.
7    Q. So is there money in accounts outside the
8 United States?
9    A. Not to my knowledge.
10    Q. You explained earlier that your husband was in
11 Honduras some of the time. Does he have a bank account
12 in Honduras?
13    A. I don't know of any bank account in Honduras.
14    Q. Do you know of any bank accounts in Ecuador?
15    A. Huh-uh.
16    MS. BARNIER: This will be Exhibit 30.
17    (Exhibit 30 was marked for identification.)
18    MS. GROPPER NELSON: Thank you.
19 BY MS. BARNIER:
20    Q. Do you recognize this document?
21    A. No.
22    Q. Is that your signature on the second page?
23    A. Yes, it is.
24    Q. Do you remember signing this document?
25    A. No.

Case: 12-0314 SupDExhibit D - 341 Hearing and Deposition Transcripts 3:5D-196 of 228
of 37

Page 181

1    Q. Do you remember borrowing $100,000 from John
2 Schrader and Nyra Krstovich?
3    A. No.
4    Q. Did you pay back the $100,000 to John Schrader
5 and Nyra Krstovich?
6    A. I don't know.
7    Q. Do you remember you and your husband
8 discussing borrowing $100,000 from John Schrader and
9 Nyra Krstovich?
10    A. I don't remember discussing it with him, no.
11    Q. Did you need money in August of 2008?
12    A. I don't know.
13      MS. BARNIER: This would be Exhibit 31.
14      (Exhibit 31 was marked for identification.)
15 BY MS. BARNIER:
16    Q. If you could turn to January 23rd on the
17 second page --
18    A. Uh-huh.
19    Q. -- there is a payment to City Storage
20 San Francisco for $169. Do you know what that was for?
21    A. My husband's company, I think, People Bridge,
22 has a storage unit or had a storage unit.
23    Q. And when did you know that People Bridge or
24 your husband's company --
25    A. I don't know which company actually owns a

Page 182

1 storage unit or whether his company owns a storage
2 unit -- not owns, has a storage unit.
3    Q. Okay. And when did you know that one of the
4 companies had a storage unit at City Storage in
5 San Francisco.
6    A. I don't remember when I knew. I mean, he has
7 had it for some period of time.
8    Q. How long?
9    A. I don't know when he got it.
10    Q. More than a year ago?
11    A. Yeah, I -- I don't know. I assume so. I
12 don't know.
13    Q. Did you talk about what was in the storage
14 unit?
15    A. I didn't really talk about it with him, no.
16    Q. Well, did you make the payment to City Storage
17 for the $169?
18    A. I did make a payment to them at some point,
19 yes.
20    Q. And this is on January 23rd. Did you make any
21 other payments to City Storage?
22    A. Yeah, he asked me to pay the monthly rent on
23 that several times.
24    Q. Did you do it in 2011?
25    A. I don't remember.

Page 183

1    Q. Have you paid it since you filed for
2 bankruptcy?
3    A. I don't remember.
4    Q. Have you ever been to the storage locker?
5    A. No.
6    Q. Do you know what's in the storage locker?
7    A. Huh-uh.
8    Q. If you knew that you were paying for a storage
9 locker, why isn't it on your Schedules?
10    A. I thought we put it on the Schedules.
11      MS. GROPPER NELSON: I don't know which
12 Schedules Ms. Barnier is referring to.
13      MS. BARNIER: The most amended Schedules.
14      THE WITNESS: Which Schedule would it be on?
15 BY MS. BARNIER:
16    Q. It would be on the Statement of Financial
17 Affairs, a storage locker containing boxes of documents
18 or a storage locker.
19    A. I don't remember.
20    Q. You don't remember that you had it or you
21 don't remember putting it on your Schedules?
22    A. I don't remember whether or not we put it on
23 the Schedules.
24    Q. But you knew you had a storage locker before
25 you filed for bankruptcy?

