Page 205

1   Q. For 2010.
2   A. Okay.
3   Q. Is that correct?
4   A. Yes.
5   Q. And did you receive $6,252 from Rainforest
6   Capital?
7   A. I don't remember.
8   Q. Okay. If you could look at the one that's
9   identified as Carl Wescott.
10  A. Uh-huh.
11  Q. There is handwriting on that above his name.
12  A. Yeah.
13  Q. Whose handwriting is that?
14  A. I don't know.
15  Q. Is that accurate, the note discount of a
16  hundred -- I believe that's what it says, "Note
17  discount, 121,640" for 522,500; is that correct?
18  A. I would have to do the math. I didn't do -- I
19  didn't write that note. That is not my handwriting.
20  Q. Is it Gina Perry's handwriting?
21  A. I don't know Gina Perry's handwriting.
22  Q. Okay. And so your husband received $31,250 in
23  a K-1; is that right?
24  A. That's what it says on the form.
25  Q. Okay. And then the Pook Snook Dook Trust also

Page 206

1   got 35,000. Were you aware of that in 2010?
2   A. I don't remember.
3   Q. Why would you personally get a 1099 in the
4   amount of $6,000 from Rainforest?
5   A. I believe at some point during the year the
6   fund was still in my name -- or the note was in my name
7   and then it got transferred to Pook Snook Dook.
8         MS. BARNIER: This would be Exhibit 36.
9         And I'm sorry, Kim, this is the only one
10  that's not marked. It is an Authorization to Close
11  Escrow from International Aircraft Title in Escrow.
12        (Exhibit 36 was marked for identification.)
13  BY MS. BARNIER:
14  Q. Have you ever seen this document before?
15  A. Yes, I have.
16  Q. When did you see it?
17  A. I saw it in Sheila's office after she came
18  back from doing discovery with you.
19  Q. Okay. And who is Steven Cohen?
20  A. I have never heard of this person before.
21  Q. Well, he says that he is associated with Atlas
22  Consulting. Do you see that?
23  A. I see that Atlas is listed on there, yes.
24  Q. And then it is also dated the 25th of
25  February, 2011, "Atlas Consulting by manager" and he

Page 207

1   signed that apparently.
2         You never heard of Steven Cohen?
3   A. No.
4   Q. And were you aware that he was signing his
5   name regarding your company?
6   A. No. It's a common name. I don't know if it
7   is -- it doesn't say Atlas Consulting, LLC.
8   Q. But it is International Aircraft Title, where
9   $25,000 got sent from the Atlas Consulting, LLC
10  account, right?
11  A. I don't -- I don't know.
12  Q. Did you ever call International Aircraft Title
13  and ask them if they received $25,000?
14  A. No.
15  Q. Why not?
16        MS. GROPPER NELSON: At what point in time are
17  we referring to?
18        THE WITNESS: When?
19  BY MS. BARNIER:
20  Q. When you learned about -- that $25,000 had
21  gone out of the Atlas Consulting account, did you ever
22  call them and say, "What did the $25,000 go for?"
23  A. No. I just saw it today in the bank
24  statement.
25  Q. You didn't know about the $25,000?

Page 208

1   A. I had heard about it from Sheila, but no, I
2   hadn't seen where -- I hadn't gone through the bank
3   statements prior to today to see where that came from.
4   Q. When your counsel told you about it, you
5   didn't go back and look at your accounts and see if it
6   was true?
7   A. No.
8   Q. Did you know it was true?
9   A. I didn't. I just took her word for it.
10  Q. So you didn't care?
11  A. No, it's not that I didn't care. I -- there
12  was nothing I could do. I mean, it is -- this was done
13  in February of 2011. It is -- you know, it was the
14  beginning of 2013.
15  Q. And did you inquire to find out if Atlas
16  Consulting actually owned an airplane?
17  A. At the time I found out -- or at the time I
18  heard about this, I asked my husband and he said that
19  no plane was ever purchased and that this wasn't him
20  and he didn't do this.
21  Q. Do you believe him?
22  A. I don't know.
23  Q. Well, given now that you have seen that the
24  $25,000 was wired out of the Atlas Consulting account
25  to International Aircraft Title in escrow, is it your

Case: 12-03148 Sup. Exhibit D - 341 Hearing and Deposition Transcripts: 5 D-203 of 228
26

Page 209

1 opinion your husband was telling you the truth about
2 the aircraft?
3    A. I have never seen any -- any documents
4 relating to a plane before this.
5    Q. Did you make any inquiries?
6    A. No.
7    Q. Did you make any inquiries about any of the
8 businesses that your husband has in Latin America?
9    A. No.
10    Q. Did you ever call Joe Simonetta and ask what
11 the value of the property was in Ecuador?
12    A. No.
13    Q. Did you ever call Joe Martin and ask him what
14 the value of the property in Honduras was?
15    A. No.
16    Q. Did your husband ever tell you what they were
17 worth?
18    A. I don't remember if he ever told me. I don't
19 know what they were worth.
20    Q. Do you have any interest in learning what
21 those properties are worth?
22    A. I don't believe that they are worth anything.
23    Q. And why do you think that?
24    A. I -- I don't know. I just -- that's just my
25 thought.

Page 211

1      THE WITNESS: I am looking for a job. I send
2 out resumés every week. I am hoping to find one soon.
3 BY MS. BARNIER:
4    Q. Why do you think you haven't been hired? You
5 are incredibly qualified.
6    A. I don't know. I ask that question to myself.
7      MS. BARNIER: Okay. We are going to stop. I
8 am not going to conclude this deposition because your
9 counsel has instructed you not to answer and we
10 disagree on some of the questions. So we will have to
11 have that discovery hearing before Judge Montali and --
12      MS. GROPPER NELSON: I think we can get Judge
13 Montali. We could have asked him the question this
14 morning -- this afternoon when we spoke with him --
15 this is on the record -- with reference to the
16 question. It is not relevant to the subject matter of
17 this deposition and I am going to object to any attempt
18 to continue this deposition.
19      We are here now. You are entitled to seven
20 hours. We are ready to continue this for seven hours
21 if you have additional questions. Otherwise, this
22 deposition is ended now.
23      MS. BARNIER: Counsel, that's so lovely of you
24 to say, but as you and I both know, the rules are if
25 you instruct your client not to answer based on

Page 210

1    Q. Were you aware that your -- do you remember at
2 your 341 hearing that your husband testified that the
3 property in Honduras was worth, he thought, between
4 500,000 and 1,000,000 dollars?
5    A. I don't remember him saying that.
6    Q. Have you ever asked him how he is going to --
7 where he is going to get the funds to develop these
8 projects?
9    A. I don't remember asking him.
10    Q. Since the bankruptcy filing, have you ever
11 asked him how he is going to get his business going?
12    A. He doesn't like to talk about it with me and I
13 pretty much let him do what he is doing. He is going
14 to either clean up this mess or he won't. I am going
15 to -- at some point, either he will be able to take
16 care of us or I will find a job and I will start taking
17 care of my kids.
18    Q. How long do you think you can wait?
19      MS. GROPPER NELSON: I am going to object to
20 the question as lacking relevance.
21      MS. BARNIER: She brought it up, Counsel, that
22 she was going to -- that's her basis. I am just asking
23 how long she plans to wait.
24      MS. GROPPER NELSON: I am going to object to
25 the question as argumentative.

Page 212

1 anything except attorney-client privilege, which you
2 did, you claimed it was her constitutional right, then
3 we need to go before a judge and ask if you are
4 right -- she doesn't have to answer -- or I am right.
5      So all I am saying is, it is my deposition,
6 not yours; that we will have to have a hearing on the
7 issue and then we will decide. So at this point, the
8 deposition will be halted, but it is not concluded at
9 this time.
10      MS. GROPPER NELSON: My comments stand.
11      THE REPORTER: Would you like to adjourn for
12 the day?
13      MS. BARNIER: Yes, we will stand adjourned for
14 today.
15      (Deposition was adjourned at 4:11 p.m.)
16      --oOo--
17
18
19
20      ‾‾‾MONETTE STEPHENS‾‾‾
21
22      Date
23
24
25

Case: 12-03148 Sup. Exhibit D - 341 Hearing and Deposition Transcripts: 51 D-204 of 228
26

Page 213

1  STATE OF CALIFORNIA

2  COUNTY OF MARIN

3      I, Kimberly K. Elwell, duly authorized to
   administer oaths pursuant to Section 2093(b) of the
4  California Code of Civil Procedure, do hereby certify
   that:

5
          MONETTE STEPHENS
6

7  the witness in the foregoing deposition, was duly sworn
   by me to testify to the truth in the within entitled
8  cause; that said deposition was taken at the time and
   place as set forth; that the testimony of said witness
9  was reported by me, a Certified Shorthand Reporter and
   a disinterested person, and was thereafter transcribed
10 by computer under my direction into booklet form; that
   the witness was given an opportunity to read and
11 correct said deposition and to subscribe to the same.

12     I further certify that I am not of counsel or
   attorney for either or any of the parties in the
13 foregoing deposition and caption named, nor in any way
   interested in the outcome of the cause named in said
14 caption.

15     Executed March 27, 2013, at San Rafael,
   California.
16

17

18

19
          KIMBERLY K. ELWELL, CSR 12980
20

21

22

23

24

25

---

WEST COAST REPORTERS, INC.
117 PAUL DRIVE, SUITE A
SAN RAFAEL, CALIFORNIA 94903
1-800-979-2361 * (415) 472-2361
FAX (415) 472-2371

March 29, 2013

To:  Monette Stephens
     835 Ashbury Street
     San Francisco, CA 94117

In Re: Carl Alexander Wescott and Monette Rosemarie
       Stephens, Debtors, et al.

Dear Ms. Stephens:

Please be advised that the original transcript of your
deposition, taken on March 15, 2013, in the above
matter, has been completed and is now ready for your
review by appointment in our San Rafael office.

In the alternative, you may choose to discuss this
matter with your attorney about providing you a copy,
and/or to determine if counsel requires that the
original transcript of your deposition be read,
corrected and signed by you before it is sealed.

Your rights regarding signature of this deposition are
contained in the Code of Civil Procedure and the
original deposition transcript will be sealed after 35
days from the date of this letter and thereafter sent
to the noticing attorney.

Very truly yours,

KIMBERLY K. ELWELL, CSR

CC:  Original transcript
     All Counsel

*CERTIFIED TRANSCRIPT OF:*

## In Re: Carl Wescott and Monette Stephens

## 12-30143 DM CHAPTER 7

### Witness: Joe Martin

### Date: April 17, 2013

### Reported by: Kim Elwell



117 Paul Drive, Suite A
San Rafael, CA 94903-2010

Main Office: 415-472-2361   Fax: 415-472-2371
depos@westcoastreporters.com   www.westcoastreporters.com



Page 3

BEFORE THE UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

In re:          Case No. 12-30143 DM

CARL ALEXANDER WESCOTT and
MONETTE ROSEMARIE STEPHENS,

Debtors.
_____/

JANINA M. HOSKINS, TRUSTEE IN
BANKRUPTCY OF THE ESTATE OF
CARL ALEXANDER WESCOTT and
MONETTE ROSEMARIE STEPHENS,

Plaintiff,

vs.

CARL ALEXANDER WESCOTT and
MONETTE ROSEMARIE STEPHENS,

Defendants.
_____/

Deposition of
JOE MARTIN
_____
April 17, 2013

NOTICING ATTORNEY: JEAN BARNIER, ESQ.

