Sheila Gropper Nelson, SBN 85031
Law Office of Sheila Gropper Nelson
260 California St., Suite 1001
San Francisco, CA 94111
Telephone: (415) 362-2221
Email: SheDoesBKLaw@aol.com
Attorney for Debtor Monette Stephens

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
(San Francisco Division)

In re
CARL ALEXANDER WESCOTT &
MONETTE ROSEMARIE STEPHENS,
Debtors.

Case Number  12-30143
APN                12-03148
DECLARATION OF SHEILA GROPPER NELSON
OF ERRATA TO THE POST TRIAL BRIEF,
TABLE OF AUTHORITIES & TRANSCRIPT
PAGES & EXCERPTS

Trial Dates:    Oct. 2 & 3 & Nov. 4,  2013

JANINA M. HOSKINS, TRUSTEE IN
BANKRUPTCY OF THE ESTATE OF
CARL ALEXANDER WESCOTT &
MONETTE ROSEMARIE STEPHENS,
Plaintiff,
v.
MONETTE ROSEMARIE STEPHENS,
Defendant.
_____/

Place:          22nd Floor
United States Bankruptcy Court
235 Pine St, 22nd Fl, S F CA 94104

        I, Sheila Gropper Nelson, declare:

1.      I am an attorney at law duly licensed to practice before this Court and I am not a

party in the above referenced action.  I know the information set forth herein of my own

personal knowledge, except as to matter set forth on information and belief, and as to that

matter I believe it to be true. If called as a witness I could and would testify competently

thereto.

APN 12-03148/BK 12-30143
dcl /Re Post Trial Brief

Page 1 of 3

2.      Attached hereto and incorporated herein is a Table of Authorities for the Post Trial Brief.

3.      Attached hereto and incorporated by reference are true and correct pages of Trial Court Transcripts as referenced in the Post Trial Brief from Trial Transcripts from October 2, October 3, and November 4, 2013.

3.      Attached hereto and incorporated by reference are true and correct copies of transcript pages from the Deposition of Trustee Janina Hoskins, plaintiff.

4.      Attached hereto and incorporated herein by reference are true and correct copies of excerpts from Plaintiff's Exhibits Numbers 68 & 69. Throughout all of Ms. Stephens' deposition of March 15, 2013 she testified to her fears regarding Mr. Wescott and his control and anger. Attaching all of those excerpts from Plaintiff's Exhibit 75 would be overwhelming.

5.      Attached hereto and incorporated herein are true and correct copies of an excerpt for Plaintiff's Exhibit Number 54, Bates Stamped pages 0000144-0000145 Transcript of 341 Meeting conducted on March 21, 2012.

6.      There are errata for the brief as follows:

    [a]    The reference on Page 13 line 14 of the Post Trial Brief to testimony from **October 2, 2013 pg. 138 L.18-22** should be corrected to be a reference to testimony from **October 3, 2013 pgs. 138-140** and **pg. 142 L1-5**. Only the corrected pages referenced are attached.

    [b]    There is a hanging footnote on Page 10 Line 12 "footnote 1". There is no footnote for that page and the reference should be disregarded.

    [c]    There is a reference to a page in the Deposition of Trustee Hoskins. The references and pages are for Pg 160, Line 22-25 and in the Post Trial Brief on page 5 line 21 counsel's remarks during Trustee's deposition appear on Pg 142 Line 14-15. Ms. Hoskin's deposition transcript was not entered into evidence.

    [d]    the word Career is misspelled on Pg. 6 Line 2 and should be read as "Career" and not "Carrier".

Case: 12-03148   Doc# 131   Filed: 03/03/14   Entered: 03/03/14 17:49:41   Page 2 of 33

[e]     Reference to Trial Transcript 11/4/13 **Page 161, Lines 2-6** on page 15 line 7 of the Post Trial Brief should be corrected to reference **Page 151 lines 2-6 of the 11/4/13 Trial Transcript.** Only the corrected page reference are attached.

7.     I have personally reviewed a post trial police report filed with the San Francisco Police Department following Mr. Wescott's physical assault of Ms. Stephens in late January, 2014. The report, and a resulting restraining and stay away order, issued by the San Francisco Superior Court, are each consistent with the existence of abuse identified in throughout the case and in the post trial brief. Both the police report and restraining and stay away order are each the direct result of Mr. Wescott's punching and assaulting Ms. Stephens, causing her to suffer black eyes, contusions, facial fracture of her orbital bone, contusions to her jaw and damage to her right ear drum after he kicked her in her right ear. (She suffered immediate damage to her ear drum but not long term damage.) This conduct occurred despite Mr. Wescott's complete absence from the underlying bankruptcy proceeding and continues to demonstrate the existence of domestic violence identified throughout the case and trial.

