1  MacCONAGHY & BARNIER, PLC
   JOHN H. MacCONAGHY, State Bar No. 83684
2  JEAN BARNIER, State Bar No. 231683
   645 First Street West, Suite D
3  Sonoma, CA 95476
   Telephone:   (707) 935-3205
4  Email:   jbarnier@macbarlaw.com

5  Attorneys for Plaintiff,
   JANINA M. HOSKINS, TRUSTEE IN BANKRUPTCY
6

7

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

   In re                                    )    Case No.: 12-30143 DM
11                                           )    (Chapter 7)
                                             )
   CARL ALEXANDER WESCOTT and               )
12  MONETTE ROSEMARIE STEPHENS,             )    AP No. 12-3148
                                             )
13          Debtors.                         )
   ──────────────────────────────────       )    **PLAINTIFF'S POST-TRIAL BRIEF**
14  JANINA M. HOSKINS, Trustee in           )
   Bankruptcy of the Estate of Carl Alexander )
15  Wescott and Monette Rosemarie Stephens, )
                                             )
16          Plaintiff,                       )
                                             )
17  v.                                       )
                                             )
18  CARL ALEXANDER WESCOTT and              )
   MONETTE ROSEMARIE STEPHENS,             )
19                                           )
            Defendants.                      )
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii, iv

ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**I. DEFENDANT WAIVED HER PURPORTED DEFENSE OF "DURESS"
BECAUSE IT WAS NEVER PLED OR RAISED PRIOR TO TRIAL** . . . . . . . . . . 1

    A. Duress Is Not Pled in Defendant's Answer . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B. An Affirmative Defense Not Raised is Waived . . . . . . . . . . . . . . . . . . . . . . . . 1

    C. An Affirmative Defense Must be Pled Before Trial Or It Is Waived . . . . . . . . 3

    D. Defendant's Cited Cases Do Not Support a Right to Amend to
       Plead Duress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**II. STEPHENS MAY NOT AMENDED UNDER
FED. R. Civ. P. 7015(B)(1) OR (2)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A. Stephens May Not Amend Her Answer to Include a Legal
       Theory Not Plead . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B. Plaintiff Never Gave Express or Implied Consent . . . . . . . . . . . . . . . . . . . . . 6

**III. STEPHENS FAILED TO MEET THE TWO-PRONG TEST OF DURESS** . . . . . 6

**IV. STEPHENS' CLAIMS OF PURPORTED DURESS, UNDUE INFLUENCE
AND COERCION ARE NOT DEFENSES TO AN ACTION BROUGHT
UNDER 11 USC §727** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**V. DEFENDANT'S POST-TRIAL BRIEF MISSTATES AND DISTORTS
STEPHENS' TRIAL TESTIMONY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**VI. THE TRUSTEE'S SKEPTICISM OF STEPHENS CLAIMS OF DURESS
IS FULLY WARRANTED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A. Stephens' Testimony Dramatically Changed Over Time. . . . . . . . . . . . . . . . 12

    B. No Indication of Duress in Stephens' Declaration in Opposition to Trustee's
       Motion for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    C. No Indication of Duress in Stephens' Deposition Taken by Trustee . . . . . . . . 13

    D. Defendant's Testimony in Deposition Taken by a Creditor Consisted of
       "I Don't Know" and "I Can't Remember". . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    E. Stephens Did Not Claim Duress, Undue Influence or Coercion When Sued
       In State Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    F. Stephens Changes Her Testimony and Her Story on the Third Day of Trial . . 17

**VII. STEPHENS' CLAIM THAT THE TRUSTEE SHOULD DISREGARD HER STATUTORY DUTY TO OBJECT TO STEPHENS' DISCHARGE IS WITHOUT MERIT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**TABLE OF CONTENTS**

**CASES**

*Brown v. Commissioner of Internal Revenue*, 51 T.C 116 (1968) . . . . . . . . . . . . . . . . . . . . . . 6

*Bush v. Woods (In re Bush)*, 2005 Bankr. Lexis 3366, 9-10
(B.A.P. 9th Cir. Dec. 15, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Dering v. Williams,* 378 F.2d 417, 419 (9th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Dunzweiler v. Superior Court of Alameda County,* 267 Cal. App. 2d 569 (1968) . . . . . . . . 4

*FDIC V. Tarkanian,* 2012 US Dist. Lexis 168344, (S.D. Cal. 2012) . . . . . . . . . . . . . . . . . . 2

*Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1300 (9th Cir. 1978) . . . . . . . . . . . . . . 3

*Furnish v. Commissioner of Internal Revenue*, 262 F.2d 727 (9th Cir. 1958) . . . . . . . . . . . 7

*Guidery v. Green,* 95 Cal. 630 (1892) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hernandez v. Heckler*, 621 F. Supp. 439, 442 (N.D. Cal. 1985) . . . . . . . . . . . . . . . . . . . . . 3

*In re Balcolf,* 141 Cal. App. 4th 1509 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*In re Fotouhi*, 2008 Bankr. Lexis 4755 (BAP 9th Cir. Oct. 16, 2008 . . . . . . . . . . . . . . . . . . 4

*In re Retz*, 606 F.3d 1189 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Judge v. Braziel (In re Braziel)*, 127 B.R. 156, 158 (Bankr. W.D. Tex. 1991) . . . . . . . . . . 18

*Keith v. Exchange Bank (In re Keith)*, 2013 Bankr. Lexis 4686 (BAP 9th Cir. 2013) . . . . . 5

*Kern Oil & Refining Co. v. Tenneco Oil Co.,* 840 F2d 730 (9th Circuit, 1988) . . . . . . . . . 3, 4

*Marr v. Rhodes*, 131 Cal. 267 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Sanders v. United States*, 509 F.2d 162, 169 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . 7

*Stratton v. Wolf (In re Wolf)*, 2007 Bankr. Lexis 2736 (Bankr. E.D. Cal 2007) . . . . . . . . . . 8

*Taylor v. U.S.*, 485 U.S. 992; 108 S. Ct. 1300, 1301; 99 L. Ed. 2d 510 (1988) . . . . . . . . . . 2

*U.S. v. Manzo*, 675 F.3d 1204, 1211 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*U.S. v. Miles,* 2012 US Dist. Lexis 45552; (N.D. Cal. 2012) . . . . . . . . . . . . . . . . . . . . . . . . 7

