Signed and Filed: September 29, 2014



_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bankruptcy Case |
| | ) No. 12-30143DM |
| CARL ALEXANDER WESCOTT and | ) |
| MONETTE ROSEMARIE STEPHENS, | ) Chapter 7 |
| | ) |
| Debtors. | ) |
| _____ | ) |
| JANINA M. HOSKINS, Trustee in | ) Adversary Proceeding |
| Bankruptcy of the Estate of Carl | ) No. 12-3148DM |
| Alexander Wescott and Monette | ) |
| Rosemarie Stephens, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CARL ALEXANDER WESCOTT and | ) |
| MONETTE ROSEMARIE STEPHENS, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

MEMORANDUM DECISION ON OBJECTION TO DISCHARGE

I. INTRODUCTION

On January 17, 2012, Carl Alexander Wescott ("Wescott") and

Monette Rosemarie Stephens ("Stephens") (together "Debtors") filed

a voluntary Chapter 7 case.  Janina M. Hoskins ("Trustee") is the

duly qualified and acting trustee of Debtors.

On October 15, 2012, Trustee filed this adversary proceeding,

objecting to the discharge of Wescott and Stephens.  Trustee moved

-1-

for summary judgment and both Debtors opposed.  Wescott did not appear at the hearing on the motion on April 26, 2013, and at that hearing the court granted Trustee's motion and on May 22, 2013, entered an Order Granting Summary Judgment (Docket No. 54) and a Judgment Denying Discharge of Debtors (Docket No. 55).

Stephens made a timely motion to reconsider on May 16, 2013, and the court granted that motion by order entered on July 18, 2013 (Docket No. 68).

On October 2-3 and November 4, 2013, the court conducted a trial on the Trustee's objection to Stephens' discharge. Following trial the court requested post-trial submissions on certain issues, after which the matter was submitted for decision.

For the reasons set forth below, the court will GRANT Stephens her discharge in this Chapter 7 case.

II. DISCUSSION[1]

**A.  The Trustee's complaint alleges seven claims for relief as follows:**

First claim - Section 727(a)(2)(A)[2] - Transfer, remove, destroy, mutilate or conceal property of the debtor with intent to hinder, delay or defraud.

In this claim the Trustee alleges that Debtors formed a limited partnership known as Pook Snook Dook Trust Limited Partnership ("Pook") and concealed their interest in Pook.

---

[1] The following discussion constitutes the court's findings of fact and conclusions of law.  Fed. R. Bankr. P. 7052(a).

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

-2-

Further, Debtors allegedly transferred funds off-shore or to other entities with actual intent to hinder, delay or defraud creditors.

Second claim - Section 727(a)(2)(B) - Post-petition, transfer, remove, etc., property of the estate with intent to hinder, delay or defraud.

Here Trustee contends that Debtors made certain post-petition transfers to Atlas Consulting, Inc. ("Atlas"), a corporation owned by Stephens. The complaint alleges that transfers were made from Wescott's personal account to Atlas and then those funds and others were expended by Debtors. Further, on June 1, 2012, Debtors allegedly transferred an interest in their home on Ashbury Street in San Francisco.

Third claim - Section 727(a)(3) - Conceal, destroy, mutilate, falsify or fail to keep recorded information from which the debtor's financial information might be ascertained, unless failure justified under all of the circumstances.

Debtors allegedly concealed or failed to preserve recorded information from which their financial condition or business transactions might be ascertained for the years 2010 and 2011.

Fourth claim - Section 727(a)(4)(A) - Knowingly and fraudulently make a false oath or account.

In this claim Debtors are accused of making knowingly false oaths and accounts. More specifically, Stephens is accused of falsely testifying that she had lost a valuable diamond ring while swimming and that she had falsely testified that she and Wescott had changed insurance companies, not realizing that the diamond ring was not insured. Further, Wescott testified that he had no bank accounts outside the United States when in fact he made

-3-

numerous transfers to bank accounts in Panama and elsewhere in
Central or South America.  Further, Debtors could not account for
$1 million they received in 2011 and their schedules and statement
of financial affairs were false and inaccurate because they failed
to list various corporations and limited liability companies that
they owned.

Fifth claim - Section 727(a)(4)(D) - Knowingly and
fraudulently withhold recorded information relating to debtor's
property or financial affairs.

Because they failed to turn over boxes of documents ordered
pursuant to a 2004 examination order, Debtors are accused of
intentionally withholding documents relating to their property and
financial affairs.