Page 184

1      MS. GROPPER NELSON: I think that's a
2 misstatement of the testimony. She knew that her
3 husband's company had a storage locker, for which he
4 asked her to make a monthly payment.
5 BY MS. BARNIER:
6    Q. You knew before you filed bankruptcy that
7 there was a storage locker; is that correct?
8    A. I don't remember.
9    Q. I'm sorry, you don't remember that there was a
10 storage locker?
11    A. I don't remember when I first knew about the
12 storage locker that my husband -- my husband's company
13 had.
14    Q. Your husband's company or he had?
15    A. I believe it was his company.
16    Q. How did you know that it was -- I believe you
17 suggested -- you think it might be People Bridge. What
18 would lead you to believe that it is People Bridge that
19 has the storage unit?
20    A. When I paid the bill, it was a company name
21 that I paid the bill for.
22    Q. I'm sorry, People Bridge was the --
23    A. I can't remember which company name owns the
24 storage locker.
25    Q. I'm sorry, now I am confused. I'm sorry. You

Case: 12-03143 Sup Doc Exhibit D - 34th Hearing and Deposition Transcripts 3:5 Filed: 11/07/19 Entered: 11/07/19 07:33:53 D-197 of 228
of 37

Page 185

1 said when you paid the bill you paid it on behalf of
2 People Bridge; is that you what you are explaining to
3 me?
4     A. I am saying I don't remember which company,
5 but it was a company name on the bill.
6     Q. Okay. And my question is: You said you
7 thought it was People Bridge. What leads you to
8 believe it was People Bridge?
9     A. For some reason, I have that in my head.
10     Q. What is People Bridge?
11     A. People Bridge was one of his old businesses.
12     Q. When did People Bridge go out of business?
13     A. I don't remember, but I do think it was out of
14 business prior to us filing for bankruptcy.
15     Q. And I'm sorry, now I am getting tired. Did
16 you ever discuss with your husband what was in the
17 storage unit?
18     A. No.
19     Q. Do you know if he removed contents from his
20 Mississippi Street office and took it to the storage
21 unit?
22     A. I don't know.
23     Q. Do you know that when he had a service pick up
24 three boxes of documents from your counsel's office, do
25 you know if he put the three boxes in there?

Page 186

1     A. I don't know.
2     Q. Do you know when was the last time he was at
3 the storage unit?
4     A. No.
5     Q. Do you have any storage units?
6     A. No.
7     Q. What's Riviera Strategy?
8     A. I wanted to start consulting again and I was
9 hoping to start a new LLC since my old LLC was now
10 tainted.
11     Q. Which LLC is tainted?
12     A. Atlas Consulting.
13     Q. What do you mean Atlas Consulting is tainted?
14     A. Well, you -- it is part of the bankruptcy at
15 this point and I wanted to start consulting again this
16 past summer. I was looking for business, so I hadn't
17 started -- I mean, there is no Riviera Strategy --
18 there is no corporate entity associated with Riviera
19 Strategy.
20     Q. So it is just -- you are doing it as a d/b/a?
21     A. We don't have -- I was going to try to do some
22 consulting with an old colleague of mine over the
23 summer. We were going to wait to see if we got clients
24 before paying, because -- fees for the business entity
25 and we never got any clients. We haven't done any

Page 187

1 business through it.
2     Q. What marketing have you done to get clients to
3 consult?
4     A. I have not done marketing per se. I have been
5 sending out resumés and bios in response to consulting
6 ads that I find on the Internet.
7     Q. And you haven't gotten any responses to any of
8 those?
9     A. I haven't received any job offers.
10     Q. When we were at your home and toured your home
11 office, the accountant noticed that the records in your
12 file drawers were very old. Most of them were older
13 than four years. Where do you keep all your current
14 accounting records?
15     A. Can you tell me which records you are
16 referring to?
17     Q. All of the records that you would have for
18 Atlas Consulting.
19     A. I made all the copies for them and gave them
20 to Sheila and Sheila gave them to you.
21     Q. I understand that, but the paper copies that
22 you had in your office, which you opened up for us,
23 were more than four years old. So do you have
24 electronic copies?
25     A. I don't believe that is true.