REPORTED BY: KIMBERLY K. ELWELL, CSR NO. 12980

1   Pursuant to Notice of Deposition and on
2   Wednesday, April 17, 2013, commencing at the hour of
3   2:58 p.m. at Pacific Business Centers, 201 Spear
4   Street, Suite 1100, Spear Conference Room,
5   San Francisco, California, before me, KIMBERLY K.
6   ELWELL, a Certified Shorthand Reporter and Deposition
7   Officer of the State of California, there personally
8   appeared
9            JOE MARTIN,
10  called as a witness by the Plaintiff, who having been
11  duly sworn by me, was examined and testified as
12  hereinafter set forth.
13            --oOo--
14
15            A P P E A R A N C E S
16  For the Plaintiff:
17      JEAN BARNIER, Attorney at Law
        MacCONAGHY & BARNIER, PLC
18      645 First Street West
        Suite D
19      Sonoma, California 95476
        (707) 935-3205
20
21  For the Defendant Monette Rosemarie Stephens:
        SHEILA GROPPER NELSON, Attorney at Law
22      LAW OFFICE OF SHEILA GROPPER NELSON
        55 Francisco Street
23      Sixth Floor
        San Francisco, California 94133
24      (415) 362-2221
25            --oOo--

Page 2

1            I N D E X
2   EXAMINATION BY:                    PAGE
3   MS. BARNIER           4
4   MS. GROPPER NELSON         50
5
6            E X H I B I T S
7   PLAINTIFF'S   DESCRIPTION            PAGE
8     1     E-mails, beginning with 2/16/2007   25
9     2     E-mails, beginning with 4/10/2007  28
10    3     E-mails, beginning with 4/8/2007   29
11    4     E-mails, beginning with 2/10/2007  31
12    5     E-mails, beginning with 4/3/2007   32
13    6     E-mails, beginning with 10/6/2007  33
14    7     E-mails, beginning with 9/15/2008  36
15    8     E-mails, beginning with 12/11/2008 40
16
17     QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
18            Page   Line
19            80     2
20
21     QUESTIONS REQUESTED TO BE MARKED
22  Page 80, Line 2: "Question: So what is it that you
    are doing with them to assist them in getting the legal
23  work done?"
24
25            --oOo--

Page 4

1            JOE MARTIN,
2   after being sworn by the Certified Shorthand
3       Reporter, testified as follows:
4
5       EXAMINATION BY MS. BARNIER
6   Q.  Mr. Martin, have you ever had your deposition
7   taken before?
8   A.  No.
9   Q.  Okay. Let me explain the process.
10  A.  Okay.
11  Q.  So you understand that although we are in an
12  informal setting, your testimony is under oath and it
13  is just as important as if you were in a court of law?
14  A.  Okay.
15  Q.  We are going to proceed in a
16  question-and-answer fashion. It is going to be
17  recorded by the court reporter, and she can only take
18  down one person speaking at a time.
19  A.  Okay.
20  Q.  So let me finish my question before you start
21  answering --
22  A.  All right.
23  Q.  -- even if you think you know the answer to
24  the question before I finish. And if I cut you off,
25  please let me know.

Case: 12-03148  Sup. Exhibit D - 341 Hearing and Deposition Transcripts  D-207 of 225

Doc# 1-4  Filed: 09/07/16  Entered: 09/07/16  Page: 5

26

Page 5

1    If I ask you a question and you don't
2  understand the question, please tell me and I will
3  rephrase.
4       Does all of that make sense?
5    A. It does.
6    Q. You may also hear attorneys today objecting to
7  questions, and they are objecting for the court record.
8    A. Okay.
9    Q. So you can ignore them if you can -- it can be
10  disconcerting -- and answer the question.
11       And then let me also add -- and I don't know
12  if Ms. Gropper Nelson plans to, but she has the right
13  to ask you questions after I am finished. So I just
14  wanted to let you know that could happen.
15    A. Sure.
16    Q. All right. So can you tell me where you
17  reside?
18    A. Okay. I live in Merritt Island, Florida.
19    Q. And what's your address?
20    A. It's 4321 Timothy Drive.
21    Q. And how long have you lived in Florida?
22    A. We have lived there since January of 2010.
23    Q. Okay. Now, can you describe your work
24  experience before you became employed by Carl Wescott?
25    A. Sure. Sure. I have -- I hold two engineering

Page 6

1  degrees, a bachelor's and a master's degree from the
2  University of Missouri, and I spent, oh, 20 months in
3  the U.S. Army as an officer prior to starting my
4  career. And my career was then primarily sales and
5  marketing for companies that market products for
6  automating corporations, various processes within
7  companies from manufacturing to IT. I had spent about
8  35 years in that profession prior to leaving.
9    Q. Okay. Now, can you give me a background on
10  your education?
11       And you mentioned you have two master's; is
12  that right?
13    A. No. No.
14    Q. Two degrees. I'm sorry, two degrees.
15       And they are both in?
16    A. One -- the B.S. is in petroleum engineering
17  and the M.S. is in engineering management.
18    Q. Okay. How did you come to be employed by Carl
19  Wescott?
20    A. Well, the use of "employed" is probably not
21  the right word, but we --
22    Q. Okay.
23    A. -- entered into an agreement together whereby
24  I would be the operating partner and he would be the
25  general or financial partner.

Page 7

1    And the way this happened by background is
2  that, at the time that I met Carl, which was in 2004, I
3  was managing the business partnerships for a company by
4  the name of Compuware out of their Western office in
5  Oakland. Compuware is an enterprise software company
6  that sells software tools for productivity and to IT
7  departments.
8       What we did, like most big enterprise
9  corporations, is look for business partners in a local
10  area that could provide services in order to implement
11  our software. Carl had a company at that time in
12  San Francisco called PeopleBridge. PeopleBridge was a
13  network engineering company, a services company. When
14  I first met him, one of my sales guys had introduced us
15  and said, "Here is somebody that might be interested in
16  partnering with Compuware on deals involving our
17  network management tools." So I said, "Good."
18       I met with him a couple of times, got
19  background on his company and then we kind of lost
20  track of each other.
21       So in 2006, we had an opportunity to sell some
22  software to -- and I don't remember the company's name,
23  but it was an enterprise company that had a network
24  operations center that they wanted to implement our
25  tools in, and I called Carl or sent him an e-mail, I

Page 8

1  can't remember which -- I contacted him and said, "Are
2  you interested in partnering with us on this deal where
3  we provide the services and you provided the services?"
4       And at that time -- excuse me -- he said, "No,
5  I am out of that business. I sold my company and now I
6  am doing real estate development in both California and
7  some of the developing countries in Latin America."
8       So -- excuse me -- I said, "Well, that's
9  interesting. That's quite a switch. How do you like
10  it?"
11       He says, "Well, I love it." He says, "I am
12  doing really well."
13       And I said, "Okay." I said, "Well, it is
14  interesting, because my wife and I just bought property
15  in Roatán, Honduras with another partner." We bought
16  two or three lots down there. And I said, "I would be
17  interested to hear what your experience is and what you
18  are doing," because at that time, everybody thought
19  that the market for international real estate was going
20  to grow quite significantly.
21       So he said, "Yeah, we should have lunch
22  sometime and let's talk about it." I think it was
23  August of 2006, we finally had lunch and he gave me
24  kind of an overview of his business model and how he
25  was investing in these countries. He had invested in

Case: 12-03148Sup Doc Exhibit D - 341 Hearing and Deposition Transcripts:51D-208 of 228
26

Page 9

1 Panama, in Mexico and was looking to invest in
2 Nicaragua and Honduras. Well, he had also invested in
3 Ecuador.
4 So he asked me, you know, what my situation
5 was in Roatán. I told him, "Well, that was strictly an
6 investment that we made, hoping that we might make good
7 on that." So I said, "Explain to me your business
8 model," and he explained it to me.
9 He said he buys large parcels of land, usually
10 in countries that are developing, where North Americans
11 and Europeans might want to buy lots or second homes or
12 retirement homes, and that was his model. He said, "I
13 will," you know, "take it, parcel it out and then
14 resell it by lots."
15 So the more we talked, I said, "Well, that's
16 kind of an interesting model." And he said, "Yeah, I
17 am making 60 percent on my money." And I said, "Well,
18 that's very interesting." So we said, "Well, let's
19 stay in touch," and just -- you know. He said, "I am
20 interested in Honduras. I want -- I don't have any
21 contacts there, but I want to make an investment
22 there." And I said, "Okay."
23 So over the course of the next month or two,
24 we chatted by e-mails a few times, and I said, "You
25 know, we are going to Roatán for Thanksgiving. We are

Page 10

1 going to meet up with our partners down there. And if
2 you are traveling in Latin America and you want me to
3 introduce you to our real estate agent there, I would
4 be happy to do that." So he said, "That would be fine.
5 Let me see."
6 Anyway, to cut to the chase, we were to meet
7 down there the week of Thanksgiving of 2006. He was
8 going to bring Monette and his son, Alexander, but
9 they, at the last minute, said they weren't going to
10 come down. So he came by himself and then he said, "I
11 have got to get back because we are entertaining for
12 Thanksgiving. We have guests coming, family."
13 So we went -- went down -- we were down there.
14 We met up with him. I introduced him to our realtor,
15 Steven Haas. And then all of us were going to look at
16 some properties, because we were curious at that time
17 and hadn't really talked too much about what he was
18 going to do and he -- that -- we had a big winter storm
19 while we were there. We were staying on one end of the
20 island, he was on the other. We were all going to take
21 the ferry over to the mainland. He didn't want to
22 invest on the island, he wanted to invest on the
23 mainland because it was -- he thought it was a better
24 value for what he wanted to do.
25 So that day that we were to meet up, we were

Page 11

1 rained in on the other end of the island. The roads
2 had washed out, so we didn't get together. He went
3 over with the realtor. They chartered a plane and flew
4 over and he looked at some property and then made an
5 offer. He made a purchase offer on 371 acres on the
6 North Coast. Then we never saw him again. He flew
7 back.
8 When we got back to San Francisco, we
9 contacted one another, and he said, "Yeah, I made an
10 offer on this property down there. I think it is one
11 of the best I have seen." He said, "I think it is
12 really good in terms of its capabilities and its
13 developable characteristics."
14 So I said, "Well, that is interesting." And
15 he said, "Well, let's get together for lunch." We got
16 together for lunch again and he told me about it. He
17 said, "If I could close this deal, would you be
18 interested in investing in it?" And I said, "No,
19 not -- I mean, we already have put money into Roatán
20 and we are not in a position to be able to invest money
21 in a property," but both my wife and I have traveled
22 internationally extensively. She lived in Thailand for
23 two years and both of us had talked about, well,
24 wouldn't it be kind of fun some day to maybe live out
25 of the country again and do some work of a different

Page 12

1 type than what I had been doing and she had been doing.
2 So we said to him -- or I told him, I said,
3 "We wouldn't be interested in investing, but we could
4 possibly talk about a sweat equity deal if there was an
5 opportunity that was, you know, on the other end of
6 this that would provide enough return that would be
7 more than what I could achieve if I stayed in my
8 current work," because at that time, I was doing
9 reasonably well.
10 So one thing led to another. We had
11 discussions and he said, "I would like to, you know,
12 maybe think about that." And he came back and said,
13 "Yeah. You know, we could work out a deal where you
14 are the -- maybe the operating partner. You have had
15 experience in project management."
16 And I said, "Yeah, but not in real estate
17 development." He said, "Well, I don't -- that's not
18 important to me. What's important is that you are
19 trustworthy and that you have good business sense."
20 So I said, "Fine. What kind of an arrangement
21 could we talk about?" And he said, "Well, why don't
22 you put something together that would be fair to you
23 and you would consider?" And I said, "Okay."
24 I put a deal together that said -- based on my
25 knowledge of how we do work in the software business, I

Case: 12-03148 Sup Exhibit D - 341 Hearing and Deposition Transcripts: 51 D-209 of 228
26

Page 13

1 said, "Well, why don't we work out a commission based
2 on the sales of the properties? But I need a minimum
3 compensation for us to make this move. You know, it's
4 a risk and we need to be compensated."
5      So he said, "All right. Well, let's think it
6 over," and we did. Finally, in the spring, he made an
7 offer. The final, formal offer, I think, was in
8 December, the end of the year, on the property. The
9 owners came back and said they didn't like his offer.
10 I think he had offered 800,000 for the property and
11 they came back and countered with 1 1/2 or 1.3. I
12 can't remember.
13      So they went back and forth negotiating on the
14 price of it and they finally closed the deal in
15 February. By that time, we had had some additional
16 discussions and lunch and we had talked it over and he
17 said, "Well, would you be interested in being the
18 operating partner down there and doing the management
19 of the project?" And I said, "Well, if we can come to
20 an agreement on compensation, then yeah, we might be
21 willing to do that."
22      We did. We finally -- I guess it was in
23 February, mid-February when he finalized the deal on
24 the property with the --
25      Q. And when you say "mid-February," is that 2008?