Executed this 3rd day of March, 2014 under penalty of perjury pursuant to the laws of the State of California.

Dated   March 3, 2014                     By:___/s/ Sheila Gropper Nelson_____
                                                          Sheila Gropper Nelson
                                                          Attorney for Monette Stephens

Case: 12-03148   Doc# 131   Filed: 03/03/14   Entered: 03/03/14 17:49:41   Page 3 of 33

## Table of Authorities:

### Cases

*Dunzweiler v. Superior Court* (1968) 267 Cal App 2d 569, 575 _____ 4

*Guidery v. Green*, 95 Cal. 630 _____ 4

*In re Marriage of Balkin*, 212 Cal.App. 3d, 66 (1989); _____ 9

*In re Marriage of Balkoff*, 141 Cal.App. 4th 1509 _____ 9, 10, 15

*Marr v. Rhodes* 131 Cal 267 (1910) _____ 4

Silver Orgs. Frank _____ 4

*Stratton v. Wilson* (In re Wolf), 2007 Bankr. LEXIS 2736 _____ 8, 10

### Statutes

*11 USC Section 727* _____ 1

CCP Section 426.50 _____ 4

*CCC 1569* _____ 8

*CCC 1565* _____ 9

*CCC 1567* _____ 9

*Cal. Fam. Code* § 850 et seq. _____ 7

*Cal. Fam. Code* § 852 _____ 8

*Cal. Fam. Code* § 852(a) _____ 7

*Fed. Rules* Civil Proc. 15 _____ 4, 5

*Fed. Rules* Civil Proc. 15(b) _____ 4

*Fed. Rules* Bankr Proc. 7015 _____ 5

*Fed. Rules* Bankr Proc. 7008 _____ 5

### Treatises

*California Civil Jury Instructions* (CACI) 333. *Affirmative Defense—Economic Duress* _____ 3

*Ladd, Expert Testimony*, 5 Vand. L. Rev. 414, 418 (1952) _____ 2

**TRIAL TRANSCRIPT    OCTOBER 2, 2013**

1  these alleged assets —

2          THE COURT:  Correct.  And the trustee has to prove

3  knowledge to prove the false oath.  And what she just — Ms.

4  Barnier just stated, that the trustee doesn't contend that Ms.

5  Stephens was controlling these various businesses, so I'm going

6  to hold her to that and sustain her objection.

7          MS. NELSON:  Thank you, Your Honor.

8          THE COURT:  But — but I'm holding her to that

9  concession.  It may not even be a concession.  It may never have

10  been a contention in the first place.

11  BY MS. NELSON:

12  Q.  Mr. Crom, I direct your attention to paragraph 5 of Exhibit

13  77 Bates-stamped 006.

14  A.  Yes.

15  Q.  And you reference that conclusion for what purpose in your

16  expert report, sir?

17  A.  The debtors who were represented by multiple professionals

18  who have terminated services?

19  Q.  Yes, sir.

20  A.  That it's — it's — in my experience it's unusual for — for

21  users of professional services to change professionals because

22  it's an expensive process and you lose continuity.  And it's

23  normally only done when you have serious concerns about their

24  ability to — to — either by the professional having a concern

25  about their ability to go in a direction that the clients want

Case: 12-03148   Doc# 131   Filed: 03/03/14   Entered: 03/03/14 17:49:41   Page 6 of
33

**TRIAL TRANSCRIPT     OCTOBER 3, 2013**

1  something to him that upset him.  And he's six foot and weighs

2  240 pounds.  And he with force stood over me and said — can I

3  use profanity?

4          THE COURT:  Whatever he said, if you're quoting him,

5  of course.

6          THE WITNESS:  He said [yelling], "Fuck you.  Fuck you.

7  Fuck you.  Fuck you, fucking cunt," and went over and over

8  again.  He then took a chair and threw it against a door.  He

9  then walked — and — and broke a door.

10          I then called his friend who lives close by to come

11  get him.  He said that he wanted to come and stay and see the

12  boys for two days.  He had — he was flying to Korea the next

13  morning.  This was a week ago last Wednesday.  His friend came

14  over.  He started yelling at him.  This is someone he's known

15  since college.  He started yelling at him.  And then in the

16  alcove between where my kids' bedrooms are, he started to punch

17  this guy and kick him.  And I went running downstairs.  And he

18  came out and he called the police.

19  BY MS. BARNIER:

20  Q.   Who called the police?

21  A.   The friend, Michael Stern.  And then the police came.  We

22  waited outside.  And when they came, my husband told — had

23  calmed down.  I told them this was the fourth time in the last

24  year that I've had to call the police.  And each time I told the

25  police that I think my husband's having a nervous breakdown,

1   that there's something mentally wrong with my husband, that he

2   needs to be taken for 5150.  This is not the first time this has

3   happened.