*Weekes v. Atlantic Nat'l Ins. Co.*, 370 F.2d 264, 271 (9th Cir. 1966) . . . . . . . . . . . . . . . . . . 3

*Wiksell v. Commissioner,* 90 F.3d 1459, 1462 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 6, 7

**FEDERAL STATUES**

11 U.S.C. §727 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

**FEDERAL RULES**

F.R.Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 4

F.R.Civ. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

F.R.Civ. P. 7015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Bankruptcy Rule 7008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1


**CALIFORNIA CIVIL STATUES**

California Code of Civil Procedure §704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18


**ENCYCLOPEDIAS**

Wright & Miller, Federal Practice and Procedure: Civil 3d § 1278 . . . . . . . . . . . . . . . . . . . 2

Wright & Miller, Federal Practice and Procedure: Civil 3d § 1270. . . . . . . . . . . . . . . . . . 4

**ISSUES**

There are two legal issues raised by the Court's order for both sides to file post-trial briefs. First, may a defendant assert the affirmative defense of "duress"on the last day of trial to deny discharge if duress has not been pled? Second, is "duress" a recognized defense to a liability for a pattern of sustained fraudulent conduct perpetuated over many years? The answer to both questions is no.

Moreover, careful scrutiny of the record in this case reveals that no true "duress" occurred here.[1]

**ARGUMENT**

**I. DEFENDANT WAIVED HER PURPORTED DEFENSE OF "DURESS" BECAUSE IT WAS NEVER PLED OR RAISED PRIOR TO TRIAL**

    A.   <u>Duress Is Not Pled in Defendant's Answer</u>

Bankruptcy Rule 7008(c)(1) and F.R.Civ. P. 8(c)(1) state:

> **In General.** In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: accord and satisfaction; arbitration and award, assumption of risk; contributory negligence, **duress** (emphasis added) ...

Stephens did not plead duress in her answer which was filed on November 19, 2012. Stephens raised four affirmative defenses in her answer. None could be construed as "duress." (Defendant's Trial Exhibit K; a courtesy copy of the relevant pages are attached hereto and labeled Exhibit 1.) Stephens admitted that duress was never specifically pled; nor was the word "duress" ever used in any of Stephens pre-trial papers.

    B.   <u>An Affirmative Defense Not Raised is Waived</u>

It is a frequently stated proposition of virtually universal acceptance by the Federal Courts that a failure to plead an affirmative defense as required by Federal Rule 8(c)(1) results in the

---

[1] Late in the evening of March 3, the day before the due-date of this brief and 27 days after the expiration of her own extended deadline to file her Post-Trial Brief, Stephens filed a highly improper "Declaration of Sheila Gropper Nelson" replete with new argument, new "evidence" in the form of double hearsay, and attempted corrections of some of the many miscites in her original brief. The Trustee is unable to timely respond to this irregular document and moves that it be stricken.

waiver of that defense and its exclusion from the case. *Wright & Miller, Federal Practice and Procedure:* Civil 3d § 1278. In the matter of *FDIC V. Tarkanian,* 2012 US Dist. Lexis 168344, (S.D. Cal. 2012) the court held that the Defendants had waived their right to assert an affirmative defense by failing to plead it. The defendants, who had been sued on a personal guarantee, claimed they should have been allowed to plead the affirmative defense of California's antideficiency statutes after a summary judgment had been entered. The district court stated at p. 11-12:

> Defendants failed to raise the issue of California's antideficiency statutes until August 2012, nearly a year and a half after the sale of the subject property when the defense, as Defendants argue it, would have first become applicable. Defendants did not raise the argument in the Answer, in oppositions to the motions for summary judgment, or in a motion to dismiss.

The court held that the defendants had waived their affirmative defense because they had delayed in asserting the affirmative defense.

> "Under the accepted interpretation of Rule 8(c) of the Federal Rules of Civil Procedure, any matter 'constituting an avoidance or affirmative defense' to the matters raised in the plaintiff's complaint must be pleaded in a timely manner or it is deemed to be waived." Taylor v. U.S., 485 U.S. 992; 108 S. Ct. 1300, 1301; 99 L. Ed. 2d 510 (1988); see also U.S. v. Manzo, 675 F.3d 1204, 1211(9th Cir. 2012)

Like the Tarkanian defendants, Stephens failed to plead duress not only in her Answer (Exhibit 1), but also in her Opposition to the Trustee's Motion for Summary Judgment and her 4/12/2013 Declaration in Support of Opposition (Courtesy copies of Dkt No. 31 and Defendants Trial Exhibit A, are attached and labeled Exhibit 2); and in the Debtor's Motion to Vacate Denial of Discharge and her Declaration in Support of Debtor's Motion to Vacate Order of Denial of Discharge (Courtesy copies of Dkt No. 57 and Plaintiff's Trial Exhibit 69, are attached and labeled Exhibit 3).

In her Declaration filed on April 12, 2013, Stephens does not raise the issue that she was under duress when she made transfers from her personal checking account to her business account or her husband's accounts, or when she signed numerous documents transferring real property. Instead, Stephens states she avoided asking her husband questions about where documents might be stored. Stephens' statements, in her Declaration, regarding abusive conduct by her husband pertain to her husband's acts after the bankruptcy was filed. There are no statements

1 demonstrating that Stephens was under duress when she made numerous fraudulent transfer of real

2 and personal property while she and her husband were being sued by creditors. (See attached

3 Exhibit 2 - Stephens' Dec. 6:6-11)

4       In the Motion to Vacate Denial of Discharge, it is defendant's counsel who asserts that the

5 defendant has been threatened verbally and physically and had her finances restricted and her

6 conduct monitored. (See attached Exhibit 3 - Points & Authorities 2:24-26). But counsel for the

7 defendant offers no proof to substantiate those statements. The Declaration filed by Stephens did

8 not support those contentions. Stephens said:

9

10     "My ability to focus and recall things has been impaired by the pressures and stresses under which I have been trying to conduct my life an affairs for at least the past three years, maybe longer." (Exhibit 3, Stephens' Dec p. 2, ¶ 8 (lines are not

11     numbered).