Sixth claim - Section 727(a)(5) - Failed to explain any loss
of assets.

Because Debtors could not account for $700,000 of $1 million
they received in 2010 and 2011, and $800,000 paid to them on a
second deed of trust, they have failed to satisfactorily explain
their loss of assets to meet liabilities.

Seventh claim - Section 727(a)(6)(A) - Refused to obey any
lawful order of the court.

The court issued an order on June 17, 2012, compelling a
turnover of documents.  Despite having documents in their
possession, the complaint alleges that Debtors have refused to
turn over documents pursuant to that order, thus refusing to obey
a lawful order of the court.

**B.   Timeliness of the duress defense.**

In her answer to the Trustee's complaint, Stephens did not

-4-

set forth the affirmative defense of duress, a specific
affirmative defense that is mentioned in F. R. Civ. P. 8(c)(1),
incorporated by Rule 7008(c)(1). It is hornbook law that an
affirmative defense not raised is waived. *Wright & Miller,*
*Federal Practice and Procedure,* Civil 3d § 1278. *Taylor v. U.S.,*
45 U.S. 992, 108 S.Ct. 1300, 99 L. Ed. 2d 510 (1988).

Nor did Stephens specifically raise the defense in her
opposition to the later motion for summary judgment filed by the
Trustee.[3] Notwithstanding the waiver of the defense of duress as
a pleading matter, F. R. Civ. P. 15(b), incorporated by Rule
7015(b), permits pleadings to be amended to conform with evidence
produced at trial. This is so even if a party (here Trustee)
objects. The court is directed by the rule to permit freely an
amendment "when doing so will aid in presenting the merits and the
objecting party fails to satisfy the court that the evidence would
prejudice that party's action...." The court may grant a
continuance to enable the objecting party to meet the evidence.

During the trial Stephens offered extensive evidence of a
marriage filled with abuse by Wescott and significant difficulties
she had in carrying on her life. Those difficulties are
summarized below. Trustee did not demonstrate any prejudice nor
did she seek a continuance to enable her to meet the evidence. In
fact, there was an interval of nearly one month between the
beginning of the trial and the final day of trial, and clearly the
Trustee had an opportunity to address the duress defense during

---

[3] Stephens' citation to California authorities to the
contrary are not dispositive as this matter is governed by federal
procedure.

-5-

Case: 12-03148    Doc# 138    Filed: 09/29/14    Entered: 09/30/14 11:07:13    Page 5 of
25

that interval.

In *Kontrick v. Ryan*, 540 U.S. 443, 458-59 (2004), the Supreme
Court noted that affirmative defenses such as duress should be
raised in an answer or responsive pleading. However, an "answer
may be amended to include an inadvertently omitted affirmative
defense, and even after the time to amend "of course" has passed,
"leave [to amend] shall be freely given when justice so requires."
*Id., citing* FRCP 15(a), made applicable by Rule 7015.

The Ninth Circuit itself has long been liberal about the
amendment of answers to raise affirmative defenses, as long as the
delay does not prejudice the plaintiff. *Rivera v. Anaya*, 726 F.2d
564, 566 (9th Cir.1984). Leave to amend "shall be freely given
when justice so requires." This policy is "to be applied with
extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316
F.3d 1048, 1051 (9th Cir. 2003). There is a presumption under Rule
15(a) in favor of granting leave to amend. *C.F. ex rel. Farnan v.
Capistrano Unified School Dist.*, 654 F.3d 975, 985 (9th Cir.2011).
A court may exercise its discretion to deny leave to amend when
there is "undue delay, bad faith or dilatory motive on the part of
the movant, ... undue prejudice to the opposing party by virtue of
allowance of the amendment, [and] futility of amendment." *Froman
v. Davis*, 371 U.S. 178, 182 (1962).

The liberal policy permitting amendment is not inconsistent
with another prevailing principle that is itself hornbook law.
That is that discharge objections should be construed narrowly
and, of course, the burden of proof is on the plaintiff objecting
to discharge. Rule 4005.