Page 188

1     Q. Did you make copies of electronic -- we asked
2 for any hard drive, if we could get that --
3     A. I gave you paper copies.
4     Q. Right. And so those were paper copies that
5 you --
6     A. They were all -- they were outside of my file
7 cabinet because I had just made copies of all my
8 Atlas -- my 2010, 2011 and 2012 files --
9     Q. Okay.
10     A. -- and they were all sitting on the floor in
11 stacks and we gave you a copy of each of those.
12     MS. BARNIER: Okay. This would be Exhibit 32.
13     (Exhibit 32 was marked for identification.)
14 BY MS. BARNIER:
15     Q. On June 1st, 2012, did you and your husband
16 transfer your interest in 835 Ashbury and also now put
17 on ownership title Alma Rojas and Elladora Ramirez?
18     A. I don't quite understand what happened here.
19 My husband was working with someone who was managing,
20 you know, the Trustee sale and our attorney at the time
21 told us that the asset had been -- I don't know what
22 you call it. That the Trustee had...
23     Q. I believe the word you are looking for is
24 abandoned.
25     A. ...abandoned the asset. And we hired a

Case: 12-03145 Sup D Exhibit D - 34t Hearing and Deposition Transcripts 3:5 D-198 of 228
of 37

Page 189

1  service to delay the Trustee sale -- or my husband
2  found somebody and I signed off on it.
3      Q.  Why would you sign off on transfer of the
4  interest in your house to -- I'm sorry, there is
5  actually four people. I forgot Miguel Sandoval.
6      A.  My husband asked me to.
7      Q.  So this is June of 2012 --
8      A.  Yeah.
9      Q.  -- right?
10      So in June of 2012, you are still following
11  the instructions of your husband as to what to do
12  financially?
13      A.  Yeah.
14      Q.  It's now March of 2013. Are you still
15  following the instructions of your husband, what to do
16  financially?
17      A.  My husband is supporting me and the kids. And
18  until I have work, I am doing what he asks me to do.
19      Q.  If he asked you to do something illegally,
20  would you do it?
21      A.  No.
22      Q.  And you thought it was legal to transfer
23  property that's in foreclosure to three other
24  individuals?
25      A.  I was told that this was legal.

Page 190

1      Q.  Who told you that?
2      A.  I don't remember. My husband was working with
3  someone who does this. I assumed that he was an
4  attorney or had a legal background.
5      Q.  Do you remember the name of this person?
6      A.  I can't remember the name of him right now.
7      Q.  Did you speak to him?
8      A.  I believe that I was on a phone call with him
9  around the time that my husband and he were discussing
10  this.
11      Q.  And what did they discuss?
12      A.  I don't remember.
13      Q.  When was the conversation?
14      A.  I don't remember the date of the conversation.
15      Q.  Roughly when was the conversation? Was it in
16  May of 2012?
17      A.  I don't remember which month it was in.
18      Q.  And you are still in your home; is that
19  correct?
20      A.  That is correct.
21      Q.  And have you received a Trustee sale?
22      A.  I don't -- I don't recall the last time we
23  received one.
24      Q.  You haven't received a notice to move out?
25      A.  No, not yet.

Page 191

1      MS. BARNIER: Here is Exhibit 33.
2      (Exhibit 33 was marked for identification.)
3      MS. GROPPER NELSON: Thank you.
4  BY MS. BARNIER:
5      Q.  On October 29th, 2010, you transferred the
6  property that you owned prior to marriage at 3910 Carol
7  Avenue, Santa Barbara to Atlas Consulting; is that
8  correct?
9      A.  That is correct, yes.
10      Q.  And why did you do that?
11      A.  Because we were going to use it as a rental
12  property or as an investment income -- I mean, as an
13  income property investment and my husband suggested we
14  do it this way.
15      Q.  Why couldn't you own property in your own name
16  and use it as a rental property?
17      A.  I don't know.
18      Q.  And is the property in Santa Barbara rented?
19      A.  No, it is not.
20      Q.  Why not?
21      A.  I am assuming it is going to be foreclosed. I
22  mean, it is in foreclosure and I am assuming it will be
23  sold at some point.
24      Q.  So you have already received the Notice of
25  Foreclosure and there is a deadline for the Trustee