Page 14

1      A. 2007.
2      Q. 2007?
3      A. I'm sorry, yeah.
4      Q. Okay. So 2007, you finalize your agreement
5 how you are going to work, is that right, or --
6      A. He finalized the sale -- the purchase of the
7 property in February. And then through the next few
8 months, we discussed an arrangement that we would --
9 would be acceptable to us. And finally, toward the end
10 of April -- in fact, it was on April 30th, we finalized
11 an agreement, signed an agreement between us.
12      Q. Now, what were your responsibilities for
13 developing this project in Honduras?
14      A. My responsibilities were to set up the legal
15 framework down there; that is, get the lawyers that we
16 needed on board, hire the engineers we needed to do the
17 topographic mapping of the property, hire the
18 environmental engineers to do the studies to see
19 that -- you know, because the government of Honduras
20 required that -- you had to submit an application to
21 their administrative natural resources that was
22 acceptable to them in terms of what you were going to
23 do to the environment. So we had to hire somebody to
24 do that, look to see that there wasn't any endangered
25 species and water issues on the property and forest

Page 15

1 issues and so on.
2      And then we had to hire -- excuse me. We had
3 to hire an architect to do a master plan in order to
4 say this is what we are going to do with this property
5 that has been mapped. We are going to divide it up
6 this way and we are going to put this many lots on it.
7 And then that would become the master plan we would
8 work from in order to build the infrastructure, which
9 would mean the roads, the sewage system, the water
10 system, the Internet, the electricity primarily to take
11 to all these different lots.
12      So my responsibility was to find the talent,
13 manage that talent and get all the permits through the
14 government in order that we could subdivide and sell
15 the lots and then to help with the sell -- the sales of
16 the lots.
17      Q. Was the project ever completed?
18      A. No.
19      Q. What stage was the project at when you left
20 the project?
21      A. Okay. When we left Honduras, we had -- the
22 master plan was completed, all the engineering plans
23 were completed for the infrastructure. That meant all
24 the engineering plans for the road designs, the sewage
25 designs, the water source designs, the electrical and

Page 16

1 all of that. And we had the application -- the
2 environmental study was complete and we had submitted
3 that to SERNA, which was the ministry of natural
4 resources, for approval and it was in that cycle that
5 it was churning through. That was about in mid-2009.
6      And then, as you may recall, they had a
7 government coup there in the summer of 2009, which just
8 threw a monkey wrench into everything, because the
9 ministries all were turned upside down with their
10 personnel. Anything that was in there that was
11 applications for permits were just lost or on hold, and
12 it was just pretty gnarly.
13      Q. Now, through mid-2009, was Mr. Wescott current
14 with the payment schedule that you had agreed to?
15      A. No. No.
16      Q. When did he --
17      A. He was not.
18      Q. When did he stop paying you?
19      A. He stopped -- he stopped paying us -- well, he
20 delayed paying us in part of 2008 and then he came up
21 current again, but we had an architect who was owed
22 $110,000 that was needing to be paid and he is the one
23 that created the master plan. And I told Carl at the
24 time, I said, "You know, we are going to have to pay
25 this guy. We owe him the money. And furthermore, if

Page 17

1 you want the permit ever approved, he is going to have
2 to do the rework when the ministry comes back and says,
3 "Well, we want you to change this, this and this,"
4 which is typical, "then he is going to have to change
5 his master plan and resubmit it." Well, he was never
6 paid.
7     And we, at the end of -- it was close to the
8 end of 2009, just sent an ultimatum to Carl and said,
9 "Look, you know, you are way behind on paying us. You
10 are way behind on the project of making that whole and
11 the people that we owe. So you either pay up or we are
12 going to have to, you know, cut it here. And by the
13 way, here is what you would owe us based on the
14 agreement that we have."
15     So he finally said, "You know, why don't you
16 just move back. I don't need you there." I said,
17 "Well, you do need us. You need somebody if you don't
18 need us." He said, "No, just move back." He said,
19 "You know, I will take care of this." I said, "Okay.
20 Well, I will send you an accounting of what you owe us
21 based on our agreement." And I did. That's when he
22 started denying that he owed us that money and "that's
23 not right" and he would do all kinds of delay tactics
24 and accusations and so forth.
25     So when we came back, we moved back to the

Page 18

1 States, to Florida, in July -- I mean, in January of
2 2010 and then I started hounding him some more, calling
3 him, e-mailing him, saying "We need to get this taken
4 care of" and he just ignored it essentially. And then
5 I hired an attorney and filed suit in July for breach
6 of contract.
7     Q. Did you ever get your money?
8     A. No, never.
9     Q. What was the name of the project in Honduras?
10     A. It was Agua Dulce, Mayan Oasis.
11     MS. GROPPER NELSON: I got the "Agua Dulce,"
12 but what was the last part?
13     THE WITNESS: Mayan Oasis.
14     MS. GROPPER NELSON: Got it. Thanks.
15 BY MS. BARNIER:
16     Q. Do you know Monette Stephens?
17     A. I do.
18     Q. How did you meet Ms. Stephens?
19     A. Right before we signed our agreement on
20 April 30th with Carl, Carl had invited us both, Leigh
21 and I, my wife, to come up to their home in
22 Healdsburg -- they had a home outside Healdsburg in the
23 wine country -- and attend the passport weekend for Dry
24 Creek Wineries. It is kind of a festival.
25     So we were both planning to go up there the

Page 19

1 28th and 29th of April. That was that weekend. And at
2 the last minute, Leigh got ill and she couldn't make
3 it. And I said, "Well, I think I am going to go up
4 anyway. It will be a chance for me to meet Carl's wife
5 and some other people."
6     So I went up and spent Saturday, Saturday
7 evening and then Sunday up there at their home, along
8 with a number of other different house guests. There
9 was a group of people up there.
10     Q. Do you remember how many other house guests
11 were there?
12     A. I don't remember exactly, but I would say at
13 least -- there was probably a dozen, if not more.
14     Q. And when was the first time you met
15 Ms. Stephens? Do you remember the date?
16     A. That was the 28th of April.
17     Q. In two-thousand- --
18     A. 2007.
19     Q. 2007. And did Mr. Wescott introduce
20 Ms. Stephens to you?
21     A. He did. He introduced her as his wife and he
22 also introduced his son. He had a little --
23     MS. GROPPER NELSON: Alexander?
24     THE WITNESS: Alexander, yeah. He was less
25 than two, I think, at the time.

Page 20

1 BY MS. BARNIER:
2     Q. Was Ms. Stephens ever present at any time the
3 project in Honduras was discussed?
4     A. Yes. We -- during that weekend, we had some
5 dinner conversations, of which she was a participant --
6 at the table, anyway. I don't recall if she had any
7 comments, but she was there when Carl would introduce
8 me as his prospective operating partner for Honduras --
9 "prospective" because I hadn't signed an agreement yet.
10 We didn't have that finalized.
11     We talked about that and then -- I mean, it
12 was brief, but there was some conversation about what I
13 was going to do there and what my responsibilities
14 were. That was the first time.
15     Q. And did you have any other meetings take place
16 where Ms. Stephens was present?
17     A. Yes.
18     Q. And where were they?
19     A. They were at their home in San Francisco on
20 Ashbury on October 3rd.
21     Q. Also of 2007?
22     A. Of 2007.
23     MS. GROPPER NELSON: I'm sorry, the date
24 again?
25     THE WITNESS: October 3rd.

Case: 12-03148  Sup Exhibit D - 341 Hearing and Deposition Transcripts: 5  D-271 of 228
26

Page 21

| | |
|---|---|
| 1 | MS. GROPPER NELSON: Uh-huh. |
| 2 | THE WITNESS: We -- before we left, we |
| 3 | finalized that agreement on the 30th of April, 2007, |
| 4 | and the agreement was that I would give notice to my |
| 5 | employer toward the end of May. I had a quarterly |
| 6 | bonus that was due, so I wanted to be there through |
| 7 | that and then our agreement would start on June 1st of |
| 8 | 2007. |
| 9 | So we left the Bay Area on June 1st. But |
| 10 | before we left, I had a physical and found out I had |
| 11 | some medical issues that I had to take care of. So I |
| 12 | made an appointment to come back to the States at the |
| 13 | end of September, early October to have a procedure |
| 14 | done, which was for -- prostate cancer was the deal. |
| 15 | So we flew back on September 30th. And then |
| 16 | Carl had invited us to come to dinner at his and |
| 17 | Monette's, their home in San Francisco. So we had -- |
| 18 | at that time had already hired a surveyor for the |
| 19 | property in Honduras and they had completed the |
| 20 | re-survey and were working on the topographic mapping. |
| 21 | And they had taken a slew of pictures of the property |
| 22 | and various, you know, markers and so forth. |
| 23 | And so we brought those with us and we went to |
| 24 | dinner. Leigh had not met Monette until that time. So |
| 25 | she met her that evening and we had a dinner |

Page 22

| | |
|---|---|
| 1 | conversation about the project. We updated both of |
| 2 | them on what we were doing and how we saw the property. |
| 3 | Monette had asked us once whether we thought it was a |
| 4 | good property and we said, "Yeah, we think it is." |
| 5 | "Will it be successful?" And we said, "Well, |
| 6 | as far as we know." You know, at that time, it seemed |
| 7 | like it would be a good project. |
| 8 | And then I think she had asked Leigh -- or one |
| 9 | of us, she had asked us what the nightlife was like |
| 10 | there and so forth and some questions like that. But |
| 11 | that was the night that we actually -- that was an |
| 12 | update, if you will, on the progress that we had made |
| 13 | thus far on the project. |
| 14 | BY MS. BARNIER: |
| 15 | Q. But how long did you spend talking about the |
| 16 | project with you, your wife, Carl Wescott and Monette |
| 17 | Stephens? |
| 18 | A. You know, I don't recollect exactly, but I |
| 19 | would say at least 30 minutes, if not more. |
| 20 | Q. Do you remember if Ms. Stephens looked at the |
| 21 | pictures and graphing that you had brought with you? |
| 22 | A. Well, she couldn't help but see it because |
| 23 | they were there at the table and were showing them the |
| 24 | pictures. I mean, I think she probably saw them |
| 25 | because we were -- the table wasn't much bigger than |

Page 23

| | |
|---|---|
| 1 | half of this, you know. |
| 2 | Q. So did she ask any other questions that you |
| 3 | can remember about the project? Did she -- so let me |
| 4 | make sure I understand. |
| 5 | She asked you if you thought it was a good |
| 6 | project; is that -- |
| 7 | A. Well, if it would be a successful project. |
| 8 | Q. A successful project. |
| 9 | A. And, of course, we -- at that time, we |
| 10 | wouldn't know. We thought it would be, based on -- the |
| 11 | property itself was in a good location, it had plenty |
| 12 | of flat land that could be developed and turned into |
| 13 | lots. |
| 14 | And as it turned out, I think after the |
| 15 | mapping, we determined that there was like 155 lots in |
| 16 | this particular parcel and Carl had been looking to |
| 17 | get, he thought, around 150. So it was pretty close. |
| 18 | Q. Was Mr. Wescott always present when |
| 19 | Ms. Stephens was present when you were talking about |
| 20 | the project? |
| 21 | A. As far as I remember, yeah. |
| 22 | Q. So you have described two occasions now where |
| 23 | you met Ms. Stephens. |
| 24 | A. Right. |
| 25 | Q. Is there any time else where you were present |

Page 24

| | |
|---|---|
| 1 | and Ms. Stephens was present regarding the discussion |
| 2 | of the project in Honduras? |
| 3 | A. One other time, and that was two days later on |
| 4 | the 5th of October, I believe. It was a lunch that |
| 5 | Carl had called, that he had scheduled. Monette, Carl, |
| 6 | there was two other couples -- the Matthesens and the |
| 7 | Matusows -- and Leigh and myself. So there were eight |
| 8 | of us that were at the Tres Agaves Restaurant here in |
| 9 | San Francisco for lunch. |
| 10 | And that was another -- for them, they had |
| 11 | invested, as of my understanding -- I don't know their |
| 12 | particulars for sure on how much, but my impression was |
| 13 | that they had -- those two couples had also invested |
| 14 | money in the Honduras project. And so they were there |
| 15 | to get an update as well. |
| 16 | So Carl had us give everybody an update on the |
| 17 | project, what had been done so far and also what our |
| 18 | plans were for, you know, hiring the attorneys, the |
| 19 | engineers and the architect to get the project to the |
| 20 | next stage. |
| 21 | Q. So you went into a lot of detail at that |
| 22 | presentation about what was going to happen at this |
| 23 | project? |
| 24 | A. Right. |
| 25 | Q. And this was at the luncheon with these |

Page 25

1 investors?
2 A. Uh-huh, correct.
3 And I had there a -- was an e-mail that Carl
4 sent afterwards --
5 Q. Hold that thought. I think I might have a
6 copy of it. So let me just ask you if that's what it
7 is.
8 (Plaintiff's Exhibit 1 was marked for
9 identification.)
10 BY MS. BARNIER:
11 Q. And what I am handing you, Mr. Martin, is a
12 document I would like you to look at. And then when
13 you are done, if you would give it to the court
14 reporter.
15 MS. BARNIER: And I do have one for you,
16 though you are wrong on the rule, but I am giving it to
17 you because I have not previously -- I didn't have it
18 so I didn't -- I am now giving it to you as part of the
19 document production per your request.
20 BY MS. BARNIER:
21 Q. Do you --
22 MS. GROPPER NELSON: Responsive to which
23 document request?
24 MS. BARNIER: I actually don't know. Let's go
25 off the record for just two minutes.

Page 26

1 (Brief discussion held off the record,
2 3:28 p.m. to 3:29 p.m.)
3 MS. BARNIER: We are back on. Thank you.
4 BY MS. BARNIER:
5 Q. Do you recognize this document?
6 A. I do recognize this. This isn't what I was
7 speaking of, but I recognize this e-mail. It is to the
8 realtor, Steve Hasz, who was responsible for
9 negotiating the purchase of the property.
10 Q. Okay. And then -- so you are CCed on this
11 one; is that correct? Joe Martin?
12 A. Yes. Yes.
13 Q. And then Leigh Lightfoot, who is that?
14 A. That is my wife.
15 Q. Okay. And then Monette Stephens was also CCed
16 on this --
17 A. Yes.
18 Q. -- is that correct?
19 Okay.
20 A. This was a power of attorney, a special power
21 of attorney that was apostilled that gave Steve Hasz
22 the authority to set up two Honduran corporations and
23 purchase the property.
24 Q. Now, when it says on this "Wire coming Tuesday
25 as you know," do you know what that is referring to?