4            My husband, I don't know how he does it, but he seems

5   to talk reason, he gets rational.  I don't know what he does,

6   but at that point I was separated from my husband.  My oldest

7   son wet the bed.  My oldest son wet the bed, and so the police

8   brought him — I had came down the stairs and I took care of him.

9   And they took my husband and they put him in a cab to go to

10  Korea the next morning.  He had a flight —

11  Q.   Who — I'm sorry.  Who put him in a cab?

12  A.   The San Francisco police that came to my house.

13  Q.   So was your husband arrested for punching and —

14  A.   No, he was not.

15  Q.   He was not arrested?

16  A.   His friend would not press charges and the police did not

17  arrest him.

18  Q.   And was your husband arrested for his abusive behavior

19  toward you?

20  A.   He was arrested once, yes.

21  Q.   He was?

22  A.   Yeah, last November.

23  Q.   Well, on that topic of arrest, Ms. Stephens, in your

24  counsel's Rule 26 disclosures it says that there are police

25  reports, correct?

Case: 12-03148   Doc# 131   Filed: 03/03/14   Entered: 03/03/14 17:49:41   Page 9 of 33

1 A. The police report from Santa Barbara, they wouldn't release

2 it to me without a subpoena because it identifies my kids.

3 Q. So there are no police reports in any of your —

4 MS. NELSON: No. Actually we have it as an additional

5 exhibit, Ms. Barnier, for the last incident.

6 BY MS. BARNIER:

7 Q. But prior to all of this there are no police reports that

8 were put in as exhibits as of a week ago, is that correct?

9 A. That's correct.

10 Q. And you say your husband has been arrested. And what was he

11 arrested for?

12 A. I can't remember exactly. I think it was assault and child

13 endangerment.

14 Q. And that assault was against you?

15 A. I came home and our house was trashed.

16 Q. And can you tell us the date when this happened?

17 A. It happened two days after Thanksgiving last year.

18 Q. Of 2012?

19 A. And '12.

20 Q. Okay.

21 A. Prior to that he had broken windows, smashed glasses. There

22 has been a cycle of abuse which has — which started a long time

23 ago.

24 Q. And your husband was arrested in November of 2012?

25 A. That's correct. And they — the district attorney called me

Case: 12-03148   Doc# 131   Filed: 03/03/14   Entered: 03/03/14 17:49:41   Page 10 of
33

1  a week or two later and said they didn't feel that they had

2  enough to press charges against him.

3  Q.  And when you — was there a police report issued as to this

4  incident —

5  A.  That's the police report that can't be — that's under

6  subpoena.  We need to request it under subpoena because of the

7  children.

8          A month later —

9  Q.  And who — and who told you that you had to have a subpoena

10 to get an arrest record —

11 A.  The sheriff's department in Santa Barbara.  I called them.

12         THE COURT:  Wait a minute.  I've lost something.  I

13 thought this happened at your home.

14         MS. NELSON:  One happened —

15         THE WITNESS:  It was — it happened — we have a home in

16 Santa Barbara that we still go down to.

17         THE COURT:  The recent event was here in San

18 Francisco?

19         THE WITNESS:  Yeah.  There were three —

20         THE COURT:  The November 2012 is in Santa Barbara?

21         THE WITNESS:  Yeah.  November 2012 and December of

22 2012 were both in Santa Barbara and both times I called the

23 police.

24 BY MS. BARNIER:

25 Q.  Were there any police reports done prior to the filing of

Case: 12-03148    Doc# 131    Filed: 03/03/14    Entered: 03/03/14 17:49:41    Page 11 of
33

1  your husband is arrested, is that right?

2  A.  No.  My —

3        MS. NELSON:  No.

4        THE WITNESS:  — husband was arrested on the first

5  incident in Santa Barbara.

6  BY MS. BARNIER:

7  Q.  Okay.  Now, Ms. Stephens, you have repeatedly told this

8  Court that your husband gets very angry with you when you

9  question him about the bankruptcy.  Is that an accurate

10 statement?

11 A.  That's an accurate statement.

12 Q.  Ms. Stephens, I'd like to direct your attention to Exhibit

13 56, Bates stamp page 45.  And if you would look at, starting

14 with page 173.

15        MS. NELSON:  I'm sorry — oh, sorry, wrong page.

16 BY MS. BARNIER:

17 Q.  Do you see that?  And it starts off with Mr. Weaver, who is

18 a creditor's attorney, and he says, "I think you said that Joe

19 Sherman made some false statements, some libelous statements

20 against you.