12       Stephens goes on to declare that she is dependent on Wescott for money but that he has

13 never hit her. Stephens goes on to suggest Wescott was arrested for domestic violence. However,

14 during trial Stephens testified that Wescott was detained by police but not arrested in 2012 - which

15 happened <u>after</u> the bankruptcy was filed. (Exhibit 3, Stephens' Dec. p. 2, ¶ 8).

16       Stephens filed her answer on November 19, 2012; the trial began almost 11 months later.

17 Despite numerous opportunities, including the Opposition to Summary Judgment filed on April

18 12, 2013, and the defendant's Motion to Vacate Order of Denial of Discharge on May, 16, 2013,

19 Stephens failed to plead duress. The defendant waived her right to make the claim of "duress" on

20 the last day of trial.

21     C.   <u>An Affirmative Defense Must be Pled Before Trial Or It Is Waived</u>

22       In the Ninth Circuit, a Motion to amend the pleadings by a defendant must be made before

23 a trial begins. In the matter of *Kern Oil & Refining Co. v. Tenneco Oil Co.* 840 F2d 730 (9th

24 Circuit, 1988), the court held that *Tenneco* had waived its right to invoke res judicata because it

25 did not raise the defense prior to trial.

26     Tenneco's principal obstacle is Fed. R. Civ. P. 8(c), which includes res judicata as an affirmative defense that must be raised in the pleadings. Tenneco admits that it

27     did not do so. Therefore, the defense is waived. *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1300 (9th Cir. 1978); *Weekes v. Atlantic Nat'l Ins. Co.*, 370 F.2d

28     264, 271 (9th Cir. 1966); [**12] *Hernandez v. Heckler*, 621 F. Supp. 439, 442

(N.D. Cal. 1985).

> It is true that we have allowed a party to raise res judicata after the initial pleadings by construing the attempt as a motion to file a supplemental answer. See *Harbeson, 746 F.2d at 520*. This does not help Tenneco because we have always required that it be raised before trial. Tenneco did not raise it until after the end of the trial.

Like *Tenneco*, Stephens did not raise the issue of duress prior to the trial.

In affirming a debtor's denial of discharge in *In re Fotouhi*, 2008 Bankr. Lexis 4755 (BAP 9th Cir. Oct. 16, 2008) , the BAP relied on *Kern v. Tenneco*. The debtor in *Fotouhi* appealed, claiming the bankruptcy court should have allowed him to amend his answer after trial. The BAP stated:

> The Ninth Circuit has held that a motion to allow a defendant to plead an affirmative defense not raised in the initial pleading must be raised before trial. See *Kern Oil & Refining Co. V. Tenneco Oil Co.,* 840 F2d at 735. Requiring that an affirmative defense be pleaded serves the purpose of providing notice to a plaintiff that a defendant intends to assert a claim for relief is completely barred. Wright & Miller, Federal Practice and Procedure: Civil 3d § 1270. *(id p. 33-34)*

Stephens cannot claim a legal theory at trial if it has not been pled.   Stephens cannot plead duress on the third and final day of trial.

     D.    <u>Defendant's Cited Cases Do Not Support a Right to Amend to Plead Duress</u>

Stephens cites three cases in support of argument that she should be allowed to amend her pleadings and claim duress: a 1900 case, *Marr v. Rhodes*, 131 Cal. 267; an 1892 case, *Guidery v. Green,* 95 Cal. 630; and a 1968 case, *Dunzweiler v. Superior Court of Alameda County,* 267 Cal. App. 2d 569.

None of these cases deal with the issue of the failure to plead specific affirmative defenses under F. R. Civ. P. 8(c)(1).  All of the cases involve California issues of civil procedure, not Federal.

 In citing *Dunzwiler,* Stephens leaves out key words of the opinion.  Stephens correctly cites the line, ... it is a rare case in which "... a court will be justified in refusing a party leave amend his pleadings so that he may properly present his case." *Dunzweiler v. Superior Court of Alameda County* (267 Cal. App. 2d at 577).  However, in the next sentence the Court goes on to say, "If the Motion to amend is timely made and the granting of the motion will not prejudice the opposing party"... *id*.  Stephens omits this in her post-trial brief.

In the instant case, Stephens's Motion to Amend was not offered until the end of the trial. It was not timely. The Trustee was highly prejudiced by Stephens's testimony at the third day of trial that she perpetrated all of her false oaths, fraudulent transfers, and concealment of assets and records under duress, because the Trustee had no knowledge that Stephens would make such a claim.

## II. STEPHENS MAY NOT AMEND UNDER FED. R. Civ. P. 7015(B)(1) OR (2)

A.   Stephens May Not Amend Her Answer to Include a Legal Theory Not Pled.

Bankruptcy Rule 7015 provides that F.R. Civ. P. 15 applies in adversary proceedings. Federal Rule 7015(b)(1) permits a party to amend during and after trial, but only in very limited situations.

> Rule 15(b). Amended and Supplemental Pleadings.
> (b) Amendments During and After Trial.
> (1) Based on an Objection at Trial. If, at trial, a party objects that evidence is not with the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.
>
> (2) For Issues Tried by Consent. When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move — at any time, even after judgment — to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. — But failure to amend does not affect the result of the trial of that issue.

Rule 7015(b) cannot be used to bootstrap a legal theory that was not included in the pleadings. The BAP in *Keith v. Exchange Bank (In re Keith)*, 2013 Bankr. Lexis 4686 (BAP 9th Cir. Oct. 3, 2013) held that the "Ninth Circuit long ago clarified that Civil Rule 15(b) relates to factual issues, not legal theories or claims." Citing *Dering v. Williams,* 378 F.2d 417, 419 (9th Cir. 1967).

In the instant case, Stephens is arguing that she should be allowed to amend her answer to include duress, a legal theory. In order to apply Rule 7015(b), Stephens must show that the (1) the amendment pertains to facts, not a legal theory and (2) the Trustee gave either express or implied consent at trial. Duress is a legal theory never plead by Stephens and the Trustee never gave either express or implied consent. Stephens cannot amend under 7015(b)(1) or (2).

B.     Plaintiff Never Gave Express or Implied Consent

Plaintiff vigorously objected to Stephens raising the issue of duress at trial. (11/3/13 Trial Transcript 16:8-15; 37:11-24; 45:15-19; 59:15-60:4; and 75:17-24).  Likewise, there was no implied consent given at trial since the Trustee objected to the evidence offered by Stephens.  Defendant in her post-trial brief does not deny these facts.  Express or implied consent must be given at trial.