Here, Stephens and her counsel have not unduly delayed the

-6-

assertion of a duress defense, nor has any delay resulted in any

prejudice to the Trustee, as she has long been aware of Stephens'

assertion of abuse/intimidation/duress. When the Trustee filed

her motion for summary judgment, Stephens raised the issue of

abuse by and fear of Westcott. In fact, in her reply to Stephens'

opposition, the Trustee's counsel stated:

> Needless to say, <u>the Trustee is highly skeptical of Ms. Stephens claims that she is psychologically intimidated by Mr. Wescott. If the matter is tried, the Trustee will present substantial evidence establishing that this claim is a cynical ploy by highly manipulative, jointly acting Debtors.</u> Nonetheless, for the purposes of this Motion, the Trustee is assuming, as she must, that every admissible fact alleged in Ms. Stephens' "Stephens Declaration in Support of Opposition to Motion for Summary Judgment" is true. Taking that declaration at its face value, the Trustee is still entitled to summary judgment.

<u>Trustee's Reply</u> filed on 4/19/2013 at Dkt. 48, page 6.[4] In fact,

in footnote 2, Trustee's counsel identifies the evidence she will

introduce to negate Ms. Stephens' assertion of intimidation:

> Among other things, there is a 341 transcript of Ms. Stephens upbraiding Mr. Wescott, not vice versa; a third party witness has testified in deposition that Ms. Stephens was actively involved in certain of the South American ventures; and Ms. Stephens executed numerous deeds concerning the Sonoma, Mendocino, and Lake County properties jointly owned by the two Debtors, see accompanying Reply Declaration of John H. MacConaghy, Group Ex. 1.

The trustee further states in another footnote:

> The Trustee does *not* accept as true the extraordinary Declaration of Sheila Gropper Nelson, which consists almost entirely of pop psychology, unqualified lay opinion, improper "vouching" for a client, and a selective disclosure of privileged information, see the Trustee's Evidentiary Objection, Dkt. No. 47.

> Trustee argues that Rule 7015(b) is being used by Stephens to

---

[4] Despite Trustee's suggestion that she would present substantial evidence establishing Stephens' cynical ploy, the Trustee offered no evidence of her own (other than cross-examination of Stephens and her witness) to disprove the duress.

-7-

bootstrap a legal theory and that liberal amendments are permitted only in connection with factual issues. But the court believes that the facts that Stephens has demonstrated are sufficient, if persuasive, to rebut critical elements of Trustee's seven claims for relief for denial of discharge.

First, for a discharge to be denied under § 727(a)(2), a debtor must have "intent to hinder, delay, or defraud a creditor or an officer of the estate" when the property is transferred, removed, destroyed, mutilated, concealed or permitted to be transferred, removed, destroyed, mutilated or concealed. It is a factual matter whether a debtor had the requisite intent.

Similarly, § 727(a)(3) excuses the concealment, destruction, mutilation or falsification of recorded information or the failure to keep it, if such act or failure to act "was justified under all circumstances of the case." Thus, justification under the circumstances of the case is a question of fact.

Section 727(a)(4) requires a false oath or account to be made "knowingly and fraudulently." Once again, whether something is knowingly or fraudulently done is not a legal theory, but a factual determination.

Next, the same "knowingly and fraudulently" element must be present before a discharge can be denied under § 727(a)(4)(D) based upon withholding from an officer of the estate recorded information, including books, documents, records, and papers, etc.

Continuing, § 727(a)(5) permits denial of a discharge when a loss of assets or a deficiency of assets cannot be explained "satisfactorily." Again, "satisfactorily" does not involve a legal theory but rather a factual determination.

-8-

Finally, a discharge may be denied for a debtor's refusal to
obey a lawful order of the court, with an exception not applicable
to this case.  Refusal is a factual matter that may or may not
result in a denial of discharge.

In view of the foregoing, the trustee has not been unduly
prejudiced by an untimely assertion of the affirmative defense of
duress.

**C.  The facts proven at trial by the Trustee:**

Nine months before filing for bankruptcy, Stephens signed a
document making Ivy League Charters, a Nevada LLC which is owned
by Gunvor SA, which is a Latin American corporation owned by
Wescott, the new general partner of Pook. (Exhibit 27)

Six months before filing bankruptcy, Stephens wrote a check
from her personal account and deposited $6,500 into the Atlas
checking account, depleting her personal account.  (Trial
Transcript, October 3, 2013; 73:6-10; Exhibit 32, p. 46); (Trial
Transcript, October 3, 2013; 76:9 -78:17; Exhibit 36, p. 22.)  At
her deposition, Stephens admitted she and her husband were
transferring monies to her business account because their personal
bank accounts had been attached.  Stephens confirmed that monies
were transferred from her personal account into the Atlas account
six weeks before filing for bankruptcy.