Page 192

1  sale?
2      A.  I haven't -- I don't know. I haven't received
3  a deadline for the Trustee sale.
4      Q.  So you still own the home at this point; is
5  that correct?
6      A.  At this point, I believe we still own the
7  home.
8      Q.  Okay. And so -- well, it would just be you
9  that owns it, right, because you are the owner of --
10  you are the manager of Atlas Consulting, right?
11      A.  Yeah, I guess. I don't -- I consider my
12  husband -- my husband has been managing all of our
13  finances and all of our assets.
14      Q.  When was the last time you rented out the home
15  in Santa Barbara?
16      A.  It has been awhile.
17      Q.  More than six months?
18      A.  Yes.
19      Q.  More than a year?
20      A.  I believe it has been more than a year, yes.
21      Q.  And so do you go down and stay in the house?
22      A.  Periodically, yes.
23      Q.  When was the last time you were there?
24      A.  I believe we were there for Christmas this
25  year.

Case: 12-0314  Sup D Exhibit D - 34: Hearing and Deposition Transcripts 3: 5D-199  of 228
of 37

Page 193

1 Q. You and your husband and your children?
2 A. Yes.
3 Q. And how long did you stay?
4 A. A little over a week.
5 Q. But other than that, the house remains vacant?
6 A. Currently, the house is vacant, yes.
7 Q. And are you making the utility payments?
8 A. Yes.
9 Q. Why would you make the utility payments if the
10 house is going to be lost in foreclosure?
11 A. I -- I was hoping we would get through this
12 and I could move back down there with the kids and that
13 we could afford it.
14 Q. Do you need a moment, Ms. Stephens?
15 A. (No audible response.)
16 Q. When did you acquire the house?
17 A. I acquired the house when I was in my early
18 20s.
19 Q. Do you want to take five minutes?
20 A. I am fine.
21 Q. And how -- did you pay cash for the house?
22 A. No. My parents helped with the down payment
23 and my first husband and I bought it together.
24 Q. And so when did you -- I'm sorry, you said you
25 were in your 20s. So was that in 19- --

Page 194

1 A. It was --
2 Q. -80 --
3 A. It was sometime in the '80s, late '80s.
4 Q. And have you borrowed money against the
5 property?
6 A. Yeah. The house is way under water.
7 Q. What did you do with the monies that you
8 borrowed against the property?
9 A. Part of the money was used to buy our house in
10 San Francisco and I don't know what happened with the
11 rest of the money.
12 Q. I'm sorry, you don't know what happened to the
13 rest of the money you borrowed?
14 A. My husband used it for various investments
15 that he was making.
16 Q. Are you the only holder on the mortgage?
17 A. Yeah, I believe so.
18 Q. Given that the house is under water, what
19 makes you believe that you could move back there and
20 live there with your children?
21 A. I have always felt that if I could start
22 working again, I could work out an arrangement with the
23 bank, refinance the house or get somebody to sign with
24 me.
25 Q. What's the address -- I believe you said Leo

Page 195

1 Zendejas was your former bookkeeper?
2 A. Yeah.
3 Q. And could you spell his last name for me?
4 A. Z-E-N- -- I am not sure. Zendejas,
5 Z-E-N-D-E-J-A-S.
6 Q. And what is his address?
7 A. I don't know.
8 Q. Do you have it at your home?
9 A. I don't know if I have his address.
10 MS. GROPPER NELSON: I think we have provided
11 it in documents.
12 THE WITNESS: I think we provided it.
13 MS. BARNIER: I don't have any documents
14 regarding his address. I have that he has been the
15 bookkeeper, but we are trying to locate him and have
16 been unable to do so.
17 THE WITNESS: I think he might have moved,
18 because I have tried calling him and even going by his
19 place and I haven't -- he didn't answer.
20 BY MS. BARNIER:
21 Q. Did he keep any records for -- that he
22 prepared for you at his place of business?
23 A. No.
24 Q. He would -- how did he work for you as a
25 bookkeeper?