Page 27

1 A. "Steve, this is what is being FedExed to you
2 overnight. I assume arriving Monday or so. Wire
3 coming Tuesday..."
4 That would have been -- probably would have
5 been -- my guess would have been the -- this is
6 February 16th. So it would have been the down payment
7 on the offer to the seller -- to the seller. That
8 would have been the monies to the seller.
9 And I believe at this time Carl had put a
10 contingency in his offer that it was to be -- it was to
11 be contingent upon him doing -- taking another trip
12 down there and doing some due diligence, further due
13 diligence before they finalized the deal.
14 Q. And is that -- he shared that information with
15 you; is that why you received --
16 A. Right, yeah.
17 Q. -- this?
18 A. Yeah.
19 Q. How often were you speaking with Carl Wescott
20 about this project on a weekly basis?
21 A. Well, not speaking as much as e-mails. We did
22 a lot of e-mail traffic. And I kept everything, so...
23 Q. Okay. And if you would look at -- this would
24 be -- if you would hand that to Kim, please.
25 A. Okay.

Page 28

1 MS. BARNIER: This would be Exhibit 2.
2 (Plaintiff's Exhibit 2 was marked for
3 identification.)
4 MS. GROPPER NELSON: Thank you.
5 BY MS. BARNIER:
6 Q. Do you recognize this e-mail?
7 A. This would have been a -- yeah, this would
8 have been the title insurance company.
9 Q. Okay. And I notice this is from Carl to, once
10 again, your wife, you and Monette Stephens --
11 A. Right.
12 Q. -- and it is dated April 10th, 2007.
13 And he has forwarded an e-mail; is that
14 correct? At the bottom; is that what it looks like to
15 you, that he has --
16 A. Yes. Yes. He forwarded that from Erick
17 Dorantes, who had sent it to him, and said this is "the
18 latest amendment to the commitment for the
19 above-referenced matter. Please notice that all
20 changes made are in bold print."
21 Yeah, this was for the title insurance policy
22 on the property.
23 Q. And how do you know it is for the title
24 insurance policy? Did Mr. Wescott tell you that's what
25 it was for?

Case: 12-0314 SupD Exhibit D - 34t d Hearing and Deposition Transcripts 3:5D-213 of 228
of 26

Page 29

1   A. He did, yes. And I knew, I mean, that we were
2   working -- he was working through First American Title.
3   He kept us, you know, informed very regularly on the
4   negotiations and what was happening with the deal.
5           MS. BARNIER: Okay. And then this would be
6   Exhibit 3.
7           (Plaintiff's Exhibit 3 was marked for
8   identification.)
9           THE WITNESS: Okay.
10          MS. GROPPER NELSON: Thank you.
11  BY MS. BARNIER:
12      Q. This is a little bit longer e-mail, so take a
13  look at it first.
14      A. Okay.
15      Q. Okay. And once again, this is dated
16  April 8th. This is from Carl to your wife.
17      Who is "bizdevexec," if you know?
18      A. That's me.
19      Q. That is also you?
20      A. I had a second e-mail address, yeah.
21      Q. Okay. So that's you, and then Monette
22  Stephens.
23      And this is, again, a forwarding of an e-mail;
24  is that right?
25      A. Yes.

Page 30

1       Q. And this is from Steve Hasz, who you said is
2   the realtor --
3       A. Exactly.
4       Q. -- selling this?
5       Now, he refers to it as "La Ceiba." Is that
6   the same project as Agua Dulce?
7       A. Yes. La Ceiba was the main city on the
8   North Coast there of Honduras. The Agua Dulce project
9   was 15 kilometers east of there.
10      Q. Now, earlier, you had testified that you were
11  going to help Mr. Wescott set up I believe it was the
12  corporations in Honduras to hold the property; is that
13  correct?
14      A. No -- actually, sort of. Let me clarify that
15  a little bit.
16      There were two corporations that were set up
17  to hold the property and that was done by Steve Hasz,
18  and this is where he is recommending how he structured
19  the purchase of the property. And then that document
20  that you showed me earlier, which was where he was
21  sending the apostille power of attorney, Carl was
22  giving Steve the authority to be able to establish
23  these two corporations; one to hold the property and
24  the other to hold the corporation that held the
25  property.

Page 31

1       Then our responsibility, once we moved down
2   there, was to set up banking relationships, in addition
3   to the other things that I mentioned and establish a
4   corporation for the operating expenses of the project,
5   and that was Agua Dulce Management Company, and that's
6   even apart -- it's separate from these.
7       Q. So when Mr. Hasz writes "Deal Sheet," do you
8   know what he is referring to on the subject line?
9       A. Yes. He is talking about what the expenses
10  are -- what the final price is for the property and
11  what the expenses are; what goes to attorneys, what
12  goes to the commissions to the realtors and so forth,
13  what the down payments were and what is owed.
14          MS. BARNIER: And then this would be
15  Exhibit 4.
16          (Plaintiff's Exhibit 4 was marked for
17  identification.)
18  BY MS. BARNIER:
19      Q. And do you recognize this e-mail?
20      A. Yeah, this was Steve's reply back saying that
21  the sellers had countered his offer and came back with
22  1,053,000.
23      Q. So this also -- and I'm sorry they are out of
24  date sequentially and there is a reason why they are,
25  why we did it that way.

Page 32

1       But this is from Carl, and he is sending it to
2   Steve and he CCed you, your wife and Monette again,
3   correct?
4       A. Yes, that is correct.
5       Q. And he is forwarding information that Steve
6   Hasz mailed just to him; is that correct?
7       A. Yes, that is correct.
8       Q. Okay. And so this is information that Steve
9   is saying that -- how to go forward purchasing. Am I
10  reading this correctly?
11      A. You are reading it correctly, yes.
12      Q. Okay. And Mr. Wescott kept you and your wife
13  informed on the progress of the purchase during this
14  time; is that correct?
15      A. Yes, it is.
16          MS. BARNIER: And then this would be
17  Exhibit 5.
18          (Plaintiff's Exhibit 5 was marked for
19  identification.)
20  BY MS. BARNIER:
21      Q. This is an e-mail from Carl to you, your wife
22  and Monette Stephens, and it says "Follow up on
23  HON-2007-04761 Title Insurance Policy."
24      Do you know what this is referring to?
25      A. Hmm, "he assures me that he will have the

Case: 12-0314 Sup DExhibit D - 34t d Hearing and Deposition Transcript 3:5 D-214 of 228
of 26

Page 33

1  commitment letter on the title..."
2      I believe this had to do with the completion
3  of the title insurance policy.
4      Q. So there is not any instructions here, he is
5  just giving you information --
6      A. Yeah.
7      Q. -- along with your wife --
8      A. Yes.
9      Q. -- and Ms. Stephens; is that right?
10     A. Exactly. We weren't -- we didn't even have an
11 agreement at this point in time. I mean, this is dated
12 April 3rd, but Carl felt it necessary to keep us
13 informed because he was, you know, courting us for the
14 idea of managing the project or investing in it. So he
15 kept us informed on what was going on with the
16 negotiations of the purchase of the property.
17         MS. BARNIER: And then this would be
18 Exhibit 6.
19         (Plaintiff's Exhibit 6 was marked for
20 identification.)
21 BY MS. BARNIER:
22     Q. And I believe --
23     A. This is what I was talking about.
24     Q. This is what you were talking about. Okay.
25         And so you -- do you recognize this e-mail?

Page 34

1      A. I do, yeah.
2      Q. And this is addressed -- it is from Carl and
3  he first writes it to -- Monette Stephens is first and
4  then John Matthesen.
5      A. Yes.
6      Q. Was he one of the investors?
7      A. Yes, he was.
8      Q. And then you are "Joe"?
9      A. Yes.
10     Q. And "Leigh" is your wife?
11     A. Yes.
12     Q. "Ken Matusow" is an investor?
13     A. Yes.
14     Q. And "marian@thequantumbusiness" is also an
15 investor?
16     A. Marian was John's wife, and Carl was absent --
17 the one name that he didn't have the address for was
18 Barbara's, which was Ken's wife.
19     Q. Oh, okay. And this is what you had testified
20 earlier about the luncheon; is that correct?
21     A. That is correct, yeah.
22     Q. So he goes on to just say -- your involvement
23 in making Alcue- -- excuse me, Agua Dulce happen?
24     A. Uh-huh.
25     Q. And it really is just a thank you note, but

Page 35

1  also saying --
2      A. Thank you all for helping make this possible
3  is really what he is saying there, because he had all
4  the people that were instrumental in making the deal go
5  or work.
6      Q. And when you say "making the deal go," does
7  that mean putting up the money?
8      A. Well, it means putting up the money and doing
9  the work on the management of the development, which
10 would have been us.
11     Q. Did you ever learn how much money Mr. Wescott
12 put into the Honduras project?
13     A. Total, with what he was paying us and the
14 project people, I would estimate at about 1.3.
15     Q. 1.3 million dollars?
16     A. Yeah.
17     Q. How much did he put down to purchase the
18 property?
19     A. I am not certain the amount that had to be
20 done in order to purchase it, but the purchase price --
21 final purchase price was 1.053. That was the --
22     Q. But what I meant was, are you aware, did
23 Mr. Wescott put up any of his own personal money to --
24     A. He claimed he did.
25     Q. Did you have any information that he did?

Page 36

1      A. No.
2      Q. Did you have --
3      A. I mean, I had his word that this -- he said,
4  "I put up my personal money. I put up, you know,
5  $1,000,000 of my own money on this project," and I
6  always thought that was true until later on when I
7  started -- when we filed our suit and I started looking
8  into some other suits and finding out people that he
9  owed money to and when they were borrowed, when the
10 money was borrowed and how much, and I came to believe
11 that maybe, maybe it wasn't his money.
12     Q. Do you have any idea why Carl Wescott would
13 address this e-mail to Monette and say "Thank you for
14 your help and involvement in making Agua Dulce happen"?
15     A. I can only speculate.
16     Q. I am not going to ask you to do that. If you
17 have an idea, that's great, but I don't want you to
18 speculate.
19         You don't know?
20     A. No, I don't know.
21         MS. BARNIER: Okay. And then on Exhibit 7...
22         (Plaintiff's Exhibit 7 was marked for
23 identification.)
24 BY MS. BARNIER:
25     Q. And this is an e-mail from Carl, dated

Case: 12-0314 Sup Exhibit D - 34t Hearing and Deposition Transcripts 3:5 D-215 of 228
of 26

Page 37

1  September 15th, 2008, addressed to Monette Stephens.
2  A. Uh-huh.
3  Q. Who is Steve Bonilla?
4  A. Bonilla [phonetic distinction.]
5  Steve Bonilla was a gentleman that Carl had
6  hired for his firm, Unexpected Development, which was
7  supposed to be the umbrella organization to manage all
8  of these projects that he had in Latin America. Steve
9  was billed as the COO of the organization. That's how
10  he was presented to us at the time.
11  Nichole Cheline I have never met. Steve I met
12  on numerous occasions and have talked to. But Nichole
13  Cheline, to my knowledge, I never met her but was the
14  project manager in Mexico.
15  Q. And who is Eric Reisner?
16  A. I don't know. His name looks familiar, but I
17  don't recall.
18  Q. Okay. And you are "Joe"?
19  A. Yes.
20  Q. And "Leigh" is your --
21  A. Oh, no, no, no. Wait, wait, wait, wait.
22  Let's see.
23  Well, I said, "Wait," because it could be
24  another -- it could be Joe Simonetta as well, but I
25  believe that is me there.

Page 38

1  Q. Okay. And also Leigh, your wife?
2  A. Yes.
3  Q. And also CCed is Douglas Gladstone and Suneet
4  Singal regarding Laguna Tranquila. Is this the same
5  project?
6  A. No, Laguna Tranquila or -quila [phonetic
7  distinction] was the project in Ecua- -- in Uruguay.
8  Q. Now, why would Mr. Wescott be e-mailing you
9  about the project in Uruguay?
10  A. He wanted our feedback on the website that he
11  had developed for marketing that project. And so he
12  sent it to us and said, you know, "Give me your
13  feedback. What do you think?" You know, "What do you
14  think about how it is presented?"
15  Q. Okay. And then he goes on to say, "I have
16  written all but three pages of the content," and he is
17  going to write the rest tonight.
18  Did you ever see a finalized version?
19  A. I think we did. I believe we saw that.
20  Q. Did you ever give him any feedback?
21  A. Yeah, I did. He made a mistake. One mistake
22  that I had sent him, I said, "You know, you have
23  Ecuador listed here in your content, and you really
24  mean Uruguay, don't you, since that is the project."
25  Q. Did he ever discuss the Uruguay project with

Page 39

1  you?
2  A. Well, yeah. In fact, he was really, really
3  bullish on that project. This was in 2009 when we were
4  starting to get really concerned about not being paid.
5  We had some vacation time and we decided that we were
6  going to go to Uruguay and see another project, because
7  we had only heard that there were these other projects.
8  So we contacted Carl and we said, "We are
9  going to take a vacation and we are going to go down to
10  Uruguay and would you introduce us to your project
11  manager, Adrian Dorsman, down there?" And he stalled
12  and went through all kinds of machinations and didn't
13  want to do it. Finally, he gave us his number and we
14  contacted Adrian.
15  And we found out that Carl was planning to be
16  in Uruguay to do some business. So we wanted to be
17  there at the same time because we wanted to confront
18  him face-to-face about the issue of the money and was
19  he going to pay or wasn't he going to pay. And when we
20  were down there, he somehow found a way not to come
21  down. And he was kind of snarky, upset with us for
22  contacting his project manager. He didn't like it.
23  Q. Did you ever see the project in --
24  A. We did --
25  Q. -- Uruguay?