21        "MR. WESCOTT:  Yes.

22        "MR. WEAVER:  What did he say that was libelous?"

23        Mr. Wescott goes onto explain in fairly good detail.

24 And at the bottom of that paragraph he adds, your husband also

25 testifies, "He also posted some incorrect information as to our

Case: 12-03148    Doc# 131    Filed: 03/03/14    Entered: 03/03/14 17:49:41    Page 12 of 33

**TRIAL TRANSCRIPT     NOVEMBER 4, 2013**

1    BY MS. NELSON:

2    Q    Ms. Stephens, as you sit here today, can you recall

3    some of the first instances, if at all, when you were

4    afraid of your husband?

5    A    Yes.

6    Q    And when were those?

7    A    When I was pregnant with my first child, he would get

8    angry with me and stomp up and down, show aggressive

9    behavior and yell at me.  I was pregnant with my first

10   child in 2005.  And at that time, he told me that if I left

11   him, he would take the child from me or he would try to get

12   as much custody as possible, and he would make sure that I

13   would get as little as possible, and I was afraid for

14   losing my child at that time.

15   Q    When was your second child born, please?

16   A    He was born in February of 2008.

17   Q    Between the birth of your first child and the birth of

18   your second child, were there any times when you were

19   afraid of your husband?

20   A    Yes.

21   Q    And what were they?  And why were you afraid of your

22   husband?

23   A    He would get very aggressive with me.  He'd yell at

24   me.  He was telling me a lot that I was stupid.  He told me

25   that I was fat.  He told me that I was unattractive.  He

1  told me that I was old, and that he would leave me and
2  have kids with another woman if I didn't have more kids,
3  after I had my first child.  He threatened me.  He told me
4  that he would make my life a living hell if I left him.  He
5  would use all the money that he had to fight me in a
6  divorce.  He often would get aggressive and yell at me face
7  on, in my face.  Sometimes he would push by me.  One time,
8  I believe it was in 2007, it was the first time that he did
9  something physical with me, I was pregnant with -- I
10 believe I was pregnant with my second child, and I didn't
11 want him to leave.  He said he was going to leave me, and
12 usually when he threatens to leave me, he says things like,
13 game on.  I'm going to fight you to the death.  I'm going
14 to make your life a living hell.
15         And I didn't want him to leave, and I was
16 holding -- I picked up his laptop because he was saying he
17 was going to leave me, and I don't know -- afterwards, I
18 felt really stupid that I did this -- so I was holding the
19 laptop, and I went downstairs.  And he jumped on me and he
20 pushed me to the ground, and I was holding the laptop, and
21 he wrenched the laptop away from me and he told me that it
22 was my fault.  And at that point, I was embarrassed that I
23 had caused this.  He made me believe that I had caused the
24 incident, and he told me that he was just trying to get the
25 laptop away from me.  And I was too embarrassed to tell

1  everywhere.  He then got angry and there were glasses up on

2  the third floor, and he started throwing glasses out of the

3  third floor window onto the street below at our house in

4  San Francisco.

5  Q    When did he first start screaming at you?

6  A    He started raising his voice with me early in our

7  marriage.  I was 40 when I met him, and I desperately

8  wanted to have a family, and I got pregnant right away, and

9  I really wanted to have -- I didn't want to get divorced.

10 I remember we were on a trip when my first one was like --

11 he was born in October, so I think it was August before the

12 October that he was born, and it was the first time I

13 remember Carl really yelling at me.  We were in Hawaii and

14 he was telling me that I was overweight and unattractive

15 and old.  And he started yelling at me and then he went out

16 and I remember I called United because I was going to

17 change my ticket to go back, and I thought, okay, I've got

18 to leave this man, and so I called United, and I was going

19 to change my flight, and he came in and he apologized and I

20 didn't change it, and I ended up staying.

21        Two weeks after Alexander was born, he went on a

22 trip and he left me with the baby alone, and that was

23 pretty much the beginning of him traveling all the time.

24 So pretty much from 2005 onward, he would be traveling.  He

25 traveled probably 50 percent of the time, and I was pretty

1   A    I think he's five-eleven, five -- yeah, he's under six

2   foot, but he's close to six feet.

3   Q    How much does he weigh?

4   A    I know he weighs 240 because he weighed himself

5   recently.

6   Q    How tall are you?

7   A    Five foot-six.

8           MS. NELSON: Your Honor, I'd like to do a

9   demonstrative here, please, if I may?

10          MS. BARNIER: Objection, Your Honor.  I'm going to

11  go to relevance.

12          THE COURT: What's the demonstrative?

13          MS. NELSON: I want her to demonstrate for me,

14  with me being play acting her, and her play acting Mr.