Instead, Stephens claims that the Trustee knew about her state of mind from Stephens' deposition and her declarations even though she points to no specific instances.  First, purported knowledge of Stephens' state of mind from her deposition and her declarations does not give express or implied consent under F. R. Civ. P. 15(b).  Second, the statements in the deposition and declarations by Stephens do not indicate that she was ever under any duress when she (1) transferred assets to conceal interests; (2) made false oaths regarding income; (3) failed to produce documents; (4) failed to account for monies; and (5) refused to turnover documents pursuant to a court order ---- the allegations made by the Trustee in her Complaint to Deny Discharge and proved at trial.

**III.  STEPHENS FAILED TO MEET THE TWO-PRONG TEST OF DURESS**

In order to establish duress, a defendant must show that 1) he/she was unable to resist demands to sign the document and 2) that he/she would have not signed the document except for the constraint applied to his or her will.  In other words, the spouse must demonstrate that he or she had no choice in executing his or her signature and, further, that he or she was reluctant to do so. *Brown v. Comm'r of Internal Revenue*, 51 T.C 116 (1968).

The facts in *Wiksell v. Commissioner,* 90 F.3d 1459, 1462 (9th Cir. 1996) seem to mirror the testimony of duress portrayed by Stephens:  an abusive husband who controlled the family's finances and a wife who went along with her husband's demands.  *Wiksell* involved the filing of joint tax returns; income that was under reported; and monies that were subject to fraud charges.  The wife in *Wiksell* claimed that since her husband controlled the finances and she was subject to duress by him, she could not be found liable for the taxes that were owed.

The Ninth Circuit held that despite her claims of abuse, the wife was responsible for the taxes.

> Appellant also argues that duress in the couple's relationship and her personal problems (e.g. her daughter's death) account for her lack of perception. See, e.g., *Sanders v. United States*, 509 F.2d 162, 169 (5th Cir. 1975). We do not understand Appellant's argument to be that her will was overcome at the time she signed the returns, see *Furnish v. Commissioner*, 262 F.2d 727 (9th Cir. 1958), but rather that the duress explains why she had no opportunity to gain knowledge about her husband's business affairs and why she had no reason to know of the unreported income. We reject this argument.
>
> Whatever tragedy and duress Appellant faced, they did not significantly cloud her perception. *Wiksell v. Commissioner,* 90 F.3d 1459, 1462 (9th Cir. 1996)

Even if Stephens' descriptions of her husband are true, she never testified that his purported acts clouded her perception about the documents she was signing nor did the purported acts overcome her will. What Stephens testified to was that she was afraid to anger her husband, but there was no testimony by Stephens or anyone else that Stephens objected to signing the documents or that she signed reluctantly.

Also, illustrative of the two-pronged elements of the duress defense is *US v. Miles* 2012 US Dist. Lexis 45552; (N.D. Cal. 2012). Like Stephens, Miles alleged that she had been subjected to emotional and verbal abuse. The court did not dispute Ms. Miles' allegations. However, the court not only held that Ms. Miles had not presented sufficient evidence of the first element of the duress defense, that she had no choice but to sign; but she failed to present evidence of the second element of the duress defense: she would not have signed the tax return absent the constraint her husband applied to her will. (*id.,* p. 12-13).

> Whatever amount of duress Ms. Miles faced from being under the influence of pain medication or from receiving Mr. Miles' threats to tear the family apart and complicate the settlement proceedings for the division of their marital assets, it did not cloud her perception or constrain her free will. See Miles Dec. ¶¶ 5-7. Ms. Miles does not explain, for example, that she was reluctant to sign the return because she believed it to be inaccurate or disadvantageous to her. Rather, Ms. Miles clearly states that she signed and filed the return because she believed that Mr. Miles had the means to pay the liability. See id. at ¶¶ 8-9. Based on her explanation, the Court finds that Ms. Miles did not sign the return reluctantly. *United States v. Miles*, 2012 US. Dist. Lexis 45552 (N.D. Cal. 2012)

Like Ms. Miles, Stephens never testified that she was reluctant to sign documents because they were inaccurate or disadvantageous to her. Rather, Stephens testified that she signed because

she believed Wescott would be able to fix their financial mess.

> By Ms. Nelson:
> Q. Ms. Stephens, is there any other reason why you signed the documents presented to you by Carl Wescott from 2007 through to January 2012, other than the reasons you have stated to the Court this morning and in your testimony on October 2nd and October 3rd?
>
> A I'm not really sure how to answer that. Carl controlled all of our finances. He controlled all of our investments. It was at his direction that we did things. He was in charge. I was taking care of the kids, and things escalated over time. You know, earlier in our marriage when he would ask me to do something, it was done in a more voluntary way, and if I disagreed, he'd get angry. So I don't -- I got to a point where I trusted him, and I also felt resigned to what was going on in our financial situation. And I thought that either -- that he would fix it if there were problems, and I didn't feel like I had the opportunity to get involved with it, nor did I have the emotional or the physical capability. I was maxed out. I was maxed out for most of the marriage, and it was a combination of our deteriorating marriage, his verbal and emotional abuse, as well as the fact that I had three very young kids I was trying to take care of during this time. My parents were having problems.
> (Courtesy copy of 11/4/13 Trial Transcript, 81:2-25, is attached hereto as Exhibit 4)

Even if the Court believes Ms. Stephens' claims of verbal abuse, defendant failed to meet her burden under the two-pronged test for the defense of duress.


**IV. STEPHENS' CLAIMS OF PURPORTED DURESS, UNDUE INFLUENCE AND COERCION ARE NOT DEFENSES TO AN ACTION BROUGHT UNDER 11 USC § 727**

Stephens cites no Ninth Circuit or BAP cases where purported duress or undue influence or coercion [2] are recognized as a defense to a denial of discharge under Section 727. There are no such cases.

Stephens relies on two cases to jump to the legal conclusion that the duress purportedly inflicted on Stephens by her husband excuses her sustained, multi-year pattern of fraudulent conduct: *Stratton v. Wolf*, 2007 Bankr. Lexis 2736 (Bankr. E.D. Cal 2007) and *In re Balcof,* 141 Cal. App. 4th 1509 (2006). Neither of these cases are applicable.