Shortly after Wescott was sued by creditors, (Exhibit 6) he
hired Lodmell & Lodmell, a law firm that advertises itself as the
number one asset protection firm in the United States. (Exhibit 8)
Debtors executed a transmutation agreement in February of 2010
(Exhibit 9).  Stephens accepted all of the real estate in
California and some personal property.  According to the

-9-

transmutation agreement, the valuation of Stephens' property totaled $27 million in 2010 which had no value at the time of their bankruptcy filing. (Exhibit 9) Stephens and her husband transferred their assets into the Wescott-Stephens Family Trust, a self-settled trust which was prepared by Lodmell & Lodmell. (Exhibit 67)

On May 1, 2010, Wescott transferred a $1 million promissory note to Stephens as her sole and separate property. Stephens accepted the assignment. (Exhibit 13) Wescott also transferred two membership interests in the Reliant Group with a value of $450,00 to Stephens on May 10, 2010. (Exhibit 14)

On May 11, 2010, a creditor obtained a writ of attachment against Debtors. (Exhibit 15)

On June 25, 2010, Lodmell & Lodmell registered Pook in Arizona and Stephens was named the general partner. (Exhibit 16) On September 24, 2010, she transferred the promissory note and the LLC interests, which were her separate property, worth almost a million and a half dollars, into the Wescott-Stephens Family Trust. (Exhibit 17)

According to Jay Crom's ("Crom") Supplemental Report, dated August 30, 2013, (Exhibit 78), an additional bank account in the name of Atlas showed a post-petition $17,500 deposit on March 5, 2012 and a $2,500 deposit on March 27, 2102. The source of these funds was not disclosed or the funds turned over to the Trustee. Stephens was paid $38,000 in 2011. Crom concluded that there are numerous unexplained transactions and post-petition cash deposits to the Atlas accounts. (Exhibit 78, p .6) No explanation of these transactions or post-petition cash deposits was offered at trial

-10-

but Crom's testimony is inconclusive as to Stephens' culpability.

Crom's Supplemental Expert Report concluded that Stephens was financially sophisticated, involved in family financial affairs and was aware of her family's financial distress as of March 2009 despite her testimony that her husband was in control of all of their finances. (Crom's Supplemental Expert Report, August 30, 2013; p. 3, 4 and 7)

Stephens had boxes of documents pursuant to a Rule 2004 Examination and court order at her home and she did not tell the Trustee she was in possession of the documents. (Trial Transcript, October 3, 2013; 135:9 –21.)

After reviewing thousands of documents discovered by the Trustee, Crom concluded ... the documents suggest that the Debtors have made attempts to transfer assets out of the reach of creditors and to conceal assets and transfers from the Trustee by withholding documents and information. (Crom's Supplemental Report, August 30, 2013)

Stephens failed to list a 5.1% equity interest in Rainforest Capital LLC on her Schedules despite the fact that she had filed three amended sets of Schedules in this case. She should have known of the interest because she received a K-1 in 2011 which was addressed to her. (Exhibit 3, p. 1) According to Crom's Expert Report, Stephens' capital account in the LLC had a balance of $187,711 as of 12/31/2011. (Crom Expert Report, April 3, 2013, p. 5)

Stephens claimed that the K-1 was a mistake and that it should have been addressed to Pook. (Trial Transcript, October 2, 2013; 154:6-10) But the Trustee had filed the Adversary Case

-11-

against Pook on May 21, 2012. (Docket No. 90) The Default
Judgment was entered on August 27, 2012. (Docket No. 20) Pursuant
to this Court's order for the Debtors to file amended schedules,
(Docket No. 137) the Debtors filed amended Schedules on July 5,
2012. Stephens knew that any property transferred to Pook was 1)
a fraudulent transfer and 2) was her separate property.

Stephens did not list the Wescott-Stephens Family Trust on
her Statement of Financial Affairs until she amended her Statement
of Financial Affairs for the third time, (Exhibit 2, p. 65) two
months after the Trustee had filed the adversary proceeding to set
aside the fraudulent transfers made to the trust.

Stephens' last amended Statement of Financial Affairs states
that there was rental income for 2010 of approximately $275,000.
(Exhibit 2, p. 53) Crom testified that there was little or no
rental income paid to the Debtors in 2010 (Trial Transcript,
October 2, 2013; 13:2-5). Stephens offered no explanation or
evidence to explain why she listed rental income when there was
none except to claim she relied on her husband and attorney to
prepare bankruptcy papers. This was a material fact since there
was approximately $245,000 deposited into the Atlas bank account,
but the funds were from the sale of concealed assets, not rental
income.