Page 196

1 A. He would come to our house and work from our
2 house.
3 Q. How long did he work for you?
4 A. He would come usually once or twice a year and
5 help with taxes.
6 Q. And how many years did Mr. Zendejas do that?
7 A. He did it off and on for probably five years.
8 It wasn't contiguous. While Carl had someone at his
9 office who was doing all of the tax preparation, we
10 didn't use Leo. And I had used Leo prior to Carl and I
11 getting married.
12 Q. Since your marriage, have you traveled outside
13 the United States?
14 A. Since my marriage?
15 Q. Uh-huh.
16 A. Yes.
17 Q. And where have you traveled to?
18 A. I can't remember everywhere we have traveled.
19 We used to travel extensively. Both Carl and I have
20 family outside of the U.S. and we used to go visit our
21 family in Europe regularly, once a year or more.
22 Q. When was the last time you traveled outside
23 the United States?
24 A. I think the last trip was when I lost my ring
25 in Mexico.

Case: 12-03145 Sup D Exhibit D - 34t d Hearing and Deposition Transcripts 3:5 D-200 of 228
of 37

Page 197

1   Q. And I'm sorry, what was that date again?
2   A. I believe it was June of 2011, although I
3   can't -- I am not certain.
4   Q. So you --
5   A. I don't believe I went out of the country in
6   2012.
7   Q. So I think we were talking earlier, you have
8   relatives in France. So have you traveled to France?
9   A. I haven't traveled to France in the last two
10  years.
11  Q. But I said since your marriage.
12  A. Since our marriage, yes, we have gone to
13  France.
14  Q. Where else?
15  A. Mexico.
16  Q. Anyplace else?
17  A. Finland, Cyprus. I believe we went to Hong
18  Kong, Australia. My husband's father lives in
19  Australia. I think that's about it.
20  Q. And did you travel when you had children?
21  A. Yes.
22  Q. Did you take your children with you?
23  A. Yes.
24  Q. Do your children have any bank accounts?
25  A. Yes.

Page 198

1   Q. Where?
2   A. I believe that my two older children have --
3   or had -- I don't know if they still do -- a Wells
4   Fargo bank account.
5   Q. And why do you say "had"?
6   A. Because I haven't seen a statement in a long
7   time, so we might have shut them down. I don't believe
8   there was any money in them.
9   Q. Was your husband a signator on your children's
10  accounts?
11  A. Yes.
12  Q. Were you a signator on your children's
13  accounts?
14  A. I don't remember.
15  Q. Can you give me the names of your children?
16  A. Derius Wescott.
17  Q. D-E-R-I-U-S?
18  A. That is correct.
19  Q. Middle name?
20  A. Sebastian.
21  Q. And your second child?
22  A. Cyrus Mason Wescott.
23  Q. And your third child?
24  A. Alexander George.
25  Q. I'm sorry?

Page 199

1   A. George.
2   Q. George, I'm sorry. George Wescott.
3       Do your children have any investment accounts?
4   A. No.
5   Q. Did they ever?
6   A. No.
7       MS. BARNIER: This will be Exhibit 34.
8       (Exhibit 34 was marked for identification.)
9   BY MS. BARNIER:
10  Q. If you could turn to the second page first,
11  June 10th, 2010 --
12  A. Uh-huh.
13  Q. -- this is addressed to you; is that correct?
14  A. Yeah.
15  Q. And this is from a CAP VI Capital Call; is
16  that right?
17  A. Correct.
18  Q. And it says that you wired Reliant $18,699; is
19  that correct?
20  A. Yes.
21  Q. Now, if your husband is managing all of the
22  money, why are you wiring Reliant money?
23  A. I believe that the account was in my name.
24  Q. Your name only?
25  A. I believe that one of these was in my name

Page 200

1   when we purchased it. I think we purchased it
2   originally in my name.
3   Q. And when did you originally purchase it?
4   A. I don't remember.
5   Q. But in June of 2010, you still owned the
6   account; is that correct?
7   A. I believe so. I don't remember when we
8   changed the account over, but yes, I think I still -- I
9   don't remember. I don't remember if I still owned it
10  in June of 2010.
11  Q. Well, if you didn't own it in June of 2010,
12  why would you make a capital call contribution?
13  A. I believe that there was a commitment to make
14  the capital call contribution as part of the original
15  document to buy the account.
16  Q. But you did make the contribution, right, for
17  CAP VI, at least that's what it says?
18      "The wire that Reliant received was for
19  $18,699."
20  A. Yes.
21  Q. So you made that contribution in June of 2010,
22  right?
23  A. I don't remember doing this, but it says it
24  here, so yes.
25  Q. Does it refresh your memory that you did do