Page 40

1  A. Yes.
2  It was a farmland. I mean, there was nothing
3  other than just a piece of property like we had in
4  Honduras. It was -- nothing had been done to it.
5  Q. He had represented to you that more had been
6  done on the Uruguay project?
7  A. No, he hadn't represented that, other than to
8  say that he was -- he thought he was further along with
9  some of the permitting that was required.
10  (Plaintiff's Exhibit 8 was marked for
11  identification.)
12  BY MS. BARNIER:
13  Q. This is Exhibit 8, of which there are numerous
14  pages. We are going to go through them slowly. So
15  let's go a little bit slowly here.
16  A. Okay.
17  Q. So this is addressed from Carl, dated
18  December 11th, 2008 to -- is that you and -- Leigh is
19  your wife, is that correct, on the first page?
20  A. Oh, the first page here? Yes.
21  Q. Okay. And it is now -- it is CCed to
22  "guillorycp." Do you know who that is?
23  A. I do not.
24  Q. Okay. And also Monette Stephens. And then it
25  looks like he e-mails himself, is that correct? Do you

Case: 12-0314  Sup Exhibit D - 34t Hearing and Deposition Transcripts3:5D-2 Filed 228
of 26

Page 41

1 recognize "c@carlwescott.com" as his e-mail?
2 A. Yes. He used a number of different e-mail
3 addresses and that was one of them. I never really
4 understood the -- I mean, I guess I sort of understood,
5 because I had a couple myself. But that was one of
6 his, yes.
7 Q. And this time, the subject is Lightfoot
8 Investment Company. And he says on this, "Here's the
9 notarized version. Carmen will apostille next," from
10 Carl.
11 Do you know what he is referring to here?
12 A. I do.
13 Q. And what is it?
14 A. Lightfoot Investment Company -- this is an
15 interesting sideline, but he -- when we were in
16 negotiations for getting an agreement signed, he told
17 Leigh and I, he said, "I have named these corporations
18 Lightfoot, Lightfoot Investment and Lightfoot
19 Holdings." So Leigh -- that was her maiden name and
20 she still goes by Leigh Lightfoot-Martin. He said,
21 "You have to be part of this now." So it was sort of a
22 quirk that -- like Carl has.
23 So anyway, that Lightfoot Investment Company
24 was the company that held title to the property. And
25 when we filed the application for the environmental

Page 42

1 permit with the ministry of Honduras, I had to be able
2 to -- somebody had to be a representative of that
3 corporation to sign the paperwork that -- for the
4 application, sign the application in the name of
5 Lightfoot Investment. This was a notarized version and
6 would be an apostille power of attorney, a special
7 power of attorney giving me the ability to make that
8 signature on the application for the permit.
9 Q. Okay. And then you -- the e-mail is also
10 dated October -- on the next page, on page two of this
11 document, October 8, 2009. And this is addressed to
12 you and your wife. The subject is "Escrow Agreement,"
13 and it goes on with a number of numbers --
14 A. Uh-huh.
15 Q. -- and it says, "Here is the escrow contract
16 for the close today." And he has forwarded an e-mail
17 also dated the same day --
18 A. Uh-huh.
19 Q. -- in which it looks like a name of Ming Chai
20 and Haw-Bin Chai and Monette Stephens have been CCed on
21 regarding this escrow agreement.
22 Why would you and --
23 A. Get that.
24 Q. -- your wife be receiving e-mails regarding an
25 escrow agreement?

Page 43

1 A. In Ecuador.
2 Q. Oh, and how do you know it is in Ecuador?
3 A. It says so and it said so in the agreement.
4 The reason for that was that we were hounding
5 him pretty regularly about the money that he owed us
6 and we were saying, look, we have got an environmental
7 engineer that needs payment so that she can complete
8 work. We have got, you know, an architect that needs
9 to be paid. We need some money here. What is going
10 on?
11 And so Carl had a way of sending you bits of
12 information that says, oh, it is coming. It is coming.
13 And this was one of them. And this was, we are selling
14 a piece of property in Ecuador and out of that, we
15 should have some money to be able to pay, make payment
16 to Hugo Qiao [phonetic], who was the master planner.
17 Q. Now, when you say -- you said that Carl was
18 saying "we." Do you know who he is referring to as the
19 "we"?
20 A. Well, I would assume it was Monette, because
21 she was on the document that she owned the property.
22 They co-owned the property.
23 Q. Okay. And so you -- so he has forwarded you a
24 number -- as you go on through page three, page four.
25 These were all attached to the e-mail --

Page 44

1 A. Yes.
2 Q. -- that he forwarded to you?
3 A. Yes, they were.
4 Q. And he also attached this escrow agreement; is
5 that correct?
6 A. That is correct.
7 Q. And this is an escrow agreement dated
8 October 7th, 2009, between Haw-Bin Chai and Ming Chai,
9 the purchaser from Carl Wescott and Monette Stephens,
10 regarding a property sale in Ecuador; is that correct?
11 A. That is correct.
12 Q. And why would he -- why did he attach the
13 escrow instructions for property in Ecuador to you?
14 A. The only reason I think was to show me some
15 legitimacy, that he wasn't just blowing hot air, that
16 he had something to back up the fact that he had some
17 money coming in and that he was going to pay us. It
18 was just to let us know, well, look, I have got this
19 coming in. This is what we are closing on. We are
20 going to have some money, so we will be able to pay.
21 Q. And did you ever receive the money?
22 A. No, never did.
23 Q. How would you describe the relationship
24 between Carl Wescott and Monette Stephens?
25 A. On the brief times that we met -- I mean, the

Page 45

1 several times -- I recall one -- a side conversation
2 that I had had with Monette in which she made a comment
3 about how Carl's IQ -- "He claims to have a high IQ,
4 but mine is actually better than his."
5     I thought that was kind of odd, but Carl had
6 bragged to my wife that he had a 165 IQ and was a
7 graduate of Stanford and all of this. It was kind of
8 interesting.
9     But Carl -- I mean, the two times Monette
10 was -- she didn't have a whole lot to say, but Carl
11 deferred to her in situations that I thought -- like
12 when we were in Healdsburg. The three of us were out
13 touring wineries and it seemed like he was, you know,
14 pretty deferential to what Monette wanted to do.
15     Later, while we were on the project, there
16 were a couple of times when we would ask him to come
17 down and meet with us because we had some important
18 business to conduct, and he said, "Monette has plans
19 for us. I can't," you know, or "I promised Monette I
20 would take her here" or "We are going somewhere."
21     So I just kind of got the impression that she,
22 you know, kind of decided in many cases what they were
23 going to do or not do, and that's why I said I think he
24 deferred to her.
25     Q. Did you ever observe Carl Wescott verbally

Page 46

1 abuse Monette Stephens?
2     A. No.
3     Q. Did you ever observe Carl Wescott humiliate
4 Monette Stephens?
5     A. No.
6     Q. You say that pretty emphatically. Why do you
7 use that tone when I ask that question?
8     A. Well, I just -- Carl was not the type of
9 person who -- I mean, he had a lot of respect for
10 Monette and he had a lot of respect for his child,
11 Alexander, and I just -- he just wouldn't have done
12 that.
13     Q. Did you ever observe Carl Wescott and Monette
14 Stephens speak to each other in front of you?
15     A. During the dinner, yeah, and when we were up
16 in Healdsburg. I mean, they, you know, would verbally
17 exchange comments. I don't recall about what, but it
18 was just sort of probably idle chit-chat.
19     Q. How would you describe the tone of those
20 interactions?
21     A. Affectionate.
22     Q. Do you know anyone named Dan Paskar,
23 P-A-S-K-A-R?
24     A. I don't, no.
25     Q. Okay. Do you know anyone named Steven Cohen,

Page 47

1 C-O-H-E-N?
2     A. I do not.
3     Q. Okay. You have been employed by the Trustee
4 to market the property in Honduras; is that correct?
5     A. That is correct.
6     Q. Is there any debt owing on that property?
7     A. There is debt owed to the architect.
8     Q. And you have already talked about that. That
9 is $110,000 that is owed?
10     A. Yes.
11     Q. In your opinion, what is the value of that
12 property today in Honduras?
13     A. I think it could probably be sold for 1.3.
14     Q. Million?
15     A. Yeah.
16     Q. Okay. And in January of 2012, would you have
17 an opinion about the value of the property?
18     A. January 2012? That would have been a year
19 ago.
20     No, probably not so much, because -- I mean, I
21 would have had a range, because things have been so
22 hectic down there.
23     Q. Do you think --
24     A. The only reason I think that it is where it is
25 today at 1.3 is we have somebody down there who is

Page 48

1 interested and has named -- put that number out.
2     Q. In your opinion, would the property have been
3 worth more than $500,000 in January of 2012?
4     A. Probably.
5     Q. Are you familiar with any other Latin or South
6 American properties that Mr. Wescott owns?
7     A. Only from just hearsay. I know he owns some
8 property in Panama, he owns some in Guatemala, he owns
9 some in Nicaragua. He had -- I know that the property
10 he represented to us that was his project in Ecuador,
11 it turned out that it was really Joe Simonetta's, and
12 we learned that after we came back to the States and
13 started investigating what was going on with him before
14 we filed suit.
15     He owned the property in Uruguay and, to my
16 knowledge, I think that is pretty much it.
17     Q. Would you have an --
18     A. And Honduras.
19     Q. Would you have an opinion -- since you visited
20 the site in Uruguay, would you have an opinion as to
21 the value of that property in January of 2012?
22     A. No, I don't. I wouldn't, because we didn't --
23 you know, I didn't really look at it in that -- I was
24 looking at it more to see if it was real and how far
25 along it was and kind of get a sense from the project

Case: 12-0314   Sup Exhibit D - 34t Hearing and Deposition Transcript 3:5   D-218   of 228
of 26

Page 49

1 manager what kind of issues he was facing. And it
2 turned out he was facing similar issues with getting
3 money, getting paid.
4 Q. So besides Uruguay, did Mr. Wescott ever
5 discuss the development of any of his other properties
6 with you?
7 A. Ecuador. He discussed that frequently because
8 that was his -- what he claimed was his, you know,
9 pride and joy. That was the first one. He represented
10 that as a successful project, and it certainly looked
11 that way from the website that we saw and, you know,
12 what had been done there. We didn't find out until
13 later that that was not really his project as much as
14 he had put some money in it and had promised to raise
15 some more money, which he didn't do.
16 Q. So I think you referred to earlier, that was
17 Joe Simonetta's project?
18 A. Yes.
19 Q. And it was Joe Simonetta who developed that
20 property?
21 A. Absolutely.
22 Q. And all Mr. Wescott had done was put up some
23 money --
24 A. Right.
25 Q. -- for that Ecuadoran property?

Page 50

1 Did you ever learn, did Ms. Stephens ever put
2 up any money for that property?
3 A. I don't know.
4 MS. BARNIER: Okay. I don't have any further
5 questions.
6 MS. GROPPER NELSON: I just have a few.
7 EXAMINATION BY MS. GROPPER NELSON
8 Q. So you said Panama -- I didn't get them all.
9 Panama, Guatemala, Nicaragua, Ecuador,
10 Uruguay. Did I miss any?
11 And Honduras.
12 A. Honduras and Mexico.
13 Q. Mexico. Okay.
14 And you said you held two degrees, correct?
15 A. Yes, ma'am.
16 Q. And neither one of them are in psychology,
17 correct?
18 A. Correct.
19 Q. Okay. And you had a local attorney represent
20 you in the Superior Court case against Mr. Wescott,
21 correct?
22 A. I did, yes.
23 Q. And his name?
24 A. Michael Mazzocone.
25 Q. And do you still have a business relationship

Page 51

1 with that individual?
2 A. Well, I haven't talked to him for a few
3 months.
4 Q. Okay. Do you think he did a good job in that
5 litigation?
6 MS. BARNIER: Objection. That calls for
7 attorney-client privilege.
8 BY MS. GROPPER NELSON:
9 Q. I am not asking for a conversation. Do you
10 have an opinion as to whether or not your attorney
11 represented you well in that litigation?
12 MS. BARNIER: I am still going to object, one,
13 as to --
14 MS. GROPPER NELSON: And I am entitled to a
15 response.
16 MS. BARNIER: You are, but may I please put my
17 objection on the record to which --
18 MS. GROPPER NELSON: You don't represent
19 Mr. Martin.
20 MS. BARNIER: I understand that. I still have
21 the right to object to preserve for the record. If you
22 don't know the rules of a deposition, I will be happy
23 to help you.
24 I object on the rules of relevance.
25 If you know.