15  Wescott, what she means when she says "he yells at me."

16          THE COURT: I got the message.  I don't need a

17  demonstrative.  This is not a jury.  I've got the message,

18  Ms. Nelson.

19          MS. NELSON: Well, I believe the physicality of

20  it, Your Honor, goes to demonstrate menace --

21          THE COURT: Again, you're getting back to where

22  you want your expert testimony.

23          MS. NELSON: No, I don't --

24          THE COURT1 I got the message that there was this

25  situation.  I can't -- I'm not going to let you turn this

1  (Phonetic) prior to us filing, in person.

2  BY MS. NELSON:

3  Q    Did you talk to him on the phone?

4  A    I was present on a couple phone calls as we were

5  getting -- as we were filing the schedules, but Carl and

6  Neil prepared and filled out the schedules.

7  Q    Did you have access to information to verify contents

8  of the schedules filed in January 2012?

9  A    I had the information that I provided to the Trustee

10 in May of 2012, the bank statements for Atlas Consulting

11 and our personal bank statements.  I didn't go through them

12 at the time that we filed.  I had given them all to my

13 husband, and he was -- he said he was going to handle all

14 of this, and he knew all the information.  When the Wells

15 Fargo Atlas account was created, he actually created the

16 account and was listed as the CEO.  He was controlling all

17 of our finances at the time, so -- and I didn't have access

18 to any of the bank account statements for the other LLC's,

19 and I was never put on the Poop Scoop Doop (Phonetic) bank

20 account.  I've testified to all of this repeatedly I think.

21 Q    You had no access to information except for what you

22 provided; is that correct?

23 A    Correct.

24      MS. BARNIER: That misstates her testimony.  She

25 said she relied on her husband for it.  That's not -- she

1  A    He gets angry with me in general.  Sometimes he gives

2  me some information about what he's doing.  If I ask

3  anything specifically or if I say anything that he takes as

4  being critical, he gets angry with me.

5  Q    Do you feel threatened when he acts in that manner?

6            MS. BARNIER: Objection, Your Honor, leading?

7            THE COURT: Sustained.

8  BY MS. NELSON:

9  Q    How do you feel when he acts in that manner?

10 A    I feel threatened; I feel scared; I feel horrible.  I

11 mean I've been keeping my head down over the last couple of

12 years trying not to make waves, so I'm just trying to get

13 through this process, so I can go on with my life.

14 Q    What do you mean when you say you're keeping your head

15 down?

16 A    I try not to make him angry.  I try not to elicit his

17 anger.

18 Q    And how is it that you keep your head down?

19 A    I try to be quiet.  I don't ask him questions about

20 things that I think are going to upset him.  I try to focus

21 on the kids.  I try to focus on things around the house.

22 If I ask him what he's doing or when money is going to come

23 in, he gets really angry with me.  If I ask him for money

24 and he doesn't have it, he gets very angry with me.  It's

25 pretty horrible right now and has been for a long time.

1    THE COURT: No, that's okay.  It doesn't suggest

2    the answer.  You can answer.

3    THE WITNESS: Okay.  I don't know if I was able to.

4    I didn't ask him.  I took his word for it, and I followed

5    the instructions.  He was the one that was doing the estate

6    planning.  He said this is what we were going to do, and I

7    did it.  If I didn't do it, he would have gotten angry with

8    me or would have been condescending or would have told me to

9    do it myself, all of which were things that I didn't feel

10   like I had the ability to do at the time.

11   BY MS. NELSON;

12   Q    In 2010, did your husband ever throw any furniture in

13   rooms when you were in the room, Ms. Stephens?

14   MS. BARNIER: Objection, Your Honor, leading.

15   THE COURT: Overruled.

16   THE WITNESS: Carl would often take things and

17   throw things at doors or windows.  He would threaten to

18   break windows.  He would pick up a chair and throw it.  One

19   time he threw, not furniture, but he threw a suitcase

20   against a cabinet, smashing the cabinet door.  One time

21   during that time period, I remember him taking the telephone

22   and throwing it against the wall.  Smashing of telephones is

23   somewhat of a habit of his.  We rarely go through a few

24   months without the telephones being smashed to pieces.  He

25   has the weights that look like baseball bats, and he used

1  the weights to smash the doors on his file cabinets one

2  night when he was angry, which I believe the Trustee saw or

3  the Trustee's attorney saw when she came to our house. He

4  broke computer monitors pretty regularly, and during that

5  time period, broke at least one computer monitor. He also

6  smashed the large screen T.V., although I don't remember

7  what year that was in.