Both of these cases voided a single, isolated, economically unfair transaction between spouses executed under duress. In *Stratton*, a Trustee filed a Complaint for Turnover of proceeds from the sale of a deceased debtor's home which his non-filing spouse claimed as her separate property. The property had been deeded by the non-filer to both spouses, but the court found that

---

[2] The federal rules do not state "undue influence" or "coercion" are defenses; only duress.

[8059.post-trial.brief.wpd]
Page 8

the ex-wife did not understand what she was signing.  The bankruptcy court looked to California state law to determine the community property rights of the ex-wife and her dead husband's undue influence in that scenario.   In *Balcof,* the Court of Appeals voided a conveyance of property from husband to wife, because the wife had hit, berated, and threatened to take the children from the husband unless he signed the document.

These cases are not applicable for two reasons.  First, they both involved an effort to void a transaction between spouses, not an attempt to excuse debtor fraud on the bankruptcy system.  Second, they both deal with a single isolated transaction, not a series of multiple fraudulent transfers, phony asset protection scams, false oaths, and concealed documents going back at least three years.  Stephens' sustained misconduct requires denial of her discharge, see *In re Retz*, 606 F.3d 1189 (9th Cir. 2010) ["Mistaken reliance on attorney" rejected as defense to 727 action when multiple instances of debtor misconduct shown].

## V.  DEFENDANT'S POST-TRIAL BRIEF MISSTATES AND DISTORTS  STEPHENS' TRIAL TESTIMONY

In support of her position that Stephens acted under duress, Stephens' post trial brief references her deposition taken by the Trustee once, and her testimony taken on the third day of trial 22 times.  But Stephens's hyperbolic statements in her post-trial brief do not match the actual testimony given by her.

In her brief, Stephens states:

•   *Wescott manipulated her, over time, to transfer control of her separate property to his management and control and has lost all of the wealth she had brought into the marriage. (Plaintiff Exhibit 75, Stephens' Depo. 3/15/2013, p. 22-23 Bate No. 4)* (Defendant's Post Trial Brief, 11:1-3)

Stephens is referring to her deposition taken by the Trustee as support for her statement.  Trial Exhibit 75, p 22-23, Bate No. 4 is an erroneous cite.  Trial Exhibit 75 Bates No. 4 has no statement regarding Wescott's manipulation, separate property, or loss of wealth; nor does Trial Exhibit 75, deposition p 22-23.  (A courtesy copy of Plaintiff's Trial Exhibit 75 Bate No. 4, and Trial Exhibit 75 deposition p. 22-23 is attached and labeled Exhibit 5).

Stephens never made any reference to her husband manipulating her during her deposition.

In fact, Stephens testified to the opposite:

> Q. Would you describe your husband as a Svengali type?
> A. No.  (A Courtesy copy of Trial Exhibit 75, deposition page 149, bates no. 0039, a is attached hereto as Exhibit 6)

Stephens allowed her husband control her investment portfolio because Stephens said Wescott was an experienced investor.  Stephen testified that her investment portfolio was worth between $1.5 to $2 million before she married Wescott.

> Q.   And what did you do with your investments after you were married?
> A. Over the course of time, my husband took over managing my investments.
> Q. And what are your investments worth today?
> A. Probably zero.
> ...
> Q. In addition to your IRA, did you have any other investment funds?
> A. Yes.
> Q. And what was their value before you married Mr. Wescott?
> A. I gave you the full number of what my overall net worth was, and I don't know what the breakdown was between my IRA versus my other investments. They have all been liquidated.
> Q. And why were they liquidated?
> A. Carl wanted to manage them.
> Q. And why did you agree to that?
> A. Because he was a seasoned investor, he had made lots of money, I trusted him, I was married to him.   (Trial Exhibit 75, deposition page 37, bates No. 0011, a courtesy copy is attached hereto as Exhibit 7).

   • *He took advantage of the fact that she was 40 when she met him, and testified she desperately wanted to have a family.*   (Defendant's Post-Trial Brief, 11:5-6)

   • *He manipulated that she got pregnant right away, and was committed to staying married.[3]  (* (Defendant's Post-Trial Brief, 11:7-8)

Stephens actual trial testimony:

"I was 40 when I met him, and I desperately wanted to have a family, and I got pregnant right away, and I really wanted to have -- I didn't want to get divorced."  (11/4/13 trial transcript 21:7-9, courtesy copy attached hereto as Exhibit 8)

There is no testimony that Wescott took advantage of Stephens because she was 40 and wanted to get pregnant or that he "manipulated" her.

   • *Almost right away after she got pregnant, Wescott told her she was overweight, unattractive and old.*   (Defendant's Post-Trial Brief, 11:9-10)

Ms. Stephens did say that at trial, but she went on to say that he apologized and she chose

1    to stay:

2         "I remember we were on a trip when my first one was like – he was born in October, so I
           think it was August before the October that he was born" ... "We were in Hawaii and he
3         was telling me that I was overweight and unattractive and old. And he started yelling at me
           and then he went out and I remember I called United because I was going to change my
4         ticket to go back, and I thought, okay, I've got to leave this man, and so I called United,
           and I was going to change my flight, and he came in and he apologized and I didn't change
5         it, and I ended up staying." (11/4/13 trial transcript 21:10-20, see attached Exhibit 8)

6         • *If she asked him for money and he didn't have it, became very angry with her, throwing
           things at doors or windows, threaten to or break windows. (Trial Transcript 11/4/13 Pg
7         77 L 12-20)* (Defendant's Post-Trial Brief, 12:21-23)

8         The trial record at p. 77 makes no reference to Stephens asking for money. At no time did

9    Stephens testify that Wescott became angry when Ms. Stephens asked him for money. (A

10   courtesy copy of 11/4/13 trial transcript p. 77 is attached and labeled Exhibit 9)

11
          • *It was identified at the 341 meetings that he totaled at least two cars long before the
12        bankruptcy filing. (Plaintiff's Exhibit 54, 341 Meeting March 21, 2012, Bates Stamped
           pages 00144-00145 and Stephens' Declaration Plaintiff Exhibit 68, Paragraph 8 Bates
13        Number 005))* (Defendant's Post-Trial Brief, 13:3-5)

14        Wescott did testify that he totaled two cars, but it was Stephens who said: "He wrecked

15   both cars. He is a really bad driver." (Trial Exhibit 54, 144:22-23, a courtesy copy of the relevant

16   page is attached and labeled Exhibit 10).