Stephens filed declarations with this Court claiming she was
never involved with the purchase, sale or financing of any
properties in California or Latin America. (Exhibit 68; 2:7-19;
Exhibit 70; 5:11) Stephens was listed as the seller of property
in California in which her husband was the broker (Trial
Transcript, October 3, 2013; 97:12-19); she admitted she was on

-12-

loans that were for the financing of property (Trial Transcript, October 3, 2013; 99:4- 9); she admitted she was a manager of 9501 Lane Drive LLC and was a new borrower; (Trial Transcript, October 3, 2013; 99:19-101:7); she signed a guarantee in favor of Luther Burbank Savings six months before declaring bankruptcy; (Trial Transcript, October 3, 2013;102:21-103:17); she personally made payments on the loan to Luther Burbank Savings (Trial Transcript, October 3, 2013; 106:12-19); she and Wescott had purchased property in South America (Trial Transcript, October 3, 2013; 116:14-25); she was a seller of property in Ecuador (Trial Transcript, October 3, 2013; 117:9-20; 118:10-119:7); and she received and wired funds to Latin America. (Trial Transcript, October 3, 2013; 119:10-121:17) (Exhibits 38, 39, 40, 41, 47, 49 and 50)

On August 26, 2012, this Court issued an Order for the Trustee to inspect documents at Stephens' home in San Francisco since the Debtors had failed to produce documents. (Docket No. 200) On September 5, 2012, the Trustee's counsel and accountant inspected documents at Stephens' home. No boxes of documents were produced for inspection.

Stephens testified that there were 20 boxes of documents in her garage. The boxes of documents had been brought to her home in the summer of 2011. Stephens further testified that this was about the same time her husband obtained a storage unit. (Trial Transcript, October 3, 2013; 135:4-21) She chose to deliver them to her attorney rather than inspect them and turn over pertinent documents to the Trustee.

At trial, Stephens admitted that she knew there were boxes of

-13-

documents in a storage unit that was not disclosed and the documents in the storage unit had come from the office that had been foreclosed upon in the summer of 2011. (Trial Transcript, October 3, 2013:135:9-16)

Stephens also admitted she made payments to City Storage in San Francisco for the storage unit. (Trial Transcript, October 3, 2013; 126:11-23).

The Trustee discovered 75 boxes of documents and 6 hard drives in the storage unit. Despite 2004 Examinations and an Order from this court compelling the Debtors to produce records, the Debtors did not do so. Many of the documents found in the storage unit were used in trial related to the sale of assets.

On February 24, 2011, $125,552.87 was wired into the Pook account (Exhibit 34) and then on February 24, 2011, $127,202.87 was transferred into another account. Stephens testified that she did not know what happened to the funds. (Trial Transcript, October 3, 2013; 88:16-23) However, at one of the 341 hearings taken on May 9, 2012, Debtors were questioned by a creditor regarding the use of the funds from the Pook Wells Fargo account. Wescott testified that "...we made loans from there." Stephens and Wescott were asked: "Have you borrowed money in the last six months from the LP?" Wescott: "I believe we have." "Who made those loans?" Stephens: "I think we discussed it together." (Trial Transcript, October 3, 2013; 90:3-91:8)

During 2011 through January 2012, $245,615 was deposited into the Atlas account (Exhibit 36). But Stephens had no explanation as to the source of the remaining $207,000 that was deposited into the Atlas account beyond the $38,000 she earned that year. (Trial

-14-

1  Transcript, October 3, 2013; 94:14-21).

2    **D.  Stephens' principal defense is based upon duress.**

3        Stephens offered little, if any, evidence to rebut the
4  numerous facts established by the Trustee, as summarized above.
5  Instead, she defended on the ground that she lacked the requisite
6  knowledge and intent in performing the acts attributed to her to
7  justify denial of discharge.

8        Over a decade before this case began Stephens and Westcott
9  were married.  Almost from the beginning he subjected her to
10 verbal and psychological abuse which slowly and incrementally
11 escalated to include physical aspects through shoving, throwing
12 and pushing.

13       Stephens focused entirely on starting a family as a result of
14 being older and all of the difficulties involved with that,
15 including three miscarriages.