Case: 12-0314 SupDExhibit D - 34t Hearing and DepositionTranscripts 3:5 D-20 Page 228
of 37

Page 201

1  it?
2      According to Sandy Williams, you wired the
3  money?
4      A. Yeah.
5      Q. So in June of 2010, you were managing your own
6  account at Reliant?
7      A. No, I don't -- I mean, I believe Carl got the
8  money for this.
9      Q. Oh, he gave you the money to make the
10 contribution; is that it?
11     A. No, he managed where money was going and what
12 we were putting into various entities. And so I -- it
13 was in my name.
14     Q. But at the bottom, when she writes -- Sandy
15 writes, "Once again, thank you so very much for getting
16 back to me." So did you --
17     A. Yeah, she e-mailed me and I -- I don't
18 remember who did the wire. I don't remember if I did
19 the wire or if Carl did the wire.
20     Q. Okay. But it was your account as of
21 June 10th, 2010, in your name only?
22     A. I believe one of these accounts -- I believe
23 CAP VI was in my name only during that time period,
24 yes.
25     Q. What happened to CAP VI?

Page 202

1      A. I don't know.
2      Q. Do you still own CAP VI?
3      A. No.
4      Q. Was it transferred?
5      A. It was either transferred or it was
6  liquidated. I don't remember.
7      Q. If you owned it, do you remember liquidating
8  it?
9      A. I don't remember.
10     Q. And then if you look, there is a series of
11 e-mails on the first page between you and Gina Perry;
12 is that right?
13     A. Uh-huh.
14     Q. Who is Gina Perry?
15     A. Gina Perry was Carl's bookkeeper.
16     Q. So you were answering -- you are e-mailing
17 Gina Perry and CCing your husband, it looks like, "Can
18 we send them a check for $33? Also, I need some checks
19 in case I need to write checks. I gave Carl all the
20 checks I could find from my account a few weeks ago."
21     Do you remember writing this?
22     A. I don't remember writing this.
23     Q. Okay. But you had checks that you could use
24 to pay bills?
25     A. I believe I had a checkbook and I -- yeah. I

Page 203

1  mean, I believe I had a checkbook.
2      Q. And then if you go in the middle, it is from
3  your husband, "She already has a book of checks at
4  home, so this probably isn't necessary at the current
5  time."
6      Do you see that, right in the middle there,
7  dated June 11th?
8      A. Uh-huh.
9      Q. And then Gina e-mails back, "Are you sure she
10 has checks? Why did she ask for them then?"
11     And then you said, "I found some in my
12 drawer."
13     So you had access to checks. And did you keep
14 a checking -- when you write checks, do you normally
15 keep a checking account balance?
16     A. No.
17     Q. Why not?
18     A. Gina and Carl were managing the finances
19 during that time period.
20     Q. So you didn't record your own checks when you
21 wrote checks?
22     A. Huh-uh.
23     Q. You would just write a check and they would
24 take care of it for you?
25     A. I would write a check and tell them what I

Page 204

1  wrote and how much I spent.
2      Q. Okay. Well, why would you ask Gina Perry if
3  you could send a check for $33?
4      A. Because she managed our personal finances
5  during that time period.
6      Q. You didn't know how much money you had in the
7  account?
8      A. No.
9      Q. You didn't know if you could write a check for
10 $33?
11     A. I don't remember, but I didn't -- I mean, I
12 didn't manage the finances during that time.
13     MS. BARNIER: This would be Exhibit 35.
14     (Exhibit 35 was marked for identification.)
15     MS. GROPPER NELSON: Thank you.
16 BY MS. BARNIER:
17     Q. Do you recognize these three documents?
18     A. Yes.
19     Q. And what are they?
20     A. They are 1099 forms.
21     Q. And one is made out to you --
22     A. Uh-huh.
23     Q. -- one is made out to Carl Wescott and one is
24 made out to Pook Snook Dook LP; is that right?
25     A. Uh-huh.

Case: 12-0314 SupDExhibit D - 34t Hearing and Deposition Transcripts 3:5D-202 of 228
of 37