Page 52

1 THE WITNESS: Well, if you could explain the
2 relevance to me, that would be helpful.
3 BY MS. GROPPER NELSON:
4 Q. Did you like him as an attorney?
5 A. I did like him, yes.
6 Q. Okay. Did he do a good job for you as an
7 attorney?
8 A. I thought so.
9 Q. Okay. Did he get you a judgment as an
10 attorney?
11 A. I did get a judgment, yes.
12 Q. Okay. And before he filed your complaint, you
13 told him all about Carl Wescott --
14 MS. BARNIER: Objection --
15 BY MS. GROPPER NELSON:
16 Q. -- true?
17 MS. BARNIER: -- it calls for attorney- --
18 BY MS. GROPPER NELSON:
19 Q. I am not asking you what you told him, I am
20 just asking if you told him everything about Carl
21 Wescott.
22 MS. BARNIER: Objection --
23 THE WITNESS: I don't know how to answer that.
24 MS. BARNIER: -- vague --
25 You've got to wait. You've got to wait for

Case: 12-03145   Sup Doc Exhibit D - 341 Hearing and Deposition Transcripts3:5   D-219   Doc 228
of 26

Page 53

1  me.
2      Objection. Vague and ambiguous as to
3  "everything."
4  BY MS. GROPPER NELSON:
5      Q. Okay. Mr. Martin, when you were discussing
6  preparing for a lawsuit against Carl Wescott, did your
7  attorney ask you to tell him everything you felt was
8  relevant -- this is just a "yes" or "no" answer -- that
9  you felt was relevant to him representing you in that
10 case?
11      MS. BARNIER: Objection. It calls for
12 information about the attorney-client privilege.
13      THE WITNESS: Yeah, I would rather not. I
14 would rather not get into this. I don't understand the
15 relevance.
16 BY MS. GROPPER NELSON:
17      Q. Okay. Did he have all of the facts necessary
18 to represent you in that case?
19      MS. BARNIER: Objection. It calls for a--
20      THE WITNESS: Well, that's --
21      MS. BARNIER: -- legal conclusion --
22      THE COURT REPORTER: Hang on, sir.
23      MS. BARNIER: Wait, wait. You've got to wait,
24 Joe. You have to wait, Mr. Martin.
25      Objection. It calls for a legal conclusion.

Page 54

1  BY MS. GROPPER NELSON:
2      Q. Did you sue Monette Stephens in that
3  complaint, Mr. Martin?
4      A. No.
5      Q. And is your judgment against Monette Stephens
6  in that complaint, Mr. Martin?
7      A. No.
8      Q. Okay. Do you feel that you had a right to sue
9  her for recovery?
10      MS. BARNIER: Objection. One, vague and --
11 BY MS. GROPPER NELSON:
12      Q. It's an opinion, Mr. Martin.
13      MS. BARNIER: Excuse me, Ms. --
14      MS. GROPPER NELSON: No, I am speaking now.
15 You can wait.
16 BY MS. GROPPER NELSON:
17      Q. Ms. Barnier's objections are as much as to
18 educate you as to what she wants you to say and what
19 she doesn't want you to say. Her objections
20 unfortunately are what are called speaking objections,
21 which are not actually permitted in a deposition or at
22 trial.
23      Now that I have told you that -- because she
24 is allowed to tell you things in a deposition, just as
25 I am, because you don't have an attorney here and you

Page 55

1  are not her client, just like you are not my client.
2  So neither one of us are entitled to speak on your
3  behalf in this deposition. So I am letting you know
4  that she gets to talk, I get to talk and you can ignore
5  both of us or you can answer both of us. It's your
6  choice.
7      Now that I have said that and it is on the
8  record, if Ms. Barnier wants to continue with her
9  objection, she is entitled to do so.
10      MS. BARNIER: Can you please repeat the
11 question that was asked?
12      (The record was read back as follows:
13      "Question: Okay. Do you feel that you had a
14      right to sue her for recovery?)
15      MS. BARNIER: And I will put my objection on
16 the record. Vague, ambiguous and calls for a legal
17 conclusion.
18      THE WITNESS: Yeah, it is vague.
19 BY MS. GROPPER NELSON:
20      Q. Okay. At the time that you sued Carl Wescott
21 in 2010, do you think that you had any right to recover
22 any monies owed to you by Monette Stephens?
23      MS. BARNIER: Objection. Calls for a legal
24 conclusion.
25      THE WITNESS: There is something I would like

Page 56

1  to point out. It is that in the course of Carl
2  convincing me that we should get involved with him --
3  and one of the reasons I trusted him was that he
4  provided me a net worth statement that had both he and
5  Monette Stephens as being 50 percent owners in business
6  properties in California, two in particular. One was
7  the office building in which they -- which Unexpected
8  Development was headquartered.
9      So, I mean, relevance there? I mean, you
10 know, I kind of looked at her as being a part owner in
11 some of the real estate investments.
12 BY MS. GROPPER NELSON:
13      Q. Okay. So you were looking at the net worth of
14 the family as a whole?
15      A. Well, I was looking at the net worth that he
16 provided, yes.
17      Q. Okay. That's fine.
18      And -- let's see. When you had dinner with
19 them, you had dinner with them in 2007, correct?
20      A. That is correct.
21      Q. Okay. And 2008 maybe?
22      A. No.
23      Q. Just 2007, right?
24      A. Correct.
25      Q. And times were good in 2007, right?

Page 57

1    MS. BARNIER: Objection --
2    THE WITNESS: What do you mean?
3    MS. BARNIER: -- vague and ambiguous.
4    THE WITNESS: I don't know what you mean by
5    that.
6    BY MS. GROPPER NELSON:
7    Q. So by the time that you were being paid by
8    Mr. Wescott from 2007 until 2008, how much did he pay
9    you in totality, do you recall?
10    A. I don't recall. I can figure it out.
11    Q. Generally.
12    A. I mean, I can tell you what the agreement was.
13    Our agreement was that we would be paid a draw of
14    $4,000 a month, consistently, monthly, and then we
15    would accrue 6,000 to an account that would be due and
16    payable at the end of the project or whenever we
17    severed our agreement.
18    Q. Okay. And what were your expenses while you
19    were living -- your personal expenses, what did they
20    total down in Honduras, do you recall?
21    MS. BARNIER: Objection. Relevance.
22    THE WITNESS: I don't recall.
23    BY MS. GROPPER NELSON:
24    Q. Were they greater than $4,000 a month?
25    A. No.

Page 58

1    Q. Were they less than $4,000 a month?
2    A. I would assume, yeah. I mean, we --
3    Q. What's the cost of living down there compared
4    to Miami?
5    MS. BARNIER: Objection. Relevance.
6    THE WITNESS: I don't understand the relevancy
7    either of the question.
8    BY MS. GROPPER NELSON:
9    Q. Did you ever have net profit out of that
10    $4,000 a month above and beyond your personal living
11    expenses?
12    MS. BARNIER: Objection. Relevance.
13    THE WITNESS: Yeah, that's -- I don't find
14    that relevant and I think the use of the word "profit"
15    is not the right word --
16    MS. GROPPER NELSON: Okay. I appreciate that.
17    THE WITNESS: -- to use there.
18    BY MS. GROPPER NELSON:
19    Q. So after paying your personal expenses on a
20    monthly basis, were there ever months when you had
21    money left over out of that $4,000?
22    MS. BARNIER: Objection. Relevance. It goes
23    to his personal means, which is not what he is being
24    deposed about.
25    ///

Page 59

1    BY MS. GROPPER NELSON:
2    Q. It is a "yes" or "no" answer, sir.
3    And I will explain the relevance. Bear with
4    me on this, okay?
5    A. What relevance?
6    Q. Well, if he was paying you and you were
7    comfortable with it and you met with him and his wife,
8    the likelihood that they were experiencing financial
9    difficulties would influence how families interact with
10    each other, wouldn't you agree with that?
11    A. I don't know. I don't have a degree in
12    psychology.
13    Q. You don't have an opinion about that, right?
14    A. (No verbal response.)
15    Q. So at the time that you had dinner with them,
16    they were interacting in a pleasant way, correct?
17    MS. BARNIER: Objection. Misstates his --
18    MS. GROPPER NELSON: She has already -- he has
19    already spoken to this.
20    MS. BARNIER: No -- he has, but if I may,
21    Counsel, it misstates his previous testimony.
22    MS. GROPPER NELSON: Okay. Will you read me
23    the testimony that Mr. Martin had on the record about
24    the interaction between Mr. Wescott and Ms. Stephens at
25    the two dinners and one lunch?

Page 60

1    Am I correct on that one?
2    THE WITNESS: Correct. That is fine.
3    MS. GROPPER NELSON: Okay. Thank you.
4    THE COURT REPORTER: Do you want to take a
5    break?
6    MS. GROPPER NELSON: Sure.
7    THE COURT REPORTER: I am going to have to go
8    back quite a ways and look for that, unless you want to
9    wait.
10    MS. GROPPER NELSON: I don't mind waiting.
11    (Pause in the proceedings while the court
12    reporter reviews the testimony for the requested
13    portion to be read back.)
14    (Discussion held off the record.)
15    (Recess taken, 4:08 p.m. to 4:10 p.m.)
16    (Discussion held off the record.)
17    (The record was read back as follows:
18    "Question: Is there any time else where you
19    were present and Ms. Stephens was present
20    regarding the discussion of the project in
21    Honduras?
22    "Answer: One other time, and that was two
23    days later on the 5th of October, I believe.
24    It was a lunch that Carl had called, that he
25    had scheduled. Monette, Carl, there was two

Case: 12-0314Sup DExhibit D - 34tcHearing and DepositionTranscripts3:5D-22agt228
of 26

Page 61

| | |
|---|---|
| 1 | other couples -- the Matthesens and the |
| 2 | Matusows -- and Leigh and myself. So there |
| 3 | were eight of us that were at the Tres Agaves |
| 4 | Restaurant here in San Francisco for lunch" -- |
| 5 | MS. GROPPER NELSON: That is fine. Thank you. |
| 6 | BY MS. GROPPER NELSON: |
| 7 | Q. Mr. Martin, at the time that you were present |
| 8 | at the Tres Agaves Restaurant, do you recall who paid |
| 9 | for that lunch? |
| 10 | A. Carl. |
| 11 | Q. Okay. And did he hesitate in any way for |
| 12 | paying for that lunch, to the best of your |
| 13 | recollection? |
| 14 | A. I don't recall him hesitating. |
| 15 | Q. Did he ask anyone for any money to help pay |
| 16 | for that lunch? |
| 17 | A. Not to my knowledge. |
| 18 | Q. Okay. And he interacted with Monette during |
| 19 | the course of that lunch, correct? |
| 20 | A. I don't recall. I was seated at one end of |
| 21 | the table, so I don't know. |
| 22 | Q. So there were about eight people at that |
| 23 | lunch? |
| 24 | A. Right. |
| 25 | Q. So everyone was interacting with each other? |

Page 62

| | |
|---|---|
| 1 | A. Yeah. We were mostly presenting or giving |
| 2 | details of the project. |
| 3 | Q. And when you say "we," do you mean -- |
| 4 | A. Leigh and I. |
| 5 | Q. -- you and your wife? |
| 6 | A. Exactly. |
| 7 | Q. And so you were explaining to all of them what |
| 8 | you were doing in Honduras? |
| 9 | A. Right, and what our plan was. |
| 10 | Q. And you were explaining this as much to |
| 11 | Monette as to everyone else at the table, correct? |
| 12 | A. To everyone that was there, right -- |
| 13 | Q. Okay. |
| 14 | A. -- and answering their questions, you know. |
| 15 | Q. And did she ask you many questions, do you |
| 16 | recall? |
| 17 | A. I don't recall. |
| 18 | Q. Okay. And at the dinner that you had at their |
| 19 | home, if I recall correctly, you said you were |
| 20 | explaining the project at that point in time as well. |
| 21 | A. Right. |
| 22 | Q. And you used the plural again in that |
| 23 | statement. You said "we," and I am assuming that |
| 24 | refers to you and your wife again -- |
| 25 | A. Yes. |