8  BY MS. NELSON:

9  Q    At the time that you had given birth in 2010, Ms.

10  Stephens, do you have a current recollection of your husband

11  breaking anything in your home?

12  A    By the time our third child was born, Carl breaking

13  things was fairly common.  As a result of him getting angry,

14  he would throw some things or smash some things, and it

15  sounds very 1950's of me when I say this, but I would scurry

16  to clean it up because I didn't want the kids to see it.

17  And usually, he wouldn't do it when the kids were awake.

18  Usually it was after the kids had gone to bed at night.

19  Q    When you signed any of the documents transferring the

20  properties in the North Counties to your name only, did you

21  have -- were you able to -- I apologize, Your Honor; I don't

22  want to do a leading question -- so I will strike that and

23  rephrase.

24        Did you ever indicate to Carl Wescott that you

25  would not transfer the properties in the North Counties to

1          THE COURT: Sustained.

2    BY MS. NELSON:

3    Q    Ms. Stephens, is there any other reason why you signed

4    the documents presented to you by Carl Wescott from 2007

5    through to January 2012, other than the reasons you have

6    stated to the Court this morning and in your testimony on

7    October 2nd and October 3rd?

8    A    I'm not really sure how to answer that.  Carl

9    controlled all of our finances.  He controlled all of our

10   investments.  It was at his direction that we did things.

11   He was in charge.  I was taking care of the kids, and things

12   escalated over time.  You know, earlier in our marriage when

13   he would ask me to do something, it was done in a more

14   voluntary way, and if I disagreed, he'd get angry.  So I

15   don't -- I got to a point where I trusted him, and I also

16   felt resigned to what was going on in our financial

17   situation.  And I thought that either -- that he would fix

18   it if there were problems, and I didn't feel like I had the

19   opportunity to get involved with it, nor did I have the

20   emotional or the physical capability.  I was maxed out.  I

21   was maxed out for most of the marriage, and it was a

22   combination of our deteriorating marriage, his verbal and

23   emotional abuse, as well as the fact that I had three very

24   young kids I was trying to take care of during this time.

25   My parents were having problems.  I mean I've articulated

1  boxes.  It was like me stealing from him.  He repeatedly

2  told me that I was going to have to pay him large sums of

3  money because I had taken his personal property and that he

4  was going to call the police on me and tell them that I had

5  stolen his personal property.  I know it's funny, Ms.

6  Barnier.  It sounds ridiculous to me now, and you're smiling

7  and laughing --

8          MS. BARNIER: No, I'm not, Ms. Stephens, and I

9  don't appreciate the accusation.  You have no idea --

10         THE WITNESS: You were smiling.

11         THE COURT: Okay.

12         MS. BARNIER: I don't know why you want to direct

13  comments to me, Ms. Stephens.

14         THE COURT: Ms. Stephens, go ahead and just

15  complete your answer.

16         THE WITNESS: I do not understand why my husband

17  was so upset about me bringing those boxes in, but I brought

18  them in, and he was furious, and he threatened me, and he

19  screamed at me, and I told my attorney that he was

20  threatening me and screaming at me.  It wasn't long after

21  that that he and my attorney parted ways.  And he arranged

22  for the boxes to be removed from her office.

23  BY MS. NELSON:

24  Q    Do you know why your medical records and OBG and

25  obstetrics and birth record bills for your children were in

**PAGE FROM HOSKIN DEPOSITION**

# CERTIFIED TRANSCRIPT OF:

## In Re: Carl Wescott and Monette Stephens

### 12-30143 DM CHAPTER 7

### JANINA HOSKINS
### Volume 1

### Job Date: 04/22/2013

### Reported by: Noel Degnan



**117 Paul Drive, Suite A**
**San Rafael, CA 94903-2010**

Main Office: 415-472-2361  Fax: 415-472-2371
depos@westcoastreporters.com   www.westcoastreporters.com

1   as to, quote, "held an interest in." Calls for a legal

2   conclusion.

3          THE WITNESS: I don't have a specific

4   recollection as to any specific LLC that Ms. Stephens held

5   an ownership interest in other than the two that you've

6   just mentioned.

7          MS. NELSON: Q. Thank you.

8          As we sit here today, do you have an opinion as

9   to what benefit the estate will obtain through the denial

10  of Monette Stephens' discharge?

11     A. Denial of the discharge is not about a benefit to

12  the estate. Denial of discharge and the obligation of a

13  trustee to pursue that is one of my enumerated duties

14  under the Bankruptcy Code.

15     Q. So there's no benefit to the estate; is that

16  correct?

17     A. It's --

18          MR. MacCONAGHY: Well, objection.

19  Mischaracterizes her testimony. You're equipped to

20  answer. It's 704(a)(3). She's got a duty to object to

21  the discharge.