17        • *She testified that he demanded that she add his name to the Atlas account, that he
           controlled all of the finances, hers theirs and his, and that he had her name him as the
18        CEO of Atlas, and that she had never had any access to the Pook Snook Dook
           accounts.(Trial Transcript 11/4/13 pg 49 L 14-20)* (Defendant's Trial Brief, 13:10-13)
19
          At trial, Stephens never testified that her husband demanded that she add his name to the
20
     Atlas account or name his as CEO of Atlas Consulting. (11/4/2103 Trial Transcript, 49:9-20, a
21
     courtesy copy of the relevant page is attached and labeled Exhibit 11).
22
          Despite defense counsel's numerous leading questions at trial, Stephens never described
23
     any specific acts of coercion or undue influence by her husband that forced her to sign specific
24
     documents against her will.
25
     BY MS. NELSON:
26
          Q.  Why did you sign that document, Ms. Stephens? (Referring to Trial Exhibit 21)
27        A.  I signed the document because my husband asked me to.
          (Courtesy copies of Trial Exhibit 21 and 11/4/13 Trial Transcript, 73:7-14, are collectively
28        attached hereto as Exhibit 12.)

[8059.post-trial.brief.wpd]

BY MS. NELSON:

    Q. How did he ask you to sign that document, Ms. Stephens?
    A. I don't remember how he asked me to sign the document. He probably just handed it to me and asked me to sign the document, and I signed the document. I didn't question him. I assumed whatever he was.... (11/4/13 Trial Transcript 73:25-74:5)

    Q. Why wouldn't you have questioned him?
    A. I didn't question him because he would have gotten mad at me or he would have gotten condescending or he would have stated to me, if I felt like I could do a better job managing our assets, then I should do it and he would take care of the kids, which was his common refrain. (11/4/13 Trial Transcript 74:6:11)

    Q. Did you ever indicate to Carl Wescott that you would not transfer the properties in the North Counties to your name only?
    THE WITNESS: No, I never told him I wouldn't do the transfers.
    THE COURT: Okay. That's your answer. Stop right there . (11/4/13 Trial Transcript 78:24-79:5)  (Courtesy copies of the 11/4/13 Trial Transcript pages 73,74,78, & 79 are collectively attached hereto as Exhibit 13).

## VI.  THE TRUSTEE'S SKEPTICISM OF STEPHENS' CLAIM OF DURESS IS FULLY WARRANTED

    A.    <u>Stephens' Testimony Dramatically Changed Over Time</u>

The Trustee's skepticism about Stephens's claims of duress is fully warranted when the testimony of Stephens is reviewed over the course of the events leading up to the trial. In her Declaration in Opposition to Trustee's Motion for Summary Judgment (April 2013), Stephens states that her husband would become angry if she questioned him. In her deposition taken by the Trustee (March 2013), Stephens testified that Wescott would suggest a course of action and she would agree. In the deposition taken by a creditor (March 2011), Stephens had no memory of any acts at all. At no time does Stephens say her husband forced her to sign documents against her will.

    B.    <u>No Indication of Duress in Stephens' Declaration in Opposition to Trustee's Motion for Summary Judgment</u>

Stephens' Declaration, filed on April 12, 2013 does not state that she signed any documents under duress. Rather, she says she relied on Wescott's business acumen regarding their real estate and businesses.

    If I was directed by him to sign a paper in relationship to any of those enterprises I did so as he was the only person with knowledge of the business. (Trial Exhibit A, Stephens Dec. p. 2 ¶8). See attached Exhibit 2.

-[8059.post-trial.brief.wpd]

I delegated the management of my personal wealth as well as the family wealth to my husband. I had every reason to believe that he was a competent and successful individual capable of handling all of our affairs. (Trial Exhibit A, Stephens Dec p.4 ¶ 21) See attached Exhibit 2.

The only reference Ms. Stephens makes to the subject of duress is her statements that when she questions him about his work, he becomes angry.

When I do ask him what he is working on, often he responds aggressively, so I avoid asking him questions. In the past and present when angry, Carl has a tendency to belittle and yell at me and there have been times when he has broken things... (Trial Exhibit A, Stephens Dec p. 6, ¶ 28, attached as Exhibit 2).

Stephens did state that her husband had "berated" her when she delivered 20 boxes of documents to her counsel that had been stored in her garage. (Trial Exhibit A, Stephens Dec p. 8, ¶ 34, attached as Exhibit 2). These boxes were in Stephen's garage, but she never told the Trustee that she had boxes of documents in her home.

C.      No Indication of Duress in Stephens' Deposition taken by Trustee

The Trustee took the deposition of Ms. Stephens on March 15, 2013 and the deposition was entered as an exhibit in trial, Trial Exhibit 75. The deposition lasted for approximately five hours and the debtor was extensively questioned about the debtors' finances and transactions. There is one instance where Stephens said her husband had yelled at her.

Q. Do you ask your husband where he gets his money?
A. Not generally, no.
Q. Could you be more specific? "Not generally," do you ever ask him, "Where did you get the money?"
A. No.
Q. You just take money from your husband?
A. My husband tells me when he brings in money that he is going to be giving me money. I ask him if he has money and I tell him how much money I need to pay bills." (Trial Exhibit 75, 41:13-23)

Q. Okay. But you never ask him where he got the money?
A. Our marriage is difficult at best right now.
Q. And what does that mean?
A. It means that our conversations are very difficult and if I ask him too much about money, he gets angry with me.
Q. And what happens when he gets angry?
A. He yells at me.(Trial Exhibit 75, 42:21-43:4)

Q. When your husband becomes angry with you, does he still give you money when you request money to pay your bills?
A. In general, yes. Trial Exhibit 75, 44:7-10)
(Trial Exhibit 75 - courtesy copies of the above pages are attached hereto as Exhibit 14)

1   This is the only instance in the deposition where. Stephens says her husband has yelled at

2   her.  And, he still gives her the money she requests since she is able to pay for two of her children

3   to attend the private Lycee Francais de San Francisco at a cost of $4,500 a month (45:21-46:11)

4   and to take her children skiing at Squaw Valley a month after filing for bankruptcy (49:9-50:6).