16       Westcott took advantage of the fact that Stephens was 40 when she
17 met him, and desperately wanted to have a family. (Trial Transcript
18 11/4/13 pg 21: 5-9)  When Stephens was pregnant with her first child,
19 Westcott would get angry with her, stomp up and down, show aggressive
20 behavior and yell at her. (Trial Transcript 11/4/13  pg 18:7-9)
21 Westcott told her she was overweight, unattractive and old. (Trial
22 Transcript 11/4/13 pg 21:13-15) and that he would leave her and have
23 children with another woman if she did not have more children
24 after her first child.  He told her he would make her life a
25 living hell if she left him.  He did just that.  He said he would
26 use all the money he had to fight her in a divorce. (Trial
27 Transcript 11/4/13 pg  19:1-6)

28       Wescott told her that if she left him, he would take the

                                    -15-

child from her or he would try to get as much custody as possible, and he would make sure that she would get as little oversight over her children as possible.  Stephens testified she was afraid for losing her child at that time. (Trial Transcript 11/4/13 pg.18:10-14 )

Over time Wescott engaged in substantially greater and more pervasive acts of abuse while orchestrating complete control over all of Stephens finances, including her separate property from her first marriage, her interest in Atlas and her prior earnings. Over the years he directed that Stephens have less and less control and knowledge of the Debtors' finances.

Stephens had to pay all of her personal and business bills through his office using either Atlas or other means that he controlled and directed.  For example, Wescott directed Stephens to make deposits including the deposit of  $6500 into the Atlas checking account.

Westcott demanded that Stephens add his name to the Atlas account and be named as CEO and he controlled all of the finances, hers, theirs and his.  She never had any access to the Pook accounts (Trial Transcript 11/4/13 pg 49:14-20)

He directed that she sign an document drafted at his directions by Lodmell and Lodmell either immediately before or immediately after she had given birth to their third child while being a de facto single parent of two toddlers, one of whom has a diagnosed disability.

Wescott insisted Stephens sign as the recipient of the Rainforest Capital note for a million dollars in  May 1, 2010, negotiated entirely by Wescott and to which she was not privy.

-16-

Wescott directed her to transfer the note to the Wescott Stephens
Family Trust on September 24, 2010.

Wescott also had an interest in the Reliant Group transferred
to Stephens entirely at his direction during substantially the
same period of time and subject to the same document authored by
Lodmell and Lodmell.

Stephens was required to sign a document making Ivy League
Charters the new general partner of Pook and was directed by
Wescott to sign a bankruptcy petition prepared by an attorney he
chose and based entirely on the information provided to that
attorney by Wescott.

Westcott would often get aggressive and yell in the face of
the more diminutive Stephens. (Trial Transcript 11/4/13 pg 19: 6-
7)  Sometimes Westcott would push Stephens.  He would say to her,
"I'm going to fight you to the death. I'm going to make your life
a living hell." (Trial  11/4/13 pg 19:3-14) On one occasion
Westcott jumped on her, pushed her to the ground. (Trial
Transcript 11/4/14 pg 19:15-22) and more than once he took
drinking glasses in their kitchen and started smashing them in the
sink and glass shattered and went everywhere in front of her.
(Trial transcript 11/4/13 pg 20: 19-25, pg 19:1)

He also threw glasses out of the third floor window onto the
street below at the couple's house in San Francisco.  (Trial
Transcript 11/14/13, pg. 51:19-20) He once threw a suitcase
against a cabinet, smashing the cabinet door.  There would rarely
be a month when he would not smash telephones to pieces.  (Trial
Transcript 1/4/13 pg 77:16-24)

Wescott's violent conduct included totaling two cars before

-17-

the bankruptcy as identified at the 341 meetings and displayed no remorse. (Plaintiff's Exhibit 54, 341 Meeting, March 21, 2012, Bates Stamped pages 00144-00145 and Stephens' Declaration Plaintiff Exhibit 68, Paragraph 8 Bates Number 005))

Wescott had weights that looked like baseball bats and used them to smash the doors on his file cabinets one night when he was angry. (Trial Transcript 11/4/13 Pg 77:24-25, pg 78:1)  More than once he broke computer monitors and even smashed the family large screen T.V. (Trial Transcript 11/4/13 Pg. 78: 3-6)

Wescott, a man who stood at 6 feet and weighed 240 pounds (Trial Transcript 11/4/13 pg 44:1-7) was used to being in control and getting his own way and consistently acted to emotionally and physically dominate and control Stephens' life.