Page 63

| | |
|---|---|
| 1 | Q. -- is that correct? |
| 2 | A. Correct. |
| 3 | Q. And do you recall if Monette asked you many |
| 4 | questions about the project? |
| 5 | MS. BARNIER: Objection. Asked and answered. |
| 6 | BY MS. GROPPER NELSON: |
| 7 | Q. You are entitled to answer the question, sir. |
| 8 | A. I think I did answer it earlier. |
| 9 | Q. Did she ask you many questions? |
| 10 | A. She asked questions. |
| 11 | Q. How many, do you recall? |
| 12 | A. I answered earlier that she asked, "Do you |
| 13 | think that it is a good property" -- |
| 14 | Q. Right. |
| 15 | A. -- and "Do you think it would be a successful |
| 16 | project?" |
| 17 | Q. So one or two questions. |
| 18 | A. And then she did -- we recall, both my wife |
| 19 | and I recall, she asked what we thought of the |
| 20 | nightlife and the city itself. |
| 21 | Q. Just asking about the environment -- |
| 22 | A. Right, exactly. |
| 23 | Q. -- and the locale? |
| 24 | A. Right. |
| 25 | Q. Okay. And so other than those few questions |

Page 64

| | |
|---|---|
| 1 | at that dinner and being a part of a group at Tres |
| 2 | Agaves and asking questions there, were there any other |
| 3 | occasions when you personally received questions |
| 4 | concerning the project directly from Monette Stephens? |
| 5 | A. No. |
| 6 | Q. Did you ever send her any specific reports |
| 7 | concerning the project? |
| 8 | A. No. |
| 9 | Q. Did she ever send you any directions on how to |
| 10 | proceed with the project? |
| 11 | A. No. |
| 12 | Q. When did you leave Compuware? |
| 13 | A. I left in the end of May of -- well, I forget |
| 14 | the exact date, but it was the last week of May, I |
| 15 | believe, or two weeks before the end of May. |
| 16 | Q. 2007? |
| 17 | A. Of 2007, yes. |
| 18 | Q. Do you recall what your gross income was for |
| 19 | 2007, sir? |
| 20 | MS. BARNIER: Objection. Relevance. |
| 21 | THE WITNESS: I don't find that to be |
| 22 | relevant. |
| 23 | BY MS. GROPPER NELSON: |
| 24 | Q. It is relevant insofar as you are alleging |
| 25 | that you were making a great deal of money prior to |

Case: 12-03145 Sup. Doc Exhibit D - 34 to Hearing and Deposition Transcripts 3:5 D-222 of 228
of 26

Page 65

1 your relationship with Carl Wescott.
2     MS. BARNIER: Objection. Relevance.
3 BY MS. GROPPER NELSON:
4     Q. I am entitled to your response, sir. She is
5 entitled to object and I am entitled to a response.
6     A. I will --
7     MS. BARNIER: If you so choose.
8     THE WITNESS: I will put it to you this way:
9 I was making more money than we agreed that we would
10 get on a guaranteed basis.
11 BY MS. GROPPER NELSON:
12     Q. Okay. Were you making more than 50,000?
13     A. Yes.
14     MS. BARNIER: Objection. Relevance.
15 BY MS. GROPPER NELSON:
16     Q. I am entitled to a response, sir. Ms. Barnier
17 is entitled to object.
18     A. A lot more.
19     Q. Were you making more than 200,000?
20     MS. BARNIER: Objection. Relevance.
21     THE WITNESS: That, I am not going to answer.
22 BY MS. GROPPER NELSON:
23     Q. Were you making six figures?
24     A. Yes.
25     Q. Were you making mid six-figures or low

Page 66

1 six-figures?
2     MS. BARNIER: Objection. Relevance.
3 BY MS. GROPPER NELSON:
4     Q. Again, she is -- the process is that an
5 attorney is entitled to object --
6     A. I understand.
7     Q. -- but the deponent is still obligated to
8 answer the question.
9     A. But this is all personal information that I --
10     Q. I am not asking for direct numbers, I am
11 asking for a range.
12     A. And the last question was, was it was
13 six-figures -- mid six-figures?
14     Q. Yes.
15     A. At least, yes.
16     Q. Okay. Thank you.
17     Other than Compuware, had you worked for
18 anyone else from 2004 to 2007?
19     A. No.
20     Q. Okay. From the period of 2004 through to
21 2007, you said you had some contact with Carl Wescott
22 but not much.
23     A. Uh-huh.
24     MS. BARNIER: I am going to tell you, you have
25 to answer "yes" or "no" for the court reporter,

Page 67

1 Mr. Martin.
2     THE WITNESS: Oh, okay. Yes.
3 BY MS. GROPPER NELSON:
4     Q. Okay. Were those contacts mutually -- did you
5 both initiate those contacts or did one of you initiate
6 it more than the other?
7     A. They were mutual.
8     Q. Okay. You called yourself the operating
9 partner for the Honduran property; is that correct?
10     A. Correct.
11     Q. What does that generally mean?
12     A. That generally means that that's the person
13 who is doing the management of the development project,
14 providing the work to get the development further
15 along. The general partner is usually somebody that
16 provides the funding.
17     Q. And you reported to Carl about the progress of
18 the project; is that correct?
19     A. Yes, correct.
20     Q. Did you ever report to Monette about the
21 project's progress?
22     A. No, not directly.
23     Q. Do you speak Spanish?
24     A. Un poquito.
25     Q. Un poquito mal.

Page 68

1     How would you communicate with the Honduran
2 officials?
3     MS. BARNIER: Objection. Relevance.
4     THE WITNESS: I don't understand the relevance
5 really, but --
6 BY MS. GROPPER NELSON:
7     Q. How did you -- how would you communicate with
8 Honduran officials?
9     A. You just -- either somebody there spoke
10 English or we would have a translator.
11     Q. Okay. And you found all of the attorneys in
12 Honduras?
13     A. Yes.
14     Q. Okay. Did Carl introduce you to any of the
15 attorneys in Honduras?
16     A. No.
17     Q. So you introduced him to Mr. Hasz, correct?
18     A. Yes.
19     Q. And how did you find Mr. Hasz?
20     A. I found Mr. Hasz through the business partner
21 that I had that -- that we had co-invested in property
22 in Roatán. Mr. Hasz is an American from Colorado who
23 has a real estate firm down in Roatán.
24     Q. How do you spell Roatán?
25     A. R-O-A-T-A-N.

Case: 12-0314 Sup D Exhibit D - 34t Hearing and Deposition Transcripts 3:5 D-223 of 228
of 26

Page 69

| | |
|---|---|
| 1 | Q. Thank you. |
| 2 | Do you still have that property? |
| 3 | MS. BARNIER: Objection. Relevance. |
| 4 | BY MS. GROPPER NELSON: |
| 5 | Q. I'm sorry? |
| 6 | A. Well, I mean, what is the relevance of the |
| 7 | question? |
| 8 | Q. Do you still have that property? |
| 9 | A. I know you are asking me that, but -- |
| 10 | Q. I am entitled to an answer, sir. |
| 11 | A. Well, I -- |
| 12 | Q. I am entitled to ask questions that are |
| 13 | capable of leading to the discovery of any information |
| 14 | relevant to this matter. So Ms. Barnier is entitled to |
| 15 | object as to relevance, but I am still entitled to ask |
| 16 | the question and you are still obligated to answer it. |
| 17 | MS. BARNIER: Let me go a little further with |
| 18 | that. |
| 19 | You have a choice to answer or not. And just |
| 20 | so you understand, Mr. Martin, that she then has the |
| 21 | right to go into the court and ask the court to |
| 22 | instruct you to answer questions. I would add that |
| 23 | since you are here visiting -- I will inform you of |
| 24 | this -- in order to take your deposition again, it |
| 25 | would have to be taken in Florida. So you can answer |

Page 70

| | |
|---|---|
| 1 | however you choose. |
| 2 | MS. GROPPER NELSON: And unfortunately, |
| 3 | Ms. Barnier is only partially right. |
| 4 | Because you are here on her deposition notice |
| 5 | and you are in California, the court can order you |
| 6 | to come back or the court could say to me, no, he |
| 7 | doesn't have to come back. If you want to take it, go |
| 8 | to Florida. |
| 9 | So it wouldn't be her decision, it wouldn't be |
| 10 | my decision, it would be up to the court. |
| 11 | MS. BARNIER: And once again, poor |
| 12 | Ms. Stephens [sic] has a difficulty understanding the |
| 13 | concept. I didn't say that it was my decision or her |
| 14 | decision. I said the court, if she made such a motion, |
| 15 | could order that you would have to. But the rules are, |
| 16 | because you are outside the state and you are visiting |
| 17 | here -- |
| 18 | THE WITNESS: Uh-huh. |
| 19 | MS. BARNIER: -- she would have to or I would |
| 20 | have to travel to Florida, because you are outside a |
| 21 | certain jurisdiction, but we probably are going to |
| 22 | disagree on this also. |
| 23 | Let's try and conclude this deposition. So |
| 24 | it's up to you how you want to answer a question. You |
| 25 | are not a party, you are a third person in terms of |

Page 71

| | |
|---|---|
| 1 | being deposed. |
| 2 | MS. GROPPER NELSON: Actually, sir, you are an |
| 3 | agent of a party and, therefore, you are -- I am |
| 4 | entitled to the question [sic]. You are the agent for |
| 5 | the Trustee in the sale of the property, and she has |
| 6 | asked the court to approve you as her agent down there. |
| 7 | So actually her representation about you not |
| 8 | being a party is not completely accurate. Nonetheless, |
| 9 | it is simply a "yes" or "no" answer. |
| 10 | BY MS. GROPPER NELSON: |
| 11 | Q. Do you still own the property on Roatán? |
| 12 | A. I do. |
| 13 | Q. Thank you. |
| 14 | Is Mr. Hasz still in Honduras? |
| 15 | A. Yes. |
| 16 | MS. BARNIER: Objection. Relevance. |
| 17 | THE WITNESS: As far as I know. |
| 18 | BY MS. GROPPER NELSON: |
| 19 | Q. Do you have any contact with him? |
| 20 | MS. BARNIER: Objection. Relevance. |
| 21 | THE WITNESS: I don't know what you mean by |
| 22 | that really. |
| 23 | BY MS. GROPPER NELSON: |
| 24 | Q. Have you spoken with him in the last six |
| 25 | months? |

Page 72

| | |
|---|---|
| 1 | A. No. |
| 2 | Q. Have you spoken with him in the last year? |
| 3 | A. No. |
| 4 | Q. Do you know how to reach him? |
| 5 | A. I do. |
| 6 | Q. Do you have his telephone number handy? |
| 7 | A. I have it, yes. |
| 8 | Q. Can you -- do you have your cell phone with |
| 9 | you? |
| 10 | A. I do. |
| 11 | Q. Is it on your cell phone? |
| 12 | A. I doubt it. |
| 13 | Q. Can we look -- can you look? |
| 14 | A. I can look. |
| 15 | MS. BARNIER: I would suggest in the interest |
| 16 | of time, I believe in the documents that were |
| 17 | provided -- |
| 18 | MS. GROPPER NELSON: I want this on the |
| 19 | record. Thank you, Ms. Barnier. I appreciate your |
| 20 | information. |
| 21 | THE WITNESS: Contacts. Yes, I have his phone |
| 22 | number. |
| 23 | BY MS. GROPPER NELSON: |
| 24 | Q. May I have it, sir? |
| 25 | A. Well, there are several numbers. I don't know |

Case: 12-0314    Sup D Exhibit D - 34t   Hearing and Deposition Transcripts 3:5D-224 of 228
of 26

Page 73

1  which one you want.
2  Q. Do you have his office number?
3  A. I have several numbers. One rings in the U.S.
4  and is forwarded. And then I have his Honduran number,
5  which is 01 --
6  Q. Why don't we get his U.S. forwarding number.
7  A. 970- --
8  Q. 970.
9  A. -- -300- --
10  Q. 300?
11  A. Yes.
12  -4078.
13  Q. -4078?
14  A. Yeah.
15  Q. And what's his Honduras number, please?
16  A. 504-445-5037.
17  Q. Great. I appreciate it. Thank you.
18  Does your wife work?
19  MS. BARNIER: Objection. Relevance.
20  THE WITNESS: Does she work? Yeah, she works.
21  Doesn't every wife work?
22  BY MS. GROPPER NELSON:
23  Q. Yes.
24  A. Okay.
25  Q. But does she work outside of the home and

Page 74

1  receive a pay stub?
2  MS. BARNIER: Objection. Relevance.
3  THE WITNESS: I am not going to answer that.
4  BY MS. GROPPER NELSON:
5  Q. Does she receive an income from sources
6  outside of the home?
7  MS. BARNIER: Objection. Relevance.
8  THE WITNESS: I don't understand the relevance
9  of that one.
10  BY MS. GROPPER NELSON:
11  Q. She was part of this project, wasn't she?
12  A. She was.
13  Q. Did she receive money from this project?
14  A. We both did.
15  Q. Okay.
16  A. I mean, not separately but together.
17  Q. Okay. Is she assisting you on behalf of the
18  Trustee?
19  A. I guess as much as -- you know, she knows what
20  the project was about and we both worked together on
21  it. She would have some knowledge and we would share
22  information, yes.
23  MS. BARNIER: I am going to --
24  BY MS. GROPPER NELSON:
25  Q. Where are you currently --

Page 75

1  MS. BARNIER: -- object, if I may.
2  THE WITNESS: Okay.
3  MS. BARNIER: That wasn't her question.
4  THE WITNESS: Okay.
5  MS. BARNIER: Could you ask the question
6  again?
7  MS. GROPPER NELSON: No, that's fine. I am
8  fine with it. If you want to ask him questions when I
9  am done, you are welcome to do so.
10  MS. BARNIER: But that wasn't the question you
11  asked him.
12  MS. GROPPER NELSON: That's okay. I didn't
13  object to his response. If you want to ask him
14  questions when I am done, you are welcome to do so.
15  MS. BARNIER: So generous of you.
16  BY MS. GROPPER NELSON:
17  Q. What are you currently doing on behalf of the
18  Trustee in relationship to the property, sir?
19  A. Working on selling it.
20  Q. And how is it that you are going about doing
21  that, please?
22  A. I am working through a law firm to make sure
23  that everything is legally taken care of so that we can
24  market this property on behalf of the Trustee.
25  Q. And what law firm are you going through?