22          THE WITNESS: I have a duty to object to the

23  discharge whether it results in a benefit or not. It

24  doesn't bring any assets into the bankruptcy estate in

25  that sense. It benefits the creditors in general in that

Case: 12-03148   Doc# 131   Filed: 03/03/14   Entered: 03/03/14 17:49:41   Page 26 of 33

1        A.   Yes.

2        Q.   And in your personal experience, not in a legal

3    context, have you had the opportunity to engage in

4    interactions with married couples as an adult individual?

5    It's a broad question.

6        A.   I'm not sure I understand the question.  Yes.

7        Q.   And in those experiences both in your personal

8    life and in the legal capacity have you had the

9    opportunity to witness abusive relationships?

10            MR. MacCONAGHY:   Objection.   Immaterial.   It goes

11    beyond the scope of this litigation.   Calls for expert

12    opinion.

13            Counsel, if that was your theory, you needed to

14    file a timely expert witness report of a psychologist, and

15    you neglected to do so.   So I'm not going to allow you to

16    get a cheap psychological opinion from a bankruptcy

17    trustee.

18            MS. NELSON:   Q.   So you don't have an opinion

19    about the use of the words "abusive relationships," do

20    you, Ms. Hoskins?

21        A.   I couldn't give you a definition as to what an

22    abusive relationship is.

23        Q.   Have you ever had a personal experience with

24    abuse?

25            MR. MacCONAGHY:   Objection.   And I instruct Ms.

Case: 12-03148   Doc# 131   Filed: 03/03/14   Entered: 03/03/14 17:49:41   Page 27 of 33

**PAGES FROM PLAINTIFF'S EXHIBITS 68 & 69**

1   understanding is that Carl had sold some of the wine at some point after he began to experience money issues

2   through a wine merchant. I was not involved with that transaction. I would not have kept track of what wine Carl

3   bought or sold. He had a winery prior to our marriage. I drink wine but it is not a passion for me.

4   28.    I have never had and do not now have access or control of any of Carl's business and personal documents.
    (341 meeting 5/9/12 CAW pg line ) Since I first met him he has routinely works on many projects simultaneously

5   and I have never tried to keep track of what he is doing. When I do ask him what he is working on, often he

6   responds aggressively, so I avoid asking him questions that will make him angry. This has been true since the birth of

7   our first child and continues to this day. In the past and present when angry, Carl has a tendency to belittle and yell

8   at me and there have been times when he has broken things including a flat screen television, computer monitors,

9   drinking glasses, and a window in a bathroom. It is only since I have had separate representation with Ms. Nelson

10  that law enforcement visited our home three times in November and December of 2012. It is reasonable to state that

11  we have been estranged on and off for over three years. This was consistent with his statement in April 2012 when
    Carl unilaterally told our then joint attorney Neil Ison that we were separating. The statements concerning whether

12  we are divorcing has remained very volatile. He is the father of the children. It is important for them and him. He

13  did not have an intact family of origin and is very sensitive around that issue. I and the children remain financially

14  dependent upon him during this bankruptcy. Though I have been looking for any kind of work I have not been

15  successful perhaps because of the strain that being the person actually dealing with the bankruptcy has caused. I did
    not want to file bankruptcy and only did so because my husband told me to do so.

16  29.    I have made every effort to comply with all of the orders and directions required of me during this

17  bankruptcy.

18  30.    In late summer 2012 it was clear that the attorney client relationship between Ms. Gropper Nelson and my

19  husband was fast deteriorating. She advised and I understood that she brought a motion to receive authority to
    withdraw as counsel for Carl. She obtained from us both a waiver of a conflict of interest.

20
21  31.    She informed me when the Court had granted her leave to withdraw as Carl's attorney. She explained that I

22  was required to produce documents for the Trustee and her attorney and agents at my home at 853 Ashbury St. On
    or about September 6, 2012 Jean Barnier and her two assistants came to my home. I and my attorney were present. I

23  had removed from my file cabinets all of the files and papers that were responsive to the Trustee's order of

24  examination and had made a copy of all of those documents and papers. Those documents and papers were

25  organized on the table in our front hall available for Ms. Barnier's inspection. Though they were not numbered they

26  were approximately two feet tall in volume. My recollection was that they were identified for Ms. Barnier and she

27  was invited to go through them. She declined that invitation at the start of the session. She then demanded to know
    where Carl was. I informed her that he was not at the house. She then demanded to know where he kept his records.

28

Stephens' Declaration In Support of
Opposition to MSJ/BK 12-30143/APN 12-03148                                            6

office once she was hired in an effort to comply with my obligation. (After bringing the "boxes" to Ms. Nelson my husband has repeatedly told me that I had no authority to take them to Ms. Nelson in violent and threatening statements.)