5   (Courtesy copies of Trial Exhibit 75, pgs 45-50 are collectively attached hereto as Exhibit 15).

6           During the deposition, Stephens repeatedly said her husband was managing their finances

7   and she agreed to this arrangement since her emphasis was on being a wife and a mother.

8   Stephens specific recounting of signing documents did not indicate that she was under duress or

9   undue influence when she transferred real property or assets when her husband asked her to sign.

10  She also testified that generally read documents that she signed.

11          A. I basically did what he asked me to do as part of the estate planning.  I had a baby at the
            beginning of 2010, in February.  I had a toddler and a preschooler during that time period

12          and, I mean, I was being a wife and a mother.  So did my husband tell me what he was
            doing in terms of setting up estate planning for the benefit of our family and our future?

13          That's what I remember.  Do I remember specifics?  I have to say I do not.
            Q. So is it your testimony that your husband would put a document in front of you, instruct

14          you to sign it and you did?
            A. My husband was managing our overall estate planning and, you know, to some extent,

15          he would say, "This is what we are doing.  This is why we are doing it," and I would say,
            "Oh, okay.  That sounds fine."

16          Q. That wasn't my question.  My question was: If your husband presented you with a
            document, did you read it before you signed it?

17          A. In general, I looked through it.  I can't tell you that I remember the details of the
            documents that I signed.

18          Q. That's not my question.  I am asking you: When you sign a document, do you read it
            before you sign it?

19          A. In general, I read it before I sign it.
            Q. Okay. Do you ask questions about what you are signing?

20          A. Sometimes.  (Trial Exhibit 75, 57:10-58:13. A courtesy copy of the referenced pages is
            attached and labeled Exhibit 16).

21          Stephens admitted she sometimes asked questions about documents.  There is no testimony

22  that she 1) was afraid to ask or 2) her husband became aggressive if she asked questions.  When

23  Stephens was questioned about her husband and her solely owned business, she stated that she

24  gave him full access.

25          Q. Is Carl Wescott a member of Atlas Consulting, LLC?
            A. No, he is not.

26          Q. Does he hold any interest in Atlas Consulting, LLC?
            A. I gave him fiduciary responsibility for Atlas Consulting to manage it.

27          Q. What does that mean, that you "gave him fiduciary responsibility"?
            A. I let him manage our -- the business, Atlas Consulting, while I was having kids.  I

28

wasn't -- I gave him full access to all of my financial interests.
...
Q. If you were the only manager of Atlas Consulting, why would you give fiduciary responsibility to your husband?
A. Because he was managing all of our finances.
(Trial Exhibit 75, 109:7-18; 111:6-9.  A courtesy copy of the referenced pages is attached and labeled Exhibit 17).

Stephens was asked in her deposition about using the bank account of her business, Atlas Consulting, to pay bills rather than her personal account after she and her husband had been sued by creditors.

A.  I don't remember.  I believe that my husband suggested we use this account.  This is where he was putting the money, this is where he suggested I pay things from and that's what I did. (Trial Exhibit 75, 134:5-8, a courtesy copy is attached hereto as Exhibit 18)

When questioned as to why she would transfer the home she owned in Santa Barbara from herself to Atlas Consulting, her consulting company, after she and her husband had been sued by creditors, Stephens replied:

Q. On October 29th, 2010, you transferred the property that you owned prior to marriage at 3910 Carol Avenue, Santa Barbara to Atlas Consulting; is that correct?
A. That is correct, yes.
Q. And why did you do that?
A. Because we were going to use it as a rental property or as an investment income -- I mean, as an income property investment and my husband suggested we do it this way.
(Trial Exhibit 75,191:5-14, a courtesy copy is attached as Exhibit 19)

Stephens testified that her husband suggested a course of action and she agreed.  A word count of the deposition shows that the words: duress; force/forced/; threat/threatened/threats/threatening; intimidate/intimidated/intimidating; abuse/abuser/abused; Abusive; violent/violence; aggressive; and afraid were never said by Stephens in her deposition.

In the verified Responses to Interrogatories and verified Responses to Request for Admissions by the Trustee, Stephens never raised the issue of duress, undue influence or coercion by her husband.  (A courtesy copy of Stephens' responses are collectively attached and labeled Exhibit 20.)

D.    Defendant's Testimony in Deposition Taken by a Creditor Consisted of "I Don't know" and "I Can't Remember"

In January of 2010, Frederick Fiechter had sued Carl Wescott for $1.6 million dollars.  On October 26, 2010 Monette Stephens was named as a defendant in the same suit.  Monette Stephens

[8059.post-trial.brief.wpd]

deposition was taken three times in the Fiechter lawsuit, on March 11, 2011, on May 3, 2011 and on July 1, 2011.  The deposition transcripts were entered as Trial Exhibits 72, 73, and 74 respectively.

A word count of these depositions shows that the words: duress; force/forced; threat/threatened/threats/threatening; intimidate/intimidated/intimidating; abuse/abuser/abused; Abusive; violent/violence; aggressive; and afraid were never said by Stephens.  But Stephens repeatedly says she "doesn't know" or "can't recall" in response to questions posed about real property and transfers made by the debtors.  Below is a typical response by Stephens when Mr. Zeff questioned her about assets.

> Q. What were your dealings with Rain Forest Capital?
> A. I can't remember.
> Q. Do you know if Rain Forest Capital owed you any money?
> A. I can't remember.
> Q. Do you know if Rain Forest Capital owed your husband any money?
> A. I can't remember.
> Q. Do you know if Mr. Wiel owed your husband any money?
> A. I can't remember.
> Q. Do you know if Mr. Wiel owed you any money?
> A. I don't recall.
> Q. Do you know whether or not in the past year any money has been paid by Colin Wiel to you or your husband?
> A. I don't know.
> Q. Do you know whether or not any money has been paid to you by Rain Forest Capital in the past year?
> A. I don't know.  (Trial Exhibit 73, 165:2-21. A courtesy copy of the deposition excerpt is attached as Exhibit 21).