As a direct and proximate result of all of Wescott's overbearing conduct Stephens learned to adapt, to keep her head down, not to make waves, and not to question him.  This started early and continued over a period of years.  She developed coping skills not to make Westcott angry or to elicit his anger to avoid the physical and emotional abuse. (Trial Transcript 11/4/13 51:16-17)

She tried to be quiet and not ask him questions about things that she thought would be likely to upset him to avoid the physical and emotional abuse.  (Trial Transcript 11/4/13 Pg 51:19-21; Plaintiff's Exhibit 75.

Westcott controlled all the couple's finances and all their investments.  Stephens testified she was "maxed out" for most of the marriage as a result of Westcott's verbal and emotional abuse.

**E.  Application of the duress defense to the undisputed facts**

-18-

**in the context of section 727.**

Related to the duress defense, Stephens bases a portion of
her defense on the theory that the inter-spousal transmutation of
property did not provide anything of value to her, and thus a
presumption of undue influence applies under California law.
While that may be so, it is of little import in this denial of
discharge action. The Trustee is not to trying to reverse the
consequences of any inter-spousal transfer, she is trying to deny
Stephens her discharge in bankruptcy. Stephens' reliance on
*Station v. Wilson (In re Wolf),* 2007 Bankr. LEXIS 2736, does not
help her. In that case the chapter 7 trustee attempted to obtain
property claimed by a debtor's former wife. He contended that the
property that was the subject of the transmutation was still
property of the estate. The wife was successful in her defense by
convincing the court that the grant deed by which he obtained the
debtor's property was the product of undue influence. The court
agreed, citing numerous cases for the proposition that the
presumption of undue influence obtains when the marital
transaction is one in which one spouse deeds his or her interest
in community property to the other for no or inadequate
consideration. Because the trustee could not demonstrate
consideration given for the property, her former spouse received
an unfair advantage that the trustee could not capitalize on for
the benefit of the estate.

Returning to this case, the principal defense is whether or
not here the difficult and oppressive circumstances under which
Stephens was forced to live her life and raise her children
completely exonerate her from the myriad instances of transfers,

-19-

1  representations, and other activities as described and largely
2  unrequited by the Trustee at trial.

3      Debtors, at the instance and control of Wescott, were
4  involved in numerous complex real estate and other business
5  activities both in the United States and in several other
6  countries.  Those businesses and activities involve numerous items
7  of real and personal property.  While maintaining that empire
8  under his control, Wescott also dominated and controlled his wife,
9  Stephens, subjecting her to extensive verbal and mental abuse, and
10 in fact if not actual physical abuse, the constant threat of it.
11 This activity by Wescott obviously had a substantial negative
12 impact on Stephens, both personal, financially, emotionally, and
13 physical.  Over the course of her strife-ridden marriage she had
14 three miscarriages, three live births of boys, one of whom is
15 physically disabled.  Based upon the undisputed testimony, she was
16 by and large a single parent of those three boys.  For several
17 years while she coped with those physical problems she also
18 attended to the illness of her own parents.

19     Trustee contends that, even if the court were to consider the
20 duress defense, that Stephens has failed to carry her burden by
21 offering expert testimony.  The court is convinced, however, that
22 the best test of the trier of fact on a discharge objection is one
23 of common sense, something an expert is not required to
24 demonstrate.  This is not a case about determining whether
25 Stephens in fact suffered from some diagnosable mental, physical
26 or emotional illness; rather it is to determine whether her
27 conduct, the conduct of a well-educated and highly experienced
28 business woman in her own right, comes within the very strict

-20-

standards of § 727, which, as discussed below, require the highest
level of intent to hinder and delay or defraud, or to deceive.

Trustee contends that duress is subject to a two-prong test,
and that Stephens has failed to demonstrate that she had no choice
in executing the various documents or making the various
disclosures that make up Trustee's case. In other words, citing
*Wiksell v. Commissioner,* 90 F.3d 1459 (9th Cir. 1966) and *U.S. v.*
*Miles,* 2012 U.S. Dist. LEXIS 45552 (N.D. Cal. 2012), Stephens
should have proven that she had no choice but to do the things her
husband said to do and secondly that she would not have done so
absent Wescott's pressure. In those cases, however, the issue was
whether the defendants could avail themselves of an innocent
spouse defense for tax liability. In *Miles*, for example, the
court found that notwithstanding the threats of her husband, Ms.
Miles' perception was not clouded nor her free will constrained.