Page 76

1  A. I am not telling you that.
2  Q. Why?
3  A. I don't think it is relevant.
4  Q. What is the name of the law firm?
5  MS. BARNIER: It is in the record.
6  THE WITNESS: You just asked that.
7  It is in the record?
8  MS. BARNIER: It is in the record, yes --
9  THE WITNESS: Okay.
10  MS. BARNIER: -- and the attorney has been
11  employed, so she can find it on the docket if you don't
12  remember all the information.
13  THE WITNESS: Then look it up. I mean --
14  MS. GROPPER NELSON: Well, let the record
15  reflect that the deponent is not responding to a
16  question for which he has the answer and has knowledge
17  of the answer and is taking directions from Ms. Barnier
18  directing him not to respond --
19  THE WITNESS: Well, let me --
20  MS. GROPPER NELSON: -- alleging that it is in
21  the record, but as Ms. Barnier is well aware, the
22  deponent is obligated to answer a question for which he
23  has the response unless there is a privilege or a basis
24  on which to refuse to answer --
25  MS. BARNIER: If you know.

Case: 12-03140 Doc Exhibit D - 34th Hearing and Deposition Transcripts 3:5D-225 of 228 of 26

Page 77

1    MS. GROPPER NELSON: -- so to the extent that
2  Mr. Martin knows the answer to the question, Mr. Martin
3  should provide the answer without coaching from
4  Ms. Barnier.
5         MS. BARNIER: I am going to object to that
6  soliloquy, because: One, I am not coaching; two, I
7  just filed objections, which I am entitled to do. I
8  have not directed Mr. Martin to answer or not answer.
9  That is his right or privilege whether he so chooses.
10        And so -- however, Mr. Martin, I would suggest
11 if you know the answer -- because it is quite easy
12 for --
13        THE WITNESS: To tell her the answer.
14        MS. BARNIER: -- counsel to go look it up on
15 the docket if she so chooses. So if you know the
16 answer, tell her the name of the law firm.
17        THE WITNESS: Central Law in San Pedro Sula.
18        MS. GROPPER NELSON: Okay. Thank you.
19        THE WITNESS: It is in the record.
20 BY MS. GROPPER NELSON:
21    Q. And will you say the name of the city again,
22 please?
23    A. San Pedro Sula.
24    Q. San Pedro Sula?
25    A. Sula.

Page 78

1    Q. How big a city is that, please?
2         MS. BARNIER: Objection. Relevance.
3         THE WITNESS: It is the second largest city in
4  the country.
5  BY MS. GROPPER NELSON:
6    Q. Where in Honduras do you live, please?
7         MS. BARNIER: Objection. Misstates his
8  previous testimony, Counsel.
9  BY MS. GROPPER NELSON:
10    Q. Do you live in Honduras?
11    A. No, I do not.
12    Q. How frequently do you go to Honduras?
13    A. I haven't been back.
14    Q. When was the last time you were there, please?
15    A. January of 2010.
16    Q. To whom are you marketing the sale of the
17 property?
18        MS. BARNIER: Objection. Relevance. This
19 goes to the Trustee's powers.
20 BY MS. GROPPER NELSON:
21    Q. To whom are you marketing the sale of the
22 property?
23    A. To whoever is interested.
24    Q. And how is it that you are marketing those
25 sales?

Page 79

1    A. How do you mean by "how is it"?
2    Q. What tools are you using in the marketing
3  process?
4    A. My knowledge of the project, putting together
5  the description and the marketing of the property.
6    Q. Are you doing it on the Web -- on the
7  Internet?
8    A. I haven't --
9         MS. BARNIER: Objection. Relevance.
10        THE WITNESS: I really haven't started that
11 part of it yet.
12 BY MS. GROPPER NELSON:
13    Q. What have you started?
14        MS. BARNIER: Objection. Relevance as to the
15 importance of what he is doing.
16 BY MS. GROPPER NELSON:
17    Q. What have you started, please?
18    A. Well, you already asked me the question and I
19 told you. Working with the attorneys, with the law
20 firm.
21    Q. And what is it you are doing with the
22 attorneys?
23    A. Getting the legal situation straightened out
24 so we can market this project.
25    Q. They are doing the legal work, correct?

Page 80

1    A. That is correct.
2    Q. So what is it that you are doing with them to
3  assist them in getting the legal work done?
4         MS. BARNIER: And now I am going to object and
5  instruct you not to answer. You are an employee of the
6  Trustee and that is an attorney-client privilege.
7  Don't answer.
8         THE WITNESS: All right.
9         MS. GROPPER NELSON: Mark the question,
10 please. Thank you.
11 BY MS. GROPPER NELSON:
12    Q. How frequently do you speak with the law firm,
13 please?
14        MS. BARNIER: Objection. Relevance.
15        THE WITNESS: I couldn't tell you.
16 BY MS. GROPPER NELSON:
17    Q. Do you speak with them on a daily basis?
18    A. No.
19    Q. Do you speak with them every week?
20    A. No.
21    Q. Do you speak with them more than three times a
22 month?
23    A. It depends.
24    Q. What does it depend upon?
25    A. It depends on their progress.

Case: 12-0314 Sup D Exhibit D - 34t Hearing and Deposition Transcript 3:5 D-226 of 228
of 26

Page 81

| | |
|---|---|
| 1 | Q. Okay. Do they call you or do you call them? |
| 2 | MS. BARNIER: Objection. Relevance. |
| 3 | THE WITNESS: It would depend upon the |
| 4 | situation. I -- |
| 5 | BY MS. GROPPER NELSON: |
| 6 | Q. How frequently do you call them? |
| 7 | A. Not very frequently. |
| 8 | Q. Okay. Do they call you more than you call |
| 9 | them? |
| 10 | A. I don't know really. I don't know. |
| 11 | Q. Okay. You don't know. |
| 12 | Have they called you in the past week? |
| 13 | A. No. |
| 14 | Q. Have they called you in the past month? |
| 15 | A. No. |
| 16 | Q. Have they called you in February 2013? |
| 17 | A. Now, when you say "called," do you mean |
| 18 | correspond or do you mean called on the telephone or -- |
| 19 | Q. No, I will get to correspondence -- |
| 20 | A. No. |
| 21 | Q. -- but have they called you in February? |
| 22 | A. No. |
| 23 | Q. No. Do they send you e-mails regularly? |
| 24 | A. Uh-huh. |
| 25 | MS. BARNIER: Mr. Martin, you need to answer |

Page 82

| | |
|---|---|
| 1 | "yes" or "no." |
| 2 | THE WITNESS: Yes. |
| 3 | MS. GROPPER NELSON: Thank you. |
| 4 | BY MS. GROPPER NELSON: |
| 5 | Q. And do you get e-mails from them on a weekly |
| 6 | basis? |
| 7 | A. No, not on a weekly basis. |
| 8 | Q. Okay. Within the past month, how many e-mails |
| 9 | have you gotten from them? |
| 10 | A. I don't know. Maybe a half-dozen. |
| 11 | Q. Okay. And is the usual course of |
| 12 | communication by way of e-mails? |
| 13 | A. Yes. |
| 14 | Q. Okay. And how is your health? |
| 15 | A. How is my health? |
| 16 | Q. Uh-huh. |
| 17 | A. Other than this whopping cough? |
| 18 | Q. Yeah. |
| 19 | A. It is pretty good. |
| 20 | Q. Well, that's good. |
| 21 | Okay. And Ms. Barnier didn't ask you at the |
| 22 | beginning of the deposition, but you are not on any |
| 23 | kind of medication that would have impaired your |
| 24 | ability to understand the questions being posed to you |
| 25 | today -- |

Page 83

| | |
|---|---|
| 1 | A. No. |
| 2 | Q. -- correct? |
| 3 | Okay. Do you know why Carl Wescott put |
| 4 | Monette Stephens in the forwarding of these e-mails |
| 5 | that Ms. Barnier entered in as exhibits? |
| 6 | A. I do not. |
| 7 | Q. Do you know why he put your wife on the |
| 8 | forwarding of these? |
| 9 | A. Because he was wanting -- well, it depends on |
| 10 | the date. But the ones that were before we made the |
| 11 | agreement, because he wanted us both to be involved in |
| 12 | this project and so he was keeping us informed. I had |
| 13 | told him early on -- I said that if we do come to an |
| 14 | agreement, it is going to be have to be one that my |
| 15 | wife is in agreement with or it won't happen. You |
| 16 | know, it is a team thing. |
| 17 | Q. Did your wife have much opportunity to |
| 18 | interact with Monette Stephens on the evenings that you |
| 19 | had dinner with her? |
| 20 | A. Just the one evening that we had dinner. And |
| 21 | it was very brief, because Monette was cooking dinner. |
| 22 | Q. Okay. Do you recall how old the child was? |
| 23 | A. He -- I want to say he was either a year or |
| 24 | less than a year old. |
| 25 | Q. So still a baby? |

Page 84

| | |
|---|---|
| 1 | A. Yeah, he was a baby. |
| 2 | MS. GROPPER NELSON: Okay. I have no further |
| 3 | questions -- |
| 4 | MS. BARNIER: That will conclude -- |
| 5 | MS. GROPPER NELSON: -- at this time. |
| 6 | MS. BARNIER: That will conclude this |
| 7 | deposition. |
| 8 | (Deposition was concluded at 4:37 p.m.) |
| 9 | --oOo-- |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | JOE MARTIN |
| 15 | |
| 16 | Date |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Case: 12-0314 Sup D Exhibit D - 34t Hearing and Deposition Transcripts 3:5 D-227 of 228
of 26

Page 85

1   STATE OF CALIFORNIA

2   COUNTY OF MARIN

3       I, Kimberly K. Elwell, duly authorized to
    administer oaths pursuant to Section 2093(b) of the
4   California Code of Civil Procedure, do hereby certify
    that:

5               JOE MARTIN

6

7   the witness in the foregoing deposition, was duly sworn
    by me to testify to the truth in the within entitled
8   cause; that said deposition was taken at the time and
    place as set forth; that the testimony of said witness
9   was reported by me, a Certified Shorthand Reporter and
    a disinterested person, and was thereafter transcribed
10  by computer under my direction into booklet form; that
    the witness was given an opportunity to read and
11  correct said deposition and to subscribe to the same.

12      I further certify that I am not of counsel or
    attorney for either or any of the parties in the
13  foregoing deposition and caption named, nor in any way
    interested in the outcome of the cause named in said
14  caption.

15      Executed April 26, 2013, at San Rafael,
    California.

16

17

18

19
        KIMBERLY K. ELWELL, CSR 12980
20

21

22

23

24

25

WEST COAST REPORTERS, INC.
110 PAUL DRIVE, SUITE A
SAN RAFAEL, CALIFORNIA 94903
1-800-972-2361 • (415) 472-2361
FAX (415) 472-2371

May 3, 2013

To:   Joe Martin
      4321 Timothy Drive
      Merritt Island, FL 32953

Re:   Hoskins vs. Wescott, et al.

Dear Mr. Martin:

Please be advised that the original transcript of your
deposition, taken on April 17, 2013, in the above
matter, has been completed and is now ready for your
review by appointment in our San Rafael office.

In the alternative, you may choose to discuss this
matter with one of the attorneys in this case about
providing you a copy, and/or to determine if counsel
requires that the original transcript of your
deposition be read, corrected and signed by you before
it is sealed.

Your rights regarding signature of this deposition are
contained in the Code of Civil Procedure and the
original deposition transcript will be sealed after 35
days from the date of this letter and thereafter sent
to the noticing attorney.

Very truly yours,

KIMBERLY K. ELWELL, CSR

CC:   Original transcript
      All Counsel

Case: 12-0314  Sup Exhibit D - 341 Hearing and Deposition Transcripts  D-228 of 228
                                    of 26