6. Before the bankruptcy was filed, I told the attorney then representing us that there was a storage unit held by one of Carl's businesses. My understanding, based on my husband's statements to me, was that the unit contained "old office furniture". I have never been to the storage unit. As best I can recall, the attorney told me (and Carl) that because the "unit" was not ours personally, it was not proper to list it on the schedules.

7. I had no opinion about the storage unit except for what I was told by Carl and by the earlier lawyer. It did not occur to me to say anything further about it to Ms. Nelson since I had been told it was not germane to the personal bankruptcy and so it faded from my consciousness. I did not actually think of the unit again in relation to the bankruptcy until I became aware of the trustee's motion to access the contents.

8. My ability to focus and recall things has been impaired by the pressures and stresses under which I have been trying to conduct my life and affairs for at least the past three years, maybe longer. The sources of these burdens are several:
(a) I remain entirely dependent on Carl Wescott for money to feed and care for my three children and myself. I have been actively looking for employment with no success since at least after retention of Ms. Nelson as my attorney.
(b) Though Carl has not yet struck me when agitated, he has broken windows, furniture, and general property. He has been destructive to our home and my personal objects. Law enforcement has been called more than once. One time Carl was arrested, though I understand that all charges were dropped. Nevertheless, Carl's intense and threatening behavior has been frightening for me and our children.
(c) Beyond the stresses of Carl's traumatizing behavior, the financial strains, and the legal issues, caring for three small children has been extremely difficult personally. This has been exacerbated by the breakdown of my marriage -- at this point, little if anything seems safe and secure for me and my young children.

9. Presumably because of these stresses, I have difficulty sleeping and often wake up several times during the night. Whether from the stresses or sleep deprivation (or both), I have difficulty focusing, and by comparison with what I think of as "normal" for me, my memory has been terrible for some time now. I started seeing a therapist on advice of Ms. Nelson and have also attended support groups. My therapist has indicated my behavior and situation are consistent with someone in an abusive relationship. She has also stated that she thinks I am suffering from post-traumatic stress disorder as well as from extreme anxiety.

**341 TRANSCRIPT      MARCH 21, 2012**

1    MR. WESCOTT:  Correct.  My company owned it and

2    sold it, People Bridge.

3    MR. WEAVER:  The buyer has now been foreclosed

4    on?

5    MR. WESCOTT:  I believe so.  His name is Ramon

6    Lim Koliak, or something like that.  I won't be able to

7    spell it correctly for you.

8    MR. WEAVER:  Has he made any effort to make any

9    further payments on the second deed?

10    MR. WESCOTT:  No.  He stopped making the

11    payments long ago, long before the foreclosure.  That is

12    why the foreclosure happened.

13    I mean, he did not pay the first either.  The

14    first foreclosed, not us.

15    MR. WEAVER:  At one point you owned a 2005

16    Lexus RX 330.  What happened to the Lexus?

17    MR. WESCOTT:  We used to have two, and I

18    wrecked one, and we sold the other.

19    MS. STEPHENS:  You wrecked that one.

20    MR. WESCOTT:  I wrecked that one too before

21    selling it.

22    MS. STEPHENS:  Wrecked both cars.  He is a

23    really bad driver.

24    MR. WEAVER:  That's why you have the license

25    suspended.

Exhibit 54

1    MR. WESCOTT:  That's why I don't have a
2  driver's license.
3        MR. WEAVER:  Both of those cars are gone?
4        MR. WESCOTT:  Correct.  Long gone.
5        MR. WEAVER:  You also indicated you had an art
6  collection worth 255,000 bucks at some point in time.
7  What is that based on?
8        MR. WESCOTT:  Was it really 255, or was it one
9  something?
10        MR. WEAVER:  255.
11        MR. WESCOTT:  You know, I used to have an
12  extensive Filmore poster collection, and that is the
13  majority of the value there.
14        MR. WEAVER:  What happened to the collection?
15        MR. WESCOTT:  Most of it we had some water
16  damage in our house from a water heater.  I sold part of
17  it, and we still actually have some of it, it is listed
18  in our -- we had a small, small amount remaining.
19        MR. WEAVER:  What do you have remaining?  How
20  many posters?
21        MR. WESCOTT:  I don't know.  Couple, three
22  dozen.  Something like that.
23        MR. WEAVER:  Any fine art, oil paintings?
24  Etchings?
25        MR. WESCOTT:  He had some art in our house.  A

Exhibit 54

Case: 12-03148   Doc# 131   Filed: 03/03/14   Entered: 03/03/14 17:49:41   Page 33 of 45
33