What Stephens 'failed to recall' was that (1) she had signed documents transferring the promissory note from her husband to herself on May 1, 2010 (Trial Exhibit 13); (2) she signed documents transferring the promissory note from herself to Pook Snook Dook L.P. on June 24, 2010 (Trial Exhibit 17); and (3) that Colin Weil had wired $356,000 into the PSD bank account satisfying the promissory note on April 13, 2011.  She signed the documents approximately six months before the taking of the deposition and the monies were paid a month before Stephens second deposition was taken.  (Courtesy copies of Trial Exhibits 13, 17 and 35 are attached hereto as Exhibit 22).

In the three depositions taken by the creditor, which totaled 230 pages of testimony, Stephens said "I don't know" 334 times; "I don't recall" 57 times; "I don't remember" 97 times;

[8059.post-trial.brief.wpd]

and "I can't remember" 26 times. Wescott was not present at Stephens' depositions and did not show for his duly noticed depositions. Stephens was represented by counsel at all three of her depositions. Not once did she testify that Wescott had forced her or intimidated her into signing documents.

  E.  <u>Stephens Did Not Claim Duress, Undue Influence or Coercion When Sued in State Court</u>

  Stephens also filed Answers to Complaints in two state court actions; one Answer was filed December 8, 2010 and the other was filed March 10, 2011. She never plead duress, undue influence or coercion as affirmative defenses. (Trial Exhibits 22 and 25 respectively. Courtesy copies are collectively attached and labeled Exhibit 23).

  F.  <u>Stephens Changes Her Testimony and Her Story on the Third Day of Trial</u>

  At trial, Stephens first testified that she was under duress from her husband when she transferred property to avoid the claims of creditors. A word count of the testimony on November 4, 2012 by Stephens demonstrates how many times Stephens is claiming duress.

| Word | Times used | Statements used in: |
|---|---|---|
| Duress | 2 | 160:25; 163:3 |
| Force / forced | 1 | 43:22; |
| Threat/threatened threats/threatening / /threaten | 19 | 19:3; 19:12; 51:10; 77:17; 79:16 (x2); 79:17; 82:15; 82:16; 92:17; 134:2 (x2); 134:3; 134:4; 141:16; 148:24; 149:18; 149:20; 164:2; |
| Afraid | 5 | 18:13; 82:10; 133:22; 133:25; 134:7; |
| Abuse/ abuser /abused | 2 | 81:23; 134:15; |
| Abusive | 12 | 42:1; 133:7; 133:9; 134:14; 143:2; 143:4; 161:18; 161:19; 163:2; 163:4; 163:8; 164:6; |
| Yell/yelled / yells/yelling | 19 | 18:9; 18:23; 19:6; 21:13; 21:15; 42:19; 43:15; 43:21; 43:23; 50:16; 65:6; 65:15; 75:10; 79:14; 132:14; 148:19; 153:21; 154:25; 164:1; |
| Violent / violence | 2 | 134:15; 160:25; |
| Aggressive | 6 | 18:8; 18:23; 19:6; 41:25; 82:25; 151:16; |
| Afraid | 6 | 18:13; 82:10; 133:22; 133:24; 134:7; 163:12; |
| Suggest | 1 | 52:13; |

1    It can be inferred that this newly concocted claim of "duress" was the last ditch effort of a

2    dishonest litigant.

3    **VII. STEPHENS' CLAIM THAT THE TRUSTEE SHOULD DISREGARD HER STATUTORY DUTY TO OBJECT TO STEPHENS' DISCHARGE IS WITHOUT MERIT**

4        Yet again, Stephens argues at the conclusion of her post-trial brief that the Trustee is

5    somehow misguided in prosecuting this action because it will not result in the recovery of

6    additional assets into this Estate.

7        Stephens ignores the express statutory duty of the Trustee under Section 704(a)(6) to

8    "...oppose the discharge of the debtor" if advisable.   She also ignores the substantial potential

9    economic benefit to unsecured creditors if her discharge is denied.   If Stephens discharge is

10   granted, it is highly likely that any post-petition property acquired by her husband Wescott  will be

11   transferred to Stephens and held in her name (as has already happened with Atlas Consulting), and

12   the meritorious claims of these creditors would be thwarted.  Stephens herself may acquire

13   separate property through inheritance or otherwise.

14
15       The underlying policy is that the "guilty spouse should not be able to hide behind
         the innocent spouse's discharge" and "[b]oth spouses  will suffer by reason of one
16       spouse's prior 'sins' insofar as after-acquired jointly owned community property is
         concerned." Judge v. Braziel (In re Braziel), 127 B.R. 156, 158 (Bankr. W.D. Tex.
         1991).

17       *Bush v. Woods (In re Bush)*, 2005 Bankr. Lexis 3366, 9-10 (B.A.P. 9th Cir. Dec.
18       15, 2005)

19       While the *Bush* case was litigated over the issue of the non-dischargability of a debt, the

20   principal that a guilty spouse cannot hide behind the discharge of his/her spouse applies to a denial

21   of discharge.  The treatment of the denial of discharge as to Stephens is of paramount importance

22   to the creditors who correctly believe that she committed multiple acts of fraud and misconduct

23   before and after bankruptcy.

24                                    **CONCLUSION**

25       Stephens is procedurally barred from amending her answer to claim duress.

26       Even if the Court granted Stephens belated leave to amend, she failed to prove the factual

27   basis of the affirmative defense of duress.   She never established that her free will was

28   constrained when she executed the multiple  pre-petition fraudulent transfers and the false

Schedules and Statement of Financial Affairs.

Stephens cannot use "duress" to excuse the facts that she 1) failed to turn over documents that were in her garage; 2) failed to inform the Trustee of a storage unit where 75 boxes of documents had been stored despite a court order to compel; 3) used her company bank account to pay personal bills when she was being sued by creditors; and 4) wrote checks transferring funds from her personal checking accounts to business accounts while being sued by creditors; 5) made false oaths in her declarations regarding her acts of buying, selling and transferring property; 6) failed to list all of her assets on her Schedules. Any one of these acts, which the Trustee proved at trial, are sufficient grounds to deny the discharge of Stephens.

Dated: March 4, 2014                    Respectfully submitted,

                                        MACCONAGHY & BARNIER, PLC


                                          /s/   Jean Barnier
                                        Jean Barnier
                                        *Attorneys for Plaintiff*
                                        *Janina M. Hoskins, Trustee in Bankruptcy*