Here there is a different test, namely whether Stephens
actually intended to harm her creditors or knowingly and
fraudulently deceived the bankruptcy court or the Trustee. Thus,
the issue is not whether Stephens was liable to any of the
creditors of this estate, but whether she should be branded for
life by denial of a discharge based upon actual fraud, actual
fraudulent intent, unjustified failure to account, or intentional
misconduct. The evidence does not support the Trustee's case and
the court cannot make the requisite findings necessary to deny
Stephens her discharge.

Turning to the causes of action, the first claim for relief
requires Trustee to prove that transfer of assets to and
concealment of interests in Pook was done with actual intent to

-21-

hinder, delay or defraud creditors.  The evidence simply does not support that conclusion given Stephens' virtual puppet-like obedient conduct at the command of her husband.  To the extent that Wescott himself actually intended to hinder, delay or defraud his creditors is obvious; the evidence simply does not support a finding that Stephens is equally culpable.

On the second claim for relief, the same actual intent is required as to property of the estate as distinguished from property of the debtor.  Transfer of assets to Atlas and actions concerning Debtors' San Francisco residence again are undisputed; what is not established by the evidence is Stephens own actual intent.

The third claim for relief has to do with the adequacy of recorded information.  Here there is no actual intent element, but the statute plainly permits an excuse when justified under all of the circumstances.  The circumstance applicable here is that Wescott was the principal one in charge of maintaining the books and records of the couples' activities.  More importantly, whatever requirement might be imposed upon Stephens herself, particularly regarding Atlas or Stephens own accounts, the failure to maintain adequate records is certainly justified under the circumstances of her being the victim of egregious spousal abuse.

The fourth claim for relief pertains to a false oath, one that must be made knowingly and fraudulently.  One component of this claim is much ado about nothing that came from Trustee's contention that Stephens could not property account for her valuable diamond ring that she says she lost while swimming.  Innuendo will not suffice and the court simply cannot find that

-22-

Stephens knowingly made a false oath about the circumstances pertaining to that ring.

As to transfers to banks outside of the United States, and the failure to list various entities or monies received, the evidence does not support a finding that Stephens acted knowingly and fraudulently in completion of her own bankruptcy schedules.

The fifth claim for relief pertains to the withholding of recorded information. Again, there is a knowing and fraudulent element that the evidence does not support vis-a-vis Stephens. The failure to turn over boxes of documents pursuant to 2004 examination is a bit more problematic for the court. On careful reflection, however, the court is satisfied that Stephens and her counsel were in a near-impossible situation when Wescott demanded return of his records while they should have been delivered to the Trustee. With the benefit of hindsight, it is easy to state that the recorded information previously maintained by the Debtors was no longer theirs, and belonged to the Trustee. That being said, the dynamics of the situation, while regrettable, do not support a finding of knowingly fraudulent conduct.

The sixth claim for relief imposes a dire consequence on a debtor who fails to explain a loss of assets. While Stephens did not fully explain the loss of assets, she did adequately explain why she was unable to explain such a loss, namely the spousal abuse that is replete on this present record.

Finally, the seventh claim for relief applies when a debtor refuses to obey a lawful order of the court. Much time was spent on this issue at trial, in the prior motion for summary judgment, and the court's subsequent reconsideration of that summary

-23-

judgment. Trustee only discovered by accident records at a storage facility. That notwithstanding, consistent with disposition of the fifth claim, the court is not prepared to find that Stephens <u>refused</u> to obey the order, rather, she simply did not appreciate the extent of her obligations, and the circumstances surrounding her delivery of that information to her counsel and her counsel's return of that information to Wescott does not constitute a basis to deny Stephens her discharge.

In conclusion, this is has been a very stressful case for the Trustee and her counsel and Stephens and her counsel. The Trustee is commended for carrying out her statutory duty of pursuing a discharge even though a successful prosecution provides no economic benefit to the estate. Trustees are encouraged to police and enforce the rules implicit and explicit in the administration of bankruptcy. Further, the fact that there is no economic benefit to the estate is not the point. The law is well settled that honest debtors are entitled to a fresh start; dishonest ones are not and the bankruptcy system needs diligent trustees in order to work properly. That the Trustee did not prevail against Stephens does not diminish the importance and significance of her efforts. The court is convinced that, notwithstanding the Trustee's and her counsel's vigor and enthusiasm, in its discretion it should not and cannot impose upon Stephens the dire consequences of denial of a discharge.

III. DISPOSITION

The court is concurrently issuing a judgment concluding this adversary proceeding and granting Stephens her discharge for the reasons stated in this memorandum decision.

-24-

1                         ***END OF MEMORANDUM DECISION***

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-25-